UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:17-CR-00245-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| SILVIA BEATRIZ PEREZ-CEBALLOS, | ) | Tuesday, October 3, 2017 |
| | ) | |
| Defendant. | ) | (8:29 a.m. to 11:58 a.m.) |
| | | MORNING SESSION |



JURY TRIAL - DAY 2
VOLUME I OF II, PAGES 1 THROUGH 144

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**          SEE PAGE 2


Court Recorder:          Genay Rogan

Interpreters:            Judy Hawks / Steven Mines
                         Lorena Parada-Valdes

Clerk:                   Brandy Cortez

Court Security Officer:  Adrian Perez

Deputy U.S. Marshal:     Justin De Los Santos

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                        JULIE HAMPTON, ESQ.
                                  JON MUSCHENHEIM, ESQ.
                                  U.S. Attorney's Office
                                  1000 Louisiana, Suite 2300
                                  Houston, TX 77002

Defendant:                        FEDERICO ANDINO REYNAL, ESQ.
                                  JOSEPH C. MAGLIOLO, JR., ESQ.
                                  Fertitta Reynal
                                  808 Travis, Suite 1005
                                  Houston, TX 77002

                                  SETH H. KRETZER, ESQ.
                                  440 Louisiana St., Suite 1440
                                  Houston, TX 77002

3

<u>INDEX</u>

| <u>GOVERNMENT'S WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>REDIRECT</u> |
|---|---|---|---|---|
| SONIA FERNANDEZ | 59 | 112 | -- | -- |
| PAUL ARNOLD | 122 | -- | -- | -- |

<u>OPENING STATEMENT</u>

| | |
|---|---|
| BY MS. HAMPTON | 9 |
| BY MR. REYNAL | 36 |

4

1       <u>**Corpus Christi, Texas; Tuesday, October 3, 2017; 8:29 a.m.**</u>

2              **(An Interpreter was Utilized for Translation)**

3                          **(Call to Order)**

4          **(Outside the presence of the jury)**

5              **THE COURT:**  Court calls Cause Number 2:17-cr-245(3),

6       *United States of America versus Silvia Beatriz Perez-Ceballos.*

7              Government?

8              **MS. HAMPTON:**  Julie Hampton and Jon Muschenheim on

9       behalf of the United States.

10             **MR. MUSCHENHEIM:**  We need a second for her to have

11      the -- oh, there we go.

12             **THE COURT:**  Okay.

13             **MR. REYNAL:**  Good morning, your Honor.  Andino Reynal

14      and Joe Magliolo appearing for Ms. Silvia Beatriz Perez-

15      Ceballos, who is present in the courtroom.

16             **THE COURT:**  All right.  So, we're ready to proceed to

17      opening statements.  Is the jury here or are we waiting on --

18             **THE MARSHAL:**  They're all here, your Honor.

19             **THE COURT:**  Okay.  They're all here?

20             **MS. HAMPTON:**  I have a couple of issues --

21             **THE COURT:**  Okay.

22             **MS. HAMPTON:**  -- to bring up with the Court, your

23      Honor.

24             First, the defense, it has come to our attention,

25      plans to present photographs of the defendant and her children

1   during opening statement.  We'd ask the Court to not allow an

2   appeal to sympathy by the defense regarding those photographs.

3   We don't have a problem with the photographs being shown, but

4   if it's just for the purposes of appealing to the jury's

5   sympathies, we'd object to it.

6          **THE COURT:**  Okay.  Mr. Reynal?

7          **MR. REYNAL:**  Your Honor, I'd simply offer the

8   photographs, at this point, as part of my client's -- you know,

9   the narrative of the events of life in Tabasco at the time,

10  which I think it may be relevant later to state of mind and

11  whether she participated knowingly in the offense.

12         **THE COURT:**  Yeah, court's going to overrule the

13  objection at this point.  Obviously, I don't know what -- where

14  exactly the defense is headed in their opening with that,

15  but --

16         **MS. HAMPTON:**  One other issue.  We'd ask for a

17  limine -- a limine instruction for the defense regarding

18  witness Luz Alba Pardo Cruz and the allegation that they

19  brought up yesterday during her testimony.  We don't believe

20  it's admissible during her testimony.  It's not -- it's not

21  permissible impeachment evidence in any way, shape, or form,

22  and we ask that they not reference that during their opening.

23         **MR. REYNAL:**  Two -- two separate issues, I think,

24  there, Judge.  One has to go with if Ms. Cruz is called again

25  by the Government today, we have a judicial finding by the

1 Commission on Human Rights, which was adopted expressly -- and

2 I can give your Honor the citations and show her the

3 document -- by the Mexican federal court sitting in one of the

4 actions that were pending against the husband.  The Court

5 expressly adopts the findings of the Human Rights Commission

6 and finds Ms. Pardo Cruz not to be credible.  The fact that

7 there is a finding that she was not credible in regards to the

8 very subject matter that she's here to testify is critical

9 evidence that goes to her bias and credibility on the stand.

10          **THE COURT:**  Okay.  Ms. Hampton?

11          **MS. HAMPTON:**  Your Honor, the evidence before the

12 Court yesterday is there is no judicial finding.  We know of no

13 judicial finding that she was --

14          **THE COURT:**  Okay.  Well, he's saying there is an

15 adoption by -- so, show us that, or where are you getting that

16 from?  Are you going to refer to that in your opening?

17          **MR. REYNAL:**  No.

18          **THE COURT:**  Okay.

19          **MR. REYNAL:**  Except -- except to the following.  I am

20 going to refer to my client's state of mind and the fact that

21 she believed that the secretary had been kidnapped and

22 tortured, and that's why she left Mexico.

23          **THE COURT:**  Okay.  But that's not -- I was asking --

24          **MR. REYNAL:**  About Ms. Cruz.

25          **THE COURT:**  Yes.

1          **MR. REYNAL:**  I'm not going to --

2          **THE COURT:**  You're --

3          **MR. REYNAL:**  -- refer to Ms. Cruz, particularly, no.

4          **THE COURT:**  To that finding at this point.

5          **MR. REYNAL:**  No.

6          **THE COURT:**  So, you need to turn that over.  We can

7    address it at break.  I don't think -- it doesn't sound like

8    it's going to be part of your opening, so I'm going to bring

9    the jury in if they're ready, because it's 8:30 --

10          **MR. REYNAL:**  Yes, your Honor.

11          **THE COURT:**  --  and we can continue to address that

12   issue in terms of the witness --

13          **MR. REYNAL:**  Okay.

14          **THE COURT:**  -- when she testifies.

15          We're ready for the jury.

16       **(Pause)**

17          **THE COURT:**  But you will show the prosecution

18   whatever you're referring to in terms of a court adopting those

19   findings.

20          **MR. REYNAL:**  I -- I certainly will at the -- at the

21   earliest break, your Honor.

22       **(Pause; voices and whispers off the record)**

23          **MR. REYNAL:**  Oh, your Honor?  I feel like we might

24   still be having some technical difficulties, I'm hearing, with

25   displaying the -- the photographs?

8

1          THE COURT:  Okay.

2          MR. REYNAL:  So, can we have just a couple more

3   minutes to get that working (indisc.)?

4          THE COURT:  Brandy, do you want to tell Adrian to

5   hold off?  Because he's getting ready to bring the jury in.

6          MR. REYNAL:  I'm sorry, your Honor.  I think that the

7   Court clerk was -- is working on it.

8          THE COURT:  Okay.  What's the issue, Brandy?

9          MR. REYNAL:  We'll just (indisc.).

10          MR. SPEAKER:  We don't want it for today.

11          THE CLERK:  (indisc.)

12          THE COURT:  It was working?

13          THE CLERK:  (indisc.)

14      **(Pause; voices and whispers off the record)**

15          MR. REYNAL:  It won't -- it won't open up?

16          MR. SPEAKER:  No.

17          MR. REYNAL:  That's fine.

18          MR. SPEAKER:  Okay.

19          THE COURT:  You're ready to proceed?

20          MR. REYNAL:  Yes, your Honor.

21          THE COURT:  We're ready.

22          THE MARSHAL:  All rise for the jury.

23   //

24   //

25   //

```
 1          (The jury entered the courtroom at 8:34 a.m.)

 2          THE COURT:  Good morning.

 3          ALL:  Good morning.

 4          THE COURT:  You can have a seat.

 5          Okay.  We're ready to proceed this morning with the

 6     trial, and we will start with the opening statements.

 7          So, Ms. Hampton?

 8              OPENING STATEMENT ON BEHALF OF PLAINTIFF

 9          BY MS. HAMPTON:  May it please the Court, Counsel,

10     and ladies and gentlemen of the jury.  This case is about

11     power, greed, and corruption.  You're going to hear evidence

12     over the next couple of weeks that this defendant was involved

13     in a very detailed money laundering scheme and bank fraud

14     scheme in the U.S., along with her husband and other co-

15     conspirators.  The point of the scheme that they created was to

16     avoid taxes in the U.S., taxes in Mexico, to hide assets that

17     they illegally obtained, and continue stealing money from the

18     State of Tabasco in Mexico.

19          Where is Tabasco?  It's a pretty --

20          MR. REYNAL:  Your Honor, I'd ask to approach.

21          THE COURT:  Okay.  You can approach.

22      (Bench conference began at 8:36 a.m.)

23          MR. REYNAL:  I don't (indisc.), your Honor, but

24     avoiding taxes has nothing to do with this case.  It's not been

25     charged, it's never been alleged.  I don't  know --
```

1          **THE COURT:**  What?  I'm sorry.  I missed that.  What

2   did you say?

3          **MR. REYNAL:**  I said avoiding taxes, which is what --

4          **THE COURT:**  Okay.

5          **MR. REYNAL:**  -- Ms. Hampton just said, has never been

6   part of this case in any way, shape, or form.  I mean, I'm

7   sorry; but she has four SUAs, and they are (indisc.)

8   corruption, theft, bank fraud, and the unlawful money

9   transmitting.

10         **THE COURT:**  Okay.

11         **MR. REYNAL:**  (indisc.)

12         **THE COURT:**  Ms. Hampton?

13         **MS. HAMPTON:**  Your Honor, part of the scheme was that

14  they concealed assets, including on their SAT, Mexican tax

15  forms, which the defense gave over in our reciprocal discovery.

16  It's part of the Government's case that they did not report

17  this income in Mexico or the U.S.  U.S. tax returns are --

18         **THE COURT:**  Overruled.

19         **MS. HAMPTON:**  Thank you.

20         **THE COURT:**  Overruled.

21      **(Bench conference concluded at 8:37 a.m.)**

22         **MS. HAMPTON:**  Tabasco.  It's a -- southern part of

23  Mexico, very small state, and you're going to hear evidence

24  that during Mr. Saiz-Pineda's term as secretary of finance,

25  between 2007 and 2007 -- 2007 and 2012; excuse me-- several

1   programs were bankrupted during his administration, including

2   healthcare and education.  You'll hear the schemes that he and

3   his co-conspirators employed.  One of his co-conspirators is

4   also indicted with Ms. Perez-Ceballos and her husband,

5   Mr. Saiz-Pineda.  His name is Martin Medina-Sonda.  He's a

6   businessman in Mexico and in the U.S. and helped Mr. Saiz-

7   Pineda and Ms. Perez-Ceballos move money into the U.S.,

8   creating false companies, creating bank accounts with those

9   false companies.

10          The people in the State of Tabasco, you're going to

11   hear from a couple of them.  You're going to hear that they

12   were vulnerable.  You're going to hear that Mr. Saiz-Pineda and

13   his co-conspirators, including his wife, took advantage of that

14   vulnerability.  They targeted them.  People who are already

15   wealthy, including Ms. Perez-Ceballos and Mr. Saiz-Pineda,

16   became exponentially wealthy at the expense of the people of

17   Tabasco and brought those assets to the U.S., which began the

18   U.S. investigation.  You'll hear about that.  You'll hear about

19   the tracing of all of the multiple bank accounts, some of which

20   will be introduced to you, not all of which, during this trial.

21   Some of which you'll hear about the most important bank

22   accounts that were used by Mr. Perez, Ms. -- sorry -- Mr. Saiz-

23   Pineda, Ms. Perez-Ceballos, and their other co-conspirators in

24   the U.S. to move these assets around attempting to make it very

25   convoluted.

12

1        You'll hear the efforts of law enforcement in the

2   U.S. to unravel the web that these people have put together

3   in -- for money laundering and bank fraud schemes.

4        You'll hear that they were hiding -- they were living

5   two lives:  one in the state of Tabasco, where they lived in a

6   moderate, about 2,000-square foot house, drove a Volkswagen

7   that Mr. Saiz-Pineda did report on his public declarations,

8   which he's required to do every year, and, then, there is

9   another life that they lived in the U.S., with 34 exotic cars

10  that Mr. Saiz-Pineda and Ms. Perez-Ceballos hid in a

11  warehouse -- in two warehouses in Miami, under the name of a

12  nominee, a straw purchaser, someone who did these things for

13  Mr. Saiz-Pineda and Ms. Perez-Ceballos.  You'll hear from that

14  person.  His name is Angel Gonzalez-Monterrubio.  He has a long

15  history with Mr. Saiz-Pineda and his co-conspirator,

16  Mr. Medina-Sonda, in Mexico and in the U.S.  He was directed to

17  create a company on behalf of Mr. Saiz-Pineda, as were many

18  people, you'll hear, and then he used those companies to hide

19  the assets of these defendants.

20       Who are the defendants?  There's three in this case.

21  One is before you.  So, most of the trial evidence will be

22  focused on Ms. Perez-Ceballos.  You will hear evidence about

23  the overall conspiracy and what was involved and what each

24  player's role were, but the people charged in this indictment

25  are former secretary of finance, Mr. Perez -- sorry --

1    Mr. Saiz-Pineda; his business partner, Mr. Medina-Sonda; and

2    Mr. Saiz-Pineda's wife, the defendant, Ms. Perez-Ceballos.

3            They orchestrated the moving of money out of Mexico;

4    they were point -- they have points of contact for funneling

5    money into the U.S., including particular individuals, but also

6    particular bank accounts, particular companies that they liked

7    to move money from Mexico into the U.S., trying to make it

8    look -- appear -- appear legitimate, and we'll show you why

9    they weren't legitimate.  They did everything they could,

10   including Ms. -- Ms. Perez-Ceballos' conduct, to bypass bank

11   security systems and to drain the State government of Tabasco

12   of every dollar, every cent they could.

13           You'll hear that in October of 2006, Governor Andres

14   Granier Melo was elected by the people of the State of Tabasco

15   to serve as the governor for 2007 to 2012.  Governor Granier

16   Melo had appointed at the end of 2006 Mr. Saiz-Pineda as his

17   secretary of finance.  You'll hear that the secretary of

18   finance controls the purse strings for the state.  They control

19   all finances, all programs; everything that the state spends

20   money on, all accounts, they have access to with the state.

21   And you'll hear what Mr. Saiz-Pineda did with his power in a

22   corrupt way.

23           You'll hear that this case involves several locations

24   around the world, including the United States and Mexico, but

25   include Ireland, Singapore, and New Zealand, and within the

14

1    U.S. itself you're going to hear about several of these

2    companies and trusts that were created to hide these assets in

3    the U.S.  None of these companies were -- were declared by

4    Mr. Saiz-Pineda in Mexico as a company that he owned, that he

5    was directing, that -- that held assets for him.

6              There is a company in California that was created for

7    the sole purpose of hiding a very expensive multi-million

8    dollar condominium that they bought in Los Angeles called

9    Century 23B.  There is a company in New York that changed names

10   a couple of times that was purchased -- sorry -- that was

11   created to hide a very expensive multi-million-dollar apartment

12   in New York City under the name of East 74th Street, and later

13   it was changed to Samurai International, LLC.  You'll hear

14   the -- from an attorney who created these corporations, who was

15   involved in this money-laundering scheme himself, who calls

16   himself "the wallet" for the organization.

17             Some of the other companies, there was a JEC Holding,

18   LLC, created in Delaware, Titan International in Florida.

19   There were several, because there were three real properties

20   purchased by Mr. Saiz-Pineda and Ms. Perez-Ceballos in Florida.

21   One was Jade Ocean 2708; Minelo Acquisitions.  Minelo was used

22   to purchase all of the vehicles, pretty much, in this case.

23   You'll hear about that.  Jade Ocean Penthouse; once they first

24   bought the Jade Ocean 2708, they wanted a penthouse in the same

25   building.  You'll hear about that.

1          Phantom International Technology; Phantom

2  International Investments.  You'll hear that the house that

3  Ms. Perez-Ceballos was living in, in Sugar Land, Texas, was

4  under the name Phantom.  You'll hear one of our witnesses say,

5  "I could never forget the name Phantom; I knew it was

6  registered to the name Phantom, not Ms. Perez-Ceballos or her

7  husband."

8          Inquisitec, LLC.  You'll hear that that company was

9  created for the sole purpose of -- of paying --

10          **THE INTERPRETER:**  Your Honor --

11          **THE COURT:**  Hold on.

12          **THE INTERPRETER:**  -- (indisc.).

13          **THE COURT:**  Slow down.

14          **MS. HAMPTON:**  Thank you.

15          Inquisitec was created for the sole purpose of paying

16  Mr. Saiz-Pineda's brother, Fernando, for his living expenses

17  while he was in the U.S. through this intricate money

18  laundering scheme.  You'll see all of the money that went

19  through that Inquisitec bank account.  You'll see Mr. Fernando

20  Saiz-Pineda state that his business on school applications is

21  Inquisitec.  You'll hear that that's not a legitimate business,

22  that he was just getting money funneled to the side from his

23  brother.

24          And, then, these -- these Mexican companies are

25  really important.  You're going to hear a lot about this.

1          Sorry; I skipped too far ahead.

2          Jofesa.  You're going to hear a lot about Jofesa.

3   And you're going to see in the bank accounts, and the agent

4   will testify to the tracing that went on in these bank

5   accounts, a lot of the money came in from Mexico from Jofesa.

6   Supposedly, Jofesa is a -- is an accounting firm owned by

7   Mr. Saiz-Pineda and his brother, Fernando, who is a vet,

8   veterinarian, by the way.  Supposedly, Jofesa, this accounting

9   firm, made millions and millions and millions of dollars with

10  no employees.  You'll hear about people who are first-hand

11  familiar with this firm, where it's located.  The address where

12  it's located in Mexico is important.  You're going to hear that

13  address over and over and over in this case, because

14  Ms. Perez --

15          **THE COURT:**  Okay, I'm sorry.  Ms. Hampton, you really

16  need to slow down.

17          **MS. HAMPTON:**  I apologize, your Honor.

18          Ms. Perez-Ceballos put a company and told people she

19  owned a company, told people that the address of that company

20  was the same address as all these other companies in Mexico:

21  Calle Magallanes (phonetic), 1113, in Villahermosa, Tabasco.

22  You're going to get -- you're going to hear that address over

23  and over and over.

24          The company that Ms. Perez-Ceballos tells the bank

25  that she's associated with is -- let's see, the fourth one down

1    on the Mexican -- Ascesoria Integral Para Su Empresa.  You're

2    going to hear about how that's just a false company.  You're

3    going to hear how Mr. Medina-Sonda and Angel Gonzalez-

4    Monterrubio are listed on the Mexican incorporation documents

5    for that company.  Both are co-conspirators in this money-

6    laundering and bank fraud scheme.

7          Remember what I said about him entering -- Saiz-

8    Pineda entering office in January of 2007 and that Governor

9    Granier was elected in October of 2006.  Between that time

10   you're going to see a lot of preparations through the --

11   through the U.S. bank documents between Mr. Saiz-Pineda and

12   Mr. Medina-Sonda.  They're getting ready for the embezzlement

13   activities for their agreement that's about to take place, for

14   their scheme that's about to take place.  In November of 2006,

15   two mirror companies are created in the U.S.  One --

16          **THE INTERPRETER:**  I'm sorry; (indisc.)?

17          **THE COURT:**  Okay.

18          **MS. HAMPTON:**  Two mirror companies.

19          **THE COURT:**  And you're not really slowing down.

20          **MS. HAMPTON:**  I'm sorry.  I will.

21          **THE COURT:**  Okay.

22          **MS. HAMPTON:**  I will slow down, your Honor.  I'm

23   sorry.

24          I said two mirror companies.  One was owned by

25   Mr. Saiz-Pineda; one was owned by Mr. Medina-Sonda.

1    Performance Investments was owned by Mr. Saiz-Pineda.  The --

2    you're going to hear a lot about this company and the bank

3    accounts associated with this company and what this company is

4    used to fund in the U.S. and where the monies -- where this

5    company came from, from Mexico.  You're going to hear about

6    Jofesa funding this company.  You're going to hear that the

7    protector of this trust was Mr. Medina-Sonda when they created

8    it.  The P.I. Trust; the settlor was Mr. Saiz-Pineda, and the

9    global trustee, which was in New Zealand, was the trustee with

10   P.I. Trust; and then if you start peeling back the layers, you

11   see that Mr. Medina-Sonda was the protector.

12          On the same day`, November 28, 2006, Medina-Sonda

13   creates a company in the U.S. that mirrors Performance called

14   Comprehensive Advisory Development Limited.  You're going to

15   hear that that company also had a trust associated with it,

16   M.M. Trust, where Mr. Medina-Sonda was the settlor; Global

17   Trustees, again, from New Zealand, involving Mr. Medina-Sonda

18   and the M.M. Trust, and that on this one Mr. Saiz-Pineda was

19   the original protector of this trust.  So, they're each

20   guaranteeing each other's companies on the same day.

21          Now, this is kind of skipping -- skipping forward.

22   You're going to hear a lot of stuff happened between here and

23   there and after this, but I'm trying -- trying to give you a

24   big picture here.  April of 2007, Mr. Saiz-Pineda had been in

25   office for four months at this point.  Mr. Saiz-Pineda and

1   Mr. Medina-Sonda opened a Maryland bank account together.

2   Mr. Saiz-Pineda is the beneficial owner; Mr. Medina-Sonda is

3   the power of attorney.  And this account, they open it, they

4   are asked about the business relationship; they tell the bank

5   that they've been business associates for ten years and that

6   their business is Patrimonium Consultors Integratos.  Guess

7   what address?  Calle Magallanes 1113, Villahermosa, Tabasco,

8   the same address as Jofesa, the same address as Ms. Perez-Cantu

9   -- Ms. Perez-Ceballos' company that we will hear about in just

10  a minute, also.  They make some declarations about what their

11  net worth is and what their income is.

12          You'll hear many different declarations throughout

13  this conspiracy by Ms. Perez-Ceballos, by Mr. Saiz-Pineda, by

14  Mr. Medina-Sonda, and others about what they told the bank, how

15  much money they make a year, how much they're worth; what they

16  told U.S. law enforcement how much they make a year, how much

17  they're worth; what they told U.S. officials in visa

18  applications how much they make, how much they're worth, where

19  they work.  You're going to hear a lot of inconsistencies.  And

20  just depending on who they're speaking to is the story that

21  they're going to tell.

22          You're going to see that Mr. Saiz-Pineda's wealth

23  declarations that he's required to file in Mexico doesn't match

24  any of these things.  You're going to see that Ms. Perez-

25  Ceballos's tax filings in Mexico doesn't match any of these

1  things, also, and doesn't -- definitely doesn't justify the

2  amounts of money going through these accounts and the amounts

3  of assets that these individuals purchased.

4          One thing you're going to hear over and over and over

5  is PEP, "Politically Exposed Persons."  What is a politically

6  exposed person?  The bankers are going to tell you this; the

7  first two witnesses are going to be bankers from HSBC, then she

8  went to UBS, and then we have one from JPMorgan Chase that's

9  now Morgan Stanley, and they're going to tell you what a

10  politically exposed person is and that Ms. Perez-Ceballos is

11  indeed, to this day, a politically exposed person.  It includes

12  individuals who have -- who -- who are or have been entrusted

13  with the prominent public functions, and their family members

14  or close associates, and includes both domestic and foreign

15  politically exposed persons.  Due to their position and

16  influence, it's recognized that many PEPs are in the positions,

17  can potentially be -- can -- can be abused for the purpose of

18  committing money laundering and related offenses.

19          So, you're going to hear that Ms. Perez-Ceballos

20  brings in money from Mexico, from an HSBC account in Mexico,

21  transfers it to an HSBC account in the U.S., and claims she's a

22  PEP.  Then she adds her husband; this was in 2009 and 2010;

23  they claim they're a PEP.  Then, you're going to hear that in

24  2013, all of a sudden Ms. Perez-Ceballos claims she's not a

25  PEP.  And I'll tell you about that in a little more detail.

1          Just go back to the real property.  So, at the top,

2    January 1st, 2007, Mr. Saiz-Pineda enters office, and he exits

3    office December 31st, 2012.  During that time period, seven

4    real properties were purchased in the U.S.  You're going to

5    hear about others in Mexico, also.  But seven real properties

6    were purchased in the U.S. totaling over $36 million.  The --

7    and all of these properties were paid for in cash; no liens, no

8    mortgages, they were fully paid for at the time they were

9    purchased.  The dates on this slide are the closings.  So,

10   you're going to see between February of '09 and December of '12

11   over $36 million in cash to purchase by these co-conspirators,

12   including Ms. Perez-Ceballos.

13          Let's go back to her account.  Ms. Perez-Ceballos

14   came to the bank in -- at HSBC in the U.S. in 2009 by herself.

15   She told the bank she wanted to open an account, she's a

16   politically exposed person, she stated she lived in Mexico, at

17   which address, Calle Magallanes 1113.  You're going to hear

18   that in 2010 she adds her husband to the account.  He comes in;

19   you're going to hear that there is something called "customer

20   due diligence" that the bankers are required to do.  He says,

21   "I'm a PEP," so they're required to do some additional

22   research, additional investigation on this type of client

23   because of the politically exposed person aspect of it.

24          You're going to hear that the banker uncovered some

25   information about Mr. Saiz-Pineda.  Her name is Sonia

22

1    Fernandez.  She's going to testify today.  And she confronted

2    Mr. Perez-Ceballos with it -- I'm sorry; Mr. Saiz-Pineda.  She

3    said, "I found out that there is some information from 2007,

4    there is a seizure of money, and that you look like you're

5    associated with it."  Mr. Saiz-Pineda adamantly denied it.  "I

6    have nothing to do with that; this is a political game that

7    these people are playing, and I have nothing to do with those

8    people involved with that seizure."  And, so, they had to take

9    his word for it, she's going to say.  They didn't have any

10   other evidence, they had a -- they had a news article, they had

11   his statement, so they go forward with it.

12          You're going to hear that at the time he made that

13   statement to the bankers the people involved in the '07

14   seizures with him was Medina-Sonda.  You're going to hear that

15   in 2010 when he said, "I don't have anything to do with those

16   people," he had open accounts with Medina-Sonda.  He had U.S.

17   business with Medina-Sonda that he's not disclosing to the

18   bank, that he's continuing.  In fact, it wasn't until after

19   Mr. Saiz-Pineda left office in March of 2013 that Mr. Medina-

20   Sonda and Mr. Saiz-Pineda dissolved their money-laundering

21   company in the U.S.  So, well -- well -- well into 2010, he was

22   still involved with Mr. Medina-Sonda.

23          So, Ms. Perez-Ceballos; she had a lot of different

24   statements.  They're very important.  The bank fraud statute

25   involves material misstatements.  These are material

23

1    misstatements.  You're going hear from the banks that these

2    statements by Ms. Perez-Ceballos put these banks at risk of

3    financial -- civil litigation, at risk of loss, because she

4    lied to them.  She told -- she told HSBC and UBS, "This money

5    is not from the sale of a business," and that's one thing

6    they're required to ask, and I'll tell you why they're required

7    to ask.  "This money that I'm bringing in from Mexico, it's not

8    from the sale of a business; it's from savings and accumulated

9    salary."  Savings and salary.  So, they said, "No; no -- no

10    sale of a business."

11          So, then she in 2013 forges a document.  Ms. Perez-

12    Ceballos actually forges three documents and takes them to,

13    first, to JPMorgan Chase, taking her husband's name off of her

14    UBS statement, in August of 2013, actually redacting it, and

15    giving the forged statement to JPMorgan Chase.  And she tells

16    JPMorgan Chase, "This is from the sale of a company."  And

17    you'll see the tracing that this money came from Mexico to HSBC

18    to UBS to JPMorgan Chase.  It's the same money we're talking

19    about.  There were no additions.

20          You're going to hear that she said he was -- "He's

21    not a PEP, I'm not a PEP, and actually I'm separated from him."

22    So, he's not in the picture; she didn't want any -- any

23    questions, or customer due diligence, about her husband at this

24    point in 2013.  You're going to hear that she told -- that

25    the -- the type of product she was asking for was an offshore

1    account in Bermuda at JPMorgan Chase.  She told JPMorgan Chase,

2    "I live in Mexico."  And she had to do that if she wanted  this

3    type of account because it wasn't available to U.S. citizens,

4    and the bankers will explain that to you.  So, she said, "I --

5    I live in Mexico, I don't live in the U.S.," because if I live

6    in the U.S. it's a hindrance to putting this money in Bermuda,

7    and that -- we're going to show you that that's a lie.  She was

8    living in the U.S.  She was living at -- living in that

9    Elmhurst house in Sugar Land.  She also gave the bank a mailing

10   address in the U.S. at an address in Lytham Street -- or Lytham

11   Court -- in Sugar Land, Texas.  You'll hear that's her

12   brother's address, Celso.  You'll hear that when she had to

13   give a U.S. address she routinely gave that address.  And at

14   the end of the case we'll submit to you it's because she didn't

15   want people knowing where she really lived, which is Elmhurst,

16   which leads back to Phantom, the company, which leads back to a

17   whole can of worms, including the lawyer that created all of

18   these shell corporations around the country, including other

19   assets owned by Phantom, including other bills paid for

20   Ms. Perez-Ceballos by Phantom.

21          You're going to hear that she routinely, including on

22   her U.S. visa application, told the U.S. Government and told

23   bankers and others, school officials, that she lived at Calle

24   Magallanes 1113, which wasn't true.  She told JPMorgan Chase a

25   different address in Mexico.  She never discloses to anyone

1    that she lives on Elmhurst.  And we're going to -- we're going

2    to show you why.

3            Just looking at the purchase of Elmhurst, you're

4    going to -- we're going to do this for every property, but

5    right now, but just -- just Elmhurst relating to Ms. Perez-

6    Ceballos.  So, the payments made to this house; first you're

7    going to hear from a man named Enrique Marichal.  He is a real

8    estate broker in Miami.  For some reason, this real estate

9    broker decided to put $5,000 as the first payment from his

10   personal account into the escrow account for this property.

11   That's a pretty good real estate broker.  I've never had one

12   like that.  And, then, you'll see payments after that from

13   December, 2011, to December of 2012, this house, $1.3 million

14   paid for entirely in cash, paid off the house.  Phantom

15   Investment, Latour bank checks, which were -- he's a lawyer in

16   Miami; you're going to hear from him also, the creator of

17   Phantom.  Phantom International Investments, and, again, the

18   biggest wire, 964,000 from Phantom.

19           Back to the cars.  You're going to hear that

20   Mr. Saiz-Pineda is an exotic car collector.  He had to hide

21   that from the Mexican government because he didn't have the

22   assets to justify the purchase of exotic cars, especially the

23   number of exotic cars and the types of exotic cars.

24           You're going to hear that he created a company; the

25   company was created at his direction called Minelo

1   Acquisitions.  The person that was behind this company that was

2   the straw man or the nominee for this company is Angel

3   Gonzalez-Monterrubio.  He's going to testify.  He's the one

4   with the lengthy background with Mr. Saiz-Pineda and

5   Mr. Medina-Sonda.  You're going to hear that all of these cars

6   are placed in Minelo Acquisitions' names.  You're going to hear

7   that they were sold off in the end of 2013 because Mr. Saiz-

8   Pineda needed to liquidate his assets.  You're going to hear

9   that he directed people to sell them off, including Mr. Angel

10   Gonzalez-Monterrubio, and including a man named Fernando

11   Latorre.  Some of the cars that were purchased -- at one point

12   they were up to 34 cars Mr. Saiz-Pineda owned in this

13   warehouse -- were a Mercedes-Benz worth 539,000, a Porsche

14   worth 459,000, a Ferrari worth 2.8 million, a Bugatti worth

15   2.2 million, a Rolls-Royce Phantom worth 398, a Pagani worth

16   1.3.  You're going to hear a lot of evidence about the Pagani.

17   This is a car that Mr. Saiz-Pineda sent Mr. Latorre into Europe

18   to go find.  It's a car that's illegal in the U.S.  It's a car

19   that Mr. Saiz-Pineda insisted on bringing through the port of

20   entry from Mexico on a truck into the U.S. and hiding in his

21   warehouse in Miami.

22          You're going to hear that Ms. Perez-Ceballos would

23   routinely fly on private jets of a government contractor for

24   the state of Tabasco, a government contractor named Antonio

25   Espinosa, who would do favors, in his own words, for Mr. Saiz-

1    Pineda, including letting Mr. Saiz-Pineda and his wife,

2    Ms. Perez-Ceballos, enjoy the use of his two twin private jets

3    painted exactly the same, exactly the same model, two different

4    tail numbers.

5           You're going to hear about crossing histories from

6    the port-of-entry for Ms. Perez-Ceballos and Mr. Saiz-Pineda,

7    corroborating multiple witnesses who will tell you that she

8    used these private jets as these favors that Mr. Saiz-Pineda

9    was given while he was in office.  These constitute bribes for

10   the Government -- in the Government's evidence.

11          You're going to hear that she would be picked up at

12   the airport by Mr. Latorre in one of these cars that Mr. Saiz-

13   Pineda, you know, had a warehouse in Miami.  Mr. Latorre's job

14   was to drop off vehicles for him.  Sometimes you'll hear that

15   Ms. Perez-Ceballos would go with Mr. Latorre and Mr. Saiz-

16   Pineda, her husband, to the warehouse so that Mr. Saiz-Pineda

17   could pick what cars he wanted to play with while he was in

18   Miami.

19          Sometimes you'll hear that that wasn't enough for

20   Mr. Saiz-Pineda and Ms. Perez-Ceballos, that they would call

21   Mr. Latorre and demand up to four vehicles at a time be dropped

22   off at their Jade Ocean penthouse, a condo in Miami so they

23   could drive those cars while they were in Miami.

24          The Indictment might seem confusing, but it's not.

25   This is a big theft scheme, this is stealing money for profit

1    because of greed and public corruption and power.  So I just

2    want to kind of go over with you the road map when you're

3    thinking about the evidence in this case.

4         In Count One there's two ways money laundering is

5    alleged, international money laundering, which means bringing

6    dirty money from some other country to the U.S., in this case

7    Mexico to the U.S..

8         And, secondly, we call it -- I call it plain vanilla

9    money laundering which is concealed, okay, concealment money

10   laundering, conducting financial transactions.

11        The main element we're going to be presenting

12   evidence to you over and over and over in this case is that

13   conceal disguise the nature, location, source, ownership and

14   control of his money and assets.  That's what the point of this

15   whole scheme was, conceal and disguise all of those things, the

16   ownership, the control because they weren't supposed to have

17   it.

18        The big picture, money laundering is -- a lot of

19   people hear money laundering they get -- they get it, you know,

20   (indisc.).  Really, there's three parts to money laundering if

21   you think about it like this, this big picture:

22        Okay, there's placement and this is where -- when

23   money laundering is occurring the money -- the illegal proceeds

24   are the most vulnerable.  This is when they're having to place

25   it, dirty money, in a financial system somewhere, okay?  So

1    there's questions, customer due diligence questions that are

2    asked, there are things that they have to get past, there's

3    roadblocks they have to get past.

4              But once they place the money into an institution the

5    next step is layering.  And this is where they try to get that

6    dirty money further and further away from the source of the

7    dirty money, okay, so they make another company, transfer this

8    to this bank account, transfer to this bank account.  Say I owe

9    the bank money on a contract, I owe this bank payment for a

10   car, and it gets further and further away, all the while

11   they're controlling all of these bank accounts.

12             And then the final part is integration and that's

13   when assets are purchased, it's integrated back into the U.S.

14   financial system in this case, okay?

15             So that's the big picture of money laundering.  We'll

16   get into the minutia after the trial is over and the Judge

17   gives you the charge.

18             The second charge -- the Second Count is a bank fraud

19   conspiracy.

20             Here the banks allege, there are many other banks

21   involved, but the banks alleged in this case are Morgan

22   Stanley, the Royal Bank of Canada or RBC, and JPMorgan and

23   Chase.

24             You're going to hear the Defendants' conduct alone,

25   just looking at JPMorgan and Chase, as many as three times, not

1 once but three times, falsified documents at JPMorgan Chase

2 that she herself redacted, she herself made certain material

3 misrepresentations to the bank alone constitutes bank fraud, an

4 attempt to conceal these assets and conceal the source of the

5 money.

6     Some of the people that you're going to hear

7 repeatedly talked about in one of the videos are these people,

8 so Enrique Marichal.  He owns -- he created a company here in

9 the middle of this money laundering scheme called EMC, I think

10 it was about 2011 that he created this company.  And

11 Mr. Marichal, like I said, he's a real estate broker in Miami.

12 He was -- he was used as a -- unlicensed money transmitting

13 business by these people, including Ms. Perez -- significantly

14 by Ms. Perez-Ceballos.

15     You're going to hear that Ms. Perez-Ceballos, out of

16 everyone in the case, she's the person that made contact with

17 Mr. Marichal.  In 2006 she met Mr. Marichal because she wanted

18 to have a rental property, a rental property that Angel

19 Gonzalez Monterrubio, Minelo, remember him, paid for.  He was

20 tasked with paying the rent on that property for Ms. Perez-

21 Ceballos and Mr. Saiz-Pineda.  You'll hear that once Ms. Perez-

22 Ceballos got the hang of Miami, she liked the location, that

23 they started looking at other properties including New York,

24 two other -- three other properties in Miami, two -- one

25 property for Ms. Perez-Ceballos in Houston and in Los Angeles.

1          Mr. Marichal was involved with all of them.  You're

2  going to hear how Mr. Angel Gonzalez Monterrubio would, at the

3  direction of Mr. Saiz-Pineda, meet Mr. Marichal in Los Angeles

4  or New York or Miami and take pictures for Mr. Saiz-Pineda so

5  that he and his wife could look at these properties and

6  wouldn't have to actually go there, put themselves out there

7  and decide whether they want to invest in these properties

8  under these false companies.

9          You're going to hear that Enrique Marichal did a

10  little bit more than what a realtor should do.  You've already

11  heard about the $5,000 escrow payment for his personal account

12  for the house of Ms. Perez-Ceballos.  You're going to hear that

13  he paid all of her bills, or he had all of her bills paid.  He

14  paid for a million dollars worth of furniture, high end

15  European furniture in his name.  He paid for another real

16  estate broker he had on the ground in Houston named Mr. Tsokos

17  to come and help Ms. Perez, drive her around so she could pick

18  the right location that she wants to and she picked the most

19  high end location that they were showing  and this is where she

20  wants her house and this is how she wants it, she wants wrought

21  iron fence behind the back, she wants this inside and that

22  inside, you're going to hear that.

23          You're going to hear when the -- even the smallest

24  things, when the furniture, the high end European furniture is

25  being delivered for Ms. Perez-Ceballos at her house she

1   couldn't even pay for the workers that got hurt in her name.

2   There was furniture deliveries, someone got hurt and Mr. Tsokos

3   had to put it on his credit card and get reimbursed by

4   Mr. Marichal.  She couldn't pay her yard expenses, she couldn't

5   pay utility bills, all of those things were never in her name.

6   Why?  Because we contend the evidence is going to show you that

7   she didn't want that house to come back to her or her husband,

8   the Sanom (phonetic) house which was the name of the house that

9   the house was under.

10          Mr. Jose Latour, he self-proclaims himself as the

11   "wallet" for this organization.  He's the attorney in Miami who

12   created multiple of these companies.  The one he used the most

13   -- the ones he used the most were Phantom and Titan to pay

14   these peoples' bills.

15          He's going to tell you that Mr. Saiz-Pineda owned all

16   of those cars, that he helped with the payments of those cars,

17   that he helped with Ms. Perez's living expenses, that at one

18   point those cars were starting to be sold off to partially to

19   pay for Ms. Perez-Ceballos's living expenses in the U.S..

20          You're going to hear that he was also an unlicensed

21   money (indisc.) for these people.  He was directed, sometimes

22   he inappropriately used his attorney trust account which is a

23   no-no, you're not supposed to use your attorney trust account

24   for things like household utility bills and things like that of

25   your clients.  He put a lot of things in his name and his

1    company names as well for these people.

2              Mr. Angel Gonzalez Monterrubio is the Minelo Company.

3    I told you a lot about him, but he's going to testify that he

4    was employed to put these vehicles in his name.  At some point

5    he was -- he fell out of the good graces of Mr. Saiz-Pineda who

6    he axed asked by Mr. Saiz-Pineda's assistant, Marlise Cuppolow

7    (phonetic), (indisc.) which you'll hear a lot about -- to issue

8    -- to execute a power-of-attorney so they could cut him out of

9    the picture.

10             You're going to hear that Mr. Saiz-Pineda paid for

11   Mr. Gonzalez's living expenses while he was in the U.S.

12   basically to keep him quiet so that he wouldn't talk after some

13   allegations came forward about Mr. Saiz-Pineda.

14             You're going to hear from Mr. Gonzalez that he was

15   subpoenaed by a Grand Jury here, here in Corpus Christi, about

16   what he knew, and he had been cooperating with the Government.

17             And you're going to hear that an attorney for

18   Mr. Saiz-Pineda met him here -- or was going to meet him here,

19   he didn't know it, that they were going to show up before he

20   testified to the Grand Jury.

21             You're going to hear that he's extremely fearful for

22   his life, that he's been in hiding and that he's worried for

23   his safety and his family's safety.

24             You're going to hear from Fernando Latorre.  This

25   Mr. Latorre is the company -- he's the company who Mr. Saiz-

1    Pineda called METech (phonetic).

2              Mr. Latorre ran the two warehouses.  He's a mechanic,

3    he knows a lot about cars.  He knows a lot about these types of

4    cars and what they take and whether they're legal in the U.S.

5    and how to keep them maintained, the things that are required

6    you do these cars.  The company, METech, you're going to hear,

7    was paid for all through the orchestration of Mr. Saiz-Pineda

8    to maintain these cars, it was his job to stay in the warehouse

9    and to change the fluids, to make sure the cars' tires didn't

10   go (indisc.) blocks so that he could drive them once a month

11   and make sure that, you know, everything worked in these cars.

12             Antonio Espinoza, he is the contractor.  You're going

13   to hear that recently he -- he signed -- he signs five year

14   contracts normally with the State of Tabasco and he signed most

15   recently for 15 million dollars, for 10 million dollars a year.

16   You're going to hear that the State of Tabasco is the only

17   state in Mexico that he has contracts with.

18             You're going to hear that he had contracts with the

19   State of Tabasco while Mr. Saiz-Pineda was in office.

20             He allowed Ms. Perez-Ceballos by herself, Ms. Perez-

21   Ceballos with her husband, to use his two private Lear jets to

22   fly from Mexico to Miami and other places.

23             You're going to hear that Mr. Antonio Espinoza wired

24   $587,000 through his account in Mexico to the escrow account in

25   the New York property so that Ms. Perez-Ceballos and Mr. Saiz-

1   Pineda could enjoy that property in New York.

2          You're going to hear that after Ms. Perez's arrest

3   that Mr. Espinoza brought her $30,000 in cash.

4          Finally, this is just to give you a big picture

5   again, of -- just to keep -- you know, we're going to get

6   caught in little minutia, in the little details throughout the

7   evidence in this trial, but the types of money movements that

8   you're going to see in this trial, they began with monies in

9   Mexico and they move into the U.S. financial system at those

10  banks listed.  Shell companies are created to purchase assets

11  and hold money, and that from there you see assets purchased,

12  including the real property listed, there's seven real

13  properties involved in this conspiracy, multiple vehicles,

14  those are just some of them, the vehicles totaled at a very

15  conservative estimate over 8 million dollars, and we're going

16  to show the money that went through the Minelo bank account

17  which was associated with the vehicles, over 10 million

18  dollars, and the Bermuda account that Ms. Perez-Ceballos opened

19  in 2013 and then other spending very conservatively estimated

20  to be around 3 million dollars.

21          What we will bring to you in this case is the truth,

22  the truth has been attempted by the Defendant and her husband

23  and her co-conspirators to be deeply hidden in a series of

24  convoluted transactions because of power, greed and corruption.

25  The Government will prove this case to you beyond a reasonable

36

1    doubt and at the end of this case the Government will ask for

2    your finding of guilty.

3         **(Pause)**

4            **MR. REYNAL:**  Could I set the board up there so your

5    Honor can see the board?

6            **THE COURT:**  Yes.

7         **(Pause)**

8            **MR. REYNAL:**  Can everybody see okay?

9         **(Pause)**

10               **OPENING STATEMENT ON BEHALF OF DEFENDANT**

11            **BY MR. REYNAL:**  You know, I -- may it please the

12   Court, members of the jury, I kept track during Ms. Hampton's

13   presentation and she said "they" 32 times.  This whole case

14   from our perspective --

15            **THE INTERPRETER:**  Your Honor --

16            **THE COURT:**  I'm sorry.  Hold on, sorry.  Sorry.

17            **THE INTERPRETER:**  I apologize, Counsel, I'm having a

18   little trouble hearing you.

19            **MR. REYNAL:**  Certainly, I'll speak up.

20            **THE INTERPRETER:**  Thank you.

21            **MR. REYNAL:**  I said that I kept track during the

22   Prosecution's presentation and they said the word "they" 32

23   times.  This case, from our perspective, comes down to the

24   following:

25            We've all heard there's no I in he.  We will prove to

37

1    you that there is no "she" in "they."  And we will begin

2    proving it to you as soon as we rise to cross examine the first

3    witness.

4            Trials aren't like they appear on TV.  You don't have

5    to wait until the end to hear the Defense's case.  We will

6    start putting on our case right away, and we will prove to you

7    that Ms. Perez-Ceballos neither agreed or participated in the

8    transactions that the Prosecutor just described to you.

9            A Prosecutor's opening statement is not like a

10   politician's speech.  A politician can promise the world and

11   know that he or she doesn't have to deliver until after the

12   votes have been cast.  A trial lawyer you get to make sure that

13   we kept our word before you render your verdict, and I know

14   you're going to keep that in mind.  And I will refer back again

15   to Ms. Hampton's opening statement when I argue to you in

16   closing and we'll see if she kept her word.

17           I'd like to begin by telling you a little bit about

18   my client, Silvia Perez-Ceballos.

19           She was born in Villahermosa, Tabasco, Mexico.  She's

20   49 years old.  She's lived in Tabasco basically her whole life.

21   Her father was a bookkeeper, her mother a seamstress.

22           She's -- we talked a little bit about this on voir

23   dire.  She is not a numbers person.  She didn't want to be a

24   bookkeeper, she wanted to be a psychologist.  She went away to

25   study psychology, you'll hear that it wasn't available as

1    something you could study even in Villahermosa in the 1980s, so

2    she went to Guadalajara.  After she finished her studies there

3    she got a specialization in child psychology and came back to

4    Villahermosa.

5         She worked her entire life treating children with

6    autism and cerebral palsy and Down's Syndrome.  You'll hear

7    about her clinic, the people who worked for her, how they

8    changed treatment there.  Apparently in the early '90s

9    electroshock treatment was still the only thing that was

10   available, even for children, and that was something that she

11   didn't agree with and she worked to change (indisc.).

12        In 1990 she met Jose Manuel Saiz-Pineda, the

13   gentleman you've been hearing so much about.  They met at a

14   reunion party for her high school class.  He's older than her,

15   but he was at the party.  He had been previously married and

16   had a child from his earlier marriage.  He comes from a wealthy

17   family.  His parents own ranches.  His father is a veterinarian

18   and teaches at the University.  He was at that time a very

19   successful gentleman with his own practice.

20        They married in 1994 and you're going to hear about

21   their relationship, and that when they were married Mr. Pineda

22   said that they needed to be -- you can elect in Mexico either

23   community property or separate property, kind of like a pre-nup

24   in the U.S. but there you actually do it when you go and get

25   married, and that Mr. Saiz-Pineda insisted that they elect

1    separately which is one of the reasons why Silvia always

2    worked.

3            But it was a traditional marriage in the sense that

4    she was allowed to work so long as the house and children were

5    taken care of.

6            They married in 1994.  In '96 they had their first

7    daughter, Maria, who's sitting in the back of the courtroom

8    there with the black blouse.

9            A few years later they had their second daughter,

10   Tanya (phonetic) who's sitting next to her.

11           And during that decade leading up to 2006 Mr. Saiz-

12   Pineda continues to become more and more successful, and he has

13   nothing to do with politics.  He has a very successful

14   accounting firm that helps -- works with high net worth

15   individuals and companies, and he was also able to develop a --

16   a model.  You're going to hear about something called a

17   cooperativa (phonetic), okay, a co-op and the way the

18   cooperative model works is it's a way under -- this is

19   absolutely the -- it's a way under the Mexican tax and labor

20   code to minimize your income tax liability.  It works a lot

21   like a medical practice.  There is a central cooperativa and

22   then there are different people who render services to clients

23   while they get paid directly by the client, the client pays the

24   cooperativa and then the cooperativa pays out in dividends to

25   the people who are doing the work, and by taking the money as a

40

1    dividend rather than taking it as straight income you realize a

2    tax savings.  This was a very good idea.  That helped a lot of

3    people.  And you are going to see that there are hundreds, if

4    not thousands of people who are listed on the books of these

5    cooperativas doing this, and it's absolutely legitimate.

6           And Ms. Perez-Ceballos with her psychology practice

7    was one of them.

8           So let's talk about the couple about 2005, and let's

9    talk about their financial circumstances in the year before he

10   goes into Government.  They are very wealthy people.  The house

11   Ms. Hampton described is one of the most -- was owned by one of

12   the -- is one of the most beautiful houses in (indisc.), it's

13   probably worth close to a million dollars if it were sold

14   today.

15          They had cars.  He bought himself (indisc.) year

16   before he was ever (indisc.) a Ferrari.  They traveled around

17   the world.  Their children were in private schools.

18          She will tell you they felt blessed, she felt blessed

19   to be in that situation, and that's why she was very happy.

20   But he decides that he wanted to support Granier-Melo's bid to

21   become Governor of the State.

22          Villahermosa, I like to think about it as the biggest

23   small town in a small state, all right, and there's a saying in

24   Spanish which is **(Speaks Spanish)** small towns sometimes can be

25   sort of cesspools or big (indisc.) in (indisc.).  Everybody

41

1    knows everybody.  And Mr. Saiz-Pineda's uncle was very close

2    friends with the man who was the mayor and everybody knows

3    them, and he wanted to support his bid to become Governor.

4              Silvia was not happy with that decision.  She wasn't

5    happy for two big reasons:

6              Number 1, because much like marriage can be different

7    in Mexico, so can politics.  It's a much more rough and tumble

8    affair and sometimes the winners prosecute the losers.

9              She also knew that it would mean a separation in the

10   family.  Up until that time her husband had been, for lack of a

11   better word, self-employed, he was his own boss, he made the

12   schedule.  He decides what he was going to do, when he was

13   going to do it and how he was going to do it.

14             When you're working for a politician your time isn't

15   your own, and she knew that and she wasn't happy, and she

16   begged him, she said "Please don't do this."  And it was the

17   summer and they were supposed to go to Europe to celebrate

18   their wedding anniversary and go to France with their two

19   daughters, and he said, you know, "I just want to work on the

20   election, and take the girls, go to France.  I'm going to do

21   this, but I promise as soon as the election is over I'm out."

22             The election happens, Granier wins.  She says, "Okay,

23   you're done?"  He says "Well, you know, I just want to help

24   with the transition, not just the transition.  (indisc.)  I'm

25   good at this, let me help (indisc.)."

1          Okay, what's she going to do?  Is she going to leave

2    him?  (indisc.)

3          And then Granier says "I'd like you to be Secretary

4    of Finance."  All right, this is an appointed position, it's

5    not like an elected position, all right, and it's kind of

6    similar to in Texas -- it's not like the Governor (indisc.) --

7    we're talking (indisc.).  Okay, he doesn't enter the contracts,

8    he doesn't decide who gets contracts, okay, he pays the bills.

9    That's his job, pay the bills.  And he wants this and, again,

10   there's not much she can do to talk him out of it and he takes

11   it.  And she was right, over the next six years she didn't see

12   nearly as much of him as she had seen before.  He worked

13   incredibly hard.  He traveled a lot and you're going to see

14   that often times it was just her and the girls taking a

15   vacation, going to Miami (indisc.), he wasn't around.

16          2012, elections in Tabasco.  It's a very dirty

17   campaign.  There are all sorts of allegations being thrown in

18   both directions about corruption, about all sorts of

19   wrongdoing.

20          Ultimately you'll hear, according to the Tabasco

21   Constitution, people are (indisc.) so Granier was going to be

22   going away, he was going to be -- Saiz-Pineda was going to be

23   going away, but the political party put forward a new person,

24   so the political party that they were a part of lost the

25   election and the atmosphere after the election became more and

43

1    more dark and more and more violent in Tabasco (indisc.).  And

2    it got to the point where Mr. Saiz-Pineda's secretary was

3    kidnapped and tortured by elements of the State Prosecutor's

4    office in Tabasco.

5            And you'll hear that Silvia got called from her

6    husband and he said "Get the girls, have your bags packed and

7    get out."  And that's exactly what she did, and that was in May

8    of 2012, sorry -- May of 2013.  Government leaves office

9    December, 2012, so it's the six-year period, 2006, 2012.  May,

10   2013, she gets the call, get the girls, get out.  She goes.

11   Her brother, Cecil (phonetic), has lived in the United States

12   for a significant period of time.  He has a job in the United

13   States, he has children in the United States.  This is where he

14   lives.  And so she went to take refuge with him in a place

15   where she thought she and her children would be safe.  And she

16   gets there in May.  Mr. Saiz-Pineda leaves to try and join them

17   in June and he's stopped at the border by Mexican National

18   Police, bundled into a car, June 25th, bundled into a car,

19   driven -- I mean, you saw the map, right (indisc.) driven all

20   the way back to Tabasco where they cobble up an arrest warrant

21   for him.  He gets thrown in jail.  He's still in jail, right?

22   Medina-Sonda, the guy you heard from, he's in jail, too, no

23   bond as of June, 2013, all right?

24           Ms. Perez-Ceballos asked for asylum in this country.

25   She says protect me and my children.  I'm the victim of

44

1    political persecution in my home country.  My husband's

2    secretary, a driver who worked for her, were both kidnapped and

3    tortured.  My husband has been in prison.  He's been acquitted

4    four times of public corruption in Mexico, but every time he

5    gets an acquittal, they file a new charge against him so they

6    can keep him without bond.  I'd like to stay.  That

7    application's (indisc.)

8            The next step, all right, has to do with UBS, HSBC

9    (indisc.) and my client (indisc.) you will see that this

10   account was opened originally, the relationship with the bank,

11   1998, all right?  I mean, eight years before he's ever in

12   public office, all right?  And it's not (indisc.) anything.

13   It's in her name, okay?  And you'll find out that there was a

14   relationship manager, I guess is the term.  And so that money

15   that was in that account was my client's money.  It was her

16   savings from the money she'd been able to put aside, all right?

17   And received the payments from (indisc.) that she (indisc.)

18   that account is subject to due diligence many times, nobody

19   ever had a problem.  And there's no problem with it, none.

20   Despite that, the early fall, right, so we're talking June, she

21   leaves in May, June, husband gets arrested, early fall, I think

22   it's October but I want to be precise (indisc.) because facts

23   matter.  She gets a call from HSBC and says, you know, we heard

24   your husband was arrested and, you know, kind of we reserve the

25   right to not service anybody so we don't want your money, and

1   you've got two weeks to get it out.  That's the time it's going

2   to take me to liquidate the investments and you've got to go

3   open up a bank account or something and I'm going to wire you

4   the money, but (indisc.) she's in America, her husband's in

5   jail, she's got two girls to take care of.  She goes to look

6   for another place to put the money, to open up an account.  And

7   she's referred to a guy who works for Chase Investments named

8   Paul Arnold, he's at the local broach in Sugarland (indisc.)

9   and when she goes to see him -- folks, she's not a numbers

10  person, she's not a finance wiz.  When she goes to see Paul

11  Arnold, she takes with her an account statement from UBS.  And

12  she takes it with her so that she can show Paul Arnold how the

13  money is invested, what kind of the system was (indisc.) stocks

14  and bonds (indisc.) she doesn't (indisc.) and she took her

15  husband's name off.  She took her husband's name off that

16  account statement because he wasn't the primary accountholder

17  and because she didn't want to be prejudged and treated

18  unfairly because of who she was married to.  Now, that being

19  said, the facts are going to show that she never lied to the

20  bank.  They went -- she went in, she met with them.  And you're

21  going to have in front of you the actual account application

22  and the words on it are you currently married to a public

23  official or high ranking military officer.  You'll see it, all

24  right?  And the truthful answer to that in the fall of 2013 is

25  no, because he is not a public official or high ranking member

1    of the military.  And they asked her about her husband and she

2    said, "We're separated," which was also true.  She didn't know

3    if she would ever see him again.  And you'll hear that the

4    primary purpose of opening that account was that she could have

5    money for her kids to go to school and for her.

6           And what are the charges in this case that the

7    Government has brought?  Charges two counts of conspiracy.

8    Count One is a conspiracy to commit money laundering.  As the

9    Judge told you yesterday, that's a partnership in crime, all

10   right?  People get together and they pick a crime that they're

11   going to commit and then they go out and do it.  That's a

12   conspiracy, all right?  And here it's a conspiracy to commit

13   money laundering.  And the second count is conspiracy to commit

14   bank fraud.  We will prove to you that she neither agreed nor

15   participated in either of those ventures, if they existed.  And

16   no agreement plus no participation equals (indisc.)

17          You heard it this morning that Sylvia tried to

18   conceal her identity.  We will prove to you that she announced

19   it loud and clear, that she came to this country and filed an

20   asylum application saying, I am Sylvia Perez-Ceballos, I am

21   married to the former Secretary of Treasury of the State of

22   Tabasco, that the only account that she ever had and the only

23   account she ever opened was in her own name.  You're going to

24   hear I think from a lot of witnesses that the Government's

25   going to put on and we're going to talk all about Mr. Saiz-

1    Pineda and Mr. Medina-Sonda, and their activities.  Ask

2    yourselves what did Sylvia have to do with it?  Was Sylvia

3    there?  Did Sylvia sign the paperwork?  Was Sylvia part of the

4    conversation?  The answer to that question invariably is going

5    to be no.  As the Judge told you yesterday, I didn't have to

6    give an opening statement.  I gave this opening statement

7    because I want you all to know the facts.  We're not lying

8    behind the (indisc.)

9            **THE COURT:**  All right, why don't we take about a 15-

10   minute break and then we'll start with the evidence.

11           **THE MARSHAL:**  All rise for the jury.

12       **(Jurors exit at 9:40 a.m.)**

13           **THE COURT:**  All right, so you all are going to

14   discuss the credibility issue or the Human Rights finding --

15           **MR. MAGLIOLO:**  Your Honor, --

16           **THE COURT:**  (Indiscernible) by court or --

17           **MR. REYNAL:**  I will.  I just -- at this point, I

18   wanted to renew my objections to the prosecutor's opening

19   statement.  She referred to as I heard it, she said that they

20   had committed tax fraud, she said that they committed visa

21   fraud, she said that they violated a thousand and one by lying

22   to Federal agents.  Those are all unnoticed 404(b).  And this

23   late constructive amendment of the indictment robs my client of

24   her Fifth Amendment right to due process and being prepared, as

25   well as violating Rule 404(b).

1          **THE COURT:**  Okay, Ms. Hampton?

2          **MS. HAMPTON:**  Your Honor, those are not the

3    Government's statements.  The Government stated that part of

4    this was to hide access to avoid taxes in Mexico and the U.S.,

5    all of which are intrinsic to this offense.  They're not

6    404(b).  And, you know, we didn't say anything about a thousand

7    and one either.  We talked about her misstatements and lies to

8    law enforcement, to banking officials, which are also intrinsic

9    to this offense, your Honor.

10         **THE COURT:**  All right, overruled.

11         **MR. REYNAL:**  Thank you, your Honor.

12         **THE COURT:**  So anything else?  You all are going to

13   visit about the issue, right, on Ms. Cruz; is she testifying

14   today?

15         **MS. HAMPTON:**  Yes, your Honor.

16         **THE COURT:**  Okay, well, I wasn't sure because you

17   mentioned several people yesterday.  So if she's -- so you all

18   need to address that so I can make a ruling, correct?

19         **MR. MAGLIOLO:**  Your Honor, one brief issue I want to

20   ask them and perhaps before we start, we could cover it.  It's

21   just a fairly brief issue.

22         **THE COURT:**  Okay.

23         **MR. MAGLIOLO:**  But I want to make sure that we're in

24   accord before I brief the Court.

25         **THE COURT:**  Okay, go ahead.

1          (Mr. Magliolo/Mr. Speaker confer)

2          THE COURT:  Is there an issue?

3          MR. MAGLIOLO:  Your Honor, just a couple things just

4    for the Court to maybe be aware during the course of the trial.

5          THE COURT:  Okay.

6          MR. MAGLIOLO:  Counsel for the Government has said

7    they're bringing a lot of witness who appear to be by her

8    opening statement coconspirators and who may be getting on the

9    stand and testifying as to some criminal activity they were

10   involved in.  It's my understanding none of those people have

11   been charged in this case.  And we have not received any

12   information regarding to what promises the Government has made.

13   I just learned they have a proffer agreement, but I haven't

14   seen it.

15         MS. HAMPTON:  Your Honor, they're part of the

16   Government's exhibits.  They're exhibits and which has been

17   provided to the Defendant a couple of times.

18         MR. MAGLIOLO:  If it's there, then it's there.

19         MS. HAMPTON:  They're Exhibits Number 112 and 113,

20   there's two proffer agreements, one for Mr. Latour and one for

21   Mr. Gonzalez.  There are no other agreements for any other

22   witness, --

23         THE COURT:  Okay.

24         MS. HAMPTON:  -- including them.

25         MR. MAGLIOLO:  So -- and so I'm just making sure

1    there's no agreements with those folks who come up here and

2    testify about their criminal activity and related to the fact

3    that they've not been charged with any kind of criminal

4    activity.

5              Just as -- the other thing is that the Government has

6    been in contact with the Mexican authorities, and many of the

7    things that we have found out, we found out from Mexico.  And

8    the Government seems to be taking the position, well, we don't

9    know about these things.  For example, we weren't I don't

10   believe, and certainly she'll correct me if I'm wrong, that we

11   received any information about their witness yesterday and what

12   they have may talked about and learned that may affect her

13   credibility either before or after testifying.  Now, there --

14   we were some cross examination on it but the most ready --

15   readily available source on findings in Mexico about the

16   prosecution and what conduct they were engaged in would be the

17   Mexican government who the -- our government is in contact with

18   a lot more than we are.  So we haven't -- but we still haven't

19   received any of that from the United States.

20             **THE COURT:**  You haven't received what?

21             **MR. MAGLIOLO:**  Any -- let's -- for example, the

22   witness yesterday.  If there were findings by the Mexican Civil

23   Rights Commission about her truthfulness, that would be

24   something that perhaps would, if the Government knows about or

25   add -- would ask about, --

1          **THE COURT:**  So you're saying you all got that on your

2    own, the Government didn't turn that over.

3          **MR. MAGLIOLO:**  We got some of it on our own but we

4    don't know if we have all of that information.  The testimony

5    yesterday was there was I think no judicial finding.  We think

6    we have located a judicial finding.  But the person who had the

7    best or the access to any judicial finding would be the

8    government.  We don't know if they've asked and they've been

9    told there's not or they just haven't bothered to ask.

10          **THE COURT:**  Okay, have you talked to them about it?

11          **MS. HAMPTON:**  Your Honor, --

12          **THE COURT:**  Have you all visited about that issue?

13          **MS. HAMPTON:**  And I would like to state on the

14    record, this isn't a joint investigation between the United

15    States and Mexico.  There has been some cooperation.  We're --

16    we can't direct them to turn things over.  These are questions

17    that we've asked.  We have turned every single document over

18    that we've received from Mexico to the defense.  And we haven't

19    received some new documents from them, and there were several

20    that we didn't have.

21          **MR. MAGLIOLO:**  And I think the Court can see my

22    concern.  So the Government is saying they have asked if

23    there's any findings about the witnesses relating to their

24    credibility, and they've either been stonewalled on it or they

25    have been told no.  If that's their --

1          THE COURT:  And when you say "witnesses," I mean, --

2          MR. MAGLIOLO:  All right, well, there's --

3          THE COURT:  -- who are you talking about other

4    than --

5          MR. MAGLIOLO:  Let's talk this specific --

6          THE COURT:  Okay.

7          MR. MAGLIOLO:  -- witness yesterday.

8          THE COURT:  So that's what I heard the Government

9    say, they asked about that and they didn't get anything, at

10   least with that particular witness.  And then --

11         MS. HAMPTON:  We were -- we asked and we were told

12   that it was not true, that there wasn't a finding.  And the one

13   -- this was after we received the -- we didn't know about this

14   document until the defense turned it over.

15         MR. MAGLIOLO:  Well, that's --

16         MS. HAMPTON:  So this was after we received the

17   document from the defense.

18         MR. MAGLIOLO:  I'm not sure.  Perhaps this document,

19   this information was talked about to the Government at the

20   initial detention hearing, your Honor, so they would have known

21   about it.  And this is my -- kind of a little bit of my

22   problem.  If they knew about it then, then I think I -- "duty"

23   may be too strong a word, but they should ask the people, the

24   Mexican government, who they have access to which we don't and

25   who they're working with, hey, what's this about this -- is it

1    true that there have been findings about this witness being --

2    is it true that torture was used to obtain evidence?

3          **THE COURT:**  Okay, well, I'm hearing they asked and

4    they were just told that's not true.  Now, the issue is do they

5    have an obligation to look at that further, can they even ask

6    the government to -- Mexican government to produce anything --

7          **MR. MAGLIOLO:**  And, again, your Honor, if you ask the

8    person that's accused of it and that person says, well, that's

9    not true, that's certainly one area --

10         **THE COURT:**  Okay, but it sounds to me you haven't

11   even talked to the Government about what they did, the extent

12   of their efforts, because I'm getting it piecemeal.  Yes, the

13   Government's saying, yes, we asked them about that --

14         **MR. MAGLIOLO:**  Okay.

15         **THE COURT:**  -- and then you're asking something --

16         **MR. MAGLIOLO:**  Well --

17         **THE COURT:**  -- else and then she's going to have to

18   respond and, --

19         **MR. MAGLIOLO:**  Well --

20         **THE COURT:**  -- I mean, talk to them.  Have you and

21   they told you --

22         **MR. MAGLIOLO:**  Have you asked any finding other than

23   the people that are accused of the crime of torture about it,

24   are there any findings, were cases dismissed because of the

25   findings?  For example, your Honor, it's our understanding from

54

1    our sources, again, not as good as their sources, that our

2    Defendant's husband has been acquitted several times on these

3    exact charges that they're bringing against our client.  Well,

4    if that's true, then that's -- and we have some evidence of

5    that that we've gathered.  But, again, they would be -- have

6    the best source to whether --

7          **THE COURT:**  And so you're saying this, the United

8    States government, the attorneys here have not produced any of

9    that, you all got that on your own.

10         **MR. MAGLIOLO:**  Yes, your Honor.

11         **THE COURT:**  Okay.

12         **MR. MAGLIOLO:**  And I would think that would be

13   something that once they learned that we are saying that we

14   believe there's information that her husband has been acquitted

15   on several times, much as we said in our opening statement, the

16   same crimes that she's accused of, then it would be perhaps

17   their obligation to ask and see.  Those are court cases, court

18   hearings in Mexico --

19         **THE COURT:**  Okay, have you --

20         **MR. MAGLIOLO:**  -- by the government.

21         **THE COURT:**  -- even asked the Government?  I'm going

22   back to my question, have you sat down, visited with the

23   Government, what is it you all have done, we need X, Y, and Z;

24   have you all asked about these particular issues, have you done

25   that?

1          **MR. MAGLIOLO:**  Have you asked about those particular

2    issues?

3          **MS. HAMPTON:**  Do you want us to go outside, your

4    Honor?

5          **THE COURT:**  Well, I mean, I -- because every time you

6    answer it, then you go to something else.  I don't feel like I

7    should really be babysitting that at this point.  Sure, you all

8    have an issue but it sounds to me you all haven't even sat down

9    to discuss that together.

10          **MR. MAGLIOLO:**  The -- every time I've asked for

11    anything, it's been no.

12          **THE COURT:**  Every time you've asked what?

13          **MR. MAGLIOLO:**  Asked about anything *Brady*, *Giglio*,

14    anything like that, it's been no.  And I would say this is --

15          **THE COURT:**  But here's -- you have some specific

16    questions right now.  Have you asked those specific questions?

17    Not general *Giglio*, general *Brady*.  You're talking about some

18    specific issues.

19          **MR. MAGLIOLO:**  I'm not sure if I have, your Honor.

20          **THE COURT:**  Okay, well, in all fairness, you all

21    should confer, correct?

22          **MR. MUSCHENHEIM:**  Your Honor, just to point out too

23    that we don't have a *Brady* obligation for the country of

24    Mexico.  That's not within our scope, that's not our

25    government --

1          **MS. HAMPTON:**  We don't have (indisc.)

2          **THE COURT:**  Well, there's --

3          **MR. MAGLIOLO:**  I completely disagree.

4          **THE COURT:**  -- some fairness issues here that

5     underlie a prosecution.

6          **MR. MAGLIOLO:**  And that's the answer I've been

7     getting, your Honor.

8          **THE COURT:**  Yeah, that --

9          **MR. MAGLIOLO:**  If that --

10         **THE COURT:**  -- but that's not acceptable.

11         **MR. MUSCHENHEIM:**  No, we're not trying to hide

12    anything.  But if counsel --

13         **THE COURT:**  I'm --

14         **MR. MUSCHENHEIM:**  -- had asked us a month ago, would

15    you reach out to Tabasco and try to find this case for me, I'm

16    having trouble, that never occurred.

17         **THE COURT:**  Well, --

18         **MR. MUSCHENHEIM:**  They announced ready.

19         **MR. MAGLIOLO:**  And, again, I don't think it's --

20    that's actually my obligation.  I think once they're on notice

21    that there are court cases in Mexico, the people that they

22    were --

23         **THE COURT:**  It sounds to me that you all haven't

24    conferred.  And when you all haven't conferred, it's kind of a

25    waste of the Court's time.  So you all can confer about it, and

1    if you are having issues with the Government, I will be happy

2    to hear you out.  But I just -- until you all confer, I mean,

3    there's rules on conferring all the time.

4          **MR. MAGLIOLO:**  Yes, your Honor.

5          **THE COURT:**  And until you -- and there's a reason for

6    that, --

7          **MR. MAGLIOLO:**  Yes, your Honor.

8          **THE COURT:**  -- because it's a waste of the Court's

9    time.

10         **MR. MAGLIOLO:**  I will ask specific questions on our

11   break, your Honor.

12         **THE COURT:**  Okay.  And then if this witness -- who's

13   going to be your first witness?

14         **MS. HAMPTON:**  Sonia Fernandez.

15         **THE COURT:**  Okay, so you all --

16         **MR. MUSCHENHEIM:**  It's not that --

17         **THE COURT:**  -- need to address the --

18         **MR. MUSCHENHEIM:**  It's not that issue.

19         **THE COURT:**  -- Cruz issue also.

20         **MR. SPEAKER:**  All rise.

21       **(Recess taken from 9:52 a.m. to 10:04 a.m.)**

22       **(Outside the presence of the jury)**

23         **MR. MUSCHENHEIM:**  Sorry, your Honor.

24         **THE COURT:**  All right, I think the jury's ready, is

25   that right, Adrian?

1           CSO PEREZ:  Yes, your Honor.

2           THE COURT:  I had given them a 15-minute break.  I

3  did ask Mr. Magliolo if you all had conferred and he said you

4  all had conferred but maybe not successful, so where are we on

5  that?  Just real quickly because the jury's ready to come in

6  and this --

7           MR. MUSCHENHEIM:  This doesn't affect the next two

8  witnesses so if you want to take it up later, --

9           THE COURT:  Okay.  We're ready then to bring the jury

10 in.  Let's make sure our first witness is in the courtroom and

11 ready to go.

12          MR. MUSCHENHEIM:  Sonia Hernandez.

13          THE COURT:  And she can just wait behind the bar

14 there.

15          THE MARSHAL:  We're bringing in the jury, just wait

16 right here.

17          THE COURT:  Okay, she can wait right there.  We're

18 ready to bring the jury in.

19     (Pause)

20          THE MARSHAL:  All rise for the jury.

21     (Jurors enter at 10:05 a.m.)

22          THE COURT:  You can have a seat, and the Government

23 will present its first witness.

24          MS. HAMPTON:  Your Honor, we call Sonia Fernandez.

25          THE COURT:  Good afternoon -- or morning, I guess.

1    Would you raise your right hand?

2              **SONIA FERNANDEZ, GOVERNMENT'S WITNESS, SWORN**

3              **THE COURT:**  Okay, you can have a seat right there.

4              **THE INTERPRETER:**  Your Honor, may we inquire if she

5    needs the services of an interpreter?

6              **THE COURT:**  Does the witness need an --

7              **MS. HAMPTON:**  No.  May I proceed, your Honor?

8              **THE COURT:**  Yes.

9                        **DIRECT EXAMINATION**

10   **BY MS. HAMPTON:**

11   Q    Will you introduce yourself to the ladies and gentlemen of

12   the jury, please?

13   A    Hi, good morning, my name is Sonia Fernandez.

14   Q    How are you employed?

15   A    I work at UBS Financial Services, Miami.

16   Q    And can you tell us about your employment history before

17   you worked at UBS?

18   A    Sure.  I started my career at DLJ which got bought out by

19   Credit Suisse First Boston.  From there I went to Morgan

20   Stanley for a year.  And I was at HSBC for nine years.  And

21   about five years ago I moved to UBS.

22   Q    What licenses do you currently hold?

23   A    My 63, 65, insurance, 31, I think that's it.

24   Q    And can you just tell us a little bit about your

25   educational background also?

1   A    Sure.  Born and raised in Miami, went to Our Lady of

2   Lourdes Academy in Miami, went to Florida International

3   University, and then went through the training program at

4   Morgan Stanley.

5   Q    Do you know a person by the name of Sylvia Beatriz Perez-

6   Ceballos?

7   A    Yes, I do.

8   Q    How do you know that person?

9   A    She was a client at HSBC who later transferred to UBS.

10  Q    Do you remember approximately what year she became a

11  client with you at HSBC?

12  A    I can't recall exactly the date but I want to say it has

13  to be around 2010.

14  Q    Okay.  Do you see Ms. Perez-Ceballos in the courtroom

15  today?

16  A    Yes.

17  Q    Can you point to her and tell us what she's wearing?

18  A    A dress and a black sweater.

19        **MS. HAMPTON:**  Your Honor, may the record reflect the

20  witness has identified the Defendant?

21        **THE COURT:**  The record will so reflect.

22  **BY MS. HAMPTON:**

23  Q    Tell us about how you first met Ms. Perez-Ceballos.

24  A    So she and her husband and their daughters came to our

25  offices at HSBC and we briefly met and we got a conversation

Fernandez - Direct / By Ms. Hampton                    61

1    started to open an account.

2    Q    In what location was that HSBC branch at?

3    A    Miracle Mile in Coral Gables, 55 Miracle Mile.

4    Q    And it's in Miami?

5    A    In Miami.

6    Q    Okay.  So it was her, her husband; do you remember his

7    name?

8    A    Jose Manuel Saiz --

9    Q    Pineda?

10   A    -- Pineda.

11   Q    Okay, and their two children.  What was the purpose of the

12   meeting?

13   A    To establish a relationship.  They had already been

14   existing clients of HSBC Mexico and it was a customary process

15   to refer business if they wanted to open accounts in the U.S.

16   And that was what the meeting was about.

17   Q    Why did they tell you -- or did you speak specifically to

18   Ms. Perez-Ceballos and Mr. Saiz-Pineda?

19   A    To both.

20   Q    Okay.  Why did they tell you they wanted to open an

21   account in the U.S.?

22   A    Just regular savings; very customary for foreign nationals

23   to establish relationships in the U.S. for retirement, for

24   school.

25   Q    Did they mention anything about for security purposes?

Fernandez - Direct / By Ms. Hampton                    62

1   A     For security?

2   Q     When they were -- when you asked why they wanted to open

3   an account?

4   A     I can't recall.

5   Q     Okay.  Where were they living at the time they established

6   the account with HSBC?

7   A     In Tabasco.

8   Q     Did they tell you what the source of funds was going to be

9   that entered this account?

10  A     Sure.

11  Q     What was that source supposed to be?

12  A     Savings.

13  Q     Who told you that?

14  A     He, I guess.

15  Q     What were there --

16          MR. MAGLIOLO:  I'm sorry, I missed that answer, your

17  Honor.

18          THE COURT:  Can you repeat --

19          THE WITNESS:  The gentleman, the gentleman.

20  BY MS. HAMPTON:

21  Q     MR. Saiz-Pineda told you that?

22  A     Yes.

23  Q     Savings.

24  A     Savings.

25  Q     And do you know what they were -- what their employment

Fernandez - Direct / By Ms. Hampton                          63

1   was at the time?

2   A    He was a CPA, certified public accountant, for 20 odd

3   years and he also held a public official position in the state

4   where he was from.

5   Q    Okay.

6   A    Tabasco.

7   Q    And Ms. Perez-Ceballos, was she employed?

8   A    She was a clinical psychologist.  I'm not sure if she was

9   fulltime employed but she was a clinical psychologist.

10  Q    Did Mr. Saiz-Pineda mention whether he was still working

11  as an accountant while he was in public office?

12  A    Yes.

13  Q    So you got the impression that he was still conducting

14  accounting business while in public office.

15  A    Correct.

16  Q    Okay, and that that was part of the income that would be -

17  - or the money --

18  A    Yes.

19  Q    -- that would be in the account.

20  A    Correct.

21  Q    Okay.  Did you discuss politically exposed person status

22  with Mr. Saiz-Pineda and Ms. Perez-Ceballos?

23  A    Yes.

24  Q    What is "politically exposed persons?"

25  A    That they have some type of affiliation with the

Fernandez - Direct / By Ms. Hampton                64

1    government, some type of function or position.  At that time, I

2    think he was the Secretary of Finance of the state and so that

3    was fully disclosed obviously and discussed.

4    Q    Who is obligated to disclose -- who is a PEP?  Can you

5    describe like who is that?

6    A    The actual PEP is the person who holds office in the

7    government and -- but they -- we do have to qualify immediate

8    family as well as being associated with that politically

9    exposed person.

10   Q    And how long does a politically exposed person or PEP

11   status last?

12   A    Always.  Once a PEP, always a PEP, at least for banking

13   institutions.

14   Q    Okay, for all banking institutions, to your knowledge.

15   A    Pretty much.

16   Q    Once a PEP, always a PEP.

17   A    Yes.

18   Q    So after they leave office, are they still a PEP?

19   A    Yes.

20   Q    Are their family members still a PEP?

21   A    Yes.

22   Q    Okay.  Is there a specific question that's asked in the

23   account opening process about whether the funds involved in the

24   account are from the sale of a business?

25   A    Yes.

Fernandez - Direct / By Ms. Hampton                 65

1   Q    And was that asked of Ms. Perez-Ceballos in this case?

2   A    I'm sure as part of the account documentation.

3   Q    Okay, and do -- what was the response, whether this

4   account was from the sale of a business?

5   A    I believe it was no.

6   Q    When you were opening the account, who was first on the

7   account; was it just -- was both of them or was just one of

8   them?

9   A    I believe it was her and then we added him.

10  Q    Okay, so she was first bringing money --

11  A    Owner.

12  Q    I'm sorry, by herself on the account.

13  A    Right.

14  Q    How long was it until Mr. Saiz-Pineda was added to the

15  account?

16  A    I can't tell you, I really don't --

17  Q    Was it more than a few years or was it pretty short?

18  A    No, it wasn't more -- yeah, it was pretty short.

19  Q    Okay.  When Mr. Saiz-Pineda was added to the account, was

20  there customer due diligence that had to be done with his

21  addition?

22  A    Certainly.

23  Q    What does that involve?

24  A    Well, we have a compliance division that pretty much does

25  all the check and balances for every new account owner.  And I

1    guess they go through a series of I don't know what type of

2    systems like aside from Google searches and everything else

3    that they use, but it's pretty extensive.

4    Q    Okay, and is that part of the Bank Security Act (phonetic)

5    anti-money laundering regulations in place for banking

6    officials?

7    A    Sure.

8    Q    Okay.  What was uncovered regarding Mr. Saiz-Pineda during

9    his customer due diligence information?

10   A    There was some type of newspaper article published in

11   Mexico that mentioned that he was involved in some kind of

12   money laundering case and was found with some (speaks Spanish)

13   what do you -- briefcases with some cash in some jet, or

14   something like that, I recall.

15   Q    Do you remember the year?  It was before --

16   A    When we found it?

17   Q    Yes.

18   A    Must have been at the time of account opening, so I want

19   to say like 2010.

20   Q    Okay, and this had occurred previous --

21   A    Yes.

22   Q    -- to 2010.

23   A    Yes.

24   Q    Okay.  Did you have to address this as far as your

25   customer due diligence search with Mr. Saiz-Pineda?

Fernandez - Direct / By Ms. Hampton                67

1   A     We did.

2   Q     How did you address it?

3   A     So we had the conversation, listen, this came up in the

4   newspapers in our findings.  What's your relationship?  Do you

5   have -- you know, what would you have to say to this article?

6   That was basically how the conversation --

7   Q     And just in hindsight, do you remember the parties that

8   were involved in this news article?

9   A     I don't.

10  Q     It was more than just Mr. Saiz-Pineda, correct?

11  A     Yes.

12  Q     Okay.  You just don't remember the names.

13  A     I don't.

14  Q     Okay, and so what was Mr. Saiz-Pineda's response when you

15  asked him about this due diligence search?

16  A     That it was basically the opposing political party that,

17  you know, writes whatever they want and publishes whatever they

18  want to slander like the current political party.  He had no

19  affiliation, that he no longer had anything to do with these

20  people, that he knows of these people but he didn't have

21  anything to do with them.

22  Q     Okay, so he told you that he no longer has anything to do

23  with the people associated with that --

24  A     Article.

25  Q     -- money seizure.

Fernandez - Direct / By Ms. Hampton                    68

1   A    Right.

2   Q    Correct?

3   A    With the article, yeah.

4   Q    Okay.

5   A    Whoever was mentioned.

6   Q    Okay.  If the bank had found out that he did in fact have

7   continued associations with the people associated in that

8   article or named in that article, would that have posed a

9   problem for the bank?

10  A    I would think so.

11  Q    If the bank had discovered that Mr. Saiz-Pineda in fact

12  had U.S. business relationships with one of the people named in

13  that article, would that have been a red flag for the bank?

14  A    Sure.

15        **MR. REYNAL:**  Your Honor, assumes facts in [sic]

16  evidence and calls for speculation.

17        **THE COURT:**  Overruled.

18  **BY MS. HAMPTON:**

19  Q    You can answer the question.

20  A    I'm sorry, can you repeat the question?

21  Q    Sure.  Would it have caused red flags for the bank if the

22  bank had found that Mr. Saiz-Pineda had U.S. business

23  relationships with one of the people named in that article?

24  A    I believe so.

25  Q    Would it have possibly stopped the opening of the account

1   relating to Mr. Saiz-Pineda regarding his HSBC involvement?

2   A     Probably.

3   Q     Okay.  Could that -- if it were found to be true that

4   Mr. Saiz-Pineda continued business relationships with the

5   person named in that article, could that have potentially put

6   the bank, HSBC, at risk of civil liability?

7   A     I would think so.

8   Q     And in fact -- well, you work for UBS now, correct?

9   A     Correct.

10  Q     UBS has a lawyer that they've hired to represent the bank

11  that's present with you today, correct?

12  A     Yes.

13  Q     He's in the courtroom.

14  A     Yes.

15  Q     He's not your personal lawyer, he's the bank's lawyer; is

16  that correct?

17  A     Correct.

18  Q     Okay.  So how would you describe Ms. Perez-Ceballos's

19  demeanor during your first meeting with her?

20  A     Very kind, open, regular conversation, you know, trying to

21  get to know one another.  That's kind of what we do.  We ask a

22  lot of questions.  You know, we try to build that relationship.

23  So a very nice woman.

24  Q     Was she involved in the discussions that you were having?

25  A     She was, sure.

1  Q    Was she attentive in the discussions you were having?

2  A    Yes.

3  Q    Okay, and these discussions were about the financial

4  accounts, correct?

5  A    Sure.

6  Q    What type of discussions were you having with Ms. Perez-

7  Ceballos and Mr. Saiz-Pineda?

8  A    Well, just regular account documentation, going through

9  the protocol that -- like the different questions.  It's kind

10  of a questionnaire and you kind of get to know a little bit

11  more about their funds, where they're coming from, --

12  Q    Okay.

13  A    -- what they do for a living.

14  Q    And she was involved in those discussions?

15  A    Yes.

16  Q    When you were at HSBC and you first met Ms. Perez-Ceballos

17  and Mr. Saiz-Pineda, what was your position?

18  A    I was a financial advisor, vice president of HSBC

19  Securities.

20  Q    Okay, and that -- you didn't list -- I don't think you

21  listed a series seven license.  Did you have a series --

22  A    Oh, yes.

23  Q    Okay, you have -- and you currently do, too.

24  A    Yes.

25  Q    So you're talking about investments-type information with

Fernandez - Direct / By Ms. Hampton                     71

1   Ms. Perez-Ceballos and Mr. Saiz-Pineda?

2   A    Yes.

3   Q    Okay.  So after your first meeting with them, you open the

4   account for first Ms. Perez-Ceballos and then add Mr. Saiz-

5   Pineda.  Was there a time that you visited them or Mr. Saiz-

6   Pineda specifically in Mexico?

7   A    I did.

8   Q    About when did that happen?

9   A    Maybe 2011 or end of 2010.  I can't recall the exact date.

10  Q    Okay.

11  A    But I did go to Tabasco.

12  Q    What was the purpose of that meeting?

13  A    Building relationships.  It was very customary for us to

14  go in country and get to know the family, the business, discuss

15  the portfolio, and see where it is that they want to take this

16  account.  You know, just build that relationship.

17  Q    Where did you meet Mr. Saiz-Pineda in Tabasco?

18  A    I believe it was his parents' house, home.

19  Q    Okay.  Did you have -- were you required by the bank to

20  meet with Ms. Perez-Ceballos also or just Mr. Saiz-Pineda?

21  A    No, because we had already met her previously so either

22  one was fine.

23  Q    Okay, you said you met him at his mother's residence.

24  A    I believe it was his mother's residence.

25  Q    Do you remember anything in particular about the

1    residence; can you describe it?

2    A    I really can't.  I remember there being like a separate

3    room which is kind of like a home office where he had a

4    computer and a big desk and that's where our meeting took

5    place.  A lady brought us coffee.

6    Q    Was it -- can you describe the exterior of the residence;

7    was it a modest house, was it a large house?

8    A    Yeah, I would say a normal house, nothing extravagant but

9    nothing humble either.  It wasn't a shack but it was, you know,

10   a very nice house.

11   Q    Thank you.  And so when you met with Mr. Saiz-Pineda at

12   his parents' residence, what discussions took place?

13   A    Pretty much the detail about ask a location, what types of

14   investments we offered at HSBC at the time, what could be a

15   good fit, you know, according to his risk profile, basic

16   things.

17   Q    Okay.  What was Sylvia's involvement in this account after

18   you had your first meetings with them?

19   A    She was not too involved.

20   Q    What was her involvement in the account?

21   A    Spending.

22   Q    And that was consistent, her involvement was consistently

23   the spending part of the account.

24   A    That was more towards the latter part of the relationship.

25   At the beginning, it was just savings, they didn't really use

Fernandez - Direct / By Ms. Hampton          73

1    much of the cash.  Then it got a little bit -- the usage just

2    grew a little bit more.

3    Q    Okay.  When you needed to speak with Mr. Saiz-Pineda, who

4    did you contact?

5    A    Usually his assistant.

6    Q    Who was that?

7    A    Marlis.

8    Q    Do you remember her last name?

9    A    Cupil, I want to say.

10   Q    Marlis Cupil?

11   A    Uh-huh.

12   Q    Where was she -- where did she -- was she in the U.S. or

13   was she in Tabasco?

14   A    She was in Tabasco.

15   Q    Okay.  Why did you have to talk to her when you needed to

16   talk to Mr. Saiz-Pineda?

17   A    She was kind of like his right-hand person, so every time

18   you would call his office, she would answer.  She -- he kid of

19   filtered like the calls.  He was a very busy gentleman,

20   constantly in meetings, so -- and that's kind of normal for

21   Mexican (indisc.)

22   Q    Which office would you call of Mr. Saiz-Pineda's?

23   A    His office.

24   Q    Was it his government office or was it a private business

25   office?

Fernandez - Direct / By Ms. Hampton                              74

1   A     I think it was his -- it was a private.

2   Q     While you were in Tabasco, did you have the opportunity to

3   visit his private business?

4   A     Not the office per se, no.

5   Q     Did he --

6   A     Just his home.

7   Q     Okay, did he -- his parents' home or his home?

8   A     His parents' home.

9   Q     Okay, did you visit his home?

10  A     No.

11  Q     Did you visit his home?

12  A     No.

13  Q     Okay.  Did you have the opportunity to maybe ask Mr. Saiz-

14  Pineda about his private business and how many employees he

15  had?

16  A     We did.  I believe he said four.

17  Q     Did he tell you the name of his private business?

18  A     I think it was in his personal name.

19        **(Pause)**

20  Q     What was the most amount of money that you remember being

21  involved in the or included in the HSBC account with both

22  Mr. Saiz-Pineda and Ms. Perez-Ceballos?

23  A     Probably about $2 million.

24  Q     Did that account ever reach $4 million?

25  A     Not during my time.

Fernandez - Direct / By Ms. Hampton                    75

1  Q    Did that account -- which was you said between about 2010

2  or '09 until what was your -- when was the end of your time at

3  HSBC?

4  A    Two thousand twelve.

5  Q    And so between that time, that account never was more than

6  about $2 million?

7  A    Right.

8  Q    Right, okay.  Did it ever reach $56 million that you know

9  of?

10  A    (No audible response)

11  Q    Okay.  Was it pretty consistent with the amount of money

12  that was in there, or was there a lot of withdrawals, there was

13  a lot of additions?

14  A    No, very (indisc.) account, same name transfers, never

15  anything strange.

16  Q    They pretty -- they keep it pretty consistent as far as

17  the amount that was in it.

18  A    Oh, yes.

19  Q    Okay.  Did they routinely add money to the account and

20  withdraw money or was it steady?

21  A    Occasionally, yes.

22  Q    Okay, but not on a normal basis?

23  A    Not on a normal basis.

24  Q    Okay.  Do you know about any of the -- any U.S. residences

25  of Ms. Perez-Ceballos or Mr. Saiz-Pineda?

Fernandez - Direct / By Ms. Hampton                    76

1    A     I do not.

2    Q     You are in Miami, right?

3    A     I am.

4    Q     Did either one of them ever tell you that they had houses

5    in Miami?

6    A     No.

7    Q     Did they ever give you an address, a mailing address in

8    Miami?

9    A     No.

10   Q     Where did they live, according to what they told you

11   during the time that you were at HSBC?

12   A     In Tabasco.

13   Q     Okay.  And you said it was about one to one and a half

14   years you were at HSBC with them; is that right?

15   A     When they were clients, yes.

16   Q     Okay, let's go to some of the -- well, your Honor, at this

17   point the Government would move to offer Exhibits 7, 8, 9, and

18   10 which are -- sorry, and 17, which are all of the related

19   HSBC accounts that this witness has information regarding as

20   relevant.

21          **MR. REYNAL:**  I don't have --

22          **THE COURT:**  You don't have those --

23          **MR. REYNAL:**  -- I understood that Ms. Hampton was

24   offering these exhibits.  I don't have them to look at.

25          **THE COURT:**  Okay, do you have a copy of them?

Fernandez - Direct / By Ms. Hampton          77

1          **MS. HAMPTON:**  I've given them an electronic copy.  I

2  have an electronic copy as well, your Honor.  They have an

3  electronic copy of it.

4          **MR. REYNAL:**  I've (indisc.)

5      **(Judge/Clerk confer)**

6      **(Ms. Hampton/Mr. Reynal confer)**

7      **(Pause)**

8          **MR. REYNAL:**  No objection, your Honor.

9          **THE COURT:**  No objection to that 7, 8, 9, 10, and 17,

10  then those are admitted.

11      **(Government's Exhibits Numbers 7, 8, 9, 10, and 17 were**

12  **received in evidence)**

13  BY MS. HAMPTON:

14  Q    Let's go to Exhibit Number 7, the account application,

15  account profile, yeah.  So, Ms. Fernandez, this is Exhibit

16  Number 7, and it's page number 87000014; do you recognize this

17  document?

18  A    I do.

19          **MS. HAMPTON:**  Can you go back to the top, please?

20  Q    What is this document?

21          **MS. HAMPTON:**  Or shrink it.

22  A    This is like a signature page for the checking account

23  basically, for the -- what they called the master deposit

24  agreement.  And it included like a W-8 within the account.

25  Q    Okay, and what -- this is the account that was opened by

1   Ms. Perez-Ceballos first, correct?

2   A    I believe so.

3   Q    Okay, on the bottom, what is it dated?  If we need to zoom

4   in, we can.

5   A    Two thousand nine.

6   Q    Okay, so it was -- I think it says December, is that

7   December or October?

8   A    October 13th, yeah.

9   Q    Okay, so 2009 is when Ms. Perez-Ceballos first comes to

10  the U.S. with her HSBC Mexico account to open the account,

11  correct?

12  A    I'm guessing.  She may not have come to the States because

13  we have like an international referring program that they refer

14  the business so the client didn't really have to be present.

15  Q    Okay, and I misstated.  When she first brought her HSBC

16  Mexico account, transferred it to the U.S. HSBC account; is

17  that correct?

18  A    Possible.

19  Q    Okay.

20       **MR. MAGLIOLO:**  I'm sorry, I didn't hear the answer.

21  A    Possible.

22       **MR. MAGLIOLO:**  Possible.

23  A    Well, let's clarify.  So I work for the securities

24  division, which is the broker dealer, and this is a bank

25  document.  I'm very familiar with it because I worked on the

Fernandez - Direct / By Ms. Hampton                    79

1    banking side before but --

2    Q    Was she referred to you from the banking department?

3    A    Yes.

4    Q    Okay, and this was -- would it have been around the same

5    timeframe --

6    A    Yes.

7    Q    -- that she came to the banking department?

8    A    Yes.

9    Q    Okay, great.

10   Q    Let's go to Exhibit Number 8, Application.  Okay.  Can you

11   tell us what this is?

12   A    That's the same one maybe for a savings account.

13   Q    And this has got the same date; is that correct?

14   A    Yes.

15   Q    Okay.

16        **MS. HAMPTON:**  Can you go back to 8 --

17        **MS. SPEAKER:**  Sure.

18        **MS. HAMPTON:**  -- Exhibit 8 and then the file under

19   Perez-Ceballos Saiz-Pineda 003028.

20   **BY MS. HAMPTON:**

21   Q    Whose name at this point are on -- is on this exhibit,

22   Exhibit 8?

23   A    Silvia and Jose Manuel.

24   Q    And what is the address that they gave you?

25   A    Calle Sanchez Magallanes.

Fernandez - Direct / By Ms. Hampton                    80

1    Q    1113, correct?

2    A    1113 Piso Uno Centro Villa Hermosa.

3    Q    So at this time, Exhibit Number 8 is where Ms. Perez-

4    Ceballos brings in Mr. Saiz-Pineda to the HSBC account,

5    correct?

6    A    Correct.

7    Q    And this was dated -- this account statement is dated

8    when?

9    A    September the 6th, opened through September 22nd, 2010.

10   Q    So she comes to HSBC in the U.S. in '09 and she adds her

11   husband in about 2010; is that correct?

12   A    It looks like it.

13   Q    Okay.

14        **THE COURT:**  You need to speak up a little bit.

15        **THE WITNESS:**  Oh, sorry.

16        **MS. HAMPTON:**  Do you have the application? Below this

17   page, please.  Next.

18   A    Okay.  So on this page it's under the application, Page

19   Number -- I can't see it -- E8 ending in 000002.  This is

20   stating an address for Jose Manuel Saiz at the same address is

21   Calle Magallanes; is that correct?

22   A    Correct.

23   Q    And what is it dated?

24   A    August 13th, 2011.

25   Q    And who signed this?

1    A    I'm guessing Jose Manuel Saiz.

2    Q    Okay.  Exhibit Number 9.  This is the savings account of

3    Ms. Perez-Ceballos; is that correct, from 2009?

4    A    I believe it's the checking account.

5    Q    Oh, checking account -- excuse me.

6    A    Yeah.

7    Q    Okay.

8         **MS. HAMPTON:**  And Exhibit Number 10.  Go to the

9    application, please.

10   Q    Okay.  So what is this document?

11   A    That's the new account application for the HSBC Securities

12   account.

13   Q    Okay.  And this application is dated, I think, at the top

14   right-hand corner.

15   A    8/26/2010, yes.

16   Q    Thank you.  And who is the primary applicant?

17   A    Silvia.

18   Q    And who is the co-applicant?

19   A    Jose.

20   Q    And what address do they both give as far as their mailing

21   address?

22   A    Calle Sanchez Magallanes -- same address, 1113 Piso Uno

23   Centro Villa Hermosa, Tabasco.

24   Q    Okay.

25        **MS. HAMPTON:**  Go down, please.  Okay, stop.

Fernandez - Direct / By Ms. Hampton                    82

1  Q    What does Ms. Perez-Ceballos tell you as far as her

2  current employer?

3  A    That she's self-employed.

4  Q    And she lists an address on Colonia Villa Hermosa,

5  correct?

6  A    Right, uh-huh.

7  Q    And Mr. Saiz-Pineda tells you what is his current

8  employer?

9  A    The State of Tabasco.

10 Q    And then the next line says in the application, "Is the

11 applicant or co-applicant a public official" --

12       **MS. HAMPTON:**  You can point it over here.

13 Q    -- "connected or associated with a public official

14 including immediate family, aides, advisors, business

15 associates, et cetera?"  It's checked "No."  Was that a typo?

16 A    It should -- yes.

17 Q    Was the handwritten one actually checked "Yes"?

18 A    Yes.

19 Q    Okay.

20       **MS. HAMPTON:**  Could you go down, please?  Okay, stop.

21 Q    Source of funds, what do they tell you their source of

22 funds were?

23 A    Accumulated savings.

24 Q    Right here.

25 A    Savings and employment.

EXCEPTIONAL REPORTING SERVICES, INC

1  Q    Accumulated savings and savings and employment, correct?

2  A    Correct.

3  Q    Is it separated here by persons like on the left?

4  A    Usually.

5  Q    So on the left is that what Ms. Perez-Ceballos told you?

6  A    Right.

7  Q    And then on the right, "Savings and employment" is what

8  Mr. Saiz-Pineda told you?

9  A    Right or joint.

10  Q    Okay.  And what did they tell you their annual income is

11  on this page for Ms. Perez-Ceballos, the primary applicant?

12  A    A hundred and eighty thousand, I think.

13  Q    Is that in U.S. dollars?

14  A    Yes.

15  Q    Okay.  And then Mr. Saiz-Pineda, what did he tell you?

16  A    Two hundred and fifty thousand.

17  Q    And they said the same things as far as source of wealth

18  under that area, correct --

19  A    Right.

20  Q    -- accumulated savings and accumulated savings and works

21  for the government, correct?

22  A    Right.

23       **MS. HAMPTON:**  Okay, go down.  For the record, that is

24  Page Number -- the Bates Stamp E10000006.

25  Q    Right here, there's an estimated net worth for Ms. Perez-

1    Ceballos and Mr. Saiz-Pineda.  What did Ms. Perez-Ceballos say

2    to you that her estimated net worth was?

3    A    Thirty million.

4    Q    And what did Mr. Saiz-Pineda tell you?

5    A    Well, that's joint.

6    Q    Okay.  Joint -- so it says $1 here on the side of

7    Mr. Saiz --

8    A    That was quite customary but really when you're talking

9    about the net worth, it's the joint.

10   Q    Okay.

11            **MS. HAMPTON:**  Let's go down.

12   Q    Now, this is the handwritten form that was typed up.  It's

13   what we saw earlier, correct?

14   A    Correct.

15   Q    And here the PEP question is checked "Yes"; is that

16   correct?

17   A    Correct.

18   Q    All right.  And then it's explained here why that's "Yes,"

19   which is Mr. Saiz-Pineda's employment, correct?

20   A    Correct.

21   Q    Okay.  When you discuss transactions or account opening

22   issues with clients, do you make notations of that in your

23   file, like call memos or anything like that?

24   A    Sure.

25   Q    What is it called?  Did I get it right?  Is it called

Fernandez - Direct / By Ms. Hampton                    85

1    something else?

2    A     Call report.

3    Q     A call report?  Okay, thank you.  Did you do that

4    regarding your conversation that we spoke about already

5    regarding Mr. Saiz-Pineda?

6    A     I did.

7    Q     And this part of Exhibit Number 10 -- is this 10?  This is

8    Page -- Bates number but it's Page E10000029.  What is this

9    page?

10   A     Oh, this is my call report.

11   Q     Okay.  So do you make this call report at the time you

12   have the conversation with the person?

13   A     Yes.

14   Q     And on this particular occasion, did you type this up at

15   the time you were -- you talked to Mr. Saiz-Pineda?

16   A     Yes.

17   Q     You don't wait weeks later.  You do it at the time so it's

18   accurate?

19   A     No.  Maybe a day but usually right away.

20   Q     Okay.  And so up here, it says, "August 25th, 2010."

21   That's the date you had the phone call or the day you typed it?

22   A     I'm guessing it was the day I typed it and the day I had

23   the conversation.

24   Q     Okay.  Can you read it to us?

25   A     "I questioned the articles on Google which accused him of

Fernandez - Direct / By Ms. Hampton                    86

1     being involved with 8 million pesos being transported

2     in a jet to and from the Yucatan, et cetera.  He said

3     he had no legal involvement with the people mentioned

4     in this accusation and it was slander from the

5     opposing political party.  He confirmed that he has

6     his independent private practice as a public

7     accountant for 20 years since 1990 in which he

8     provides tax and financial consulting to a book of

9     clients which he has built over the years.  He

10    currently has pending projects, as he calls them,

11    which he would be receiving funds from but this is

12    completely separate from the salary he receives as a

13    public official of Tabasco.  Since he will only be in

14    office for a six-year term, he has not completely

15    given up his book of business, contact with clients

16    so that he can return to a full-time practice once

17    his term is finalized.  His clients consist of high

18    net-worth individuals, corporations and real estate

19    transactions.  He charges by the hour billable time

20    for his expertise in accounting and fiscal policy and

21    also a percentage when involved in tax (indisc.) or

22    real estate transaction.  He also mentioned that all

23    transfers received are from HSBC Mexico and not from

24    different parties and sources and in order to stay

25    within Mexican fiscal policy, this will maintain as

Fernandez - Direct / By Ms. Hampton                    87

1              such for any future transactions.  His intention is

2              to build a nest egg outside of Mexico for him and his

3              family that he can rely on for more safety and

4              confidentiality.  He's been a client of HSBC Mexico

5              and personally known to the Premier Relationship

6              manager in HSBC Mexico since 1998."

7    Q    Would it be a problem for the bank if Mr. Saiz-Pineda had

8    during this time in 2010 told the Mexican government that he

9    wasn't operating his accounting firm?

10   A    I think so.

11   Q    He told you he is operating his accounting firm outside

12   his government employment, correct?

13   A    Right.

14   Q    And would it be something that the bank would be

15   interested in knowing maybe on your customer due diligence

16   search that he wasn't operating that firm and that wasn't part

17   of supposedly his income that he was telling the Mexican

18   government?

19   A    Sure.  I mean, the more you know, the better.

20   Q    Okay.  Exhibit Number 17.  Application.  This application

21   is dated what date?

22   A    July 12th, 2011.

23   Q    Okay.  What's the difference with this application and the

24   2010 application?

25   A    Perhaps an extension or a subsidiary account.  It has a

1    different account number at the top.  If you notice, it starts

2    with 6PX versus 6DW.

3    Q    Okay.  Same two account holders, correct?

4    A    Yes.

5    Q    Primary is Ms. Perez-Ceballos and co-applicant is

6    Mr. Saiz-Pineda.  Same address?

7    A    Yes.

8    Q    Okay.  Same employment information?

9    A    Uh-huh.  I'm not sure why that keeps coming up as "No."

10   Q    Okay.  Here it says "No" again but the handwritten says

11   "Yes" --

12   A    Yes.

13   Q    -- is that correct?  Thirty million dollars again, is that

14   correct?

15   A    Yes.

16   Q    Same income --

17   A    Same.

18   Q    -- 180,000 and 250,000?

19   A    Correct.

20   Q    Okay.  So after you leave HSBC, you went to UBS, you said?

21   A    Correct?

22   Q    When -- about what year was that?

23   A    2012.

24   Q    And you're a financial advisor at UBS also?

25   A    Correct.

1   Q    Okay.  At some point, did you have contact with Ms. Perez-

2   Ceballos and Mr. Saiz-Pineda again?

3   A    I did -- we did.

4   Q    Tell us about that, please.

5   A    So when I transferred over, they called me maybe a couple

6   of months later wanting to transfer their accounts because HSBC

7   had decided to close all the politically-exposed-person

8   accounts.  So they needed a new home for their assets.

9   Q    Did you meet with them in person or was it over the phone?

10  A    I did not.  Over the phone.

11  Q    So how did you receive documentation to transfer the HSBC

12  accounts to UBS?

13  A    So we send them usually the DHL and then they return via

14  DHL -- or scans through email.  There's some clients that

15  prefer scans through email.

16  Q    When you moved the account to -- from HSBC to UBS for

17  them, did you talk to Silvia or was she present when you

18  discussed politically-exposed-person status again?

19  A    I mean, I don't remember who I spoke to really or what

20  transpired in the conversation but it was -- I didn't really

21  have to ask that question again.  We knew.

22  Q    Okay.  You still would --

23       THE COURT:  Could you bring that up?  It'll move.  So

24  you can bring it up closer to you.

25       THE WITNESS:  I'm sorry.

Fernandez - Direct / By Ms. Hampton                    90

1   BY MS. HAMPTON:

2   Q    You already knew because once a PEP, always a PEP, right?

3   A    Correct.

4   Q    Okay.  Let's go to Exhibit Number --

5        MS. HAMPTON:  Well, at this time, I'd offer to move

6   -- to introduce Exhibit Number 24, your Honor, which is the UBS

7   account.

8        THE COURT:  Is there any objection?

9        MR. REYNAL:  No objection, your Honor.

10       THE COURT:  It's admitted.

11       (Government's Exhibit Number 24 was received in evidence)

12  BY MS. HAMPTON:

13  Q    So let's go over the UBS application of Ms. Perez-Ceballos

14  and Mr. Saiz-Pineda, which is Exhibit Number 24.

15       MS. HAMPTON:  Account documents.

16  Q    So this is the signature page?

17  A    Correct.

18  Q    Okay.  And what is this --

19       MS. HAMPTON:  Can we go down a little bit?

20  Q    What day is this dated?

21  A    April 30th, 2012.

22  Q    And who signed this application?

23  A    Jose Manuel Saiz-Pineda and Silvia Beatriz Perez-Ceballos.

24  Q    On April 30th, 2012, right?

25  A    Correct.

1    Q    Just for the record, this page is E25000001.  And what

2    address did they give you as far as their address for this

3    account?

4    A    Same address, Calle Sanchez Magallanes 1113 Piso Centro

5    Villa Hermosa.

6    Q    Okay.

7         **MS. HAMPTON:**  Let's go down, please.

8    Q    And they gave you their information, their contact

9    information.  He's still employed with the government.

10   A    Uh-huh.

11   Q    Here, what does Mr. Saiz-Pineda tell you about his annual

12   income?

13   A    Two hundred thousand to 499,999.

14   Q    Okay.  And his liquid assets?

15   A    Above 10 million.

16   Q    And his net worth?

17   A    Above 10 million.

18   Q    Okay.

19        **MS. HAMPTON:**  Let's go down.

20   Q    Next, what did Ms. Perez-Ceballos tell you as far as,

21   again, her contact information and her address, the same

22   address, correct?

23   A    Same address, correct.

24   Q    And that she was self-employed?

25   A    Correct.

1   Q    With the same address?

2   A    Yes.

3   Q    Calle Sanchez Magallanes 1113?

4   A    Uh-huh.

5        **MS. HAMPTON:**  Can we go back up, please?  This is

6   Page E25000004, for the record.

7   Q    And what did she tell you her annual income is?

8   A    Fifty thousand to 99,999.

9   Q    This is a little different than HSBC, correct?

10  A    correct.

11  Q    She before said one hundred and --

12  A    180, uh-huh.

13  Q    Okay.  And now she's saying it's between 50 and 99.  And

14  what did she tell you her liquid assets and net worth are?

15  A    Above 10 million.

16  Q    What did she tell you as far as her knowledge of

17  investments under "Investment Information"?

18  A    Two years having investment accounts, equities, bonds --

19       **MR. REYNAL:**  Your Honor, just a point of

20  clarification.  I don't know if I need to object here or not.

21  I didn't hear a predicate for any conversation that this person

22  had with Ms. Perez-Ceballos.  Did the witness have a

23  conversation with Perez-Ceballos?

24       **MS. HAMPTON:**  I'll clarify, your Honor.

25       **THE COURT:**  Okay.

Fernandez - Direct / By Ms. Hampton          93

1   **BY MS. HAMPTON:**

2   Q     When you were filling out this application at UBS, you're

3   reading with the client.  Are you going -- are you talking to

4   them about these questions as you're filing out this

5   application?

6   A     We do.

7   Q     Okay.  And did you talk to Ms. Perez-Ceballos about her

8   investment information, specifically her knowledge of

9   investments in the years you were talking about here?

10  A     I'm guessing.

11  Q     Do you remember?

12  A     I don't recall the specific date but --

13  Q     Do you -- is that what you do when you open these

14  applications?

15  A     Yes.

16  Q     What did Ms. Perez-Ceballos tell you as far as her

17  knowledge of investments?

18  A     That she has a good understanding of financial markets and

19  market assets.

20  Q     And what did she tell you as far as her total investable

21  assets held at UBS?

22  A     Twenty to 40 percent.

23  Q     What does that mean?

24  A     Kind of their -- whatever percentage of their net worth or

25  liquid assets that they're going to have in investable assets

1   at UBS.

2   Q    So does that lead you to believe that she's got assets

3   somewhere else?

4   A    Yes.

5   Q    Okay.  Do you ask where else?

6   A    Yes, usually.

7   Q    What did she tell you?

8   A    HSBC Mexico.

9   Q    Okay.  Only HSBC Mexico?

10  A    Yes.

11  Q    Did she tell you about other liquid assets she has in the

12  U.S.?

13  A    No.

14  Q    Other liquid assets other than HSBC in Mexico?

15  A    No.

16  Q    Other investable assets such as real property?

17  A    Real estate property.

18  Q    She did tell you about that?

19  A    Not in the United States.

20  Q    Okay.  What did she tell you about in Mexico?

21  A    Just that they had several properties in Mexico.

22  Q    Okay.  Did she tell you whether they disclosed that to the

23  Mexican government either in their taxes or in wealth

24  declarations?

25  A    No, we don't disclose that.

Fernandez - Direct / By Ms. Hampton                95

1    Q     Okay.

2            **MS. HAMPTON:**  Let me go to Page 33.  On Page -- well,

3    go up a couple pages here.  Let's talk about this, from the

4    beginning of this application, please.  Okay.  So this is Page

5    29.  And can you go down to the Bates stamp?  I'm sorry.  Thank

6    you.  Bates Stamp is E25000029, same Exhibit 24.

7    Q     What is this document?

8    A     That's an internal enhanced due diligence questionnaire

9    that we use for every new account.

10   Q     Okay.  And it lists nonresident alien here, politically --

11   A     Sensitive country, uh-huh.  Sorry.

12   Q     Okay.  Politically-exposed person and sensitive country

13   affected party, correct?

14   A     Yes.

15   Q     What does that mean?

16   A     Mexico is considered a sensitive country.

17   Q     Okay.  And then the account type -- it looks like it's

18   joint and Ms. Perez-Ceballos is listed and then Mr. Saiz-Pineda

19   is written in there; is that correct?

20   A     Correct.

21   Q     Do you know why he's written in there instead of typed?

22   A     Well, because you can't -- like, the -- it cuts you off.

23   Q     Okay.  And what address did they give you as their mailing

24   address?

25   A     Calle Sanchez Magallanes 1113 Piso Centro Villa Hermosa,

Fernandez - Direct / By Ms. Hampton                96

1    Tabasco.

2    Q    Okay.  And then hold on here.  Investment experience, two

3    years equities, two years bonds and then other current bank

4    brokerage relationships.  What did they list?

5    A    HSBC Mexico and HSBC USA.

6    Q    Okay.  Did they list anything -- Merrill Lynch?

7    A    No.

8    Q    Wells Fargo?

9    A    No.

10   Q    Any other -- Banorte?

11   A    No.

12   Q    No?  Okay.

13        **MS. HAMPTON:**  Okay, keep going, please.

14   Q    And then here the politically-exposed question is -- the

15   politically-exposed-person question is answered "Yes"; is that

16   correct?

17   A    Yes.

18   Q    And explain why and that she's also immediate family

19   member.

20   A    Correct.

21   Q    It's himself but also immediate family member, correct?

22   A    Right.

23        **MS. HAMPTON:**  Okay.  Okay, here, other sources of --

24   this is Page 33 on the top part of the page.  Can we go down to

25   the Bates stamp real quick?  E25000033.

Fernandez - Direct / By Ms. Hampton                      97

1   Q    And here on this page, it talks about other sources of

2   wealth and it says, "Residential real estate rental income,"

3   correct?

4   A    Correct.

5   Q    Do you know where that rental income occurred?  Was it in

6   the U.S. or Mexico?

7   A    To my knowledge, Mexico.

8   Q    Okay.  But not your -- not in the U.S.  You didn't know

9   about any properties in the U.S., correct?

10  A    We do not.

11  Q    Does this mean that they own property in Mexico and

12  they're renting it out?  So they're making money off the rental

13  income?

14  A    Correct.

15  Q    Okay.  And then "Securities, mutual funds," does it say

16  where?

17  A    The mutual funds were held at HSBC.

18  Q    In Mexico or in the U.S.?

19  A    No, in the U.S.

20  Q    Okay.  So the ones they're transferring?

21  A    Right.

22  Q    Okay, great.  And then here, Other Sources of Wealth, Sale

23  of a Business, what is checked?

24  A    "No."

25  Q    Why is this question asked?

1  A    Well, just to get to know more about each individual

2  client.  If they're self-employed, you know, it could be a

3  substantial amount of money when you sell your business.

4  Q    Is this something that --

5  A    So you want to make sure you know --

6  Q    -- is this something that you make a point to ask clients?

7  Is this money coming from the sale of the business?

8  A    Yes.

9  Q    Okay.  And what did Ms. Perez-Ceballos and Mr. Saiz-Pineda

10 tell you regarding this money?

11 A    "No."  Well, it was an account transfer.  So if it was

12 answered before, no, it's the same exact account.

13 Q    Sure.  So -- and you were familiar with the HSBC account?

14 A    Correct.

15 Q    Did they ever tell you at HSBC that that money that they

16 were moving to HSBC was from the sale of a business?

17 A    No.

18 Q    And you had to ask that, correct?

19 A    Yes.

20 Q    I'm going to come back and do 24 in just a minute.  But

21 when you would speak to -- in -- when you're at UBS when you

22 would speak -- or need to speak with Mr. Saiz-Pineda or

23 Ms. Perez-Ceballos, how would you have to get in touch with

24 them?

25 A    Phone or email.

1    Q    Who would you call?

2    A    I usually called him and ended up speaking to Marlis.

3    Q    Ms. Cupil?

4    A    Yes.

5    Q    Okay.  And at that time, was it your understanding that

6    Ms. Marlis Cupil was working for his private business or the

7    government as his assistant?

8    A    I understood his private business.

9    Q    Why did you believe that?  Do you remember?

10   A    She always answered the phone.

11   Q    And why did you believe you were calling a private

12   business instead of -- I mean, did she answer the phone as far

13   as business name or -- do you remember?

14   A    I don't remember but I'm guessing.

15   Q    Okay.  So at some point in -- well, first let me go back

16   to 24 right now.  Sorry.  Let's go to the statements for July

17   of 2012.  I just want to go over some of the account activity

18   with you, okay?

19   A    Sure.

20            MS. HAMPTON:  All right.  Well, let me go back up to

21   the very beginning, please.  This is a statement from -- this

22   is Exhibit 24 under B statements and the Bates number is -- I

23   can't get it in here over -- E25 -- I can't -- I don't know.

24   What is the next page?  It's Page 1 of this document as far as

25   the order.  It's going to be E25, okay, 000037 -- is going to

Fernandez - Direct / By Ms. Hampton                    100

1    be the Bates stamp number.

2    Q    What is this document here?

3    A    That's the UBS client account document -- client account

4    statement -- I'm sorry.

5    Q    It looks like it's a monthly statement, the account --

6    A    Monthly statement, yes.

7    Q    Okay, great.  And what-- which one is this dated?

8    A    April 2012.

9    Q    Whose names are on the account here?

10   A    Silvia Beatriz Perez-Ceballos and Jose Manuel Saiz-Pineda.

11   Q    And to your knowledge -- we'll go through a few of these

12   but do their names always appear in this order with Ms. Perez-

13   Ceballos here and Mr. Saiz-Pineda here under her?

14   A    Yes.

15   Q    Okay.  And then on the right-hand side, same thing, is

16   Ms. Perez-Ceballos and Mr. Saiz-Pineda, correct?

17   A    Yes.

18   Q    And what address did they list, that same address

19   Magallanes?

20   A    Same address, Calle Sanchez Magallanes.

21   Q    Okay.  Let's go down to July 2012.  Okay.  This is same

22   thing.  Both of their names are on there.  Both of their names

23   are on the right-hand side with the same address, correct?

24   A    Correct.

25   Q    2.1 value of the account still, right?  Okay.

1   A    Okay.

2   Q    Let's go down to -- I'm sorry.  I said July but I meant

3   June.  I'm sorry.  I'm sorry, June.  Okay, right there.

4        And these account statements, you can see some of the

5   ways purchases are made on the account?

6   A    Correct.

7   Q    Okay.  So let's look at some of the purchases that were

8   made in June of 2012.  Okay.  So this is a -- what is this

9   "Card purchases" over here?  Is that because this is associated

10  with a debit card?

11  A    Correct.

12  Q    Okay.  The pages before this are the different --

13  A    Mutual funds.

14  Q    -- mutual funds that are invested and the fluctuation

15  monthly with the market, correct?  Okay.  So this is just

16  purchases out of this account, right?

17  A    Correct.

18  Q    All right.  So in June, we have just locations Houston,

19  May 25th, Sugar Land, 27th, Houston, Sugar Land, Katy, Texas

20  which is near Houston and every one of these is like Sugar Land

21  or Houston or Katy, Texas, correct?

22  A    Correct.

23  Q    Okay.

24       **MS. HAMPTON:**  Go to the next screen, please, July.

25  Okay.  So in July, let's go down to the Expenditures section.

1  Okay.  And this is for the record, Bates Stamp Page -- I missed

2  it -- E25000 -- I cannot tell.  On the top, it's Page 47.  Can

3  you down 117, the next page?  It's going to be 83 -- E25000083.

4  Okay.  Here -- yeah, right here, yes.  Thank you.  Can you go

5  up, please, a little bit?

6  Q     This is the debit card; is that correct?

7  A     Correct.

8  Q     And is that in the name of Ms. Perez-Ceballos, the debit

9  card?

10  A     Yes.

11  Q     Okay.  What are some of the locations of the use of the

12  debit card on July 15 through July 21st here?

13  A     Smith and Wollensky New York, CVS Pharmacy, New York, New

14  York, Nassau --

15  Q     Jersey City?

16  A     -- New Jersey.

17  Q     Okay.

18  A     Uh-huh.

19  Q     And then after July -- well, July 21st to 23rd, Jersey

20  City, New York --

21  A     New York.

22  Q     -- New York, correct?

23  A     Correct.

24  Q     Okay.  And the 24th, New York, New York; 25th, New York.

25  Okay.  Are there ATM activities also shown on this debit card?

1    A    If there were, yes, they would show up.

2         **(Pause)**

3    Q    Okay.  Here, July 22nd, posting date, 23rd, the card under

4    Ms. Perez-Ceballos' name was used in New York; is that correct?

5    A    Right.  That is Citibank for a withdrawal, $500.

6    Q    Okay.  Thank you.  All right.  On the card purchase

7    there's also a section on this page, which is 46 at the top of

8    the screen, still under B, "Statements," there's some purchases

9    in Sugar Land for June -- this is the end of June, I guess, on

10   this statement, right?

11   A    Right.

12   Q    Okay.  And then there's a purchase on July 15th.  Where is

13   that purchase made?

14   A    Lake Buena Vista, Florida.

15   Q    And Nassau's near there, correct, around the same area of

16   the country?  Do you know?

17   A    (No audible response)

18        **THE COURT:**  Is that a yes?  No?  What?

19        **MS. HAMPTON:**  She didn't know, I don't think.

20   A    No.  Nassau, it's not in Florida.

21   Q    Not -- around the same area, I'm sorry, is what I was --

22   the globe.  I'm sorry.  August -- August 2012, again, same

23   account information, both of their names up here, hers is on

24   top, same address, correct?

25   A    Correct.

Fernandez - Direct / By Ms. Hampton                104

1  Q    Okay.

2        **MS. HAMPTON:**  Can we go to the expenditures section,

3  please?

4  Q    Okay.  And this starts at the tail end of July again; is

5  that correct?

6  A    Correct.

7  Q    Under "Card Purchases"?

8  A    Yup.

9  Q    For the record, this is Bates Stamp Number E25000094.

10 Where are all of these purchases taking place between July 25th

11 and August 11th?

12 A    New York.

13 Q    Do you -- did you see any hotel purchases in any of these

14 statements?  We weren't really looking for it --

15 A    I haven't, but --

16 Q    But do you see any on this one for August -- between

17 July 25th and August 11th?

18 A    I don't think so.  It looks like museums and theaters on

19 this Petrie Court.

20 Q    Yeah.  The --

21 A    I don't know what Petrie Court is.

22 Q    Okay.  For $162?

23 A    Yeah.  That's not -- right.

24       **MS. HAMPTON:**  Can you go to January 2013?

25 Q    Okay.  Again, January 2013, both names are on there,

Fernandez - Direct / By Ms. Hampton                105

1   Ms. Perez-Ceballos and Mr. Saiz-Pineda, same address, correct?

2   A    Correct.

3   Q    Still around 2.1 value?

4   A    Correct.

5   Q    Okay.

6        **MS. HAMPTON:**  Can you go to "Expenditures" on

7   Ms. Perez's account, please?

8        Okay.  For the record, this is Page Number, Bates

9   stamped, again, it's Exhibit 24, E25000156.

10  Q    Can you tell us the location of some of these that have

11  locations, purchases?

12  A    Tennessee, Vermont, Florida.  That's it.

13  Q    And Aventura, Florida, beginning January --

14  A    15th.

15  Q    -- 15th?  Okay.  And then through January 22nd there's

16  continued purchases through Aventura, Florida, correct?

17  A    Correct.

18  Q    Do any of these appear to be hotels?

19  A    Well, maybe Hilton.  "Hilton, advance purchase," I don't

20  know what that is.

21  Q    Okay.

22       **MS. HAMPTON:**  Can you go to August 2013?  This is

23  July.  Okay.  August 2013, the Bates stamp on this page is

24  E25000235.  You have to go down more to get it.

25  Q    And at the top it's Page 199.  Okay.  So, on this August

Fernandez - Direct / By Ms. Hampton                    106

1   2013 statement, again, both Ms. Perez-Ceballos and Mr. Saiz-

2   Pineda are listed, correct?

3   A    Correct.

4   Q    And he's listed under her name, correct?

5   A    Correct.

6   Q    And then on the right-hand side, Ms. Perez-Ceballos, his

7   name under, and then also that address again, correct?

8   A    Correct.

9   Q    Okay.  These are the correct documents from UBS that we

10  subpoenaed, correct, and you've reviewed these?

11  A    Yes.

12  Q    Okay.  And then, October of 2013.  Same thing, same

13  questions, October 2013, Ms. Perez-Ceballos, Mr. Saiz-Pineda

14  under her, same thing on the right, with the same address under

15  them, correct?

16  A    Correct.

17  Q    Okay.  So, at some point did you find out some information

18  about Mr. Saiz-Pineda being arrested in Mexico?

19  A    Yes.

20  Q    When was that?

21  A    I want to say sometime in 2013.

22  Q    Okay.  What happened regarding this account and UBS?

23  You're still working at UBS?

24  A    Still working at UBS.

25  Q    What happens during -- about the account?

EXCEPTIONAL REPORTING SERVICES, INC

1    A    So, we get news from our compliance department that

2    Mr. Saiz is in jail.  And I get an e-mail saying we need to

3    exit the relationship.

4    Q    What did you do next?

5    A    So, I called Silvia and I explained to her that based on

6    the current circumstances, UBS could no longer service her

7    account; and that I'd be willing to help her, you know, get

8    those funds transferred wherever else she had an account.

9    Q    Before you knew Mr. Saiz-Pineda was arrested, did you have

10   more contact with Silvia?

11   A    Yes.

12   Q    Can you tell us about that?

13   A    So, we didn't know that he was arrested, but she became a

14   little bit more involved, just in account statements and e-

15   mails, "How much cash do I have," normal conversation, just --

16   but a little bit more involvement than in the past.

17   Q    Okay.  So she asked -- you said e-mails; she asked, "How

18   much money do I have?"

19   A    Right.

20   Q    Any other contact with her before you found out Mr. Saiz-

21   Pineda was arrested?

22   A    No.

23   Q    What types of payments was she making through this UBS

24   account?  Do you remember what she was paying for?

25   A    I believe the girls' tuition for high school and, you

Fernandez - Direct / By Ms. Hampton                    108

 1    know, sundry expenses or vacations or --

 2    Q     Is this a private high school that they were paying for?

 3    A     Yes.

 4    Q     Okay.  And they were paying for it out of this account?

 5    A     Yes.

 6    Q     Okay.  Do you remember approximately when the account was

 7    closed?

 8    A     At some point in 2013.

 9              **MS. HAMPTON:**  Can you show us the last statement?

10    Q     This is October 2013.

11    A     Right.  And it looks like it was already liquidated,

12    right?

13    Q     I'm sorry?

14    A     It looks like it was already liquidated, because the end

15    balance is $171.

16    Q     Okay.  So, what does that tell you?

17    A     That we liquidated at some point in October.

18    Q     Okay.  When you called Ms. Perez-Ceballos to tell her you

19    had to end the relationship, what was the response from

20    Ms. Perez-Ceballos?

21    A     "We completely understand.  I've been going through a very

22    difficult time."  You know, I guess a normal conversation on

23    how -- your husband is in jail, you know, how do you have that

24    conversation?

25    Q     Okay.

1   A    It's a little difficult.

2   Q    Did you discuss transferring the money that was in UBS to

3   another account?

4   A    Yes.  We needed to transfer, whether it was in kind, she

5   would have to have a brokerage relationship in the same name to

6   transfer the assets in kind, without having to liquidate or she

7   would have to liquidate and then send the money wherever it was

8   that she had a relationship.

9   Q    Did Ms. Perez-Ceballos specifically request transferring

10  it to an account not in her name?

11  A    She asked.

12  Q    What did she ask?

13  A    If it was possible to transfer the account to a third

14  party, whether it be a company or another person.  And I said

15  we could not.  We needed to have it in the same name.

16  Q    So you denied her request; it had to be in her name,

17  correct?

18  A    Yes.

19  Q    Okay.  Where did you ultimately transfer the money?

20  A    I believe it was three different institutions:  J.P.

21  Morgan, Wells Fargo, and I want to say Bank of America.  I'm

22  not sure.

23  Q    Any reasoning as to why there were three different

24  accounts that the money was transferred to from Ms. Perez-

25  Ceballos?

1  A    No.  I think maybe she didn't want to get caught having

2  just one financial relationship and having, you know, her --

3  her accounts diversified in different institutions.

4  Q    Was that her decision to move it to three different

5  accounts or was that something you suggested or advised her to

6  do?

7  A    No.  Her -- her decision.

8  Q    Did you speak to Ms. Perez-Ceballos after the arrest of

9  her husband regarding Marlis Cupil?

10  A    Briefly.

11  Q    What did Ms. Perez-Ceballos tell you?

12  A    That she was not the person that they thought she was.

13  That's it, that I can remember.

14  Q    Do you remember Ms. Perez-Ceballos calling Marlis Cupil a

15  bad person?

16          **MR. REYNAL:**  Objection, your Honor, to the leading.

17          **THE COURT:**  Sustained.

18  **BY MS. HAMPTON:**

19  Q    Do you recall telling myself and other agents specific

20  information that Ms. Perez-Ceballos told you about Marlis Cupil

21  and what she called her?

22          **MR. REYNAL:**  Improper impeachment, your Honor.

23          **THE COURT:**  Overruled.

24  A    I remember she said that she wasn't who she said she was;

25  and that she may be a bad person.  Was -- I don't know if that

Fernandez - Direct / By Ms. Hampton                    111

 1   was the terminology I used, but perhaps.

 2   Q    In what context was she discussing Marlis Cupil?  Was it

 3   in relation to her husband's arrest?

 4   A    Yes.

 5   Q    Did Ms. Perez-Ceballos tell you a reason why she called

 6   Ms. Marlis Cupil a bad person or put blame on her?

 7            MR. REYNAL:  Objection, your Honor; assumes facts not

 8   in evidence.  The witness said that she couldn't remember if

 9   she used those words or not.

10            THE COURT:  Sustained.

11   BY MS. HAMPTON:

12   Q    Do you remember Ms. Perez-Ceballos giving you a reason why

13   she made those statements about Marlis Cupil?

14   A    Just that she was more involved maybe than she should have

15   been in a lot of his activities.

16   Q    When did that conversation happen, do you remember?

17   A    About the time I told her we needed to liquidate.

18   Q    So, pretty --

19   A    So, October --

20   Q    -- quickly?

21   A    Yeah.

22   Q    October, you think, or --

23   A    Yeah, or maybe September, late September.

24   Q    Did Ms. Perez-Ceballos ever express to you any fear of

25   living in Mexico?

Fernandez - Direct / By Ms. Hampton                          112

1   A     No.

2   Q     The account address was in Mexico, correct?

3   A     Yes.

4   Q     Did she ever list with you a Houston address that she

5   resided at?

6   A     No.

7   Q     To your knowledge, did Ms. Perez-Ceballos ever live at a

8   Houston address?

9   A     Not that I know of.

10  Q     Did she ever tell you she lived at a Houston address?

11  A     Not that I can recall.

12  Q     Is HSBC, to your knowledge, a Federal Deposit Insurance

13  Corporation or FDIC insured institution?

14  A     Yes, of course.

15  Q     And UBS, is it also an FDIC insured institution?

16  A     Yes.

17          **MS. HAMPTON:**  May I confer with co-counsel?

18          **THE COURT:**  Yes.

19       **(Pause)**

20          **MS. HAMPTON:**  Pass the witness, your Honor.

21                    **CROSS EXAMINATION**

22  **BY MR. REYNAL:**

23  Q     Hi, Ms. Fernandez.

24  A     Hi.

25  Q     How are you?

Fernandez - Cross / By Mr. Reynal                113

1   A    Fine, thank you.  How are you?

2   Q    My name is Andino Reynal.  I represent Silvia, who is

3   sitting over here.  I get the sense watching you testify that

4   you -- you like Silvia?

5   A    Sure.

6   Q    Can you tell the jury your opinion of her?

7   A    Very nice lady.  I mean, I didn't know her that well, but

8   from what I can see, she was a very nice woman.

9   Q    Thank you.  You've been in banking for a long time?

10  A    A long time.

11  Q    And you said that you went from the banking side to the

12  investment side?

13  A    Correct.

14  Q    Approximately, when did that happen?

15  A    That was 2003, I started at HSBC.  And I lasted about two

16  and a half years in the banking division, and then transferred

17  over to the broker/dealer side.

18  Q    Can you explain to the members of the jury the distinction

19  between the investment side and the banking side?

20  A    Sure.  So, we work with our partners, that's the bankers.

21  And they handle the banking relationship -- checking; savings;

22  debit cards; if they want a mortgage, they refer to the

23  mortgage division.  And then the brokers get a little bit more

24  involved in the asset allocation of the portfolio.  We offer

25  them different investment alternatives based on their risk

Fernandez - Cross / By Mr. Reynal                114

1    profile, and kind of, you know, have the discoverings of, "What

2    do you want to do with this money?  Where do you want to go

3    long term?  What is it for?"  And that's it.  Those are the

4    basic differences, but we work in partnership.

5    Q    Okay.  And because you refer each other business?

6    A    I'm sorry?

7    Q    You refer each other business?

8    A    Correct.

9    Q    The money that you handle, where is it held?

10   A    HSBC Securities, when I was at HSBC.  Where is it held?

11   In the United States.  Was that your question?  I'm sorry.

12   Q    No.  It was -- my question was:  When you're managing

13   somebody's finances and the money that you're managing, that

14   you open up the account for, is that money in the bank or in

15   the securities?

16   A    Both.

17   Q    Okay.  Can you explain that?

18   A    So -- well, UBS is very different.  So about UBS, it's

19   a -- it's -- the checking account is part of the investment

20   account.  So you get one account statement, as you guys saw in

21   the exhibits.  The cash portion of the account is built into

22   the investment account.  At HSBC they were completely

23   different.  So you had a money market that was sitting in cash

24   in the brokerage account, and you had your checking and savings

25   account that were completely separate.

Fernandez - Cross / By Mr. Reynal                         115

1    Q    Okay.  The account you opened up for Silvia and --

2    A    Jose.

3    Q    -- Jose --

4    A    Uh-huh.

5    Q    -- at HSBC, that was on the securities side?

6    A    The one we opened?  Yes -- the one I opened.

7    Q    And just so we're clear, on the securities side, that's

8    not FDIC insured, is it?

9    A    No.  It's SIPC insured.

10   Q    SIPC?

11   A    SIPC, Securities Insurance Protection Corporation.

12   Q    Okay.  But not FDIC?

13   A    Some instruments within the account are FDIC insured, like

14   certificates of deposit that are FDIC backed.  But the

15   institution, per se, is SIPC.

16   Q    Okay.  And all the documents that we've been looking at

17   from HSBC, those were related to opening up this securities

18   broker relationship?

19   A    Correct.

20   Q    Now, at UBS were you -- you said that it was a little bit

21   blended because it was attached to a checking account.  Did

22   you -- did you open up both?

23   A    No.  We only opened one account at UBS, and it's kind

24   of -- the checking portion of the account is part of the cash,

25   but it's all one account.

1    Q    Okay.

2    A    So there's no division.  Like, it's not a separate entity

3    or institution.

4    Q    In that respect then, are the -- is that account FDIC

5    insured?

6    A    Yes.  The cash portion of the account is insured.

7    Q    Okay.  Understood.  So they're merged, the securities side

8    and the banking side of UBS?

9    A    Correct.  Yeah, I guess just to facilitate to the client

10   just one statement --

11   Q    Okay.

12   A    -- versus a bunch of statements.

13   Q    And I understand it, in fairness to you, these events

14   occurred a pretty long time ago.  I think your last

15   conversation with Silvia was in October of 2013, so that's four

16   years ago.  And before that it was in 2010, so we're talking

17   seven years ago.  So, if you don't remember or you don't know,

18   feel free to say, "I don't remember.  I don't know."  Do you

19   recall having a long conversation on that first occasion that

20   you met about what it meant to be a politically exposed person?

21   A    We were in the office for a pretty long time.

22   Q    Yeah.  But my question was:  Did you spend a long time

23   talking about whether he was the Secretary of the Treasury for

24   the State of Tabasco?

25   A    Well, a significant amount of time, just to make sure that

1   he was, in fact, working for the government.

2   Q    Okay.  Did you have -- spend a long time giving them the

3   definition and the permutations of what it meant to be a

4   politically exposed person?

5   A    I can't say we explained definitions, but pretty much

6   enough to know that you're a government official.

7   Q    Okay.  So, in --

8   A    There's only one meaning there, right, "Are you a

9   government official, yes or no?"

10  Q    And I guess my question, and probably what we're

11  wondering, right, is that the prosecutor said, "For your

12  purposes, once a PEP, always a PEP"?

13  A    Right.

14  Q    Okay.  And I understand, for your purposes, you receive

15  training and all the rest?

16  A    Correct.

17  Q    And what I want to know is whether that was a large part

18  of your conversation with Silvia, this extended PEP status over

19  time, even after your spouse has left government office?

20  A    (No audible response)

21  Q    I'm sorry, can you repeat your answer?

22  A    No.

23  Q    Thank you.  We talked about -- or, the prosecutor asked

24  you some questions about Calle Sanchez Magallanes, Piso Numero

25  Uno.  Is it uncommon for your clients to list a business

Fernandez - Cross / By Mr. Reynal                                118

1   address for their account statements?

2   A    Not uncommon.

3   Q    Okay.  Did you know that that was a business address?

4   A    I did not.

5   Q    Would it have been uncommon -- would it have surprised you

6   to find out that that was a business address?

7   A    No.  But when we ask for permanent residence, you want to

8   believe that it's the permanent residence.  I mean --

9   Q    But I guess I heard you to say that people do list their

10  business as --

11  A    People do list --

12  Q    Okay.

13  A    -- businesses.

14  Q    And so, would you -- if that happened to be his business,

15  would that have been a big problem for you?

16  A    Big problem?  No.  But we would have had to differentiate.

17  Q    Do you have children?

18  A    I do.

19  Q    How many?

20  A    Two.

21  Q    How old are they?

22  A    Ten and seven.

23  Q    I've got thirteen, ten, and a year.  Do you take your ten

24  and seven-year-old to -- to business meetings often?

25  A    No.

1   Q    Boy, girl, two girls --

2   A    Two girls.

3   Q    Two girls.  If you were to take them to a business

4   meeting, what do you think would be likely to happen?

5   A    At ten and seven?

6   Q    Yeah.

7   A    I'd have to take them out.

8   Q    Okay.  How old -- do you recall how old Tanya and her

9   sister were when they --

10  A    I don't, but they weren't ten and seven.

11  Q    Okay.

12  A    They were older, maybe high school or junior high.  I

13  don't remember.

14  Q    Okay.  So this was 2010 --

15  A    '10.

16  Q    -- you said?

17  A    Uh-huh.

18  Q    And so, if one was born in '96 and '98, they would have

19  been twelve and -- '96, 2007, so that's ten -- thirteen?

20  A    Yeah.

21  Q    Did it surprise you that they were at the meeting?

22  A    No, because you're traveling from abroad, so it's common.

23  We get a lot of families.

24  Q    Okay.  And, in your experience, you've been doing this for

25  a while, often is there one member of a couple that is more

1    active financially than the other?

2    A    Sure.

3    Q    Would it be fair to say in this case Mr. Saiz took the

4    lead with financial matters?

5    A    Yeah.

6    Q    Just one moment.

7    A    Sure.

8         **MR. MAGLIOLO:**  Just one moment, your Honor.

9         **THE COURT:**  That's fine.

10        **(Pause)**

11   **BY MR. REYNAL:**

12   Q    Did you -- did you find that it was odd that you dealt

13   with Mr. Saiz's secretary during the majority of the banking

14   relationship?

15   A    Not odd, but because it's customary for you to deal with,

16   like, the secretary or right-hand man to handle a lot of things

17   for the executives or -- or, you know, in this case, a

18   professional, but, yeah, sometimes.  I questioned it sometimes,

19   sure.

20   Q    Okay.  It was clear to you from the beginning of the

21   relationship that this was a very wealthy couple?

22   A    Sure.

23   Q    Yeah.  I mean, I guess 30 million --

24   A    Thirty million bucks is --

25   Q    I don't know.

1   A    Yeah, it's a good amount of money.  I mean, not the

2   highest net worth, but ...

3   Q    Do you have a lot of clients that have more?

4   A    Yes.

5   Q    Okay.  A lot of clients from Latin America who have more?

6   A    Yes.

7   Q    All right.

8           **MR. REYNAL:**  Pass the witness.

9           **THE COURT:**  All right.  Ms. Hampton?

10          **MS. HAMPTON:**  Nothing further.

11          **THE COURT:**  Thank you, ma'am.  You can step down.

12          Can this witness be excused, Counsel?

13          **MS. HAMPTON:**  Yes, your Honor.

14          **MR. REYNAL:**  Yes, your Honor.

15          **THE COURT:**  All right.  You're free to leave the

16   courthouse.  Thank you.

17       **(Witness excused)**

18          **THE COURT:**  The government's next witness?

19          **MS. HAMPTON:**  Paul Arnold, your Honor.

20          **THE COURT:**  Is this the witness here?

21          **MS. HAMPTON:**  Yes, your Honor.

22          **THE COURT:**  Okay.  You can approach, ma'am --  oh,

23   sir.  I'm sorry.  Just watch the slope there.  I didn't quite

24   catch the name.  If you'll raise your right hand, please.

25   //

1        **PAUL ARNOLD, GOVERNMENT'S WITNESS, SWORN**

2        **THE COURT:**  You can have a seat.

3        **MS. HAMPTON:**  May I proceed, your Honor?

4        **THE COURT:**  Yes.

5                    **DIRECT EXAMINATION**

6    **BY MS. HAMPTON:**

7    Q    Please state your name, please, and introduce yourself to

8    the jury.

9    A    Yes.  My name is Paul Arnold.  I'm a -- what I do or --

10   Q    Sure.

11   A    Oh, yes.

12   Q    Tell us where you're employed, please.

13   A    Yeah.  I'm a financial advisor with Morgan Stanley, but I

14   used to work for J.P. Morgan Chase as a financial advisor.

15   Q    How long have you worked with Morgan Stanley?

16   A    About seven months.

17   Q    Okay.  And how long did you work with J.P. Morgan Chase

18   before?

19   A    Nineteen years.

20   Q    Before that, were you in the financial -- financial

21   industry or did it begin with J.P. Morgan?

22   A    It began with J.P. Morgan.

23   Q    So about 20 years?

24   A    Approximately, yes.

25   Q    Okay.  What is your job at Morgan Stanley?  What's your

Arnold - Direct / By Ms. Hampton                   123

1    title?

2    A    I'm an international financial advisor.  I specialize in

3    working with clients from abroad.

4    Q    Okay.  And what was your title at J.P. Morgan Chase when

5    you left?

6    A    International financial advisor as well.

7    Q    Okay.  Do you hold licenses?

8    A    Yes.

9    Q    What licenses?

10   A    A 63, 65, and Series 7, and Group 1, which is in insurance

11   as well.

12   Q    Okay.  Series 7 is the financial advisor license, correct?

13   A    That's right.

14   Q    And what is a 63 and a 65?

15   A    That's mostly if you have managed accounts, be able to

16   have fiduciary duties to oversee accounts, to be able to

17   receive commissions based on managing the account.  But, yes,

18   it's mostly when you have managed accounts.

19   Q    Okay.  Do you have to do continuing education -- and we

20   call it C.E. -- for those licenses?

21   A    Yes.  For the insurance licensing, you usually do every

22   three years.  But since I already done 20 -- almost 20 years, I

23   really don't have to do them anymore.  For the C.E., that's

24   every two years, I believe, for the --

25   Q    Those are to maintain --

1    A     -- Series --

2    Q     -- your licenses?

3    A     To maintain the licenses.

4    Q     Keep you up on regulations --

5    A     That's right.

6    Q     -- SEC rules, anti-money laundering laws, correct?

7    A     That's correct.

8    Q     Okay.  Can you tell us about your educational background?

9    A     I got an undergraduate degree at Florida State University

10   of Business and Finance.  And then about four years later I got

11   an MBA from Houston -- Houston Baptist University here in

12   Houston -- no, not here, but Houston.

13   Q     We talked a little bit about anti-money laundering

14   training.  What does that involve from your end as a financial

15   adviser?

16   A     It talks about how -- how it's done, the different concept

17   of layering that individuals would do.  Usually they have case

18   analysis.  They would -- you know, the last ones that over the

19   last four or five years have gotten more about specific cases

20   to see how they were done in order to -- in order to manipulate

21   the financial system.

22   Q     You said "layering".  What is that?

23   A     It's a way for individuals to transact -- to be able to

24   make deposits in a way that it doesn't seem where the original

25   source of the money comes from.  And then do transactions so

Arnold - Direct / By Ms. Hampton                    125

1   it's difficult to tracing where the money came from.

2   Q    Okay.  Are you familiar with the money-laundering term of

3   "placement?"  Placement into the financial institution?

4   A    Yes, it's another form.

5   Q    Okay.  Placement and then layering.  And then what is

6   "integration" in the money laundering sense?

7   A    It's basically when you actually integrate the money, bad

8   money with good money.

9   Q    Would it include buying an asset?

10  A    It could be.

11  Q    And integrating it to the real property --

12  A    Yes.

13  Q    -- system or another financial system?

14  A    That's right.

15  Q    Do you know a person by the name of Silvia Beatriz Perez-

16  Ceballos?

17  A    Yes, I do.

18  Q    Do you see that person in the courtroom today?

19  A    Yes, I do.

20  Q    Can you tell us what she's wearing?

21  A    She's wearing a black dress with a white blouse.

22         MS. HAMPTON:  Your Honor, may the record reflect this

23  witness has identified the defendant?

24         THE COURT:  The record will so reflect.

25         (Witness identified Defendant)

EXCEPTIONAL REPORTING SERVICES, INC

Arnold - Direct / By Ms. Hampton                         126

1   Q    When did you first meet Ms. Perez-Ceballos?

2   A    Approximately about three years ago -- or yeah, three-and-

3   a-half years ago.  She was referred by another branch because

4   most of the branches with Chase and JPMorgan, they have only

5   domestic financial advisors.  Since I work in international

6   downtown Houston, whenever they have a client that is

7   considered international client, they will sometimes call me or

8   somebody in the staff in our group so ...

9   Q    What location do you work at?  What city?

10  A    In Houston, downtown Houston.

11  Q    And do you speak Spanish fluently?

12  A    Yes, I do.

13  Q    Okay.  It's probably a must in the international division?

14  A    That's right.

15  Q    Okay.  So you said -- I think you said three to three and

16  a half years ago.  Do you remember about what month and year it

17  was that you met Ms. Perez-Ceballos?

18  A    Probably around August.  August, September of 2013.

19  Q    And she was referred to you from the banking side of

20  JPMorgan?

21  A    That's right.

22  Q    Okay.  So why was she referred to you?

23  A    I believe it was the branch manager who called me but

24  basically said that I have a client that has a Mexican

25  passport, a client that is not a U.S. citizen or U.S. resident,

1   doesn't have a social security number, and was thinking of

2   transferring money from UBS to do an investment.  And so I

3   basically -- I usually cover those three areas.  It has to be a

4   non-resident aliens, consider a person that doesn't pay taxes

5   in the U.S., is citizenship from another country outside the

6   United States.  There are some countries that we cannot do

7   business but Mexico is of course okay.  And then they had to

8   make sure they live abroad.  They have to have their primary

9   residence outside the United States.

10  Q    If they don't -- if they live in Texas, could you have

11  worked with her if she lived in Texas?

12  A    If that's not her primary residence, yeah, 'cause to -- a

13  lot of our international clients have a U.S. mailing address.

14  But yes, they have to have their primary residence outside the

15  United States.

16  Q    Okay.  Is that requirement for you to work with the client

17  or for a particular type of investment?

18  A    That's for us to be able to open a non-resident client

19  account.  They have to be an NRA and that's usually the

20  criteria.  Because the investments we have, they don't pay

21  taxes, income taxes or state taxation.  So we want to make sure

22  that it's offered only to international clients.

23  Q    So after she was -- Ms. Perez-Ceballos was referred to

24  you, did you meet with her?

25  A    Yes.  After I briefly asked her a few questions to see if

Arnold - Direct / By Ms. Hampton                    128

1   she's considered a non-resident alien, we set an appointment to

2   meet downtown Houston.

3   Q    What questions did you ask her to consider her a non-

4   resident alien?

5   A    Usually will be basically where she is citizen.  If she

6   have -- does she have a passport from Mexico.  I mentioned to

7   her what usually will we need in order to make copies of it.

8   Usually will be two forms of ID.  A voter registration card

9   from Mexico is usually one of the best because it shows the

10  address in Mexico and is official, and then also the passport.

11  And she had both of those.  And then the other question usually

12  is where you pay your taxes and she told me she pays taxes in

13  Mexico.  And the voter ID usually will be used as a

14  verification of residence as well.

15  Q    And where did Ms. Perez-Ceballos told you -- tell you that

16  she resided in August of 2013 when you were speaking to her?

17  A    Well, over the phone we didn't cover that but when she met

18  me later, then we went over an application process and that's

19  where I was able to get information about her residency in

20  Mexico and her mailing address which is the residence in Sugar

21  Land.

22  Q    Do you remember the address in Sugar Land?

23  A    No.

24  Q    Okay.  We'll get to that in a minute.

25       When you met with Ms. Perez-Ceballos, what was

1   discussed?

2   A     Usually learn a little bit about her investment

3   objectives, what her plans are with the money that she is

4   bringing from UBS.  A little bit about, you know, what is the

5   strategy.  What kind of expected return she's looking at.

6   Trying to determine her risk tolerance and to get a little bit

7   more information about her.  And then for me to determine what

8   will be the best investment for -- for her.

9   Q     Okay.  And what did you-all decide?

10  A     JPMorgan has gotten very limited on the international

11  investments that we offer so at that time we basically had

12  three types of accounts.  One was a regular brokerage account

13  where we cannot put beneficiaries.  And I know when we were

14  discussing being able to put beneficiaries on the account was

15  very important for her for the two daughters.  On a brokerage

16  account, you cannot -- with Chase because with Morgan Stanley

17  you can but not with Chase.  With Chase you cannot put

18  beneficiaries.  And then also on a fixed income account that we

19  have for NRAs, you cannot put beneficiaries.  The only account

20  we could put beneficiary is in a structure called -- it's like

21  a managed account done through Sun Life Financial.  It's an

22  insurance company that has registration in Bermuda.  It's

23  almost like a trust and then inside that trust we put offshore

24  mutual funds.  And in that type of structure we can put

25  beneficiaries.

1   Q    Where are the offshore funds located on the Sun Trust --

2   Sun Life Financial Trust?

3   A    Most of them are Ireland or Luxembourg.

4   Q    And this one?

5   A    I think mostly Ireland use JPMorgan funds, PEMCO funds,

6   MFS  funds.   And  most  of  those  are  registered  in

7   Ireland.

8   Q    And where was the Sun Life Financial account?

9   A    That one's registered in Bermuda.

10  Q    And that's what Ms. Perez-Ceballos decided to do?

11  A    That's the one -- that structure was the one that had the

12  most in mind because we can have beneficiaries.  There's no

13  fees involved for coming in or coming out.  Based on the

14  conversation I had with her, she explained to me that she might

15  need the money within every year for the daughters' school

16  expenses.  We kind of talked a lot about the diversification of

17  the portfolio, what kind of return she was expecting.  So we

18  thought that will be the right structure in order to have no

19  fees to come in or come out.  And then also to be able to do

20  withdrawals for the daughters' education expenses.

21  Q    Did Ms. Perez-Ceballos appear to understand your

22  conversation with her about all of these investment-type issues

23  that you discussed?

24  A    Yes.  I try to, you know, don't be too -- depends on the

25  client's understanding or experience in finance, I try to -- of

Arnold - Direct / By Ms. Hampton                    131

1   course I was speaking Spanish all the time, and then try to

2   make sure she understand.  I believe her brother was with her

3   so he kind of understood a little bit.  But I would imagine --

4   you know, I'm hoping that she understands everything I -- and I

5   -- you know, I usually, any client of mine I always ask them if

6   I say something that you don't understand, please let me know

7   and I can explain it to you in detail.

8   Q    Did Ms. Perez-Ceballos appear to understand your

9   conversation with her?

10  A    I believe so.

11  Q    Do you remember her brother's name?

12  A    This three and a half years ago and uh …

13  Q    Just a question.  You don't remember?

14  A    No, I don't.

15  Q    Okay.  Was anyone else present with Ms. Perez-Ceballos?

16  A    No.  I mean, I -- I believe was a banker.  Usually have  a

17  banker because to discuss the banking business and then I'm the

18  financial adviser.  So it's usually two individuals.  But I

19  believe it was just her and her brother.

20  Q    What was -- what was Ms. Perez's -- Ms. Perez-Ceballos'

21  decision on what to do with this money she was bringing to

22  JPMorgan Chase?  With all of your advice?  Sorry.

23  A    I mean, we were going to do a conservative portfolio with

24  the structure that she can put beneficiaries and with idea of

25  once a year maybe do a withdrawal for the daughters' education

1   expenses.  And that was another reason why recommended very

2   conservative.  Her risk tolerance was conservative as well.

3   But also if she's going to be needing part of that money soon,

4   I want to make sure it was -- it has very low volatility.

5   Q    And so she said she would just need the money about once a

6   year, not soon or not daily or anything like that?

7   A    That's right.

8   Q    Okay.  And she decided to -- I guess my question before

9   was, did she decide to go with the offshore account investment

10  instead of any other alternative?

11  A    Well, yes, that's the one I would recommend because that's

12  the only one we could do her objectives regards having

13  beneficiaries and then also be able to have no fees coming in

14  or coming out.

15  Q    And she told you she would just need to make a withdrawal

16  approximately once a year?

17  A    Yeah, she was -- that's her estimate of maybe she will be

18  needing money once a year.

19  Q    Did she tell you why she needed to make a withdrawal once

20  a year?

21  A    For the daughters' education expenses.

22  Q    Do you know what kind of education expenses she was

23  referring to?  Did she tell you?

24  A    School expenses, maybe tuition, books, room and board --

25  well, not room and board but just mostly education expenses.

1    Q    Do you know where the daughters were going to school -- I

2    mean, in which country?

3    A    Not specifically.  She didn't tell me the school they're

4    going to or anything like that.

5    Q    Do you know what country they were going to school in?

6    A    From my understanding was local school in Sugar Land,

7    close to Sugar Land.  And yeah, not specifically though.

8    Q    Was it a college school or was it like a high school or a

9    junior high?  Do you know?

10   A    Must have been high school because I believe their ages

11   probably were around 14, 16, something like that.

12   Q    Okay.  So you -- you-all meet, she decides let's do this

13   offshore account, right?  What happens next?

14   A    Well, whenever we set up an offshore investment contract

15   -- which is this type of account -- we cannot give a specific

16   information regards to funds we're going to purchase while

17   they're in the U.S.  So in order for them to set it up I can

18   only get general information from them in order to complete an

19   application.  Once their -- once the customer is outside the

20   United States, we can send the documentation for them to

21   complete it and then send it back to us.  That's just a

22   requirement that Chase had in order to make sure there's a

23   customer that lives outside the United States.

24   Q    Why is that so important to Chase on this type of

25   investment?

1  A    They just want to make sure that it's a customer that

2  lives abroad.  That it's not a person that is trying to avoid

3  tax -- taxation.

4  Q    Okay.  And so in this particular instance, you couldn't

5  give her the paperwork, Ms. Perez-Ceballos, right in front of

6  you.

7  A    That's right.

8  Q    You had to have her leave the office and mail it where?

9  A    By UPS to another country.  In this case was Mexico.

10 Q    An address she gave you in Mexico, correct?

11 A    Yes.  I believe her brother gave me an address to send it

12 to him because he wanted to review the documentation.

13 Q    In Mexico or in the U.S.?

14 A    In Mexico.

15 Q    Okay.  Her brother that was with her in the office?

16 A    That's right.

17 Q    Okay.  And so you did that.  You mailed the documentation.

18 Did you mail it twice to her brother and to her or just once to

19 her brother?

20 A    I think it was just mailed to him with all the application

21 process and the specific information about the funds, the

22 offshore funds.

23 Q    Okay.  And then did something happen?  What happened next?

24 Did she bring back the application to you after it had been

25 mailed off?

1   A    Usually after we mail it, we'll put a UPS envelope to send

2   it back.

3   Q    Okay.

4   A    But sometimes if a customer is in the U.S. and they bring

5   it to the U.S., they have to sign an attestation form that

6   specifies that they sign it -- they received it outside the

7   United States and they brought it with them to the United

8   States.  But the main key is that Chase wants to make sure that

9   they sign it outside the United States.  In this case --

10  Q    Did you explain that to Ms. Perez-Ceballos?

11  A    Yes, the -- in order for us to be able to set up that

12  account, we had to send you the documents outside the United

13  States to have it signed outside the United States and then

14  send it back to the United States.

15  Q    What would happen if in an account situation you found out

16  that that didn't happen?  That the -- you mailed it off to

17  Mexico but the person maybe had someone retrieve it in Mexico

18  and actually signed it in the U.S..  What problems would that

19  present, if any?

20  A    Well, if I know that, I at least have to tell them, well,

21  I need to wait until you are back in Mexico for me to resend it

22  back if I were to know that.

23  Q    What happened in this case?  Did Ms. Perez-Ceballos mail

24  it back to you or did she come and bring it back to you in

25  person?

1   A    At first I didn't remember because I don't have my notes

2   since those are back at JPMorgan.  But on the interviews I had

3   with Agent Trevino, she showed me that was brought in by her

4   and that she signed the Attestation Form.

5   Q    What is the "Attestation Form"?

6   A    It's just basically a form that she's specifying that she

7   received the documents while she was outside the United States

8   and that they signed them outside the United States and they

9   brought it with them to -- to United States.

10  Q    So she -- is this something that she's swearing under oath

11  in an attestation, maybe under the penalty of perjury?

12       **(No audible response)**

13       You said she --

14  A    I don't know the exact writing in the form so --

15  Q    She attests which --

16  A    Yeah.

17  Q    -- is another word for that swears that this is true.

18  A    Yes.

19  Q    okay.  So she says she received the documents outside of

20  Mexico, correct?

21  A    Correct.

22  Q    That she signed --

23       **MR. REYNAL:**  Objection, leading, your Honor.

24       **THE COURT:**  Sustained.

25  Q    Where did she say she signed the documents?

1    A     Mexico.

2    Q     And where did she say -- did she tell you whether she

3    brought those documents back to the U.S.?

4    A     Yes.  You will -- yeah.  In order to do an Attestation

5    Form means that they brought them in.  They will not do an

6    Attestation Form if there was no --

7    Q     Where did she tell you she received the documents?

8    A     In Mexico.

9    Q     So she comes into your office with this paperwork.  What

10   happens next?

11   A     And then after we received the documentation, we submit it

12   to Chase.  There's two type of applications within the

13   documentation.  One is for Chase processing and then the other

14   one is with Sun Life.  So the approval process takes about a

15   week.  Chase does their due diligence and then they submit that

16   documentation to Sun Life and they do their own due diligence.

17   They do a verification of the client.

18   Q     Okay.

19   A     And -- but that's done through a different department in

20   New York.

21   Q     At this time when she -- when Ms. Perez-Ceballos brought

22   the documents back to you, do you ask her more specific

23   questions about her situation?  Her status?  Poignant questions

24   about her?

25   A     When she brought 'em in?

1    Q    Yes.

2    A    See, I don't believe I was in the office when she brought

3    'em in.

4    Q    During the first meeting you had with her, do you ask her

5    specific questions:  Are you married?  Where do you reside?

6    Those types of things?

7    A    Yes, of course, yeah.

8    Q    And where did she tell you she resides?

9    A    When I did the preliminary application to help her

10   complete the documentation is -- was in Tabasco, Texas,

11   Tabasco, Tex -- I mean, Mexico, I'm sorry.  Mexico residence

12   and mailing address was in the United States.

13   Q    Did you require a documentation showing that she resided

14   in Tabasco?

15   A    Yes, her voter registration card which is what we cover

16   before she came.

17   Q    Any utility bills required?  Credit card bills or anything

18   like that?

19   A    If a customer doesn't have a voter ID, sometimes we will

20   ask for a utility bill that is no more than 90 days past due,

21   or a bank statement from another account they have in Mexico.

22   Q    Did you ask for that from Ms. Perez-Ceballos?

23   A    No because she had her voter ID and it showed the address

24   of her residence.

25   Q    Did you ask Ms. Perez-Ceballos where the funds came from

Arnold - Direct / By Ms. Hampton                    139

1    that she was bringing to JPMorgan Chase?

2    A    Yes.  The funds came from an account with UBS and she

3    brought a statement from UBS.  And basically we ask her where

4    the source of wealth for that investment.  And she had

5    mentioned to me she had two different businesses and she sold

6    part shares of those -- that business.  I don't remember the

7    names but I know with Agent Trevino, she revealed some notes

8    that I taken.  And there were some kind of like consulting

9    firms.  She sold part her shares of that firm in order to build

10   that account.  And she did that in order to spend more time

11   with her daughters.

12   Q    When Ms. Perez-Ceballos told you about the two companies,

13   were they U.S. companies or Mexican companies?

14   A    They were two Mexican companies.

15   Q    Did you document the name of those companies?

16   A    She mentioned to me.  I -- the names it was -- I didn't

17   want to misspell it so I had her write both of the names of the

18   companies.

19   Q    Okay.

20   A    Yeah.

21   Q    And did she tell you whether the sale of this company --

22   why -- first of all, why do you -- did you ask her whether the

23   source was from a sale of a company?  That's one of the things

24   you asked or no?

25   A    Well, that's -- that's what she mentioned to me that the

1   funds came from, from -- she sold part ownership of that

2   company and yeah.  So.

3   Q    Did Ms. Perez-Ceballos indicate when the sale had

4   occurred?  Was it recent or was it a long time ago?

5   A    I don't remember if I asked her exactly what year she sold

6   it.  If she did, I probably put in notes with JPMorgan.

7   Q    Did Ms. Perez-Ceballos tell you why she sold her company?

8   A    Yes.  I believe she said that she wanted to spend more

9   time with her daughters because she wants to get more involved

10  in their education.  And that she wanted to reduce the amount

11  of work she was doing in Mexico and to be able to spend more

12  time with them.

13  Q    Did -- I mean, you were the one present with Ms. Perez-

14  Ceballos when she's telling you these things.  Did you get the

15  impression that it was a recent sale and that she was recently

16  wanting to spend more time with her daughter [sic] instead of

17  work or was it something that happened a long time ago?

18  A    Yeah, I got the impression that maybe had happened within

19  a year or two years.

20  Q    And what did she tell you the type of business it was?

21  A    It was called something Assessorial (phonetic) or

22  something which is consulting firm or other businesses.  I take

23  good notes in my customer contact log in the file but since

24  that's JPMorgan, I don't have access to that.  But if I had

25  those access I would give you in details.

Arnold - Direct / By Ms. Hampton                    141

1   Q    We'll put that up in a minute.

2         What about -- did you go over Ms. Perez-Ceballos'

3   marital status?

4   A    I believe in the questionnaire, there is a question on

5   that.  I believe it said -- it was married.  From my

6   recollection I believe she had told me she was separated so I

7   never went more in detail about her husband.

8   Q    Ms. Perez-Ceballos told you she was separated?

9   A    I believe so.

10  Q    If Ms. Perez-Ceballos had told you that she was married,

11  would you have been required to do anything additional

12  regarding her husband?

13  A    Is she's married and there's -- yes.  Sun Life will

14  probably require for us to -- well, unless the source of wealth

15  comes from her husband, then Sun Life would ask us to get more

16  documentation about the husband.

17  Q    When --

18         **THE COURT:**  Let's break right there.  Let's go ahead

19  and take a lunch break.  It's almost 12:00.  If you'll return

20  at 1:15.  Please remember your instructions.  Don't discuss the

21  case with anyone at all and don't try to get information

22  outside the courtroom.  Thank you.

23         **THE MARSHAL:**  All rise.

24     **(Jurors exit courtroom; pause)**

25         **THE COURT:**  You can step down sir.

1        **(Witness steps down)**

2              All right.  I won't keep you long but just the two

3    issues are still remaining regarding you-all are visiting about

4    I guess exculpatory documents that the government may have

5    asked the Mexican government for.  And then the issue of the

6    credibility of Ms. Cruz, right?  You-all are still visiting

7    about that or where are we?

8              Did you show them the document where the court

9    adopted the findings?

10             **MR. REYNAL:**  I did and I don't know if your Honor

11   would like to review it over the lunch break.

12             **THE COURT:**  If you have a copy I'll take it.

13             **MR. REYNAL:**  Mexican judicial documents sometimes are

14   fairly long.  I took the liberty of --

15             **THE COURT:**  Can you direct me to a particular person

16   -- I mean, a page?  Okay.

17             **MR. REYNAL:**  Yeah.  I tabbed off where they began

18   discussing the --

19             **THE COURT:**  And the government has a copy or --

20             **MR. REYNAL:**  Sure.

21             **THE COURT:**  -- they've looked at that.  Okay.  So

22   anything else on that issue right now from the government?

23             **MR. REYNAL:**  Let me also just -- I don't think your

24   Honor's -- just in case your Honor wants to see it, I don't

25   want you to be without it.  That's the relevant part of the

1   document but it actually comes in two folios so I will hand up

2   the other one.   I don't think it's -- I don't think the first

3   400 pages are important but I want --

4           **THE COURT:**  So what you tabbed for me is what?   This

5   blue tab?

6           **MR. REYNAL:**  The blue tab is where they begin

7   discussing the Human Rights Commission Report.

8           **THE COURT:**  Okay.

9           **MR. REYNAL:**  But as you'll see, it begins on a later

10  page --

11          **THE COURT:**  Okay.

12          **MR. REYNAL:**  That first document has the beginning of

13  it and this is by translation.

14          **THE COURT:**  Okay.  But you don't have anything at

15  this point on this or you-all are going to look at it also?

16          **MR. MUSCHENHEIM:**  We need to look at it and talk

17  about it ourselves, your Honor.

18          **THE COURT:**  Okay.  And then what about the other

19  issue you-all were conferring on during the break?

20          **MR. MUSCHENHEIM:**  I guess I don't understand the

21  other issue if it's --

22          **THE COURT:**  Well it's something to do with whether

23  the U.S. prosecutors had requested certain information from the

24  Mexican government and what had been received.  And I guess

25  what you all received has been turned over but there were

1    specific questions as to whether you-all had requested certain

2    documents is my understanding.

3              **MR. REYNAL:**  I have a discovery letter that I sent to

4    the government and I will get a copy of it ready to review it

5    and we can file it (indisc.).

6              **THE COURT:**  Okay.  I just keep asking about this

7    because I don't want us to -- I don't want to waste jury time

8    having to address it.  We address things during lunch, during

9    the breaks, before trial, after trial as much as possible.  So

10   you-all need to stay on it because I'm not going to be very

11   happy if we have to recess during some testimony to address

12   these issues.  Okay?

13             **MS. HAMPTON:**  Yes, your Honor.

14             **THE COURT:**  All right.  Thank you.  You can be

15   excused.

16        **(Recess taken from 11:58 a.m. to 1:12 p.m.)**

17        **(Morning session concluded at 11:58 a.m.)**

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

October 3, 2017

                    Signed                                    Dated

*TONI HUDSON, TRANSCRIBER*