UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,    )   CASE NO: 2:17-CR-00245-3
                       )
         Plaintiff,    )     CRIMINAL
                       )
   vs.              )   Corpus Christi, Texas
                       )
SILVIA BEATRIZ PEREZ-CEBALLOS, )  Tuesday, October 3, 2017
                       )
         Defendant.   )  (1:12 p.m. to 5:24 p.m.)
                        AFTERNOON SESSION


JURY TRIAL - DAY 2
VOLUME II OF II, PAGES 145 THROUGH 324

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


**APPEARANCES:**         SEE PAGE 2


Court Recorder:       Genay Rogan

Interpreters:         Judy Hawks / Steven Mines
                    Lorena Parada-Valdes

Clerk:                Brandy Cortez

Court Security Officer:  Adrian Perez

Deputy U.S. Marshal:    Justin De Los Santos

Transcribed by:       Exceptional Reporting Services, Inc.
                    P.O. Box 18668
                    Corpus Christi, TX 78480-8668
                    361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**<u>APPEARANCES FOR</u>:**


Plaintiff:                      JULIE HAMPTON, ESQ.
                                JON MUSCHENHEIM, ESQ.
                                U.S. Attorney's Office
                                1000 Louisiana, Suite 2300
                                Houston, TX 77002

Defendant:                      FEDERICO ANDINO REYNAL, ESQ.
                                JOSEPH C. MAGLIOLO, JR., ESQ.
                                Fertitta Reynal
                                808 Travis, Suite 1005
                                Houston, TX 77002

                                SETH H. KRETZER, ESQ.
                                440 Louisiana St., Suite 1440
                                Houston, TX 77002

## INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | REDIRECT |
|---|---|---|---|---|
| PAUL ARNOLD | 154 | 200 | 217 | |
| ENRIQUE MARICHAL | 224 | | | |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 29, 30, 37 | 155 |
| 116 | 187 |
| 95 | 270 |

```
 1        Corpus Christi, Texas; Tuesday, October 3, 2017; 1:12 p.m.

 2                (An Interpreter Utilized for Translation)

 3                            (Call to Order)

 4          (Outside the presence of the jury)

 5              THE COURT:  Okay.  Any issues to address before the

 6   jury comes in?

 7              MS. HAMPTON:  I would like to admit my power point

 8   from opening as part of the record so that it's clear on appeal

 9   what was argued.

10              THE COURT:  Argued.  I mean, what was -- what you did

11   in your opening?  That's fine just for the record, not --

12              MR. REYNAL:  For the record, not for the jury.

13              THE COURT:  Not for the jury.

14              MS. HAMPTON:  Right, not for the jury.  Thank you.

15              MR. REYNAL:  I'd just ask for a copy.

16              MS. HAMPTON:  Oh, sure and I have a photocopy

17   (indisc.) Thank you.

18              MR. REYNAL:  Oh, it's for the record.  Just for the

19   record.

20              THE COURT:  Just for the record.

21              Anything from the defense?

22          (No audible response)

23              Okay, has the Government looked at the issue anymore

24   on the credibility of Ms. Cruz?

25              MR. MUSCHENHEIM:  Yes.
```

1      **THE COURT:**  Findings?

2      **MR. MUSCHENHEIM:**  Yes, your Honor, there's a couple

3  of things about it.  First of all this witness to the extent

4  it's a specific instance of misconduct that she committed that

5  would affect her truthfulness -- well 608 doesn't allow

6  specific instances of misconduct to conduct truthfulness.

7  However, I understand client -- counsel's point in as it shows

8  bias.  I think that asking her about bias is certainly within

9  something he could do.  Are you biased because of the

10 prosecutor like you did at the other hearing?  The question is

11 does the jury get that document?  That's one of the questions.

12 I don't think they should. It's full of witness statements.  We

13 don't get to cross examine it.  It's way more than just a

14 judicial finding.  The finding in there is that because they

15 decided not to use that evidence, they -- they -- it's

16 basically like a motion to suppress finding.  We're not using

17 this evidence.  It's not a finding that Luz is -- committed

18 some misconduct herself and so they want to attack her

19 misconduct with a judicial opinion from something she wasn't

20 involved in.

21     You know, to say isn't it true that Mr. Saiz-Pineda

22 had this finding from -- from a federal court?  I think that --

23 probably a legitimate question to ask.  It was in counsel's

24 opening.  I think he should get to ask that and she will say

25 what she's going to say.  But to say --

1          **THE COURT:**  Yes.

2          **MR. MUSCHENHEIM:**  -- isn't it true that you were

3     found to have violated the rights of Marlis and -- and to admit

4     that -- those details, that -- Marlis is on their witness list,

5     it -- we should get to test that on cross examination what

6     happened.

7          **THE COURT:**  All right.

8          **MR. REYNAL:**  Your Honor?

9          **THE COURT:**  How does it come -- how does it come in?

10         **MR. REYNAL:**  I'm not --

11         **THE COURT:**  And -- and it's two different things.

12    One, to question her about it versus a document coming in also.

13         **MR. REYNAL:**  I'm just seeking to question her about

14    it.

15         **THE COURT:**  Okay.  And, specifically though, about

16    some of the findings herein, correct?

17         **MR. REYNAL:**  Yes, absolutely.  I -- I asked her

18    whether the, you know, the National Human Rights Commission

19    Report refers by initials and I -- I laid the predicate at the

20    hearing this morning that they're referring to her through my

21    questioning and I -- I can give a copy of the record from this

22    morning to -- from yesterday morning to you.

23         **THE COURT:**  So you're not seeking to introduce the

24    document, you're seeking to introduce what the --

25         **MR. REYNAL:**  That she lied during the -- that there

1    was a finding that she had been dishonest.

2           **THE COURT:**  And the Government's seeking to exclude

3    that question?

4           **MR. MUSCHENHEIM:**  That -- that Ms. Luz was found

5    dishonest in a hearing and I didn't see that in the document

6    that was offered to me this morning.

7           **MR. REYNAL:**  If -- if I may, your Honor, I can refer

8    to those records this morning on page 19, I -- I asked her a

9    question.

10          "QUESTION:  Later on it was determined by the

11          Mexico's National Human Rights Commission that those

12          statements had been the product of coercion?

13          "ANSWER:  That's right.

14          "And referring to you and the other prosecutors the

15          National Rights Commission, Human Rights Commission

16          wrote, (quote) 'Also the Human Rights Commission

17          makes a report to the Attorney General of the State

18          of Tabasco for filing reports that do not match how

19          the actual facts happened.  The situation of what's a

20          clear distain for the culture of the legality and

21          respect for human rights ignoring the truth and

22          obstructing the work of this national organization in

23          the investigation of the violation of the human

24          rights of the victims.  That's true, isn't it?

25          "ANSWER:  The document is true."

1          **THE COURT:**  Okay.  So here's the question though.  I

2    understand this goes towards bias or whatever but the findings

3    themselves, how does that come?  Evidentiary-wise, how do we

4    bring that in?  Obviously, when we have criminal offense trying

5    to come in or conviction, there's the rules that we follow in

6    609 or whatever the rule is.  So how does this come in?  I

7    agree, it's very relevant.  It's regarding this very issue.

8    You can question her about some things but I'm just a little

9    concerned about the findings themselves.  How does that -- how

10   -- under what does that come in?

11         **MR. REYNAL:**  It goes to the heart of our right to

12   impeach her credibility under the Sixth Amendment by bringing

13   to her --

14         **THE COURT:**  I know, I know but say she has a criminal

15   conviction, we still have to follow certain rules of evidence.

16   Oh, it comes under this and it meets the rule because X, Y and

17   Z, so I'm trying to figure out where that comes in or how --

18         **MR. REYNAL:**  It comes in as prior conduct (indisc.)

19   dishonesty.

20         **THE COURT:**  And that's in with -- I -- I'm not, I'm

21   just trying to be careful as to where we allow it in.  I'm not

22   really saying you shouldn't go there because I think you

23   should.  I'm just trying to be sure it is proper under the

24   rules.

25         **MR. MUSCHENHEIM:**  It's -- that's just 608(b),

1    extrinsic evidence is not admissible to prove specifics --

2    specific things, thank you, of a witness conduct in order to

3    attack the witness's character for truthfulness, your Honor.

4    So -- so --

5              THE COURT:  Okay.  We'll pick up --

6         **(Voices overlapping)**

7              MR. REYNAL:  But the court may, on cross examination

8    allow them to be inquired into if they are probative of the

9    character for truthfulness of -- or untruthfulness of the

10   witness.

11             THE COURT:  So we will pick up there at our next

12   break and we'll continue because I'm assuming the jury

13   (indisc.)

14             MR. MUSCHENHEIM:  Okay.

15             MR. REYNAL:  608(b)(1), your Honor.

16             MR. MUSCHENHEIM:  Thank you, your Honor, and anyway,

17   I -- I didn't agree with everything he said but (indisc.)  I'll

18   do it at the next break.

19             THE COURT:  No, that's okay, we can finish it out.

20   We're doing -- at least we're making progress.

21             MR. MUSCHENHEIM:  Okay.  Yes, your Honor.

22             MS. HAMPTON:  And she's not going to be our next

23   witness, your Honor.  Just -- if you need more time.

24             MR. REYNAL:  Can we inquire as to who the next

25   witness is?

1        **MS. HAMPTON:**  Mr. Marichal is, your Honor.  He's very

2   sick and he needs to get back home.  He's undergoing

3   chemotherapy.  We -- we're taking him out of order.

4        **THE COURT:**  Okay.

5        **MR. REYNAL:**  Marichal.

6        **THE MARSHAL:**  All rise for the jury.

7     **(The jury entered the Courtroom at 1:19 p.m.)**

8        **THE COURT:**  You can have a seat and we'll continue

9   with the witness.

10        **MS. HAMPTON:**  Thank you, your Honor.

11       **PAUL ARNOLD, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

12                  **DIRECT EXAMINATION (CONTINUED)**

13  BY MS. HAMPTON:

14  Q    Mr. Arnold, we were discussing whether -- what Ms. Perez-

15  Ceballos told you about her marital status?  What did she tell

16  you?

17  A    That she was married and I believe she said she was

18  separated.

19  Q    And did you -- did you take that to mean physically, like

20  by distance separated or something else?

21  A    Something else, like they're not talking to each other or

22  not together.

23  Q    Did Ms. Perez-Ceballos tell you about any properties she

24  owns in the U.S. as part of your discussions with her?

25  A    No.  She did mention they have properties in Mexico but

1   not the U.S.

2   Q    Did she mention that she has a vacation home in the U.S.?

3            MR. REYNAL:  Objection.  Facts not in evidence, your

4   Honor.

5            THE COURT:  Overruled.

6   BY MS. HAMPTON:

7   A    I don't believe so except the one in Sugar Land.  That's

8   kind of like a vacation home.

9            MS. HAMPTON:  Your Honor, at this time the Government

10  offers to admit Exhibits 29, 30, and 37.

11       **(Pause)**

12           MR. REYNAL:  No objection, your Honor.

13           THE COURT:  All right.  They're admitted.  That's 29,

14  30 and 37.

15       **(Government's Exhibits Numbers 29, 30 and 37 were received**

16  **in evidence)**

17  BY MS. HAMPTON:

18  Q    Mr. Arnold, do you remember in speaking to me prior to

19  your testimony discussing whether Ms. Perez-Ceballos had told

20  you she has vacation homes in the U.S.?

21  A    No.  No, the only house that I thought she had in the U.S.

22  was the one in Sugar Land.

23  Q    Do you remember telling me that you believe Ms. Perez-

24  Ceballos told you about another house?

25           MR. REYNAL:  Objection, your Honor.  Improper

1    impeachment.  He said that the only thing he remembered was the

2    house in Sugar Land.

3              **THE COURT:**  Sustained.

4              **MR. REYNAL:**  Thank you.

5    **BY MS. HAMPTON:**

6    Q    Okay, let's look at Exhibit Number 29.  Okay.  Did

7    Ms. Perez-Ceballos tell you what she would be making

8    withdrawals from this account for?

9    A    For the daughters' education expenses.

10   Q    Did Ms. Perez-Ceballos tell you where her daughters were

11   residing?

12   A    In Sugar Land.

13   Q    And Ms. Perez-Ceballos told you she was residing where?

14   A    In Mexico.

15   Q    Okay.  Did you question why her children were living in

16   Texas and she was living in Mexico?

17   A    Well they didn't -- I believe that she -- they were just

18   going for summer school or some schooling here in the U.S., but

19   I didn't think they would be living all the time in the U.S.

20   Q    Okay.  So this is --

21             **MS. HAMPTON:**  Is this Exhibit 29?

22        **(Voice off the record)**

23             **MS. HAMPTON:**  Can you go to account application?  Can

24   you go down a little bit?  I mean, to the top.  To the top.

25   //

Arnold - Direct / By Ms. Hampton                    157

1   **BY MS. HAMPTON:**

2   Q     This is -- what -- can you tell us what this page is, this

3   is the first page of this Exhibit?

4   A     Looks like for the bank's.  It looks like a -- the form

5   that is used for opening a checking account or savings account.

6   Q     Okay.  And who's this for, who's the account holder?

7   A     Looks like a checking -- yeah, it's a Chase checking

8   account and it's for Ophelia Cruz.

9   Q     Top left corner?

10  A     Oh, over there to the left, okay, Sylvia B. Perez-

11  Ceballos.

12  Q     And the date opened was what?

13  A     June 14, 2013.

14  Q     And it was open as a new account it states, is that

15  correct?

16  A     It looks like it, yes.

17  Q     What does that mean, a new account, when it says that on

18  here?

19  A     That they didn't have a prior account with Chase.  It's a

20  new relationship.

21  Q     Anywhere in the world?

22  A     Yes.  It's with a system.  If there was another account

23  open, in New York it would pick it up.

24  Q     Okay.  So this June 14, 2013, application of Ms. Perez-

25  Ceballos was the first time she had a banking relationship with

1   JP Morgan Chase?

2   A     From looking at this, yes.

3   Q     Okay.  And does it show where she opened the account?

4   Under issued by on the right?

5   A     JP Morgan Chase, Richmond Sage, yeah, that's the branch

6   close to the Galleria.

7   Q     And the address that she gave?

8   A     Calle Three, I guess, 115 Colonia Rovirosa (phonetic),

9   Central Tabasco, 86050, in Mexico.

10  Q     Okay.

11          **MS. HAMPTON:**  Can you go down?

12  Q     And is that her signature at the bottom?

13  A     I haven't seen other documents -- I would have to see

14  another document that she signed with me to verify it.

15  Q     Sure.  On the left, it says name and then there's a typed

16  name, Sylvia B. Perez-Ceballos, correct?

17  A     But yeah, it looks like that's the signature she put in

18  this document.

19  Q     Okay and the date was again, 6/14 of 13?

20  A     That's right.

21  Q     Okay.  And second page here is a passport of Ms. Perez-

22  Ceballos?

23  A     That's right.

24  Q     And a voter ID card, is that correct?

25  A     That's right.

Arnold - Direct / By Ms. Hampton                    159

1          **MS. HAMPTON:**  Can you turn it around, sir?

2     Q    It's a little hard to read but the address on these

3     documents -- I think the voter ID is a little easier to read.

4     Is that the address that's listed in the bank account as well?

5     A    It looks like it.

6     Q    Okay.

7          **MS. HAMPTON:**  Okay, is there a 30 please?

8     Application?  Can you turn it, please?

9     Q    And what is this document?

10    A    I think that's a signature card for opening a checking

11    account.  I work in the investment side but in the bank side,

12    that's the one that they use to -- for having signatures so you

13    know it to compare with checks.

14    Q    So this is a checking account opened by Ms. Perez-Ceballos

15    and on the same day, right, June 14, 2013?

16    A    That's right.

17    Q    Okay.

18         **MS. HAMPTON:**  Exhibit Number 37, please.  Okay.  Keep

19    going down.  Okay.  Stop.

20    Q    What is this?

21    A    That's the application for the Sun Invest, the Sun Life

22    account.  There's usually two applications.  One is for the

23    general Chase account of Chase Investments and then this is the

24    application for the actual product which is with Sun Life.

25    Q    Okay.  And the address as far as residential address

1    that's given by Ms. Perez-Ceballos was what?

2    A    The same as Calle Tres, 115 Colonia.

3    Q    And the mailing address?

4    A    And then that's one in Sugar Land, the 2706 Lytham

5    (phonetic) Court, Sugar Land, Texas.

6    Q    Is this the Sugar Land address you were referring to?

7    A    Yes.

8    Q    Did you believe that that address belonged to Ms. Perez-

9    Ceballos?

10   A    Yes.

11   Q    Did Ms. Perez-Ceballos ever tell you about another

12   residence in Sugar Land?

13   A    No.

14   Q    Did she ever give you an address on Elmhurst in Sugar

15   Land?

16   A    No.

17   Q    Why did you believe that this Lytham Court address in

18   Sugar Land belonged to Ms. Perez-Ceballos?

19   A    Well the customer wanted her mailing to come to the U.S.

20   and that's the address she provided us.

21   Q    Is that the only reason why you believed?

22   A    I believe -- I believe that was in the bank as well, in

23   the bank documents is a mailing address if I'm not mistaken.

24   Q    You stated earlier that you believed she had a vacation

25   home in Sugar Land.  Why did you believe that?

1  A    Because she gave us an address that her daughters come

2  when they go to school.

3  Q    Oh, did Ms. Perez-Ceballos tell you that her daughters

4  live at Lytham Court in Sugar Land when they come to go to

5  school?

6  A    Not specifically but that's what I thought that they would

7  be living if that's her address in Sugar Land.

8  Q    Did you think that because that's the address in the U.S.

9  Ms. Perez-Ceballos gave you?

10  A    Yes.

11  Q    Did she provide that address to you or did someone else

12  provide that address to you?

13  A    I believe she gave it to us.  She -- she gave the

14  information.

15  Q    Where did Ms. Perez-Ceballos tell you she was bringing

16  this money to JP Morgan Chase from?  What bank?

17  A    From UBS.

18  Q    What did she tell you about her relationship with UBS?

19  A    That she had moved from Florida, their house, the vacation

20  home they had in Florida, they had sold it and moved and they

21  decided to move to Houston and she felt it was a better

22  environment for the daughters to go to school in Houston so

23  that's the reason they had moved to Sugar Land.

24  Q    Well previously I asked you about other vacation homes

25  that Ms. Perez-Ceballos told you about and you said, "No, just

1   the Sugar Land house."  Correct?

2   A    Yeah, but she didn't have that house because she sold the

3   other house.

4            **MR. REYNAL:**  Objection.  Leading, your Honor.

5            **THE COURT:**  Overruled.

6   **BY MS. HAMPTON:**

7   Q    You knew about other vacation homes that Ms. Perez-

8   Ceballos had previously?

9   A    Well she told me she sold the house and then she moved to

10  Houston and she -- and we believed that was the house she had

11  moved to.

12  Q    Where was the house Ms. Perez-Ceballos told you she sold?

13  A    That, I don't know.  She just said she didn't want to live

14  in Miami anymore, I mean she didn't want their daughters to be

15  in Miami.

16  Q    So you know is was in Miami?

17  A    Yes.

18  Q    Okay.

19  A    I think that's what she said.

20  Q    When did she, when did Ms. Perez-Ceballos tell you about

21  the Miami house?

22  A    It was a brief reason as to why she didn't want to live --

23  she wanted to move to Houston because she thought it would be a

24  better environment for the daughters to go to school in Sugar

25  Land.

                    Arnold - Direct / By Ms. Hampton                 163

1   Q    Did Ms. Perez-Ceballos tell you how long she lived in

2   Miami at this vacation house?

3   A    No.

4   Q    Did Ms. Perez-Ceballos tell you when the sale of the

5   vacation home in Miami occurred?

6   A    Not that I recall.  If I did, I put it in my notes, my

7   customer contact log.

8   Q    Did she state whether it was recently that she sold it or

9   a long time ago?

10  A    I don't -- I don't remember.

11  Q    What was the reason Ms. Perez-Ceballos told you about this

12  vacation home in Miami, was it in regard to questioning you

13  were asking?

14  A    No, it's just questions as to why she closing the account

15  from UBS.

16  Q    Did Ms. Perez-Ceballos tell you that she was asked to exit

17  her relationship with UBS?

18  A    No.

19  Q    Would that have caused any red flags if she had told you

20  that?

21  A    Yes.

22  Q    Okay.  Let's go down.  This is again Government's Exhibit

23  Number --

24           **MS. HAMPTON:**  Is this 37?

25           **MS. SPEAKER:**  Yes, 37.

Arnold - Direct / By Ms. Hampton                                    164

1   **BY MS. HAMPTON:**

2   Q    Who did Ms. Perez-Ceballos designate as a guardian under

3   this investment?

4   A    I believe that's her brother, Celso Jose Perez-Ceballos.

5   Q    And that's the brother that came with her to the office

6   when you visited?

7   A    I believe so.

8   Q    Okay.

9         **MS. HAMPTON:**  Can you go down please?  This was page,

10  I can't see the page, I'm sorry.  On top, it was page 6.  Okay.

11  Q    On page 8 from the top, there's a statement here that says

12  source of funds and investment amount) information, correct?

13  A    Correct.

14  Q    And what was the initial investment amount Ms. Perez-

15  Ceballos was bringing to JP Morgan Chase?

16  A    If that's the amount we put in there, that should have

17  been the initial investment, the 1,910,000.

18  Q    Okay.  What is this over here, these initials over here on

19  the side of this investment amount?

20  A    Because we didn't know when we did the application the

21  exact amount, so once the funds -- once we agreed on the funds,

22  we told her that she needs to initial the exact amount we're

23  going to invest because that was in addition to the original

24  documents and whenever there's a change in the documents we

25  have to have the customer initials.

1  Q    And there's two initials here, right?  Why are there two

2  initials?

3  A    Don't know, don't know why there's two initials.  You only

4  need one.

5  Q    Okay.

6          **MS. HAMPTON:**  Keep going down please.  Okay.

7  Q    Here this is under page 9 from the top, signatures.  Whose

8  signature is that?

9  A    It looks like Mrs. Perez' signature.

10 Q    And what's it dated?

11 A    October 11, 2013.

12 Q    Okay.

13         **MS. HAMPTON:**  Keep going please.  Again, in October

14 she provides her voter registration card and on page 12 from

15 the top, is that correct?  Okay.

16 Q    This is page 18 from the top, what's this document?

17 A    That's -- that's the general Chase investment application

18 that we need to fill out.  So you have the Sun Life application

19 and then the Chase investment application whenever we do that

20 type of investments.

21 Q    Okay.

22         **MS. HAMPTON:**  Can you go down, please?

23 Q    What did she list as her address?

24 A    The same one, Calle, C stands for Calle, that Tres, 3, 115

25 Colonia Rovirosa, Centro Tabasco, Mexico.

1  Q    And that's where she stated again where she was residing

2  at the time, correct?

3  A    Yes.

4  Q    And this was in October of 2013?

5  A    Yes, it would have been about the same time with the

6  (indisc.) application.

7  Q    Okay.

8       **MS. HAMPTON:**  You can go down.

9  Q    And then there's a mailing address listed there.  What's

10 the mailing address again?

11 A    The 2706 Lytham Court, Sugar Land, Texas.

12 Q    Okay.  And what did Ms. Perez-Ceballos list as her

13 employment at this point?

14 A    A housewife.

15 Q    Okay.  And at the bottom of this page --

16      **MS. HAMPTON:**  Can we zoom in please?

17 Q    Right under employment, it says select if applicable.  Can

18 you read that for us?

19 A    I am/was a senior military government or political

20 official in a non-U.S. country or I am either closely

21 associated with or I am a spouse, parent, sibling, or child

22 such as an official.

23 Q    What is that question?

24 A    That's -- it's related to if you are politically exposed.

25 That means that if the person has relationship within the

Arnold - Direct / By Ms. Hampton                    167

1   family of someone that is politically related or in a

2   government position.

3   Q    What does that mean?  Is it currently in a government

4   position or always in a government position or what does that

5   mean?

6   A    Usually, it's always.

7   Q    Usually, it's always?

8   A    Yeah, well, always, I'm sorry.  Always.

9   Q    What does that mean?  What do you mean by that?

10  A    That means if you're politically exposed --

11          **MR. REYNAL:**  Your Honor, it calls for speculation as

12  to what the person who's reading this believes versus what he

13  believes.

14          **THE COURT:**  What was the question, Ms.?

15          **MS. HAMPTON:**  What is a politically-exposed person,

16  your Honor?

17          **THE COURT:**  Yeah, overruled.

18  A    The person has family members that are related to someone

19  in government prior or currently or before.

20  Q    And what did Ms. Perez-Ceballos tell you as far as whether

21  she was a politically exposed person?

22  A    Usually, we ask that in Spanish and as far as I know if we

23  didn't check that, that means there was no one in the family

24  related politically.

25  Q    If you had, if you had determined that there was someone

1    in the family that was a current or former political exposed

2    person, would you have checked that box?

3    A    Yes.

4    Q    And what would that -- what would checking that box do as

5    far as the account opening?  What would be required?

6    A    Back then, there would have been more information about

7    the political person.  The reason I said back then is because

8    over the last few years, they don't even allow accounts to be

9    opened if they are politically exposed.  But back then, I

10   believe, it would have required more detailed information about

11   what kind of position that is a decision related to you know

12   principal parts of government or it just like a (indisc.)  They

13   just want to know more information about the position of that -

14   - of that relative that's politically exposed.

15   Q    How is that information obtained by the bank, the

16   additional information?

17   A    Usually, we'll get the name, where they work, their

18   occupation and usually, we just get that information and our

19   due diligence team in New York they, I'm sure they do a Google

20   check and that kind of thing to verify the information.

21   Q    Okay.

22        **MS. HAMPTON:**  Next page please.

23   Q    What is this?  This is page 20 from the top, what is this

24   page?

25   A    That's a summary of their financial information regards to

1    their income, expenses and overall net worth.

2    Q    What did Ms. Perez-Ceballos -- again, is this October of

3    2013?

4    A    Yes.

5    Q    What did Ms. Perez-Ceballos tell you about her total

6    annual income?

7    A    It was a combination of other assets and -- which is

8    rental income and then pension, Social Security, that add up to

9    60,000 of annual income.

10   Q    The other assets you said is rental income.  In Ms. Perez-

11   Ceballos' case, it's rental income?

12   A    I believe so.  I believe she had told me she had some

13   rental property in Mexico.

14   Q    Okay.  Do you know how many rental properties in Mexico?

15   A    I would have to look back in my notes.

16   Q    Okay.  Was -- is there a possibility that there -- well

17   did she tell you there were rental properties in the U.S.?

18   A    No, I don't think so.  I think it was Mexico.

19   Q    Okay.  Just Mexico?  Okay.  And then her expenses, her

20   total annual expenses, what did she say they were?

21   A    Living expenses 2,500 a month which times 12 is around

22   $30,000 annual expenses.

23   Q    And her total net worth at this point she claimed was

24   what?

25   A    About 5,510,000.

1    Q    Okay.

2         **MS. HAMPTON:**  Go down please.

3    Q    Who signed that page?

4    A    Mrs. Perez.

5    Q    Okay.

6         **MS. HAMPTON:**  Next page.

7    Q    Let's see, this is page 21 from the top.  What is this

8    page about?

9    A    That was -- that's the signature page of the contract and

10   then once I receive the documents, then I can sign my part off

11   -- off to submit it for processing.

12   Q    Okay.  So what day did Ms. Perez-Ceballos sign this?

13   A    The 11th.

14   Q    And you signed it?

15   A    On the 16th.

16   Q    After you sign it, what's the process?

17   A    Then, we submit this through a special mail with Chase.

18   It goes to the home office and then the home office starts

19   doing their due diligence.  They do their own due diligence and

20   they submit the other documents to Sun Life.  And Sun Life does

21   their own verification check on the information.

22   Q    Did you have to collect documents to send off with the

23   package to Sun Life from Ms. Perez-Ceballos?

24   A    Collect?  Yeah, yes.

25   Q    What kind of documents?

1    A    Oh, additional documents in the application?

2    Q    Yes, sir.

3    A    Yes, it would be a passport, a copy of the motor

4    registration card, and I believe we submitted the UBS statement

5    because that was the source of wealth.

6    Q    Okay.

7              **MS. HAMPTON:**  Can you keep going, please?

8    Q    Okay, this is page 37 from the top.  What is this?

9    A    That's the UBS statement that I believe we used to show

10   the source of wealth.

11   Q    Where did you receive this document?

12   A    Where I was when I received it?

13   Q    I'm sorry, who did you receive this document from?

14   A    Oh, Mrs. Perez.

15   Q    Did she hand it to you in person or was it mailed to you?

16   A    I believe that was in person.

17   Q    Okay.  This -- what was the purpose of Ms. Perez-Ceballos

18   bringing you this document?

19   A    It's to get an idea as regards to wealth and then also the

20   styling of account.  Because at the time, I didn't know were we

21   going to do a brokerage account or an offshore investment

22   contract.  So if we do a brokerage account, we would do an

23   ACAT, and we need a statement to do that.

24   Q    So this is when you're first talking to her about moving

25   the money to Bermuda and before you actually move it to

1    Bermuda, which was in October, correct?

2    A    That's right.

3    Q    This is just to get base level what you're dealing with?

4    A    Yeah, and what type of investment she has and that kind of

5    thing.

6    Q    Okay.  So this statement says it's from UBS, and it says

7    it's from August of 2013, correct?

8    A    That's right.

9    Q    Was it important to have a current statement from where

10   the money's coming from for you to view when you're making your

11   analysis?

12   A    Yes.  Usually, they want something within 60 -- 60 days.

13   Q    Okay.  And who is the accountholder here?

14   A    It's Silvia Beatriz Perez-Ceballos.

15   Q    Does there appear to be a joint accountholder here?

16   A    No.

17   Q    If there were a joint accountholder for this UBS account,

18   what would you expect this document to look like?

19   A    There would be another person next to it or below it.

20   Q    Is there any address on this document, the face of this

21   document, that you can see?

22   A    No.

23   Q    Okay.

24        MS. HAMPTON:  Can we go back to Exhibit 24, please,

25   that document?  The statements, statements.

Arnold - Direct / By Ms. Hampton                  173

1          **(Pause)**

2     Q     So did Ms. Perez-Ceballos give you an August 2013 UBS

3     statement that looked like this?

4     A     No.

5     Q     What was missing from the statement she gave you?

6     A     It looks like it was missing the address information and

7     then the second name.

8     Q     The second name being Jose Manuel Saiz-Pineda, correct?

9     A     Yes.

10    Q     The address missing being Calle Sanchez Magallanes 113

11    Piso One in Villahermosa, correct?

12    A     Yes.

13    Q     Had Ms. Perez-Ceballos brought you this document in August

14    of 2013 when you were first talking to her, what would you have

15    had to do?

16    A     On the address part, we would like confirm to make sure is

17    this her address in Tabasco or the one from her border

18    registration, so we would have to get a confirmation.  We might

19    have asked for a utility statement to be 100 percent sure it's

20    the correct address.

21           And then whenever there's a second owner, we have to

22    obtain information on that second owner, more specific

23    information regards his source of wealth.

24    Q     Any other information on the second owner?

25    A     I believe some (indisc.) require two forms of IDs from the

**EXCEPTIONAL REPORTING SERVICES, INC**

1   second owner.

2   Q    And what kind of documents regarding source of wealth

3   would you require from the second owner?

4   A    Well, it's usually information as to what -- where the

5   money came from, what does he do.  Most of the time, we'll take

6   the name of the companies and then we do our verification

7   check.  There's no specific document that they're required,

8   back then.  Now Sun Life does.  But back then, they would just

9   have wanted two forms of IDs for the second owner and

10  information about his source of wealth, so what does he do,

11  what kind of occupation, that kind of thing.

12  Q    And what about -- what if the second owner was a

13  politically-exposed person, what additional items would you

14  need?

15  A    Then we would need to know exactly what position he holds

16  and then have to go back and check the box and then see if Sun

17  Life would approve it.

18          MS. HAMPTON:  Can we go back to Exhibit 37, please?

19  JPMS Perez, yeah, all the way down where we were.  Okay.  Hold

20  on here, hold on.

21  Q    The second page here, this is the second page of the

22  August 2013 document as well, correct?

23  A    That's right.

24          MS. HAMPTON:  Keep going.  This is page 38 down from

25  the top.  Okay, stop.

1   Q    Again, page 39, this is an additional page --

2        **MS. HAMPTON:**  Can you go up a little bit, please?

3   Q    -- of the August 2013 statement; is that correct?

4   A    Correct.

5   Q    And is there only one name again and one address here?

6   A    That's right.

7   Q    Or no address, I'm sorry.  Is that correct?

8   A    Yes.

9   Q    Okay.  Okay, so here, this is page 41 from the top, 41

10  down from the top.  What is this page and why is there writing

11  all over it?

12  A    When they called me from the other branch as a referral, I

13  started taking some notes right away as to who the client is,

14  who is referring me the client, which according to this is

15  Javier Vincente, he must be a banker.  Oh, no, that's -- it

16  looks like a financial adviser.  He probably only does

17  domestic, so a financial adviser of the branch.  And I was able

18  to gather information as to that address in the U.S.  It's a

19  mailing address.  That's why I wrote there, mailing.

20  Q    You're referring to the Lytham address; is that correct?

21  A    Yes, Lytham Court, which is the same address that we had

22  on the application.

23  Q    Okay.

24  A    And I just gathered a little bit of information about her

25  employment, how long she did her consulting job.  This is

Arnold - Direct / By Ms. Hampton                    176

1   consulting for ten years.

2           MS. HAMPTON:  Can you go, I'm sorry, down a little

3   bit here.

4   Q    On the bottom, there's some handwriting.  Is this all your

5   handwriting?

6   A    Yes.

7   Q    Okay.  On the bottom there's some handwriting, right here

8   I'm pointing to it up here on the screen, up here.  The dot

9   won't show up.  If you can look up here, Mr. Arnold.

10  A    Okay.

11  Q    Right about here (indicating).  What does that say on the

12  bottom?

13  A    To send Monday, October 7th.

14  Q    No, can you see where the pointer is here?

15  A    Okay, yes.  Has account with UBS in Miami.  The

16  approximate size of that account is about $2 million.

17  Q    Okay.

18          MS. HAMPTON:  Can we go to the next page, please?

19  Q    And so what is this?  This is page 42.  What is this?

20  A    It looks like their receipt from a UPS statement.  I mean

21  a UPS bill.

22  Q    You said before in your earlier testimony that you were

23  requested to send the documents into Mexico to

24  Ms. Perez-Ceballos' brother; is that correct?

25  A    Yes.  The brother wanted to review them.  It seemed like

Arnold - Direct / By Ms. Hampton                    177

1  he told us that he knows a little bit more about investments,

2  or is more savvy about investments, so he wanted to review the

3  documentation, and -- and it was okay for us to send it to him

4  in Mexico.

5  Q    So this is -- this is the address in Mexico you sent it to

6  Celso Perez-Ceballos, correct?

7  A    Yes, yes.

8  Q    Is this the address you sent with the attestation you

9  talked about earlier, where she was supposed to attest to

10 receiving it in Mexico, or was there a different package?

11 A    No, the attestation doesn't specify what address she

12 received the document.  It just says that she received the

13 documents in Mexico.

14 Q    Did you send the attestation with this package, or was

15 there a different package?

16 A    No, the attestation is only done if a customer decides to

17 bring the documents to the U.S.

18 Q    Okay.

19 A    Most the time, we will put another UPS envelope inside

20 this one so the customer sends it back by UPS.

21 Q    Okay.  This is page 44 of Exhibit 37.  This is an e-mail

22 to you; is that correct?

23 A    Yes.

24 Q    Can you tell us about what day this happened?

25 A    It's Thursday, October the 3rd.

1   Q    Of 2013?

2   A    2013, yeah.

3   Q    And who is e-mail from?

4   A    It looks like from her brother, Celso Perez.

5   Q    And what's the e-mail regarding?

6   A    "Thank you for your time this morning.  In continuation of

7   what we talked about."  He wanted to be more specific of how

8   we're going to divide the beneficiaries, their exact names of

9   the beneficiaries and the date of birth.  Because I told them

10  that whenever we have beneficiaries, we need that information

11  specific.  And then he wanted me to send it to his address in

12  Mexico in order for me to send it UPS.

13  Q    Okay.  Next page, what is this?

14  A    That's my -- my own notes.  When I originally start

15  gathering information from the client, and usually I do this

16  when the customer is present.  I kind of start getting idea

17  what's their mailing address, their residence, who is going to

18  be the primary owners of the account, and then the

19  beneficiaries.

20  Q    Who is the one giving you this information?

21  A    The client.

22  Q    Who's the client?

23  A    Mrs. Perez.

24  Q    Okay.

25          **MS. HAMPTON:**  Next page, please.

Arnold - Direct / By Ms. Hampton                179

1   Q    This is page 46 of this Exhibit 37 under JPMS Perez.  What

2   is this?

3   A    That's notes because she has to do the financial

4   documentation that we saw earlier, so in order for me to gather

5   the data in order to complete the form, help the client

6   complete the form, I start asking her about her source of

7   income and her expenses, and then her overall assets.  Then

8   also in this form she had mentioned the two companies that she

9   worked before, or she sold part ownership, and I was having

10  trouble writing it correctly so I just asked her to write those

11  two companies for me.

12  Q    The two companies are where I'm pointing to up here; is

13  that correct?

14  A    Yes.

15  Q    Okay.  What are the names of the two companies?

16  A    The first one is Asesoria Integral Para Su Empresa

17  (indisc.) de Seve (phonetic), and then the other one is

18  Investigaciones y Servicios Mutiples de Personel en la

19  (indisc.) (phonetic).

20  Q    What did Ms. Perez-Ceballos tell you about her

21  relationship with these two companies?

22  A    As far as I can remember, she was part owner of those

23  companies.  I don't know if she owned shares and she sold part

24  of that ownership to be able to just kind of decide not to

25  continue working.

1  Q    Why did she tell you about these two companies?  Was it a

2  response to a question that you asked?

3  A    Yeah.  In addition to knowing where the funds are coming,

4  the source of funds, we also need to know the source of wealth,

5  as to how was the money created inside the UBS account.  So she

6  provided me this information as to kind of give me an idea

7  exactly how the money was created, and it was basically the

8  selling part of her ownership, is the money she made to have

9  the money in the UBS account.

10 Q    Did Ms. Perez-Ceballos tell you about these companies to

11 tell you about where the money came from in this account?

12 A    No, in the UBS account.  Yes, and then the UBS to us.

13 Q    If Ms. Perez-Ceballos had told UBS that that money was not

14 from the sale of the business, would that have been a problem

15 if you knew that up front in approving her application?

16 A    No.  I mean, we would need to know where the money came

17 from, how she made the money.

18 Q    Well, if she told you that it was from the sale of a

19 business, correct?

20 A    Yes.

21 Q    And then you found out that she told UBS that it wasn't,

22 would that send up a red flag for you?

23 A    Yes.

24 Q    Why?

25 A    There's conflicting information.

1   Q    Did Ms. Perez-Ceballos tell you when she came to talk to

2   you about opening this JP Morgan Chase that her husband had

3   been arrested in Mexico?

4   A    No.

5   Q    Did she tell you that her husband had just left office as

6   Secretary of Finance for the State of Tabasco?

7   A    No.

8   Q    Would those things have sent up a red flag in your

9   application process with Ms. Perez-Ceballos?

10  A    Yes.

11  Q    Would you have been able to approve her application?

12  A    I don't approve applications.  I basically collect data,

13  and I send it to JP Morgan for their due diligence process, but

14  I would gather that information and submit it.

15  Q    From everything you know in your banking, 20 years, you

16  said, banking experience?

17  A    Yes.

18  Q    And the way that your company works, or JP Morgan Chase at

19  the time, do you believe Ms. Perez-Ceballos' application would

20  have been approved if she had disclosed those things?

21  A    Probably not.

22  Q    When was the last time you had any contact with

23  Ms. Perez-Ceballos?

24  A    It was in April of this year.

25  Q    Okay.  Tell us about that.  Why were you in contact with

 1  her then?

 2  A    Just wanted to inform her that I made a change of firms

 3  and -- and basically that I could serve -- I would have a much

 4  better investment platform in the new company, just -- just the

 5  initial conversation just to you let her know that I had made a

 6  change of firms.

 7  Q    I apologize, before we go there, I want to show you one

 8  more thing, okay.  Exhibit 38.  It's towards the end.

 9            THE COURT:  Did you say 38?

10            MS. HAMPTON:  Yes, Your Honor.  This was already

11  preadmitted, I believe.

12            THE COURT:  Okay.

13            MS. HAMPTON:  Scan two, please, towards the end.

14  BY MS. HAMPTON:

15  Q    Okay.  Do you -- do you remember collecting documentation

16  in October of 2013 when you were sending the package off to Sun

17  Life in Bermuda?

18  A    Yes.

19  Q    Did Ms. Perez-Ceballos provide you with additional

20  documentation at that time?

21  A    Yes.

22  Q    And did that include a current UBS statement?

23  A    Yes.  From what I remember, yes.

24  Q    I'm showing you Exhibit Number 38, which is page 98 from

25  the top of scan two.  Do you recognize this?

Arnold - Direct / By Ms. Hampton                              183

1    A    Yes.

2    Q    What is it?

3    A    It looks like a UBS statement from October of 2013.

That's when the position was sold.  Yeah, the documentation we

collected originally was in August.  It wasn't October.

October was -- the October statement, we got it when we started

doing the process of selling the Sun Life account, but the one

we collected when we opened account was -- I believe, it was

the August statement.

10   Q    Does this October 23rd -- sorry, 2013 statement from UBS

11   state a joint account or a single accountholder?

12   A    A single account.

13   Q    And who is that?

14   A    Silvia Beatriz Perez-Ceballos.

15   Q    Is there anything under Ms. Perez-Ceballos' name here on

16   the left under account name?  Is there a blank here?

17   A    On the left, no, it's blank.

18   Q    And then under her name, under this -- before it gets to

19   this address, is there anything there?

20   A    No.

21   Q    Okay.  And what address did Ms. Ceballos put on this

22   particular -- or give you with this application?

23   A    This was the Calle Sanchez Magallanes 113 Piso Uno, Centro

24   Villahermosa.

25   Q    Is this the same address that she told you about on her

EXCEPTIONAL REPORTING SERVICES, INC

1   application in Mexico where she resided?

2   A     Looks like it's different.

3   Q     Did Ms. Perez-Ceballos tell you anything about this

4   address on Calle Sanchez Magallanes?

5   A     No.

6   Q     Did you catch the different address here?

7   A     I don't think so.

8   Q     Would you have questioned it if you did catch there was a

9   different address here?

10  A     Yes.  Yes, because for Sun Life to do a withdrawal

11  process, they need to verify her address, and I would need to

12  know exactly which -- is this her physical address or is this a

13  mailing address that she has in Mexico, so we would need to

14  know exactly what is her correct residential address.

15  Q     So at this time, she has provided to you three different

16  addresses; is that correct?

17  A     From Mexico?

18  Q     Two from Mexico and one from Lytham Street in Sugar Land;

19  is that correct?

20  A     Oh, correct, correct.

21  Q     Okay.

22         MS. HAMPTON:  Can you go to Exhibit Number 24,

23  please?  The statement at the very end.

24  Q     Okay, this is page 223, this statement's portion of

25  Exhibit 24.  Does this document look like the document

Arnold - Direct / By Ms. Hampton                    185

1   Ms. Perez-Ceballos gave to you?

2   A    No.

3   Q    Why not?

4   A    This has two names.  It's a joint account.

5   Q    And would you have been required to do something else if

6   you had been given this document by Ms. Perez-Ceballos?

7   A    Yes.  Under Sun Life, they would have required to get two

8   forms of ID of the second owner for the source of wealth.

9   Q    Okay, thank you.  Okay, so you said the last time you

10  spoke with Ms. Perez-Ceballos was in April of 2017, correct?

11  A    Yes.

12  Q    Can you tell us again why you contacted her?

13  A    The last conversation, which is basically to review her

14  residential status, because she had mentioned to me before that

15  she was planning to become a U.S. resident, and we had had

16  conversations before that in order to change the account from

17  an NRA to a domestic client, we would need her Social Security

18  number, preferably a driver's license so we can verify her home

19  address.  And in -- yeah.

20  Q    Okay.  Was Ms. Perez-Ceballos interested, according to

21  your conversations with her this year, in moving her accounts

22  from Sun Life in Bermuda to accounts with you at Morgan

23  Stanley?

24  A    Yes.

25  Q    What did you request of her, if anything, to get that

1    accomplished?

2    A    Sun Life changed their requirements as to what is needed

3    to sell an investment early March of this year.  Every time a

4    customer wants to do a withdrawal from Sun Life, they require

5    two forms of ID, they require source of wealth verification,

6    usually there will be a statement.  They also require sometimes

7    a letter from an accountant, specifying what her income was

8    before.  And then, a requirement of a utility bill or a bank

9    statement from an address in Mexico.

10   Q    Do you know why Sun Life in Bermuda requires all of those

11   additional documentations to make withdrawals?

12   A    Yes.  Sun Life was audited last year by the government of

13   Bermuda, and they decided early this year that they did not

14   have an adequate due diligence system, and they fined -- the

15   government of Bermuda fined Sun Life and required that every

16   time a customer does a withdrawal of a small amount or the

17   whole thing, they require new documentation.  The government of

18   Bermuda wanted to make sure that they didn't have accounts with

19   money laundering.

20   Q    And, specifically, what did you ask Ms. Perez-Ceballos to

21   produce to be able to bring that money from Bermuda back to the

22   U.S. with Morgan Stanley?

23   A    Basically, she had to sign an application from Sun Life, a

24   withdrawal application.  There's a self-certification form that

25   specifies that where she lives and where she pays taxes.  Then

Arnold - Direct / By Ms. Hampton                    187

1    I give her a list of the items she needs to provide me with

2    which is two forms of ID; verification of residence, which

3    could be a bank statement, utility bill; and then verification

4    of source of funds, which is a bank statement from JP Morgan as

5    to when the money transferred from Chase to Sun Life; and then

6    we needed the source of wealth documentation, which is usually

7    the UBS statement.

8    Q    Did Ms. Perez-Ceballos turn any of those items over to

9    you?

10   A    Yes, she provided everything.

11   Q    Everything?

12   A    Yes.

13   Q    And what did she tell you about where she was currently

14   living in April of this year?

15   A    I would have to look at my notes.

16   Q    Okay.  I'm going --

17        **MS. HAMPTON:**  Well, Your Honor, at this time, I'd

18   offer Government's Exhibit 116, and I tender a copy to defense

19   counsel.

20        **(Pause)**

21        **MR. REYNAL:**  No objection.

22        **THE COURT:**  No objection.  It's admitted.

23        **(Government's Exhibit Number 116 was received in evidence)**

24        **MS. HAMPTON:**  Thank you.  May I publish it to the

25   jury, Your Honor?

1          **THE COURT:**  Yes.

2          **MS. HAMPTON:**  Thank you.

3     **BY MS. HAMPTON:**

4     Q     Showing you Government's Exhibit 116, do you recognize

5     this?

6     A     Yes.  That's my customer contact log that I use to

7     remember the conversations with clients.

8     Q     And this one is relating to who?

9     A     Silvia Beatriz Perez-Ceballos.

10    Q     Okay.  What was the first day of the contact log here?

11    A     First day, it looks like 6th of March, March 6th.

12    Q     Can you tell us what your chicken scratch says there?  I

13    can't read it (laughs).

14    A     T-E-L is telephone residence.  That she was okay to, you

15    know, bring the relationship with me.  In order for me to be

16    able to service the Sun Life account, there's a broker-dealer

17    form that we need to have her sign in order for me to be the

18    broker-dealer for the Sun Life account.  That's for that

19    March 6th.

20          For March 8th is when I received the broker-dealer

21    change form in order for me to be able to service her Sun Life

22    account because that was with Chase.  So in order for Morgan

23    Stanley to be the broker-dealer, I needed to have that form

24    signed.

25    Q     The next date?

1  A    And then March 10th, Griselle (phonetic) is my assistant.

2  I received the form and I gave it to her so she can send it to

3  Sun Life.  And then I was going to wait a few days so I can see

4  the account through the website of Sun Life.  Only when I'm

5  actually assigned to that account, I can see the account.

6  And I put in my notes because I know that there was some

7  conversations we had late last year that she wanted to become a

8  U.S. person, and she wanted to go through the process of

9  changing from a non-resident alien to a domestic client.  So

10  now when we're going to do this process, I was going to make

11  sure I put her in a domestic type of account.

12          And then on the 28 of April, STO is (indisc.)

13  telephone office from Mexico.  Has now been living in the U.S.

14  and has a new Social Security number.  Said that Claudia

15  Martinez, she's a financial adviser with Chase, she's one --

16  the one that had some of my accounts when I left, called her

17  about opening a domestic account.  She would like -- oh, she

18  would like to start the Sun Life account withdrawal process.  I

19  told her that since she had a prior portfolio, we would need to

20  use that with the Chase Bank statement for the source of wealth

21  and source of funds documentation.  And I told her that it's a

22  little bit lengthy process to do a withdrawal with Sun Life

23  because of the situation that Sun Life just went through

24  recently.

25          And then on May 24, we sent the Sun Life documents to

1   do the withdrawal, withdrawal request, and --

2   Q    Let me stop you there.  So May 24th, you sent Sun Life

3   documents for the withdrawal request.  Does that mean you had

4   received everything as far as documentation from

5   Ms. Perez-Ceballos at that time?

6   A    No.  Oh, let me see, let me see.  Send Sun Life

7   Documents for with -- oh, yes, that means we already got the

8   documents and now we're going to send it to Sun Life for

9   processing.

10  Q    Who brought you the documents that you were requesting?

11  A    They were mailed to us.

12  Q    By who?

13  A    By Mrs. Perez.

14  Q    Who did you have conversations about -- who did you have

15  conversations with regarding the documents that you were

16  requesting that you needed?

17  A    I told her that I was going to send her the documents, and

18  I sent her with a list of all the documents she needed, and

19  then maybe about a week or two later, we received the

20  documents.

21  Q    Are you talking about Ms. Perez-Ceballos when you say

22  "her"?

23  A    Yes.

24  Q    I'm going to show you page three of Exhibit 116.  What is

25  this?

1   A    That's the form, the Sun Life withdrawal request form.

2   That is one of the requirements for Sun Life to do a

3   withdrawal.

4   Q    You received this this year from Ms. Perez-Ceballos?

5   A    I would have to look at the date, if this is the one for

6   this year.  Yes, this is the one for this year.

7   Q    I'm going to go to the -- let's see, I think this is the

8   sixth page.  Is it signed there?

9   A    Yes, those are the documents we received this year.

10  Q    And what date was that signed?

11  A    May 10 of 2017.

12  Q    By Ms. Perez?

13  A    That's correct.

14  Q    And by you?

15  A    Yes, on the 24 of May, then I sign off that everything was

16  there and then in order for us to submit it.

17  Q    Okay, back to page three.  So this was a new application

18  Ms. Perez-Ceballos submitted this year to you?

19  A    Yeah, that's the withdrawal request form.

20  Q    Okay.  And this year, where did Ms. Perez-Ceballos tell

21  you she was residing as her permanent address?

22  A    The same address as we had before.

23  Q    Which is the address in Tabasco?

24  A    That's right.

25  Q    And what was -- what did she list as her mailing address?

Arnold - Direct / By Ms. Hampton                    192

1   A    The same address we had before.

2   Q    The Lytham address, correct?

3   A    Yeah, the Sugar Land address.

4   Q    You said that you had asked Ms. Perez-Ceballos to provide

5   documentation attached to this application to withdraw,

6   correct?

7   A    Correct.

8   Q    And you kept that documentation?

9   A    Yes.

10  Q    As part of your file?

11  A    Yes.

12  Q    Okay.  Page 12 of Exhibit 116, let me show you this.  I'll

13  zoom in a little bit.  What is this?

14  A    That's a credit card statement from Bancomer (phonetic).

15  Q    Why did -- did Ms. Perez-Ceballos give you this credit

16  card statement?

17  A    Yes.

18  Q    And what was the purpose of you receiving this statement?

19  A    It's a form of verification of residence.

20  Q    And the residence Ms. Perez-Ceballos tells you through

21  this credit statement she's living at is what?

22  A    Calle Tres, Number 115, Colonia Rovirosa, Villahermosa,

23  Tabasco.

24  Q    There's a date over here.  Let me back it up a little bit

25  here, sorry.  On the bottom -- I'm going to turn it over on the

1   same page.

2            What is this e-mail address and the date of May 26,

3   2017?  What is that?

4   A    I don't know.

5   Q    Is there an e-mail address here that says for, para?  Can

6   you read that?

7   A    Yes.  It looks like there was an e-mail.

8   Q    Was this document e-mailed or was it mailed?

9   A    It was sent by mail, it was a copy.

10  Q    Do you know the date of this document?  Let me turn it

11  back around so we can try to read it.  Can you tell?

12  A    Not from what I'm seeing right now.

13  Q    I'm sorry?  On the right, what is that?  Over here,

14  Comision Federal de Electricidad, what is that?

15  A    It looks like a utility bill.  It looks like a copy of two

16  different documents.  Because one looks like an electric bill

17  from her brother, and then the other one looks like a credit

18  card statement from her, so I think that's maybe a copy of two

19  different documents.

20  Q    Why is there an electricity bill from Mr. Celso

21  Perez-Ceballos in here?

22  A    I have no idea.

23  Q    And what address is that that Mr. Celso Perez-Ceballos

24  lists on his electricity bill?

25  A    Calle Tres, Number 115.

1    Q    Is that same address Ms. Perez-Ceballos has listed on her

2    account since you've opened it?

3    A    I believe so.

4    Q    Next page, what is this?

5    A    That's a utility -- that's a bill from -- telephone bill,

6    I'm sorry.

7    Q    In whose name?

8    A    Celso Perez-Campos.

9    Q    And the same address?

10   A    Yes.

11   Q    Okay.  Do you know why this document was included in her

12   application?

13   A    Yes.  Since he was a legal guardian, Sun Life also

14   required verification of residency of the legal guardian.

15   Q    You said that Chase -- I'm sorry, Sun Life required

16   verification of the source when it came -- when the money came

17   into JP Morgan Chase and went off to Bermuda at Sun Life?

18   A    Yes.  That was going to be the statement, the UBS

19   statement.

20   Q    Okay.  I want to show you this page a little bit further

21   in the interior of this package.  What is this?

22   A    That's the UBS statement.

23   Q    Who gave you this statement?

24   A    Mrs. Perez.  That's what I got in the mail.

25   Q    When did you receive this in the mail, approximately?

Arnold - Direct / By Ms. Hampton                    195

1   A    Must have been early, mid-May.

2   Q    Okay.  And we've reviewed the other, which was Exhibit 24,

3   UBS statement from October 2013.  This one again, does it have

4   both names or just one name, Ms. Perez-Ceballos?

5   A    Just one name.

6   Q    And the address?

7   A    It's Calle Sanchez Magallanes, 1113 Piso One, Centro

8   Villahermosa, Tabasco, Mexico.

9   Q    The bank that you're working at currently, Morgan Stanley,

10  Smith Barney, has a lawyer that represents the bank that's

11  accompanied you to court, correct?

12  A    That's right.

13  Q    And that lawyer, you didn't hire that lawyer to represent

14  you personally, did you?

15  A    It's for both purposes.

16  Q    I'm sorry?

17  A    It's mine and Morgan Stanley.

18  Q    The lawyer -- who's paying for the lawyer?

19  A    Morgan Stanley.

20  Q    Okay.  If -- and you said you've been doing this for 20

21  years, right, almost?

22  A    Correct.

23  Q    If someone provides the bank falsified documentation, JP

24  Morgan Chase, in your experience, or Morgan Stanley, could that

25  potentially put the bank at risk of civil liability or

 1  litigation?

 2          **MR. REYNAL:**  Your Honor, this assumes facts not in

 3  evidence.  He didn't say anything about these documents being

 4  used for any bank.  He said he worked for the investment house.

 5          **THE COURT:**  Overruled as phrased.  You can answer.

 6          **THE WITNESS:**  Can you repeat the question?

 7  **BY MS. HAMPTON:**

 8  Q    Could the -- if someone turns over falsified documents to

 9  the bank, either JP Morgan Chase or Morgan Stanley, could that

10  potentially put bank at risk of civil liability?

11          **MR. REYNAL:**  Your Honor, I object, that's a

12  hypothetical.  He doesn't work for a bank.  He works for an

13  investment house.  He has the entire time this process has gone

14  on.  It's not the proper question for him.

15          **THE COURT:**  Do you want to respond, Ms. Hampton.

16          **MS. HAMPTON:**  Your Honor, he's got extensive banking

17  experience.  He knows the bank has brought a lawyer with him to

18  court.  I believe he can answer this question based on his

19  experience and his knowledge of this case and what he's been

20  shown in court today.

21          **THE COURT:**  Overruled.  You can answer, sir.

22          **THE WITNESS:**  If I know there's falsified

23  information, I will have to bring that to my manager.  It will

24  be my manager's decision process as to whether he wants to

25  eliminate or close a position, close an account.  If it is a

1    new account, they won't open it; but if it is an existing

2    account, it will be the manager's criteria whether he wants to

3    -- I'm sure he will brought it up to the diligence team or the

4    compliance team.

5    **BY MS. HAMPTON:**

6    Q    What is the Office of the Comptroller of the Currency, the

7    OCC?

8    A    They -- they kind of see the operation of brokerage firms,

9    to make sure we're in compliance within different laws and

10   regulations.

11   Q    Are they kind of like the bank regulators?

12   A    That's right.

13   Q    What is the Securities and Exchange Commission, the SEC?

14   A    The Securities and Exchange Commission is another form of

15   government that supervise the different activities that we do.

16   Q    And to keep your licenses, you have to follow the rules;

17   is that correct?

18   A    Absolutely, absolutely.

19   Q    Does the bank also have to follow a lot of rules?

20   A    In the banking side?

21            **MR. REYNAL:**  Your Honor, I object; vague.  What bank

22   are we talking about?

23            **THE COURT:**  Sustained.

24            **MR. REYNAL:**  He doesn't work for a bank.

25   //

1    **BY MS. HAMPTON:**

2    Q    Does JPMorgan, Chase, and Morgan Stanley, in your

3    experience, have to follow a lot of rules set forth by the OCC,

4    the SEC, and other governmental entities?

5    A    Absolutely.

6              **MR. REYNAL:**  He doesn't work for JPMorgan, Chase, or

7    for Morgan Stanley Bank, your Honor.  He's already testified to

8    that.

9              **THE COURT:**  Overruled.

10   Q    And if the bank doesn't follow those rules, in your

11   experience and your training, if the -- if the financial

12   advisor or the bank personnel doesn't follow those rules, could

13   a lawsuit occur?

14   A    Absolutely.

15   Q    Could violations with the bank regulators occur?

16   A    Yes.

17   Q    Could the bank be fined because of those violations?

18   A    Absolutely.

19             **MS. HAMPTON:**  May I confer with co-counsel, your

20   Honor?

21             **THE COURT:**  Yes.

22        **(Pause)**

23   **BY MS. HAMPTON:**

24   Q    In your experience, your training, your knowledge base in

25   banking, is Morgan Stanley Smith Barney an FDIC or Federal

1  Deposit Insurance Corporation insured bank?

2  A    They have a banking division.

3  Q    Okay.  And the banking division is FDIC?

4  A    That's right.

5  Q    And is the securities division also insured?

6  A    Yes, the division investments, yes.

7  Q    JPMorgan Chase, is it an FDIC insured institution as well?

8  A    They have two divisions, the investment and the banking.

9  Q    Okay.  If Ms. Perez-Ceballos had been successful in

10  withdrawing money this year from Bermuda in the Sun Life

11  account, where would that money have come back to -- or gone,

12  at that point?

13  A    To the Chase bank account.

14  Q    And to the Chase bank account or to the Morgan Stanley

15  bank account?

16  A    Either or.  The customer can decide that.  Would I have

17  noticed that when the money goes back to the original account

18  that came in, it's easier for Sun Life to process it.  So,

19  normally we would have the money go back to JPMorgan Chase.  We

20  could link the new investment of Morgan Stanley with that Chase

21  bank account, and then we can transfer the funds.

22  Q    How -- how was the money sent from JPMorgan Chase in

23  October of 2013 to Bermuda?  How was it actually transmitted

24  there?

25  A    I believe it was a wire transfer.

1   Q    And if the money were to be transferred back to either

2   JPMorgan Chase or to Morgan Stanley, how would it have been

3   sent back to the U.S.?

4   A    Wire transfer, too.

5   Q    Thank you.

6            **MS. HAMPTON:**  Pass the witness.

7            **THE COURT:**  Mr. Reynal?

8            **MR. REYNAL:**  Thank you, your Honor.

9                        **CROSS EXAMINATION**

10  BY MR. REYNAL:

11  Q    How are you, Mr. Arnold?

12  A    I'm doing good.

13  Q    Good afternoon.  My name is Andino Reynal and I represent

14  Silvia Perez-Ceballos.  I'm sure you observed just now that

15  there was a little back and forth between the government and

16  the defense about who you actually work for.  Would you like to

17  clarify it for the ladies and gentlemen of the jury?

18           At the time that you opened this account, did you

19  work for JPMorgan Chase, the bank, or did you work for Chase

20  Investments?

21  A    For Chase Investment Services Corporation.

22  Q    Okay.  Is Chase Investment Services Corporation FDIC

23  insured?

24  A    No.

25  Q    Okay.  And when we looked earlier at an account that was a

Arnold - Cross / By Mr. Reynal                201

1    JPMorgan Chase Bank, that wasn't an account that you opened,

2    was it?

3    A     Correct.

4    Q     No documentation was given to you in connection with

5    opening that account?

6    A     No.

7    Q     As far as you know, no documentation was given to the

8    person in Sugar Land in connection with opening that account,

9    other than the lady's passport and voter registration card,

10   true?

11   A     Could you repeat that again?

12   Q     I said, as far as you're concerned, as you sit here right

13   now, you can't tell the ladies and gentlemen of the jury what

14   documentation, if any, was supplied to the branch that opened

15   up her checking account?

16   A     No.  I'm not in a supervision role that I would know.

17   Q     And so, the account that she opened -- and again, I'm

18   sorry, this is lawyer stuff -- but the account that she opened

19   and the documents that she gave you and the conversations that

20   you had were in connection with opening an account at Chase

21   Investment, and not FDIC insured?

22   A     Correct.

23   Q     Okay.  And Sun Life certainly is not FDIC insured, is it?

24   A     No.

25   Q     It's in Bermuda?

Arnold - Cross / By Mr. Reynal                          202

1    A    That's right.

2    Q    Okay.  I'm glad we put that to rest.  You have a little

3    bit of an accent.  I also have a little bit of an accent

4    perhaps.  I was born in Argentina.  Do you have a connection

5    outside the United States?

6    A    Yeah.  My mom's from Nicaragua and my dad's American, and

7    my wife's from Argentina.

8    Q    Uh-huh.  Congratulations.  So, Spanish is a native

9    language for you?

10   A    That's right.

11   Q    And most of your clientele is from Latin American

12   countries?

13   A    That's right.

14   Q    Is it uncommon for people from Latin American countries to

15   want to have an account in the United States?

16   A    No.

17   Q    Can you tell us some of the reasons why somebody would

18   want to have an account in the United States?

19   A    Mostly to have their money in U.S. dollars.  They have --

20   had gone through lots of devaluation of the peso, in the case

21   of Mexico, and/or safety for the family, money that they want

22   to take away from their high risk business in Mexico and want

23   to put money to protect their family for the future.

24   Q    Okay.  Is that what people refer to as -- in your

25   industry, as flight to safety?

1   A    I guess you can say that.

2   Q    And there's another one called flight to quality.  Have

3   you ever heard that term used?

4   A    From the bonds from emerging markets to high -- yeah.

5   Because, yeah, we can invest in high grade bonds which the

6   bonds that you would purchase in Latin America will be maybe a

7   higher -- a lower rating.  So, yes, you can assume that a lot

8   of customers want more safety of their -- of their principal.

9   Q    I want to focus in -- we spent a lot of time talking about

10  where people live and what their addresses were, and their

11  mailing address, and this address and that address.  In your

12  industry, is residency sort of a specialized term, like what it

13  means for somebody to be a resident of a certain place?

14  A    It's where they live.

15  Q    Okay.  And how do you decide where somebody lives?  Are

16  there certain criteria you look for, like paying taxes, for

17  example?

18  A    Yes.  Citizenship, residency, and where they pay taxes.

19  Q    Okay.  So, let's focus on citizenship.  That's the

20  passport that somebody holds.

21  A    Okay.

22  Q    Right?

23  A    That's right.

24  Q    In this case, Ms. Perez-Ceballos holds a Mexican passport?

25  A    Correct.

Arnold - Cross / By Mr. Reynal                    204

1    Q    Where they pay taxes, that's where they file their tax

2    returns.   In this case, you had every reason to believe that

3    Ms. Perez-Ceballos filed tax returns in Mexico, true?

4    A    That's right.

5    Q    And then we go back to this thing called residency.  Now,

6    how do you decide where somebody's a resident?

7    A    Well, basically, we can only get proof of residence.

8    There's no way that any financial advisor can know exactly

9    where a customer lives.

10   Q    I know.  But, for example, let's say in a few years I send

11   my son off to college in California.  All right?  And I want to

12   get in-state tuition.  Do you think that they're going to say

13   that he's a California resident for in-state tuition?

14   A    Probably not.

15   Q    Probably not?

16   A    Yeah.

17   Q    Right?  Even though he's going to be living there most of

18   the year?

19   A    Correct.

20   Q    So, residency means somewhere -- something more than just

21   where you spend a lot of time?

22   A    That's right.

23   Q    And residency also has something to do with intent to

24   remain at a place, doesn't it?

25   A    Correct.

Arnold - Cross / By Mr. Reynal                          205

1   Q    So, if somebody, for example, fled from one country to

2   another, but maybe had the hope of being able to return to the

3   first country, they would still be residents of the first

4   country until they decided to live permanently somewhere else?

5   A    Correct.

6   Q    Now, in the case of Ms. Perez, she never made it a secret

7   that she spent a lot of time in the United States, did she?

8   A    No.

9   Q    And, in fact, you knew that she had talked about her

10  children a lot?

11  A    Correct.

12  Q    I'm sorry, you have to answer out loud.

13  A    Yes -- uh, yes.

14  Q    She did.  Do you recall those conversations?

15  A    Yes.  They were going --

16  Q    What would you guys talk about with regards to her kids?

17  A    They were going to school; when her tuition expenses might

18  come due; that she feels like for them to go to school in Sugar

19  Land is -- or the Houston area is safer than Florida.

20  Q    Certainly safer than Mexico?

21  A    Yes.  So, yeah, mostly was as to -- tried to time when she

22  might need money for the tuition expenses.

23  Q    And so you knew that her kids went to school in the United

24  States?

25  A    Yes.  I wasn't too sure whether it was summer school.  I

Arnold - Cross / By Mr. Reynal                               206

1    didn't go into specifics, okay, how many semesters they're

2    going.  So, the majority of my clients from Latin America, when

3    their kids go to school in the United States, it usually will

4    be summer -- for the whole summer.

5    Q    Are there some that come and stay for the school year and

6    then go back for the -- for the summers in their home country?

7    A    Yes.  I'm sure they get special permission to stay in the

8    United States for a longer period of time.

9    Q    And whenever you spoke, you spoke to her on the phone?

10   A    Yes.

11   Q    And when you called her, you called her on an American

12   number?

13   A    Well, she told me that she had a cell number she uses when

14   she's in Mexico, in the U.S., in order for her daughters to

15   easily get a hold of her.

16   Q    But you called her on an American number?

17   A    It was a cell phone -- yeah, with -- I believe it's 281

18   area code.

19   Q    And you've lived in the Houston area for a long time; 281

20   is sort of Katy, Sugar Land?

21   A    I believe so, yes.

22   Q    Okay.  And her mailing address was over there in Katy,

23   Sugar Land?

24   A    Oh, in Sugar Land, yes.

25   Q    Now, I know that it's been a long time, I think

Arnold - Cross / By Mr. Reynal                    207

1   approximately four years, since you began your relationship

2   with Silvia?

3   A    That's right.

4   Q    And you've signed up a lot of clients since then?  Have

5   you signed up a lot of clients since then?

6   A    Yes.

7   Q    Yes?  About how many clients do you think you've signed up

8   in the last four years?

9   A    Since I've been with JPMorgan for a long time, it's more

10  maintaining and growing existing relationships.  So it would be

11  just an estimate, probably about another 15, 20 clients.

12  Q    And they're all Latin Americans?

13  A    Most of them is Latin American, that's right.  Some is

14  Spain.

15  Q    Some from Spain --

16  A    From Spain.

17  Q    -- because of the weather.  And they all want to have this

18  flight to safety?

19  A    Yes, to have money in the U.S. as a diversification for

20  their currency, most of the time.

21  Q    Similar people to Ms. Perez?

22  A    Yes.

23  Q    And similar conversations to the one you had with Silvia?

24  A    Correct.

25  Q    Is it fair to say that as you sit here today, you don't

Arnold - Cross / By Mr. Reynal                    208

1   recall everything that was said at the meeting you had with

2   Ms. Silvia?

3   A    Correct.

4   Q    Now, the -- have you ever heard of a corporativa?

5   A    Corporativa?

6   Q    Uh-huh.  It's, you know, like you could have a sociedad

7   nomina?

8   A    Okay.

9   Q    But have you ever heard of a corporativa?  It's a type of

10  corporate entity that you have in Mexico?

11  A    I've heard of it.

12  Q    And a corporativa basically is a, sort of a tax structure

13  where people render services.  And then instead of --

14       MS. HAMPTON:  Your Honor, I object.  There's no

15  question here.

16       MR. REYNAL:  I'm asking him --

17       MS. HAMPTON:  He's making a statement and no

18  question.

19       THE COURT:  What -- what's your question?

20       MR. REYNAL:  My question is:  I'm going to ask him if

21  I'm right about what a corporativa is.  He said that he's

22  familiar with the term.  I'm going to ask him if I'm right in

23  my description.

24       THE COURT:  Overruled.

25  //

1   **BY MR. REYNAL:**

2   Q    A corporativa basically is a -- is a corporate entity tax

3   structure in Mexico where people render services, instead of

4   receiving the payment directly themselves, the payment is made

5   to the corporativa, of which they're members/shareholders, and

6   then the corporativa pays it out to them in the form of

7   dividends.  Is that about accurate, from your understanding?

8   A    Sounds like -- yes.  I haven't read the definition of

9   corporativa in a while, so -- but it sounds kind of like it,

10  yes.

11  Q    Earlier when you were asked about the source of the money

12  that was in the UBS account, okay, and Ms. Hampton said it was

13  the sale of a business, I thought I heard you answer that it

14  was either that or it could have been the sale of stock in a

15  business.  Was I -- did I hear you right on that?

16  A    They're ownership shares.  That's what I believe I -- from

17  the information I received.  They were her ownership interest

18  that was sold in order to -- to use the money for the

19  investment at UBS.

20  Q    And I'm sure you didn't get very, overly technical about

21  it at the time, did you?

22  A    No.

23  Q    It wasn't a big agenda item for you, was it?

24  A    No.

25  Q    Is it possible that she told you that this came from the

Arnold - Cross / By Mr. Reynal                          210

1    sale of her interest in -- because of her retained earnings in

2    two corporativas?

3    A    I guess it's possible.

4    Q    The application that we saw -- well, let me back up for a

5    second.  Silvia's a Spanish speaker, true?

6    A    Correct.

7    Q    And your communications with her have been exclusively in

8    Spanish?

9    A    I believe so.

10   Q    Okay.  And the accounts that -- the account applications

11   are all in English?

12   A    Correct.

13   Q    And the way they get filled out is through a, sort of a

14   collaborative process, would that be fair?

15   A    Yes.

16   Q    You talk to her and then you fill out the information?

17   A    Yes.  I go over with her as to all the questions that are

18   asked.

19   Q    And -- but that's why they're typed, right?

20   A    That's right.  That's right.

21   Q    Because you're filling them out on the computer and then

22   you mail them to her, and she signs them and sends them back?

23   A    Correct.  Correct.

24   Q    Is that correct?

25   A    That's correct.

Arnold - Cross / By Mr. Reynal                          211

1   Q    Okay.  During that process, you're building a relationship

2   with the person who wants to open up the account; is that true?

3   A    That's right.

4   Q    It's very important in your business to develop a personal

5   relationship, right?

6   A    Absolutely.

7   Q    Absolutely.  And you ask questions about their lives,

8   right?

9   A    That's right.

10  Q    And about their businesses?

11  A    That's right.

12  Q    And when you're filling out the form, you're also working

13  off that conversation that you're having with them, true?

14  A    Yes.

15  Q    Now, if you have the same questions that repeat inside

16  forms, and you've already asked for the information, do you

17  sometimes just fill it in in both places, because they said it

18  to you once?

19  A    Yes.  If it's the same exact question, and it's the same

20  exact question in both forms, correct.

21  Q    I'm going to show you what's Page 1 of the Sun Life

22  Investor Application Packet on the ELMO.  I'm sorry, I forgot

23  what exhibit it is, but it didn't have a sticker on it.

24       **MS. HAMPTON:**  Which exhibit is it?  I'm sorry, which

25  document?

Arnold - Cross / By Mr. Reynal                          212

1          **MR. REYNAL:**  The Sun Life Investor Packet.

2          **MS. HAMPTON:**  Thirty-seven?

3          **MR. REYNAL:**  Yes.  So, here it is.  Now I want to go

4    down here.

5    **BY MR. REYNAL:**

6    Q    Is -- well, can you read the highlighted portion out loud

7    for us, please?

8    A    "It's the participant or a close relative of a politically

9    exposed person, member of any uniformed forces, labor union

10   officials, or journalists."

11   Q    You would agree with me that that question is phrased in

12   the present tense, would you not?

13   A    Yes.

14   Q    Now, in fairness, that question repeats on the Chase

15   investment form.

16   A    I don't know if it's exactly the same way, but I'll have

17   to look at the other one.

18          **THE COURT:**  Can you just put the mic up a little

19   closer to you?

20          **THE WITNESS:**  Oh, I'm sorry.

21   A    I don't know if the question with the Chase form is

22   exactly the same.

23   Q    It's not; that's why I'm going to put it up for you right

24   now.

25   A    Oh, okay.

1    Q    So, now, you didn't write the form, did you?

2    A    No.

3    Q    Okay.  And it says:  "I am-was a senior military,

4    governmental, or political official in a U.S. country."  All

5    right.  So that has present tense and past tense in the first

6    clause of the sentence, true?

7    A    Yes.

8    Q    Now the second clause of the sentence says:  "I am either

9    closely associated with, or I am a spouse, parent, sibling or

10   child of such an official."  That is phrased in the current

11   tense, correct?

12   A    Yes, correct.

13   Q    Is it a little bit confusing?

14   A    No.

15   Q    As you sit here today, do you recall the precise words

16   that you used when asking about PEP status?

17   A    There's no way I can remember exactly what I used, but in

18   general terms, I usually ask the question in Spanish.

19   Q    Okay.  But as you sit here today, you don't remember

20   exactly how you asked it?

21   A    No, no way.  Yeah -- no.

22   Q    It's fair, I mean, just -- you know.  I think you

23   testified that you met with Silvia in person only once?

24   A    I believe so.  I would need to go refer to my notes,

25   because I would write that down how many times I met with a

Arnold - Cross / By Mr. Reynal                          214

1    client.

2    Q    Based on your recollection as you sit here today, I

3    believe your earlier testimony is you met with her on the one

4    occasion when she did her initial --

5    A    Yeah.

6    Q    -- meeting?

7    A    I believe so, then.

8    Q    Is that what you believe as you sit here?

9    A    As far as I remember four years ago, I believe I only met

10   her in person once -- could be twice.  I'd have to check my

11   notes.

12   Q    And which notes are these?

13   A    Usually I keep a customer contact log; and that kind of

14   gives me -- every time I have a conversation with a client, I

15   document everything that was talked about.  So whenever I have

16   the next conversation with a client, I can build up from there.

17   Q    What happened to your notes?

18   A    When you leave firms, you cannot take the previous file.

19   So I can't take any information from JPMorgan to the new firm,

20   Morgan Stanley.

21   Q    Now, but I thought you said earlier that Agent Trevino had

22   refreshed your recollection with your notes?

23   A    Well, she showed me the e-mail that was sent to me before.

24   Q    Okay.  How many times did you meet with Agent Trevino?

25   A    I believe three times.

1  Q    The first time you met with her, did she make an

2  appointment?

3  A    Yes.  We made an appointment through -- with my manager.

4  Q    And she said, "I'm from the DEA and I want to talk to

5  you"?

6  A    Yeah.  She introduced herself and --

7  Q    No.  I mean, when she made the appointment.

8  A    Well, the appointment -- I'm just trying to remember how

9  they made an appointment in the first place.  I believe she

10  communicated with our compliance team at Morgan Stanley.  And

11  eventually, through e-mails, we set up a time that was

12  convenient for her and myself.

13  Q    So you knew you were going to meet with the DEA agent?

14  A    Yes.

15  Q    Must have been sort of a nerve-racking experience?

16  A    Yes, and my first time meeting with a DEA agent.

17  Q    So we've established, I think, that to the best of your

18  recollection, you only met her once, maybe twice.  At that

19  first meeting, okay -- and I know this is four years ago -- did

20  you discuss with her what her goals for the relationship would

21  be?

22  A    Yes.

23  Q    The purpose of the meeting was to discuss how you can

24  serve her --

25  A    Yes.

1   Q     -- or your entity?

2   A     Her investment objectives.

3   Q     Okay.  As you sit here, is it possible that she brought

4   the UBS account statement with her to that meeting to show you

5   the breakdown in how her money was invested and where it was?

6   A     Yes.

7   Q     Do you think that's how it went down?

8   A     Usually I ask to bring the statement of where the -- they

9   had the account previously, in case we were to do a brokerage

10  account.  We would do an ACATS transfer, which is a movement of

11  funds from one firm, and usually we would require a bank

12  statement from the previous firm.

13  Q     But that's sort of a second layer, right, once you've made

14  a decision?

15  A     Well, it's always good when a client is going to meet you

16  first, so you can get a little bit better idea of their

17  financial, to bring their statement or ID.s with them.

18  Q     And as you sit here today, you agree that it's at least

19  possible that she brought it with her to show you how her money

20  was invested and how much there was?

21  A     Correct.

22  Q     And it was your idea -- well, your recommendation to her

23  that she invest in the Bermuda account?

24  A     Yes, based on the desire to have beneficiaries on the

25  account.  Yeah, it was -- it was the proper investment for her.

Arnold - Redirect / By Ms. Hampton                217

1          **MR. REYNAL:**  Your Honor, can I have just one moment?

2          **(Pause)**

3    BY MR. REYNAL:

4    Q    At the time you met with Silvia, nothing would have

5    prevented you from asking the name of her separated spouse,

6    would it have?

7    A    No.

8    Q    You chose not to ask?

9    A    I believe when she mentioned she was separated, I probably

10   decided not to.

11   Q    Fair enough.

12   A    And I think also because she had mentioned to me that the

13   funds were her income from her own --

14   Q    They were her money?

15   A    Yeah.

16   Q    And she believed it was her money?

17   A    Correct.  That's what she told me.

18   Q    If she had wanted to, she could have said she was single?

19   A    I suppose.

20   Q    Thank you.

21         **MR. REYNAL:**  Pass the witness.

22                    **REDIRECT EXAMINATION**

23   BY MS. HAMPTON:

24   Q    What was Ms. Perez-Ceballos' demeanor when you were

25   meeting with her at JPMorgan Chase?

Arnold - Redirect / By Ms. Hampton                    218

1   A    She was very friendly, very nice.

2   Q    Was she at all distraught?

3   A    No.

4   Q    Did Ms. Perez-Ceballos ever tell you that she fled from

5   Mexico?

6   A    No.

7   Q    Did Ms. Perez-Ceballos ever tell you that she was fearful

8   of going into Mexico?

9   A    No.

10  Q    What did Ms. Perez-Ceballos tell you in 2013 and in 2017

11  about her relationship with Mexico?

12  A    That she's a resident -- resident of Mexico.

13  Q    And what did that mean to you?

14  A    That she lives in Mexico.

15  Q    If you were told that Ms. Perez-Ceballos has lived in the

16  U.S. since May of 2013 to the present, to you, does that mean

17  she intended to go back to Mexico, if she was a resident of

18  Mexico?

19  A    Well, if she were to tell me she lives in the United

20  States, then I would recommend to change the account to a

21  domestic account.

22  Q    But she didn't tell you that she lived in the United

23  States?

24  A    Not at the time when we did the application.

25  Q    Okay.  I'm going to show you Exhibit Number 29.  At any

EXCEPTIONAL REPORTING SERVICES, INC

Arnold - Redirect / By Ms. Hampton                              219

1   time did she tell you she lived in the U.S.?

2   A     No.  I mean, there were -- in November of last year she

3   was telling me she was staying longer in the U.S., but not

4   actually living.  And that's why I recommended to start looking

5   into changing the account, make sure she gets a Social Security

6   number and a driver's license.

7   Q     Did Ms. Perez-Ceballos tell you she was traveling

8   routinely between Mexico and the U.S. between 2013 and 2017?

9   A     I believe that was my understanding from the initial

10  meeting.

11  Q     And what did she tell you about the cell phone?  I'm

12  sorry.

13  A     The cell phone is the best way to communicate with her

14  whenever she's either in Mexico or the U.S., because her

15  daughters, if they need her, she can get with them right away.

16  Q     But that she used the cell phone where?

17  A     She could use them either or.

18  Q     Okay.

19  A     I mean, I have both numbers.  I had the number for Mexico

20  and the cell phone.

21  Q     But did she specifically tell you, Ms. Perez-Ceballos,

22  that she used that cell phone while she was in Mexico to

23  communicate with her family?

24  A     I mean, she mentioned to me that she could be either in

25  Mexico or in the U.S., and I could call her at that number.

Arnold - Redirect / By Ms. Hampton                    220

1   Q    Okay.

2        **MS. HAMPTON:**  Exhibit Number 29, Page 3 -- oh,

3   Exhibit Number 37, I think, Page 3.  Exhibit 37, sorry.

4   Page 3.

5   Q    This is back to that Sun investor application.  Who fills

6   this out?

7   A    After we collect all the information from the client, we

8   will pre-fill it for the client for them to review it and sign

9   it.

10  Q    And there's a spot in this section talking about:  "Other

11  source of wealth has been indicated.  Please describe in

12  detail."  What information is listed on this -- this form?

13  A    The sale of business, staffing consulting business in

14  Mexico.

15  Q    What does that mean to you?

16  A    She's selling a business.

17  Q    And what kind of business?

18  A    That was the -- I believe that's Asesorias Integradas --

19  Q    But did she tell you that it's a staffing consulting

20  business?

21  A    Asesorias Integradas Unidas (phonetic), that's Spanish,

22  but it means consulting.

23  Q    Okay.  Where did you get the information about -- that the

24  source of wealth was from a sale of a business?

25  A    When we asked where the money came from, from UBS, she

Arnold - Redirect / By Ms. Hampton                  221

1    mentioned to me -- to us that it came from those two businesses

2    she operated.  And she sold ownership rights -- ownership

3    interest in that business, and she already got out of that

4    business.

5             **MS. HAMPTON:**  Can you go to Page 46 of the same

6    exhibit, please?

7    Q    And you took notes when you were speaking to her about

8    what the businesses were, correct?  You had her write down the

9    business names?

10   A    Yeah, the business name.  As to what they were worth, I

11   don't remember getting exact information of what's the value of

12   each of the business.

13   Q    Okay.  What businesses did Ms. Perez-Ceballos tell you

14   that she sold, that were the basis of this account?  What are

15   the names?

16   A    I believe it's the first one.

17   Q    Well, what are the names of the businesses she gave you?

18   A    The Asesorias Integradas Para Su Empresas Ese Adasave y

19   Investigaciones de Services Multiples de Personas en la Region

20   (phonetic).

21   Q    Thank you.

22            **MS. HAMPTON:**  I pass the witness.

23            **MR. REYNAL:**  No further questions, your Honor.

24            **THE COURT:**  All right.  Thank you, sir.  You can step

25   down.

222

```
1              THE WITNESS:  Okay.

2              THE COURT:  Let me excuse the jury real quickly,

3    though.  Let's go ahead and take our afternoon break.  You can

4    take 15 minutes.

5              THE MARSHAL:  All rise.

6              MS. HAMPTON:  Your Honor, may the witness be excused?

7              THE COURT:  Any objection from the defense?

8              MR. REYNAL:  No, your Honor.

9              THE COURT:  Okay.  You can leave the courthouse.

10   Thank you.

11        (Witness excused)

12        (Jurors exit courtroom at 2:56 p.m.)

13             THE COURT:  Anything to address, Counsel?

14             MR. MUSCHENHEIM:  No, your Honor.

15             MS. HAMPTON:  No, your Honor.

16             THE COURT:  All right.  Who's your next witness?

17             MS. HAMPTON:  Enrique Marichal.

18             THE COURT:  Okay.

19        (Recess taken from 2:57 p.m. to 3:14 p.m.)

20        (Outside the presence of the jury)

21             THE COURT:  Is the jury ready?

22             THE CLERK:  Yes, your Honor.

23             THE COURT:  Okay.  Also, the witnesses, we're having

24   trouble hearing them for the record, one.  I'm having a little

25   trouble hearing them.  I don't know if my allergies may be
```

1    affecting my hearing, it might be the interpreters are so close

2    to me that I'm picking up their -- and I'm not complaining

3    about that.  I think it's the witnesses.  So, they need to be

4    told to speak up, articulate, don't die off at the end of their

5    sentences.

6          **MR. MAGLIOLO:**  Your Honor, I've been having trouble

7    hearing, but I figured it was just because I'm old and I didn't

8    want to say -- I'm having --

9          **THE COURT:**  Well, I -- I thought I was -- well, it's

10   a combination of things, but the record, there is an issue with

11   the record also and, anyway, so, you-all need to tell your

12   witnesses to speak up the whole time and articulate; there are

13   some of them that are mumbling as they finish their sentences

14   or whatever it may be.

15         And I can keep telling them.  It's just after a while

16   coming from me, it looks like I'm harassing people.  So, I

17   think that is part of you-all's job also to make sure they can

18   be heard.

19         You know, I'm looking at some of the jurors on the

20   end and they're kind of sitting on the edge of their chair

21   sometimes, so I'm assuming maybe they can't hear either.

22         Are they ready?

23         **THE MARSHAL:**  Yes, your Honor.

24         **THE COURT:**  Okay.  Who's the next witness?

25         **MS. HAMPTON:**  Enrique Marichal.

Marichal - Direct / By Ms. Hampton                    224

1          **THE COURT:**  Okay.  And he's present in the courtroom?

2          **MS. HAMPTON:**  Yes, your Honor.

3          **THE COURT:**  You can bring them in.

4          **THE MARSHAL:**  All rise for the jury.

5       **(Jurors enter courtroom at 3:16 p.m.)**

6          **THE COURT:**  All right.  You can have a seat, and the

7   Government will call their next witness.

8          **MS. HAMPTON:**  Government calls Enrique Marichal.

9          **THE COURT:**  Just tell him to be careful with the

10  slant there.

11          Sir, if you'll raise your right hand.

12              **ENRIQUE MARICHAL, GOVERNMENT'S WITNESS, SWORN**

13          **THE COURT:**  You can have a seat.

14          **MS. HAMPTON:**  May I proceed, your Honor?

15          **THE COURT:**  Yes.

16          **MS. HAMPTON:**   Thank you.

17                          **DIRECT EXAMINATION**

18  **BY MS. HAMPTON:**

19  Q    Will you introduce yourself to the ladies and gentlemen of

20  the jury, please?

21  A    What -- what do I do?

22  Q    Will you introduce yourself to the jury, please?

23  A    Yes.  My name is Enrique Marichal.

24  Q    Mr. Marichal, will you move the microphone to your mouth

25  and --

1   A    Okay.

2   Q    -- speak into the microphone?  Okay?

3   A    My name is Enrique Marichal.

4   Q    Yes, sir.  Where do you -- what city and state do you

5   reside in?

6   A    I reside in Florida in Bay Harbor Island.

7   Q    In Bay Harbor Island, Florida?

8   A    Yes.

9   Q    Okay.  Do you also -- what do you do for a living?

10  A    I'm a -- I am a real estate broker in Florida and a real

11  estate broker in New York.  I do property management and also,

12  I do some renovation and -- for properties.

13  Q    You have a broker's license in Florida and New York?

14  A    Yes.

15  Q    What are your duties as a real estate broker?

16  A    The idea that if the -- my duties as a real estate broker

17  -- well, I try to find -- to get a match between buyers and

18  sellers, and to -- and to be honest with both of them and get

19  the property what they want.

20  Q    Yes, sir.  Do you also help people if they need lease

21  properties or properties to rent?

22  A    Yes.  As a real estate broker, we do sales and rentals,

23  yes.

24  Q    Do you know Silvia Beatriz Perez-Ceballos?

25  A    Yes.

Marichal - Direct / By Ms. Hampton                226

1  Q    Do you see her in the courtroom today?

2  A    Yes.

3  Q    Can you point to her and tell us what she's wearing?

4  A    She's there, over there.

5  Q    Okay.

6          **MS. HAMPTON:**  Your Honor, may the record reflect the

7  witness has identified the Defendant?

8          **THE COURT:**  The record will so reflect.

9  **BY MS. HAMPTON:**

10 Q    Approximately what year did you meet Ms. Perez-Ceballos?

11 A    September, October 2006.

12 Q    Okay.  In 2006, how did you meet Ms. Perez-Ceballos?

13 A    She called to the company, the real estate company,

14 broker's I was working with, and she called to the company.  I

15 was there.  I took the call.  That is -- that is how I meet at

16 the first time.

17 Q    When Ms. Perez-Ceballos called you, the real estate

18 company that you were working, what company was that?

19 A    Weichert Realtors.

20 Q    And where is that located?

21 A    In Sunny Isles, Florida.

22 Q    Sunny Isles, Florida?

23 A    Yes.

24 Q    How close is that to Miami?

25 A    Well, it's in Miami Beach.

1   Q    Okay.  It's on Miami Beach.

2   A    Yes.

3   Q    Sorry, I'm not familiar with the area.

4   A    Yes.

5   Q    So, Ms. Perez-Ceballos contacted Weichert Realty in 2006.

6   A    Yes.

7   Q    And you were, what, were you on call that day to answer

8   calls?

9   A    No, we don't -- we don't have like a -- maybe.  We don't

10   have like a call system.

11   Q    Okay.  What happened when she called the office?  You got

12   ahold -- you got on the phone with her?

13   A    Yes, I got on the phone with her, yes.

14   Q    And what happened next?

15   A    Well, she asked me that she wanted to rent -- lease an

16   apartment in Miami Beach.

17   Q    Sorry, rent what in Miami Beach?

18   A    To lease an apartment.

19   Q    To list an apartment?

20   A    No, no.  To lease -- to rent.

21   Q    Okay.  Rent an apartment.  What kind of apartment?

22   A    It's a two-bedroom apartment, two or three-bedroom, two --

23   two-bedroom apartment, yes.  Or two or three --

24   Q    Where did she -- where did Ms. Perez-Ceballos tell you she

25   wanted to rent an apartment?

1  A     Why?

2  Q     Where?

3  A     In Miami Beach.

4  Q     Can you tell us about the real estate market at that time

5  in Miami Beach?

6  A     2006 was -- it was -- that's good; was before the crash.

7  Q     Did Ms. Perez-Ceballos tell you details over the phone

8  about what kind of property she wanted?

9  A     Well, normally when somebody calls to the office, and you

10  -- you speak with some -- some things our client, where we ask

11  what she want, how many room, the price range, if she has pets

12  -- pets or not.  You know, the usual questions to know what

13  exactly you are looking for, especially with foreign people who

14  don't know exactly what -- what to do.

15  Q     And what did Ms. Perez-Ceballos tell you she was looking

16  for?

17  A     She was looking, she told me at that moment, we're looking

18  at two-bedroom apartment in Miami Beach.

19  Q     Did Ms. Perez-Ceballos tell you where she was from?

20  A     Mexico, yes.

21  Q     Did Ms. Perez-Ceballos tell you why she wanted to come to

22  Miami to rent an apartment?

23  A     She told me she wanted to rent an apartment to come to

24  Miami from time to time.  That's pretty normal in Miami for

25  foreign people.

1  Q    What else -- what happened -- what else happened during

2  the phone call with Ms. Perez-Ceballos?  Did she say anything

3  else?

4  A    No, that's it.  And then -- and then I have to look the

5  listings in the -- our MLS system to try to find the proper

6  property for her.  That's it.

7  Q    Did you meet with Ms. Perez-Ceballos at some point?

8  A    Yes, of course.

9  Q    Approximately when did you meet with Ms. Perez-Ceballos?

10  A    I have something -- and that particular point, can I

11  explain that?

12  Q    Yes, sir.

13  A    At that particular point, I really, really -- I have, you

14  know, it have been a long time, but I have a good memory.  So,

15  I don't remember exactly if in that moment, I think she went --

16  I meet -- I found the system, but I didn't arrange show the

17  property at that moment.  I said, later.  I said, she came

18  later, maybe 15 -- 16 --

19  Q    Okay.  So, you talked -- sorry.

20  A    -- 15 day or 30 days later, and I prepared the property to

21  show.

22  Q    Okay.  So, she called first, and then she came, you said,

23  15 or 16 days later?

24  A    Yeah, whatever, something like that, but really, I'm not

25  sure.  Really -- really at that moment that's about --

1    Q    Sure.  It's approximately.

2    A    Yeah, approximate, yes.

3    Q    Okay.  Right.  And when Ms. Perez-Ceballos came to Miami,

4    why did she come to Miami?  Did she tell you?

5    A    Well, to see the properties.

6    Q    Okay.  And you had some properties lined up --

7    A    Yeah, I have some properties, whatever what they want.

8    Q    Okay.  Did Ms. Perez-Ceballos come to Miami with anyone?

9    A    Yes.  She came with Mr. Saiz, her husband, mother.

10   Q    Okay.  With Mr. Saiz, her husband, and his mother or just

11   Mr. Saiz-Pineda's mother?

12   A    Silvia and Mr. Saiz's mother.

13   Q    Okay.  So, two people?

14   A    Yes.

15   Q    Okay.  What happened when they arrived in Miami?

16   A    Well, they called me.  We can make an appointment to show

17   the properties the next day, and then, I think it was next day,

18   and then I showed the properties.

19   Q    How many days did you show properties to Ms. Perez-

20   Ceballos in Miami?

21   A    Only one.

22   Q    One day.  What happened on that day?

23   A    You know why?

24   Q    Yes, sir.

25   A    And I'm very good to -- to a lot of the properties.  I

1    know Miami very well.  It is my place.  So, normally --

2    normally what I do, I choose only three -- at the beginning,

3    only three properties because to -- I spoke with the client,

4    but I had to see the client in person.  So, normally what I do,

5    I show the first time only three properties.  And then I know

6    exactly how is the client, exactly.

7            Well, in that case, I have three properties to show,

8    and one of the property I showed, she like it very much.  It

9    was good, you know, because I know the building.  It was a very

10   good building.

11           And so, she decided to for that building -- for that

12   apartment, and so I didn't have to show anything else.  It was

13   a good -- it was a good match for her.

14   Q    Can you tell us a little bit about the apartment?

15   A    What?

16   Q    Can you tell us about the apartment, what kind of

17   apartment was it, and where it was located?

18   A    It was an apartment in a high-end -- high-end building in

19   Miami Beach with three -- it was a three-bedroom apartment.

20   Q    Do you remember -- it was for rent?

21   A    For rent.

22   Q    Okay.

23   A    Face ocean -- face oceanfront, yes.

24   Q    Do you remember the -- oceanfront?  I'm sorry?

25   A    Oceanfront on the Miami Beach, yeah.

Marichal - Direct / By Ms. Hampton                        232

1  Q    Okay.  And do you remember how much the rent was supposed

2  to be?

3  A    It was -- I think it was $4,000.

4  Q    For how often?

5  A    Huh?

6  Q    How often?

7  A    How what?

8  Q    $4,000, how often?

9  A    A month.

10 Q    Okay.  During the day that you were showing Ms. Perez-

11 Ceballos these apartments, did you have conversations with her?

12 A    Yeah, of course, I was showing the apartment, yes.

13 Q    Did she choose which apartment she wanted?

14 A    Yes.

15 Q    Okay.  And did -- did you-all discuss whether she was

16 employed at the time?

17 A    No.

18 Q    Do --

19 A    Because normally I don't have to do that.  They have to do

20 an application -- well, they have to -- the application for

21 them is normally for the listing -- the listing agent, so the

22 agent from the landlord; your credit report and all of that,

23 and they have to do an application for the association of the

24 building.  And normally they approve that.

25 Q    Did it come up in conversation?  Do you know whether she

Marichal - Direct / By Ms. Hampton                    233

1    was employed?

2    A    No.  I didn't know, and so I thought she was just a

3    housewife.

4    Q    How do you know that?

5    A    Because of the -- I saw deposit was -- it was Mister --

6    so, it was what she told me, she has a husband in Mexico, she

7    wanted to do that.  And normally, she was -- I think she was a

8    household -- housewife, said.

9    Q    Did Ms. Perez-Ceballos tell you that she had a business?

10   A    No.

11   Q    In the years that you knew Ms. Perez-Ceballos, did she

12   ever tell you she had a business?

13   A    We didn't talk about that, no.

14   Q    Do you remember whether Ms. Perez-Ceballos rented that

15   property on Miami Beach under her name?

16   A    I think so.  I don't --

17   Q    You think so or do you know?

18   A    -- I don't remember, I don't remember, but I think so,

19   yes.

20   Q    Okay.  Who is Angel Gonzalez-Monterrubio?

21   A    Angel Gonzalez-Monterrubio was -- he was an employee from

22   Mr. Saiz's office.

23   Q    Employee of the Defendant's husband?

24   A    Yes.

25   Q    What did he do for Mr. Saiz-Pineda?

Marichal - Direct / By Ms. Hampton                    234

1   A    Exactly I don't know.  I don't know exactly.

2   Q    Did Mr. Angel Gonzalez-Monterrubio ever rent an apartment

3   on Miami Beach for Mr. Saiz-Pineda or Ms. Perez-Ceballos under

4   his name?

5   A    Not from -- not from me.

6   Q    Did you ever help Mr. Angel Gonzalez-Monterrubio rent an

7   apartment in Miami Beach?

8   A    No.

9   Q    Okay.  So, after you find the property for Ms. Perez-

10  Ceballos, she likes it, did you have any more contact with her

11  about that property?

12  A    Well, normally when we meet with the client, say yes, we

13  prepare the -- the lease contract, sign -- it'll have to be

14  signed by the -- the lessee and the lessor, both, if they

15  agree, and then with the contract, we have to -- they have to

16  do an application for the association to be approved.  After --

17  after the application is done, and then it's approved.

18  Q    And did you handle that paperwork yourself or did someone

19  else?

20  A    Normally we -- we do the lease contract, yes.  We do -- we

21  do that, and the Florida -- a (indisc.) form.

22  Q    Do you still have that lease contract in your possession?

23  A    No, no, I don't; I don't have it.

24  Q    Why not?

25  A    Because what belonged to the company has been more than

Marichal - Direct / By Ms. Hampton                    235

1   ten years, and according to the Florida law --

2   Q    It's at Weichert?

3   A    Weichert.  There has to be -- they have to keep record for

4   five years.

5   Q    Okay.

6   A    Less than five years, yes.  But it was a regular standard

7   lease calling for one year.

8   Q    After you finished the paperwork with Ms. Perez-Ceballos

9   for this property in Miami, when was the next time you had

10  contact with Ms. Perez-Ceballos?

11  A    I see one -- one year later, something like that; maybe

12  more.

13  Q    What happened one year later, approximately?

14  A    Well, year -- maybe one year, one year and a half; she

15  called me and she told me that this -- her husband wanted to --

16  he was interested in buying, wanted to look at some properties

17  in Miami Beach.  And she asked me if it was possible if I could

18  go to Mexico to -- to show brochure about properties.

19  Q    Why did Ms. Perez-Ceballos tell you you needed to come to

20  Mexico to meet with her husband?

21  A    Because I -- I suppose she -- her husband tell -- told her

22  to call me because I didn't have any relation, any

23  communication with him.

24  Q    So, up until this time, you had had only communication

25  with Ms. Perez-Ceballos.

1   A    Yes.

2   Q    Did Ms. Perez-Ceballos tell you why you needed to go to

3   Mexico instead of them coming to Miami like it had happened

4   before?

5   A    No, but -- no.

6   Q    Did Ms. Perez-Ceballos tell you what business her husband

7   was in --

8   A    No.

9   Q    -- at that point?  Did you know what business her husband

10  was in?

11  A    At that moment, no.

12  Q    And this was approximately 2007; is that correct?

13  A    Yes, because it was -- yeah, of course; one year later,

14  yeah.

15  Q    Did you travel to Mexico to meet with Mr. Saiz-Pineda?

16  A    Yes.

17  Q    Do you remember approximately when you went to Mexico?

18  A    Well, she told me about 2007, we'll say, one year later,

19  November -- I remember the lease was signed November 2006.

20  That mean, November 2007 could be or the beginning of 2008,

21  yes, it could be.

22  Q    Okay, so about the beginning of 2008 you traveled?

23  A    Could be, yes.  Yes.

24  Q    Where did you go in Mexico?

25  A    I went directly to Villahermosa -- well, I went to Mexico

Marichal - Direct / By Ms. Hampton                237

1   and I stayed in a hotel near the airport, and then I took a

2   plane to -- to Villahermosa.  Sorry.

3   Q    In Tabasco?

4   A    Traveled to Tabasco, yes.

5   Q    Thank you.  And so, when you got to Tabasco, did you meet

6   with Mr. Saiz-Pineda?

7   A    Yes.

8   Q    Where did you meet with Mr. Saiz-Pineda?

9   A    At his home.

10  Q    Where is his home at in Tabasco?

11  A    It was in Villahermosa, in a -- I had never been there.

12  In a neighborhood, got closed gate community; nice place.

13  There was a lot of (indisc.) houses, is not only was houses but

14  (indisc.), but it was nice and very modern.

15  Q    When you went to Mr. Saiz-Pineda's house, was Ms. Perez-

16  Ceballos present?

17  A    When I -- when I went there, and they opened the door was

18  Mr. Saiz and Silvia was there, yes.

19  Q    And according to your conversation with Ms. Perez-

20  Ceballos, she knew why you where there, correct?

21  A    Of course.  And he, both, yes.

22  Q    Okay.  What happened next when you arrived at their house

23  in Tabasco?

24  A    When I arrived there, well, I -- I spoke with Mr. Saiz,

25  and we went, Mr. Saiz and me, to an office he has at home, and

1    I spoke with him, and presented brochures about some -- two

2    buildings, and the building I thought it was the best for them.

3    It was -- was the -- the newest building to be built in Sunny

4    Isles.

5    Q    The newest building to be built where?  I'm sorry.

6    A    In Sunny Isles.

7    Q    Okay.  Sunny Isles.

8    A    That was the Jade Ocean.

9    Q    Jade -- and the building was named Jade Ocean?

10   A    Jade Ocean, yes.

11   Q    At that point, was Jade Ocean already constructed or was

12   it --

13   A    No, it was going to be constructed, yes.

14   Q    Okay, it was being built.  Why did you think that that

15   would be a good building for Mr. Saiz-Pineda and Ms. Perez-

16   Ceballos?

17   A    First, the -- it was the first, the newest one.  There was

18   another Jade that was built before, and this was a newer one.

19   And he wanted a preconstruction.  So, I think it was the best

20   and the newest and is a lot more modern at that moment, and

21   this was why.

22   Q    Did Ms. Perez-Ceballos tell you what kind of building she

23   wanted to live in?

24   A    No.  Did you say, Mister -- Mr. Saiz or Miss --

25   Q    Ms. Perez-Ceballos.

Marichal - Direct / By Ms. Hampton                    239

1   A    No.

2   Q    Did you have a conversation with Ms. Perez-Ceballos about

3   a particular location she was interested in living?

4   A    No.

5   Q    Do you recall telling myself that you did have a

6   conversation with Ms. Perez-Ceballos about a particular

7   location --

8           **MR. REYNAL:**  Objection, your Honor, to the improper

9   impeachment again.

10          **THE COURT:**  Sustained.

11          **MR. REYNAL:**  Thank you.

12  **BY MS. HAMPTON:**

13  Q    After this meeting, did you have another discussion with

14  Ms. Perez-Ceballos regarding where she wanted to live?

15  A    No, I -- no, I didn't have any discussion with her about

16  that.  I only have a meeting with Mr. Saiz.

17  Q    Did she ever tell you her preference for buildings?

18  A    No.

19  Q    What did Mr. Saiz-Pineda tell you in 2007 or early 2008

20  when you met with him in Tabasco as far as what his business

21  was?

22  A    I didn't ask for that.  He was a potential client, and

23  that's it.  I -- we never -- we don't --

24  Q    What did he eventually tell you his business was?

25  A    He say he was -- he said accountant.  He have an office

1    about that.

2    Q    How long was your meeting with Mr. Saiz-Pineda in Tabasco?

3    A    That -- at that moment, maybe one hour.  No more that;

4    maybe less.

5    Q    Was anything decided during that meeting?

6    A    No.  I presented brochures, I spoke the -- what I think in

7    my experience which building was best, I preferred -- I offered

8    the Jade Ocean because it was the newest one.  That's it.  I

9    left with him all the brochures and went back to Miami.

10   Q    Were you contacted by anybody on Mr. Saiz-Pineda's staff

11   to set up this meeting with him in Tabasco?

12   A    Of course.  All those meeting was done through Mr. Saiz's

13   office.

14   Q    Which office?

15   A    His office, accountant office.

16   Q    His accountant's office?

17   A    Yeah, I suppose it was -- yes, accountant or the -- yes.

18   Q    And who would you speak to at Mr. Saiz-Pineda's office?

19   A    All the time, I spoke with his office with his assistant,

20   Marlis Cupil.

21   Q    And Mr. Marichal, when we're speaking, there's a court

22   reporter taking --

23   A    Yeah, I know.  Yeah.

24   Q    So, when I'm speaking, you can't --

25   A    Ah, okay.

1    Q     -- you're doing it again; you can't talk over the

2    question --

3    A     Yeah, yeah, I'm sorry; I'm sorry; I'm sorry.

4    Q     Okay.  You can't talk over the question.

5    A     Yeah.  Yeah.

6    Q     You have to wait till the end of the --

7    A     Okay.  Sorry.

8    Q     -- end of the question, and then I'll give you the same

9    opportunity --

10   A     This -- this is my first time in a trial, so...

11   Q     I understand, sir.  I understand.

12   A     So, I'm sorry.

13   Q     Please wait till the end of the question.

14         Okay.  Was there another property that you helped

15   Mr. Said-Pineda and Ms. Perez-Ceballos with after the Jade

16   Ocean property?

17   A     Yes.

18   Q     What was the next property?

19   A     It was in New York.  And then came Los Angeles -- Angeles,

20   yes.

21   Q     What timeframe were you helping them purchase a New York

22   property?

23   A     Huh?  Sorry?

24   Q     What -- what was the timeframe that you were helping them

25   purchase the New York property?

Marichal - Direct / By Ms. Hampton                    242

1            **MR. REYNAL:**  Your Honor, I object.  I think the

2    question is confusing.  She should specify whether it's

3    Mr. Saiz or Ms. Silvia, or both.

4            **MS. HAMPTON:**  I did, your Honor.  I said both, and he

5    said he was helping them.

6            **THE COURT:**  Okay.  Overruled.

7    **BY MS. HAMPTON:**

8    Q    And what timeframe were you helping Mr. Saiz-Pineda and

9    Ms. Ceballos -- Perez-Ceballos with the New York property?

10   A    I do not remember if the New York property was -- the

11   contract was signed in -- in 2008.  I have a note.  Can -- can

12   I take it out?

13   Q    Sure.  Yes, please.

14   A    Thank you.  Because there's too many -- let me see if it's

15   here.  I have my glasses somewhere.

16           Let's see.  The New York property -- property, the

17   contract was signed on April 2008.

18   Q    And when did the property finally close?

19   A    Eleven November, 2009.

20   Q    Okay.  When you were helping them, Mr. Saiz-Pineda and

21   Ms. Perez-Ceballos, purchase the New York property, did

22   Ms. Perez-Ceballos tell you a preference of which property she

23   wanted in New York?

24   A    No.  May I say something?

25   Q    Yes, sir.

1   A    The only preference in that case was preconstruction.

2   Q    Was, I'm sorry, what?

3   A    Preconstruction building.

4   Q    Ms. Perez-Ceballos wanted preconstruction?

5   A    No, not Perez-Ceballos.  That was being told by the

6   Mr. Saiz's office.

7   Q    And when you would communicate with Mr. Saiz-Pineda's

8   office, who would you communicate with?

9   A    With Marlis Cupil, his assistant.

10  Q    Why didn't you communicate directly with Mr. Saiz-Pineda?

11  A    Because he told me that all communication about the

12  property or the brochures, everything go through his office,

13  through Marlis, his assistant, Marlis Cupil.  So, I never

14  communicated directly with him unless he was in Miami to talk.

15  Q    When you helped them purchase the property in New York and

16  -- between April 2008 and November of 2009, what did you

17  believe Mr. Saiz-Pineda's occupation was?

18  A    In that moment, I knew he was an accountant, have an

19  office accountant, I think, very important in Villahermosa, and

20  then I don't remember if it was Marlis who told me that he had

21  something -- something to do with the government, but I don't

22  know which one.  Many people have business with the government.

23  Q    He has something to do with the government?

24  A    Yeah.

25  Q    And you didn't know what?  I'm sorry?

1   A    Exactly what his position, no.

2   Q    It was Marlis that told you that?

3   A    Yeah.  I think it was Marlis, yeah.  Marlis, yeah, as far

4   as I remember.

5   Q    Did Mr. Saiz-Pineda ever tell you that he was an elected

6   official in Mexico?

7   A    He --

8   Q    I'm sorry, appointed official in Mexico.

9   A    I knew exactly when he was an appointed official and his

10  -- his, you know, his position when we have a meeting in Mexico

11  with lawyers and Mr. Saiz; with the lawyers and Mr. Saiz, yes.

12  Q    When was that?

13  A    That was in September -- September 9, I think.  I have it

14  here.  September 9th, 2010.

15  Q    So, it wasn't until 2010 until --

16  A    I know exactly when because when we have a meeting with

17  the lawyers, Latour, and the lawyer counsel in Miami -- in

18  Mexico at the airport, there was a request from Mr. Saiz, and

19  in that meeting, the first thing he did was to say to both --

20  to everybody who -- who was -- what he was doing in the

21  government.  I didn't know before he was -- he held -- he hold

22  that position.

23  Q    What was the purpose of that meeting, September of 2010 in

24  Mexico, with the lawyers and Mr. Saiz-Pineda?

25  A    Yeah, because the purpose of the meeting that they told me

1  they wanted to know the tax implication about to move to the

2  United States and maybe his business or to move -- to live

3  permanently here, and also -- and the (indisc.) other (indisc.)

4  lawyer, he wasn't a specialist in that field.  And Mr. Latour

5  was there because they wanted to know about the immigration

6  rules, visa, and all that, investment visa and all that.

7  Q    Why were you there?

8  A    Because Mr. Saiz was one very important client.

9  Q    Why were you there present for this meeting about tax

10  implications in the U.S.?

11  A    I was there because Mr. Saiz was a very good client, and

12  he requests if I could be there.  And he was a (indisc.)

13  client, and I have to keep my client.  Well, actually, he --

14  Q    What was the purpose of you being present?

15  A    Can I repeat that?  Mr. Saiz request to -- just to be

16  there.  As I --

17  Q    For what purpose, sir?

18  A    Because I had -- I am -- I was his realtor, his -- I was

19  his real estate broker.  That's it.  And I introduced the --

20  the lawyer.  That's it.  And I didn't know Latour in that time.

21  Q    You introduced Mr. Saiz-Pineda to a lawyer?

22  A    No.  Let me explain to you.  Mr. -- Mr. Saiz asked me if I

23  (indisc.) -- if I know a lawyer who know about tax implication,

24  all of that, property tax law, and also immigration law.  The -

25  - the law -- the attorney who did all the paper for the

1    companies that owned the apartment, it was Mr. Cantor, the

2    Cantor Office, but I -- I didn't know him, but I met him,

3    because he -- a lawyer from his office has many meeting at the

4    associate of Miami Beach, Miami Association of Realtors,

5    offering his -- their service as the lawyers, as -- for tax,

6    for corporation; that's it.  So, when they asked me what

7    lawyer, I say, well, that one.

8    Q    Mr. Cantor?

9    A    Yes.

10   Q    So, you introduced Mr. Saiz-Pineda to Mr. Cantor.

11   A    Yes.

12   Q    Did you have a conversation with Mr. -- with Ms. Marlis

13   Cupil about Mr. Saiz-Pineda, Ms. Perez-Ceballos, buying

14   properties in the U.S.?

15   A    To find properties?

16   Q    Buying properties.

17   A    Yes.  She was involved all the time.

18   Q    Approximately when did that conversation happen?

19   A    Well, from two thousand and -- oh, 2008 or '07 till 2012,

20   something like that.  Everything was done -- all the paper, all

21   the (indisc.), everything was done through Mr. Saiz office,

22   through his assistant, Marlis Cupil.

23   Q    Did your introduction of Mr. Cantor to Mr. Saiz-Pineda

24   occur before or after the New York property was purchased?

25   A    I think before.  Yes, before, because they -- they did

Marichal - Direct / By Ms. Hampton                    247

1    the -- here, let me check.  Let me check.  I know that

2    because -- (indisc.).  Yes.  Yes, because they did -- they did

3    the -- what I mean, they did the -- the document for the, for

4    the company, for the company, yes.

5    Q    So, you said before that the New York property contract

6    was entered into in 2008 and closed in 2009.

7    A    (indisc.)

8    Q    So, when did the meeting with Mr. Cantor happen in Mexico?

9    A    I told you, September 29th, 2010.

10   Q    So, the -- you introduced Mr. Cantor after the New York

11   property was closed?

12   A    Let me see.  Let me see.  Was closed 2009; no, because,

13   let me see, he closed -- he closed -- look, he closed Jade two

14   -- this Jade, the small apartment, in April, 2009.  And he was

15   in -- he did the con- -- the -- the property, the -- the papers

16   for the company.

17   Q    What other properties were Mr. Cantor involved in helping

18   Mr. Saiz-Pineda purchase?

19   A    Can you repeat that?

20   Q    What other properties was Mr. Cantor --

21   A    He -- Cantor?  Yes, I can't tell you that, yes.

22   Q    Mr. Marichal --

23   A    I'm sorry.

24   Q    -- you can't speak --

25   A    Yes.  Yes.

Marichal - Direct / By Ms. Hampton                    248

1   Q     -- we can't speak over each other.

2   A     Yes.

3   Q     Okay.

4   A     Okay.

5   Q     What other properties was Mr. Cantor involved in helping

6   Mr. Saiz-Pineda purchase?

7   A     Yeah, wait, wait, one -- well, hold on a minute, please.

8   Cantor was involved in the two -- the two apartment in -- in

9   the Jade Ocean and the Century.

10  Q     In New York?

11  A     He did -- he only did the -- the -- the paper for the

12  company, who was going to be the owner, because New York,

13  the -- the attorney involved was the developer attorney.

14  Q     Okay.  So, who is the owner of New York?

15  A     It's a company.

16  Q     What's the name of the company?

17  A     It's -- oh, let's see.  It was his -- let's see, how did

18  he -- it's Samurai International.

19  Q     And the name of the company before that?

20  A     It was 25 -- 25 Northeast 74th Street Holdings, yeah.

21  Q     Okay.  And who really owns the property at New York?

22  A     Well, Mr. Saiz.

23  Q     Okay.  And it was in a company named East 74th Street and

24  now Samurai?

25  A     Yeah, they changed the name.

Marichal - Direct / By Ms. Hampton                    249

1    Q    Okay.  Who created the company called Samurai?

2    A    All those -- all those names from the -- the two apartment

3    in -- in Jade, Century, and New York was created by Mr. Cantor.

4    Q    Was Mr. Latour also involved after Mr. Cantor passed away?

5    A    When he -- when Mr. Cantor passed away -- well, he was

6    involved before.

7    Q    Uh-huh.

8    A    He took care of the -- he was involved in -- in Gladiator.

9    That was the name of the -- for the apartment then housing Jade

10   Ocean and for the Sugar Land.

11   Q    Do you remember the purchase price of the New York

12   property?

13   A    Yes.  I can tell you right now, find -- New York, five

14   million -- five point -- five point eight -- five million

15   eight -- eight seventy-five thousand.

16   Q    Who paid for that, that property?

17   A    Mr. Saiz, I suppose.  I didn't have to do nothing with

18   that.  They -- they go from the developer and the -- the buyer

19   and seller.  I don't have nothing to do with that.

20   Q    Okay.  So, Mr. Saiz-Pineda paid for that property.

21   A    I suppose so.

22   Q    Okay.  The -- let's talk about the Jade Ocean 27 --

23   A    I don't know, really, exactly.  I don't know exactly.  I

24   suppose he paid that, but I don't know exactly where the --

25   what --

1  Q    Let's talk about Jade Ocean 2708 --

2  A    Yes.

3  Q    -- the first one.  Okay?  What company was that property

4  put under?

5  A    At the beginning it was Jade Ocean -- Jade Ocean Holding

6  2 -- 2708.  Yeah.

7  Q    Is that currently what it is?

8  A    No, that now is another name.  It's -- I don't -- I don't

9  have it with me right now.  It's --

10  Q    Who is the real owner of that property?

11  A    Okay.  Okay.  Now the name is Spartan Investments.

12  Q    Now it's Spartan Investments.

13  A    Yes.

14  Q    And who is the real owner of that property?

15  A    Mr. Saiz.  Well, was -- look, it was, well, a long time

16  ago.  I don't know if it is something -- sell it or do with

17  something; I really don't know.  But for that moment, for me,

18  it was Mr. Saiz.  Right now?

19  Q    Did you visit Mr. Saiz-Pineda at that property?

20  A    Twenty-seven-o-eight?

21  Q    Yes, sir.

22  A    Let me see, just once.

23  Q    Just once?

24  A    Yeah, only once.  Normally, if I meet in Jade Ocean, I

25  meet downstairs, the lounge.

1   Q    Was the defendant present?

2   A    No.

3   Q    Let's talk about the penthouse at Jade Ocean.

4   A    Yes.

5   Q    What company is that one under?

6   A    Jade Ocean?  Gladiator International.

7   Q    And before Gladiator, what -- what was the name of the

8   company?

9   A    Huh?

10  Q    Before --

11  A    It was Jade -- Jade Ocean Penthouse Holdings.

12  Q    So, it was first Jade Ocean Penthouse, and then they

13  changed it to Gladiator.

14  A    Yes.

15  Q    Okay.  Who is the real owner of that property?

16  A    In -- in this moment?  In -- in that moment, when they

17  bought that, it was Mr. Saiz.  (indisc.) -- but right now,

18  today, I don't know.

19  Q    What was the purchase price of the Jade Ocean property

20  2708?

21  A    Seven million six hundred thousand.

22  Q    Is that the penthouse?

23  A    Yes.

24  Q    Okay.  So, seven million --

25  A    Ah, you're talking about the other one.  Are you talking

1    about the old -- the old one?  Twenty-seven-o-eight?

2    Q    Yes, sir; 2708.

3    A    Twenty-seven-o-eight, 2708; two million nine hundred and

4    fifty.

5    Q    And when was 2708 closed on?

6    A    The contract was done -- contract was signed on June,

7    2007, and the closing date was April, 2009.

8    Q    Who paid that 2.95 million for that house, that property?

9    A    I don't know how to answer that.  Let me explain.  Can I

10   explain?  Or --

11   Q    Do you know who paid for that property?

12   A    Exactly, no, I didn't -- they -- they do between Mr. Saiz

13   office and the developer.  I suppose, I don't know, it was

14   Mr. Saiz, but --

15   Q    Okay.

16   A    -- could be another person.  I don't know.  I don't -- I

17   don't -- I don't deal with -- you know, with those money; I

18   don't have to do nothing.  With a broker, we don't have to do

19   nothing with that.  We -- we have the seller and the buyer.

20   Q    Yes, sir.  Yes, sir.

21   A    They do -- like -- and that's it.

22   Q    What about the penthouse?  Did you say that was seven

23   point six?

24   A    Yes.

25   Q    Okay.  When -- when did that close?

1  A    The penthouse; the penthouse.  Let me check.  Let me

2  check.  The penthouse closed November, 2009.

3  Q    And who paid for that?

4  A    Suppose -- I suppose -- I'd say Mr. Saiz, but could be

5  another -- a company; as I --

6  Q    So, April --

7  A    -- I don't know.

8        MR. REYNAL:  Your Honor, I don't think he had

9  finished his answer.

10       THE WITNESS:  Huh?

11       MR. REYNAL:  I just --

12       THE COURT:  Did you finish your answer?

13       THE WITNESS:  Yes.  Though, you know -- can I explain

14 something, (indisc.)?

15       THE COURT:  Yes.

16       THE WITNESS:  She -- she is asking me who paid for

17 the property.

18       THE COURT:  Okay.  If you don't know, you say you

19 don't know.

20       THE WITNESS:  Yeah, I -- yes, but, you know, we, as a

21 broker, we are -- you know, we are middlemen.  We have the

22 seller and we have the buyer.  In this case the seller was a

23 developer.  Or any case, when somebody buys a property, agrees

24 to buy the property, the buyer -- they do that through an

25 attorney or title company, and the buyer sends the money to the

1    title company and to the lawyer, and that's it.  I don't have

2    nothing to do with that.  I don't know if he's -- he did it

3    personally, from his own company, for another company; I don't

4    know.  I don't know.  The only three people who can know that

5    is the title company or the attorney who handled the process.

6    **BY MS. HAMPTON:**

7    Q    You know who you dealt with in these transactions as far

8    as who was --

9    A    Sorry?

10   Q    -- who was purchasing these properties, correct?

11   A    What?  I'm sorry.  Can you repeat the question?

12   Q    You know who you dealt with in these transactions as far

13   as who was purchasing --

14   A    Well, of course; it was Mr. Saiz.

15   Q    Okay.  In each of these properties?

16   A    Yes.

17   Q    Okay.  You said Century 23 -- where is that one?

18   A    Century 23?  It's in L.A., Los Angeles.

19   Q    When did that property close?

20   A    Let me check.  The contract was on March, 2008, and the

21   closing date was April -- no; April, 2010.

22   Q    And what was the purchase price of that property?

23   A    Five million seven hundred.

24   Q    And who paid for that property?

25   A    It's the same question.  I supposed it was Mr. Saiz; I

1    don't know.

2    Q    Who is the owner of that property?

3    A    The owner was -- it was a company called Related from New

4    York.

5    Q    It was called what?  I'm sorry.

6    A    Related Group.  It's a big company, developer, in New

7    York.

8    Q    What company is Century 23B, LLC?

9    A    Oh, Century 23B, the owner of the -- of that apartment.

10   Q    Who is the real owner of the L.A. property?

11   A    Right now?  I don't know.  In that moment, it was

12   Mr. Saiz.

13   Q    Thank you.

14   A    Yes, because I did -- all this was through Mr. Saiz's

15   assistant.

16   Q    Did you help with another property in Miami later on?

17   A    No.  No.

18   Q    Did you help with a property at Porsche Tower in Miami?

19   A    Where?

20   Q    Porsche Tower?

21   A    Yes.

22   Q    Tell us about that property.

23   A    Well, that was a pre-construction -- pre-construction.

24   The contract was signed in January, 2012; the price was 12

25   million five hundred; and the idea was to sell the penthouse

1   in -- in the Jade and pay for the Porsche, because he bought

2   the apartment for the -- the penthouse at the Jade when the

3   market crashed for seven million six hundred, as I told you

4   before.  I mean, that moment when he bought the Porsche, and

5   right now, the price -- well, right now the market's slow right

6   now, but (indisc.) -- like, the penthouse could -- could go for

7   12 million, 14 million.

8   Q    Can you tell us a little bit about Porsche Tower?  What

9   is -- what kind of property is that?

10  A    It's a high-end property.  It was the -- it's the newest

11  one built right now in Sunny Isles.  It's an especial property

12  because they have, like, a car elevator just so you -- you can

13  park your car in front of your apartment.  It doesn't matter if

14  you're on the -- the 15th floor or (indisc.) floor.  That's the

15  main thing.  And it's --

16  Q    Has a car elevator for each apartment?

17  A    Yes.  No, not for each one.  There is a car elevator

18  for -- you have your -- your parking space is in the same level

19  in front of your apartment.

20  Q    So, your -- your car is parked at the same level as your

21  apartment.

22  A    Yes.

23  Q    Okay.  And you said the purchase price was $12.5 million?

24  A    Yes.

25  Q    Who did you talk to in your negotiations about purchasing

Marichal - Direct / By Ms. Hampton                257

1   that property at Porsche Tower?

2   A    I spoke with?

3   Q    Yes, sir.

4   A    With the developer.

5   Q    I'm sorry?

6   A    I asked Mr. Saiz if he was interested in the property; we

7   went to the -- I went -- I took him to the sales center, and

8   then the one representative from the sales center make a

9   presentation of the project, that's what it is, and then

10  Mr. Saiz decide to reserve the -- the property.

11  Q    Did you travel at the request of Mr. Saiz-Pineda to

12  properties around the nation to look -- look at them for him?

13  A    No.

14  Q    Did you travel with Angel Gonzalez-Monterrubio?

15  A    Never.

16  Q    Did you take pictures of photo -- photographs of

17  properties for Mr. Saiz-Pineda to consider before purchasing

18  them?

19  A    No.  I sent the brochures.

20  Q    How did you find out about the Los Angeles property?

21  A    I never been to L.A., okay?  I never been there.  So, when

22  he told me about an apartment in L.A. --

23  Q    Who told you?

24  A    Mr. Saiz.  I start looking through the internet to -- to

25  see what's going on.  First I just look the -- the high-end

1   areas in L.A.; Beverly Hills, that area, you know, that's --

2   so, I started looking, and then I found that there was a --

3   there was a building was being -- was being built in -- called

4   Century City, but it's close to the Beverly Hills area; it's a

5   very high-end area.  It's called Century City Group because

6   they are the Century Fox field office, and studio is there.

7   So, I -- I found that that building was built by Related, New

8   York.  I know them; the -- Related New York, it was -- it's a

9   very, very important company in New York.  They did the Time-

10  Warner Towers in New York and many buildings.  It's very

11  important.  So, they were in New York, and then I made contact

12  with them, they send me the -- they -- they send me the

13  brochures, with pricing and everything, and I said -- and send

14  that to Mr. Saiz' office, attention Marlis.

15  Q    Did you ever travel to the Los Angeles property?

16  A    When that -- when that was built, yes.

17  Q    Did you travel there with anyone?

18  A    I went with my wife.

19  Q    And about the New York property, did you travel there

20  before Mr. Saiz-Pineda had agreed to purchase it?

21  A    I -- I -- I used to live in -- in Manhattan --

22  Q    Uh-huh.

23  A    -- for five years.  So, I -- and I like to go to

24  Manhattan.

25  Q    Is that where this property is located?

1   A    Yes, Manhattan, yes; in -- in upper east side Manhattan.

2   Q    Did you travel to New York to look for a place for

3   Mr. Saiz-Pineda before he had picked one out?

4   A    Well, at the beginning I -- I know -- because I know New

5   York very well, and I know when people from foreign countries,

6   like, where they like to live.  I found a nice, nice place, the

7   upper east side, midtown Manhattan, that is a nice place, and I

8   was looking for new buildings, and then I found several

9   buildings, and then I pick out -- picked that one.  I saw it

10  wasn't ready; I pick another one, and then I would send that to

11  Mr. Saiz.  By the way, one of -- the one I picked out was built

12  by Related, too.

13  Q    Did Mr. Saiz-Pineda tell you why he wanted a New York

14  property?

15  A    No, he didn't, but I guess everybody want to have an

16  apartment in New York.

17  Q    What was Ms. Perez-Ceballos' involvement with the New York

18  property?

19  A    Well, I suppose when they see the brochure maybe they --

20  he showed the brochure to her, but always when I get back, the

21  answer from always back through his office, through Marlis.  We

22  never talked about -- you know, about Silvia.  I never talked

23  about Silvia about the property, anything.

24  Q    Did Ms. Perez-Ceballos visit the New York property?

25  A    When it was ready, yes, yes.  I don't know how long -- how

1   many times they went there.

2   Q    Did Ms. Perez-Ceballos visit the Los Angeles property?

3   A    I really don't know.  It's too far for me, Los Angeles.

4   It's a long --

5   Q    Did Ms. Perez-Ceballos visit both Jade Ocean properties?

6   A    Yes.  But when they went there, she always stayed in the

7   small apartment.

8   Q    Did you --

9   A    Not --

10   Q    -- help Ms. Perez --

11   A    Yes?

12   Q    I'm sorry; were you finished?

13   A    Yes.

14   Q    Okay.  Did you help Ms. Perez-Ceballos purchase a property

15   in Texas?

16   A    Let me see; Mr. Saiz told me that he wanted to buy a

17   property, a house, in -- in Sugar Land, in Texas -- in Texas,

18   in Houston.

19   Q    For what purpose?

20   A    I suppose it was for children, Silvia, for his family,

21   yes.

22   Q    So, Mr. Saiz told you he wanted to purchase a property in

23   Texas; did he say it was for his family, for Silvia?

24   A    I don't remember.  But --

25   Q    Knowing what you know now and all of the -- the

1    dealings --

2    A    I suppose it was for -- for her, yes.  It was a house; his

3    brother was here.  Yes.

4    Q    What was the address of the house in Sugar Land?

5    A    It's 615 Elm -- Elm -- Elmhurst Court, Sugar Land.

6    Q    Six one five Elmhurst Court in Sugar Land?

7    A    Yes.

8    Q    Okay.  When was that house purchased?

9    A    Let's see; let me get.  Sugar Land.  The -- the contract

10   signed was in August, 2009, and the closing date was twelve,

11   2012.

12        **(Pause)**

13   A    May I say something?

14   Q    Was that -- was that house something that was already

15   built or was it something --

16   A    No.

17   Q    -- that was --

18   A    It was -- no.  In that -- in those community -- I'm sorry.

19   Q    I wasn't finished with my question, again, Mr. --

20   A    Yeah, I just hurt your feelings.  Sorry.

21   Q    I know you're --

22   A    Sorry.  Sorry.

23   Q    You're trying to --

24   A    Sorry.  Sorry.

25   Q    -- to jump ahead, but -- was it -- was it pre-constructed

1   or is it something that was -- I'm sorry; was it already built?

2   A    No.

3   Q    Okay.  How -- tell us about the process of selecting the

4   property in Houston, in Sugar Land.

5   A    When they -- when Mr. Saiz told me he wanted to buy a

6   house in Sugar Land, I had never been in Houston, I had never

7   been in Sugar Land, so I spoke with the -- the one who helped

8   Bertha Tsokos and Tony --

9   Q    Uh-huh.

10  A    -- to help me, because I am not a real estate broker in

11  Texas, and we -- we went together.  And he told -- he -- he

12  looked which area in Sugar Land.  There was a lot of building.

13  So, he -- and he found that there was something, Sugar Land,

14  that place, there was a lot of lot -- you buy the lot and then

15  you build the house.

16  Q    What did you employ Mr. Tsokos to do, specifically?

17  A    Yeah, because I can't be there all the time; first,

18  because he was the broker, he was the broker who sold the

19  property.  And then, when we have to do papers, you know,

20  equipment, everything, he helped me.  He was, like, my man in

21  Houston that it was --

22  Q    Mr. Tsokos is a broker, a real estate broker?

23  A    I don't know if he's a -- I don't exactly -- I am -- I am

24  not sure he's -- I think he's a real estate broker, yes.

25  Q    Okay.  What -- you said he -- he was licensed in Texas and

Marichal - Direct / By Ms. Hampton                    263

1    so --

2    A    Yes.  He was licensed in Texas.  Yes.

3    Q    So you were using him to help you?

4    A    Yes.  Of course.

5    Q    Okay.  And what did you use him to help you do,

6    specifically?

7    A    To find where I can find a place to build a house in a

8    nice place in Sugar Land.

9    Q    Okay.  And how did you do that?  How did you -- did you

10   direct him to -- to do anything, or how did he help you do

11   that?

12   A    I just tell him, look, I want -- looking a house, like

13   this, in a nice neighborhood in Sugar Land, a pre-construction

14   to be built, and he knows the area.  I don't -- I -- I never

15   been there.

16   Q    Did you --

17   A    And he offered -- he offered -- then he came back with a

18   lot of brochures for that company.  I checked the company.

19   It -- it was one of the biggest and most important companies in

20   Houston.

21   Q    Okay.  Did you travel to Houston to meet Mr. Tsokos about

22   this project?

23   A    Later.  Later.  Not at the beginning.

24   Q    Did --

25   A    Everything -- sorry.

1  Q    Did Mr. Tsokos -- did you give Mr. Tsokos direct contact

2  with Ms. Perez-Ceballos?

3  A    No.  At the beginning, no.

4  Q    Did Mr. Tsokos, to your knowledge, have direct contact

5  with Ms. Perez-Ceballos?

6  A    Not at the beginning.

7  Q    But did he?

8  A    Yeah.  Yes.

9  Q    Okay.  What was the purpose of that?

10 A    When we -- when we -- when the -- the house was finished,

11 we went there to -- with Silvia to see the -- to show the

12 property.

13 Q    With just Silvia?

14 A    Silvia, me, and Mr. Tsokos.

15 Q    Did Mr. Tsokos, to your knowledge, did he take Ms. Perez-

16 Ceballos around to pick out a lot and to look at --

17 A    No.  No.

18 Q    -- pre-construction houses?

19 A    No; because she didn't - he didn't meet -- he didn't meet

20 in that -- at that time because --

21 Q    When you, Mr. Tsokos, and Ms. Perez-Ceballos went to look

22 at the house after it was constructed, do you remember about

23 when that was?

24 A    Well, after the closing, of course.  So, this was -- let's

25 see, the closing was on -- well, let's see; twelve, 2012, to be

1    at the beginning of the -- 2013.

2    Q    What happened at that meeting with Ms. Perez-Ceballos and

3    Mr. Tsokos?

4    A    Well, we -- we -- Mr. Tsokos and me checked the house, the

5    house, and we realized there are some -- you know, there was

6    another house here, another house here, and we realized there

7    was something missing.  But -- but -- but the builder don't do

8    that, so -- so, for example, there was a lake in front of the

9    house.  All the house has a fence, especially for the

10   childrens, and this house come without a fence, and we had to

11   do that.  We had to --

12   Q    Why was Ms. Perez-Ceballos there?

13   A    Huh?

14   Q    Why was Ms. Perez-Ceballos present?

15   A    She was present because the -- the house -- the house it

16   was ready, and we -- we showed the property to her.  We

17   couldn't show that before; it wasn't ready.

18   Q    Did Ms. Perez-Ceballos ask for changes to be made?

19   A    No changes, only -- only -- what was it -- we had to do

20   something, I think, on the -- on the grass or some -- yes, and

21   some trees in front.  That was -- but at the end it was -- so,

22   the association would have to do that.  And there was something

23   about the rail on the stair.  That's it.  That's it.  Not too

24   many.

25   Q    And Ms. Perez-Ceballos told you that, that she wanted

Marichal - Direct / By Ms. Hampton                266

1  trees and a rail?

2  A     She told me about the rails, and Mr. Tsokos know that.

3  The rail that -- that was in the house, it was not so nice, and

4  so she said, "My -- my husband wouldn't like that, so let's try

5  to do something different," so we spoke with the builders and

6  we do something with that.

7  Q     What changes did you all make to the house when you

8  inspected it with Ms. Perez-Ceballos?

9  A     Those -- that's all of the changes; small changes.

10 Q     And did Ms. Perez-Ceballos approve the changes that you

11 all were talking to her about that day?

12 A     Yeah, I would say yes.  All the changes were done be- --

13 if there was any change, it was done before, at the beginning.

14 Q     Who owns that Elmhurst house?

15 A     The Elmhurst is -- is owned by a company called Phantom

16 International Investment.

17 Q     And who is the real owner of that house?

18 A     Right now?  Today?  I don't know.  In that moment, and

19 I -- I suppose it's the same thing, Mr. Saiz.

20 Q     Ms. Perez-Ceballos?

21 A     Mr. Saiz.

22 Q     Why only Mr. Saiz?

23 A     I always -- because I just -- just always deal with

24 Mr. Saiz for Silvia.  I didn't deal with Silvia.

25 Q     Who --

1  A    All the time I dealt with Mr. Saiz.

2  Q    Who was that house built for?

3  A    To -- for -- to live there, for Mr. Saiz, for Silvia, and

4  her daughters, I suppose.

5  Q    To your knowledge, did Mr. Saiz-Pineda ever live at that

6  house?

7  A    I don't know.  I don't --

8  Q    To your knowledge, did he?

9  A    No, I don't think -- I don't know.

10 Q    To your knowledge, did Ms. Perez-Ceballos ever live at

11 that house?

12 A    Silvia you say?

13 Q    Yes.

14 A    Yes, of course.

15 Q    When did she start living at that house?

16 A    Well, let's see, it would be -- the closing date was 2012,

17 I think the furnishing or furniture and all of the electronic

18 and shade was done in -- because you -- you contract to furnish

19 it five week before, it was before.  The furnishing, they

20 installed the electronic system, the shade, I will say that the

21 house was ready in April it could be.

22 Q    I'm sorry?

23 A    In April, it could be in April, yes, I suppose she went

24 there April, maybe later, I'm not sure.

25 Q    You said a few times about equipment and shades.  What are

1  you talking about?

2  A    Well, all, like my apartment and home needs shade because

3  of the heat and because of the sun, and we -- we provide

4  electronic shades, you don't do it by hand, you do it by remote

5  control or you do it through an electronic system.  You can do

6  it from your cell phone, you can do it everywhere.

7  Q    You were involved with putting shades in this house?

8  A    No, I -- not involved.  I present -- they asked me for to

9  do that and they asked me to start to do a consult for

10  automatization electronic system.  I did that in the penthouse,

11  so I talked with my provider, and I talked with the provider of

12  shades and they did that work.

13  Q    So you were involved with putting shades, like window

14  shades, is that what you're saying?

15  A    Well, yes, window shades, but very special here.

16  Q    And -- so very special window shades?

17  A    Yes.

18  Q    And --

19  A    Especially the -- they're completely -- sorry.  The other

20  thing is completely electronic.  I did that in the pink house,

21  so I did that in -- in Sugar Land and I've done that for a lot

22  of people.

23  Q    And you were involved with putting electronics in the

24  house?

25  A    No, I don't -- I made the proposal and the people that

1   specialize, the company who can do that they do it.

2   Q    Okay.

3           **MS. HAMPTON:**  Your Honor, at this time I'd like to

4   show the Exhibit Number 95 to the witness, but not appear,

5   please, just to the witness first so that he can look at it.

6           **THE COURT:**  Okay, that's fine.  You can approach.

7           **THE WITNESS:**  Okay.  Let's see -- can I see this?

8           **THE COURT:**  Yeah, she's going to show it to you.

9           **THE WITNESS:**  Okay.

10          **(Counsel confers; pause, Counsel confers)**

11  **BY MS. HAMPTON:**

12  Q    Don't read it, sir.  Just take a look at it and see if you

13  recognize it.

14  A    Yes, okay.  Yes, ma'am.

15  Q    We're going to scroll down -- scroll down some of the

16  pages here, this is Exhibit Number 95.  Tell us if you need us

17  to go slower on the scrolling, okay?

18  A    Okay.  That's -- do I talk to -- tell you about this?

19  Q    No, do you recognize this document?

20  A    Yeah, of course.

21  Q    What is this document?

22  A    It's a proposal for -- for the furniture.

23  Q    Did you turn over certain documents that you've kept as

24  part of your records to the Government in this case?

25  A    Yes.

1    Q    Okay, is this part of those records?

2    A    Yes.

3    Q    Is this regarding the Sugar Land property?

4    A    Yes.

5    Q    Are these true and accurate copies of the documents you

6    turned over to the Government?

7    A    Yes.

8    Q    Okay.

9         **MS. HAMPTON:**  Your Honor, the Government would move

10   to admit Exhibit 95 at this point.

11        **MR. REYNAL:**  No objection, your Honor.

12        **THE COURT:**  It's admitted then.

13     **(Government's Exhibit Number 95 was received in evidence)**

14        **MS. HAMPTON:**  May I publish to the jury, your Honor?

15        **THE COURT:**  Yes.

16   **BY MS. HAMPTON:**

17   Q    Okay, let's go to the first page.  Now you kept a binder

18   for each of the -- well, three of the properties that you

19   turned over to the Government, correct?

20   A    Yes.

21   Q    You kept one for Jade Ocean, one for Mexico --

22   A    Yes.

23   Q    -- and one for Sugar Land, correct?

24   A    Yes.

25   Q    Okay.  This is the one for Sugar Land, correct?

1   A    Yes.

2   Q    This is Page 1 of Exhibit 95.  Tell us what this is.  Can

3   you tell us what this is, please?

4   A    Well, this is the -- you know, like Sugar Land, the

5   proposal for -- we provided for a proposal for the furniture

6   and equipment proposal.

7   Q    Did you -- did you come up with this proposal?

8   A    Huh?

9   Q    Did you, yourself, come up with this proposal?

10  A    Yes.

11  Q    Okay.  This proposal is for the purchase of furniture --

12  A    Yes.

13  Q    -- and equipment?

14  A    Yes.

15  Q    What kind of equipment?

16  A    Electronic system equipment, shades, on the shades.  The

17  electronic, this is very expensive.  You can -- with the home

18  automatization and electronic system you can control everything

19  in your -- in your home, music, TV, audio, shades, everything.

20  Q    Is this something that you routinely do for all of your

21  clients?

22  A    No, but --

23  Q    Had you ever done this before for any other client?

24  A    Just once for a client, but it's a client from long time

25  ago.

Marichal - Direct / By Ms. Hampton                    272

 1   Q    When?

 2   A    A long time ago.

 3   Q    About when?

 4   A    Eight years ago maybe.

 5   Q    Was it anything to this magnitude?

 6   A    Yes -- no.  May I explain?

 7   Q    Sir, was it -- and was it 900 --

 8              **MR. REYNAL:**  Your Honor --

 9              **THE COURT:**  Let him finish.  You can finish your

10   response.

11              **THE WITNESS:**  I don't know about the price.  But I

12   know -- look, here in that kind of property, by high end

13   property buyers -- owners spend a lot more money than this.

14   **BY MS. HAMPTON:**

15   Q    The -- who was your previous client that you did this for?

16   A    I don't remember, it was a long time ago.  I did all of

17   the -- I have only did the -- I didn't do it, someone do it,

18   the electronic people.

19   Q    So you've done this for one other client?

20   A    Yes, but you say I done, I haven't done that.  I just

21   contact the provider and they do that for me.  I am the

22   middleman.

23   Q    Okay.  Is this your handwriting right here?

24   A    Yes.

25   Q    Okay.  So you took the time to come up with a proposal for

1   furniture and equipment for the Sugar Land house, correct?

2   A     Yes.  Yes.

3   Q     Okay.  And this is for how much money?

4   A     Nine hundred thirty-two thousand dollars.

5   Q     How much was the purchase of the house for Sugar Land?

6   A     Yes, you are right, this was $140,000, 140,400,000 yes.

7   It was too much, I know.

8   Q     Sir, what was the purchase price of the Sugar Land

9   property?

10  A     One thousand I think 400 --

11  Q     One thousand --

12  A     No, I'm sorry, I'm sorry, 1 million 400.

13  Q     Okay, I think you said 1.3 million before.

14  A     Yes, a million 6, yes.

15  Q     Okay.  And so --

16  A     Yes, you're right.

17  Q     Let's go to the next page.

18  A     Too much.

19  Q     Let's go to the next page.

20  A     I know, I know (indisc.).

21  Q     What is this?

22  A     This is the -- this is only the furnitures.

23  Q     Okay.  What is EMC International, LLC Design and

24  Construction?

25  A     I use to have that company to separate -- separated this

Marichal - Direct / By Ms. Hampton                    274

1    from my normally real estate business.

2    Q    When did you create EMC?

3    A    I honestly don't remember which one -- this one I don't

4    remember right now.  A long time ago, I don't remember right

5    now.

6    Q    Did you create EMC before you met Mr. Saiz-Pineda or

7    after?

8    A    Yes.  No, I did before.

9    Q    What other clients do you use EMC for?

10   A    No, I didn't use wallet for -- you know what happened, at

11   the end I didn't use -- I didn't want to use two companies

12   because it was too complicated with tax and tax complications,

13   so if I had to do some renovation, whatever, I used my company,

14   EMC real estate for a cash company who can do property

15   management, some renovation, provide some service and sale

16   already all in one company.  So I closed this company.

17   Q    What else -- who else, what other clients did you use this

18   company for?

19   A    One maybe, a small client who had to do some renovations,

20   but normally I closed this company because it was too

21   complicated to do so many tax forms.

22   Q    How many times did you use EMC International to help

23   Mr. Saiz-Pineda with his property?

24   A    I seen the -- I -- the proposal, I said "you have a good

25   deal," was Mexico, Sugar Land and the penthouse in Miami.

Marichal - Direct / By Ms. Hampton                    275

1   Q    Can you remember any other clients you used this company

2   to help?

3   A    Could be one, yeah, could be, yeah.  But it had nothing to

4   do with this.

5   Q    Who's -- who's been your best client you ever had?

6   A    Mr. Saiz, of course.

7   Q    Why?

8   A    Everything.

9   Q    I'm sorry?

10  A    He bought four properties from me, a big property.

11  Q    All right.  What did you get out of doing this proposal

12  for -- and this is for furniture on this page, is that correct?

13  A    Yes.

14  Q    Okay.  What did you get out of doing this for Mr. Saiz-

15  Pineda?

16  A    I went -- we went -- I have -- I went -- in that moment,

17  in that time was 2,000 -- what?  In October 2012 I was

18  recovering from my colon cancer operation.  I had in 2012 at

19  the beginning I had to be at the hospital for 30 days and I

20  have to be home more than 40, for a month or more, so I asked

21  my friend of mine, a Venezuela friend of mine who is a

22  designer, I said who can help me out?  He went -- he went -- I

23  present him.  There's a lot of furniture companies, high end

24  furniture companies styled in European in Miami.  So they --

25  they help you to select the furniture, it's easier.  They can

1    do that.

2    Q    Yes, sir.  The question was what did you get out of --

3    what benefit did you get --

4    A    Of course (indisc.).

5    Q    -- for doing this?

6    A    Well, in -- this -- I wouldn't want to tell you about what

7    I made.  I get a profit, of course, for my service.

8    Q    A profit?

9    A    Yeah, of course.

10   Q    How much of a profit?

11   A    Not too much, let me see, maybe 13 to 15 percent.

12   Q    Thirteen to 15 percent?

13   A    Yes.

14   Q    Of what, the total of --

15   A    For the proposal, yes.

16   Q    For the 900,000?

17   A    Yes.

18   Q    Okay.  So let's talk about this Page 2, Exhibit Number 95.

19        You said this is high end European or Italian

20   furniture?

21   A    Yes.

22   Q    Who picked this furniture out?

23   A    We -- we made the proposal, we sent photos, we sent to

24   Mr. Saiz -- Mr. Saiz's office and they decide, they decide --

25   they

Marichal - Direct / By Ms. Hampton                 277

1   -- the photos and they decide they like it or not.  Sometime

2   they say "We don't like this or not, we don't need this" and we

3   took it out, but this was the last one.

4   Q    Why didn't Ms. Perez-Ceballos and Mr. Saiz-Pineda buy

5   their own furniture?

6   A    Why?  Sorry?

7   Q    Yes, sir.

8   A    Why Mr. Ceballos and Mrs. Ceballos and Mr. Saiz?

9   Q    Yes, sir, why didn't they buy their own furniture?

10  A    They buy their own furniture.

11  Q    Why didn't they put it in their name?

12  A    Ah, you mean why the company put it in my name?

13  Q    Yes, sir.

14  A    Because, you know, in Miami, I don't know if happen here,

15  people don't want to do business with foreign people they don't

16  know nothing about so that's a problem, so sometime you have to

17  -- you don't take -- I don't take the risk.  Why?

18          Because in this kind of company they ask for 50

19  percent down.  Okay, they put 50 percent down, so it's

20  difficult for a company, no, that is the reason, but it's --

21  some people don't like to do business and so I think the

22  business was -- it was -- this thing, we wasn't -- it wasn't

23  good, but we take the risk, that's it.

24  Q    Do you usually buy furniture for your clients under your

25  company's name?

1   A    No.  But this was a very good client.

2   Q    Okay.  So the first thing in --

3   A    And I don't -- I don't do that anymore, it's too

4   complicated to do.

5   Q    Okay.  The first thing -- I think it's separated by rooms,

6   is that correct, in this proposal?

7   A    Yes.

8   Q    The hall, there's a bench that's -- is this priced --

9   A    Everything, what they approved.

10  Q    I'm sorry, is this priced in US dollars, sir?

11  A    Yes.

12  Q    Okay.  There's the living room furniture --

13  A    Everything, for every room.

14  Q    Okay.  And there's the family room furniture.  Can you

15  keep going down, Page 3.  There's the breakfast, pantry, dining

16  room, keep going please.

17          Covered porch bar, raised study, master bedroom,

18  bedroom number 2, bedroom number 3, bedroom number 4, bedroom

19  number 5, totaling what?

20  A    Four twenty.

21  Q    And with tax it was about 449?

22  A    Yes.  For all of it 449, yes.

23  Q    This was just your proposal, correct?

24  A    Yes.

25  Q    Did it end up being this price?

1  A    I don't remember, and they took out some furnitures, yes

2  and they took --

3  Q    Okay.  Where did you buy the furniture?

4  A    In Miami, there's a lot of companies, commercial companies

5  who deal with European furniture.  There's a lot of clients who

6  buy that kind of furniture.

7  Q    Did you check to see whether there's a lot of high end

8  European furniture in Houston?

9  A    No, I don't know.  I didn't check that.  You know why?

10  Because I don't know Houston, that company like this, I had

11  done it with them before.  I also bought some from them for me.

12  I know them.  It's in Miami, it isn't a problem, I can go in my

13  car, and I go look here.

14  Q    Can you walk us through how you purchased this furniture

15  for Mr. Saiz-Pineda and Ms. Perez-Ceballos?  So you said you

16  took pictures, right?

17  A    No, let me explain, okay?  Let me explain?

18  Q    Yes, go ahead.  Yes, sir.

19  A    The client asked me to make a proposal about furniture and

20  services, okay?

21  Q    Yes, sir.

22  A    They say they want good furniture, European furniture and

23  the best service.  From my understanding Mr. Saiz and

24  Ms. Silvia, they know good things, no?  They have --

25  Q    They know what, I'm sorry?

1   A    They asked me, Mr. Saiz liked good things.

2   Q    Good things, okay, sorry --

3   A    High end, so -- sorry, (indisc.) you here okay?  So I went

4   to that home, that place, I spoke with them and we -- we choose

5   the furniture, we made the proposal, sent the proposal -- of

6   the company for the furniture, whatever, we made the same

7   proposal the Marlis, to the -- Mr. Saiz's assistant.  They

8   checked that and then they received an email from Mr. Saiz's

9   office that say Mr. Saiz agree to this, this and this.

10  Q    Okay.

11  A    They send this to give me accountants and  this and this

12  and this, or maybe he's saying "We don't want the Number 83,

13  just take it out or change for that."

14  Q    Sure.

15  A    If they had some change, we send -- we sent all we got

16  with photos, yes, everything with photos, that's it --

17  Q    Yes, sir.  And then what happened?  How did you actually

18  purchase the furniture?

19  A    Then they said you have to send 50 percent or 40 percent

20  as a down payment to the -- for this company.

21  Q    The company told you you had to send 50 percent?

22  A    I don't remember how much, I think it was 50 percent.

23  Q    And so you're communicating with the furniture company?

24  A    Of course.

25  Q    What furniture company was it, do you remember?

1  A    Here it was -- almost -- you have all the papers, I think.

2  Here it was Addison, it was --

3  Q    Addison?

4  A    -- and it was the main one, they liked that one.

5  Q    So they're communicating with the company?

6  A    Of course.

7  Q    Okay, and then they tell you what down payment you need?

8  A    Yeah, they did, that was how they sell.

9  Q    And did you send them a down payment?

10  A    They sent a down payment.

11  Q    Who sent the down payment?

12  A    I think they sent it directly or I don't remember if they

13  sent it to me and I sent it to them, I don't remember right

14  now.

15  Q    When you said "they sent the down payment" --

16  A    Well, I meant to say -- when I say "them" I say Mr. Saiz's

17  office.

18  Q    Okay, so they would send the --

19  A    Or maybe they send it to me and then I sent it to them, I

20  don't remember right, I don't remember.

21  Q    Okay.  Did Mr. Saiz-Pineda ever -- or Ms. Perez-Ceballos

22  every make direct payments for these furniture, or was it all

23  through you?

24  A    As I told you before, I don't remember if this company, if

25  they send the money to me or they send it directly to them.

Marichal - Direct / By Ms. Hampton                    282

1   Maybe, I don't know, but I think they sent it directly, but I

2   don't remember right now.

3   Q     Okay.  Let's go down to Page -- the next page here.

4            Page 11, what is this?

5   A     Well, this, this is for the closet, the shade, the couch,

6   it's all of your TV Control 4, home theatre, et cetera, et

7   cetera.

8   Q     And the home theatre, what price did you estimate for

9   there?

10  A     No, but what's here, we didn't do that.

11  Q     We didn't -- I'm sorry, what's the number over here that

12  you estimated for the home theatre?

13  A     Theatre, where?  It says here --

14  Q     I'm sorry, right here?  Oh, I'm sorry.  I'm looking at the

15  system, the audio system controls and equipment for the home

16  theatre.

17  A     Yes.  Yes.

18  Q     What was the price?

19  A     There, $388.

20  Q     And this is -- is this the document you created?

21  A     Yes, of course, this is my proposal.

22  Q     And you put the address that it's relating to at the top,

23  right?

24  A     Yes.

25  Q     Okay, it was Elmhurst Court?

1   A    Yes, that's the address.

2   Q    Let's go to the next page.  What are some of these items

3   that you've listed here?

4   A    Lights, -- there's some equipment -- I'm sorry, the

5   kitchen, inspection.

6   Q    What's the inspection and supervision line, what is that

7   about?

8   A    Because the -- I didn't -- I couldn't come that time into

9   Houston too many times, I have to send someone to do the

10   inspection for me, especially my friend and he's not getting

11   charged for that.

12   Q    I couldn't hear you, sir.

13   A    He charged for that to do that.

14   Q    Mr. Tsokos did?

15   A    No, not Mr. Tsokos, my friend from Venezuela who helped me

16   because I was sick.

17   Q    Okay, so you had --

18   A    And he's a professional person and he charged me.

19   Q    What was -- what was your friend employed to do from

20   Venezuela?  He was inspecting?

21   A    Yeah, I told you to check everything was okay.  I trust

22   him, that's it.

23   Q    Okay.  Okay.  Why couldn't Mr. Saiz-Pineda and Ms. Perez-

24   Ceballos inspect and check to see if things were okay with

25   their house?

Marichal - Direct / By Ms. Hampton                    284

1    A    I don't think Mr. -- Mrs. Silvia know about that, and

2    Mr. Saiz I think was (indisc.) in Mexico, so I don't think he

3    can from time to time come to Houston to check if everything,

4    what's going on.

5    Q    Was the $20,000 you asked for your friend from

6    Venezuela --

7    A    Yes.  No, no, maybe it was -- (indisc.) but that's normal

8    that people charge here or there, yes.  It's not too much

9    money.

10   Q    Did Mr. Saiz-Pineda pay $20,000 for your friend to inspect

11   that house?

12   A    It must be, yes.  No, it's not my friend, it was a

13   professional guy who helped me to do it who know how to do

14   that, to check everything, because I couldn't go there.  If I

15   wasn't sick I could go there.

16   Q    All right, let's go to the next page.  What is this?  This

17   is Page 13?

18   A    Well, that's all of the expense and you have all of the

19   records, everything, everything.

20   Q    What's furniture transportation and installation?

21   A    The transportation that Addison furnishes, charged for the

22   transportation or haul furniture from Miami to Houston and they

23   start everything, closet and everything.

24   Q    So it was $32,000 to transport this --

25   A    That's what they charged, yes.

Marichal - Direct / By Ms. Hampton                    285

1   Q     -- we can't talk over each other.

2   A     Sorry.  That --

3   Q     It was $32,000 to transport this furniture from Miami?

4   A     Yes.  And the -- and the personnel to do that, to install

5   the furnishing.

6   Q     What's Control 4?

7   A     Control 4 is the home automatization electronic system

8   that controls everything.

9   Q     Controls --

10  A     TV, audio, shade, whatever.

11  Q     Okay.

12  A     You can be in China and you can control your TV with your

13  cell phone, everything, air conditioner, everything.

14  Q     And who did you employ to do that Control 4?

15  A     In that case I employed a company recommended by the

16  people who did the -- who did the Control 4 in the Jade Ocean.

17  They did all the -- all of the installation.  It's a very

18  complicated electronics installation with the cable and all of

19  that.

20  Q     Why couldn't Mr. Saiz-Pineda and Ms. Perez-Ceballos hire

21  someone to do that home automation system themselves?

22  A     Because they don't live here.

23  Q     Okay.  And then the shades, you talked about the very nice

24  shades --

25  A     Yes.

1  Q    -- for $78,000.  Did you pay for that also?

2  A    No, I didn't pay for that, Mr. Saiz paid.

3  Q    Did you use -- did you use your company to pay for that?

4  A    I don't remember.  Yeah, they sent me the money to me and

5  they paid -- yes, they did, they paid the expense, yes, that's

6  right.

7  Q    Who is "they?"

8  A    By -- what I mean "they" I mean Mr. Saiz, the -- from

9  Mr. Saiz's office.

10 Q    Okay.  Let's go to the next page.  No, hold up, hold up.

11 Sorry.

12          And then here you total out your ledger --

13 A    Yeah.

14 Q    -- including the very bottom line, a trip to

15 Bloomingdales?

16 A    Yes.

17 Q    What did you go to Bloomingdales for?

18 A    We had to -- I had to buy some kitchen accessories.

19 Q    I'm sorry, I did not hear that.

20 A    We have to buy from Bloomingdales, Macys, kitchen

21 accessories, some lines for the bed and that's it.

22 Q    Acc -- kitchen accessories?

23 A    Yes.

24 Q    Okay.  Like what?

25 A    Like mixer, knife and fork, all the things you need in a

1   kitchen.

2   Q    Okay, and that was over $1,000?

3   A    Yeah.

4   Q    You got a mixer for Mr. Saiz-Pineda and Ms. Perez-

5   Ceballos?

6   A    All this was bought for Mr. Saiz, yes.

7   Q    Have you ever done that for another client?

8   A    Like this one?  This one?  No.

9   Q    You stocked their kitchen with -- with equipment?

10  A    Yes.  They were -- they were a very good client, I tried

11  to do my best.

12  Q    Okay.

13  A    Normally in Miami we -- we do that, me as a broker, try to

14  give a very high end concierge service.

15  Q    What were the travel expenses for $27,000?

16  A    My travel expense, maybe Control 4, none of (indisc.) it

17  was too expensive, really, to come back and forth and back and

18  forth, too expensive and too far.

19  Q    Okay.  Is this $761,000 in total expenses in addition to

20  the $900,000 we originally saw?

21  A    No.

22  Q    They're two different -- are they two different things or

23  they're the same thing and this one's a lesser amount?

24  A    Well, that come -- you're going to -- that go to this

25  total expense, no?

Marichal - Direct / By Ms. Hampton                288

1   Q    The first page of this -- can we go back to Page 1?

2   A    It's the same thing -- oh, that's the proposal.

3   Q    This -- this -- sorry, is this a different figure or the

4   same figure that was reduced?

5   A    Oh, maybe you're right.  I not sure, but maybe you're

6   right.  It could be, yeah.

7   Q    Do you know which one it is, sir?

8   A    Final furniture proposal or the furniture.  You're talking

9   about the travel expenses?

10  Q    No, sir, I'm just talking about the total expenses.  Here

11  it's totaled at 932, and Page 13 I think it was 700,000.

12  A    That is the total -- total expense, no?  No, this is the

13  proposal 9,000 -- 900, that is the proposal.

14  Q    Okay.

15  A    And the other is expense, the real expense.

16  Q    Okay.  Let's go back to Page 13.  Thank you for clarifying

17  that.

18        Why did you keep track of that on a ledger?  Why did

19  you keep track of the total expenses?

20        **MS. HAMPTON:**  Go back one page, please, this page,

21  13.

22  A    Well --

23  Q    Do you remember why you kept this document, sir?

24  A    Which document?

25  Q    This one that's up here right now.

**EXCEPTIONAL REPORTING SERVICES, INC**

1   A    Because they are the expenses.

2   Q    Okay.  And did you turn these expenses over to someone, or

3   did you just keep them for your records?

4   A    Not for me.

5   Q    For your records?

6   A    For my records, yes.

7   Q    And then were you expecting to be repaid for these

8   expenses?

9   A    Mr. Saiz's office send the money and I pay the expense.

10  Q    Did you pay this $761,000 from your account --

11  A    For all these -- for all these expenses, yes.

12  Q    Did you pay this and then you were reimbursed?

13  A    No.

14  Q    How did that happen, can you tell us?

15  A    They send me money.

16  Q    Before you had to pay for it?

17  A    Yes, before.

18  Q    Okay.  And where did you put the money that Mr. Saiz-

19  Pineda would send you?

20  A    In this company.

21  Q    Your EMC Company?

22  A    Yeah.

23  Q    And then what would you do with the money?

24  A    I paid the expenses.

25  Q    Okay.  Thank you, sir.  Page 14, what is this?

1  A    There has to be Houston furniture.  That means that has to

2  be total payment to Addison House furniture, so it's a payment

3  for -- for the Addison House.

4  Q    This was --

5  A    It was like we got an advance or something like --

6  Q    What date was this?

7  A    Nine 2000 -- 09/13 -- yes, 09/13, yes.

8  Q    Was it September or February of '13?

9  A    September.

10 Q    Okay.  So you're paying a bill in September for the

11 furniture --

12 A    Yeah, I know that because I don't remember why.  Because

13 they didn't send me the whole money -- the whole money and what

14 happened there was some furniture retained from the company

15 till we pay them, it was -- a little bit complicated because in

16 that moment I think Mr. Saiz was not being -- he wasn't here I

17 would say.

18 Q    Was this something that had been -- a bill that was due

19 from previous --

20 A    Yes, a bill to Addison-- yes, to Addison House.

21 Q    And you paid this with a check from your company --

22 A    Yes.

23 Q    Okay.

24 A    That's when they send me that, they send me that later,

25 yes.

Marichal - Direct / By Ms. Hampton                    291

1    Q    And you just said that this occurred after Mr. Saiz-Pineda

2    was arrested, correct?

3    A    I understand he was arrested in June, no?

4    Q    Yes, sir.

5    A    In June or July so, yes, that's the reason so like we send

6    it, you know, what happened.  We sent almost the 80 percent of

7    the furniture before but more or less 20 percent they keep it

8    (indisc.)

9    Q    If Mr. Saiz-Pineda had paid you upfront and gave you the

10   money to pay for this furniture, why didn't you -- why hadn't

11   you paid it in September?

12   A    The furniture -- hold on a minute, please.  I have to --

13   Q    Are you okay, Mr. Marichal?

14   A    Yes.  When you deal with a company or any commercial

15   company, you have to pay the payment any company you have to

16   pay down maybe 30 percent, 40 percent, 50 percent, okay.  They

17   give me -- Mr. Saiz pay that and then I pay that.  They didn't

18   want to deal with -- directly with them but they -- in Miami,

19   they don't know those people, there's a lot of foreign people.

20   They want to deal with people is in Miami, has a company, who

21   live in Miami, you know, live in the United States because

22   (indisc.) okay.  So we pay something down, okay?  But, again,

23   when the furniture was ready and came from Italy to Miami, in

24   that moment we have to be paying the balance in order to

25   sending furniture to Houston.  They pay something but didn't

1    pay everything, and there was something left.  It was more or

2    less 100, this money.

3    Q    Why did --

4    A    That --

5    Q    I'm sorry.

6    A    Yes?

7    Q    Why did you pay Mr. Saiz-Pineda's furniture bill after he

8    was arrested?

9    A    Because they send me the money.

10   Q    I'm sorry?

11   A    They send me the money.

12   Q    He had already sent you the money?

13   A    Yes, from the -- his --

14   Q    Before he was arrested.

15   A    He send me the -- no, if I paid this in this time, 9th,

16   September, that mean they send me the money in September or

17   August.

18   Q    Of 2013?

19   A    Yes.

20   Q    Who sent you the money?

21   A    From the -- from always send me the money from Mr. Saiz

22   office.

23   Q    He was -- you said he was in jail at this time, right?

24   A    I understand -- if I understanding, he was in jail in June

25   or July.

Marichal - Direct / By Ms. Hampton                    293

1   Q    So who sent you the money?

2   A    From his office.

3   Q    Who sent you from his office?

4   A    I suppose was his assistant or his -- I don't know,

5   somebody who is from his office.  I don't know exactly which

6   one.  Always I deal -- I speak all the time with Marlis, that's

7   it.

8   Q    Did you request money from his office?

9   A    Of course, because why not?  What happened?  I made a deal

10  with the furniture company that send -- you haven't paid some

11  amount, send a lot of money, almost everything.  Send the

12  money, send the furniture, and (indisc.) to Houston to Sugar

13  Land and retain furniture that we will send the amount that is

14  owed.

15  Q    Okay.

16  A    So --

17  Q    Let me ask you, though.  On this payment, after Mr. Saiz-

18  Pineda was arrested, did you request money from his office to

19  be sent to you so you could make this payment?

20  A    Well, yes, I request that a long time ago.  They didn't

21  send me.

22  Q    They had already sent you the money.

23  A    Huh?

24  Q    They had already sent you the money.

25  A    They have -- I requested before she was -- he was in jail.

1   Q    Okay.

2   A    I was --

3   Q    You requested it before June of 2013?

4   A    Yes, of course.

5   Q    And you held onto it for three months.

6   A    They send me (indisc.) they send (indisc.) maybe they --

7   Q    Okay.

8   A    -- send in September, yes.

9        **MS. HAMPTON:**  All right, let's go to the next page.

10  A    Because the furniture company was pressing me for the

11  money.  Remember, the deal was we pay on the furniture company.

12  Q    Okay, thank you, sir.

13       **MS. HAMPTON:**  Can you turn it around, please?

14  A    (Indiscernible)

15  Q    Okay, what is this?

16  A    That is the same thing, it's Houston -- sorry.

17       **MS. HAMPTON:**  Can we --

18  A    Furniture payment.

19       **MS. HAMPTON:**  -- can you zoom in a little bit?

20  Thanks.  We're going to zoom in, sir.  There you go, is that a

21  little better?

22  A    Furniture payment.

23  Q    And this was in March of '13 and -- both of them March of

24  '13, correct?

25  A    Yes.

Marichal - Direct / By Ms. Hampton                    295

1    Q    Why are there two different payments, a hundred thousand

2    dollars and $30,000, on two different checks to the same place

3    for the same --

4    A    Because this was for the furniture and this one was for

5    the closet.

6    Q    There were two different companies involved.

7    A    No, the same company but maybe they wanted to separate.

8    Q    Okay.

9    A    I don't know.

10   Q    All right, thank you.

11         **MS. HAMPTON:**  Go to the next page.

12         **THE WITNESS:**  I can't see that.

13         **MS. HAMPTON:**  We'll fix it, sorry.

14         **THE WITNESS:**  My eyes don't have --

15   BY MS. HAMPTON:

16   Q    Okay, what is this?

17   A    Furniture, a payment, furniture payment.

18   Q    What is the date?

19   A    Eleven-thirteen, I know what is that (indisc.) I think

20   that was something that had to be paid they didn't send before.

21   Q    Okay, another bill that was due?

22   A    Yes.

23   Q    Okay, yes, sir.  And this is -- is this November of 2013?

24   A    Yeah, it was.

25   Q    Okay, so this is again for the Sugar Land house, right?

1   A    Yes, now I understand.

2         **MS. HAMPTON:**  Okay, go to the next page, please.

3   Turn it around.

4   Q    What is this one?

5   A    That is payment for transportation from Miami to Sugar

6   Land.

7   Q    Okay.

8   A    Furnish and closet installation.

9   Q    Transportation of the furniture?

10  A    Yes, --

11  Q    Okay.

12  A    -- and installation, yes.

13  Q    And is this a bill that was due around September of '13 or

14  was it just an old bill that hadn't been paid again?

15  A     No, I think was have to be -- it was transportation, it

16  have to be paid in that time, yes.

17  Q    Did you already have the money from Mr. Saiz-Pineda or

18  Ms. Perez-Ceballos or --

19  A     No, --

20  Q    -- someone else --

21  A    -- because I don't have -- no.  First, maybe

22  transportation wasn't ready.  No, the furniture wasn't ready to

23  send to Houston.  Maybe had the money, I didn't have the

24  furniture wasn't ready.  I -- or maybe they send me to me, I

25  don't remember.

1  Q    You don't remember whether you had the money already to

2  pay for this bill --

3  A    For this bill exactly, I don't.

4  Q    Is it possible you paid this $32,000 out of your --

5  A    No.

6  Q    -- own pocket?  You wouldn't have done that.

7  A    No.

8         **MS. HAMPTON:**  Okay, all right, let's go to the next

9  one.

10 A    No, too much money.

11 Q    Is a sales order former from Addison Hills (phonetic)?

12 A    Hold on --

13 Q    You kept onto that one, too?

14 A    Yes.

15        **MS. HAMPTON:**  Okay, let's go on to the next page.

16 Q    This is a purchase order of some furniture; is that

17 correct?

18 A    Yes, all the order (indisc.) holding everything, all the

19 invoice from the providers.

20 Q    I think it's a sales order and there's a number right; is

21 that correct?

22 A    Yes.

23 Q    Who is it -- who's the bill to address on here?

24 A    (No audible response)

25 Q    Can you see, do you want us to zoom in?

Marichal - Direct / By Ms. Hampton                    298

1    A    Yes, yes, that is my mailing address.

2    Q    That's your mailing address.

3    A    Yes, because I don't want to mix the mail at home because,

4    you know, a home you normally receive a lot of junk mail so I

5    prefer to all my all has to do with business to go through a

6    special UPS store mailing address, that's it.

7    Q    Okay.

8    A    Because of home is crazy.

9    Q    There's an EMC International/Houston.  Is that the name of

10   your company with the slash Houston?

11   A    No.  Maybe I -- maybe they do that because that was the

12   maybe the furniture company who put slash Houston to separate

13   the furniture from Jade (phonetic) from Miami or Houston.

14   Q    That wasn't something that you told the furniture company

15   to put on the bill.

16   A    No.

17   Q    And it says "shipped to" same address, right?

18   A    Yeah, in that moment, yes.

19   Q    So where was this furniture coming from?

20   A    Italy.

21   Q    Italy?

22   A    Yeah, I told you before.

23        **MS. HAMPTON:**  Okay, all right, let's go on to the

24   next page.

25        **THE WITNESS:**  All the --

1      **MS. HAMPTON:**  This is the final page of this -- no,

2  of this particular document.

3  **BY MS. HAMPTON:**

4  Q    And so this bill is -- here it says total -- is this sales

5  tax and then total and then deposit.  Let's talk about that.

6      **MS. HAMPTON:**  Can you zoom in a little bit there on -

7  - this is page E126000021 -- or from the top, page 21 on

8  Exhibit 95.

9  Q    It says total sales price over here on the right, $39,046.

10 A    Uh-huh.

11 Q    Right?  And then it says "deposit $35,000."

12 A    Yes.

13 Q    Do you know who made the deposit?

14 A    Maybe they send me the money from Mr. Saiz office send me

15 the money to pay this.

16 Q    And how did you make the deposit, was it a check or was it

17 cash; do you remember?

18 A    For the -- no, for the Addison check.

19 Q    Okay.

20 A    I'm sure it was check.

21     **MS. HAMPTON:**  All right, let's go to the next page.

22 A    I don't like to do wire too much.

23 Q    Another bill?

24 A    Is that what that says?

25 Q    This looks like the closet bill; is that right?

1   A    Yes, yes, the closet.

2   Q    Okay.  Again, it's under your company name, slash Houston,

3   right?

4   A    Yes.

5   Q    Okay, all right.

6        **MS. HAMPTON:**  And stop here.

7   Q    That's total sales is $54,189.

8   A    Yes, yes, that was all there was.

9   Q    And it looks like it was paid for in full, right?

10  A    Yes.

11  Q    Did you pay that?

12  A    With the money they send me, yes.

13  Q    Did you use your business check to pay that?

14  A    I suppose so.

15  Q    Okay.

16  A    I never use my personal checking account.

17  Q    Well, let's talk about that.

18  A    All those --

19  Q    You did use your personal checking account --

20  A    Yeah.

21  Q    -- in this case, didn't you?

22       **MR. REYNAL:**  Object to the leading.

23  A    Maybe I did a check, maybe.

24       **THE COURT:**  I'm sorry, what was the objection?

25       **MR. REYNAL:**  Leading, you did use your personal

1   checking --

2           **THE COURT:**  Sustained.

3           **MR. REYNAL:**  -- account, didn't you?  Thank you, your

4   Honor.

5           **MS. HAMPTON:**  Your Honor, it was in response to the

6   question by the witness.  He brought up his personal checking

7   account saying he hadn't used it.

8           **THE COURT:**  Sustained.

9           **THE WITNESS:**  I don't know.

10  **BY MS. HAMPTON:**

11  Q    Did you use your personal checking account in this case to

12  help Mr. Saiz-Pineda and Ms. Perez-Ceballos purchase the

13  Elmer's house?

14  A    I don't remember, unless you're talking about the

15  escrow --

16  Q    Yes, sir.

17  A    -- $5,000.  I can explain that.  Maybe I use that.

18  Q    Well, did you send $5,000 from your personal account to

19  the escrow of this house?

20  A    You just -- you say I didn't remember that.  You just told

21  me about that.  If I did that, it was for a good reason.  When

22  we found the -- we send -- we found the lot and the house model

23  they want and they agree, Mr. Tsokos or wife also spoke with

24  the developer and they say we have the lot and we have the

25  house.  Maybe we have the lot.  But you have to reserve that

1   now, that was $5,000, because I don't know if I can hold that

2   for 24 hours, you have to do this.  So it was $5,000, I will

3   get a commission about $30,000, it was the -- Mr. Saiz was a

4   very good client.  I of course as a realty broker I have

5   commission from him so I take the risk.  I put --

6   Q    You didn't -- sorry, sir.  You didn't use your business

7   account?

8   A    Maybe in that moment I didn't have it because I was in

9   Houston with another maybe.

10  Q    You didn't tell your client, I need $5,000 to put an

11  escrow payment down for this house if you really want it?

12          MR. REYNAL:  Object to the leading, your Honor.

13          THE COURT:  Sustained.

14  BY MS. HAMPTON:

15  Q    Did you tell Mr. Saiz-Pineda that you needed $5,000 from

16  him?

17  A    Yes.  But, you know, they told me that, I had to do that

18  immediately, and then they told then they have to send me

19  $5,000 for this because --

20  Q    Do you routinely use your personal checking account to pay

21  for clients' expenses?

22  A    No.

23  Q    Okay.

24          MS. HAMPTON:  All right, let's go back to Exhibit

25  Number 95.

1   Q    This is -- what is this one for; is this more furniture?

2   A    Yes, all that, yes.

3   Q    And what's the date of this one?

4   A    Let me -- I don't --

5   Q    It's right here.

6   A    -- know, let me see it, please.

7   Q    I'm pointing to it up here if you can look up on the

8   screen right here.

9   A    I don't know (indisc.) somewhere.

10  Q    Right-hand side of the middle.

11  A    Right hand -- two -- yes.

12          **MS. HAMPTON:**  Okay, let's go to the end of this one.

13  Okay, stop.

14  Q    This one was for $43,000 and --

15  A    Yeah.

16  Q    -- there was a $20,000 --

17  A    Yes.

18  Q    -- deposit.  Who made that deposit?

19  A    They send me the name -- the money.  Mr. Saiz office wire

20  the money to me and I did that.

21  Q    What kind of --

22  A    All those invoice was like that.

23  Q    What kind of office is it that's wiring you this money for

24  Mr. Saiz?

25  A    I -- the office that wired the money?

Marichal - Direct / By Ms. Hampton                    304

1    Q    Yes, sir.

2    A    I don't know.  I just know that Mr. Saiz, I spoke with the

3    assistant of Mr. Saiz office, I say, look, you have the

4    proposal, I have to pay this for the furnish company, and they

5    send me money.  From where, I don't know.

6    Q    What was the name of the company --

7    A    Which one?

8    Q    -- for Mr. Saiz-Pineda's --

9    A    It was --

10   Q    -- office that would wire you money.

11   A    Who wired the money?

12   Q    The name of the company.

13   A    Is -- it was accountant something.  I don't remember right

14   now.

15   Q    Accountant something?

16   A    Accountant something.  I don't remember the name.  I think

17   he has a other company, I don't know.

18   Q    Was it a U. S. company?

19   A    No, I don't think -- no, it was a Mexican company, I

20   suppose.

21   Q    So you received a wire from Mexico into the U. S. into

22   your bank account.

23   A    Could be from Mexico, I don't know (indisc.) I don't know,

24   I didn't check that.  I don't have the tools to check where

25   they come from.  The bank have the tools to check if

1  everything's okay.

2  Q    Did you look at your --

3  A    (Indiscernible)

4  Q    Did you look at your banking statement --

5  A    Yeah.

6  Q    -- and the wire activity?

7  A    I receive the wire, I receive the money, that's it.

8         **MS. HAMPTON:**  Okay, let's go to the next page.

9         **THE COURT:**  Let's recess right there.  It's 5:00

10  o'clock, we'll go ahead and recess.  Please don't discuss the

11  case with anyone at all, not even with each other, and don't

12  attempt to get any information about the case outside the

13  courtroom.  Thank you very much for your time and attention

14  today.  We'll see you tomorrow at 8:30.

15         **MR. SPEAKER:**  All rise for the jury.

16         **THE WITNESS:**  Okay, so that's it?

17         **THE COURT:**  For today.

18     **(Jurors exit at 5:01 p.m.)**

19         **THE WITNESS:**  (Indiscernible)

20         **THE COURT:**  Hold on.  Yes, we will continue your

21  testimony in the morning so be here about -- we're going to

22  start at 8:30 so be here about 8:15.

23         **THE WITNESS:**  Okay.

24         **THE COURT:**  Okay?

25         **THE WITNESS:**  Okay (indisc.)

1          **THE COURT:**  Sure.  Government will finish questioning

2     you and then the defense will have a chance to ask you

3     questions.

4          **THE WITNESS:**  Okay, thank you.

5          **THE COURT:**  Okay, thank you for your time today.

6          **THE WITNESS:**  Thank you, Judge.  Eight-thirty you

7     said.

8          **THE COURT:**  Eight-fifteen for you.

9          **THE WITNESS:**  Okay.

10         **THE COURT:**  Anything to discuss before recess,

11    counsel?

12         **MS. HAMPTON:**  No, your Honor.

13         **THE COURT:**  Anything from the defense?

14         **MR. REYNAL:**  Just if we can inquire who the potential

15    witnesses are going to be for tomorrow.  And I also -- I'm

16    having some trouble with the exhibits.

17         **THE COURT:**  Okay.

18         **MR. REYNAL:**  And the reason for that is the way

19    they're loaded on the stick, they won't come up (indisc.) I

20    can't copy them over onto my desktop.  None of the documents

21    actually have an exhibit sticker on them.  And I don't want to

22    break stuff up during trial, but if the Government can inform

23    me the exhibits they plan on using tomorrow, I can print them

24    off at my office or make them more available so that I can

25    review them and be more effective.

1          THE COURT:  Okay, so you --

2          MR. MUSCHENHEIM:  We can do that.

3          THE COURT:  All right, so you just need to know which

4    exhibit so you can print and have access to them.

5          MR. REYNAL:  Yes, your Honor.

6          THE COURT:  Okay, what else?  Any of the --

7          MR. REYNAL:  The witnesses.

8          THE COURT:  I'm sorry, the witnesses for tomorrow.

9    So we'll finish Mr. Marichal --

10         MS. HAMPTON:  I expect to be with him another two

11   hours, your Honor.  I've got a lot more to cover with him.

12         THE COURT:  Okay, so -- and then you will cross him.

13   So after him?

14         MS. HAMPTON:  Antonio Tsokos, possibly Bertha Tsokos.

15   I plan tomorrow at some time to put on Luz Pardo Cruz.

16         THE COURT:  Okay, so would you all want to argue that

17   issue today on her credibility?  I may have to leave about 15

18   minutes early tomorrow.  I will not be available after hours

19   tomorrow so either now, lunch, during breaks, but not tomorrow

20   afternoon after --

21         MR. MUSCHENHEIM:  Judge, I don't mind arguing it now.

22   We got --

23         THE COURT:  Okay, let's go.

24         MR. MUSCHENHEIM:  -- pretty far along on her --

25         THE COURT:  What's that?

1       **MR. MUSCHENHEIM:**  -- on the Rule 608 on the

2    impeachment issue.

3            **THE COURT:**  Yes.

4       **MR. MUSCHENHEIM:**  Your Honor, I -- the one thing that

5    Mr. Reynal said, I didn't quite agree with.  He said that the

6    witness had made an admission that she had agreed that she had

7    done this misconduct.

8            **THE COURT:**  No, I don't --

9       **MR. MUSCHENHEIM:**  And I -- that wasn't the question.

10            **THE COURT:**  -- think that's what he said.

11       **MR. MUSCHENHEIM:**  The question was, did the

12    Commission on Human Rights make a finding that.

13            **THE COURT:**  And that's what he said.

14       **MR. MUSCHENHEIM:**  So it's kind of two different

15    things.  So a Commission on Human Rights is not a judicial

16    conviction of this lady for her conduct.  And then in another

17    proceeding, a Federal proceeding in Mexico, a -- the opinion

18    supplied by Mr. Reynal says that they did not consider the

19    evidence from -- that the prosecutor in that proceeding had

20    offered from Ms. Marlis Cupil because of this misconduct.  That

21    is not saying it happened, it didn't happen, it just -- we're

22    not considering that evidence.  So I just think it's a --

23            **THE COURT:**  Not considering the evidence because of

24    the misconduct, right?

25       **MR. MUSCHENHEIM:**  Right.  But so, I mean, I just the

1   -- it's not a judicial fact that this lady did something wrong

2   and that's what he wants the jury to take from this, this lady

3   did something wrong, the judicial finding that this witness did

4   something wrong.  I just think if Ms. Marlis wants to come

5   testify as to what happened, I could ask questions, too, or

6   Ms. Hampton could ask questions, too, and we shouldn't get to

7   substitute -- this is not a -- it's improper to say this lady

8   did something wrong with this judicial finding.  I think they

9   can ask about it.  Hey, you know, are you biased, what happened

10  to our client, Mr. Saiz, in Federal Court?  Was he -- is that

11  the same case?  Is it -- and there's a lot of things they could

12  ask about.  But to say that this -- a judicial finding --

13          **THE COURT:**  How are you going to use that, the

14  judicial finding, I guess?

15          **MR. REYNAL:**  The same way I used it the last time

16  which was that she was found --

17          **THE COURT:**  Was there a judicial finding of "X?"

18          **MR. REYNAL:**  That you were not credible, yes.

19          **MR. MUSCHENHEIM:**  Well, I didn't see that in there

20  that she was not credible.  I didn't see any line that said Luz

21  Alba is not credible.

22          **MR. REYNAL:**  Let me read -- well, your Honor, already

23  read the transcript --

24          **THE COURT:**  I only read those few pages and it just

25  talked about we're not going to consider that testimony, --

1          **MR. REYNAL:**  Right.

2          **THE COURT:**  -- kind of lays out what happened to

3    those witnesses.

4          **MR. REYNAL:**  Well, when I asked Ms. Alba about --

5          **THE COURT:**  That is not what you asked her outside

6    the presence of the jury necessarily.

7          **MR. REYNAL:**  No, no, but I mean, when I asked her

8    about the finding in the report where the Commission -- so this

9    report's adopted by the Mexican Federal --

10         **THE COURT:**  And where does it say that they're

11   adopting that whole report?  I -- the only -- I only focused on

12   what you pointed out to me where it talks about we're not going

13   to consider or that the court had found -- or they were going

14   to not consider the statements by those witnesses, I guess,

15   because --

16         **MR. MUSCHENHEIM:**  I mean, --

17         **THE COURT:**  -- of the misconduct.

18         **MR. REYNAL:**  So, your Honor, --

19         **MR. MUSCHENHEIM:**  -- if we could take her on voir

20   dire and say, is it true that you abused Marlis Cupil --

21         **THE COURT:**  Well, she's going to say no.

22         **MR. MUSCHENHEIM:**  -- because I just don't think she

23   quite --

24         **THE COURT:**  That -- she's going to say no.  I mean,

25   that's not what they're trying to get to.

1          **MR. REYNAL:**  When I asked her whether the Commission

2     had found that --

3          **THE COURT:**  Okay, but just because she says, yes,

4     they found that, that doesn't mean that comes in.

5          **MR. REYNAL:**  No, I understand.  I thought that was

6     your Honor's question.  I -- maybe I --

7          **THE COURT:**  How are you -- that's what you're going

8     to ask her.

9          **MR. REYNAL:**  So Rule --

10         **THE COURT:**  Did the Commission --

11         **MR. REYNAL:**  -- 608(b)(1) says that prior instances

12    of dishonesty may -- specific instances.  It speaks directly to

13    this issue and says specific instances of dishonesty can be

14    inquired into on cross.

15         **THE COURT:**  Okay, and I'm asking you how do you plan

16    to do that.

17         **MR. REYNAL:**  Oh, certainly.  Is it a --

18         **THE COURT:**  Exactly what you asked her yesterday I

19    guess.

20         **MR. REYNAL:**  Yes.  Isn't it a fact that you -- in

21    relation to your conduct in this case, you were found to have

22    been dishonest?  And they can ask her about it on redirect and

23    try to rehabilitate her.  This event happened.

24         **THE COURT:**  Okay, and where is the judicial finding

25    of dishonesty?

1          **MR. REYNAL:**  The judicial finding of dishonesty

2    appears for the first time in the Mexican Human Rights

3    Commission report.

4          **MR. MUSCHENHEIM:**  That is not --

5          **THE COURT:**  Which is not a judicial finding.  They

6    did a report.  You're saying the court adopted the entire

7    report?  I didn't see that where you directed me.

8          **MR. REYNAL:**  I --

9          **THE COURT:**  I just saw where they excluded those

10   statements, I believe, --

11         **MR. REYNAL:**  It says --

12         **THE COURT:**  -- from those particular witnesses.

13         **MR. REYNAL:**  It says that the juris prudence, and

14   then they cite -- and this I'm referring to page 257 --

15         **THE COURT:**  Okay, I gave it back.

16         **MR. REYNAL:**  -- of the translation.  I understand you

17   don't have it in front of you but I just want it to be clear

18   for the record.  Discussing what happened in this case, the

19   Federal Court in Mexico states that Marlis Cupil's statement

20   lacks any basis --

21         **THE COURT:**  Right.

22         **MR. REYNAL:**  -- because it was obtained by torture.

23         **THE COURT:**  Okay.

24         **MR. REYNAL:**  They go on to say that the findings of

25   the National Commission of Human Rights are juris prudence are

1  precedential for them in this regard.  And they cited -- they

2  say:  "As the judge averses (phonetic) this correctly stated

3  the aforementioned supported sits in the records.  There is a

4  certified copy of recommendation 42-2013," that's the National

5  Human Rights Commission report, "of the year October 20th of

6  2013, issued by the National Commission on Human Rights

7  addressed to Arturo Nunez," the governor of the State of

8  Tabasco, "in relation to the arbitrary arrest, illegal

9  imprisonment, and abuse made by elements of the Attorney

10 General's Office."  And then it goes on to reincorporate the

11 findings that were made by the National Human Rights

12 Commission's report as to what truly happened that night and

13 incorporated, they include, the -- a reference to the Istanbul

14 protocol, which I assume is against torture, and then go into

15 the different injuries that Ms. Cupil and others suffered.

16 They go on to say that she was forced to sign a ministerial

17 statement which our witness admitted that she presented to her

18 to sign at the hearing yesterday.

19       **THE COURT:**  So you're going to get into all that.

20 I'm still waiting for this judicial adoption of the dishonesty.

21 I understand you're going to question her on those matters.

22       **(Pause from 5:11 p.m. to 5:13 p.m.)**

23       **MR. REYNAL:**  I can't find it at the moment where that

24 particular part is cited in entirety.  My argument is that

25 because the court in this action gave precedential effect to

1    the National Human Rights Commission report and that the

2    National Human Rights Commission -- I mean, if your Honor would

3    like more information on what faculty it has to investigate and

4    what authority it has under Mexican law, I think we can provide

5    that.  And then your Honor can make an informed decision on

6    whether this has the right -- this is a judicial finding.  I

7    think that we would probably be able to present evidence to

8    your Honor that the National Human Rights Commission is in fact

9    given broad powers under Mexican law.

10        **THE COURT:**  You can certainly brief that, that's

11   fine.  But here's -- the representation to me was made that

12   there was a judicial finding of dishonesty.  I'm still not

13   picking that up.  Everything you've told me, you can go into

14   that.  I agree, you can question her on those matters.

15        **MR. MUSCHENHEIM:**  But, --

16        **THE COURT:**  But you're --

17        **MR. MUSCHENHEIM:**  -- your Honor, he question her and

18   say, isn't it true that the Human Rights Commission found you

19   to be dishonest.  It's not --

20        **THE COURT:**  Well, that's --

21        **MR. MUSCHENHEIM:**  -- that's a little different.

22   That's what I object to.

23        **THE COURT:**  Well, that's what I'm telling him --

24        **MR. MUSCHENHEIM:**  Yeah.

25        **THE COURT:**  -- I'm not hearing --

1      **MR. MUSCHENHEIM:**  I don't see --

2      **THE COURT:**  -- that yet.

3      **MR. MUSCHENHEIM:**  And that's not --

4      **MR. REYNAL:**  I --

5      **MR. MUSCHENHEIM:**  That's --

6      **THE COURT:**  The --

7      **MR. MUSCHENHEIM:**  -- Rule 608.

8      **THE COURT:**  I'm speaking.  The representation to me

9   that was this morning, there's a judicial finding of "X," and

10   that's where we're going from.  I agree you should question

11   her, you're allowed to question her, it's relevant, about these

12   matters.  But once we start saying judicial finding of "X,"

13   that to me is something different.  And I'm still -- you have

14   not pointed that out to me yet.

15      **MR. REYNAL:**  I -- and I apologize for that, your

16   Honor.

17      **THE COURT:**  Okay.

18      **MR. REYNAL:**  I will say that this is a quasi-judicial

19   finding.  And 608(b)(1) does not refer to judicial findings at

20   all.

21      **THE COURT:**  Right, and so you shouldn't either.  This

22   refers specific instances.

23      **MR. REYNAL:**  If -- and here we have a specific

24   instance of dishonesty.  She created a report and the report

25   said that there was no torture, and then the Human Rights

316

1    Commission investigated and determined that she lied and that

2    there had been torture.

3            THE COURT:  Okay, so I guess here is -- I'm trying to

4    remember how you questioned her yesterday.  And it was about --

5    I guess you were specific.  Did this happen, did they find you

6    "X," and did they find this and that?  So how do you I guess go

7    there without saying that, right?  Particularly if she's going

8    to say that didn't happen when you ask her about did you do

9    this to this witness or -- so what does he do after that if she

10   says, no, I didn't and he has this information --

11           MR. MUSCHENHEIM:  Then he brings Marlis Cupil up to

12   testify or some other evidence with knowledge, other than a

13   hearsay finding.  It's not -- it's a nonjudicial finding.

14           THE COURT:  But it's my understanding that this

15   opinion or findings from that court did address certain actions

16   by Ms. Cruz that are specifically set out in that opinion or

17   what do you call it, findings.

18           MR. REYNAL:  The National Human Rights Commission

19   report or --

20           THE COURT:  No, I'm talking about --

21           MR. REYNAL:  -- the 56 --

22           THE COURT:  -- the court.

23           MR. REYNAL:  That's the -- the court's, I think it

24   would be findings of fact and conclusions of law under our

25   (indisc.)

1          **THE COURT:**  And I think there are some specific

2     matters in there.

3          **MR. MUSCHENHEIM:**  That finds as to her specifically,

4     not the office or the office.

5          **THE COURT:**  As to what?

6          **MR. MUSCHENHEIM:**  I didn't see her name specifically

7     in there.

8          **THE COURT:**  Well, I thought he just mentioned that

9     when they made some findings regarding what happened in regards

10    to a statement, that Ms. Cruz --

11         **MR. MUSCHENHEIM:**  That's what he said.  I just -- I

12    haven't see that.

13         **THE COURT:**  Okay.

14         **MR. MUSCHENHEIM:**  That's what he said, yes.

15         **THE COURT:**  Yeah, we can't just be --

16         **MR. MUSCHENHEIM:**  I haven't see that in here.

17         **THE COURT:**  -- making things up.

18         **MR. MUSCHENHEIM:**  Right, I haven't seen that in

19    there.

20         **MR. REYNAL:**  We're not making anything up, your

21    Honor.

22         **THE COURT:**  Well, --

23         **MR. REYNAL:**  It says --

24         **THE COURT:**  -- I mean we can't be loose with what

25    we're doing here.  I'm trying to --

318

1          **MR. REYNAL:**  I laid the predicate with the witness

2  yesterday that she was the prosecutor who got the warrant and

3  who was there and who took Ms. Marlis' statement.

4          **THE COURT:**  Okay.

5          **MR. REYNAL:**  After -- and she admitted all those

6  things on the record in this court under oath.

7          **THE COURT:**  Okay.

8          **MR. REYNAL:**  Probably the only time she was truthful.

9  Afterwards, I questioned her as to whether the Commission had

10  found that in regards to her duties in that, she had been

11  dishonest.  We have a report here that doesn't address -- not a

12  report, a judicial finding, a findings of fact and conclusions

13  of law that while it does name her by name, states that

14  Ms. Marlis Cupilis (sic) was tortured to give her statement.

15          **THE COURT:**  Okay, but was she tortured by Ms. Cruz or

16  what?  I'm lost --

17          **MR. REYNAL:**  It doesn't --

18          **MR. MUSCHENHEIM:**  It matters.

19          **MR. REYNAL:**  -- name who tortured her to give the

20  statement.

21          **THE COURT:**  So you're saying you're going to say

22  Ms. Cruz was there or she did it or what?

23          **MR. REYNAL:**  She admits she took the statement.

24          **MS. HAMPTON:**  Your Honor, the report says that she

25  was tortured by some unknown -- police entity assuming -- and

1   they took her to the Attorney General's office.  Nobody's named

2   and so she's talking generally about the Attorney General's

3   office after she was tortured is where she was taken.  There's

4   never a mention that we've seen of Ms. Cruz.

5          **THE COURT:**  Okay, so --

6          **MR. REYNAL:**  They don't mention people by name.  I

7   think that's according to their rules on privacy.  They give

8   people's initials.  But she admits that she --

9          **THE COURT:**  Where are her initials then?

10          **MR. REYNAL:**  Well, I mean, it says "CB1" (phonetic),

11  I think.  It --

12          **THE COURT:**  Okay.

13          **MR. REYNAL:**  -- doesn't have --

14          **THE COURT:**  Actual initials.

15          **MR. REYNAL:**  Yeah, doesn't have actual initials.

16  This, your Honor, --

17          **THE COURT:**  I'm just -- I'm having a problem.  I

18  don't know how the Commission's report comes in or even -- it's

19  not the report.  How you go there with those findings, you're

20  going to need to show me or some authority how that comes --

21  how that gets addressed, even if you're not trying to admit the

22  report.  And then you have the findings of fact as to I would

23  think -- I don't know, it's kind of -- I don't know what the

24  authority is or what the law is on those, on how that -- I

25  agree it's very relevant and it may be specific instances.  But

1     I think how you go about it can create problems for the record.

2     So I'm just trying to be sure how do you do that, how do you go

3     there.  I'm not trying to keep you from going there.  I just --

4              MR. MUSCHENHEIM:  Judge, it doesn't even --

5              THE COURT:  -- there may be limitations on what you

6     can do in terms of the findings, in terms of the Human Rights

7     report.

8              MR. REYNAL:  I would propose, your Honor, to simply

9     ask her the question.  She can tell the truth or she can lie.

10              THE COURT:  Right, and then when she says, no, you're

11     going to try to admit it and then there may be a problem with

12     that.

13              MR. REYNAL:  Your Honor, I don't --

14              THE COURT:  She already said that wasn't true, if I

15     remember right.

16              MR. REYNAL:  She said that it didn't happen that way.

17     She said that the document is true and accurate.

18              THE COURT:  Right.

19              MR. REYNAL:  She said that it didn't happen that way.

20              THE COURT:  But just because you questioned her on

21     the document outside the presence of the jury doesn't mean it

22     goes before the jury now.

23              MR. REYNAL:  I agree, your Honor.  I am not

24     suggesting that I put the document into evidence.

25              THE COURT:  Well, the matters in the document as

1  phrased, isn't there a finding of "X," didn't the Human Rights

2  Commission find "X," that's what I'm having a little trouble

3  with, how that plays into 608(b) specific instances.

4       **MR. MUSCHENHEIM:**  It doesn't seem to be truthful

5  misconduct either.  I think he's trying to bring in other

6  things that may be relevant to bias that, you know, --

7       **MR. REYNAL:**  Well, if they are relevant to bias,

8  then --

9       **THE COURT:**  Then it comes in.

10       **MR. REYNAL:**  -- it can come in, too.

11       **THE COURT:**  Then it comes in.

12       **MR. MUSCHENHEIM:**  I mean, well, but I'm saying the

13  bias -- the rule addresses truthfulness.  And he began by

14  saying this is relevant to the truthfulness of this lady.

15  Specific instances of conduct as to bias is -- I mean, this is

16  a judicial finding.  I mean, that's just way, way out there.

17       **MR. REYNAL:**  Your Honor, this is core Sixth Amendment

18  stuff.  I mean, this is United States versus (indisc.)

19       **THE COURT:**  Right.  I'm just talking about the

20  specific questions you want to ask in terms of the findings

21  made, how does that come in?  Show me how that comes in.

22       **MR. REYNAL:**  I think that as I said before, the

23  question can be put to the witness.

24       **THE COURT:**  Well, of course it can.

25       **MR. REYNAL:**  And --

1          **THE COURT:**  You just -- can you ask that question in

2   front of the jury?

3          **MR. REYNAL:**  Well, no, but the way I would suggest to

4   do it would be to ask the witness the question and then she

5   gives her answer, and then the question becomes, you know,

6   impeachment to a different record, all right?  And if it was a

7   record that was made under oath in a prior proceeding, it would

8   be admissible as substantive evidence itself.  It's not, okay,

9   so it would be introducible as impeachment evidence to show a

10  specific act of dishonesty.

11         **MR. MUSCHENHEIM:**  Of the witness.  It doesn't say the

12  witness.  Of the witness.  It doesn't say the witness.  There's

13  no finding as to the witness.

14         **THE COURT:**  I don't know.  Get me a brief I guess.

15         **MR. REYNAL:**  Certainly, your Honor.

16         **THE COURT:**  It'll probably be in the afternoon before

17  we get to her so --

18         **MR. MUSCHENHEIM:**  Thank you, your Honor.

19         **MR. REYNAL:**  We'll get it done, your Honor.

20         **THE COURT:**  Mr. Kretzer's good at briefing so he

21  can --

22         **MR. REYNAL:**  Okay, Mr. Magliolo has something he

23  would like to say.

24         **MR. MAGLIOLO:**  Your Honor, we've got a record of the

25  young lady's testimony and there --

1          **THE COURT:**  Yeah, from yesterday.

2          **MR. REYNAL:**  -- appear to be about five instances of

3     you can call anything other than perjury pertaining to whether

4     or not she met with the prosecutor, three with us, and then

5     another two with the Government as to whether they had talked.

6          **THE COURT:**  Okay, and I'm sure you're going to cross

7     examine her on that.

8          **MR. MAGLIOLO:**  And the Court -- I'm sure the Court

9     remembers.

10         **THE COURT:**  Yes.

11         **MR. MAGLIOLO:**  Well, I'm a little concerned that

12    perhaps this young lady prosecutor doesn't understand our laws

13    perhaps as to what perjury is and not.  It's my understanding

14    that in Mexico, you can't talk to the prosecutor so they may

15    have influenced what she did.  And I'm just suggesting the

16    Court may think about appointing her an attorney so she can be

17    aware of what our laws are, and that might help her protect her

18    as being a witness, because arguably there's at least five

19    times, and if you read that record it's really clear, her

20    answers that she didn't talk to the prosecutor when I think the

21    prosecutor would agree they talked probably more than once.

22    And only after the prosecutor basically argued with her that

23    (indisc.)

24         **THE COURT:**  She had to push her, she --

25         **MR. MAGLIOLO:**  -- did she actually perhaps --

324

1          **MR. MUSCHENHEIM:**  And then she said yes, --

2          **MR. MAGLIOLO:**  Yeah, tell the --

3          **MR. MUSCHENHEIM:**  -- I did.

4          **MR. MAGLIOLO:**  -- truth so --

5          **THE COURT:**  She -- yeah, she did.  But I don't

6    know --

7          **MR. MAGLIOLO:**  So it was just a thought.

8          **THE COURT:**  It's you all's witness.  Does she need

9    some representation?  I don't know.

10         **MS. HAMPTON:**  We don't feel that she needs

11   representation but we --

12         **MR. MAGLIOLO:**  Well, --

13         **MS. HAMPTON:**  -- defer to the Court on that.

14         **MR. MAGLIOLO:**  -- of course they don't feel like she

15   needs representation.  But this is for the -- not for me, it's

16   for the witness, your Honor.  And I think that would be

17   something the Court might want to consider.  But just a thought

18   is all it is, your Honor.

19         **THE COURT:**  Okay, I'll think about it.  What else?

20         **MR. REYNAL:**  Nothing from the defense, your Honor.

21         **THE COURT:**  Okay, you can be excused.

22         **MR. REYNAL:**  Thank you.

23         **(This proceeding was adjourned at 5:24 p.m.)**

24

25

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

<u>October 4, 2017</u>

Signed                                                    Dated

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**