UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:17-CR-00245-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| SILVIA BEATRIZ PEREZ-CEBALLOS, | ) | Thursday, October 5, 2017 |
| | ) | |
| Defendant. | ) | (8:29 a.m. to 12:00 p.m.) |

MORNING SESSION

JURY TRIAL - DAY 4
VOLUME I OF II, PAGES 1 THROUGH 136

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**             SEE PAGE 2

Court Recorder:          Genay Rogan

Interpreters:            Judy Hawks / Steven Mines
                         Lorena Parada-Valdes

Clerk:                   Brandy Cortez

The Marshal:             Adrian Perez

Deputy U.S. Marshal:     Don Mihelich

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiff:                    JULIE HAMPTON, ESQ.
                              JON MUSCHENHEIM, ESQ.
                              U.S. Attorney's Office
                              1000 Louisiana, Suite 2300
                              Houston, TX 77002

Defendant:                    FEDERICO ANDINO REYNAL, ESQ.
                              JOSEPH C. MAGLIOLO, JR., ESQ.
                              Fertitta Reynal
                              808 Travis, Suite 1005
                              Houston, TX 77002

                              SETH H. KRETZER, ESQ.
                              440 Louisiana St., Suite 1440
                              Houston, TX 77002

## INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | REDIRECT |
|---|---|---|---|---|
| ANGEL GONZALEZ-MONTERUBBIO | 10 | 50/80 | 92/109 | 97/102 |
|    VOIR DIRE / MS. HAMPTON | 73/100 | | | |
|    VOIR DIRE / MR. REYNAL | 78 | | | |
| ELIZABETH GUTIERREZ | 111 | | | |
| JUSTIN DOBBS | 116 | | | |
| ANTONIO ESPINOSA | | | | |
|    DE LOS MONTEROS LEAL | 121 | | | |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 1, 2, 3, 4, 5, 6, 11, 14, 16, 18 | 9 |
| 20, 22, 23, 25, 35, 36 | 9 |
| 71, 72, 73, 74, 75, 76, 78, 79 | 13 |
| 80, 81, 83, 84, 85, 86, 88 | 13 |
| 42 | 32 |
| 57, 58, 59 | 34 |
| 109 | 113 |

| DEFENSE EXHIBITS | RECEIVED |
|---|---|
| 3.13 | 79 |
| 3.9 | 104 |
| 3.21 | 106 |
| 3.22 | 107 |

4

1      **Corpus Christi, Texas; Thursday, October 5, 2017; 8:29 a.m.**

2              **(Interpreters utilized for translation)**

3                        **(Call to Order)**

4          **(Outside the presence of the jury)**

5              **THE COURT:**  2:17CR-245-3, *United States of America*

6      *versus Silvia Beatriz Perez-Ceballos.*  Is the Government ready

7      to proceed?

8              **MS. HAMPTON:**  Yes, your Honor.

9              **THE COURT:**  Is the Defense ready to proceed?

10             **MR. REYNAL:**  Yes, your Honor.  Just two small

11     housekeeping matters.  Number one -- and I don't like to be a

12     tattler, but we didn't get -- I sent Ms. Hampton two e-mails

13     last night asking for who the witnesses were going to be today.

14             **THE COURT:**  And I meant to address that.  I was just

15     in a hurry to get out of here yesterday.

16             **MR. REYNAL:**  No, I know we all were.

17             **THE COURT:**  So I usually try to address that at the

18     end of the day.

19             **MR. REYNAL:**  So I never got a response to those

20     e-mails.  We've had so far two witnesses who have appeared who

21     hadn't been noticed the day before.  Mr. Marichal, you know,

22     was sort of a surprise witness.

23             **THE COURT:**  I remember her saying his name the day

24     before.  Marichal, I do.  Because I usually write it down and I

25     have his name down.  And Tsokos or whatever -- the other one.

1          **MR. REYNAL:**  Yeah.

2          **THE COURT:**  I had him and his wife is what the

3    Government had mentioned.

4          **MR. REYNAL:**  And certainly Monterrubio was not

5    mentioned the day before.  So I just -- you know, I would ask

6    that the Government please provide us with a --

7          **THE COURT:**  Okay.

8          **MR. REYNAL:**  -- conservative estimate that covers the

9    entire day.

10         **THE COURT:**  So when did you receive their e-mail and

11   is there a reason you didn't respond?

12         **MS. HAMPTON:**  I did respond that we were working on

13   it.  We were here until almost 8:00 o'clock last night working

14   on this, your Honor.

15         **THE COURT:**  Okay.  So you sent your response after

16   that?

17         **MS. HAMPTON:**  No, I forgot to send a response.  As

18   soon as we came this morning I did tell them.  None of these

19   witnesses are a surprise to the Defense, your Honor.  They've

20   been on the witness --

21         **THE COURT:**  It doesn't matter.  We're in a three-week

22   trial.  They're entitled and they asked, and I said okay at the

23   very beginning, can we have the Government's witness list for

24   the next day.  I said yes.

25         **MS. HAMPTON:**  It wasn't intentional, your Honor.

6

1          **THE COURT:**  Okay.  So who are your witnesses for

2    today?  Are we still dealing with Mr. Gonzalez here?

3          **MS. HAMPTON:**  The witnesses for the rest of the trial

4    that we --

5          **THE COURT:**  Not the rest of the trial.  You can tell

6    them who the rest of the trial is certainly.  But we do expect

7    so they can go back and prepare for the next day, right?

8          **MR. REYNAL:**  That's correct.

9          **THE COURT:**  That's the purpose of this.  And I'm as

10   respectful to you all -- this goes to both sides -- as you all

11   are to me.  So you all don't get huffy with me, I won't get

12   huffy with you all, okay?  That's just for the record so

13   everyone understands where we are.

14          So Gonzalez and we finish him today.  Who else?

15          **MS. HAMPTON:**  Elizabeth Gutierrez.  Mr. Knowles or

16   Mr. Dobbs, they're both VISA witnesses.  I'm not sure which one

17   is coming.  I believe it's Mr. Dobbs.  Antonio Espinosa,

18   Adriana Arcelia, Fernando Latorre, Eberto Cabello, Amanda

19   Davis.

20          **THE COURT:**  All right.  So we need Mr. Gonzalez back

21   in?

22          **MR. REYNAL:**  And have we resolved this question of is

23   he afraid of my client --

24          **THE COURT:**  How is the Government going to proceed

25   with that?

1          **MS. HAMPTON:**  We're not going to proceed with that.

2          **THE COURT:**  Okay, all right.

3          **MS. HAMPTON:**  I do have another matter, your Honor --

4          **THE COURT:**  Okay.

5          **MS. HAMPTON:**  -- that I called to the attention of

6     defense counsel this morning.  We would ask -- we submit that

7     the Government has provided relevance to many of these bank

8     records.  I'd like to offer some of them, most of them at this

9     time and relay to the Court why we've established relevance.

10          **THE COURT:**  Okay.

11          **MS. HAMPTON:**  Exhibit Number 1, Merrill Lynch bank

12     records for the account of Comprehensive Advisory and

13     Development, which is what Mr. Medina -- sorry, Mr. Gonzalez-

14     Monterrubio testified about yesterday, Comprehensive Advisory

15     belonging to Medina-Sonda.

16          Exhibit Number 2, Morgan Stanley Smith Barney bank

17     records for the account of Comprehensive Advisory and

18     Development.

19          Exhibit Number 3, Morgan Stanley Smith Barney records

20     for the account of Performance Investment Limited testified to

21     yesterday by Mr. Gonzalez-Monterrubio as Performance belonging

22     to Mr. Saiz-Pineda.

23          Exhibit Number 4, Merrill Lynch bank account records

24     for the account of Performance Investment Limited.

25          Exhibit Number 5, Deutsche bank records for the

1   account of Comprehensive Advisory and Development.

2          Exhibit Number 6, Deutsche bank records for the

3   account of Comprehensive Advisory and Development.

4          Exhibit Number 11, Wells Fargo bank account records

5   for the account of Phantom International Technology.

6          Exhibit Number 14, Wells Fargo bank records for the

7   account of Century 23D property.

8          Exhibit Number 16, Wells Fargo bank account records

9   for Phantom International Investments.

10          Exhibit Number 18, Wells Fargo bank account records

11   for the account of EMC International.

12          Exhibit Number 20, Wells Fargo bank account records

13   for the account of JEC Holdings, LLC.

14          Exhibit Number 22, Wells Fargo bank account records

15   for the account of Minelo Acquisitions, LLC.

16          Exhibit Number 23, Wells Fargo bank account records

17   for the account of Inquisitec, LLC.

18          Exhibit Number 25, RBC bank account records for

19   Comprehensive Advisory and Development.

20          Exhibit Number 35, Wells Fargo bank account records

21   for the personal checking account of Silvia Beatriz Perez-

22   Ceballos.

23          And Exhibit Number 36, Wells Fargo -- excuse me --

24   Bank of -- Wells Fargo bank account records for the personal

25   savings account of Silvia Beatriz Perez-Ceballos.

1            THE COURT:  Okay.

2            MS. HAMPTON:  Those are the bank records, your Honor.

3            THE COURT:  Mr. Reynal?

4            MR. REYNAL:  At this point I would object to these

5    records.  I don't think that the Government has shown through

6    relevance all of these records to a money laundering or bank

7    fraud conspiracy.  I don't think that we have any evidence of

8    an SUA or that the funds that went into these accounts were

9    linked to an SUA.  And I would simply say that these records

10   shouldn't come in before the Government puts on some evidence

11   that the monies in there were linked to crime.

12            THE COURT:  Anything for the record from the

13   Government?

14            MS. HAMPTON:  Your Honor, the Government has

15   established the relevance of each of these companies through

16   testimony so far and we'd ask that they be admitted.

17            THE COURT:  The Defense objection is overruled.

18   They're admitted.

19            MR. REYNAL:  Thank you, your Honor.

20        (Government's Exhibits Numbers 1, 2, 3, 4, 5, 6, 11, 14,

21   16, 18, 20, 22, 23, 25, 35 and 36 were received in evidence)

22            THE COURT:  Okay.  Anything else before we bring the

23   witness in and the jury?

24            MS. HAMPTON:  No, your Honor.

25            MR. REYNAL:  Nothing from the Defendant.

1          **THE COURT:**  Is the witness available?

2          **MR. SPEAKER:**  Yes.

3          **THE COURT:**  He can go ahead and take the stand.

4          Good morning, sir.

5          **THE WITNESS:**  Good morning.

6          **THE COURT:**  You can approach over here and we'll

7    bring the jury in.  All right.

8          **THE MARSHAL:**  All rise for the jury.

9        **(Jurors enter courtroom at 8:37 a.m.)**

10         **THE COURT:**  Good morning.  We're ready to proceed

11   then.  Continue with the witness.  Sir, you can have a seat.

12        **ANGEL GONZALEZ-MONTERRUBIO, GOVERNMENT'S WITNESS,**

13                     **PREVIOUSLY SWORN**

14             **DIRECT EXAMINATION (CONTINUED)**

15            **(Interpreter utilized for translation)**

16   **BY MS. HAMPTON:**

17   Q    Good morning, Mr. Gonzalez-Monterrubio.

18   A    Good morning.

19   Q    What specifically was your job for Mr. Saiz-Pineda?

20   A    As I you told before, I guess like corporate lawyer,

21   checking --

22   Q    Can you speak into the microphone, sir?

23   A    Yes.  Hello.  Okay, sorry.  I was like a corporate lawyer

24   checking some of the stuff of all the clients in the company.

25   Then I do administrative jobs.  And then finally the big part

1   of my employment was outsourcing services.

2   Q    What is "outsourcing services"?

3   A    Well, some companies use to pay companies in the office in

4   order to pay salaries.  And I was the person in charge to move

5   the resources according to the (indisc.) in the firm.

6   Q    Moving the resources?

7   A    Yes.  I mean I had to transfer from the company who was

8   providing the services to the company -- to the final company

9   who has to do the payments to the employees.

10  Q    What do you mean?  Transfer what?

11  A    I was moving the money.  For example, if one company had a

12  contract with a client, they use to pay that company.  That

13  company in the firm has to move the money inside of -- with

14  other companies.  And finally it make the expression to the

15  employees is if this was related to that.

16  Q    Did you create companies for Mr. Saiz-Pineda?

17  A    Yes.

18  Q    Did you create companies for Mr. Medina-Sonda?

19  A    Yes.

20  Q    Did you move money for both of them as well?

21  A    Yes.

22  Q    And those were your main jobs?

23  A    Yes, that's correct.

24  Q    Did you have a social relationship with Mr. Saiz-Pineda?

25  A    Social relationship, no.

1   Q   Were you friends with him, personal friends with him?

2   A   No.

3   Q   Was it a professional relationship?

4   A   Yes, that's correct.

5   Q   From what you know about Mr. Saiz-Pineda and Mr. Medina-

6   Sonda did they ever stop working together in their business?

7   A   Well, I just left the company in 2012.  Until that time

8   they still worked together at that time.

9   Q   In 2012 they were still working together?

10  A   Yes, that's correct.

11  Q   Do you know whether at the time of Mr. Saiz-Pineda's

12  arrest in 2013 whether he was still working with Mr. Medina-

13  Sonda?

14  A   Well, I'm not sure if they were still working at that

15  time.

16  Q   Where were you at?

17  A   You mean where I was living?

18  Q   Yes, sir.

19  A   In Houston.

20  Q   Were you still working for Mr. Saiz-Pineda at that time?

21  A   Yes.

22  Q   Were you still working for Mr. Medina-Sonda at that time?

23  A   Well, I didn't have a relationship with Martin Medina.

24  Q   Why not?

25  A   Because like in 2010 the company was like divide and they

1  moved lawyers and accountant to another building and Medina was

2  taking care of that part.  And I just stayed in the office in

3  Sanchez Magallanes (indisc.).  So that office was mainly

4  directed by Saiz-Pineda.

5  Q     Whose idea was it to name the company Minelo?

6  A     You mean who choose the name for Minelo?

7  Q     Yes.

8  A     I don't know.

9  Q     What was Minelo used for?  Do you know?

10  A     Well, as far as I know it was for buying sold cars.

11  Q     Buying and selling cars?

12  A     No, I don't know if he's selling cars.

13  Q     Oh, I'm sorry.  Just buying cars?

14  A     Yes.

15       **MS. HAMPTON:**  Your Honor, at this time the Government

16  would move to admit Exhibits 71 through 76, 78 through 81, 83

17  through 86 and 88.

18       **(Voices heard off the record)**

19       **MR. REYNAL:**  No objection.

20       **THE COURT:**  They're admitted.

21       **(Government's Exhibits Numbers 71, 72, 73, 74, 75, 76, 78,**

22  **79, 80, 81, 83, 84, 85, 86 and 88 were received in evidence)**

23       **MS. HAMPTON:**  May I publish to the jury, your Honor?

24       **THE COURT:**  Yes.

25       **MS. HAMPTON:**  Let's look at Exhibit 71 first.

1      **(Pause)**

2            Okay.  This -- can we go down, please.

3      **(Pause)**

4            Can you turn that upside down, please?  Can you zoom

5   in, please?  Okay.

6   **BY MS. HAMPTON:**

7   Q    Can you see this?  It's a little hard to read, but this is

8   Page 3 of Exhibit 71.  Now, who is the registered owner of this

9   particular vehicle?

10  A    Are you asking me?

11  Q    Yes, sir.

12  A    Well, I couldn't see clearly but I think it's saying

13  Minelo Acquisition, something like that.

14          **MS. HAMPTON:**  Can we zoom in a little bit more?

15  Q    Can you see it?

16  A    Yes.

17  Q    What does it say?

18  A    Minelo Acquisitions, LLC.

19          **MR. REYNAL:**  Your Honor, I think the document speaks

20  for itself.  I don't think he's ever seen it before.

21          **THE COURT:**  He just stated what's on there, correct?

22  Overruled.

23  Q    Do you recognize the address under Minelo Acquisitions,

24  LLC?

25  A    The vehicle Audi (indisc.) is like the Audi in which was

1  in the hotel when I was checking on the apartments in Miami.

2  But I don't know (indisc.).

3  Q    Is that an address that you've ever lived at?

4  A    Lived?

5  Q    Yes, sir.

6  A    No.

7  Q    Do you know if that is an address that your company,

8  Minelo Acquisitions --

9  A    I don't know.

10  Q    -- was registered at?  Okay.

11        At the top it's really hard to read.  Let's go back

12  to the very first page, please.  Let's look at the type of

13  vehicle this is.  This is Page 2.

14        Can you see what type of vehicle this is registered

15  to Minelo Acquisitions?

16  A    I'm trying to find it but... Audi, Audi.

17  Q    Okay.  Let's go the next one, please, 72.  This is Page 1

18  of Exhibit 72.  Under owner information who is listed as the

19  owner?

20  A    Owner information, Minelo Acquisitions, LLC.

21  Q    Do you recognize that address?

22  A    No.

23  Q    Is that the same address or a different address than the

24  one we just --

25  A    It's a different one.  If you mean the previous one, it's

 1  a different one.

 2          **MS. HAMPTON:**  Can we go down, please?

 3  Q    Page 3, it's kind of hard to read.  But you can read the

 4  emblem at the top, right?  What kind of car is this?

 5  A    Bentley.

 6          **MS. HAMPTON:**  Can we go down, please?

 7  Q    And this is the back of the title history, correct?

 8  A    Minelo Acquisitions.

 9  Q    Okay.  Let's go to Exhibit 73, please.  Page 20.  What is

10  this vehicle?  Who is this vehicle registered to?

11  A    Minelo Acquisition, LLC.

12  Q    Do you recognize that address?

13  A    No.

14  Q    Can you tell what kind of car this is from this

15  registration or title?

16  A    I think it say Bent is that one.

17          **MS. HAMPTON:**  Can you go down, please?  Can you turn

18  that around, please?

19  Q    This is Page 22 of Exhibit 73.  Under maker, model --

20  maker, manufacturer, what does it say?

21  A    Bentley.

22  Q    Okay.  What year?

23  A    2013.

24  Q    Okay.  Let's go to Exhibit Number 74, please.  Page 3.

25  Who is the registered owner of this vehicle?

Gonzalez-Monterrubio - Direct / By Ms. Hampton          17

1   A     Minelo Acquisitions, LLC.

2   Q     Okay.  Can you go down, please?

3   A     Sorry?

4   Q     I'm sorry, I'm not talking to you.

5             This is Page 7 of Exhibit 74.  Do you see the make or

6   manufacturer of the vehicle?

7   A     You mean Prestige (indisc.)?  You mean that or which one?

8   Q     No, sir.  Under motor vehicle, mobile home or --

9   A     Oh, okay.

10  Q     -- vessel description --

11  A     Buga.

12  Q     -- the make or manufacturer?

13  A     It say Buga.

14  Q     Do you know if that's an abbreviation for something?

15  A     I guess it could be -- not really.

16  Q     Okay.

17  A     I don't want to guess.

18            **MS. HAMPTON:**  Okay, stop here.

19  Q     Page 10, what is the heading of this particular document?

20  A     Bugatti (indisc.), SAS.  Under Bugatti --

21  Q     Under 8 --

22  A     Bugatti Grand Sport (phonetic).

23  Q     Okay.  It's a Bugatti there, Grand Sport?

24  A     Uh-huh.

25  Q     Okay.  Let's go to Exhibit 75.

1          On page one, who is the registered owner of this

2   vehicle?

3   A    Minelo Acquisitions, LLC.

4   Q    Can you tell what type of vehicle this is up here under

5   vehicle make?

6   A    Cadi.  I guess --

7   Q    Do you know what that means?

8   A    -- Cadillac maybe.

9   Q    And the year?

10  A    Two thousand nine.

11  Q    Okay.  Let's go to the Exhibit Number 76, please; page

12  one.

13          What is the registered owner of this vehicle?

14  A    Minelo Acquisitions, LLC.

15  Q    And vehicle make up here?

16  A    Cadi.

17  Q    Cadillac?

18  A    Cadillac.

19  Q    And what year?

20  A    Two thousand ten.

21  Q    Okay.  Let's go to Government's Exhibit 78; page three,

22  please.

23          Who is the registered owner of this vehicle?

24  A    Minelo Acquisitions, LLC.

25  Q    Do you recognize that address?

1   A     No, I don't recognize the address.

2   Q     Is that the third address we've seen for Minelo

3   Acquisitions?

4   A     Yes, it's the third address.

5   Q     Can you go on, please?

6         **(Pause)**

7              Can you go here, please, stop here?  Can you go to

8   the top of the page or zoom out a little bit, please?

9              Now, this is page eight of Exhibit Number 78.

10  A     Uh-huh.

11  Q     Do you recognize this document?

12  A     Well, what I recognize is my signature there, but those

13  letters are not mine.

14  Q     Okay.  Whose name is at the top as being appointed as

15  power of attorney?

16  A     Enrique Marichal.

17  Q     And can you tell what kind of car this is from this

18  document?

19  A     Well, I guess a Ferrari.

20  Q     And what year?

21  A     Two thousand nine.

22  Q     When did -- what was the date that you signed this?

23  A     I don't remember, because those letters are not mine.  In

24  fact, if you check, they have three different letters there.

25  Q     Okay.  Is there a date on here with your name at the

Gonzalez-Monterrubio - Direct / By Ms. Hampton          20

1   bottom?

2   A     Two thousand ten, say, is the one with my --

3   Q     January 29th of 2010, right?

4   A     Yes, that's correct.

5   Q     Okay.  So, this car was an '09 from the year before, and

6   this was January, 2010; is that correct?

7   A     Uh-huh.  Uh-huh.

8   Q     Okay.  Can you go down, please?

9         **(Pause)**

10            And, then, page number nine, under -- I think it says

11  "make," what is the make of this car?

12  A     Where?

13  Q     Can we zoom in, please?

14        **(Pause)**

15  A     It's Ferrari.  Do you mean the -- the car name?

16  Q     Yes, sir.  And when -- what was the date of the purchase,

17  according to this document?

18  A     Two thousand nine, I guess.

19  Q     What month and year?  What month and day?  It's in the top

20  left-hand corner.

21  A     The top -- oh, I'm sorry.  December 21, 2009.

22  Q     Can you go down a little bit, please?

23            What was the --

24            Can you go back, please?

25            What was the -- the total due or the purchase price?

Gonzalez-Monterrubio - Direct / By Ms. Hampton                21

1   A    Three hundred thirty-nine thousand and five hundred

2   dollars.

3   Q    Under buyer's signature, do you know whose signature that

4   is?

5   A    No.

6   Q    Is that your signature?

7   A    No.

8   Q    Okay.  Let's go to Exhibit Number 79; page nine, please.

9        Who is this vehicle registered to?

10  A    Minelo Acquisitions, LLC.

11  Q    What -- what type of vehicle is this?  Can you tell from

12  the make?

13  A    It says "Ferr."  That would have to be Ferrari.

14  Q    And what year?

15  A    Sorry; I can't -- I can't see it clearly.

16  Q    Can we zoom in, please?

17  A    It's June 24th, 2011.

18  Q    What year is the car?

19  A    Ah, the car, sorry; 2003.

20  Q    And the title was issued, you said, in 2011; is that

21  correct?

22  A    That's correct.  Uh-huh.

23  Q    Can we go to Exhibit Number seventy -- excuse me --

24  eight -- 80; Exhibit Number 80, please.

25        Who is the registered owner of this vehicle?

Gonzalez-Monterrubio - Direct / By Ms. Hampton                22

1    A     Minelo Acquisitions, LLC.

2    Q     And from the -- this is page one.  From the vehicle make,

3    can you tell what type of vehicle it is?

4    A     Oh, Ferrari.

5    Q     And what was the year of the Ferrari?

6    A     Two thousand thirteen.

7    Q     Down here under registration and information, what was

8    the -- can we go up a little bit?

9          What was the issue date for this title under

10   "registration information"?

11   A     I don't know.

12   Q     Do you see the area that says "issue date"?  Does that say

13   April 25th, 2013?

14   A     Oh, the issue date.  Yes.

15   Q     Okay.

16   A     Uh-huh.

17   Q     Can we go to Exhibit 81, please?

18         **(Pause)**

19          Who's the registered owner of this vehicle?

20   A     Minelo Acquisitions, LLC.

21   Q     And what type of vehicle was this?

22   A     Ferrari.

23   Q     And what year was the Ferrari?

24   A     Two thousand thirteen.

25   Q     And what was the issue date for the -- under registration

Gonzalez-Monterrubio - Direct / By Ms. Hampton                23

1    information, what was the issue date for the title?

2    A    April 25, 2013.

3    Q    Thank you.

4         Can we go to Exhibit 83, please?  Page 21, please?

5    Twenty-one, please?

6         Who is the registered owner of this vehicle?

7    A    Minelo Acquisitions, LLC.

8    Q    Can you tell the make of this vehicle from this piece of

9    paper?

10   A    I can't read clearly.  Sorry.  I can't --

11   Q    Okay.  Let's go down, please.

12        Okay.  Under motor vehicle, mobile home, or vessel

13   description --

14   A    Oh.  The --

15   Q    -- what is the make model or make manufacturer?

16   A    "Lamb."

17   Q    Do you know what that stands for?

18   A    Well, it has to be Lamborghini.

19   Q    And what year was it?

20   A    Two thousand ten.

21   Q    Okay.  Can we go to page 31, please?

22        Under make, under the section that says "make" here,

23   what does it say?

24   A    Lamborghini.

25   Q    And the model?

Gonzalez-Monterrubio - Direct / By Ms. Hampton                24

1    A     Murcielago.

2    Q     And the body?

3    A     Roadster.

4    Q     Can you go to the bottom of the page, please?

5          And, first of all, reassignment information, the name

6    of the seller was Prestige Motor Cars, and they were selling it

7    to who?

8    A     Minelo Acquisitions, LLC.

9    Q     Okay.  What is the date that -- that the sale happens

10   here?

11   A     December 26, 2009.

12   Q     Can you go back up -- I'm sorry -- for a minute, just the

13   top of the page?

14         And what was the year of this vehicle?

15   A     I couldn't find date.  Oh.  Ten; 2010, I think.

16   Q     So, the purchase was in December of '09 for the next

17   year's vehicle?  Is that correct?

18   A     Yes.

19   Q     Okay.

20         Can we go down to the bottom of the page, please?

21         Do you see that there is a purchaser's signature

22   there?

23   A     Yes.

24   Q     Do you recognize that signature?

25   A     Which one?

Gonzalez-Monterrubio - Direct / By Ms. Hampton          25

1   Q    Under purchaser, right here.

2   A    Yes.

3   Q    Whose signature is that?

4   A    It's my signature.  Well, it looks like mine, yes.

5   Q    Do you remember signing that document?

6   A    No, I don't recall that.

7   Q    Tell us how -- did you sign documents like this?

8   A    Yes.

9   Q    Tell us how you would sign documents like this.

10  A    Well, as I told you before, I was given some document by

11  Marlis Cupil.  She used to give me the document, mainly blank,

12  and I -- and I just sign -- signed those documents.

13  Q    Did you sign this document in Mexico or the United States?

14  A    I don't recall that.  That document I don't -- I don't

15  really recall.

16  Q    Would you have signed documents in the U.S. like this

17  also?

18  A    Yes.  I signed some -- some documents here in the U.S.

19  Q    Did you go to the -- to the Prestige Motor Car Imports to

20  sign this?

21  A    Not that I remember.

22  Q    Where would you sign it?  In an office?  Or --

23  A    Well, I remember just one time that I was required to go

24  to Miami, and Enrique Marichal take me to an office.  I

25  remember I knocked on the office, and I signed some documents

1    there, but I don't recall having a -- a car dealer or something

2    like that.

3    Q    Okay.  Did you ever see this car?

4    A    No.

5    Q    This Lamborghini?

6    A    No.

7    Q    Did you pick up the Lamborghini from the car dealership?

8    A    No.

9    Q    Do you know who did?

10   A    No.

11   Q    Okay.  All right.  Let's go to Exhibit Number 84; page

12   five, please.

13          Who is the registered owner of this vehicle?

14   A    Minelo Acquisitions, LLC.

15   Q    Can we go down, please?

16        **(Pause)**

17          Page nine.  Can you tell the make or manufacturer of

18   this vehicle?

19   A    Say "Lamo."  I'd have to say Lamborghini, something like

20   that.

21   Q    What year was this?  Make -- what year is the vehicle?

22   A    Two thousand eleven.

23   Q    What was the date of the issuance of the title?  It's on

24   the left-hand side.

25   A    Okay.  July 26, 2011.

Gonzalez-Monterrubio - Direct / By Ms. Hampton          27

1   Q     Can we go to page -- sorry -- Exhibit 85, please?

2         **(Pause)**

3              Who is the titled owner of this vehicle?

4   A     Owner you mean?  Minelo Acquisitions, LLC.

5   Q     Okay.  And do you see what kind of vehicle this is, the

6   vehicle make?

7   A     Merz; I guess it's Mercedes-Benz.

8   Q     Mercedes?

9   A     Uh-huh.

10  Q     And what year was the vehicle?

11  A     Two thousand nine.

12  Q     And what was the issuance date of this title, under title

13  information?

14  A     Do you mean the run date?

15  Q     The issuance date of the title under title information.

16  A     Oh, I'm sorry.  It's January 12, 2010.

17  Q     Can you go to page 13, please?  Can you go down, please?

18             On the application attest -- attest -- attestment and

19  signature, whose signature is that?

20  A     It's mine.

21  Q     And what was it dated?

22  A     December 29, 2009.

23  Q     Do you remember signing this document?

24  A     Specifically, that document, no, but it looks like my

25  sign.

Gonzalez-Monterrubio - Direct / By Ms. Hampton                28

1    Q    Do you remember where you signed the document?

2    A    In Mexico.

3    Q    Why do you know it was in Mexico?

4    A    Because it's the only way that I could receive that kind

5    of paper.  Marlis was (indisc.) those paper in Mexico.

6    Q    Did you pick up this Mercedes from the car dealership?

7    A    No.  No.

8    Q    Okay.  Let's go to Exhibit 86, please.

9              Who is the registered owner of this vehicle?

10   A    Minelo Acquisitions, LLC.

11   Q    What was the vehicle make?

12   A    Make?  Oh, I'm sorry.  "Pors."  I guess it's Porsche.

13   Q    What year was it?

14   A    Two thousand five.

15   Q    What was the issue date for the title?

16   A    January 6, 2011.

17   Q    Can you go to page seven, please?

18              Under "make" what does it say on page seven?

19   A    The make?  A Porsche.

20   Q    And the model?

21   A    Carrera GT.

22   Q    And could we go to the bottom of the page, please?

23              Whose signature is that as the purchaser?

24   A    It's mine.

25   Q    Do you remember signing this document?

Gonzalez-Monterrubio - Direct / By Ms. Hampton          29

1   A    No, I don't recall that.

2   Q    Do you know where you signed this document?

3   A    Where?  I don't recall that also.

4   Q    Okay.  Let's go to Exhibit 88; page eight, please.

5              Who is the registered owner of this vehicle?

6   A    Minelo Acquisitions, LLC.

7   Q    Can you tell the make or manufacturer of this vehicle?

8   A    It says "Roll."

9   Q    Do you know what that means?

10  A    Rolls Royce could be; I'm not sure.

11  Q    A Rolls Royce?

12  A    Uh-huh.

13  Q    And what was the year?

14  A    Two thousand thirteen.

15  Q    What was the date of the issuance of the title to Minelo?

16  A    October 15, 2012.

17  Q    Was it issued in '12 for a next-year-model vehicle?

18  A    Uh-huh.

19  Q    Okay.

20             Can we go to Exhibit 22, please; to account

21  statements.

22             Do you know what this document is, sir?

23  A    Yes.  It's a statement, bank statement.

24  Q    A bank statement from which bank?

25  A    Wells Fargo.

Gonzalez-Monterrubio - Direct / By Ms. Hampton                    30

1   Q    And who is the account holder according to this document?

2   A    Minelo Acquisitions, LLC.

3   Q    Do you recognize that address?

4   A    No, it's -- it's like -- they all related to buying this

5   car.  I remember that address and it's related with that.

6   Q    Did you have anything to do with opening this bank

7   account?

8   A    No.

9   Q    Do you know who opened this bank account?

10  A    No.

11  Q    Do you know how the bank account was opened?

12  A    No.

13  Q    Did you ever receive money from this bank account?

14  A    Never.

15  Q    Did you ever wire money to this bank account?

16  A    I don't recall that.

17  Q    Do you know why this bank account was opened?

18  A    No.

19  Q    Did anyone talk to you about opening this bank account?

20  A    No, that I remember.

21       **(Pause)**

22  Q    Let's go to Exhibit Number 20.

23       Do you remember yesterday when we were talking about

24  JEC Holdings?

25  A    I remember the name.  Yes, that's correct.

Gonzalez-Monterrubio - Direct / By Ms. Hampton     31

1   Q     Did you know that your name was on that company as a

2   manager?

3   A     Yes, I saw the -- the picture there.

4   Q     Did you know that before we discussed it?

5   A     No.

6   Q     Okay.  And that's the company that you were on as the

7   manager with Mr. Marichal, correct?

8   A     Yes.  I remember Marichal's name was in the top, something

9   like that.

10  Q     Do you -- do you know what this document is?

11  A     It's a bank statement.

12  Q     For Wells Fargo?

13  A     Yes.  That's correct.

14  Q     And it's for JEC Holdings?

15  A     Yes; LLC.

16  Q     Do you recognize that address?

17  A     It related with the cars.

18  Q     Did you open this bank account?

19  A     No.

20  Q     Did you sign for this bank account?

21  A     No.

22  Q     Did you ever use this bank account?

23  A     No.

24  Q     Do you remember sending money to this bank account?

25  A     I don't recall that.

 1  Q    Do you know why this bank account was opened?

 2  A    No, I don't know.

 3  Q    Do you know who opened the bank account?

 4  A    No.  No, ma'am.

 5       (Pause)

 6           MR. HAMPTON:  Your Honor, at this time the Government

 7  would offer Exhibit 42, which is the incorporation documents

 8  for company Century 23B, which includes JEC Holdings as a

 9  manager.

10           MR. REYNAL:  No objection.

11           THE COURT:  It's admitted.

12       (Government's Exhibit Number 42 was received in evidence)

13           MR. HAMPTON:  May I publish to the jury, your Honor?

14           THE COURT:  Yes.

15  BY MS. HAMPTON:

16  Q    Mr. Gonzalez, do you know what Century 23B, LLC, is?

17  A    Again?  Which, ma'am?

18  Q    Do you know what the company named Century 23B, LLC?

19  A    No.  No.

20  Q    About when did you go to Los Angeles?  What timeframe was

21  that?

22  A    Two thousand ten.

23  Q    And the purpose was to do what?

24  A    To take pictures of one apartment and to give that

25  information to Saiz-Pineda.

1    Q    Do you remember the address of the apartment?  Or the --

2    A    No, I just remember that it's close to Beverly Hills and

3    the Plaza; it was close to that area.

4    Q    Do you remember the name of the building that you were at

5    in Los Angeles taking pictures?

6    A    No, ma'am.  I don't remember.

7              **MR. HAMPTON:**  May I have a moment, your Honor?

8              **THE COURT:**  Yes.

9         **(Pause; voices and whispers off the record)**

10   **BY MS. HAMPTON:**

11   Q    On page four of Exhibit 42; can you zoom in a little bit?

12             Where it says "Name and complete address of any

13   manager or managers," under box number seven here --

14   A    Okay.

15   Q    -- what is the name of the -- of the manager?

16   A    JEC Holdings, LLC.

17   Q    And the address?

18   A    It's 1001, I think, Brickell Bay Drive, 3112.

19   Q    Do you know anything about this company?

20   A    No.

21   Q    Were you involved in the creation of 23 -- Century 23B?

22   A    No.

23             **MR. HAMPTON:**  Your Honor, at this time the Government

24   would offer to admit Exhibits 57, 58, and 59 -- sorry; it's 57,

25   58, 59, which are real property records relating to properties

 1  that were purchased using JEC Holdings.

 2          **MR. REYNAL:**  No objection, your Honor.

 3          **THE COURT:**  They're admitted.

 4      **(Government's Exhibits Numbers 57, 58, and 59 were**

 5  **received in evidence)**

 6          **MR. HAMPTON:**  May I publish to the jury, your Honor?

 7          **THE COURT:**  Yes.

 8  **BY MS. HAMPTON:**

 9  Q    Let's start with Exhibit 57.

10      **(Pause)**

11          Closing docs.  First page of this document under

12  "closing docs" is -- there are some -- there are some names

13  here under these wire transactions.  Do you see these -- these

14  names right here, sir?

15  A    Yes.

16  Q    Do you recognize the name Amazing Real Estate?

17  A    No.

18  Q    Have you ever heard of a company named Amazing Real Estate

19  in Mexico?

20  A    Oh, I -- I don't recall that.

21  Q    Okay.

22      **(Pause)**

23          Page 35 of the closing documents, Exhibit 57.

24          What is this?

25  A    Power of attorney.

Gonzalez-Monterrubio - Direct / By Ms. Hampton        35

1   Q    And the power of attorney is relating to a company called

2   Jade Ocean 2708 Holdings, LLC; is that correct?

3   A    Yes, it's correct.

4   Q    Do you know anything about that company?

5   A    No.  It looked like one was the apartment in which I was

6   taking pictures.

7   Q    This was one of the apartments you were taking pictures?

8   A    It looks like, but I'm not sure, because it's Jade Ocean.

9   Q    Okay.  Down here there is a signature block.  Do you

10  recognize this signature?

11  A    Yes.

12  Q    Who --

13  A    Martin Medina-Sonda.

14  Q    And under his name what is his title?

15  A    Manager.

16  Q    Of what company?

17  A    JEC Holdings, LLC.

18  Q    Do you know anything about Mr. Medina-Sonda's involvement

19  with JEC Holdings, LLC?

20  A    No.

21  Q    Do you know why he was given power of attorney for this

22  particular property regarding JEC Holdings?

23  A    No.

24  Q    Let's go to Exhibit 58; closing documents; page one, some

25  wire transfers.

1          You -- do you recognize, again, the -- the company

2    name, Amazing Real Estate, S.A., and it's (indisc.)?

3    A    I don't -- I don't recognize the name of the company.

4    Q    Okay.

5         **(Pause)**

6          Page 40 -- 40, I think it is, of this Exhibit; do you

7    recognize this document?

8    A    Not the document, but my sign -- signature is there.

9    Q    What is the date of this document?

10   A    June 11, 2010.

11   Q    And according to this, what is it regarding?

12        **(Pause; no audible response)**

13          Well, under -- under the R-E, regarding --

14   A    Oh, okay.  Sorry.

15   Q    -- sir.

16   A    Sorry.  I was trying to understand the text.  It's Jade

17   Ocean Penthouse Holding, LLC.

18   Q    Do you know anything about that company?

19   A    No.

20   Q    Do you know what company -- what property this company is

21   involved with?

22   A    I guess the one apartment in Jade Ocean, no?

23   Q    Okay.  And you said this is your signature?

24   A    Yes, it looks like.

25   Q    And what did you sign as?

1  A    Manager of Jade Ocean.

2  Q    Do you remember signing this?

3  A    No, I don't recall that.

4  Q    Does it say manager of Jade Ocean or manager of something

5  else?

6  A    Do you mean --

7  Q    Can you read it?  Can we --

8  A    -- with another document?

9  Q    Can you -- can you make it a little bigger, please?

10         What does it say?  Angel Gonzalez; what else does it

11  say?

12  A    Yes.  Angel Gonzalez, manager.

13  Q    Of what?

14  A    A (indisc.) Holdings, LLC.

15  Q    And as -- and, then, JEC as manager of Jade Ocean

16  Penthouse; is that correct?

17  A    Sorry; again?

18  Q    It says you're the manager of JEC Holdings --

19  A    Uh-huh.

20  Q    -- and then JEC Holdings is the manager of Jade Ocean

21  Penthouse; is that correct?

22  A    If it's what it say in that document.

23  Q    Do you know anything about the creation of Jade Ocean

24  Penthouse?

25  A    No.

Gonzalez-Monterrubio - Direct / By Ms. Hampton          38

1    Q    Okay.

2              Can we go to Exhibit 59, please?

3    A    But that signature is a little bit weird.

4    Q    Do you remember signing this document?

5    A    I don't remember signing that document, but --

6    Q    Okay.

7    A    -- I just --

8         **(Pause)**

9    Q    Mara Escrow closing documents, under Exhibit 59;

10        **(Pause)**

11             It's page 119.

12        **(Pause)**

13             Can you zoom out a little bit?

14             Do you recognize this document?

15   A    Well, I don't remember the -- the document, but I

16   recognize the last name Cantor.

17   Q    Can you go to the very top of the document so we can see

18   it, please?

19             The title of this document is Special and Limited

20   Power of Attorney.  Is that correct?

21   A    Yes, that's correct.

22   Q    For what company is involved here?

23   A    The Century 2018, LLC -- or, no --

24   Q    Can you zoom in, please?

25   A    Yes.  I couldn't hear -- or see clearly.  Sorry.  Century

1   23B, LLC.

2   Q    A California LLC?  Is that correct?

3   A    That's correct.

4   Q    And who is it appointing as special unlimited power of

5   attorney?

6   A    You mean Enrique Marichal, Steven L. Cantor, and Maritza

7   Perez.

8   Q    Who is Maritza Perez?

9   A    I don't know her.

10  Q    Okay.  And then there's an address regarding the real

11  property located at; is that correct?

12  A    Yes, that's correct.

13  Q    Is that the property you visited in Los Angeles?

14  A    I don't remember exactly the location of the property but

15  I can tell you that you can see Central Park a little bit far

16  away.

17  Q    Central Park, are you talking about New York or Los

18  Angeles?

19  A    Sorry, sorry, I was mixing the New York.  No, but in this

20  one you can see Beverly Hills in the distance.

21         **MS. HAMPTON:**  Okay, can we go down, please?

22  Q    What day was this executed?

23  A    May, 2010.

24  Q    May 14th, 2010?

25  A    Yes, sorry, sorry.

Gonzalez-Monterrubio - Direct / By Ms. Hampton            40

1   Q    And are these your signatures on this document?

2   A    Yes.

3   Q    What did you sign as; can you read your titles?

4   A    What is confusing -- in which I say (indisc.) Century 23B

5   LLC and California LLC.

6   Q    Yes, sir.  And up here there's a heading above your

7   signature, the first signature, that says JEC Holdings LLC, a

8   Delaware Limited Liability Company, correct?

9   A    Yes, that's correct.

10  Q    As nominee for JEC Holdings NZ, Limited Partnership, a New

11  Zealand Limited Partnership; is that correct?

12  A    Yes, that's what it say.

13  Q    Have you ever been to New Zealand?

14  A    No, never, I haven't been.

15  Q    Did you know anything about a New Zealand partnership?

16  A    No.

17  Q    And then over here it's saying that you're signing also as

18  a member of Century 23B LLC and California LLC; is that

19  correct?

20  A    That's correct.

21  Q    Did you know you were a member of that LLC?

22  A    No.

23          **MS. HAMPTON:**  Can we go to Exhibit 56, please?

24  Q    These are the New York documents, the New York closing

25  documents.

1      **MS. HAMPTON:**  Go under "closing documents," page two,

2   please.  Can we zoom in?

3   Q    Do you know what kind of -- do you recognize this document

4   or do you know what kind of document it is?

5   A    No, I don't know.

6   Q    Do you see a bank title up here?

7   A    It's a JPMorgan Chase Bank.

8      **MS. HAMPTON:**  Can we zoom in one more time or a

9   couple more times?  And then go down.

10  Q    What is the amount?

11  A    Which is -- oh, 1,301,978 I guess dollars, I guess

12  currency dollar.

13  Q    Okay, and the bank again is JPMorgan Chase Bank, correct?

14  A    Yes, that's correct.

15  Q    And this bank is what?  Where it's -- or the originating

16  bank.

17  A    HSBC Mexico.

18  Q    And what is the name of the company that's the originating

19  bank account owner?

20  A    (indisc.)

21  Q    What is the address of that company?

22  A    Sanchez Magallanes (indisc.)

23  Q    Is that the correct address for that company?

24      **THE INTERPRETER:**  Sanchez Magallanes --

25  A    That is the second --

Gonzalez-Monterrubio - Direct / By Ms. Hampton                     42

1          **THE INTERPRETER:**  Sanchez Magallanes 1005 First

2    Floor.

3    A    Can I answer?

4    Q    What -- is that the correct address for that company?

5    A    Well, I don't know is it the correct address, but that is

6    address for the company.  They divide the company in two.

7    Q    What does this company do?

8    A    I don't know.

9    Q    Did --

10   A    Which one?

11   Q    Whose company is Federacion Tabasquena (phonetic)?

12   A    Federacion is a company who concentrate their resources

13   from the cooperativas.

14   Q    Who does that company belong to?

15   A    Saiz-Pineda, Martin Medina.

16   Q    Does that company conduct any business?

17   A    Well, no, the federations are related to the cooperativas.

18   Q    And the cooperativas are ways to move money throughout the

19   companies; is that correct?

20   A    That's correct.

21   Q    Okay, so is this Federacion Tabasquena a real company or

22   is it just something to hold money?

23          **MR. REYNAL:**  Objection, your Honor, is it a real

24   company.  I mean, what does that even mean?

25          **THE COURT:**  Sustained.

Gonzalez-Monterrubio - Direct / By Ms. Hampton          43

1    BY MS. HAMPTON:

2    Q    What kind of -- does it conduct any business?

3    A    Well, per se directly for (indisc.) no, she has to work

4    through the cooperativas.

5    Q    Does it have any employees?

6    A    No.

7    Q    Is anyone other than Mr. Saiz-Pineda involved with

8    Federacion Tabasquena?

9    A    Martin Medina.

10            MS. HAMPTON:   Okay, can we go to page four, please?

11   This -- can you -- no, just stay here.

12   Q    What is the send date on page four, the same exhibit?

13   A    The send date, where can I find that?  Oh, sorry, August

14   12 31 (phonetic) (indisc.) no, but this is from Mexico because

15   the date changed in Mexico.

16   Q    Okay, so what is it?

17   A    So we have first day -- no, but this is in English, no?

18   It says August -- I'm not sure this is August or December.

19   Q    Okay, it says "8/12/31."

20   A    That's correct.

21   Q    Okay, we'll get back to that.  And this is to -- this is -

22   - where is the bank originating from here?

23   A    Banco Mercantil Del Norte SA.

24   Q    And what is the originating account at that bank?

25   A    Federacion Tabasquena.

1   Q    What is the address for Federacion Tabasquena?

2   A    It's Sanchez Magallanes (indisc.)

3           **MS. HAMPTON:**  Page six?

4           **MR. SPEAKER:**  (Indisc.)

5           **MS. HAMPTON:**  Oh, wait, I'm sorry, page four.

6   **BY MS. HAMPTON:**

7   Q    What is the amount that was sent?

8   A    Five hundred thousand.

9           **MS. HAMPTON:**  Page six.

10  Q    What is the date of --

11          **MS. HAMPTON:**  Can you go back up please, at the very

12  top?

13  Q    What is the --

14          **MS. HAMPTON:**  Very top, please.

15  Q    What is the date of this document at the top?

16  A    I think January 22, 2009.

17          **MS. HAMPTON:**  Okay, let's go down.

18  Q    What is the amount of this transaction?

19  A    One million three hundred dollar.

20  Q    Three hundred thousand dollars?

21  A    Three hundred thousand dollars, sorry.

22  Q    Okay, and what bank is this being sent from?

23  A    (Indisc.) Morgan Stanley.

24  Q    Morgan Stanley and Company, Incorporated?

25  A    That's correct.

1  Q    And what is the name of the accountholder from that bank?

2  A    Performance Investment Limited.

3  Q    Who owns Performance Investment Limited?

4  A    Saiz-Pineda.

5  Q    Does Performance Investment Limited have any business?

6  A    I don't know.

7  Q    Does Performance Investment Limited have any employees?

8  A    Not that I know.

9  Q    What is Mr. Medina-Sonda's company?

10  A    Medina-Sonda?

11  Q    Similar to Performance.

12  A    Comprehensive Advisory Development.

13        **MS. HAMPTON:**  Okay, let's go to page eight, please.

14  Q    What is the date of this transfer?

15  A    September 23, 2008.

16  Q    Received from, what does it say, which bank?

17  A    JPMorgan Chase Bank.

18  Q    What is the amount?

19  A    Five hundred eighty-seven thousand dollar with $478.

20  Q    Okay, and the bank that it's -- it says "ordering bank" is

21  what?

22  A    HSBC Mexico SA.

23  Q    What is the name of this company behind HSBC Mexico?

24  A    Institution -- this is in Spanish -- (speaks Spanish)

25  Q    That's part of the HSBC --

1    A    That's correct, that is part of that.

2    Q    And then what is the originating account sending the

3    money?

4    A    (indisc.)

5    Q    Do you recognize that company?

6    A    Yes.

7    Q    Tell us about that company.

8    A    That company is like a federation.  That company doesn't

9    work by itself.  That company was created with other companies

10   that used to move their resource to the attic.

11   Q    And by "resources," what do you mean?

12   A    Money.

13   Q    Okay.

14   A    Money (indisc.)

15        **MS. HAMPTON:**  Let's go to page ten.

16   Q    What is the date of this transfer?

17   A    March 26, I guess, 2008.

18        **MS. HAMPTON:**  Okay, go down, please.

19   Q    What is the amount of this transfer?

20   A    Five hundred eighty-seven thousand dollars and $500.

21   Q    What is the originating bank that's sending the money?

22   A    (Speaks Spanish)

23   Q    And who is the accountholder?

24   A    Espinosa de los Leal Antonio.

25   Q    Antonio Espinosa de los Leal?

1  A    I think it is Antonio Espinosa de los Monteros but --

2  Q    Who is Antonio Espinosa, who is that?

3           **MR. REYNAL:**  Your Honor, calls for speculation as to

4  who this person is on this document that he's never seen

5  before.

6           **MS. HAMPTON:**  Your Honor, he testified he knows this

7  person yesterday.

8           **THE COURT:**  Do you know the person?

9           **THE WITNESS:**  Yes.

10          **THE COURT:**  Okay, overruled.

11  **BY MS. HAMPTON:**

12  Q    How do you know this person?

13  A    Because he used to work with the companies in the office.

14  Q    In Mexico?

15  A    Yes.

16  Q    Okay, do you know what kind of work he did with the --

17  with Mr. Saiz-Pineda in Mexico?

18  A    I don't recall exactly time of work.

19          **MS. HAMPTON:**  Can you go up, please, to the date of

20  this?

21  Q    I believe this was in 2008.  Do you remember in 2008

22  whether Mr. Espinosa was working with Mr. Saiz-Pineda and the

23  companies in Mexico?

24  A    I don't remember the date.

25          **MS. HAMPTON:**  Page 48, please.  Can you go up,

1    please?

2    Q    What is the date of this transaction --

3    A    I don't know the date.

4    Q    -- where it says "value date?"

5    A    I cannot see clearly but it look like -- okay, August --

6    Q    It's another one of those inverted numbers.

7    A    Okay.

8    Q    But it says 8/12/31; is that correct?

9    A    That's correct.

10   Q    Okay, and what is the U. S. equivalent amount?

11   A    Five hundred thousand dollar.

12   Q    Right here, doe this tell us more about the date --

13   A    Yes, --

14   Q    -- up here on the top right?

15   A    -- it's more clear, uh-huh, December 31, 2008.

16   Q    Okay, so December 31st, 2008, $500,000.

17          MS. HAMPTON:  Can we go down, please?

18   Q    The -- who is the sender of the $500,000?

19   A    Federacion Tabasquena.

20   Q    And what is the address?

21   A    Sanchez Magallanes (speaks Spanish)

22          THE INTERPRETER:  Forty-nine thousand, one hundred

23   thirteen.

24          MS. HAMPTON:  Page 49, please.

25   Q    What is the date of this wire transfer?

Gonzalez-Monterrubio - Direct / By Ms. Hampton                49

1   A    December 31st, 2008.

2   Q    What is the amount?

3   A    One million, eight hundred forty-nine thousand, ninety-

4   seven eight dollars.

5   Q    And who is the company that's sending the money?

6   A    Productores Por El Campo (phonetic).

7          **MS. HAMPTON:**  May I have a moment, your Honor?

8          **THE COURT:**  Yes.

9          **(Pause)**

10  **BY MS. HAMPTON:**

11  Q    Mr. Gonzalez-Monterrubio, --

12  A    Yes?

13  Q    -- did any of your own money every go into the Manila

14  Acquisitions account?

15  A    You mean by commissions?

16  Q    Any of your personal money?

17  A    No, no.

18  Q    Did you have anything to do with the control of Manila

19  Acquisitions bank account?

20  A    No.

21  Q    Or the company itself?

22  A    No.

23         **MS. HAMPTON:**  I pass the witness.

24         **MR. REYNAL:**  May I proceed, your Honor?

25  //

1          **THE COURT:**  Yes.

2          **MR. REYNAL:**  Thank you.  Good morning,

3     Mr. Monterrubio.

4          **THE WITNESS:**  Good morning.

5          **MR. REYNAL:**  My name's Andino Reynal.  I represent

6     Silvia Beatriz Perez-Ceballos.

7          **THE WITNESS:**  Okay.

8          **MR. REYNAL:**  I just want to ask you a few questions

9     this morning; that okay?

10          **THE WITNESS:**  Yeah, it's no problem.

11                    **CROSS EXAMINATION**

12     BY MR. REYNAL:

13     Q    I kind of want to start a little bit near the end.  You

14     mentioned a meeting in Houston in 2013, I think it was late

15     summer or early fall; is that right?

16     A    Well, I can say it was June or July, something like that.

17     Q    June or July, okay, so during the summer.  It was after

18     Mr. Saiz-Pineda had been arrested.

19     A    That's correct.

20     Q    And you said that at this meeting, it was to discuss the

21     events that just happened in Tabasco.

22     A    Well, I didn't say that.  What I say that everybody was

23     concerned about the situation in Mexico.  I was present, the

24     lawyer for -- the son was the lawyer who representing Saiz in

25     Mexico.

1  Q    And that was Javier Joliere (phonetic).

2  A    Yes, Joliere is the last name, that's correct.

3  Q    And everybody was very concerned.

4  A    Yes.

5  Q    You were very concerned.

6  A    That's correct.

7  Q    You were scared.

8  A    Yes.

9  Q    Silvia was there.

10 A    Yes, she was.

11 Q    You observed her.

12 A    Yes, I saw her.

13 Q    She was very concerned.

14 A    Yes.

15 Q    She was scared.

16 A    Yes.

17 Q    You knew that one of the reasons you were scared is

18 because in Tabasco, the government can throw you in jail

19 whether you commit a crime or not.

20          MS. HAMPTON:  Your Honor, objection, calls for facts

21 not in evidence.

22          THE COURT:  Overruled.

23          THE WITNESS:  So do I have to answer?

24          MR. REYNAL:  Yes, you have to answer.

25          THE WITNESS:  Sorry.

Gonzalez-Monterrubio - Cross / By Mr. Reynal          52

1    BY MR. REYNAL:

2    A    Yes.

3    Q    You were scared because you heard that Marlis Cupilus

4    (sic) had been kidnapped and tortured.

5    A    I didn't say that.

6          MS. HAMPTON:  Objection, your Honor, calls for facts

7    not in evidence.

8          THE COURT:  Overruled.

9    Q    I didn't ask you what you said.  I said was that one of

10   the reasons why you were scared.

11   A    One of the reason?  I could say yes.

12   Q    You certainly didn't want to go back to then.

13   A    You mean that I didn't want to go back to Mexico.

14   Q    Yeah, you did not want to go back to Mexico.

15   A    Well, in fact I did in that year in January.

16   Q    My question was you didn't want to go back to Mexico at

17   that point.  Maybe you did but you didn't want to go back.

18   A    Well, at that specific moment, no.

19   Q    Okay.  And you don't want to go back to Mexico now.

20   A    Well, if I had a possibility, I would say no.

21   Q    You understood that Silvia had fled to the United States

22   for the safety of herself and her daughters.

23   A    No, I didn't understood that because I never was told

24   about that.

25   Q    Okay.  Is that why you believed she was in the United

1  States with her daughters?

2  A    No, I didn't know what is the purpose.

3  Q    All right.  Now I want to take you back in time.

4  A    Okay.

5  Q    Let's go back to around 2004.

6  A    Okay.

7  Q    I guess at that point you were just finishing your

8  studies.

9  A    No, I conclude my studies working in the firm.

10  Q    Okay, so you were still studying.

11  A    Yes, that's correct.  I was still studying.

12  Q    And you had been studying in Medela (phonetic).

13  A    No.

14  Q    Always in Villa Hermosa.

15  A    In Villa Hermosa.

16  Q    Okay.  And you met Martin Medina.

17  A    Yes, that's correct.

18  Q    And you and he established a relationship.

19  A    Yes.

20  Q    And did you ask for a job or did he offer it to you?

21  A    No, he offered me a job because I -- my job was constantly

22  in Banorte like in was July, he knew when he offered me a

23  position in the office.

24  Q    And he offered you a position because presumably -- or you

25  understood that he offered you a position because he thought

Gonzalez-Monterrubio - Cross / By Mr. Reynal          54

1    you were qualified.

2    A    I don't know the reason.

3    Q    Okay.  Do you feel like you were qualified for the job?

4    A    Well, I didn't know even what type of job at that time,

5    but I was in need of a job, any type of job.

6    Q    You didn't -- your testimony is you didn't know that

7    Mr. Saiz-Pineda and Mr. Martin-Medina were accountants.

8    A    I never say that I didn't know.

9    Q    Okay.  So you knew that they were accountants.

10   A    Well, what I know at that time about the office was, was

11   Martin was talking in the classroom and they were Ornelo's

12   (phonetic) accounting firm.

13   Q    Okay, so we agree you knew that they were -- had an

14   accounting firm.

15   A    No, I hear that.

16   Q    Okay.  Well, when you got there, there was accounting

17   going on, wasn't there?

18   A    Yes.

19   Q    Okay, so we can agree they had an accounting firm, right?

20   A    Yes.

21   Q    You went to work for it, true?

22   A    Uh-huh.

23   Q    Their accounting firm was successful.

24   A    I don't know that.

25   Q    They had clients.

```
1   A     Yes, they had.

2   Q     They had more than one client.

3   A     Yes.

4   Q     They had more than ten clients.

5   A     Yes.

6   Q     They had maybe more than a hundred clients.

7   A     I don't know that.

8   Q     Okay.  Are you testifying here today that they at no time

9   had more than a hundred clients?

10  A     Sorry?

11  Q     Are you telling this jury that at no time while you worked

12  there did they ever have more than a hundred clients?

13  A     I don't know that.  I testifying that because I don't know

14  that.  I never count every client in the firm.

15  Q     But we can agree they have lots of clients.

16  A     Yes, lots, yes.

17  Q     Now, you studied law.

18  A     That's correct.

19  Q     You studied finances.

20  A     No, I just study law and I study finance previously to

21  that.

22  Q     Okay, so you had some background in finances and some

23  background in law.

24  A     That's correct.

25  Q     And at the firm that Martin Medina and Saiz-Pineda had,
```

Gonzalez-Monterrubio - Cross / By Mr. Reynal                56

1   they did accounting work, true?

2   A    Uh-huh.

3   Q    And they also did I guess tax planning.

4   A    Well, if you can name it that way, I can say yes.

5   Q    Okay.  And I just want to -- I want -- we had a lot of

6   talk about cooperativas.

7   A    That's correct.

8   Q    And you know we don't have those in this country.

9   A    Uh-huh.

10  Q    You have to answer out loud.

11          **THE COURT:**  Say yes or no.

12  A    Yes, I'm sorry, yes, that's correct.

13  Q    And you understand that it might be a little bit difficult

14  for somebody here to understand how a cooperativa works.

15  A    Yes.

16  Q    There's nothing illegal about a cooperativa, is there?

17  A    Per se, no.

18  Q    Okay.  They are provided for in Mexican law.

19  A    It's a type of companies in Mexico.

20  Q    Okay.  And these companies can be used or are used to

21  achieve a financial benefit in terms of taxation and labor

22  laws, true?

23  A    As far as I was told because I not accountant, yes.

24  Q    Okay.  And you're not here telling anybody that that's

25  illegal, are you?

Gonzalez-Monterrubio - Cross / By Mr. Reynal            57

1   A     Well, nobody's asking me that.

2   Q     I'm asking you.  Are you telling us that that's illegal?

3   A     To have a cooperativa?

4   Q     Uh-huh.

5   A     No.

6   Q     To within the law try and get a tax advantage or optimize

7   your finances; is that illegal in your mind within the law?

8   A     Well, no.

9   Q     Now, I kind of -- I want to kind of step-by-step walk

10  through how a cooperativa works, okay?  The cooperativa is

11  originally founded by a small group of people, true?

12  A     Well, I no expert and I not accountant so I cannot confirm

13  that.

14  Q     Okay.  You worked at the office for, what, eight years?

15  A     Eight years, that's correct.  But I never was involved in

16  that aspect with the cooperativas.

17  Q     Well, when you talk about outsourcing, didn't that also

18  involve the cooperativas?

19  A     Yes.

20  Q     Okay, and that's what you did.

21  A     No, you were asking me about the reason with a

22  cooperativas and I don't know because I not accountant.

23  Q     I just want to ask you about the mechanics --

24  A     Okay.

25  Q     -- of how this outsourcing cooperativas works.

Gonzalez-Monterrubio - Cross / By Mr. Reynal          58

1   A    Okay.

2   Q    Okay.  And I think the term "outsourcing" maybe conceals

3   as much as it reveals in the sense that these cooperativas were

4   designed as a mechanism for companies to pay employees and

5   vendors, true?

6           MS. HAMPTON:  Your Honor, I'm going to object to

7   there's no question and there's sidebar comments --

8           THE COURT:  Sustained.

9           MS. HAMPTON:  -- included in his questions.

10          THE COURT:  Sustained.

11  BY MR. REYNAL:

12  Q    The cooperativas, the way they work is that they pay out

13  to purchase services or real property or whatever the person

14  who participates in the cooperativa wants.

15  A    You mean the way they was using -- they were using the

16  office?

17          MS. HAMPTON:  Objection, your Honor, that wasn't a

18  question, that was a statement.

19          THE COURT:  Sustained.

20          MR. REYNAL:  Let me rephrase it, okay?

21  BY MR. REYNAL:

22  Q    Based on your experience, isn't it true that the way the

23  cooperativas worked was as a way for people to pay for goods or

24  services?

25  A    Goods or services?  We use the cooperativas to pay salary.

1  Q    To pay salary, okay, that's a service, wouldn't you agree?

2  Somebody's salary, somebody's giving a service and, therefore,

3  they get a salary.

4  A    Well, that was -- I was told that the (indisc.) was

5  focused on that.

6  Q    Okay.

7          **THE WITNESS:**  So sorry.

8          **MR. REYNAL:**  No, drink your water.

9          **THE WITNESS:**  Okay.

10 **BY MR. REYNAL:**

11 Q    So who is getting paid by the cooperativa, who are these

12 employees?

13 A    The client's employees.

14 Q    The client's employees.  So the client puts money into the

15 cooperativa, and then the cooperativa pays the employees.

16 A    No, the process is not in that way.

17 Q    Okay.

18 A    The process I was told and I was instructed to move the

19 resources is they pay to other companies like (indisc.) or

20 other type of companies sometimes cooperativas.  And they then

21 move that money to the federation, and federation return at

22 some point to other cooperativa the resource and they disburse,

23 make the payments.

24 Q    To the employees.

25 A    Is that for employees?  Yes.

1  Q    Okay, and it could also be for other things.

2  A    Yes.

3  Q    And the --

4       MR. REYNAL:  (Indisc.) the cooperativa founding

5  documents.

6       (Ms. Hampton/Mr. Reynal confer)

7       MR. REYNAL:  I'm sorry.  May I approach, your Honor?

8       THE COURT:  Yes.

9  BY MR. REYNAL:

10 Q    I want to hand you what's in evidence as Government's

11 Exhibit 122; remember that from yesterday?

12 A    Yes.

13 Q    Okay.  There's a section of that that deals with all the

14 potential uses that a cooperativa can be put to; is that right?

15 A    Well, I don't know if this have that.  If you show me

16 that --

17 Q    I'll show you.

18 A    -- section.  Because those document were prepared in the

19 office also.

20 Q    I'm sorry?

21 A    Those document were prepared in the office --

22 Q    Yeah, you said you knew about this.

23 A    -- by the -- that's correct -- by the lawyer.  Just show

24 me that.

25 Q    Okay.  Do you see the part -- can you see it on your

```
                  Gonzalez-Monterrubio - Cross / By Mr. Reynal          61

  1    screen up there, too?

  2    A     No, I don't know how --

  3    Q     Maybe it's easier to see it --

  4    A     I don't know how to turn it on.

  5              THE COURT:  Oh, it's not on?

  6              THE WITNESS:  No.

  7              MR. REYNAL:  There's a button.

  8              THE COURT:  It's right there on the right, there

  9    should be a button.

 10              THE WITNESS:  The right?  Here?  No, so sorry.  Yes,

 11    it's better here.  Tell me.

 12              MR. REYNAL:  Is that easier to read?

 13              THE WITNESS:  Yes.

 14              MR. REYNAL:  Okay.

 15    BY MR. REYNAL:

 16    Q     You see there's a --

 17              MR. REYNAL:  I'm going to just zoom in a little bit.

 18    Q     And it's in Spanish, sorry, but all I'm going to ask, you

 19    see it says "objecto" (phonetic).

 20    A     Yes.

 21              THE INTERPRETER:  Object.

 22    Q     What does that mean?

 23    A     Well, it's not a specific translation but I can say that

 24    is the (indisc.) that this company's allowed to do.

 25    Q     Okay.  And just looking through this, have you been able
```

1   to read through the bottom of the page yet?

2   A    (No audible response)

3   Q    Could -- were you able to read through the bottom of that

4   paragraph?

5   A    Yes.

6   Q    Okay, and just looking through that and then going on to

7   the second page, you know, there's -- I think we end at like

8   object number 42, right; is that the last one?

9   A    Forty-two?  What it say?  Thirty-two.

10  Q    (Indisc.) see, 42.

11  A    Oh, okay, okay.

12  Q    So they could be used to -- for -- I mean, you would agree

13  with me, based on reading that, they can be used to pay for

14  pretty much any kind of service or good or anything.  It's very

15  broad.

16  A    Well, you just state that it doesn't say that they can pay

17  but you say that they do any act of (indisc.) that is what it

18  state.

19  Q    Incredibly broad.

20  A    Yes, that's correct.

21  Q    And it's designed that way because the clients of the firm

22  who use the cooperativa structure had lots of different types

23  of businesses.

24  A    Well, they have a lot of type of business but I don't know

25  if that was the reason.

Gonzalez-Monterrubio - Cross / By Mr. Reynal          63

1   Q    Okay.  And the clients of the cooperativas had to pay for

2   a lot of diverse -- or wanted to be able to pay for a lot of

3   different types of services and for different types of products

4   or goods, true?

5   A    Okay, yes.

6   Q    Yes?

7   A    Yes.

8   Q    This outsourcing cooperativa was -- withdrawn.

9        In order to participate in a cooperativa, you need to --

10  the term in Spanish is (speaks Spanish), in English, "give

11  over," money --

12            **THE INTERPRETER:**  To grant or give.

13  A    Yes.

14  Q    And in return for that, you get like a share in the

15  cooperativa.

16  A    Not (indisc.) return of the money.  The return of your

17  effort, of your participation, in the cooperativa.

18  Q    But that is kind of kept track of in --

19  A    I don't understand "kept track of."

20  Q    Oh, sorry, that is accounted for by giving you an interest

21  in the cooperativa so they can keep track of how much your

22  effort, how much you have put into the cooperativa.

23  A    Well, that is open.  The way that they use to analyze how

24  much will you receive according to your job.

25  Q    According to your job.  And but that was kept track of

1   through like a system of sort of shares of nominal interest in

2   the cooperativa; isn't that right?

3   A    No, I don't understand.

4   Q    Okay, let me see if I can refresh your recollection.

5            **MR. REYNAL:**  May I approach?

6            **MS. HAMPTON:**  Your Honor, I'd ask to see the

7   document.  If he's refreshing his recollection as to something,

8   it has to be this witness's statement.

9            **MR. REYNAL:**  No, it doesn't.  It could be with

10  anything.

11           **THE COURT:**  What are you showing?

12           **MR. REYNAL:**  I'm showing him corporate documents from

13  one of the cooperativas.

14           **THE COURT:**  Okay, so what's the --

15           **MS. HAMPTON:**  Is there a reason to believe this

16  witness knows about this particular corporate document?

17           **THE COURT:**  Well, I guess he has to ask him about it,

18  doesn't he?

19           **MR. REYNAL:**  I'm not seeking to introduce it at this

20  point.  I was just seeking to refresh his recollection.  May I

21  proceed, your Honor.

22           **THE COURT:**  Yes, overruled.

23  **BY MR. REYNAL:**

24  Q    Is there something called like a certificate of -- how

25  would you translate (speaks Spanish)?

1          **THE INTERPRETER:**  May the interpreter have a moment?

2          **THE COURT:**  Yes.

3          **THE INTERPRETER:**  The interpreter needs to interpret

4     that.  Grant a certificate.

5          **THE WITNESS:**  Okay.

6          **THE INTERPRETER:**  May the interpreter take a moment

7     to confer with her colleague?

8          **THE COURT:**  Yes.

9          **THE INTERPRETER:**  The interpreter will rephrase,

10    certificate of contribution.

11    **BY MR. REYNAL:**

12    Q    Does that refresh your recollection as to how it was

13    accounted for, how much effort or money people put into the

14    cooperativa?

15    A    Well, I no accountant.

16    Q    Okay.

17    A    This is an accountant term.  I don't know what is the

18    purpose per se of that certificate but I was -- can I tell you

19    is that every person in the cooperativa would receive according

20    to the --

21    Q    You have to slow down.

22    A    -- to their effort.

23    Q    You have to slow --

24    A    It's the only way.

25    Q    Slowly.

Gonzalez-Monterrubio - Cross / By Mr. Reynal                66

1   A    Yes.  I don't know the real purpose of the (speaks

2   Spanish) because I not accountant.

3   Q    Okay.  I didn't ask you about the real purpose.  I asked

4   you whether the interest that people had in the cooperativa

5   that they could at some point take out was kept track of with

6   these (speaks Spanish)

7            **MS. HAMPTON:**  Objection.

8            **THE COURT:**  Okay, hold on.

9            **THE INTERPRETER:**  Certificate of contribution.

10           **MR. REYNAL:**  Certificate of contribution.

11           **THE COURT:**  Don't answer it.

12           **MS. HAMPTON:**  Objection, asked and answered.  The

13  witness has said he doesn't know, your Honor.

14           **THE COURT:**  Sustained.

15  **BY MR. REYNAL:**

16  Q    Was it your job to pay out to people who -- clients who

17  participated in these cooperativas?

18  A    My job was to pay to the list of employees that the

19  company was sending to me.

20  Q    Okay, so you're familiar with the list of the employees as

21  a general matter?

22  A    Well, not directly in the company per se.  I just was to

23  use the list of the company send to me.

24  Q    Okay.  Were often times the employees of the cooperativa

25  also the clients of the firm?

Gonzalez-Monterrubio - Cross / By Mr. Reynal       67

1   A    I don't understand.

2   Q    The people who were listed as the employees of the

3   cooperativa with their certificates of -- with their

4   certificates, were they also many times the client of the firm?

5   A    Of the firm?  You mean -- you are inferring that the

6   person in the cooperativas, that all these person are employees

7   of the firm?  Because I don't understand the question.

8   Q    I'll rephrase the question.  And maybe I can back up.  At

9   the company you worked for, they created cooperativas.

10  A    That's correct.

11  Q    You were on the creation documents for at least one

12  cooperativa.

13  A    That's correct.

14  Q    But after the cooperativa comes into existence, other

15  people get interests in the cooperativa get a financial stake

16  in the cooperativa based on their contributions, true?

17  A    Is not clear for me and I don't want to say something that

18  I don't know.

19  Q    I want to know your understanding.

20  A    No, if you explain to me in another way, maybe I will

21  understand because it's confusing the way that you are telling

22  me that.

23  Q    It's confusing for me, too.

24          MS. HAMPTON:  Objection, your Honor, sidebar comment.

25  Q    Was this --

1          **THE COURT:**  Sustained.

2     **BY MR. REYNAL:**

3     Q    You -- can you tell us some of the businesses that were

4     clients of the firm in relation to the cooperativas?

5     A    The most important was payroll, that was the main issue in

6     the cooperativas, no?

7     Q    And can you tell us some of the companies that were making

8     payroll through the cooperativas?

9     A    Well, no, I just remember car dealer.

10    Q    I'm sorry?

11    A    Car dealers.

12    Q    Car dealers.

13    A    That's correct.

14    Q    Anybody else?

15    A    Car dealers and I don't remember other -- that was the

16    biggest part, the car dealers.

17    Q    But there were lots of companies.

18    A    Yes.

19         **(Pause)**

20         **MR. REYNAL:**  One moment.

21    Q    I'm going to show you --

22         **MR. REYNAL:**  May I approach?

23         **THE COURT:**  Yes.

24    //

25    //

1  **BY MR. REYNAL:**

2  Q    -- another document.  Is this the kind of document that

3  you would have worked with or you would have had at the office

4  as part of (speaks Spanish)?

5  A    You mean I know this company that was created in the

6  office, yes.

7  Q    Okay, and these were the types of documents that you

8  worked with.

9  A    No.  I wasn't in the legal team.  I just was operating the

10  process of the outsourcing.  This was prepared by the legal

11  team in the office.

12  Q    But this was part of the transaction documents (indisc.)

13  A    What the company was used for that purpose.

14  Q    Okay, but yesterday you testified to another legal

15  document that was given to you about (speaks Spanish)

16  A    Yes.

17  Q    -- and you said that you knew that one.

18  A    Yes, I know that document also.  I telling you that.

19  Q    And you know this document as well.

20  A    Yes.

21  Q    Okay.

22          **MR. REYNAL:**  Move to admit, your Honor.

23          **THE COURT:**  Have you shown the Government --

24          **MR. REYNAL:**  Defense Exhibit 3.13.

25  //

1          **MS. HAMPTON:**  I haven't seen it and he hasn't

2    established the foundation, your Honor.  This witness testified

3    he doesn't know about this document, that he's not on the legal

4    team.  And his name's not on this account and his name's not on

5    this company like it was on the other one.

6          **THE COURT:**  Well, he certainly knew about the one

7    yesterday --

8          **MS. HAMPTON:**  His name --

9          **THE COURT:**  -- so is it something similar?

10         **MS. HAMPTON:**  His name was on that company, your

11   Honor.

12         **MR. REYNAL:**  It is, it's the same document, your

13   Honor.  And he just testified that he knows this document like

14   he knows the other because they were documents they kept

15   (indisc.) and I have a business records affidavit for it as

16   well.

17         **THE COURT:**  Okay, what's the -- any other objection

18   from the Government?

19         **MS. HAMPTON:**  Can I have a minute to review it?

20         **THE COURT:**  Yes.

21      **(Pause from 10:01 a.m. to 10:03 a.m.)**

22         **THE COURT:**  Why don't we take our morning break?

23   It's a little bit after 10:00 so let's take about a 15-minute

24   break.

25         **THE MARSHAL:**  All rise for the jury.

1        (Jurors exit at 10:04 a.m.)

2        (Recess taken from 10:04 a.m. to 10:09 a.m.)

3        (Outside the presence of the jury)

4            THE COURT:  Before the jury or outside the jury?

5        (Judge/Clerk confer)

6            THE COURT:  So Ms. Hampton?

7            MS. HAMPTON:  I don't mind either way, your Honor.

8            THE COURT:  Okay, we can bring him in if you-all want

9    to do it now.  And she -- for the record she stated she wanted

10   to take the witness on Voir Dire.

11           MR. REYNAL:  I'm going to use the restroom real

12   quick.

13           THE COURT:  Yes, go ahead and then we can bring him

14   in, we can do it before the jury is ready.

15       (Recess taken from 10:11 to 10:13 a.m.)

16       (Outside the presence of the jury)

17           THE COURT:  Can we bring the witness -- oh, well,

18   when Ms. Hampton comes back I guess we'll bring -- need you to

19   bring the witness in also.

20           MR. MUSCHENHEIM:  I'll get him.

21           THE COURT:  'Cause we're going to question him

22   outside the jury.

23           MR. MUSCHENHEIM:  I think we'd like to, your Honor,

24   because it could be 30 minutes.

25           MR. REYNAL:  I hope they're not -- they're not going

1  to talk to the witness now before he gets back on the stand to

2  ask him  (indisc.).

3          **MR. MUSCHENHEIM:**  I'm sorry?

4          **THE COURT:**  I don't know, I don't know where he is.

5          **MR. REYNAL:**  You're not going to talk to the witness

6  about this document before he goes back on --

7          **MR. MUSCHENHEIM:**  We want to Voir Dire.  We want to

8  take him on Voir Dire.

9          **MR. REYNAL:**  But you're not going to talk about it

10  out in the hallway here.

11          **MR. MUSCHENHEIM:**  I have not spoken to him out in the

12  hallway.  I said in Spanish "excuse me, may I use the room" so

13  I could talk to the Border Patrol agent about his testimony

14  this afternoon, (indisc.) but I asked him to leave the room.

15          **MR. REYNAL:**  No, no, no, no.  That's cool.  I just

16  don't --

17          **MR. MUSCHENHEIM:**  Oh, of course not.  No, sir.  No,

18  sir.

19          **MR. REYNAL:**  I don't want any -- any appearance, we

20  don't like appearances.

21     **(Counsel confer)**

22          **THE COURT:**  Okay, Mr. Gonzalez, if you will approach

23  over here.  We're going to ask you some questions before the

24  jury comes in regarding the document.

25  //

 1              **MR. REYNAL:**  Should I hand him a copy of the

 2    document?

 3              **THE COURT:**  Sure.  And Ms. Hampton's going to -- you

 4    can let him stand here.

 5              **MS. HAMPTON:**  Is this marked as a Defense Exhibit?

 6              **MR. REYNAL:**  Yes.

 7              **MS. HAMPTON:**  Number?  What is the number, please?

 8              **MR. REYNAL:**  Up in the left hand corner.

 9              **MS. HAMPTON:**  3.13?  Is it 3.13?

10                        **VOIR DIRE EXAMINATION**

11                      **(Outside presence of jury)**

12    BY MS. HAMPTON:

13    Q    Mr. Gonzalez --

14    A    Yes?

15    Q    -- do you have the document in front of you as Defense

16    Exhibit 3.13?

17    A    Uh-huh (yes.)

18    Q    Have you ever seen that document before?

19    A    Sorry?

20    Q    Have you ever seen that piece of -- that document before?

21    A    This one?

22    Q    Yes, sir.

23    A    I have seen the original I think.

24    Q    I'm sorry?

25    A    The original in Mexico.

Gonzalez-Monterrubio - Voir Dire / By Ms. Hampton          74

1   Q    You've seen the original?

2   A    Yes.

3   Q    For that particular document?

4   A    Let me check that, all right?  Yes, this was one of the

5   companies in the firm.

6           MS. HAMPTON:  What is Exhibit Number -- where's the

7   other exhibit we had?

8           MR. SPEAKER:  It's here.  I mean --

9   BY MS. HAMPTON:

10  Q    I'm going to show you Government's Exhibit 122.  This was

11  admitted yesterday.  You've seen this document, correct, with

12  your name on it?

13  A    Yes, that's correct.

14  Q    And you've seen Defense Exhibit 3.13 in addition to

15  Exhibit 122?

16  A    I don't know the name of that one, but -- okay, this is --

17  okay, sorry, what --

18  Q    Have you seen the document that's in front of you?

19          MR. REYNAL:  Asked and answered, your Honor.

20          THE COURT:  I thought he said yes, the original.

21          THE WITNESS:  Uh-huh (yes.)

22  BY MS. HAMPTON:

23  Q    When did you see it?

24  A    When or where?

25  Q    Yes, sir.  When?

1  A    I don't know exactly the day, but this (indisc.), I want

2  to clarify that.  Every document in the -- I have company's

3  constitution, looks like the same, it looks like the same, so

4  it's so simple to say, okay, I -- I saw this document because

5  it would be the same attorney also, with the same Notary.

6  Q    Can you -- can you flip to where the annexes start in that

7  document and see if that looks familiar to you?

8  A    Uh-huh (yes.)  **(Witness reading document)**  Well, I don't

9  know who is Jose Barrio Pettatroni (phonetic), I don't --

10        Well, that one is the constitution (indisc.), the

11  company per se, and this is Anna (indisc.), I don't know what

12  is the name here.

13  Q    When you said "that one" you're referring to Exhibit 122?

14  A    That one is the constitution, the formation of the

15  company.

16  Q    Okay.

17  A    And this is an additional document.

18  Q    Have you seen that document?

19        **MR. REYNAL:**  Asked and answered, your Honor.

20        **THE COURT:**  Sustained.

21        **MS. HAMPTON:**  May I approach, your Honor?

22        **THE COURT:**  Yes.

23  **BY MS. HAMPTON:**

24  Q    I have turned to the page where it begins with Annex

25  Number 1.  Do you recognize those pages?

Gonzalez-Monterrubio - Voir Dire / By Ms. Hampton          76

1   A     Well, this is --

2   Q     Those listing of individuals?

3   A     It has the numbers of the (indisc.) in the company.

4   Q     Have you seen those pages before?

5   A     I not sure about this.  And also there are people that I

6   don't know.

7   Q     Have you seen those pages before, sir?

8   A     I not sure.  Now I not sure about this.

9   Q     Do you -- have you ever seen those pages before, sir?

10          MR. REYNAL:  Asked and answered, he said he wasn't

11   sure.

12          THE COURT:  Sustained.

13   Q     You're not sure or you don't know?

14   A     No, I -- I not sure.

15          MR. REYNAL:  Asked and answered.

16          THE COURT:  Sustained.  I'm sorry you don't like his

17   answers, but they are what they are.

18          MS. HAMPTON:  May I approach again, your Honor?

19          THE COURT:  Yes.

20          THE WITNESS:  I'm sorry.

21   Q     I'm turning to the last page, sir.  What is that page?

22   A     That's the personal information with the manager.

23   Q     Is that the day it was registered and -- with the public

24   record?

25   A     It say July 16th, 2016 I guess because it's not clear.

Gonzalez-Monterrubio - Voir Dire / By Ms. Hampton          77

1    Our -- our (indisc.) was different.

2    Q    Where were you on --

3              THE INTERPRETER:  Entry date.

4    Q    Where were you in 2016?

5    A    Here, I was living here.

6    Q    Does it appear that -- what does it appear from that last

7    page, what is that -- what does that last page say?

8    A    In Spanish I can say it, **(Speaks Spanish)**

9    Q    Okay.

10             THE INTERPRETER:  General information about the

11   representatives or the -- delegates.

12   A    Uh-huh (yes.)

13   Q    Is that -- is there a filing date for a public record on

14   that page?

15   A    Oh, I don't know.  As far as I know this look like all

16   letters -- documents in the office, but I don't have any

17   information about that.

18   Q    About what?

19   A    All this.

20   Q    About what?

21   A    Well, it is difficult to me to concern that this is

22   original document, but I didn't know about this because

23   otherwise -- how can I say this, putting that in the records of

24   the company in 2016 and I wasn't there.

25   Q    Thank you.

Gonzalez-Monterrubio - Voir Dire / By Mr. Reynal        78

1              **MS. HAMPTON:**  Your Honor, we would object.  We

2    haven't established that this is an authentic document and that

3    this witness has knowledge of this document.

4              **THE COURT:**  Okay.  Do you have any questions for the

5    witness?

6              **MR. REYNAL:**  Certainly.  Your Honor, I think what's

7    going on here is they're trying to scare him away from the

8    document, but --

9                      **VOIR DIRE EXAMINATION**

10   **BY MR. REYNAL:**

11   Q    But if you look at the front page of the document, does it

12   show when the document was done?

13   A    This document say December 16, 2011.

14   Q    Thank you very much.

15             And these were the type of documents and you said --

16             **MR. REYNAL:**  No further questions.

17             **THE COURT:**  Okay.  Anything else?

18             **MR. SPEAKER:**  Nothing.

19             **THE COURT:**  So what's the difference -- what was the

20   2016 date?  What is that?

21             **MR. REYNAL:**  The 2016 date, when you have a company

22   in Mexico, my understanding is that you have to pay taxes and

23   you have to reform the Government -- I can hand it up to your

24   Honor if you want to see it, but the document itself, which

25   includes -- in fact, I didn't have to give him this bit on the

```
 1   back, it doesn't make any difference.  The document itself has

 2   on this page with the signature of the Notary.

 3            We also have the business records affidavit if your

 4   Honor would like to see it?

 5            THE COURT:  All right.  Anything further from the

 6   Government?

 7            MS. HAMPTON:  Your Honor, this witness -- this

 8   witness is not the right witness to introduce this document.

 9   There are several parts of this document he's never seen.  He

10   said he can't verify what this document is.

11            THE COURT:  Overruled.  The Court will admit it, and

12   it's D-3.13?

13            MR. REYNAL:  Yes, your Honor.

14            THE COURT:  Okay.

15         (Defense Exhibit Number 3.13 was received in evidence)

16            THE COURT:  Is the jury ready?  You might check.

17            MR. REYNAL:  Thank you, your Honor.

18         (Counsel confers)

19         (Pause)

20            COURT SECURITY OFFICER:  They're ready, your Honor.

21            THE COURT:  All right.  Wait, let him sit down.

22            COURT SECURITY OFFICER:  All rise for the jury.

23         (Jurors enter courtroom at 10:25 a.m.)

24            THE COURT:  All right, you can have a seat and we'll

25   continue.
```

**CROSS EXAMINATION (RESUMED)**

BY MR. REYNAL:

1   Q   Mr. Monterrubio --

A   Yes?

Q   -- I know I keep doing this to you, but let me -- let me back up, I think it might make this part of the examination easier and if there's anything I say you don't understand just let me know, okay?

A   Okay.

Q   You said earlier that the cooperativas were created for a fiscal optimization.

A   Physical?

Q   Fiscal, **(Speaks Spanish)**

A   That's fine.

Q   Is that correct?

A   Well, that was the purpose I guess, yeah.

Q   Can you explain to us what that meant to you?

A   Well, as I told you before I not accountant.  I can repeat just what I was told.

Q   I want to know what it means to you, not what you were told, what it means to you based on what --

A   I don't --

      **MS. HAMPTON:**  Objection, your Honor, asked and answered.

      **THE COURT:**  Overruled.

Gonzalez-Monterrubio - Cross / By Mr. Reynal          81

1  **BY MR. REYNAL:**

2  Q    Based on -- just based on your -- everything, what does it

3  mean to you?

4  A    Well, I just want to repeat what I was told by the office

5  that this company --

6         **MS. HAMPTON:**  Objection, your Honor, calls for

7  hearsay.

8         **THE COURT:**  Sustained.

9  Q    In order to achieve this fiscal optimization did different

10 companies become members of the cooperativa?

11 A    Well, companies are not allowed to be members of this

12 cooperativa, it has to be a person.

13 Q    So individuals became part of the cooperativa?

14 A    Individuals, that's correct.

15 Q    I'm going to show you what's been -- withdrawn for a

16 second.

17         And if you were a member of the cooperativa did you

18 have to take -- could you take when you wanted to get your

19 money out of it as the member?  In other words could you say

20 "Hey, today I want to get my money" and then you would be paid

21 or it would be sent where you wanted it?

22 A    I don't know this is correct (indisc.) or with accountant

23 terms.  We used it a lot but I don't know is the right thing.

24 Q    But that's how it worked?

25 A    Sometimes.

Gonzalez-Monterrubio - Cross / By Mr. Reynal                82

1   Q    So I'm going to show you what's in evidence as Defendant's

2   3.13, okay, and this is a document related to asesoria integral

3   para su empresa sociedad cooperativa de responsabilidad

4   limitada de (indisc.).

5           **THE INTERPRETER:**  And that would be a limited

6   liability variable capital cooperative corporation.

7   Q    And just to refresh your recollection this is the same

8   company that the -- I'm sorry -- that the Government was

9   talking about yesterday, isn't that true?

10  A    I didn't see that name of the company there.

11  Q    Okay.  Does that help?

12  A    Yes, a different year.

13  Q    See, a different year.  And the document they showed you

14  yesterday was when the company was created, true?

15  A    Yes.

16  Q    And then the document I'm going to show you now contains a

17  list of all of the people who are clients of the firm for the

18  cooperativa, true?

19  A    No, it is every people who were a client of the

20  cooperativa, I cannot say that.

21  Q    Okay, these are all people who have formed part of the

22  cooperativa?

23  A    I not sure about that because I didn't prepare these

24  documents.  It was a legal area and accounting area.  I just

25  see names, but I don't remember this date physically where

Gonzalez-Monterrubio - Cross / By Mr. Reynal                83

1   (indisc.) cooperativa.

2   Q    Okay.  So do you, as you sit here today, are you saying

3   that this document didn't exist, or are you saying you don't

4   know the legal significance of all of these names?

5   A    Well, I never said it didn't exist, you have the document

6   in your hand.

7   Q    Okay.  And the first person on this is --

8   A    Uh-huh (yes.)

9   Q    -- you, right?

10  A    Yes, that's right, Uh-huh (yes.)

11  Q    Because you were one of the formers of the company, right?

12  A    Yes.

13  Q    And you were also an employee?

14  A    Well, we can say that, yes.

15  Q    Okay.  And then it goes on and it lists the names of

16  everybody else, right?

17  A    Uh-huh (yes.)

18  Q    And can you tell us what the numbers are next to the

19  person's name?

20  A    The numbers?

21  Q    Yes.

22  A    That is like IRS identification if I can say something

23  like that.

24  Q    Okay, it's like a -- what we would use a Social Security

25  number for here in the United States?

Gonzalez-Monterrubio - Cross / By Mr. Reynal          84

1  A    Yes -- well, I don't know that, but this is not a Social

2  Security number, this is a number related to tax, that's

3  (indisc.).

4  Q    And let me back up.  Whoops --

5        You would agree with me that this list of names and

6  tax ID numbers goes on for pages, doesn't it?

7  A    As I told you I don't know, it's those people who receive

8  money at that time.

9  Q    My question is you would agree with me that this document

10 goes on listing names for pages, isn't that true?

11 A    I don't know.  I cannot say that because I don't know

12 those people --

13 Q    You can't say that there are many pages of names here?

14 A    No, there are many pages of names, but I don't if they

15 received money from that account or not.

16 Q    Okay --

17 A    That was part of the accounting (indisc.).

18 Q    Because this just says that they're part of the

19 cooperativa, correct?

20 A    No.  That numbers -- it doesn't mean that they are part of

21 the cooperativa, that's mean that they received payment, but I

22 don't know if all received payment or not.

23 Q    Now let's go back to you again.

24 A    Yes.

25 Q    Okay.  It's got your name listed first.

Gonzalez-Monterrubio - Cross / By Mr. Reynal          85

1   A     Uh-huh (yes.)

2   Q     Okay, do you see that?

3   A     Yes.

4   Q     And next to that it says certificado aportacion.

5         **THE INTERPRETER:**  Certificate of contribution.

6   Q     Certificate of contribution.  And that's when you went

7   into the cooperativa, right?

8   A     That is what the document said.

9   Q     Well, you formed the cooperativa, you don't -- you're

10  saying now to this jury that you don't know how you got into

11  it?

12  A     No, I -- I already said this yesterday, I was asked to

13  create this cooperativa for the firm, so this is a legal issue

14  and a accountant issue.

15  Q     Okay.  And as we go through here it shows the amounts that

16  were paid out to people for the cooperativa, true?

17  A     That document say that.

18  Q     That was your job, wasn't it?

19  A     No.

20  Q     You didn't pay out the salaries?

21  A     Yes, but I -- it wasn't my job to control how much monies

22  one were receiving.

23  Q     Okay.

24  A     I was just disbursing the money.

25  Q     Would you agree with me that there were hundreds of people

1    who got money?

2    A    Well, no, I don't know a hundred, but a lot of people

3    received money, that's right.

4    Q    And you know that the real personal amount because you

5    sent it?

6    A    Yes, I was disbursing the money.

7    Q    Do you recognize the highlighted name?

8    A    Which one?  Ah, Silvia Beatriz Perez-Ceballos.

9    Q    Can you tell us how many -- what was that word again?

10          **THE INTERPRETER:**  Contribution.

11   Q    How many certificates of contribution she had according to

12   this document?

13   A    I don't know because it's like erased, but it look like

14   17,072.

15   Q    And can you say how much she was paid out?

16   A    How much she was paid I don't know, I can repeat the

17   number that is there.

18   Q    Okay.  But you repeated lots of numbers for the

19   Prosecutor, why don't you repeat one for me?

20   A    Sorry?

21          **MS. HAMPTON:**  Objection, your Honor, sidebar comment.

22          **THE COURT:**  Sustained.

23   **BY MR. REYNAL:**

24   Q    What number does it say there?

25   A    Yes, it's our pesos, so it's 8 million pesos **(Speaks**

Gonzalez-Monterrubio - Cross / By Mr. Reynal                87

1    **Spanish)**

2              **THE INTERPRETER:**  It's 8 million, 536,500.

3    Q    Thank you.  How many cooperativas did -- were set up by

4    Mr. Medina and Mr. Saiz-Pineda for their customers?

5    A    I don't recall exactly.

6    Q    Estimate?

7    A    Well, like -- like six, something like that.

8    Q    Six.  And they all had many, many, many, many people who

9    were getting paid out of them?

10   A    Well, not all.  There are people and some -- some have

11   less people than others.

12   Q    Okay.  Would you agree with me now that to the best of

13   your memory this fiscal optimization through cooperativas

14   involved probably more than 100 different clients?

15   A    I don't know that number.

16   Q    Okay.  Was one of the cooperativas called Investigaciones

17   y Servicios Multiples de personal en la Region (indisc.)?

18   A    It don't sounds familiar for me.  Could you repeat that

19   name again?

20   Q    Isn't it true that one of the cooperativas was called

21   Investigaciones y Servicios Multiples de personal en la Region

22   (indisc.)?

23   A    It's the company **(Speaks Spanish)** is not a cooperativa.

24   Q    Sorry, that was my mistake.  Does the name sound familiar

25   to you?

Gonzalez-Monterrubio - Cross / By Mr. Reynal                88

1   A    No, it doesn't right now familiar to me.

2   Q    How about **(Speaks Spanish)** --

3   A    **(Speaks Spanish)**

4   Q    Go ahead and say it.

5   A    No, but read the complete name, yes?

6   Q    **(Speaks Spanish)**?

7   A    Yes, that it is a cooperativa, that is correct.

8        **THE INTERPRETER:**  And the designation is (indisc.) is

9   (indisc.) capital (indisc.) corporation.

10  A    No, (indisc.).

11       **THE INTERPRETER:**  Cooperative Corporation.

12  Q    Cooperative.  And the part about (indisc.) Capital is

13  because people put -- make -- put money in and get money out,

14  the capital varies all of the time.

15  A    The capital varies all the time, but it's a legal term

16  that I don't know.

17  Q    And you're not here telling the jury that there was

18  anything illegal about that business, are you?

19  A    Define illegal.

20  Q    When you were doing it did you think it was illegal?

21  A    No, I not telling you that.  I just telling the truth.

22  Q    That's all we want to hear.

23       Mr. Espinoza, you mentioned him, I believe that when

24  Ms. Hampton first asked you about him you said you thought that

25  his company was a client?

1    A    Uh-huh (yes.)

2    Q    And then today you said that he worked with Saiz-Pineda

3    and Medina Sonda.  Which one is it?

4    A    I didn't say that word, I said that make it in Spanish

5    work with someone that means they have a relation in the

6    company with business relation.  It doesn't mean that the other

7    is both on the (indisc.).

8    Q    Okay, so you're not telling the members of the jury that

9    Mr. Espinoza was part of a company with Medina Sonda and Saiz-

10   Pineda that you know of?

11   A    I just telling that they have -- at some point a business

12   relationship with the company.

13   Q    Okay.  Medina Sonda and Saiz-Pineda with Mr. Espinoza?

14   A    Well, as far as I know, yes.

15   Q    Okay.  Could it have been that that was with

16   Mr. Espinoza's company rather than with Mr. Espinoza

17   personally?

18   A    I not sure about that.

19   Q    If we go a little bit back in time, was it common in

20   Mexico for people to purchase properties in cash?

21   A    Well, yes, sometimes it's still done.

22   Q    And that's done many times because the person who's

23   selling the property doesn't want the Government to know how

24   much they got paid for it?

25   A    I don't know the reason but it's common.

1              **MS. HAMPTON:**  Objection, your Honor, it's not in the

2    form of a question.

3              **THE COURT:**  Overruled.

4    **BY MR. REYNAL:**

5    Q    You can, just you said it was common?

6    A    No, I say that I don't know the reason.

7    Q    But?

8    A    But some people used to do that.

9    Q    Would it be fair to say that rich people in Mexico are

10   concerned about their security?

11   A    Yes.

12   Q    Poor people in Mexico are concerned about their security,

13   right?

14   A    Yes.

15   Q    Everybody in Mexico is concerned about their security?

16   A    Yes.

17   Q    Is it fair to say that rich people in Mexico care about

18   confidentiality?

19   A    I don't know why.

20   Q    Is it fair to say that in Mexico it's common to not let

21   everybody know everything you have?

22   A    You're asking if this is common?

23   Q    Uh-huh.

24   A    Yes, it's common.

25   Q    Yes, it's common, is your answer?

1    A    Yes.

2    Q    Okay.  And that's because if people know what you have,

3    they know what they can take from you, right?

4    A    Well some people have different reasons.  I don't -- I

5    cannot say is that is the main reason.

6    Q    That's one reason?

7    A    That's correct.

8         **(Pause)**

9         **MR. REYNAL:**  I'm almost done.  I'm sure you're eager

10   to get back to Illinois.

11   Q    Ms. Silvia never worked on any of these transactions with

12   you, did she?

13   A    You mean is I saw -- saw her moving the money or a

14   transaction?

15   Q    Yeah.

16   A    Well, I don't recall seeing her in the office.

17   Q    You don't recall ever seeing her in the office?

18   A    That's correct.

19   Q    Okay.  And she certainly didn't go with you to any

20   closings or buy properties with you, did she?

21   A    No, she wasn't present.

22   Q    Is Mr. Saiz a pretty intense guy?

23   A    You mean with a strong character?

24   Q    Uh-huh.

25   A    Yes, he is.

1  Q    Is he a guy who makes all the decisions?

2  A    I think he's a guy in that -- that right.

3  Q    Would it surprise you that Mr. Saiz never shared his

4  finances with his wife?

5  A    I don't know.

6  Q    Would it surprise you?

7  A    I don't think so.

8  Q    It wouldn't surprise you?

9  A    No.

10        **MR. REYNAL:**  Pass the witness.

11        **(Pause)**

12                    **REDIRECT EXAMINATION**

13  **BY MS. HAMPTON:**

14  Q    Mr. Gonzalez-Monterrubio, I'm going to show you again

15  Government's Exhibit 122.

16  A    Okay.

17  Q    You testified yesterday that you've seen this document, is

18  that correct?

19  A    That's correct.

20  Q    Whose names are on this document?

21  A    My name, Angel Gonzalez, another accountant, Eduardo

22  Arellano-Perez (phonetic), Martin Alberto Medina-Sonda, and her

23  lawyer, Reyna Marisa May Reyes (phonetic), and Karla Bayardo

24  Castillo (phonetic).

25  Q    Now I'm going to show you Defense Exhibit D313 -- D., or

1    3.13, Page 1.  What names are on this document?

2    A    Well, it's the person who was working behalf of the

3    company, Jesus Alberto Leon Ramirez.

4    Q    Have you ever seen this document before today?

5    A    Before today?

6    Q    Yes, sir.

7    A    Well it looks like several documents that we have in the

8    company.

9    Q    But have you ever seen this document?

10   A    No, no, I could say no.

11   Q    So down here, there's some names listed, right?

12   A    I notice it's in another city, it says Palenque Chiapas

13   (phonetic).

14   Q    It's in Palenque Chiapas?

15   A    Yes, it's not in Villahermosa, it's in Palenque Chiapas.

16   Q    Okay.  Is your name on this document, on the front page as

17   one of the people who started this?

18   A    No, no.

19   Q    Were you involved in Asesoria Integral Para Su Empresa?

20   A    In the Constitution of the Association (phonetic), yes.

21   Q    But your name is missing from this document, correct?

22   A    That's correct.

23   Q    Where did -- where -- what city were you involved with

24   Asesoria?

25   A    In the creation, you say?

Gonzalez-Monterrubio - Redirect / By Ms. Hampton          94

1    Q    Yes, sir.

2    A    Villahermosa.

3    Q    Have you ever seen -- I'm going to go to the page that

4    begins with an XO -- uno.  Have you ever seen these pages?

5    A    I cannot say that because that is part of the legal area

6    in the companinadia (phonetic).  It doesn't have to -- anything

7    to do with me.  I just was processing the payments of the

8    (indisc.)

9    Q    Do you know who created this document?

10   A    The legal area has to be -- did it.

11   Q    Do you know?

12   A    Well I'm not sure.  I tell you that, no.

13   Q    Do you know who created these pages with the annex on

14   them?

15   A    No.

16   Q    Have you ever seen the annex pages before?

17   A    No.

18   Q    I'm going to go to the page, it's 23 on this Exhibit, 3.13

19   Defense Exhibit.  At the top, it says 23.  Defense called your

20   attention to Ms. Perez-Ceballos' name.

21   A    Uh-huh.

22   Q    Approximately, how much in U.S. dollars is 8,500,000

23   pesos?

24        **MR. REYNAL:**  Objection, your Honor.  To the extent --

25   I mean, this is 2011.  To the extent he knows the exchange rate

1    in 2011, it's varied somewhat.

2              THE COURT:  Yeah.  I thought yesterday he says that

3    he didn't know.  Was it this witness who said he wasn't sure?

4              MR. REYNAL:  It was, your Honor.

5              MS. HAMPTON:  He's -- he said he's in banking and

6    that today the exchange -- well can I ask him about --

7              THE COURT:  No, no, my question was:  what did he say

8    yesterday about the conversion?  I thought it was this witness

9    that said he didn't know.  It is --

10             MS. HAMPTON:  He said he knew the conversion was 19

11   to 1 currently, your Honor.

12             MR. REYNAL:  He said he didn't know what it was but I

13   think he said --

14             THE COURT:  Sustained.

15             MR. REYNAL:  Thank you, your Honor.

16   BY MS. HAMPTON:

17   Q    The last page of this Exhibit, what is this saying, do you

18   know what it says?

19   A    Well that is the -- the person (indisc.) the company.

20   Q    In what state --

21   A    In Chiapas.

22   Q    -- is this supposed to be file in?

23   A    Well the company was created in Villahermosa, it has to be

24   including the (indisc.) Villahermosa but this say it's Chiapas.

25   Q    Okay.  And what state is Villahermosa in?

Gonzalez-Monterrubio - Redirect / By Ms. Hampton          96

1   A     Oh, sorry, Tabasco.

2   Q     Okay.  And so this is a different state?

3   A     That's correct.

4   Q     Were you involved at all in the formation --

5   A     No.

6   Q     -- of a company in Chiapas?

7   A     No.

8   Q     Okay.  And what is the date of this -- what is -- what is

9   that heading say up there in English?

10  A     The name?

11  Q     The heading, where it says right here?  I'm going to point

12  to it.

13  A     Public Register of the Commerce.

14  Q     And what is the date of the Public Register of the

15  Commerce for this document?

16  A     The -- it's July 12th, 2016.

17  Q     Where were you in in 2016?

18  A     Here, living here in the U.S.A.

19  Q     Where -- do you know if that was before or after Mr. Saiz-

20  Pineda was arrested?

21  A     With that day?

22  Q     Yes, sir.

23  A     That was after.

24  Q     Did you receive payments from Asesoria in the U.S. up to

25  2016?

Gonzalez-Monterrubio - Recross / By Mr. Reynal        97

1   A    No.

2   Q    Did you make payments for Asesoria up to 2016?

3   A    No.

4   Q    To your knowledge did the defendant, Ms. Perez-Ceballos,

5   have anything to do with Asesoria?

6   A    No.

7   Q    To your knowledge, did Ms. Perez-Ceballos run a consulting

8   business under the name of Asesoria?

9   A    No, I didn't know.

10  Q    To your knowledge, did Ms. Perez-Ceballos run a psychology

11  business under the name of Asesoria?

12  A    No.

13  Q    To your knowledge, did Ms. Perez-Ceballos ever conduct any

14  business out of Calle Magallanes -- Calle Sanchez Magallanes

15  1113?

16  A    No, not according to my knowledge.

17          **MS. HAMPTON:**  Pass the witness.

18                    **RECROSS EXAMINATION**

19  **BY MR. REYNAL:**

20  Q    You never had a social relationship with Mr. Saiz-Pineda,

21  did you?

22  A    Yes, that's correct.

23  Q    You never knew what his wife did or didn't do for work,

24  did you?

25  A    That's correct.

Gonzalez-Monterrubio - Recross / By Mr. Reynal          98

1  Q    That's not the kind of thing he's going to share with you,

2  is it?

3  A    I guess no.

4  Q    So the fact is Ms. Perez could have been the greatest

5  psychologist in the world and you wouldn't have known about it,

6  would you?

7  A    Yes.

8  Q    I'm going to show you 3.13 again, what we've been talking

9  about so much.

10  A    Yes.

11  Q    Is that a stamp on it from the notary that created the

12  document?

13  A    No, the document -- no, that is a notary document with --

14  they are certificating.

15  Q    Uh-huh.

16  A    They don't -- but they weren't created that document.

17  Q    So it's your testimony to this jury that you think this is

18  fake?

19  A    No, sir, I don't know.

20  Q    You don't know.  So this could have been among the

21  documents.  It looks like the documents but you just don't

22  know?

23  A    The document -- seeming like the documents in Mexico, it

24  looks like because it's the same lawyer.

25  Q    Okay.  Now, you said you were in charge of payments?

1  A    That's correct.

2  Q    Who's Marisa Reynal?

3  A    She's a lawyer in the office.

4  Q    Okay.  Would she authorize payments?

5  A    Well, no.  What happened there is you see the name of

6  Marisa is because they are -- the company who was paid was in

7  her name.

8  Q    Okay.  So I'm going to show you --

9         **MR. REYNAL:**  May I approach?

10         **THE COURT:**  Yes.

11      **(Counsel approached)**

12  **BY MR. REYNAL:**

13  Q    -- what has been marked Defendant's Exhibit 3.14 and I'm

14  going to ask you again.  Is the type of document or the

15  documents that you kept or that were kept in the office?

16  A    Yes, it looks like.

17  Q    It looks like it?  Just like the one I showed you before?

18  A    Yes.

19         **MR. REYNAL:**  Move to admit, your Honor.

20         **MS. HAMPTON:**  I'd like to take him on voir dire, your

21  Honor, and I haven't seen this document.  Can I have a minute,

22  please?

23         **THE COURT:**  Yes.

24      **(Pause)**

25         **MS. HAMPTON:**  May I take the witness on voir dire?

1      **THE COURT:**  Yes.

2                      **VOIR DIRE EXAMINATION**

3    BY MS. HAMPTON:

4    Q    Mr. Gonzalez-Monterrubio --

5    A    Yes.

6    Q    -- the document the Defense attorney just showed you, have

7    you ever seen this document before?

8    A    Well, I don't know exactly I've seen that document.  I

9    just say that it looks like the document that we have.

10   Q    Do you know if this is a true and accurate copy of this

11   document?

12   A    No.

13   Q    Do you know if this is the real document or the correct

14   document?

15   A    No.

16   Q    Do you have any knowledge about the contents of this

17   document?

18   A    No.

19            **MS. HAMPTON:**  Your Honor, I'd ask that it be

20   excluded.

21            **MR. REYNAL:**  Your Honor, he testified that this

22   document, like the other document that I showed him, was the

23   documents that they kept in the office.  You know, I think --

24   well, I won't extemporize, your Honor.

25            **THE COURT:**  And I'm --

1          MR. REYNAL:  It's admissible.  I also have a business

2    record affidavit.

3          THE COURT:  It's -- you have a business record

4    affidavit on that?

5          MR. REYNAL:  I do, your Honor.  It's in Spanish.

6          THE COURT:  Okay.  Overruled.  It's admitted.  And

7    what number is that?

8          MR. REYNAL:  It is Defense 3.14.

9          MS. HAMPTON:  May we see the business record

10   affidavit, your Honor?

11         THE COURT:  Yes.  I thought there was reciprocal

12   discovery.

13         MR. REYNAL:  There has been reciprocal discovery.

14         THE COURT:  Well, why does the Government keep saying

15   they haven't seen these records?

16         MS. HAMPTON:  Reciprocal discovery was given to us on

17   Friday last week, your Honor.

18         THE COURT:  Okay.  So you have it.  You just haven't

19   reviewed it?

20         MS. HAMPTON:  I don't know if I have it.  Sorry, I

21   don't know if I have it, your Honor.  There was a lot that was

22   turned in.

23         THE COURT:  Well, there's representations being made

24   in front of the jury.  So it's my understanding the Defense had

25   provided the documents to the Government?

Gonzalez-Monterrubio - Recross / By Mr. Reynal          102

1          **MS. HAMPTON:**  I haven't seen this document.  I

2     apologize, your Honor.

3          **THE COURT:**  Okay.  Can you look to see if that was

4     given to you?

5          **MS. HAMPTON:**  Yes, your Honor.

6          **THE COURT:**  Like now, so we can clear it up because

7     the representation appears to be that you weren't given that

8     document.  So we need to clear that up.

9          **MS. HAMPTON:**  I don't have -- it's downstairs, your

10    Honor.  The reciprocal discovery is downstairs.

11         **THE COURT:**  Well, can somebody go check on that --

12         **MS. HAMPTON:**  Yes, your Honor.

13         **THE COURT:**  -- so we can clear that issue up?

14         So that's admitted -- or she wants to see the

15    business records affidavit.

16         **MR. REYNAL:**  If you like, I could move on to

17    different document and we can get it over lunch.

18         **THE COURT:**  Yes, that's fine.  Yes.

19         **MR. REYNAL:**  That way we keep moving.

20         **THE COURT:**  Yes.

21                    **RECROSS EXAMINATION (RESUMED)**

22    BY MR. REYNAL:

23    Q    You said you work in finances?

24    A    (No audible response)

25    Q    Okay.  I'm going to hand you what's been marked as Defense

Gonzalez-Monterrubio - Recross / By Mr. Reynal          103

1   Exhibit D3.9 and ask you if you recognize that.

2   A    This is an accountant document.  I think it's an analytic

3   of payment but this is not -- I don't used to handle this

4   document.

5   Q    How about the documents that are attached?

6   A    Those are wires transfer, uh-huh.

7        THE INTERPRETER:  Your Honor, the interpreter is

8   having difficulty hearing the witness.

9        THE COURT:  Okay.

10        THE INTERPRETER:  If he could move closer to the

11   microphone.

12        THE COURT:  If you can speak up.

13        Right, you need him to speak up?

14        THE INTERPRETER:  Yes, your Honor.  Thank you.

15        THE WITNESS:  Those are wire transfer.

16   BY MR. REYNAL:

17   Q    Do you recognize those as the records that were kept in

18   the offices on Sanchez Magallanes?

19   A    Yes -- well, those are the documents that we used to kept

20   for the transfers.

21   Q    And do they appear to be true copies of the ones that were

22   kept in the office?

23   A    Okay.  Yes.  That's good.

24        MR. REYNAL:  Move --

25        MS. HAMPTON:  No objection, your Honor.

1          **THE COURT:**  It's admitted.

2          And, Mr. Reynal, when you approach the witness, if

3    you can just speak up because you're not at a mike there.  So

4    the record can be --

5          **MR. REYNAL:**  I'm sorry.  I apologize.

6          **THE COURT:**  -- it's more for the record.

7          **(Defense Exhibit Number 3.9 was received in evidence)**

8    **BY MR. REYNAL:**

9    Q    I'm going to show you what's in evidence as Defense 3.9

10   and ask you if this chart shows payments that were made to

11   Silvia Beatriz Perez-Ceballos as part of the Cooperativa

12   Aseoria Integral Para Su Empresa.

13   A    So were you asking me something?  Sorry, I was --

14   Q    Yes.  My question was, does this chart show payments that

15   were made to Ms. Silvia Perez-Ceballos by Asesoria Integral

16   Para Su Empresa?  Does it show that?

17   A    Yes, in a period of 2010, January to December.

18   Q    Okay.  And that is money that is being taken out of the --

19   that is Ms. -- represents getting the money out that belongs to

20   Ms. Perez, right?

21   A    I don't if that money belongs to her but that money was

22   transferred to her.

23   Q    Okay.  Well, it appears she was a client of the

24   Cooperativa or an employee, right?

25   A    No.  Even people without any relation used to receive also

Gonzalez-Monterrubio - Recross / By Mr. Reynal          105

1    money through this.

2    Q    Well, we've seen the documents in evidence that show that

3    she was part of the Cooperativa, haven't we?

4    A    Well, the document that you showed me --

5    Q    Okay.

6    A    -- it shows that she was receiving money from the

7    Cooperativa.

8    Q    Okay.  And the documents I showed you earlier --

9    A    Uh-huh.

10   Q    -- showed that she was part of the Cooperativa, didn't

11   they?

12   A    Well, I -- yes, she was there.  That's correct.

13   Q    Okay.  And so this shows that she got out 8 million and

14   some-odd pesos, right?

15   A    Yes.

16   Q    And the documents that follow reflect how those were paid

17   out and we can see that in each one of them --

18   A    Uh-huh.

19   Q    -- they're getting paid out to HSBC, correct?

20   A    That's correct.

21         **MR. REYNAL:**  May I approach, your Honor?

22         **THE COURT:**  Yes.

23         **(Counsel approached)**

24   Q    I'm going to show you what's been marked as Defense

25   Exhibit D. -- D3.21 and ask you if you recognize that document

Gonzalez-Monterrubio - Recross / By Mr. Reynal          106

1   to be like the document I just showed you.

2   A    I just want to give you completely but those are

3   transfers.  That's correct.

4   Q    And these were the types of documents -- or these are the

5   documents that you guys kept in the regular course of business

6   when you worked in Mexico?

7   A    Yes, that's correct.

8          **MS. HAMPTON:**  No objection, your Honor.

9          **THE COURT:**  Okay.  What number is that?

10         **MR. REYNAL:**  Defense 3.21.

11         **THE COURT:**  It's admitted.

12         **(Defense Exhibit Number 3.21 was received in evidence)**

13  **BY MR. REYNAL:**

14  Q    And this is a summary of what?

15  A    Well, this is an accountant report summarizing the payment

16  that she received in a period of January 2011 to December 2011.

17  Q    Okay.  And the payments occur roughly monthly?

18  A    I don't know.  No, they skip February, March, April and

19  they start with January, May, June and --

20  Q    And this will show that she made 8,101,790 pesos?

21  A    It shows that she received that amount of money.  That's

22  correct.

23  Q    In 2011?

24  A    Yes.

25  //

1  Q    As a result of her participation in the Cooperativa?

2  A    I don't know.  I just have to say that she received that

3  money from the Cooperativa.

4  Q    Okay.  Doesn't that indicate to you that she was part of

5  the Cooperativa?

6  A    Yes.

7  Q    I'm going to show you what's been marked as Defense

8  Exhibit D3.22.  Is this document like the last two that I

9  showed you, the types of regular records that were kept by the

10  office and that you worked with?

11  A    Yes, it's similar.

12          **MS. HAMPTON:**  No objection, your Honor.

13          **THE COURT:**  It's admitted.

14      **(Defense Exhibit Number 3.22 was received in evidence)**

15  **BY MR. REYNAL:**

16  Q    Would you agree that this one summarizes payments for the

17  year of 2012?

18  A    Yes.

19  Q    And she made, again, about 8 million pesos?

20  A    Yes.

21  Q    Mr. Monterrubio, you have a criminal defense attorney,

22  don't you?

23  A    Sorry?

24  Q    You have a criminal defense attorney?

25  A    Yes.

1  Q    Okay.  You have a criminal defense attorney because you

2  want your rights to be protected?

3  A    Yes.

4  Q    Okay.  You want a criminal defense attorney because you

5  want them to be able to have good agreements with the

6  Government?

7  A    No.

8  Q    No?

9  A    Just to protect my rights.

10 Q    You don't want your defense attorney to help you out with

11 the Government?

12 A    No, I just asked my defense attorney to protect my rights.

13 He knows how he had to do.

14 Q    You certainly wouldn't want to be sitting where Silvia is

15 sitting, would you?

16 A    Sorry?

17 Q    You wouldn't want to be sitting where Silvia is sitting,

18 would you?

19 A    I try to avoid to see anyone.  I just focuses on the

20 questions.

21 Q    Okay.  You certainly wouldn't want to be sitting where

22 Silvia is sitting, would you?

23 A    Nobody wants to be there.

24 Q    Okay.  And you don't want to be sitting back in Mexico

25 either, do you?

1    A    Yes, no.

2    Q    And you know that Ms. Hampton could make you sit in that

3    chair, don't you?

4    A    Yes, I know.

5          **MS. HAMPTON:**  Object, your Honor, argumentative.

6          **THE COURT:**  Sustained.

7    **BY MR. REYNAL:**

8    Q    And you believe that Ms. Hampton could make you sit in

9    Mexico if she wanted to, too, don't you?

10   A    Yes, I believe I don't know that.  No.

11         **MR. REYNAL:**  No further questions.

12                    **FURTHER REDIRECT EXAMINATION**

13   **BY MS. HAMPTON:**

14   Q    Mr. Gonzalez-Monterrubio --

15   A    Yes.

16   Q    -- you were just shown exhibits for the years of 2010,

17   2011 and 2012; is that correct?

18   A    That's correct.

19   Q    During those years, it appears from those documents that

20   Ms. Silvia Perez-Ceballos made approximately how much in pesos?

21   A    About 25 millions.

22   Q    Pesos, correct?

23   A    Yes, pesos.

24   Q    Do you know what Ms. Perez-Ceballos did to earn 25 million

25   pesos --

Gonzalez-Monterrubio - Redirect / By Ms. Hampton          110

1   A    No.

2   Q    -- in 2010, 2011 and 2012?

3   A    No, I don't know.

4   Q    Do you know -- during those years, was her husband in

5   public office at that time?

6   A    Yes, yes.

7   Q    Do you know what Ms. Perez-Ceballos did before 2010 to

8   earn income?

9   A    No.

10  Q    Do you know what Ms. Perez-Ceballos did after 2012 to earn

11  income?

12  A    No.

13  Q    Do you know where that 24 -- 25 million pesos came from --

14  where that money came from?

15  A    Well, at this moment, I don't recall.  No.

16  Q    Thank you.

17        MS. HAMPTON:  I pass the witness.

18        THE COURT:  Anything further for the witness?  Can

19  the witness be excused then, from the Government?

20        MS. HAMPTON:  Yes, your Honor.

21        THE COURT:  From the Defense?

22        MR. REYNAL:  Yes, your Honor.

23        THE COURT:  All right.  Thank you, sir.  You can step

24  down.  You're free to leave the courthouse.

25  //

1          **THE WITNESS:**  Thank you.

2      **(Witness excused)**

3          **THE COURT:**  So the Government's next witness?

4          **MS. HAMPTON:**  Elizabeth Gutierrez, your Honor.

5          **THE COURT:**  She can approach.

6          You can approach, ma'am, right over here.  Watch the

7  slope there.  If you'll raise your right hand.

8      **ELIZABETH GUTIERREZ, GOVERNMENT'S WITNESS, SWORN**

9          **THE CLERK:**  Thank you, ma'am.

10         **THE COURT:**  You can have a seat right here.  And just

11  be sure to speak up, if you need to bring the mike up closer.

12         **MR. MAGLIOLO:**  May we have just one moment, your

13  Honor?

14         **THE COURT:**  Yes.

15     **(Pause)**

16         **MS. HAMPTON:**  May I proceed, your Honor?

17         **THE COURT:**  Yes.

18                    **DIRECT EXAMINATION**

19  **BY MS. HAMPTON:**

20  Q    Will you state your name, please?

21  A    Elizabeth Gutierrez.

22  Q    How are you employed?

23  A    I'm a special agent with the DEA.

24  Q    How long have you been with the DEA?

25  A    Approximately ten years.

Gutierrez - Direct / By Ms. Hampton                    112

1   Q    Were you involved in a search of a residence this year in
2   New York City?
3   A    I was.
4   Q    Approximately what day was that?  Do you remember?
5   A    I don't remember the exact date but it was in May of this
6   year.
7   Q    Okay.  And where was the -- what was the residence?  Do
8   you remember?
9   A    It was 255 East 74th Street, a condo in the building.
10  Q    In New York City?
11  A    Yes, ma'am.
12  Q    Okay.  How were you able to participate in a search of
13  that residence?
14  A    There was a search warrant signed for us to enter the
15  condo.  We also spoke with the building manager who let us in.
16  Q    When you -- can you tell us -- when you entered the
17  apartment or the condo in New York City, what did you observe?
18  A    It was a furnished condo.  There were sofas, tables,
19  artwork, a fully furnished kitchen.  All the amenities were
20  inside of the apartment.
21  Q    Did you identify documents that were found during that
22  search warrant?
23  A    I did.  There was mail that was left on a table as you
24  entered the apartment in the hallway.
25  Q    Did it appear as if anyone had lived in that apartment?

1  A    Um, it seemed that at some point in time, yes.  There was

2  clothes in the closet and there was living room furniture,

3  kitchen utensils and so forth.

4  Q    Can you describe the clothing in the closet?

5  A    There were a couple of pieces that were hanging.  There

6  was also women and men's clothing in the drawers.

7  Q    And in the closet, was it women's or men's clothing?

8  A    From what I recall, they were both, a couple pieces of

9  women and a couple pieces of men's clothing.

10 Q    And was that the closet of which room?

11 A    There were three separate rooms.  I'm not exactly sure

12 which one was designated as a master bedroom and so forth but

13 it was in one of the three rooms that was in the apartment.

14         MS. HAMPTON:  Your Honor, I move to admit Exhibit 109

15 at this time as the documents uncovered during the search

16 warrant.

17         MR. MAGLIOLO:  Could I see it, your Honor?

18         THE COURT:  Yes.

19         MR. MAGLIOLO:  No objection, your Honor.

20         THE COURT:  It's admitted.

21      (Government's Exhibit Number 109 was received in evidence)

22         MS. HAMPTON:  May I publish to the jury, your Honor?

23         THE COURT:  Yes.

24 //

25 //

1    BY MS. HAMPTON:

2    Q    Okay.  This is Page 1 of Exhibit 109.  What is this?

3    A    This was a receipt for clothing for dry cleaning.

4    Q    And whose name is the receipt in?

5    A    Enrique Marichal.

6         MS. HAMPTON:  Can we go to Page 3, please?

7    Q    What is this?

8    A    It's a receipt or paperwork from a prescription plan.

9    Q    Under what last name?

10   A    Saiz.

11   Q    Thank you.

12        MS. HAMPTON:  Can we go to Page 7, please?

13   Q    What is this?

14   A    This looks like some sort of a reservation for a Disney

15   cruise of some sort.

16   Q    And whose name is it in?

17   A    Jose Perez-Ceballos.

18   Q    Is it Celso Jose?

19   A    Yes, Celso Jose.

20   Q    Okay.

21        MS. HAMPTON:  Page 9, please.

22   Q    What is this?

23   A    The same.  There were multiple pages of the Disney Cruise

24   Line reservations.  This one's under Mrs. Silvia Beatriz Perez-

25   Ceballos.

Gutierrez - Direct / By Ms. Hampton                    115

1   Q    What is the date for this document, please?

2   A    This is June 12th, it looks like.  Issued the 20 -- June

3   12th.  The 20th of June, 2012.

4   Q    Okay.

5        MS. HAMPTON:  Page 15, please.

6   Q    What is this?

7   A    This was an envelope that was also in the mail that we

8   found for Mr. Enrique Marichal.

9   Q    Under the address of 255 East 74th Street, Apartment 28B?

10  A    Yes, ma'am.

11       MS. HAMPTON:  I pass the witness.

12       MR. MAGLIOLO:  No questions, your Honor.

13       THE COURT:  All right.  Can this witness be excused

14  then, Counsel?

15       MS. HAMPTON:  Yes, your Honor.

16       THE COURT:  No objection from the Defense either?

17       Thank you, ma'am.  You can step down.  You're free to

18  leave the courthouse.

19       THE WITNESS:  Thank you, Judge.

20     (Witness excused)

21       MS. HAMPTON:  They're bringing the witness, your

22  Honor.

23       THE COURT:  Okay.  Who's your next witness?

24       MS. HAMPTON:  Mr. Dobbs.

25     (Pause)

Dobbs - Direct / By Ms. Hampton                    116

1        **THE COURT:**  Sir, good morning.  You can approach over

2   here.  Watch the slope here as you come up.

3        Good morning.  If you'll raise your right hand,

4   please.

5               **JUSTIN DOBBS, GOVERNMENT'S WITNESS, SWORN**

6        **THE COURT:**  You can have a seat.

7                        **DIRECT EXAMINATION**

8   **BY MS. HAMPTON:**

9   Q    Good morning.  Will you --

10  A    Good morning.

11  Q    Sorry.  Will you introduce yourself to the jury, please?

12  A    Yes.  Good morning.  My name is Justin Dobbs, D-O-B-B-S.

13  Q    How are you employed, sir?

14  A    U.S. Department of State, Diplomatic Security Service.

15  Q    What are your duties with the Diplomatic Security Service?

16  A    I'm a special agent with the State Department.  We

17  investigate passport and visa fraud crimes.  We provide

18  security at embassies and consulates overseas, as well as

19  provide protection for the Secretary of State.

20       **MR. MAGLIOLO:**  Your Honor, at this time we're going

21  to object, and perhaps we should do this outside the presence

22  of the jury, 404(b), your Honor.

23       **THE COURT:**  Okay.  Let's take about a ten-minute

24  break and we'll proceed.

25       **THE MARSHAL:**  All rise for the jury.

1          **(Jurors exit courtroom at 11:22 a.m.)**

2                  **THE COURT:**  Go ahead.

3                  **MR. MAGLIOLO:**  Okay.  Judge, if they're going to go

4      into (indisc.) is a separate offense, which they haven't given

5      us notice of, your Honor.  I don't know what --

6                  **THE COURT:**  Okay.  Well, I guess let's find out what

7      the purpose of this witness -- I'm looking for it on -- I'm

8      looking for him.  I see some other diplomatic security

9      service --

10                 **MS. HAMPTON:**  We had problems with those witnesses.

11                 **THE COURT:**  Okay.  So it's not -- that's fine.

12                 **MS. HAMPTON:**  It's the same person -- or, same

13     company, your Honor.

14                 **THE COURT:**  Okay.

15                 **MR. MAGLIOLO:**  We fully understand that.  We --

16                 **THE COURT:**  Okay.  Yeah, I just couldn't find him, so

17     I was trying --

18                 **MR. MAGLIOLO:**  We fully understand that that happens

19     with that type of witness, your Honor.

20                 **THE COURT:**  So, I guess, what's the purpose or what's

21     the government presenting this witness for?

22                 **MS. HAMPTON:**  Statements that this Defendant,

23     Mr. Saiz-Pineda, and her brother made to the U.S. government in

24     their visa applications regarding their employment, their

25     income, and their addresses, your Honor.

1           **MR. MAGLIOLO:**  And that would be visa fraud, your

2     Honor, and we object to it.

3           **MS. HAMPTON:**  It's intrinsic --

4           **MR. MAGLIOLO:**  That's 404(b) and we have no notice of

5     it.

6           **MS. HAMPTON:**  We would argue that it's intrinsic to

7     the crime and it's -- this is part of a pattern that she

8     conducted in this case, as far as her and her co-conspirators,

9     giving materially false information at --

10          **THE COURT:**  How is it intrinsic to the offense, I

11    guess?

12          **MS. HAMPTON:**  It's important in the timeline, your

13    Honor.  In 2011 these statements were made to the visa -- to

14    the U.S. authorities regarding their visas.  And it's in the

15    middle of when they're making other statements to banking

16    authorities.  And then, other statements regarding their income

17    to the bank -- to the banks and to company records, et cetera,

18    your Honor.

19          **THE COURT:**  Okay.

20          **MR. MAGLIOLO:**  Completely different opinion, your

21    Honor.  The time it -- and she also says it's for a pattern.

22    It's not admissible for a pattern, your Honor.

23          **THE COURT:**  Pattern, I'm a little more leery about.

24    That's why I'm trying to figure out, how is it intrinsic.

25          **MS. HAMPTON:**  It's -- it's statements that --

1          **THE COURT:**  I'm going to let them argue then as to --

2    respond to the government's arguments regarding how it's

3    intrinsic to --

4          **MR. REYNAL:**  Your Honor, I fail to see how this is

5    intrinsic to any kind of a money laundering or bank fraud

6    conspiracy, or even intrinsic to, you know, public corruption.

7    I mean, the -- the relationship between a statement that's made

8    on a visa application, what the prosecutor's trying to do is

9    show that these people lied on the visa application, so they

10   must have lied here, so they must have lied there.  And that's

11   exactly the kind of pattern evidence that Rule 404 prohibits.

12         So, I mean, part one is, you can't get into that

13   evidence, even if you do give notice.  Right?  Pattern,

14   character, those types of evidence, other bad acts evidence

15   just doesn't come in under the rule.  Under (b)(2), had they

16   given notice that they were going to use it for some other

17   purpose, then maybe they could have gotten into, but they

18   didn't give notice.  And that's their default.

19         So, you know, we think, number one, it's -- it's

20   pattern evidence and, therefore, should be excluded; and number

21   two, it doesn't go to show identity, absence of mistake, any of

22   the kind of things that are listed in 404(b)(2).  We haven't

23   been given notice of it.  It's not intrinsic to the events

24   because it wasn't given to a bank or a financial institution or

25   anything else.  So we object.

1          **MS. HAMPTON:**  Your Honor, it's intrinsic to the

2     crime, but for their ability to obtain these visas and enter

3     the U.S., many of the transactions that occurred in the U.S.,

4     many of the real properties, many of them -- just the money

5     laundering transactions, which is many purchases of assets

6     could not have occurred.

7          The time period that they made the statement is very

8     important because it's very inconsistent with other statements

9     that they've made to various other authorities, your Honor.

10         **THE COURT:**  The Court's going to sustain the

11    objection at this time.  If you-all want to do some further --

12    we can address it further.  I just don't see how it's intrinsic

13    to the offenses before the Court at this time.

14         **MR. REYNAL:**  Thank you, your Honor.

15         **THE COURT:**  So, for purposes -- for now, the Court's

16    not going to allow this witness to testify.

17         Okay.  Do you have another witness?

18         **MS. HAMPTON:**  Yes, your Honor.

19         **THE COURT:**  Who's your next witness?

20         **MS. HAMPTON:**  Mr. Espinosa.

21         **THE COURT:**  Okay.  We can go ahead and bring him in

22    the courtroom.  Sir, you can step down.  You might check with

23    the government to be sure you can leave.

24     **(Witness excused)**

25         **THE COURT:**  All right.  Let's bring -- oh, has it

1    been ten minutes?  If they're ready, we're ready.

2         **THE MARSHAL:**  It's about ten.

3         **THE COURT:**  Okay.

4    **(Pause)**

5         **THE MARSHAL:**  All rise for the jury.

6    **(Jurors enter courtroom at 11:30 a.m.)**

7         **THE COURT:**  All right.  You can have a seat.

8         The government's next witness?

9         **MS. HAMPTON:**  Antonio Espinosa.

10        **THE COURT:**  Good morning, sir.

11        **MR. ESPINOSA:**  Good morning.

12        **THE COURT:**  You can approach over here.  Watch the

13   slope there.  And if you'll please raise your right hand.

14              **ANTONIO ESPINOSA DE LOS MONTEROS LEAL,**

15               **GOVERNMENT'S WITNESS, SWORN**

16        **THE COURT:**  You can have a seat.

17        **MS. HAMPTON:**  May I proceed, your Honor?

18        **THE COURT:**  Yes.

19                   **DIRECT EXAMINATION**

20        **(Testimony translated through interpreter)**

21   BY MS. HAMPTON:

22   Q    Will you state your name, please?

23   A    (No audible response)

24   Q    Will you state your name, please?

25   A    Antonio Espinosa De Los Monteros Leal.

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    122

1    Q    How are you employed, sir?

2    A    I'm a businessman.

3    Q    Where do you live?

4    A    Presently, in Miami.

5    Q    Do you know Jose Manuel Saiz-Pineda?

6    A    Yes.

7    Q    How do you know him?

8    A    I met him 15 years ago through my daughter's school.  And

9    the relationship is through his second daughter and -- who is a

10   friend of my first daughter.  And the friendship really is

11   theirs, the girls, and then through the women as well, girl's

12   mother and Silvia -- a group of women.

13   Q    Your wife and Ms. Perez-Ceballos are friends?

14   A    That's right.

15   Q    And are you friends with Mr. Saiz-Pineda?

16   A    Yes.

17   Q    Do you know Mr. Martin Medina-Sonda?

18   A    No.

19   Q    Were you -- do you have -- do you conduct business with

20   Mr. Saiz-Pineda, or have you conducted business with Mr. Saiz-

21   Pineda in Mexico in the past?

22   A    I'm sorry, I didn't hear the question.

23   Q    Have you conducted business with Mr. Saiz-Pineda in Mexico

24   in the past?

25   A    No.

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    123

1  Q    Have you ever worked with Mr. Saiz-Pineda in any capacity?

2  A    If I've worked with him?

3  Q    Yes, sir.

4  A    No, I've never worked at all with Mr. Saiz-Pineda.

5  Q    Did you ever have contracts with Mr. Saiz-Pineda or were

6  you ever a client with Mr. Saiz-Pineda?

7  A    I've never been a client of Mr. Saiz-Pineda's.

8  Q    Did you ever visit Mr. Saiz-Pineda in his office in

9  Mexico?

10 A    On two occasions in his office.  But which office are you

11 referring to, the one in the government or after the

12 government?

13 Q    Which one have you visited?

14 A    I have never visited him in his accounting offices.  I

15 don't know those offices at all.  Never been there.

16 Q    You mentioned Mr. Saiz-Pineda was in government.  Do you

17 know when he was in government?

18 A    Yes.

19 Q    When was that?

20 A    From 2007 to 2012.

21 Q    During that time period, did you have a business in

22 Mexico?

23 A    During that period and prior to that, yes.

24 Q    What is your business in Mexico?

25 A    I have many companies.

1  Q    Can you tell us about your companies, please?

2  A    Sure.  The main business is -- we have 250 supermarkets.

3  Q    What are those called?

4  A    Abarrotes Monterrey.

5  Q    Anything else?

6  A    Yes.  We're the main suppliers of fuel, of gasoline in the

7  State of Tabasco.

8  Q    Do you have -- or, did you, during Mr. Saiz-Pineda's time

9  in office, have contracts through your companies with the

10 government of Tabasco?

11 A    Two of my companies have a contract with the government of

12 Tabasco.

13 Q    Which companies?

14 A    One was a car rental company, and the gas stations, the

15 supplier of fuel.

16 Q    During Mr. Saiz-Pineda's time in office, did you have

17 contact with him regarding your contracts that you had with the

18 State of Tabasco?

19 A    I didn't understand the question.

20 Q    Between 2007 and 2012, did you have contract -- contact

21 with Mr. Saiz-Pineda regarding your contracts in the State of

22 Tabasco?

23 A    If I had communication with him about contracts?  Not at

24 all.  He -- he wasn't involved in contracts at all.

25 Q    Did you have contact with him while you had contracts

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    125

1    during that time period?

2    A    Yes.

3    Q    Can you tell us how you had contact with him?

4    A    It was difficult to have to go through somebody that was

5    under supervision.  And I met with him -- or, saw him

6    sometimes -- ten, twelve times at most.

7    Q    During that time period, what percent of your annual

8    income came from your contracts with Tabasco?

9    A    Two percent, approximately -- 2 to 3 percent.

10   Q    How much money is 2 to 3 percent, approximately?

11   A    $300 million is the average annual revenue for my company.

12   So that would be 10 to 12 million, approximately.

13   Q    Annually?

14   A    Yes, annually.

15   Q    Do you currently have contracts with the State of Tabasco?

16   A    Yes.

17   Q    Did you -- do you sign a term, like a time period for

18   contracts with the state?

19   A    Yes.  Well, in fact, it's the people there who handle for

20   each company the contracts, they do that, but it's for three or

21   four months at a time.

22   Q    Do you sign -- did you sign a contract for a five-year

23   contract with the State of Tabasco?

24   A    No.  I've never had a five-year contract with the State of

25   Tabasco.  They're either annual or quarterly contracts, and

1   they're renewed.

2   Q    Do you have contracts with any other state in Mexico,

3   other than the State of Tabasco?

4   A    Present, only Tabasco.

5   Q    During Mr. Saiz-Pineda's time in office, between 2007 and

6   2012, did you have contracts with any other state in Mexico,

7   other than Tabasco?

8   A    Contracts?

9   Q    Yes, sir.

10  A    No.

11  Q    During Mr. Saiz-Pineda's time in office, did you own some

12  aircraft?

13  A    Yes.

14  Q    What are the tail numbers of those aircrafts -- of those

15  airplanes?

16  A    XAKBL and XAKBA.

17  Q    XAKBL and XAKBA; is that correct?

18  A    KBA and KBL.

19  Q    Okay.  Who do those aircraft belong to?

20  A    To one of my companies.

21  Q    At any time during Mr. Saiz-Pineda's time in office, did

22  you permit him to use those aircraft?

23  A    Yes.

24  Q    Why?

25  A    Public relations.

1    Q    What do you mean by "public relations"?

2    A    Public relations with the government or with businessmen,

3    with people who would use it.

4    Q    What do you mean "public relations" -- "public relations

5    with the government"?  What does that mean to you?

6    A    To have good relations with them.

7    Q    What types of things would you do to have good public

8    relations with the government?

9    A    No.  During -- during that time, I mean, just recently I

10   got a request from one of the people who work for the

11   government asking for three trucks with food to help with the

12   problems that resulted from the earthquakes, those kinds of

13   things.

14   Q    Do you -- do you consider the use of your aircraft a gift

15   to Mr. Saiz-Pineda or another government official?

16   A    No.

17   Q    What do you consider --

18   A    No, merely public relations for him and for all of the

19   ones who use it.

20   Q    Did you require payment for the use of your aircraft?

21   A    No.

22   Q    Did you require payment for the expense of fuel for your

23   aircraft?

24   A    I didn't understand the question.

25   Q    Who paid for the fuel?

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    128

1   A    I did.  My company.  My company did, personally paid for

2   it.

3   Q    Can you tell -- can you give the jury an idea of how much

4   it costs in fuel to fly your plane from Tabasco to, let's say,

5   Texas and back?

6   A    Fuel in Mexico is a lot cheaper than it is here in the

7   United States.  It's twice as expensive here.  So in local

8   currency, 70,000 pesos, in Mexican pesos, in local currency.

9   Q    Is that one way or roundtrip?

10  A    It's roundtrip.

11  Q    And do you know what that is in approximate U.S. dollars?

12  A    Three thousand five hundred or $4,000.

13  Q    How often -- or, how many times approximately do you

14  remember allowing Mr. Saiz-Pineda to use your aircraft?

15  A    A number of times.  Quite a few times.

16  Q    Approximately how many?

17  A    More than 30, 40.  I don't know.

18  Q    Did you allow members of Mr. Saiz-Pineda's family to use

19  your aircraft?

20  A    Yes.  I imagine he wasn't traveling alone.

21  Q    What family members of Mr. Saiz-Pineda did you allow to

22  use your aircraft?

23  A    I didn't review that.  I didn't notice who would get on

24  the plane, but I would imagine that his family -- his wife, his

25  daughters.

1  Q    Did Mr. Saiz-Pineda use your aircraft for business

2  purposes?

3  A    No.

4  Q    What did he use it for?

5  A    Pleasure trips.  To visit his family.

6  Q    What are the differences between your two aircraft?

7  A    The motor, one was larger than the other.  That was all.

8  Q    Do you use each aircraft for a different purpose?

9  A    I only have one now, today.

10 Q    At that time when you had two, did you use each aircraft

11 for a different purpose?

12 A    For the same.  It was a company, really.

13 Q    Did you use your aircraft -- did you rent -- did you allow

14 people to rent your aircraft for use?

15 A    The idea actually was to lease it or rent it for use with

16 the governments -- with all governments, not just for the

17 government of Tabasco.

18 Q    Did you -- did you make Mr. Saiz-Pineda rent your aircraft

19 or pay for the use of your aircraft?

20 A    No.

21 Q    Why not?

22 A    Public relations.

23 Q    What other types of public relations did you do for

24 Mr. Saiz-Pineda?

25 A    None.

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    130

1   Q    Were there -- did Mr. Saiz-Pineda provide his own pilots

2   for your aircraft or did you provide the pilots?

3   A    No.  The company has its own pilots because it's

4   registered as an airline.  It has to have its own pilots,

5   really like an airline.

6   Q    Who pays the pilots?

7   A    The company does.

8   Q    Whose company is that?

9   A    Mine.

10  Q    So who pays the pilots?

11  A    Well, the company does.  The company does, but the company

12  belongs to me, so I pay.  I pay the pilots.

13  Q    Did Mr. Saiz-Pineda -- do you know if Mr. Saiz-Pineda

14  relayed to others that he employed those pilots; that they

15  worked for him?

16  A    I didn't understand the question.

17  Q    Do you know whether Mr. Saiz-Pineda stated that he

18  employed those pilots?

19  A    No.

20  Q    You don't know that he said that?

21  A    No.

22        MR. REYNAL:  Objection, your Honor; assumes facts not

23  in evidence.

24        THE COURT:  Overruled.

25  Q    Do you know where Mr. Saiz-Pineda would use the planes to

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    131

1    fly?

2    A    I think that the most frequent place was Miami.

3    Q    Where else would he use it?

4    A    What I remember is Miami.  I don't know if there were

5    other places further north, but from what I remember, Miami was

6    the destination.

7    Q    Do you know Silvia Beatriz Perez-Ceballos?

8    A    Yes, I know -- I know her, his wife.

9    Q    Do you see her in the courtroom?

10   A    I was seeing her before from the back and I see her now

11   facing me.

12        **MS. HAMPTON:**  Your Honor, may the record reflect the

13   witness has identified the Defendant?

14        **THE COURT:**  The record will so reflect.

15   **BY MS. HAMPTON:**

16   Q    Did you allow Ms. Perez-Ceballos to use your aircraft?

17   A    I didn't hear.

18   Q    Did you permit Ms. Perez-Ceballos to also use your

19   aircraft?

20   A    I would loan it to her husband.  I don't know if she went

21   by herself or -- but, of course, I expect she would travel

22   with.

23   Q    Do you -- did you allow Ms. Perez-Ceballos to use it alone

24   when Mr. Perez -- when Mr. Saiz-Pineda wasn't traveling with

25   her?

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    132

1    A    Oh, yes, of course.  When he asked -- if he asked me, yes,

2    I would.  She never asked.

3    Q    Why did you allow that?

4    A    He would ask -- Jose Saiz-Pineda would ask me, "Could you

5    do me this favor?"  And I would say, "Go ahead."

6    Q    He asked you for a favor?

7    A    I asked him or he asked me?

8    Q    Did you say that Mr. Saiz-Pineda asked you for a favor?

9    A    Well, he would ask me, "Could you loan me the airplane?"

10   "Go ahead," I would say.

11   Q    You testified it was, I think you said 30 to 40 times that

12   you remember that you let Mr. Saiz-Pineda use your aircraft; is

13   that correct?

14            **MR. REYNAL:**  Object to the leading, your Honor.

15            **THE COURT:**  Overruled.

16   Q    Is that correct, sir?

17   A    Yes.

18   Q    Do you know approximately how much fuel you paid for in

19   those 30 to 40 times?

20   A    Well I didn't run the numbers but it's quite a bit.

21   Q    What type of maintenance has to be done to the aircraft

22   when you fly it around or how often does it have to be done?

23   A    No -- well, at a minimum, every six months.  You have to

24   -- if you're going to have them operational under the

25   regulations governing the airline.

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    133

1  Q    How much does that cost to maintain the aircraft every six

2  months?

3  A    The maintenance?

4  Q    Yes, sir.

5  A    Forty thousand or 50,000.  It depends on the age of the

6  aircraft and the kind of maintenance that's required.

7  Q    Dollars or pesos, sir?

8  A    Dollars.

9  Q    Forty to $50,000 every six months?

10  A    Yes.

11  Q    Did Mr. Saiz-Pineda help you pay for that?

12  A    No.

13  Q    Why not?

14  A    He didn't, nor did anybody else who used it.

15  Q    What type of aircraft are these?

16  A    Hawkers (phonetic).

17  Q    Did you purchase these aircraft?

18  A    Pardon?

19  Q    Did you purchase -- were you involved in the purchase of

20  these two aircraft?

21  A    Well, my personnel -- my people, the people who know about

22  this, yes.

23  Q    Okay.  Would you consider your relationship with Mr. Saiz-

24  Pineda a business relationship or more of a friendship?

25  A    A friendly relationship.

Espinosa De Los Monteros Leal - Direct / By Ms. Hampton    134

1    Q    Have you ever been to his house?

2    A    In Villa Hermosa?

3    Q    Yes.

4    A    Some three or four times, perhaps.

5    Q    Have you ever been to his house in the U.S.?

6    A    Once in Miami.  It was where he was living.  I don't know

7    if it was his house or not.

8    Q    You remember where the residence was located in Miami?

9    A    Yes, it was in Sunny Island (phonetic).

10   Q    Did you visit him anywhere else in the U.S.?

11   A    Once at his house, once in New York that I recall and two

12   or three times as a family in Miami.

13   Q    So you just -- you said you visited him once in Miami at

14   the Sunny Isles (phonetic) residence and now it's two or three

15   times in Miami?  Is it a different place in Miami?

16   A    No.  I'm saying that in Miami, two or three times at a

17   restaurant or somewhere with the family.

18   Q    Okay.  And how many times in New York.

19   A    Once.

20   Q    Where did you meet him in New York.

21   A    Well, no, it was a number of friends and we went to a

22   concert together.  A number of couples.

23   Q    I'm going to show you what's been admitted as Government's

24   Exhibit 56.

25           THE COURT:  Let's go ahead and recess right there.

1    It's right about noon.  So let's take a lunch break.  Please

2    remember your instructions.  Don't discuss the case with

3    anyone, not even with each other and don't try to get

4    information about the case outside the courthouse.

5              So we'll see you at 1:15.

6              **THE MARSHAL:**  All rise.

7         **(Jurors exit the courtroom at 11:58 a.m.)**

8              **THE COURT:**  He can set.  You can step down.

9         **(Witness steps down)**

10             **MR. SPEAKER:**  Are you guys going to look through your

11   reciprocal discovery to see if you can find it?

12             **THE COURT:**  To be back at --

13             **MR. MUSCHENHEIM:**  I'm not going to take it with me

14   and I didn't want to wheel through the courthouse two banker

15   boxes of documents (laughs) for the jury to see.

16             **MR. SPEAKER:**  (indisc.)

17             **MR. MUSCHENHEIM:**  I didn't know where we were on

18   that.

19             **MR. SPEAKER:**  I thought the Judge was interested in

20   seeing (indisc.) on reciprocal discovery.

21             **MR. MUSCHENHEIM:**  Right.  And I -- your Honor, the

22   time I was looking at that, I didn't get through about -- a

23   stack of papers that high.

24             **THE COURT:**  No, that's fine.  It was just what I was

25   hearing -- I know during final pretrial at some point, we

1  discussed reciprocal discovery or something.  What I was

2  hearing was -- I've never seen it to me means it wasn't handed

3  over.

4          **MR. MUSCHENHEIM:**  Right.  And it --

5          **THE COURT:**  And I'm, like, so --

6          **MS. HAMPTON:**  I apologize, your Honor.

7          **THE COURT:**  That's okay.  I'm just -- that's what I

8  -- and I'm, like, I thought there was -- so I assumed they

9  didn't turn it over and that's why we're taking time.  And I

10  don't mind taking time if you-all haven't had a chance to look

11  at it but I was picking up it hasn't been handed over to us.

12          **MS. HAMPTON:**  It's a lot of documents and none of

13  them are marked as exhibits.  I'm sorry, your Honor.

14          **THE COURT:**  I get it.

15          **MS. HAMPTON:**  I had not seen that document and I did

16  not mean for it to say that he hadn't turned it over.  I don't

17  know if he's turned it over.

18          **MR. REYNAL:**  I accept that but they've been turned

19  over.

20          **THE COURT:**  Okay.  So what do you-all need --

21          **MR. REYNAL:**  We don't -- I don't think we can leave

22  it -- I think we can leave it at that.

23          **THE COURT:**  All right.  I have some 12:15 matters so

24  if you-all don't have anything further, you-all are excused.

25          **(Recess taken from 12:00 to 1:14 p.m.)**

(MORNING SESSION CONCLUDED AT 12:00 P.M.)


                              CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____                    October 6, 2017

          Signed                                     Dated



                    *TONI HUDSON, TRANSCRIBER*