UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,     )     CASE NO: 2:17-CR-00245-3
                              )
              Plaintiff,      )          CRIMINAL
                              )
     vs.                      )      Corpus Christi, Texas
                              )
SILVIA BEATRIZ PEREZ-CEBALLOS, )    Tuesday, October 10, 2017
                              )
              Defendant.      )     (1:14 p.m. to 5:02 p.m.)
_____        AFTERNOON SESSION



JURY TRIAL - DAY 6
VOLUME II OF II, PAGES 122 THROUGH 250

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**            SEE PAGE 2


Court Recorder:          Genay Rogan

Interpreters:            Judy Hawks / Maria Enriqueta Foraker
                         Lorena Parada-Valdes

Clerk:                   Brandy Cortez

Court Security Officer:  Adrian Perez

Deputy U.S. Marshal:     Eric Propst

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

123

**APPEARANCES FOR:**

Plaintiff:                    JULIE HAMPTON, ESQ.
                              JON MUSCHENHEIM, ESQ.
                              U.S. Attorney's Office
                              1000 Louisiana, Suite 2300
                              Houston, TX 77002

Defendant:                    FEDERICO ANDINO REYNAL, ESQ.
                              JOSEPH C. MAGLIOLO, JR., ESQ.
                              Fertitta Reynal
                              808 Travis, Suite 1005
                              Houston, TX 77002

                              SETH H. KRETZER, ESQ.
                              440 Louisiana St., Suite 1440
                              Houston, TX 77002

124

**INDEX**

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | REDIRECT |
|---|---|---|---|---|
| JOSE LATOUR | 5/63 | | | |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 12, 13, 15, 19, 21, 28, 33, 34, 41, 43, 46 | 51 |
| 47, 48, 51, 52, 53, 54, 55, 61, 62 | 51 |

1      **Corpus Christi, Texas; Tuesday, October 10, 2017; 1:14 p.m.**

2              **(Interpreter Utilized for Translation)**

3                      **(In Progress)**

4        **(Outside the presence of the jury)**

5              THE COURT:  Any issues to address, Counsel?

6              MR. REYNAL:  Not from the Defense, Your Honor.

7              THE COURT:  Okay.  We'll just wait on the jury --

8              MR. MUSCHENHEIM:  Yes, Your Honor.

9              THE COURT:  -- and proceed.

10       **(Pause)**

11             THE CLERK:  Judge, I do have one question.

12             THE COURT:  Okay.

13             THE CLERK:  This morning, I think they said Exhibit

14   62 was admitted, but I'm showing that was admitted on October

15   4th around 9:55.  So, is 62 the right number or --

16             MS. SPEAKER:  I have (indisc.) --

17             MR. MUSCHENHEIM:  We may have reoffered it.  I

18   noticed that when I was checking our boxes that it was already

19   in --

20             THE CLERK:  Okay.

21             MR. MUSCHENHEIM:  -- and we mistakenly reoffered it.

22             THE COURT:  Yes.  The witness can approach.  And I

23   think we're waiting to see if the jury's ready.

24       **(Pause)**

25             THE COURT:  You're not involved in the Robert Pruitt

1  case, are you?

2          **MR. KRETZER:**  I don't know what that is, ma'am.

3          **THE COURT:**  No?

4          **MR. MUSCHENHEIM:**  May soon find out.

5          **THE COURT:**  Huh?

6          **MR. MUSCHENHEIM:**  I said he may soon find out.

7          **THE COURT:**  No.  No.  This is -- I think he's

8  scheduled for execution in a couple of days.

9          **MR. KRETZER:**  Oh, okay.

10         **THE COURT:**  There's been a lot of briefing.

11         **MR. KRETZER:**  Sure.  A lot of big lawyers jump on

12  cases when someone's set for execution.  It's amazing how many

13  people can get involved at the last minute.

14         **THE COURT:**  Yes.

15      **(Court confers with Clerk / Pause / Voices off the record)**

16         **THE COURT:**  Is the jury ready?

17         **COURT SECURITY OFFICER:**  They're ready, Your Honor.

18         **THE COURT:**  Okay.  You can bring them in.

19         **THE MARSHAL:**  All rise for the Jury.

20      **(The jury enters the Courtroom at 1:18 p.m.)**

21         **THE COURT:**  You can have a seat and we'll continue.

22  //

23  //

24  //

25  //

1          **JOSE LATOUR, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

2                  **DIRECT EXAMINATION (CONTINUED)**

3    **BY MS. HAMPTON:**

4    Q    Mr. Latour, I'm going to go back to Government's Exhibit

5    13 under "Wire Request Accounts," page 16.

6              **MS. HAMPTON:**  Can you enlarge this a little bit,

7    please?

8    Q    What day is this wire transaction on?

9    A    This wire transaction is dated May 12th, 2014.

10   Q    Who is the wire transfer from and who is it going to?

11   A    It is going from Mr. Latorre's MB tech to my law firm's

12   Trust account.

13   Q    There's a note on this wire transfer that says R-E-C,

14   Mr. L-I-N-G.  Do you see that on the bottom left?

15   A    Yes, ma'am.

16   Q    What is that referencing?

17   A    It's a -- this was a transfer that was from the funds from

18   Mr. Latorre that I did not know what to call these funds, given

19   the confusion that had had happened with the liquidation

20   vehicle.  So that is the terminology that I put there that was

21   inaccurate.

22   Q    Who is Mr. Ling?

23   A    It's someone I knew many years ago.  It has nothing to do

24   with this.

25   Q    And what is the $560,000 from?

Latour - Direct / By Ms. Hampton                              128

1    A    It's proceeds of vehicle sales.

2    Q    Page 17.  Same day, May 12th, 2014.  A wire in the amount

3    of $560,000.  Is that correct?

4    A    Yes, ma'am.

5    Q    From who to who?

6    A    From Mr. Latorre's MB tech to Latour Law Trust and, again,

7    the annotation there where it says Mr. Wen (phonetic) was an

8    annotation that I put in there because I did not know what else

9    to put in there.  But it was from the funds of the sales of the

10   vehicles.

11   Q    Who is Mr. Wen?

12   A    I have many Vietnamese clients named Wen.  It was just a

13   filler.

14   Q    Nothing to do with this 560,000?

15   A    Nothing to do with it, no.

16   Q    What is this $560,000 from?

17   A    From proceeds of vehicle sales.

18   Q    Let's go to Exhibit 23.  The signature card.  At the

19   bottom of page 1, let's look at which account this belongs to.

20   Which account is this?

21   A    Inquisitec, yes.

22   Q    And who is the signor on the account?

23   A    I was.

24   Q    What day was this account opened, on page 1, top of page

25   1?

Latour - Direct / By Ms. Hampton                    129

1    A    The account was opened on January 5th, 2012.

2    Q    And on page 2, under "Business Information" what date was

3    this Inquisitec established originally, according to this

4    document?

5    A    December 19th, 2011.

6    Q    Okay.  Let's go to statements, please.  Who used this

7    checking account?

8    A    Fernando Saiz.

9    Q    And so this is page 1 of the statements under Exhibit 23

10   for Inquisitec, correct?

11   A    Yes.

12   Q    What address is that?

13   A    That is my office address, different suite.

14   Q    Let's go to page 2.  There's a wire transfer or deposit

15   made on January 6th of 2012.  Can you tell us what that's for?

16   A    Yes.  That was a transfer from funds in Titan, the parent

17   company, to Inquisitec.

18   Q    And, again, Titan -- all the money in Titan was from

19   Jofesa, is that correct?

20   A    Correct.

21   Q    Okay.  So this $50,000 came from Jofesa, correct?

22   A    Correct.

23   Q    Okay.  Let's go to page 5.  There are, let me see, three

24   withdrawals, two on January 27th and one on February 3rd.  Can

25   you tell us what those are about, please?

Latour - Direct / By Ms. Hampton                    130

1   A      The January 27th are ADP payroll processing for Dr. Saiz

2   and the two-third is the fees charged to the company for that.

3   Oh, and the one on -- the last one for $560, I'm not sure what

4   "Openxcell" (phonetic) is, but I believe it was a phone

5   service.

6   Q      Did you make the notation on those three withdrawals that

7   says "Phantom International?"

8   A      I'm sorry, can you ask the question again?

9   Q      Those three withdrawals that we just discussed?

10  A      Yes.

11  Q      Did you make the notation that says "Phantom

12  International?"

13  A      Yes.

14  Q      What did this have to do with Phantom International?

15  A      Well, it meant that I was transferring the money from --

16  actually, this is Inquisitec.  I don't know why I made those

17  notations.

18  Q      Yes, this is the Inquisitec account, correct?

19  A      Yes.  This should have said from Titan to -- wait.  It's

20  because Phantom is a parent of Inquisitec.  That's why.

21  Q      Page 9.  March -- February 7th through March 6th, 2012.

22  A      Yes.

23  Q      On February 17th -- sorry, February 9th, there's two

24  withdrawals.  Can you tell us what those were for?

25  A      Yes.  Those withdrawals are for the payroll of Dr. Saiz

Latour - Direct / By Ms. Hampton                    131

1    and the funds came from Phantom International Investments into

2    Inquisitec and that's why they're annotated as such.

3    Q     And the withdrawals from February 17th through February

4    27th, are those the same?

5    A     Yes.

6    Q     When you said "payroll," are you talking about Fernando

7    Saiz, himself, getting paid by the company?

8    A     Yes.

9    Q     For his personal use?

10   A     Yes.

11   Q     Okay.  Page 12.  March 7th through April 5th, 2012.

12   A     Those are all transactions relating to the processing of

13   Dr. Saiz' payroll and the taxes and the fees that ADP charged

14   along with it.

15   Q     So monies were sent from Inquisitec to Phantom, to

16   Fernando Saiz?

17   A     Actually, from Phantom International to Inquisitec, to

18   Fernando Saiz.

19   Q     Thank you.  Page 21.  June 7th, 2012, to July 6th, 2012.

20   The withdrawals between 6/8 and 7/6, what are these?

21   A     Same thing.  Payroll processing by ADP for Dr. Saiz,

22   transferred from Phantom International to Inquisitec, and then

23   to him.

24   Q     Page 55.  April 5th, 2013, through May 6th, 2013.  There's

25   a deposit on May 1st, 2013.  Can you tell us where that came

Latour - Direct / By Ms. Hampton                            132

1   from?

2   A    That money -- let's see.  That was for whatever reason

3   classified as a loan, but it came from the same bus -- Phantom

4   International account into the Inquisitec account, probably

5   because there were insufficient funds to cover payroll.  So

6   that money was put into Inquisitec.

7   Q    When you say "payroll," was anybody other than Fernando

8   Saiz being paid out of this?

9   A    Only Fernando Saiz.

10  Q    And he used this account for business expenses or personal

11  expenses, the monies that came from here?

12  A    Well, probably both, but the account was established was

13  for his purpose -- the business was for his purpose.

14  Q    Page 59.  May 7th through June 6th, 2013.  Can you tell us

15  about the deposit on May 24th, please?

16  A    Yes.  Can I see the dates again, please?

17  Q    Yes, sir.

18  A    Those were funds that were transferred either directly

19  from Titan or from Phantom International in order to provide

20  the working capital for Inquisitec, which included his payroll

21  and other business associated expenses.  That's what the

22  100,000 is.

23  Q    And that came from --

24  A    Either --

25  Q    -- which account?

Latour - Direct / By Ms. Hampton                    133

1    A    -- directly from Phantom International or from the parent

2    Titan.

3    Q    And up here on May 24th, it says from Latour Law, P.A.,

4    what account is that?

5    A    That's my operating account, but it's probably -- again,

6    it was probably one of those situations where the money got

7    transferred from an existing account or -- either from Trust or

8    -- I'm sorry, from Titan or Phantom International to Latour Law

9    and then to Inquisitec.  But more than likely, it was funds in

10   Trust because it went through my law firm account.

11   Q    Page 66.  July 6th, through August 6th, 2013.  Can you tell

12   us about the deposits on July 22nd, 2013?

13   A    Yes.  The first one was a transfer where I moved money

14   from Titan, the parent company, to Latour Law and then $20,000

15   for -- to capitalize the expenses of Inquisitec.  The second

16   one appears to be an additional $10,000 for the same thing.

17   Q    And July 29th deposit?  What is that for?

18   A    That was the same thing, for an application business that

19   was planned.  That was transferred from Titan into Inquisitec

20   via Latour Law for the same business purposes.

21   Q    So you moved it from Titan to Latour Law to Inquisitec?

22   A    That's what it looks like.  It may have been from Trust to

23   Latour Law to Inquisitec.  I do not recall.

24   Q    Page 70.  August 7th, 2013, through September 6th, 2013.

25   Can you tell us about the withdrawal on August 13th?  What is

1   that for?

2   A    Yes.   That was -- Dr. Saiz leased a house in Houston for

3   him and his family and he negotiated a one-year prepayment for

4   the lease.   And those funds came out of Inquisitec.   Again,

5   probably via Trust to Latour Law and then Inquisitec prepaid

6   the house for his residence.

7   Q    And this withdrawal for $45,000 was sent from Inquisitec

8   to Latour Law, P.A.?   Is that correct?

9   A    The other way around.   From Latour Law to Inquisitec.

10  Now, whether Latour Law was -- it either came from Trust or

11  from Titan to Latour Law, and then to Inquisitec.

12  Q    It looked -- is this a -- are you saying this is a

13  deposit?   It looks like it's a withdrawal.   Is that correct?

14  A    Yes.   Yes.   It -- the annotation is the way that -- what

15  -- the way I wrote that, it's telling myself that I transferred

16  it from one account and, presumably, either the Titan or the

17  Trust account, which is where the money would have been, to

18  Latour Law, and then it came out of Inquisitec.   So that's just

19  to show the flow of funds.

20        **MS. HAMPTON:**   Can you go down please?

21  Q    The September 3rd deposit, $1,300, what is that in

22  relation to?

23  A    September 3rd deposit.   That was a transfer, again, from

24  one of those other accounts via Latour Law operating account to

25  Inquisitec to pay for some furniture, purchase or rental, for

1    Dr. Saiz's house.

2    Q     Personal residence or business?

3    A     Personal residence, but leased by the company.

4    Q     September 3rd there is a withdrawal or a debit of $6,000.

5    What is that in relation to?

6    A     That was for furniture for that same house for Dr. Saiz.

7    Q     September 4th, there's a deposit of $5,000.  Where did

8    that come from?

9    A     That came from the funds that I explained before, that I

10   had not put the right -- that I had just annotated it this way

11   because I did not know how to annotate it and those funds went

12   back in there probably because the balance was down to 1,600

13   and I was told to do that.

14   Q     Does Asia Pacific have anything to do with Inquisitec?

15   A     No.

16   Q     Page 75.  September 7th through October 4th, 2013.  There's

17   a deposit on September 24th.  Can you tell us where that came

18   from?

19   A     Yes.  That came from Titan, the parent company.  And I

20   moved it from the Titan account to Latour Law, and Latour Law

21   to the Inquisitec account for capitalizing the expenses for

22   Dr. Saiz.

23   Q     Page 82.  October 5th through November 6th, 2013.  November

24   6th there's a deposit.  Where is that from?

25   A     From that same Asia Pacific account.  That account was

Latour - Direct / By Ms. Hampton                    136

1    established for another purpose and it was not for --

2    associated with these entities or companies, but that's where I

3    moved these monies to when the car sales began.

4    Q    The Minelo car sales?

5    A    Yes.

6    Q    Page 97.  January 8th through February 6th, 2014.

7         MS. HAMPTON:  Can you go down, please?

8    A    Yes.

9    Q    February 3rd, 2014, there's a deposit.  Can you tell us

10   where that came from?

11   A    I am uncertain as to it specifically, but there -- I

12   believe that -- I don't honestly know, the 12,000 loan.  It was

13   the same funding as I've described.  Minelo did not have a bank

14   account.  And so, when the cars were sold, this is how I put it

15   into Asia Pacific because it was not used.

16   Q    We just went over Exhibit 22, which was Minelo's bank

17   account, correct?

18   A    Minelo bank account?

19   Q    Well --

20        MS. HAMPTON:  Can you minimize this and go back to

21   Exhibit 22, please?

22   Q    Signature card or statements, that's fine.

23   A    Yes.

24   Q    Do you recall this?

25   A    I do.  I -- the account was never used and I don't know if

1    it was closed by that time.  I know that the reason is the

2    account said that because the company was not -- it wasn't real

3    estate and it wasn't earning revenues, it didn't file taxes.

4    So I may have closed the account by the time -- that the other

5    stuff we're looking at.  I'm not certain.

6    Q    Okay.

7         **MS. HAMPTON:**  Can you close this, please, and go back

8    to Exhibit 23?

9    Q    Page 112, please.  April 5th through May 6th, 2014.

10        **MS. HAMPTON:**  Go down, please.

11   Q    May 6th there's a deposit.  Can you tell us where that

12   came from?

13   A    Yes.  That came from -- well, originally Titan

14   International to Phantom International, and then another

15   working capital contribution for Inquisitec.

16   Q    Page 131.  August 7th through September 5th, 2014.

17        **MS. HAMPTON:**  Move it down, please.

18   Q    August 8th -- August 19th there's a deposit.  Can you tell

19   us where that came from?

20   A    It was also from Inquisitec relating to a cattle patent

21   that Dr. Saiz procured and a plan project for that, but it was

22   capitalization.

23   Q    Where did the money go?

24   A    Ah --

25   Q    Where did the money come from?

Latour - Direct / By Ms. Hampton                    138

1  A    -- it came from Titan, Phantom, and then through Latour

2  Law to Inquisitec.

3  Q    Page 132.  September 4th there's a couple of payments.

4  Can you tell us what those are regarding?

5  A    The December 4th payments, I'm unfamiliar with the one on

6  the 4th, but it may have been funds withdrawn by Fernando Saiz.

7  The second tour, the ADP payroll processing for him.

8  Q    And there's a deposit on September 5th.  Where's that

9  coming from?

10 A    It came from Titan and it was for the orthodontist or

11 dental treatment of one of Dr. Saiz' daughters or, perhaps, his

12 wife.  I don't recall.

13 Q    Let's go to Exhibit 28.  Signature card.  Let's go to the

14 bottom of page 1.  What account is this relating to?  What

15 account is this?

16 A    This is my law firm.  I believe it's the Trust account.

17 Oh, no.  It's a savings account for my law firm, I'm sorry.

18 Q    Under the name Latour Law, P.A.  Is that correct?

19 A    Correct.

20 Q    All right.

21       **MS. HAMPTON:**  Can you go up to the top?

22 Q    What date was this opened?

23 A    This was opened in -- on June 4th, 2013.

24 Q    At this time, you had other Latour Law bank accounts open,

25 correct?

1   A    Correct.

2   Q    Why did you open this one?

3   A    Because I -- my other -- my business was growing and I

4   wanted to set aside reserve capital for payroll, to try to get

5   ahead for -- just to save for business operations.

6   Q    On page 2, under "Business Information," when does it say

7   that Latour Law, P.A. was created?  Page 2.

8   A    Yeah.  This incarnation of my professional corporation was

9   established 8/16/2010.

10  Q    Let's go to statements, please.  This began June of 2013,

11  correct?

12  A    Yes.

13  Q    According to page 1.  And page 2?

14  A    Yes.

15  Q    There's a deposit.  Can you tell us where the deposit's

16  from on June 28th, 2013?

17  A    I don't recall its source, but it came from my operating

18  account into the savings account.

19  Q    Your operating account that we already went over, right?

20  A    Correct.

21  Q    Okay.  Let's go to page 5.  July 1st through July 31st,

22  2013, 7/15/13 there's a deposit.  Where did that come from?

23  A    All three of the deposits that are reflected in here came

24  in from the Asia Pacific account with the annotations being --

25  as I've explained I -- the annotations do not reflect the

1    reality of it.  It was all money associated with the proceeds

2    from the sale of the Minelo vehicles.

3    Q    The annotations are false?

4    A    I'm sorry?

5    Q    Are they false?

6    A    The --

7    Q    The annotations that you put on your --

8    A    -- the annotations?

9    Q    Yes, sir.

10   A    Yes, ma'am, they are.

11   Q    And, I'm sorry, where did the $170,000 come from?  What

12   monies --

13   A    From the proceeds of the sales of the Minelo vehicles that

14   Mr. Latorre had been depositing.

15   Q    Okay.  And the $100,000 deposited on the 22nd of July,

16   2013?

17   A    It would have been the same.

18   Q    And the $65,000 deposited on July 26th --

19   A    It is the same.  Yes.

20   Q    There's a transfer -- there's a few transfers.  There's a

21   transfer of 170,000, 30,000, and 75,000 are withdrawal or

22   debits, excuse me, on the 22nd of July, the 29th, and the 29th.

23   Where did those go?

24   A    I'm a little confused here on that -- on that 170,000.

25   The -- let me just see here.  Please bear with me one second.

Latour - Direct / By Ms. Hampton                    141

1    Oh.   Okay.   So the initial 170,000 at the top came into the

2    Latour Law savings, probably after Mr. Latorre had deposited my

3    trust.   And, at this point, on 7/22 where you see it exit,

4    that's where I decided to put the Minelo money into that Asia

5    Pacific -- or, not necessarily at that moment, but I

6    transferred it to that account that was idle.   And that's the

7    same thing with the other transfers, like the one at the

8    bottom, the 7/29.

9    Q    You transferred those to which account?

10   A    To the Asia Pacific account.

11   Q    What is Asia Pacific?   What company is that?

12   A    It was a company that I formed for some of my activities

13   in Asia that I did not use and the account was open.   And when

14   -- and after the Minelo account was closed, or maybe because I

15   didn't remember the Minelo account existed, when the proceeds

16   came in and I did not receive instructions from the Mexican

17   attorney on what to do with those funds because I couldn't just

18   keep them.   I had to put them somewhere.   I put them into that

19   Asia Pacific account and I annotated them falsely.

20   Q    Is that the only use you've made of the Asia Pacific

21   account?

22   A    I don't recall if there was any other activity in it.   At

23   some point, I believe there was, at the beginning.   But from

24   this point, yes.

25   Q    Page 8, please.   August through -- August 1st through

Latour - Direct / By Ms. Hampton                    142

1    August 31st, 2013.  There are two withdrawals or debits.  Tell

2    us about the one on August 2nd.  Where did that go?

3    A    The one on August 2nd was, I believe, it was a payroll

4    thing, but I applied it to my IRA and 5,000 -- the 5K was what

5    my assistant was being paid at that point in time for the

6    bookkeeping.  That's the 30.  The other one was me moving money

7    that I had put into savings back into Asia Pacific for the same

8    reason I had just explained.

9    Q    You're referring to the $35,000 withdrawal?

10   A    Yes.  The --

11   Q    Where did that money go?

12   A    Into the Asia Pacific Ventures account.

13   Q    So it left this Latour Law, P.A., to Asia Pacific?

14   A    It left the savings account to Asia Pacific, yes.

15   Q    And what is the notation "Per S. Chen?"  What is that

16   regarding?

17   A    That is an annotation that I created that -- because I did

18   not know how to explain the vehicle sales.

19   Q    Okay.  Page 11.  September 1st through 30th, 2013.  There's

20   a $6,000 transfer.  There's two $6,000 withdrawals on September

21   3rd.  Can you tell us what each of those were for?

22   A    I am not sure about the first one for payroll because the

23   "LL" would be Latour Law.  It may have been a payment, but I

24   don't know why it would be six instead of five to my assistant.

25   The second one, it was for furniture for Dr. Saiz' home.

1  Q    At the end of the second withdrawal, on September 3rd,

2  what was the ending daily balance?

3  A    Two eighty-nine.

4  Q    And then what happened on September 24th?

5  A    A hundred and eighty dollars got transferred, let's see --

6  Q    A hundred and eighty thousand dollars --

7  A    A hundred -- I'm sorry, a hundred eighty-thousand dollars

8  got transferred for legal fees, I guess, that were past due to

9  me.  That would be six months of legal fees that were

10  transferred.

11  Q    And then the same day, $30,000 is withdrawn.  Can you tell

12  us where that went?

13  A    Yes.  It went to a September -- I had not been paid for my

14  September retainer and that was for -- the $30,000.

15  Q    Page 14, please.  October 1st through 31st, 2013.  Can you

16  tell us about the October 1st withdrawal for $30,000?  Where

17  did that go?

18  A    That went to pay me the -- both of those were the payments

19  for October and for November for the retainer of my services

20  for Titan.

21  Q    Can you go back to page 11?  So the month before, you

22  transferred $180,000 to this account, to this Inquisitec

23  account, correct?

24  A    Correct.

25  Q    From --

Latour - Direct / By Ms. Hampton                    144

1   A     Wait -- to --

2   Q     -- where?

3   A     -- to the -- are we on?

4   Q     Oh, Latour Law, excuse me.  Latour Law.

5   A     Latour Law Savings, right?

6   Q     Yes.  Yes.  And then -- can we go back down to page 14?

7   And then the next month you take $60,000 of the 180,000 and

8   move it to another account, correct?

9   A     Well, the -- the prior 180,000 was six months that I had

10  not been paid that brought me current to September.  And then

11  these two are for October and for November of that year.

12  Q     So this account, this Latour Law, P.A., account that was

13  open in 2013 holds some of your retainer fees, correct?

14  A     Correct.

15  Q     Correct.  And then the other Latour Law, P.A., also holds

16  some of your retainer fees, correct?

17  A     The operating account took it once I -- once it was

18  disbursed, it went into the Latour Law operating account.

19  Q     Page 17, please.  November 1st through 30th, 2013.  There's

20  a withdrawal of $30,000.  Where did that money go?

21  A     That went to my operating account for my December

22  retainer.

23  Q     Page 27.  There is a withdrawal on February 3rd, 2014, for

24  $1,875.85.  Where did that go?

25  A     That was a fee due to the New Zealand trustee, Cone and

1    Marshall.

2    Q    Page 30.  March 1st through 31st, 2014; there is a deposit

3    on March 28th, 2014.  Where did that come from?

4    A    It was from Titan, which it's March '14, so it would have

5    been from the proceeds of the vehicle sales, and it was my

6    advance for those six -- for, I guess, four months' advance.

7    Q    Page thirty --

8    A    May to August, 2014.

9    Q    Page 33.  April 1st through 30th, 2014.  There is a

10   deposit of $20,000 on April 16th and then a withdrawal of

11   $30,000 on April 25th.  Tell us where those came from and where

12   they went.

13   A    I -- I have no memory of the $20,000 deposit.  The -- the

14   $30,000 withdrawal was my retainer for May, 2014.

15   Q    Page 36, please.  May 1st through 31st, 2014.  There's two

16   withdrawals; one's on May 7th and one's on the 27th.  Where --

17   where did those go?

18   A    Those went to my operating account from the savings

19   account.  This is part of that -- for some reason I transferred

20   it two times, but I was -- I guess I needed the money on the

21   7th, so I took 10,000 and I paid the other 20,000 at the end of

22   the month as I was supposed to.

23   Q    Page 39.  June 1st through 30th, 2014.  There's two

24   withdrawals; one's on June 8th -- excuse me -- June 18th, and

25   one's on June 24th.  Where did those withdrawals go?

1    A    Those withdrawals were -- were issued in June for July.

2    It was when I was ill, and I -- I took the money -- I asked

3    Fernando Saiz if it was okay if I got paid in advance, and I

4    did.

5    Q    Page 43; July 1st through 31st, 2014.  There's two

6    withdrawals.  One's on July 18th and one's on July 29th.  Where

7    did those monies go?

8    A    To my operating account for the same reason I explained.

9    Q    Page 49; September 1st through 30th, 2014.  There is a

10   deposit on September 2nd.  Where did that money come from?

11   A    That money came from vehicle sales from Fernando Latorre

12   for -- it was the next year's retainer, for the following year.

13   Q    The withdrawals or debits between September 19th and

14   September 29th; where were those going?

15   A    Those were all advances.  I was already, as you can see --

16   let me see the -- I was already getting the October funds in

17   advance because I wasn't working at the time because I was ill.

18   Q    Page 54.  October 1st through 31st, 2014.  There are three

19   withdrawals this month between October 16th and the 27th.  What

20   are those?

21   A    It's -- it's the same, ma'am.  Same -- I was taking my

22   paycheck a little early.

23   Q    Page 58.  November 1st through 30th, 2014.  There is a

24   withdrawal of $25,000 on November 10th.  Where did that go?

25   A    Those were, based upon my -- my tax return, those were the

1    funds that Latour Law owed me for my travel and my reimburses -

2    - imbursements and dues and other things, and I withdrew that

3    to -- it went to Latour Law operating.

4    Q     Page 61.  December 1st through 31st, 2014.  There's a

5    $300,000 withdrawal.  Where did that go?

6    A     My accountants had advised me that these funds needed to

7    be in trusts or -- because they were for the -- for the future,

8    for the next year, and I had them in savings, so they got moved

9    to the trust account or they would count as income for me for

10   that present year.

11   Q     Page 64.  January 1st through 31st, 2015.  There is a

12   deposit of $300,000 on January 2nd, 2015.  Where did that money

13   come from?

14   A     That -- that is the one we just spoke about that was

15   transferred into trust until the new year began, and then back

16   into the savings account of the law firm.

17   Q     Did you use this account, which is Exhibit 28, the Latour

18   Law account opened in 2013, for any other clients other than

19   the Saiz-Pinedas?

20   A     For my own operations and for -- for them only.  To -- to

21   the best of my memory.

22   Q     And you used your regular operating account for your other

23   clients?

24   A     Uh, yes.  I -- yes.

25   Q     Let's look at Exhibit 33.  Signature card.  The bottom of

Latour - Direct / By Ms. Hampton                    148

1    page one tells us this is an account for who?  Whose account is

2    this?

3    A    That's the Asia Pacific entity I described.

4    Q    And what was the date of the opening of the account on the

5    top of page one?

6    A    That was in July, 2013.  Looks like July 29th; I'm sorry.

7    Q    Did you open this account after your Latour Law P.A. one

8    that you opened in 2013?

9    A    Yes, I did.

10   Q    And, then, on page two, when does it say that Asia Pacific

11   was created?  Under "business information."

12   A    Right then and there, in July 22nd of 2013.

13   Q    I thought you testified that this was a company that you

14   had already -- it was already in existence?  Is that the case?

15   A    I -- I did not recall the date of incorporation.  I -- I

16   have been doing business in Asia for a very long time, and I

17   had opened a Hong Kong account that was supposed to --

18   Q    So --

19   A    -- be necessary; it was not.  And --

20   Q    Was this company in existence before July 22nd --

21   A    No, ma'am.

22   Q    -- 2013?

23   A    That entity was not in existence.

24   Q    We can't talk over each other, okay?  The court

25   reporter's --

1   A    Yes.

2   Q    -- writing everything down.

3   A    Yes.

4   Q    Okay.  So let's go to statements under Exhibit 33.  Starts

5   in July 29th through July 31st of 2013, correct?

6   A    Yes.

7   Q    And what does the account start off with?

8          Can you go back to page one, please?

9          What is the deposit --

10  A    Seventy --

11  Q    -- being --

12  A    Seventy-five thousand one hundred dollars.

13  Q    Page two, please?

14         Do you remember where that money came from, the

15  $75,000 deposit?

16  A    It came from my savings account, but it was sourced from

17  the sale of the vehicles by Mr. Latorre.

18  Q    Okay.  So, this $75,000 was from the sale of the Minelo

19  vehicles?

20  A    I believe so.

21  Q    Okay.  Can we go to page five?  August 1st through 31st,

22  2013.  Can you go down, please?

23         On August 2nd there is a deposit of $65,000.  Where

24  did that come from?

25  A    That was the same thing.  It would have been from the sale

Latour - Direct / By Ms. Hampton                    150

1    of the vehicles.

2    Q    Which account was it transferred to Asia Pacific from?

3    A    Via my law firm account, it may -- probably my trust

4    account.

5    Q    On August 12th there is a $45,000 withdrawal.  Where did

6    that go to?

7    A    Uh, I don't know specifically, but it would have been

8    related to expenses that had been disbursed for Saiz matters,

9    and -- and I was getting repaid for that.

10   Q    Do you remember the $50,000 check from August 13th?

11   A    I do not.

12   Q    Okay.  And, then, the transfer on August 16th of $25,000

13   was to where?

14   A    That went to my operating account, and I believe that that

15   was my retainer payment.

16   Q    And the note says "retainer per Chen call"?  What is that

17   regarding?

18   A    I'm sorry?

19   Q    The note on August 16th for the $25,000 transfer says --

20   A    I --

21   Q    -- "retainer per Chen call."  What is that regarding?

22   A    It -- it is a fictional statement that -- in accordance

23   with what I've explained to this account.  After all of the --

24   Q    Thank you.  Thank you.

25             Can we go to page 11, please?  September 1st through

1    September 30th, 2013.

2              September 4th there is a debit or a withdrawal of

3    $5,000.  Can you tell us where that went?

4    A    That went to Fernando Saiz and Inquisitec.

5    Q    And that says "business checking, Chen reimbursement," on

6    that September 4th transaction?  What is that regarding?

7    A    That is an inaccurate statement.  It was -- as I've

8    explained.

9    Q    It's, you say, fictional?

10   A    Fiction.

11   Q    It's a made-up person?

12   A    Yes.

13   Q    Okay.  September 12th there is a $5,000 withdrawal or

14   debit.  Where did that go to?

15   A    It went to my operating account for Latour Law, and I'm

16   not sure what it was for, but I did the same thing; I noted it

17   with Chen.  There is no Chen.

18   Q    And where did the $5,000 and $5,000 in that account

19   actually come from?

20   A    All originating from the sales of the proceeds -- I'm

21   sorry; from the proceeds of the sales of Mr. Latorre's vehicle

22   sales.

23   Q    Did you use this account at Asia Pacific for any other

24   clients other than the Saiz-Pinedas?

25   A    This particular month I had a series of meetings, and I

Latour - Direct / By Ms. Hampton                      152

1   believe all of those expenses, the Las Vegas expenses and all

2   those things, those were my expenditures that I used funds

3   that -- that were mine with this -- with this account.

4   Q    Can we go to -- hold on.  Can you -- can you go back to

5   the -- to the end of page 23, please?  Go up to page 22.

6            As of November 30th, 2013, what was the balance in

7   this account?

8   A    Eighty-two dollars and one cent.

9   Q    So, did you close this account?  In November?

10  A    I do not recall.

11  Q    Okay.  It was opened in July of '13, and in November it

12  had zero in it, correct?

13  A    Correct.

14  Q    Is it still open?

15  A    I cannot recall.  I believe it is.

16  Q    All right.  Let's go to Exhibit 34, please.  Signature

17  card.

18            This is an account of which company, according to the

19  bottom of page one?

20  A    I believe it's the same one.

21  Q    Yes, sir.  And this is the savings account for it; is that

22  correct?

23  A    I'm sorry?

24  Q    Is this the savings account for this -- this account?

25  A    Yes.  Yes, it is.  I'm sorry.  Yeah.

Latour - Direct / By Ms. Hampton                    153

1   Q    Was the savings account used for Asia Pacific?

2   A    I don't believe it was, but I'm not certain.

3   Q    Okay.  Close that, please.  Let's go to Exhibit 41.

4        You were involved in the creation of -- of Asia

5   Pacific, the company, correct?

6   A    Yes, ma'am.

7   Q    Okay.  Page one; can we -- can we go down, please?  Can

8   you go to page two?  Thank you.

9        Okay.  So, page two is what?

10  A    That's the Certificate of Formation of the limited

11  liability company that I formed.

12  Q    And there is a statement on there about that the company

13  was dissolved or something?  Can you read that or tell us when

14  the company was dissolved?

15  A    Let's see.  "I further certify that said company is" --

16  yes -- "voluntarily dissolved on November 6th, 2013."

17  Q    So, you created it in July; is that right?

18  A    Yes, ma'am.

19  Q    And dissolved it in November?

20  A    Yes, I did.

21  Q    Why did you dissolve it?

22  A    Because my accountant told me --

23  Q    Okay, without talking about what people told you.

24  A    I'm sorry.

25  Q    Okay.

Latour - Direct / By Ms. Hampton                    154

1   A    I -- I dissolved it because I understood that it was not

2   an account that I needed to be using and I should not have

3   created it because it was not being used.

4   Q    Can you go to page four, please?  What is this?

5   A    This is the articles where I formed it and I listed myself

6   as the manager.

7   Q    And it's dated on what date?

8   A    July 22nd.

9   Q    Which is the same day you opened the bank account?

10  A    I don't recall, but approximately.

11  Q    Okay.  All right.  Can you go to page five, please?

12       What is this?

13  A    That's when I dissolved the entity.

14  Q    And the stamp at the top of page five is dated what?

15       Can you go up, please?

16  A    November 6th, 2013.

17  Q    All right.  Let's go to Exhibit 42, please.

18       Were you involved with the creation of Century 23B?

19  A    No.

20  Q    Did you become involved with the company later with some

21  filings?

22  A    Yes, I did.

23  Q    Do you remember approximately when you became involved?

24  A    If I may look at my --

25  Q    Yes, sir.

1    A    April of 2011, approximately.

2    Q    Okay.  So, page one is what?

3    A    I believe that's the original filing documentation for the

4    California entity.

5    Q    And this is page two; I apologize.  What date was it --

6    the LLC filed?

7    A    November 26th, 2008.

8    Q    And where was it filed?

9    A    In State of California.

10   Q    Can you go down, please?  Page four, please?

11          What is this?

12   A    I'm sorry; could you scroll up a little?  Or down, I

13   guess.

14   Q    Yes.  Yes.

15   A    I'm sorry; I meant to see the top of the form.  I

16   apologize.  It looks like it's an annual report filing for the

17   State of California.

18   Q    Okay.  And, then, can you go down, please?

19          And in the box that's number seven, who is listed as

20   the manager or member?

21   A    JEC Holdings, LLC.

22   Q    What address is that?

23   A    The Brickell Bay address was the office of Steve -- of

24   Steve Cantor, the attorney who formed the trust and the

25   entities.

1    Q    Page five, please.  What is this?

2    A    Looks like another annual report.

3    Q    Dated when?

4    A    September 25th, 2014.

5    Q    Whose address is that?

6    A    That is my business address and my suite number at the

7    time.

8    Q    And what does this form do in 2014?

9    A    It changes the manager of the entity; it was before this,

10   actually.  But it affirms that -- that I'm the manager of the

11   entity.

12   Q    As -- as of August of 2014?

13   A    No, it was before that.  I think that's the just the

14   renewal for that particular year.

15   Q    Okay.  Can we go to Exhibit 43?

16        Were you involved in the formation of East 74th

17   Street Holding, LLC?

18   A    No, ma'am.

19   Q    Did you become involved with -- with the company later?

20   A    Yes, I did.

21   Q    Let's go to incorporation documents, page five.

22        According to page five of this Exhibit 43, when was

23   East 74th Street Holdings, LLC, created?

24        Can you zoom out, please, and go back to the top?

25   Can you go back to the top?  Thank you.

1   A    I'm sorry; I'm not seeing the date.

2   Q    Page five, and then we'll go to page six.  I think it goes

3   on to page six.

4   A    Okay.  Looks like November 19th, 2008.

5   Q    Can we go to page eight, please?

6        According to page eight, who was signing as the

7   manager of East 74th Street Holdings?  Or who -- whose -- whose

8   signature block is on here?

9   A    The authorized person for the entity when it was formed

10  was Martin Alberto Medina-Sonda.

11  Q    Do you know who that is?

12  A    No, ma'am.  I'm aware of who he is now, but I did not.

13  Q    Can you go to page 17, please?  What is this document?

14  A    That is a -- I guess every two years there is a statement

15  that needs to be provided, and that's particular to whatever

16  state this was.

17  Q    Here the name changes, correct?

18  A    Yeah.  That -- that's -- I am the authorized

19  representative at this point.

20  Q    What's the filing period date on this document up in the

21  top right?

22  A    It says November, 2010, so -- can you scroll down again?

23  Q    Yes, sir.  Let's go to page 19.  I think that's the only

24  date on that page.

25        Page 19; what is this?

1    A      November, 2012.

2    Q      And what is this document?

3    A      This is the -- oh, okay.  All right.  This is the

4    statement that has to be done every other year with the State

5    of New York to update the registration of the entity, and --

6    and that's now where I'm the signer effective -- I'm not sure

7    if this is the first time or the second time; probably the

8    second.

9    Q      Did -- did you decide to change the name from East 74th

10   Street Holdings to Samurai?

11   A      No, that had already been done before I was engaged.

12   Q      Do you know who picked the name Samurai?

13   A      I would assume Jose Saiz, but I do not know.

14   Q      Can you go to page 21, please?  What is this document?

15   A      That's a name change filed probably by Mr. Cantor changing

16   the original East 74th Street Holdings.

17   Q      And it's dated when?

18   A      November 19th, 2008.

19   Q      That's the date of the filing of the Articles of

20   Organization.

21   A      Oh, I'm sorry.

22   Q      Is that correct?

23   A      Yes.

24   Q      Okay.  Can we go to the next page?

25          What's the date of this document on page 22?

Latour - Direct / By Ms. Hampton                    159

1   A      September 19th, 2013.  Oh, wait --

2   Q      And whose signature is that?

3   A      Hold on.  Hold on.  Can you please scroll back to the --

4   that's me, but can you please scroll back up to the --

5   Q      Yes, sir.

6   A      -- to the top?  Okay.  This is a Certificate of Change

7   where I'm being added as a designate, but the name had already

8   been changed to Samurai.

9   Q      Can you go --

10  A      And --

11  Q      -- to page 22?

12  A      -- and I'm changing the registered agent.  That's what it

13  is.  The New York registered agent; that's what it is.

14  Q      And this was -- page 22 is dated September of 2013; is

15  that correct?

16  A      September 19th, 2013, correct.

17  Q      Let's go to Exhibit 46, please.  What is -- which property

18  is Gladiator associated with?

19  A      Gladiator is the owner of the Jade penthouse, the larger

20  apartment in Florida.

21  Q      Let's go to the file named Gladiator.  Can we go to page

22  two?

23          What is this?  What is this?

24  A      That is the Articles of Organization for the limited

25  liability company Mr. Cantor formed dated August 19th, 2009,

Latour - Direct / By Ms. Hampton                    160

1    for Jade Ocean Penthouse Holdings.

2    Q    So, that's when Jade Ocean Penthouse was created, was in

3    2009, correct?

4    A    I'm sorry; I couldn't hear you.

5    Q    That's when Jade Ocean Penthouse Holdings was created, in

6    2009, correct?

7    A    Correct.

8    Q    Okay.  Can we get out of this file and go to change Jade

9    Ocean to Gladiator right now, please?  Page seven, please.  Oh.

10   Maybe it's on the other file.  I'm sorry.  Can you go back to

11   the other file?  Okay.  Page seven.  Yes.

12   A    Yes, that's --

13   Q    Under Gladiator file.  What is this document?

14   A    This is a name change under Florida law changing -- this

15   is a form to change the name of the limited liability company,

16   and it was executed -- well, that date up there is the original

17   formation.  Let's see.  The date --

18   Q    Can you go down to page eight, please?

19   A    Yeah, September 15th, 2010, Ms. Perez, who worked for

20   Mr. Cantor, changed the name of the entity.

21   Q    Do you know whose idea it was to call it Gladiator?

22   A    No, ma'am.

23   Q    Can we go to Exhibit 47?  Page three, please?

24        What is this document?

25   A    That is the formative document for Inquisitec, LLC, which

Latour - Direct / By Ms. Hampton                    161

1   I formed.

2   Q    And the date on the bottom of the document is what?

3   A    The date is September 23, 2015.

4   Q    Can you go down to page four, please?  The --

5   A    I'm sorry; the -- the -- that was the date of the

6   certification.

7   Q    Yes, sir.  Yes, sir.

8   A    The date of establishment is December 19th, 2011.

9   Q    Page four is what we're looking at.  So, the -- Inquisitec

10  was established when?

11  A    December 19th, 2011.

12  Q    And the address is your address?  Is that correct?

13  A    Yes, my office address.

14  Q    Okay.  Can we go to Exhibit 48, please?  To incorporation

15  docs, page four?

16        According to page four -- and this is related to JEC

17  Holdings; is that correct?

18  A    Correct.

19  Q    When was it filed?  When was it formed?

20  A    I don't know if this -- this appears to be an amendment

21  and not the original.  This is when it was amended.  I don't

22  know when the entity was formed.  This is the date of --

23  Q    Okay.

24  A    -- the changes that I made.

25  Q    The date of the amendment was what?

Latour - Direct / By Ms. Hampton                    162

1   A    Oh, I'm sorry; 28th of June, 2011.

2   Q    Can you go down, please?

3        Page five, there is another amendment; is that

4   correct?

5   A    Yes.  There was.

6   Q    What's this -- what is the date of this one?

7   A    The date is November 27th, 2012.

8   Q    Page six.  What is this?

9   A    I believe that this is when -- let's see the date.  This

10  was when I changed from the Delaware registered agents that

11  Mr. Cantor had to the ones that I use.

12  Q    And this -- the date of this document on page six was

13  what?

14  A    The date of this document is September 5th, 2013.

15  Q    Let's go to Exhibit 50, please; under Minelo.  Page two is

16  what?

17  A    That's the Articles of Formation of the limited liability

18  company, Minelo Acquisitions, filed on July 28th, 2009.

19  Q    And whose address is that?

20  A    Mr. Cantor's office address.

21  Q    Can you go to page five, please?  What is this?

22  A    This is when I transferred the -- the manager of record.

23  This was in April of 2011 when I agreed to represent the trust

24  entities; I substituted myself as the registered agent.  SLC

25  Corporate Services, Mr. Cantor, had a special company to do

EXCEPTIONAL REPORTING SERVICES, INC

1   corporate service.

2   Q     Okay.  And this is a Florida company, correct?

3   A     Yes, it is.

4   Q     Okay.  Can we go to Exhibit 51, please?  Page two?  What

5   is this?

6   A     That is the formation of Phantom International

7   Investments, a company that I formed on May 13th, 2011, for --

8   as a subsidiary of Titan, the Delaware company.

9   Q     What was the purpose of forming this company?

10  A     This was the company that was going to handle other

11  investments made by Titan, the subsidiary of Jofesa, but which

12  were not related to Technology.

13  Q     And what did this company end up being used for?

14  A     For the purchase of the Elmhurst home.

15  Q     Can we go to Exhibit 52, please?  Under Phantom.  Can you

16  go to page two?  What is this?

17  A     That is the Articles of Organization for the entity that I

18  formed, Phantom International Technology, which was to handle

19  the investments focusing on technology companies and IT.

20  Q     And what date was this company created?

21  A     This -- February 25th, 2011.

22  Q     Thank you.  Can we go to Exhibit 53, please?  Page five?

23        What is this document?

24  A     This is a -- an entity that I formed, Private Placement

25  Partners, in August 23rd, 2010, that had nothing to do with any

Latour - Direct / By Ms. Hampton                    164

1    of this.  It was an entity I formed before I had something else

2    approved that I needed approved.  This was for marketing

3    overseas.

4    Q    Exhibit 54; under Jade to Ocean -- or Jade Ocean; I'm

5    sorry -- page three.

6    A    Let's see here.

7    Q    What is this document?

8    A    It's an Article of Amendment filed by Mr. Cantor's

9    office -- can you scroll to one more page down?  Yeah, where

10   they changed the name of the entity on September 3rd of 2010

11   from Jade Ocean 2708 Holdings to Spartan Investment, LLC.

12   Q    Do you know whose idea was it to call this company

13   Spartan?

14   A    No, ma'am.

15   Q    Can you go to another file within Exhibit 54, the one that

16   says Spartan?  Page 15, please?

17        What is this?

18   A    Let's see.  Okay.  Can -- can you go a little lower so I

19   can see the date on the stamp, please?  Okay.  Yeah.

20   September -- all right.  So, after I had taken over in 2011 of

21   the entities, the registered agents I assigned to a business

22   that does that, NRA (sic) registered services, and this was me

23   saying I am no longer the registered agent, this company that

24   does this is the registered agent.

25   Q    Who is the registered agent?

1   A     NRAI Services, Inc.

2   Q     Okay.  And this was dated when?

3   A     September 6th, 2013.

4   Q     Let's go to Exhibit 55, please; page three.  What is this?

5   A     That is a Delaware Articles of Formation for Titan

6   International Management, which I formed -- let's see; it was

7   filed on February 28th, 2011, with the intention of being the

8   wholly-owned subsidiary of Jofesa, and the parent company

9   through which the other two entities would invest in the U.S.

10  Q     Can you go down, please?  One more.

11        Okay.  That's all on that.

12        So, you were -- you testified you were involved with

13  the purchases of two real properties, correct?

14  A     The purchase of only one real property.

15  Q     The attempted purchase of Porsche, correct?

16  A     Oh, yes, correct.

17  Q     I said purchases.

18  A     Yes, I was.  I'm sorry.

19  Q     Okay.  And, then, the Elmhurst property?

20  A     And the Elmhurst property, correct.

21  Q     Let's go over some of the property records regarding

22  Elmhurst, which is Exhibit 61.  Under StarTex 615, page six,

23  please.

24        What is this document?

25  A     I believe it is the document generated by the builder

1    confirming the contract of purchase and construction of the new

2    home.

3    Q    Who is the buyer?

4    A    Phantom International Investments.

5    Q    And the Partners in Building are the -- the people we've

6    seen in the bank accounts; is that correct?

7    A    The seller -- yeah, the seller and the builder.

8    Q    Okay.

9         **MS. HAMPTON:**  Can we go to Page 8, please?

10   Q    According to Page 8, this is a receipt and disbursement

11   ledger; is that correct?

12   A    That's -- yes.

13   Q    What was the total under "Receipts of Funds" from the

14   buyer?

15   A    $965,643.21.

16   Q    And according -- under the "Payer Description," who does

17   it say sent that money?

18   A    Phantom International Investments.

19        **MS. HAMPTON:**  Page 22, please.

20   Q    On Page 22, what was the contract sales price listed as

21   for the owner's property?

22   A    $1,328,612.

23        **MS. HAMPTON:**  Page 28, please.

24   Q    Page 28 is a "Customization Addendum."  And who is listed

25   as the buyer?

1   A     Phantom International Investments.

2   Q     Do you know what this Customization Addendum refers to?

3   A     Yes, ma'am.

4   Q     What is it?

5   A     Mr. Marichal provided it to me and indicated that it was

6   the customization of the special features added to the home,

7   beyond the basic contract.

8   Q     What's the date of this document?

9   A     December 12, 2011.

10        **MS. HAMPTON:**  Page 38, please.

11  Q     On Page 38 there's a section that says "Payments

12  Received."  What four payments were received on what dates?

13  A     At that point, on December 15th there was a 5,000 --

14  December 15th, 2011, there was an initial deposit of 5,000; on

15  April 16th, 2012, there was a check for $200,174; on

16  September 10th, 2012, I guess that's a check or a wire for

17  23,637; and then there was a wire on the 14th of $144,427.

18  Q     And then we've seen the December 2012, $960,000 payment --

19  A     Correct.

20  Q     -- which was the final payment, correct?

21  A     Correct.

22  Q     Okay.

23        **MS. HAMPTON:**  Page 39, please?

24  Q     Is this your signature?

25        **MS. HAMPTON:**  Can we go up one page?

1  Q   So this is the next page after "Payments Received,"

2  correct, Page 39?

3  A   Correct.  Correct.

4  Q   And you signed --

5  A   I don't see my signature --

6  Q   Oh, I'm sorry.

7  A   -- but I would have signed, yes.

8  Q   But your name is there?  I apologize.  Your name, right?

9  A   Yes.  Yes.

10  Q   As what -- what capacity?

11  A   As a manager of the -- of Phantom International

12  Investments.

13          **MS. HAMPTON:**  Page 40.

14  Q   What is this?

15  A   Let's see.  I think it's the -- the earnest money contract

16  is sort of the initial summary of -- of the purchase agreement.

17  Q   And the earnest money was the $5,000 that we've discussed?

18  A   I believe so.

19  Q   Is that what the document says?

20  A   Yes.  Yes, I'm sorry.

21          **MS. HAMPTON:**  Page 78.

22  Q   What is this?

23  A   This is a letter, let's see, from me to the gentleman that

24  represented, I guess, the selling realtor.  Let me see here.

25  Q   Mr. Tsokos?

Latour - Direct / By Ms. Hampton                    169

1   A    Yeah, Mr. Tony Tsokos.  Right.  They needed -- they

2   requested confirmation that I was authorized to sign for

3   Phantom International Investments.  And Mr. Marichal asked me

4   to provide this letter, which I did.

5        **MS. HAMPTON:**  Page 137.

6   Q    What is this?

7   A    It looks like a new home warranty application form.

8   Q    Who completed this home warranty application?

9   A    Well, I signed it, so I must have completed it.

10  Q    What's the date?

11  A    The date is December 28th, 2012.

12  Q    Was this home warranty agreement signed before the house

13  was built or after the house was built, or sometime in between?

14  A    It looked from the other documents that it was after they

15  were handing off the keys.  So I would say after, but I'm not

16  certain.

17       **MS. HAMPTON:**  Let's go to Exhibit 62.  Under "Closing

18  Docs," Page 2, please.

19  Q    What is this document?

20  A    Reservation deposit agreement, I guess, holding the unit.

21  Q    Which unit is this referring to, this document?

22  A    It's Unit 5205, plus a cabana, plus a garage, on a Porsche

23  designed tower that was being built by Desert Development.

24  Q    Whose name is listed as the buyer on this?

25  A    Jose Saiz.

Latour - Direct / By Ms. Hampton                    170

1          **MS. HAMPTON:**  Can you go to Page 4, please?

2     Q    On Page 4, who signs as the buyer?

3     A    I'm not familiar with the signature, but it's printed.

4     It's Jose Saiz.

5     Q    What date is this?

6     A    I'm sorry, what what?

7     Q    What's the date of this document?

8     A    The date is November 26th, it looks like 2012.

9          **MS. HAMPTON:**  Can you zoom in a little bit?

10    Q    And there was a deposit, according to this document, in

11    the amount of what?

12    A    $625,000.

13         **MS. HAMPTON:**  Can you go to Page 10, please?

14    Q    What is this document?

15    A    I -- I believe it's the same one.  The reservation -- or,

16    no.  Maybe that's the deposit one -- the deposit agreement.

17    Q    According to this document on Page 10, that first

18    paragraph under the "Fill in the blank" lines, how much is --

19    what's the total purchase price of this property?

20    A    $12,500,000.

21         **MS. HAMPTON:**  Can you go down, please?  Can you go

22    back up -- I'm sorry, back up to Page 10?

23    Q    On the bottom right side of that page there's some -- it

24    looks like initials.  Do you see that?

25    A    Yes.

Latour - Direct / By Ms. Hampton                            171

1   Q    Do you know whose initials those are?

2   A    I don't recognize them, but I'm assuming they're Jose

3   Saiz's, because he signed the contract.

4             **MS. HAMPTON:**  Page 16.  Can you go up to Page 15?

5   Q    Do you recognize this document?

6   A    Yes, I do.

7   Q    What's it dated?

8   A    It is dated February 4th, 2013.

9   Q    Page 16, is this your signature on the next page?

10  A    Yes, it is my signature on the next page.

11  Q    And you signed for which company?

12  A    For Gladiator International.

13            **MS. HAMPTON:**  Page 17.

14  Q    According to Page 17, now who's the purchaser of this

15  property?

16  A    The purchaser was transferred from Mr. Saiz to Gladiator

17  International, LLC.

18            **MS. HAMPTON:**  Page 18.

19  Q    What is this?

20  A    This was an -- that's my signature.  And there was a

21  delay, and Mr. Marichal asked them --

22  Q    No.  Please don't talk about what other people said.

23  A    I'm sorry.

24  Q    What is this document?  What is this schedule here?

25  A    It is the payment schedule for when monies were due for

Latour - Direct / By Ms. Hampton                    172

1    payments for the apartment.  And the slashed one extended the

2    date for payment for that deposit.

3    Q    How much of these -- do you recall how much of these

4    payments were made for this -- for this property?  Which of

5    these payments were made?

6    A    I believe all of the payments were made, except the

7    balance at closing.

8    Q    Which was $6,250,000; is that correct?

9    A    Correct.

10   Q    So, $6,250,000 was actually paid for this property,

11   correct?

12   A    Yes.

13   Q    What happened to that money?

14   A    The money was -- I was -- when they advised that they

15   were --

16   Q    Was it -- was it returned?  Was the money returned?

17   A    No, it was not returned -- 500,000 of it was returned.

18   Q    And what happened to the rest of it?  Who kept the rest of

19   it?

20   A    The developer.

21   Q    Is that because of contracts, basically, the contracts

22   that were signed in the -- the rules that everyone agreed to?

23   A    The rules stipulated and the terms of the agreement were

24   different, but at the end of the day when I advised that we

25   were unable to close, the $500,000 was the most that they were

Latour - Direct / By Ms. Hampton                          173

1    willing to give back.

2    Q    Did Mr. Jose Manuel Saiz-Pineda file a lawsuit to recover

3    the other millions of dollars that he lost on this property?

4    A    Not to my knowledge.

5              **MS. HAMPTON:**  Page 32.  Can you go up so we can see

6    the first document?  I apologize.  This one's 14 pages long, I

7    believe.  Okay.  Go back.  Sorry, go back down to Page 19.  Oh,

8    sorry.  I thought it started there.  Just go back to Page 32,

9    please.

10   Q    Is this your signature?

11   A    Yes, it is.

12   Q    What's the date of this document?

13   A    February 4th, 2013.

14   Q    And this is again in relation to the Porsche property; is

15   that correct?

16   A    Correct.

17   Q    Do you know -- relating to the Elmhurst property, do you

18   know when Ms. Perez-Ceballos began living there?

19   A    I do not know exactly, no.

20   Q    Do you know when she moved into the property?

21   A    No.

22   Q    Do you know if she was residing there?

23   A    Yes.

24   Q    How do you know that?

25   A    When I visited her to meet with Mr. Rushton, the

Latour - Direct / By Ms. Hampton                    174

1    immigration attorney, I visited her at her house with Fernando

2    Saiz and she was residing there at that time.

3    Q    And that was what year?

4    A    That was 2013.

5    Q    When you visited her in 2013 -- do you have the month?

6    Sorry, do you have the month that it was?

7    A    No.  I can find it if you want me to.

8    Q    Yes, sir, please.

9    A    It probably -- I'm not certain, but it should have been

10   around August of 2013.

11   Q    Okay.  And when you visited her in -- around August of

12   2013, who was present at the meeting that you had?

13   A    Just Mrs. Saiz and Fernando Saiz.

14   Q    And Mr. Rushton, is that his name?

15   A    Oh, at the meeting with Mr. Rushton, it was just

16   Mrs. Saiz, Mr. Rushton, and me.

17   Q    Okay.  And then -- and then there was a meeting with you,

18   Ms. Perez-Ceballos, and Mr. Fernando Saiz-Pineda, correct?

19   A    When we went to her house to pick her up, it was just --

20   yeah.

21   Q    Earlier you testified that you were present with Mr. Jose

22   Manuel Saiz-Pineda when he was arrested?

23   A    Yes.

24   Q    Approximately -- do you remember the day that happened?

25   A    I have it, but I don't remember off --

1  Q    If you need to refresh your memory about what day that

2  happened --

3  A    I'm sorry, I don't have the date written down, but it was

4  early June of 2013.

5  Q    Where did you meet Mr. Saiz-Pineda before he was arrested?

6  A    I was asked to fly to Acapulco, Mexico.

7  Q    So did you meet Mr. Saiz-Pineda in Acapulco?

8  A    I met him in Acapulco.

9  Q    Is Acapulco in the State of Tabasco?

10  A    No.

11  Q    Who was present when you met with Mr. Jose Manuel Saiz-

12  Pineda in Acapulco?

13  A    Mr. Javier Olaya, who was the criminal defense attorney,

14  and Mr. Saiz's son was -- older son was present.

15  Q    So there were, what, four people including you?

16  A    Yes, ma'am.

17  Q    Okay.  And how long did you stay in Acapulco meeting with

18  Mr. Jose Manuel Saiz-Pineda?

19  A    Just overnight.

20  Q    Do you remember what month and year it was that you met

21  with him in Acapulco?

22  A    It would have been the night before his arrest in early

23  June 2013.

24  Q    Did you travel with Mr. Saiz-Pineda when he was attempting

25  to enter the United States?

Latour - Direct / By Ms. Hampton                    176

1   A    Yes, I did.

2   Q    At some point -- first of all, how did you travel with

3   him?  How did -- how did you get to the border?

4   A    We flew on a -- on a private propeller plane from Acapulco

5   to, I believe, Reynosa.

6   Q    And then once you arrived at the -- which port of entry

7   did you arrive at in America -- in the United States?

8   A    McAllen.

9   Q    At an airport?

10  A    I do not recall the name.

11  Q    But it was an airport?

12  A    It was an airport on the Mexican side, yes.

13  Q    And after that, Mr. Saiz-Pineda was arrested, correct?

14  A    Correct.

15  Q    Who arrested him?

16  A    The U.S. border officials at the port of entry on the

17  bridge.

18  Q    And who took custody of Mr. Saiz-Pineda?

19  A    The U.S. government took custody of him then and there.

20  And it is my understanding that he was then transferred to the

21  custody of Mexican authorities shortly thereafter.

22  Q    Did you ever meet with Mr. Jose Manuel Saiz-Pineda in

23  Tabasco?

24  A    No.

25  Q    Did you ever meet with any associates of Jose Manuel Saiz-

1   Pineda in Tabasco?

2   A    I made one trip to Tabasco shortly after being engaged and

3   I met with Fernando Saiz and several people when we -- when I

4   was there expressing -- explaining the documents I needed from

5   Jofesa, but Mr. Jose Saiz was not there.

6   Q    Who is Mr. Jose Manuel Saiz-Pineda's assistant?  Who is

7   that?

8   A    The one that I was introduced as his assistant was a woman

9   named Marlis, and I cannot remember her last name.

10  Q    After Mr. Saiz-Pineda was arrested, did you open a safe

11  deposit box?

12  A    Yes, I did.

13  Q    And we've looked at some bank records from one of your

14  Wells Fargo accounts for that safe deposit box, correct?

15  A    Correct.

16  Q    What did you keep in the safe deposit box?

17  A    I kept all of the Minelo vehicle papers and the -- all of

18  the papers involving all of the cars that were under

19  Mr. Latorre's care that we discussed earlier.  As well as,

20  there was a number -- there were a number of watches and pens

21  and other valuables that had been removed from the safe at the

22  Jade penthouse, and I put them in there after discussing with

23  their -- with Dr. -- Fernando Saiz, that I was uncomfortable

24  with the way that Mr. Olaya, the attorney, was proceeding; and

25  that I wanted to get them locked up and safe.

1   Q    Where did you -- where did you retrieve the watches and

2   pens from?

3   A    They were retrieved -- after the arrest, Mr. -- there were

4   several meetings, and then Mr. Olaya, who I had been told --

5   Q    Well, where did you receive --

6   A    From -- from the penthouse.  There was a safe at the Jade

7   penthouse apartment that Mr. Marichal was ordered to have

8   opened.

9   Q    How did you enter the -- I'm sorry, which property?  The

10  penthouse property?

11  A    The penthouse, correct.

12  Q    How did you enter the penthouse property?

13  A    When I arrived -- if I remember correctly, when I arrived,

14  the safe person had already been there, and Mr. Marichal let me

15  into the apartment where the safe was open and the valuables

16  were there.

17  Q    And what did you receive from -- retrieve -- I'm sorry.

18  What did you retrieve from that apartment that day?

19  A    A number of watches, several pens, I believe, and one

20  watch box, and -- essentially, elegant watches.

21  Q    Did you put all of the watches in the safe deposit box?

22  A    I -- I did.  I initially kept them in my office safe, and

23  then I moved them to the safety deposit box, and then -- yes.

24  Q    Okay.  First of all, about when was it that you went into

25  the penthouse to retrieve the jewelry and the pens?  About what

Latour - Direct / By Ms. Hampton                    179

1    month and year?

2    A    It would have been almost immediately after the arrest.

3    So it would have been July or early August.  Probably July of

4    2013.

5    Q    Okay.  And you've recently turned over some of those items

6    to the U.S. government; is that correct?

7    A    Yes, ma'am.  I turned over all the items that I had that

8    Mr. Olaya did not take with him on that date.

9    Q    On what date?

10   A    On -- I cannot recall how many days passed, but after I

11   gathered all of the materials, it was either the same day or

12   the next day Mr. Olaya and a number of Mexican lawyers came to

13   my office and they -- they wanted to know, sort of, an

14   inventory of vehicles and everything, and there were some

15   watches that they took with them.

16   Q    Did you -- did you turn over some of these properties to

17   Mr. Olaya?

18   A    Yes.

19   Q    Okay.  And you kept some of them?

20   A    He -- he knew which ones to take, and the rest I kept.

21   Q    Okay.

22           MS. HAMPTON:  Your Honor, I'd offer Exhibits 105,

23   106, and 107 at this time, which are photos of the watches

24   Mr. Latour (indisc.).

25           MR. REYNAL:  Can we approach, Your Honor?

                    Latour - Direct / By Ms. Hampton                180

1            **THE COURT:**  Yes.

2         **(Begin bench conference)**

3            **MR. REYNAL:**  I'm not sure exactly which pictures

4    these are, but if these are the ones that I -- I think they are

5    of the watches -- they contain annotations as to values.  And I

6    don't think we have any testimony --

7            **MS. HAMPTON:**  I can put the agent -- I can put them

8    on with the agent, if that's better.

9            **THE COURT:**  Okay.

10           **MS. HAMPTON:**  She can testify about that.

11           **THE COURT:**  Okay.

12        **(End bench conference)**

13   **BY MS. HAMPTON:**

14   Q    Do you know what types of watches that you retrieved from

15   the penthouse?

16   A    I know there were a number of Rolexes; there was a --

17   several Richard Miele watches; and I believe an Audemars

18   something.  I don't remember the other ones, but I remember a

19   lot of Rolexes.

20   Q    Do you know the value of any of those watches?

21   A    Yeah.

22   Q    How do you know that?

23   A    Because when I took them and I -- they looked very

24   expensive.  And I Googled and I looked -- I looked them up

25   contemporaneously.

Latour - Direct / By Ms. Hampton                    181

1   Q    When the vehicles -- the Minelo vehicles were starting to

2   be sold in 2013, do you know whether Mr. Fernando Latorre

3   opened another bank account?

4   A    Yes, I do.

5   Q    How do you know that?

6   A    I cannot recall if it was -- he was concerned about the

7   task of liquidating a very high value number of cars.  And I

8   cannot recall if I suggested to him to keep it separate or if

9   he asked me if he should keep it separate, but I remember

10  thinking that it made sense.

11  Q    And those -- that account was just for what purpose?

12  A    As I understood it from when I discussed it with him --

13  Q    Okay.  No, no, no.  Stop.

14  A    It was -- it was for the purpose of liquidating the

15  vehicles.

16  Q    And we've seen some of those --

17  A    The proceeds.

18  Q    -- liquidations in the bank records today, correct?

19  A    Correct.

20  Q    Okay.  What about the "Premium De Collection Cars" that

21  we've heard, what happened to those cars?

22  A    There was an -- the timing -- I've tried to find the

23  timing of that; I can't find it -- but the Premium the

24  Collection Cars were -- Mr. Latorre phoned me anxious --

25  Q    No.  We're not talking about what --

1   A    Okay.

2   Q    -- he told you.

3   A    Okay.  They were collected.  They -- a shipper who had

4   delivered some or most of them to his warehouse showed up and

5   took the Premium the Collection Cars in one event on one

6   evening.  I don't remember the date of when that was.

7   Q    Were the cars the Mexican cars from Premium De Collection

8   gone overnight?

9   A    Literally.

10  Q    How many cars were there, do you remember?

11  A    I don't remember.

12  Q    Approximately?

13  A    Twenty-five -- twenty, twenty-five.

14  Q    Do you know where those cars went?

15  A    I do not know where they went.

16  Q    So we've seen some of the proceeds from the sales today of

17  these vehicles.  Where did you send the proceeds from the sale

18  of the Minelo cars?  What -- what did you do with it?

19  A    They went to Mr. Marichal for payment of the properties

20  and the taxes; they went to Fernando Saiz for the maintenance

21  of -- for the Inquisitec and his family living costs, et

22  cetera; and to Silvia Saiz for her expenses as well, and the

23  payment of the home.

24  Q    How would you send money to Ms. Perez-Ceballos?

25  A    Well, the bills were all paid directly.  They were not

Latour - Direct / By Ms. Hampton                          183

1  paid by Mr. Marichal.  I was paying those bills directly, all

2  the regular bills.  But occasionally, I took cash to Fernando

3  Saiz.

4  Q    How -- how many times, approximately, did you take case to

5  Fernando Saiz-Pineda?

6  A    Seven or eight times, possibly, best guess.

7  Q    Were each of those times for Ms. Perez-Ceballos?

8  A    Yes.

9  Q    Approximately how much --

10          MR. REYNAL:  Object, Your Honor; insufficient

11  predicate.  He thinks -- he just said he took it from

12  Mr. Fernando, not from Ms. Silvia.

13          THE COURT:  Sustained.

14  BY MS. HAMPTON:

15  Q    Who -- what was your understanding -- who was the money

16  for that you would turn over to Mr. Fernando Saiz-Pineda?

17          MR. REYNAL:  Object to the hearsay, Your Honor.

18          MS. HAMPTON:  Your Honor, he's directly involved in

19  these transactions.  He knows --

20          THE COURT:  Okay.  But if he knows.  The "I believe"

21  and "I think" that has been going on for some time is not

22  acceptable.  So you lay the foundation, and I don't want him to

23  say, "Well, I believe," and, "I think," and, "Probably."

24          MS. HAMPTON:  Yes, Your Honor.

25          THE COURT:  Okay.

1    **BY MS. HAMPTON:**

2    Q    Do you know where the money was going?

3    A    Yes, ma'am.

4    Q    Where was it going?

5    A    It was going to Silvia Saiz.

6    Q    How do you know that?

7    A    Because Fernando Saiz told me it was for her.

8            **THE COURT:**  Sustained.

9            **MR. REYNAL:**  Objection, Your Honor.

10           **THE COURT:**  Sustained.  The Court instructs the jury

11   to disregard that response -- that answer.

12   **BY MS. HAMPTON:**

13   Q    And it was cash, you said, that you sent to Mr. Saiz-

14   Pineda?

15   A    Yes.  I physically carried it.

16   Q    What was the cash -- where did you get the cash?

17   A    I -- I withdrew the cash from Wells Fargo, from the

18   accounts which contained the proceeds of the vehicles.

19           **THE COURT:**  And just to be clear, just so you know,

20   that's not personal knowledge if someone has told you

21   something.

22           **THE WITNESS:**  Yes, ma'am.

23           **THE COURT:**  One, if someone tells you something,

24   that's generally hearsay; and two, you don't know, right?  You

25   don't have personal knowledge.

1          **THE WITNESS:**  Your Honor, I understand.  Apologies.

2   BY MS. HAMPTON:

3   Q    Were you ever asked to send money to a bank account in the

4   name of Ms. Perez-Ceballos?

5   A    No.

6   Q    Could you have done that?  Could you have wired money from

7   your -- any of your accounts to her bank account?

8   A    Yes.

9   Q    And, I'm sorry.  And the cash that you delivered or you

10  had, did you deliver it yourself?  Let me ask you that.

11  A    Yes.

12  Q    How did you deliver it yourself?

13  A    I flew to Houston, met with Fernando Saiz, and discussed

14  business, and gave him the money at that time.

15  Q    Where would you hand over the cash to Mr. Fernando Saiz-

16  Pineda?

17  A    Usually it was a several-hour meeting, either at the

18  airport or at a hotel where we discussed business.

19  Q    And each of the cash deliveries that you made,

20  approximately how much were -- did they range in quantity, as

21  far as total cash or was it normally a certain amount?

22  A    It was normally 5, $7,000, because all of the home bills,

23  as I said, I was paying directly.  So I believe it was just --

24  Q    And how many times did you deliver 5 to $7,000?

25  A    My best guess is seven to eight times.

Latour - Direct / By Ms. Hampton                    186

1   Q    Each of those times you traveled to Houston?

2   A    Yes.

3   Q    Okay.  Did you ask anyone else to deliver cash for you?

4   A    Yes.

5   Q    Who?

6   A    My assistant, Bianca Saltz, I believe did it; and my

7   associate, Laura Callava, I believe.

8         **THE COURT:**  Okay.  And you're saying "I believe"

9   again.

10        **THE WITNESS:**  I'm sorry.  Did it.

11        **THE COURT:**  Okay.

12        **THE WITNESS:**  Apologies.

13  **BY MS. HAMPTON:**

14  Q    Did they deliver cash to Houston?

15  A    Yes.

16  Q    On how many occasions?

17  A    That -- that's included in the total of eight --

18  Q    Okay.

19  A    -- that I recall.

20  Q    Were you involved in the purchase of two BMWs?

21  A    A BMW and a mini Cooper.

22  Q    Okay.  And when were you involved in the purchase of

23  those?

24  A    I do not recall the dates and I don't have them written

25  down.

                        Latour - Direct / By Ms. Hampton              187

1    Q    Who were those BMWs for?

2    A    For Mrs. Saiz's daughters.

3    Q    Was this before or after Mr. Jose Manuel Saiz-Pineda's

4    arrest?

5    A    After.

6              **MS. HAMPTON:**  Your Honor, I'd offer Exhibit 89 at

7    this time.  This is the -- this is the vehicle records

8    regarding these vehicles.

9              **MR. REYNAL:**  No objection.

10             **THE COURT:**  Okay.  They're admitted.

11        **(Government's Exhibit Number 89 was received in evidence)**

12             **THE COURT:**  But why don't we take our afternoon break

13   there.  Let's take about a 15-minute break.  Was that 89?

14             **THE MARSHAL:**  All rise for the jury.

15             **MS. HAMPTON:**  89, Your Honor.

16        **(Recess taken from 2:55 p.m. to 3:14 p.m.)**

17        **(Outside the presence of the jury)**

18             **THE COURT:**  Are you ready to continue, counsel?

19             **MS. HAMPTON:**  Yes, Your Honor.

20             **THE COURT:**  Okay, is the jury ready, Mr. Perez?

21        (No audible response)

22             **MR. SPEAKER:**  All rise for the jury.

23        **(Jurors enter at 3:15 p.m.)**

24             **THE COURT:**  All right, you can have a seat and we'll

25   continue.

**DIRECT EXAMINATION (CONTINUED)**

1

2   BY MS. HAMPTON:

3   Q    Mr. Latour, you stated when we left that you had purchased

4   two vehicles for Ms. Perez-Ceballos, correct?

5   A    Yes, ma'am.

6   Q    What are the vehicles?

7   A    One was a MINI Cooper --

8        MR. REYNAL:  Your Honor, misstates the testimony.  He

9   said he purchased two vehicles for the daughters.

10        THE COURT:  Sustained.

11   BY MS. HAMPTON:

12   Q    Who did you purchase the vehicles for?

13   A    My -- they were for Silvia Saiz's daughters.

14   Q    What vehicles were they?

15   A    One was a BMW and one was a MINI Cooper.

16        MS. HAMPTON:   Your Honor, I'd offer Exhibit 89.

17        MR. REYNAL:  (Indisc.)

18        MS. HAMPTON:   Yes.

19        MR. REYNAL:  No objection, Your Honor.

20        THE COURT:  It's admitted.

21        **(Government's Exhibit Number 89 was received in evidence)**

22        MS. HAMPTON:  May I publish, Your Honor?

23        THE COURT:  Yes.

24   //

25   //

```
                   Latour - Direct / By Ms. Hampton              189
```

1   BY MS. HAMPTON:

2   Q    Page one of Exhibit 89, what is this?

3   A    I believe that's the BMW, the 2016 BMW.

4   Q    What's the address of the titled owner?

5   A    2706 Lytham Court, Sugar Land, Texas.

6   Q    Page two, what is this?

7   A    It is a 2016 MINI Cooper.

8   Q    Who's the titled owner?

9   A    Silvia Beatriz Perez-Ceballos.

10  Q    At what address?

11  A    2706 Lytham Court, Sugar Land, Texas.

12            MS. HAMPTON:  Your Honor, I offer Exhibits 105, 106,

13  and 107.

14       (Ms. Hampton/Mr. Reynal confer)

15            MR. REYNAL:  No objection, Your Honor.

16            THE COURT:  They're admitted.

17       (Government's Exhibits Numbers 105, 106, and 107 were

18  received in evidence)

19            MS. HAMPTON:  May I publish, Your Honor?

20            THE COURT:  Yes.

21  BY MS. HAMPTON:

22  Q    Exhibit 105, what is this?

23  A    That's one of the watches that I turned in when I was

24  subpoenaed.

25  Q    And what kind of watch is this?

 1  A    It is -- I don't remember the model number, but it's a

 2  Rolex and it's a very rare Rolex and it's -- from what I

 3  Googled, it's --

 4  Q    Okay, thank you.

 5           **MR. REYNAL:**  Excuse me.

 6  Q    Thank you, sir.

 7           **MR. REYNAL:**  (Indisc.)

 8           **THE COURT:**  Just answer the question, okay?

 9           **THE WITNESS:**  Yes.

10           **MS. HAMPTON:**  Exhibit 106, please.

11           **THE WITNESS:**  Apologies, Your Honor.

12  **BY MS. HAMPTON:**

13  Q    What is this?

14  A    It's a watch, Breitling.

15  Q    Do you know what kind of watch this is?  I'm sorry.

16  A    I apologize?

17  Q    Do you know what kind of watch this is?

18  A    It's called a Breitling for Bentley.

19  Q    Bentley like the car?

20  A    Yes, ma'am.

21  Q    Is this associated with Bentley?

22  A    Yes.  When you purchase a Bentley vehicle, you're given --

23  some vehicles you're given a watch that goes with it.

24           **MS. HAMPTON:**  And Exhibit 107, please.

25  Q    What is this?

Latour - Direct / By Ms. Hampton                    191

1   A    That's the Audemars watch that I had in storage and that I

2   gave to the government.

3   Q    And this is one of the watches you put in the safe deposit

4   box?

5   A    One of the ones in my safe, yes.

6   Q    What kind of watch is this?

7   A    I believe it's Audemars Piguet.

8   Q    Okay, thank you.  Did you direct anyone other than your

9   staff to send money to Houston, cash?

10  A    No.

11  Q    Did you direct Mr. Fernando Latorre?

12  A    No.

13       **(Pause)**

14  Q    Mr. Latour, do you have a money transmitting business

15  license, either federally or in any state?

16  A    No, ma'am.

17       **(Pause)**

18  Q    Do you have an agreement with the Government regarding

19  your cooperation?

20  A    No, ma'am.

21  Q    Do you -- have you been promised anything in this case

22  regarding your cooperation?

23  A    No, ma'am.

24  Q    How would you describe your role in this case?

25  A    I would say that my role was --

1          **THE COURT:**  What's the objection?

2          **MR. REYNAL:**  Your Honor, I think it calls for a

3    narrative and --

4          **MS. HAMPTON:**  I'll rephrase, I'll rephrase.

5          **THE COURT:**  Okay.

6    **BY MS. HAMPTON:**

7    Q    You in one word have described yourself as far as what you

8    did in this case; is that correct?  What is the one word?

9    A    I was the wallet.

10   Q    For who?

11   A    For Jose Saiz.

12        **(Pause)**

13   Q    When was the last time you had contact with Ms. Perez-

14   Ceballos?

15   A    When she telephoned me in 2014 when I was ill.

16   Q    Was it anything to do with the money or was it because you

17   were ill?

18   A    It's because I was ill.

19   Q    When -- who did you have contact with regarding the 2016

20   BMW and MINI Cooper?

21   A    Fernando Saiz.

22   Q    Did you also -- were you also involved in the filing of

23   tax returns for some of these companies?

24   A    Yes.

25   Q    Why did you do that?

Latour - Cross / By Mr. Reynal                      193

1   A    Well, it was my job as an attorney for the Titan group,

2   and as the person administering the trust assets, I had the

3   accountants do the appropriate tax filings every year for all

4   the entities.

5              **MS. HAMPTON:**  May I have a moment, Your Honor?

6              **THE COURT:**  Yes.

7              **MS. HAMPTON:**  Pass the witness, Your Honor.

8                         **CROSS EXAMINATION**

9   **BY MR. REYNAL:**

10  Q    I'd like you to look at the jury and tell them that you

11  don't have an agreement with the Government.

12  A    I do not have an agreement with the Government.

13  Q    Okay.  You sure?

14  A    Yes, sir.

15  Q    You've met with them several times.

16  A    Yes, sir.

17  Q    And when you met with them, you signed a letter agreement

18  with them, didn't you?

19  A    A proffer agreement.

20  Q    Yeah, and that proffer agreement says that you're not

21  going to be -- nothing you can say here is going to be used

22  against you, right?

23  A    No, sir.

24  Q    That's not what it says?

25  A    It said in the context of my meetings with them, but that

1    anything I said, I opted to tell the complete truth.

2    Q    That's not my question.

3    A    Yes, sir.

4    Q    My question was your agreement with the Government says

5    that nothing you say is going to be used against you; isn't

6    that what it says?

7    A    You're mischaracterizing it, no.

8    Q    That's not what it says, okay.

9              **MR. REYNAL:**  Can I have a -- can I have that put up

10   on this screen, please, 112?

11             **MS. HAMPTON:**  It's not admitted yet, Your Honor.  We

12   move to admit Exhibit 113.

13             **MR. REYNAL:**  I'm not moving to --

14             **MS. HAMPTON:**  I'm sorry, 112.

15             **THE COURT:**  Well, if you're going to show it to the

16   jury, you can't --

17             **MR. REYNAL:**  I'd just like to show him.

18             **THE COURT:**  Oh, just him, okay.  It's just for the

19   witness.

20             **MS. HAMPTON:**  We move to admit it also, Your Honor,

21   at this time.

22             **THE COURT:**  I had already ruled on that.  We can see

23   where we go from here.

24             **MR. REYNAL:**  Can you please scroll down?

25   //

1    **BY MR. REYNAL:**

2    Q    Have you been able to review it all?

3    A    Yes, sir.

4    Q    Would you agree with me that the Government --

5         **MS. HAMPTON:**  Oh, that was just page one.  There's

6    three pages.

7    A    I agree that for the information stated during my meetings

8    with them, it cannot use, but there is no promises of any non-

9    prosecution or anything like that.

10   Q    Okay, so you did have an agreement with them and it was

11   that they weren't going to use what you said against you,

12   right?

13   A    In the meetings with them, yes, sir.

14   Q    And how much have you been paid by Jofesa and Fernando and

15   Jose over the course of your relationship with them?

16   A    I would estimate that over a million and a half dollars

17   over the course of this seven years.

18   Q    Okay, and has the Government told you that you have to

19   give that money back?

20   A    No, sir.

21   Q    And we heard a lot about Mr. Chen and Mr. Ling and

22   Mr. Ping and Mr. Wynn and putting those down on bank documents.

23   A    Yes, sir.

24   Q    And you did that, right?

25   A    Yes, sir, I did.

1   Q    Nobody directed you to do that, did they?

2   A    No, sir.

3   Q    You did that on your own.

4   A    I did.

5   Q    Have you been prosecuted for that?

6   A    No, sir.

7   Q    And you say you have no agreements with the Government?

8   A    The proffer agreement that I signed is an agreement with

9   the Government, but there's no promise that I'm --

10       **(Pause)**

11  Q    You made a number of trips to Houston.

12  A    Yes, sir.

13  Q    Primarily those trips were to see Mr. Fernando.

14  A    Yes, sir.

15  Q    You testified I believe earlier that you believe that you

16  met or saw Ms. Silvia at her house --

17  A    Yes, sir.

18  Q    -- and that did you say there was furniture in it?

19  A    Yes, sir.

20       **MR. REYNAL:**  Can I see Exhibit 95 of page 99, please?

21  Please stop there.

22  Q    You don't have a plane ticket you can show us that says

23  that you went there in August, do you?

24  A    No, sir.

25  Q    That's just your recollection.

1   A    Yes, sir.

2   Q    If we've had testimony that a worker installing furniture

3   was injured at the end of September, would that refresh your

4   recollection that perhaps you went to the house later than you

5   had originally thought?

6   A    It is possible.  I was only in the living room and I don't

7   know to the extent of the furniture being completed.

8   Q    Is it possible that your meeting also could have been one

9   or two months later?

10  A    Yes, sir, it's possible.

11       **(Pause)**

12  Q    Jofesa was owned by Jose and Fernando Saiz.

13  A    Yes, sir.

14  Q    They never made a secret of it.

15  A    No, sir.

16  Q    And the vast, vast, vast majority of the money you

17  received came from Jofesa.

18  A    Yes, sir.

19  Q    Probably in excess of 98 percent of it.

20  A    I couldn't say, sir.

21  Q    But certainly the vast, vast majority.

22  A    I don't know how much the vehicles added up to, but the

23  majority I would say.

24       **MR. REYNAL:**  No further questions.

25       **THE COURT:**  Anything further from the Government for

Latour - Redirect / By Ms. Hampton                    198

1   the witness?

2              **MS. HAMPTON:**  Yes, Your Honor, the Government would

3   offer Exhibit 112 at this time.

4              **MR. REYNAL:**  I object, Your Honor.  He's testified to

5   his understanding.

6              **THE COURT:**  Sustained.

7              **MR. REYNAL:**  Thank you.

8                      **REDIRECT EXAMINATION**

9   **BY MS. HAMPTON:**

10  Q    Mr. Latour, does your proffer agreement cover your sworn

11  testimony under oath?

12  A    No.

13  Q    And did you come here -- have you told the truth today?

14  A    Yes, ma'am.

15  Q    Did you come here voluntarily?

16  A    Yes.

17             **MS. HAMPTON:**  Pass the witness.

18             **MR. REYNAL:**  No further questions.

19             **THE COURT:**  Nothing further, all right.  Can the

20  witness then be excused, Ms. Hampton?

21             **MS. HAMPTON:**  Yes, Your Honor.

22             **THE COURT:**  Mr. Reynal?

23             **MR. REYNAL:**  Yes, Your Honor.

24             **THE COURT:**  Thank you, sir.  You can step down and

25  you're free to leave the courthouse.

1          **THE WITNESS:**  Yes, ma'am, thank you.

2      **(Witness steps down)**

3          **MS. HAMPTON:**  Government calls Special Agent Patricia

4  Ebright-Trevino.

5          **THE COURT:**  Good afternoon, you can approach and

6  raise your right hand.

7      **PATRICIA EBRIGHT-TREVINO, GOVERNMENT'S WITNESS, SWORN**

8      **(Pause)**

9          **MS. HAMPTON:**  May I proceed, Your Honor?

10         **THE COURT:**  Yes.

11                        **DIRECT EXAMINATION**

12  BY MS. HAMPTON:

13  Q    Will you introduce yourself to the ladies and gentlemen of

14  the jury, please?

15  A    Patricia Trevino.

16  Q    How are you employed?

17  A    I'm a special agent with the Drug Enforcement

18  Administration.

19  Q    How long have you been with the DEA?

20  A    Seventeen years.

21  Q    Is DEA kind of in your genes, your family's bloodline, law

22  enforcement?

23  A    Yeah.

24  Q    Did you grow up -- where did you grow up partly, in the U.

25  S. and in Mexico?

1   A    I spent some time in Mexico growing up.

2   Q    Are you fluent in Spanish?

3   A    Mostly.

4   Q    You can communicate conversational wise and read Spanish

5   documents; is that correct?

6   A    Yes.

7   Q    Okay.  What kind of training do you have to undergo to

8   become a DEA agent and to continue your job as an agent?

9   A    We go to an academy for four months of training.

10  Q    And each year do you have other trainings that you have to

11  attend?

12       THE COURT:  Hold on a second.  Can you bring that

13  forward and speak --

14       THE WITNESS:  Oh, I'm sorry.

15       THE COURT:  -- up a little bit so everyone can hear?

16  BY MS. HAMPTON:

17  Q    Each year do you have to continue training, does DEA

18  provide other trainings for you throughout --

19  A    There are other trainings provided, offered for us.

20  Q    When did you begin your investigation into this case

21  regarding Ms. Perez-Ceballos, Mr. Jose Manuel Saiz-Pineda, and

22  Mr. Medina-Sonda?

23  A    The investigation was initiated in May or June of 2013.

24  And I began my work on it after that, August or September of

25  2013.

1  Q    How did you begin your investigation?

2  A    The investigation was initially started based upon the --

3  an open source reporting of the money seizure that occurred in

4  Tabasco in May of 2013.

5  Q    What day in May did that money seizure happen?

6  A    Approximately May 22nd.

7  Q    And that was the 88 million pesos?

8       MR. MAGLIOLO:  Your Honor, she's -- we object to that

9  as leading.

10      THE COURT:  Sustained.

11 BY MS. HAMPTON:

12 Q    Well, what was the money seizure, how much money was

13 seized in Mexico?

14      MR. MAGLIOLO:  We object to any hearsay response,

15 Your Honor.

16      THE COURT:  Overruled.

17 A    Approximately 88 million pesos.

18 Q    Where was it seized?

19      MR. MAGLIOLO:  Again, Your Honor, unless she has her

20 own personal knowledge, she's answering from hearsay, we object

21 to hearsay.

22      MS. HAMPTON:  Your Honor, this is not offered for the

23 truth of the matter asserted; this is offered to show why she

24 took the direction she did in her investigation.

25      THE COURT:  Okay, then you kind of just need to go

1   there and instead of her testifying all over about what we've

2   already heard.  So just establish and move on.  So overruled to

3   that extent.

4   **BY MS. HAMPTON:**

5   Q    Where did the money seizure occur, please?

6   A    At a shop, an auto part shop in -- near Villahermosa.

7          **THE COURT:**  Okay, because I just -- she's not here to

8   repeat what the evidence is.

9          **MS. HAMPTON:**  Yes, Your Honor.

10          **THE COURT:**  So we just --

11   **BY MS. HAMPTON:**

12   Q    As part of your investigation, did you begin collecting U.

13   S. financial documents?

14   A    Yes.

15   Q    What type of documents did you collect?

16   A    Bank statements, everything that could be provided from

17   the bank issued via Grand Jury subpoena, information found on

18   FinCEN.

19   Q    Did you also collect company documents?

20   A    Yes, we did.

21   Q    And real estate records.

22   A    Yes.

23   Q    Okay, and you -- did you analyze each of the bank

24   documents, the company documents, and the real estate records

25   yourself?

1    A    Yes.

2    Q    You reviewed all these documents, most of which the jury

3    has seen.

4    A    Yes.

5    Q    So when did in the U. S. the first bank account or first

6    company trust, when was that first created in the U. S. by

7    Mr. Medina-Sonda and Mr. Saiz-Pineda?

8    A    The first -- the very first -- the first financial account

9    was created November 28th of 2006.

10   Q    What happened in 2006 in Tabasco?

11   A    The elections had recently occurred and Andres Granier was

12   elected Governor for the State of Tabasco.

13   Q    And what was Mr. Saiz-Pineda's position supposed to be

14   beginning in 2007?

15   A    The Secretary of Finance and Administration.

16   Q    So back to November 28, 2006, what was created on that

17   day?

18   A    A bank account with Merrill Lynch, and it was -- if my

19   memory's correct, it was in the name of Comprehensive.

20   Q    And was there another bank account created on the same day

21   under the name of Performance?

22             MR. MAGLIOLO:  Your Honor, she's leading in her --

23             THE COURT:  Sustained.

24             MR. MAGLIOLO:  May the --

25             THE COURT:  Sustained.

1    BY MS. HAMPTON:

2    Q    What other activities happened on November 28, 2006,

3    according to the records you've reviewed?

4    A    A bank account was --

5              MR. MAGLIOLO:  Well, then we'd have to object to

6    hearsay if she's --

7              THE COURT:  Yeah, well, what is the purpose of this

8    witness?  Because has that information come in already?

9              MS. HAMPTON:  No, Your Honor?

10             MR. MAGLIOLO:  (Indisc.)

11             MS. HAMPTON:  I'm trying to --

12             THE COURT:  But she's not going to repeat all the

13   financial and the banking that you've already showed to the

14   jury.

15             MS. HAMPTON:  There's other documents that they

16   haven't seen that she's summarizing right now, Your Honor.  I

17   can continue with --

18             THE COURT:  And they've come in as business records

19   already or --

20             MS. HAMPTON:  They've already been admitted, Your

21   Honor, yes.

22             THE COURT:  Okay.

23             MR. MAGLIOLO:  Then we ask for the proper predicate

24   so we -- so I can understand she's talking about something

25   that's in evidence so I'll know when I have to object.

Ebright-Trevino - Direct / By Ms. Hampton                205

1      **THE COURT:**  Okay, you want to refer to the exhibit --

2      **MS. HAMPTON:**  Yes, Your Honor.

3      **THE COURT:**  -- that's being discussed?

4      **MS. HAMPTON:**  Let's go to Exhibit Number 1.

5   Actually, go to Exhibit Number 2, I'm sorry, Exhibit Number 2.

6   Can you pull the files, the name of the files out?  And that

7   document that says "MSSB001 to 100, Performance Application."

8   And right under that -- sorry, 001 to 06.

9   **BY MS. HAMPTON:**

10  Q     Page one, what is this document?

11  A     It's an application for Morgan Stanley.

12  Q     And what is the date of this document?

13        **(Pause)**

14  A     March -- I believe the typed is 28, 2007.

15        **MS. HAMPTON:**  Can you go up to page one, please?  Can

16  you zoom in a little bit?

17  Q     This document is you said for Morgan Stanley.  What's the

18  party name of the document?

19  A     Comprehensive Advisory and Development Company Limited.

20  Q     And the country of organization, according to this

21  document.

22  A     Ireland.

23  Q     And what year was it established?

24  A     Two thousand and six.

25        **MS. HAMPTON:**  Can you go to page two, please?

1  Q     Under subsection five of page two, who is the beneficial

2  owner of Comprehensive Advisory's account?

3  A     Martin Alberto Medina.

4  Q     And under subsection roman numeral three, paragraph one,

5  what is the answer regarding source of wealth or source of

6  funds Mr. Medina gives in this account?

7  A     The beneficial owner is a partner in "Patrimonium

8  Consultores, which is an important tax advisory firm in Mexico.

9  His wealth comes from the income from his firm."

10         **MS. HAMPTON:**  Page three, please.

11  Q     There is a question on number three; what question is

12  that?

13  A     "For each owner of the account and for each person with

14  authority over the account, please identify whether they

15  currently are or have formerly been a senior government or

16  political figure in a government office."

17  Q     And what does Mr. Medina-Sonda say?

18  A     "No."

19         **MS. HAMPTON:**  Can we get out of this document?  The

20  same exhibit, Exhibit 2, can we go to 007 to 519?  Page 25, can

21  you zoom in, please?  I think this is the wrong -- I'm sorry,

22  go back to page one.  I'm sorry, I jumped around too much

23  there.

24  Q     What is the date of this statement?

25  A     3/1/2007 to 3/31/2007.

1   Q    Okay, so this is when this account begins, this is March

2   of 2007, correct?

3   A    Correct.

4   Q    Was Mr. Saiz-Pineda in office at this time?

5   A    Yes.

6        **MS. HAMPTON:**  Okay, can we get out of this file and

7   go to 520 to 637?  Page 25, please.

8   Q    What is this document?

9   A    It's a portion of the establishment of PI Trust, and this

10  is the share transfer, share certificate.

11       **MS. HAMPTON:**  Can you zoom in a little bit?  Okay, so

12  can you go down.

13  Q    For which company is this for?  This is page 25.

14  A    Performance Investment Limited.

15  Q    And in the middle of the page, --

16       **MS. HAMPTON:**  So if you can go down a little bit.

17  Q    -- whose name is there regarding shares of the company?

18  A    Mr. Jose Manuel Saiz-Pineda.

19  Q    And what trust is listed there next to Mr. Saiz-Pineda?

20  A    That is Global Trustees Limited in New Zealand.

21       **MS. HAMPTON:**  Page 26, please.

22  Q    What is the date of this document?

23  A    November 28th, 2006.

24  Q    So is this the day that you were referring to earlier in

25  your testimony?

Ebright-Trevino - Direct / By Ms. Hampton                    208

1   A    Yes.

2   Q    What happened according to this document on page 26 on

3   November 28, 2006?

4            THE WITNESS:  Can we zoom out on the page?  I know

5   what happened but I don't know what this document says.

6   A    I don't know that this is the correct page, but it's a

7   transfer of shares.  Basically a personal holding company was

8   established in Ireland.  Performance Investment Limited was

9   established on November 28 of 2006.

10  Q    And who is behind, according to page that we just looked

11  at 25, Performance Investment Limited?

12  A    Mr. Saiz-Pineda.

13           MS. HAMPTON:  Okay, page 33, please.  Can you zoom

14  in, please?

15  Q    What is this?

16  A    It looks like it's the transfer where they're transferring

17  Performance Investment Limited to be taken care of by Global

18  Trustees New Zealand Limited.

19  Q    And what's this dated?

20  A    November 30th, 2006.

21           MS. HAMPTON:  Page 34, please.

22  Q    What is this document?

23  A    It's a cancelation of the shares of Performance Investment

24  Limited.

25  Q    And who does it name on this document for Performance

1    Investment Limited?

2    A    Jose Manuel Saiz-Pineda.

3    Q    And what is the address for Mr. Saiz-Pineda?

4    A    Sanchez Magallanes 1113.

5    Q    What is the date of this document?

6    A    November 28th, 2006.

7         **MS. HAMPTON:**  Page 37, please.

8    Q    What is this document?

9    A    Discretionary settlement of PI Trust.

10   Q    And what's it dated?

11   A    November 28th, 2006.

12   Q    What's PI Trust?

13   A    It is a trust established by Saiz-Pineda.

14   Q    Where is the trust established by Mr. Saiz-Pineda?

15   A    It says the jurisdiction of New Zealand.

16        **MS. HAMPTON:**  Page 38, please.  Can you go to the

17   top?

18   Q    On page 38, where is the address of Mr. Saiz-Pineda on the

19   top paragraph?

20   A    Sanchez Magallanes 1113.

21        **MS. HAMPTON:**  Page 61, please.

22   Q    What is page 61?

23   A    This is the deed of appointment appointing an original

24   protector of PI Trust.

25   Q    And who does Mr. Saiz-Pineda appoint as a protector for PI

1    Trust?

2    A    Martin Alberto Medina-Sonda.

3            **MS. HAMPTON:**  Okay, let's go to Exhibit 3.  Actually,

4    can we go back to Exhibit 1?  I apologize.  Exhibit 1 under

5    "docs," page one.

6    Q    What is this document?

7    A    Certificate of foreign status of beneficial owner for

8    United States tax withholding.

9    Q    And who is the name of the company on this document?

10   A    Comprehensive Advisory and Development Company Limited.

11   Q    And box number two, the country of incorporation is where?

12   A    Ireland.

13   Q    The address in box number five is what?

14   A    Sanchez Magallanes 1113.

15           **MS. HAMPTON:**  Can we go to page five, please?

16   Q    It's a bad copy, but what is this document?

17   A    Signature card for Comprehensive Advisory and Development

18   Company Limited.

19   Q    And whose named as the signatory?

20   A    Martin Alberto Medina-Sonda.

21   Q    What's the date?

22   A    Twenty-eighth of November, 2006.

23   Q    Is that the same date as the Performance -- the PI Trust

24   was created?

25   A    Yes.

Ebright-Trevino - Direct / By Ms. Hampton          211

1              **MS. HAMPTON:**  Page 36, please.

2    Q    What is this document?

3    A    Notice of change in directors or secretaries and their

4    particulars.

5              **MS. HAMPTON:**  Can you go down, please?

6    Q    For which company?

7              **MS. HAMPTON:**  Can you go back up, please?

8    A    I think it's Comprehensive if -- Comprehensive Advisory

9    and Development Company Limited.

10   Q    And what's the date of this document of the change?

11   A    Twenty-eight November, 2006.

12             **MS. HAMPTON:**  Can we get out of this document?  Can

13   we go into 341 to 344, page one?

14   Q    What is the address of Comprehensive Advisory Development?

15   A    Sanchez Magallanes 1113.

16             **MS. HAMPTON:**  Can we go out of this document and into

17   the wire documents of Exhibit 1, under "comprehensive wire?"

18   Q    Page one is dated when?

19   A    4/26/2007.

20   Q    And what is the wire amount in this wire transfer?

21   A    Twenty-two thousand eight hundred and thirty.

22   Q    Where is the money being wired in from, according to this

23   wire transfer?

24             **MS. HAMPTON:**  Can you go down, please?  No, no, no,

25   go back.  Go back up, please.

1   A    From Banorte Banco Mercantil del Norte.  And above that is

2   -- the word's cut off, but it should be Federation Tabasquena.

3   Q    Where I'm pointing up here?

4   A    Yes.

5   Q    So this is Federacion Tabasquena, correct?

6   A    Yes.

7   Q    And that's coming in from Mexico; is that correct?

8   A    Yes.

9   Q    Okay.  On this Comprehensive account that we're looking at

10  in Exhibit Number 1, who is the protector of the trust for

11  Mr. Medina-Sonda?

12  A    Mr. Saiz-Pineda is listed as the protector.

13  Q    Okay, so how do you compare these two companies,

14  Comprehensive and Performance?

15  A    They're designated as personal -- they were created as

16  personal holding companies in the country of Ireland.  And then

17  on that same date, --

18          **MR. MAGLIOLO:**  Your Honor, if she's going to testify

19  as an expert as to the rules in Ireland, I'm going to have to

20  object that she has not been designated as an expert.

21          **MS. HAMPTON:**  She's not, Your Honor.  She's

22  testifying about what's in the records.

23          **THE COURT:**  Yeah, overruled at this time.

24          **MS. HAMPTON:**  Come down on page one, please.  Keep

25  going.  Can you go back up to page one?

1    **BY MS. HAMPTON:**

2    Q    Okay, there's a second wire on page one here, correct?

3    What's the date of this wire?

4    A    4/30/2007.

5    Q    And what's the amount of the wire?

6    A    Two hundred and five thousand, two hundred and forty-two.

7    Q    And where does this money come from?

8    A    I see it's cut off, it says Sanchez Magallanes.  If --

9    maybe if we could go down.

10   Q    Is that the address, Sanchez Magallanes?

11   A    Yes.

12        **MS. HAMPTON:**  Okay, can we go down to the next page,

13   please, page two?

14   Q    There's another wire; what's it dated?

15   A    7/5/2007.

16   Q    And what's the amount?

17   A    Fifty-five thousand, three hundred and forty-one.

18   Q    And where is the money coming from?

19   A    Again it looks like the words cut off.  It should read

20   Federation de Cooperativas and then it says Sanchez and then

21   Magallanes is cut off.

22        **MS. HAMPTON:**  Okay, keep going to the next page,

23   please.

24   Q    What is the date of this wire?

25   A    7/5/2007.

1   Q    And what was the amount?

2   A    49,538.

3   Q    And where is it coming from?

4   A    Banorte Federacion Tabasquena.

5   Q    And what's the address?

6   A    It's cut off, but it would be Sanchez Magallanes.  It's

7   partial.

8   Q    Is it down here on the bottom of the page?

9   A    Yeah, it's partial after, it says Sanchez M-a and then on

10  the next line it says gallanes.

11       **MS. HAMPTON:**  Page 4, please.

12  Q    When was this wire?

13  A    7/5/2007.

14  Q    What's the amount?

15  A    27,830.

16  Q    Where is this money being wired in from?

17  A    Banorte again Federation Tabasquena.

18       **MS. HAMPTON:**  Page 7.  Can you move up, please.

19  Q    What is the date of this wire?

20  A    11/6/2007.

21  Q    What's the amount?

22  A    111,835.

23  Q    And where is it coming from?

24  A    Federation Tabasquena.

25       **MS. HAMPTON:**  Page 7, please.

Ebright-Trevino - Direct / By Ms. Hampton                    215

1    Q    And the date of this wire?

2    A    11/21/2007.

3    Q    And what's the amount of the wire?

4    A    45,521.

5    Q    And where is this money coming from?

6    A    Federation de Cooperativas.

7    Q    Page 8.  What's the date of this wire?

8    A    1/30/2008.

9    Q    And what's the amount?

10   A    110,550.

11   Q    And where is this money coming from?

12   A    Federation Tabasquena.

13   Q    Page 11.

14        **MS. HAMPTON:**  Is this the top of the page?  Okay,

15   better.

16   Q    What is the date of this wire?

17   A    Either February 11th or 11/2 of 2008.

18   Q    What is the amount of the wire?

19   A    314,646.

20   Q    Where is this money coming from?

21        **(No audible response)**

22        I'm pointing to it up here.  Is it from Performance?

23   A    Yes, Performance Investment Limited.

24   Q    So right here Mr. Saiz-Pineda is sending $314,000 to

25   Mr. Medina-Sonda, correct?

1   A    Correct.

2   Q    Through their companies?

3   A    Yes.

4   Q    So on Page 11 there's another wire, what's the date of the

5   next wire?

6   A    3/26 of 2008.

7   Q    And what's the amount?

8   A    325,000.

9   Q    And where is this money coming from?

10  A    I believe this is an outgoing wire to Mara Escrow Company.

11  Q    Okay.

12       **MS. HAMPTON:**  Can you go up to the top of the page

13  real quick, Page 11.  You can go down a bit.

14  Q    And the third wire on Page 11 --

15       **MS. HAMPTON:**  Can you go to the bottom of the page?

16  Q    -- is what?

17  A    I'm sorry?

18  Q    What is this wire, the third one on Page 11?

19  A    325,000.

20  Q    On what date?

21  A    3/26/2008.

22  Q    And who is this money going to?

23  A    Performance Investment Limited.

24       **MS. HAMPTON:**  Page 12, please.

25  Q    What is the date of this wire?

Ebright-Trevino - Direct / By Ms. Hampton                217

1    A    4/15/2008.

2    Q    And what's the amount?

3    A    157,334.

4    Q    And where is the money coming from?

5    A    Federation Tabasquena.

6         MS. HAMPTON:  We can get out of that document.  Let's

7    go to Exhibit 3 now.  The PI Trust file.  Go down, please.

8    Q    What is this?

9    A    Discretionary settlement of PI Trust.

10   Q    And what's it dated?

11   A    November 28th, 2006.

12        MS. HAMPTON:  Can you go down, please.

13   Q    Who was listed as the settler of the property -- of the

14   account?

15   A    Jose Manuel Saiz-Pineda.

16        MS. HAMPTON:  And can we get out of this document,

17   please.  Can we go to the performance transfer of shares file.

18   Q    What is this document, Page 1?

19   A    It's a transfer of shares sheet from Mr. Saiz-Pineda to

20   Global Trustees.

21        MS. HAMPTON:  Can you go down -- can you go to Page 2

22   and then Page 3, please.

23   Q    Who were the shares transferred to, according to Page 3?

24   A    This is when they acquired the company, they bought it and

25   they cancelled out the shares that were -- Number 1 share was

Ebright-Trevino - Direct / By Ms. Hampton                    218

1    Pemco and Number 2 was Humecorp.

2    Q     When who bought the company?

3    A     Mr. Saiz-Pineda.

4          **MS. HAMPTON:**  Okay, let's get out of this document

5    and go to statements.

6    Q     This is the account of -- which account are we looking at,

7    according to Page 1?

8          **MS. HAMPTON:**  Can you go down, please.

9          **THE WITNESS:**  Performance Investment Limited.

10         **MS. HAMPTON:**  Can you go to Page 103.  103.

11   Q     Okay, Page 103 of this bank statement document, what does

12   the deposit and withdrawal section tell us?

13         **MS. HAMPTON:**  Can you zoom in, please?

14         **THE WITNESS:**  There is an incoming wire received.

15   Q     From where?

16   A     It says from bank for Performance Investment Limited.

17   Q     And what date?

18   A     I believe it's 8/12 of 2008.

19         **MS. HAMPTON:**  Okay, Page 133, please.

20   Q     There is a -- deposits and withdrawal section.  What does

21   this tell us about this money in this account under the

22   deposits and withdrawal section.

23   A     On 1/22 of 2009 it shows a cash withdrawal of 1,300,000

24   sent to Starr, S-t-a-r-r, Associates.

25   Q     What is that in relation to, Starr Associates?

1   A    It also says per customer request.

2   Q    What is Starr Associates in relation to?

3   A    Starr Associates is the company --

4        **MR. MAGLIOLO:**  Your Honor, I have no objection as

5   long as she's reading off the document.  But if she's telling

6   us something she learned, I'd have to object to it, Your Honor.

7        **THE COURT:**  Sustained.  If she's just discussing the

8   document, which is admitted into evidence, that's fine.  But I

9   don't know where she's --

10  **BY MS. HAMPTON:**

11  Q    You reviewed several documents in this case including

12  closing documents, is that correct?

13  A    That's correct.

14  Q    Which property is Starr Associates related to?

15  A    The New York condominium.

16       **MS. HAMPTON:**  Exhibit 4, please.  And go to

17  application, Page 1.

18  Q    What is this?

19  A    Certificate of Foreign Status of Beneficial Owner for

20  United States Tax Withholding.

21  Q    And what company is this for?

22  A    Performance Investment Limited.

23  Q    What's the country of incorporation or organization?

24  A    Ireland.

25  Q    And what's the address of this company?

1   A      Seventh Floor, Hume House, Ballsbridge, Dublin 4.

2   Q      What's the mailing address?

3   A      Sanchez Magallanes.

4          **MS. HAMPTON:**  Page 11, please.

5   Q      What is this page, Page 11?

6   A      International Client Account Information Form.

7   Q      What information did you obtain from this document?

8   A      The beneficial owner is listed as Jose M. Saiz and the

9   Owner Number 2 is scratched out and handwritten power of

10  attorney with Martin Medina-Sonda.

11         **MS. HAMPTON:**  Page 12, please.

12  Q      What is this -- what did you learn from this page?

13  A      The spouse of Beneficial Owner 1 is Silvia Beatriz Perez-

14  Ceballos.

15  Q      And this is a Performance Investment account at Merrill

16  Lynch, correct?

17  A      Correct.

18  Q      Page 13.  What did you learn from this document?

19  A      That both Mr. Saiz and Mr. Medina --

20         **MR. MAGLIOLO:**  Your Honor, again if it what the

21  document says, we would have no objection with the document,

22  but what she may have learned I would object to.

23         **THE COURT:**  What's she testifying to?

24         **MS. HAMPTON:**  She's telling us what the document

25  says, Your Honor.  What she learned in her investigation by

Ebright-Trevino - Direct / By Ms. Hampton                    221

1    looking at this document.  What does the document --

2              THE COURT:  What she learned how?  With another

3    document that's been admitted?

4              MS. HAMPTON:  No, by looking at the document, Your

5    Honor.

6              THE COURT:  Just the document, okay.

7              MS. HAMPTON:  Yes, Your Honor.

8              THE COURT:  Overruled.

9    BY MS. HAMPTON:

10   Q    What did you learn by looking at this document?

11   A    Both Mr. Saiz and Mr. Medina-Sonda marked no in response

12   to their relationship as being or their association with a

13   politically exposed person.

14   Q    And how are those questions worded on this Page 13?

15   A    "Is client a current senior foreign political figure

16   politically exposed person?"

17   Q    And that's checked no, correct?

18   A    Correct.

19   Q    And then it says a former senior political figure and

20   that's checked no also, correct?

21   A    Correct.

22             MS. HAMPTON:  Can you find the date on this document,

23   please?

24        **(Pause)**

25   //

1   BY MS. HAMPTON:

2   Q     Page 25, what is the date?

3   A     3/8/2007.

4   Q     Was Mr. Saiz-Pineda in office in March of 2007?

5   A     Yes.

6         MS. HAMPTON:  Can you go back to Page 15, please.

7   Q     Under Page 15 --

8         MS. HAMPTON:  Can you go up, please.

9   Q     What does Mr. Saiz-Pineda -- Mr. Saiz-Pineda is Beneficial

10  Owner Number 1, correct?

11  A     Correct.

12  Q     And the second column is power of attorney for Medina-

13  Sonda, correct?

14  A     Correct.

15  Q     What does Mr. Saiz-Pineda say is his --

16        MS. HAMPTON:  Can you zoom in, please.

17        MR. MAGLIOLO:  We object to the form of the question,

18  what Mr. Saiz-Pineda says.  Saiz-Pineda.  The document reflects

19  what it reflects.  We don't know who filled it out, so it would

20  be what the document reflects, Your Honor.

21        THE COURT:  What was the question?

22        MS. HAMPTON:  I didn't finish the question.  I was

23  trying to get to the right part of the document, Your Honor.

24  //

25  //

1    **BY MS. HAMPTON:**

2    Q    What does this document --

3             **MS. HAMPTON:**  I'll rephrase, Your Honor.

4    Q    What does this document say regarding Mr. Saiz-Pineda's

5    business details, his current business details in 2007?

6    A    Patrimonium Consultores Integrados.

7    Q    And what does it say for Mr. Medina-Sonda?

8    A    Patrimonium Consultores Integrados.

9    Q    And how long has this business been in operation right

10   here, what does the document say?

11   A    Ten years.

12            **MS. HAMPTON:**  Can you go down, please.

13   Q    On the bottom of Page 15 still, what is the approximate

14   gross annual -- I can't read that -- revenue I think it says --

15   annual revenue for Mr. Saiz-Pineda?

16   A    Ten million.

17   Q    And annual income from business?

18   A    Five hundred thousand.

19   Q    And what does it say for Mr. Medina-Sonda?

20   A    Ten million and five hundred thousand.

21            **MS. HAMPTON:**  Can you go to Page 17, please.  Go

22   down, please.

23   Q    What information is contained on this page as far as

24   Mr. Medina-Sonda and the length of his relationship?

25   A    He -- Mr. Saiz indicates that he has known personally

1   Martin Medina-Sonda for 15 years.

2          **MS. HAMPTON:**  Can you go down, please.

3   Q    Under the category other financial services the client has

4   dealt with firms -- sorry, other financial service firms the

5   client has dealt with, what does Mr. Saiz-Pineda, what does it

6   say for Mr. Saiz-Pineda?

7   A    Banorte and Morgan Stanley.

8   Q    And what does it say for Mr. Medina-Sonda?

9   A    Banamex, Morgan Stanley.

10         **MS. HAMPTON:**  Page 22, please.  Can you go down,

11  please.

12  Q    Who is named as the beneficial owner of this account?

13  A    Jose Manuel Saiz-Pineda.

14  Q    And who is authorized -- whose name is authorized to

15  control the assets?

16  A    Brian Fitzpatrick, Ann Dugdale, and Martin Alberto Medina-

17  Sonda.

18  Q    Where is Mr. Fitzpatrick and Ms. Dugdale?

19  A    Ireland with Pearse Trust.

20         **MS. HAMPTON:**  Page 32, please.

21  Q    What is this?

22  A    It's some kind of a -- I don't -- it's a letter.  I'm not

23  sure exactly.

24  Q    And who's named in the letter in Paragraph 1?

25  A    Mr. Jose Manuel Saiz-Pineda and Mr. Martin Alberto Medina-

1    Sonda.

2            MS. HAMPTON:  Can you go to Page 64, please.

3    ?

4    A    Jose Manuel Saiz-Pineda.

5    Q    Is this -- according to -- why do banks ask for copies of

6    these, do you know?

7    A    I do know.

8    Q    Do they do this as part of their account opening

9    verification of customer process?

10   A    Yes.

11   Q    And so Mr. Saiz-Pineda's passport is contained in the bank

12   files?

13   A    Yes.

14           MS. HAMPTON:  Go to Page 65.  Can you go down,

15   please.  Can you go down, please.

16   BY MS. HAMPTON:

17   Q    Whose passport is that?

18   A    Martin Alberto Medina-Sonda.

19           MS. HAMPTON:  Can you go to Exhibit 5, please.  Under

20   (indisc.) under Deutsche Bank LLC (indisc.) MM Trust.

21   Q    What is this document, Page 1?

22   A    Discretionary settlement of MM Trust.

23   Q    What is MM Trust?

24   A    This is the trust belonging to Mr. Medina-Sonda.

25           MS. HAMPTON:  Can we go to Page 2, please.  I'm

1    sorry, go back to -- well, Page 2, this is fine.

2    Q    What is the date of the settlement of this trust?

3    A    November 28th, 2006.

4    Q    And who does it name as the person belonging to this

5    trust, the settler?

6    A    Martin Alberto Medina-Sonda.

7    Q    At what address?

8    A    Sanchez Magallanes 1113.

9    Q    Is this the same date that the PI Trust was created by

10   Mr. Saiz-Pineda?

11   A    Yes.

12   Q    What was the purpose of these two trusts from the

13   documents you looked at?

14   A    The purpose of the trust was to give them some sort of

15   footing and they utilized these trusts for the establishment of

16   personal holding companies that were established in Ireland and

17   then they went further and then began to open the bank accounts

18   with those companies.

19   Q    And did the bank ask for these documents in association

20   with the opening of these accounts?

21   A    Yes.

22        MS. HAMPTON:  Go to Page 25, please.

23   Q    What is this document?

24   A    The deed of appointment and if you go down a little

25   further on the document it will say that Mr. Saiz-Pineda is

1   designated as original protector of MM Trust.

2   Q    Who is the protector of Mr. Saiz-Pineda's trust, PI Trust?

3   A    Mr. Medina-Sonda.

4   Q    And then this trust, MM, is designated Mr. Saiz-Pineda as

5   protector?

6   A    Correct.

7   Q    What is the protector?  What does that mean?

8        **MR. MAGLIOLO:**  Again, Your Honor, if she knows of her

9   own knowledge.

10       **THE COURT:**  Where is that coming from?  How do you

11   know?

12       **THE WITNESS:**  The only thing I can do is read what's

13   here.

14   **BY MS. HAMPTON:**

15   Q    From reviewing these documents -- you've reviewed many

16   documents about PI Trust and MM Trust, correct?

17   A    That's correct.

18   Q    What is the protector, according to the documents you've

19   reviewed?

20       **MR. MAGLIOLO:**  Your Honor --

21       **THE COURT:**  Sustained.

22       **MS. HAMPTON:**  Let's go to Exhibit 6, please.  Can you

23   pull it out, please (indisc.)?

24       **(Government's counsel confer)**

25       Can we go to 001-023, November 2008.

1          **MR. MUSCHENHEIM:**  Did you say December?

2          **MS. HAMPTON:**  November of 2008.

3    **BY MS. HAMPTON:**

4    Q    What bank is this account at in Exhibit Number 6?

5    A    Deutsche.

6    Q    And who is the account holder?

7    A    Comprehensive Advisory and Development Company Limited.

8    Q    And Exhibit 5, what was that bank?

9    A    Deutsche as well, I believe.

10          **MS. HAMPTON:**  Can we go to Exhibit 7.  Can you go to

11   profile, account profile.

12   Q    What bank account is this?

13   A    HSBC Bank and I believe it was a checking account 80000.

14   Q    And whose account is this HSBC?

15   A    Well, this particular -- we opened up the folder for

16   8000 --

17          **MR. MAGLIOLO:**  Your Honor, (indisc.)

18          **THE COURT:**  Sustained.

19   **BY MS. HAMPTON:**

20   Q    Whose account is the 8000 account at HSBC?

21   A    It belongs to Silvia Beatriz Perez-Ceballos.

22          **MS. HAMPTON:**  Can you go down to the form, please.

23   Q    What is the source of funds --

24   A    This form --

25   Q    -- listed on -- I'm sorry.

1   A    This form is for the savings account ending in 2686.

2   Q    Okay.  What is the source of funds listed?

3   A    Salary and accumulated savings.

4   Q    And under the nature of expected transaction activity for

5   this account, what is listed as far as expected cash, expected

6   checks, and expected ACH direct banking?

7   A    Zero to five per month.

8   Q    In what amounts?

9   A    One to 1,000.

10  Q    That's checked consistently down for everything, is that

11  correct?

12  A    Yes.

13  Q    Including ATM transactions?

14  A    Yes.

15       **MS. HAMPTON:**  Can you go to the bottom of this page,

16  please.

17  Q    What is this dated?

18  A    9/1 of 2010.

19       **MS. HAMPTON:**  Can we go to another copy in this

20  exhibit, Exhibit 7.  And go to 014, HSBC application 014.

21  Q    This is the 8,000 -- the 8000 account you're talking

22  about, correct?

23  A    Yes.

24  Q    Which account -- what account is this?

25  A    It's a checking account in the name of Silvia Beatriz

Ebright-Trevino - Direct / By Ms. Hampton                230

1   Perez-Ceballos.

2   Q    And what is the address on this document for Silvia

3   Beatriz Perez?

4   A    Calle Sanchez Magallanes 1113.

5          **MS. HAMPTON:**  Can you go down, please.

6   Q    On the bottom of Page 1, what is the date of this

7   document?

8   A    October 13th, 2009.

9          **MS. HAMPTON:**  Can you get -- oh, can you get out of

10  this one?  I'm sorry.  We're still on Exhibit 7, multiple

11  account docs file.  Can you get out of that?  Sorry.

12  (Indisc.).  Can you go to 015-21, please?

13  Q    Page 1, what is this document?

14  A    Deposit account summary.

15  Q    For whom?

16  A    For the checking account ending in 80000 for Silvia

17  Beatriz Perez-Ceballos.

18         **MS. HAMPTON:**  Can you go to Page 20, please.

19  Q    What do we see on July 28, 2010 regarding a subtraction,

20  what is that?

21  A    There is a debit, a subtraction from the account.

22  Q    According to your review of the records, do you know where

23  that $800,000 went?

24  A    Yes.

25  Q    Where did they go?

1   A    It went to the savings account, I believe, that's linked

2   to this checking account.

3            **MS. HAMPTON:**  Page 22.  Can you go down a bit?

4   Q    On July 28, 2010 there was a deposit, an opening deposit,

5   is that correct?

6   A    Yes.

7   Q    Do you know -- what's the amount of the opening deposit?

8   A    800,000.

9   Q    Do you know where that -- according to your review of the

10  records, where that money came from?

11  A    It came from the linked checking account, 80000.

12  Q    And this page on Page 22 is regarding which account?

13  A    The savings account ending in 2686.

14  Q    And what happened on 8/24 of 2010 regarding a deposit?

15  A    There was another incoming deposit from the checking

16  account 8000.

17           **MS. HAMPTON:**  Page 58, please.

18  Q    There were some purchases made out of this account,

19  correct, beginning in December of 2011?

20  A    Yes.

21  Q    Where were some of the purchases made?

22  A    Sunny Isles Beach, Florida; Sunrise, Florida; North Miami

23  Beach, Florida; Aventura, Florida.

24           **MS. HAMPTON:**  Can you go down, please.  Can you go

25  down, please.  Can you go down to Page 59.

1    Q    Where else?

2    A    New York.

3         **MS. HAMPTON:**  Can we go out of this exhibit to

4    Exhibit 8, please, under application, Page 1.

5    Q    Whose account is this?

6    A    Silvia Beatriz Perez.

7    Q    What kind of account is this?

8    A    This is another checking account.

9    Q    Ending in 4575?

10   A    Yes.

11   Q    And the address is the same on this account, is that

12   correct?

13   A    Yes.

14        **MS. HAMPTON:**  Can we go to Page 2, please.  Well, I'm

15   sorry, go back to the bottom of Page 1.

16   Q    What is the date of this account, that it was opened?

17   A    October 13, 2009.

18        **MS. HAMPTON:**  Page 2, please.

19   Q    What is this page?  What is this document?

20   A    If you go down, I believe this is where he is added to --

21   to this account.  He became --

22   Q    Who was added?

23   A    Jose Manuel Saiz-Pineda.

24   Q    With the same address?

25   A    Yes.

Ebright-Trevino - Direct / By Ms. Hampton                    233

1   Q    And what's the date of this document?  Can we go down to

2   the bottom, please?

3   A    August 13th, 2011.

4          MS. HAMPTON:  Can we get out of this document,

5   please?  Go to another one in the same Exhibit 8, where it's

6   003 to 0028.

7   Q    And what is this document?

8   A    Deposit account summary for Account Number 4575, held by a

9   Silvia Beatriz Perez-Ceballos and Jose Manuel Saiz-Pineda.

10         MS. HAMPTON:  Can you go down, please?

11  Q    Under account deposit or summary -- deposit account

12  summary for the period ending in 9/22/2010, what deposits are

13  made to their account?

14  A    $1,000,001.89.

15  Q    Do you know where that money came from, from your review

16  of the documents?

17         MR. MAGLIOLO:  We object to that, Your Honor.  Again,

18  review of the documents, we don't know what documents.  There's

19  no proper predicate for that.

20         THE COURT:  Overruled.

21  A    They had been transferred --

22         MR. MAGLIOLO:  Well, then the answer is yes -- do you

23  know, is the question.

24         THE COURT:  Sustained.  Do you know, yes or no?

25  //

1    BY MS. HAMPTON:

2    Q    Do you know?

3    A    Yes.

4    Q    Where did it come from?

5    A    They had been transferred from the savings account linked

6    with this -- at HSBC.

7    Q    And after this funding was deposited into this account,

8    from your review of the records, where did it go?

9    A    Then it went to an HSBC Securities account.

10          MS. HAMPTON:  Can we go to Exhibit 9, please?  Under

11   001 to 0089.  Can you go to page five, please?

12   Q    Which account is this?

13   A    This is the checking account 8000.

14   Q    And what happened --

15          MS. HAMPTON:  Can we go down a little bit on page

16   five?

17   Q    What happens on December 28, 2009, as far as deposit?

18   A    The account received a deposit in the amount of $20,416.

19   Q    From where?

20   A    It says a book credit.  And during the course of the

21   investigation --

22          MR. MAGLIOLO:  Your Honor, we'd object to "during the

23   course of the investigation."  The question has been asked and

24   answered.

25          THE COURT:  Sustained.

EXCEPTIONAL REPORTING SERVICES, INC

1   **BY MS. HAMPTON:**

2   Q    Did you find out where this -- does this wire show where

3   this money came from?

4            **MR. MAGLIOLO:**  Your Honor, may we approach the bench?

5            **THE COURT:**  Yes.

6        **(Bench conference begins at 4:34 p.m.)**

7            **MR. MAGLIOLO:**  The Court has ruled against the

8   prosecutor asking these questions over and over, asking about

9   the course of the investigation, asking about other documents.

10           **THE COURT:**  You need to pinpoint the records, if

11  she's testifying about the records.

12           **MS. HAMPTON:**  Your Honor, --

13           **MR. MAGLIOLO:**  Thank you, Your Honor.

14           **MS. HAMPTON:**  -- it's important for this witness to

15  be able to testify about what she did and what she learned from

16  the records in her investigation as we go through this, and

17  that's all I'm doing, Your Honor, nothing improper.

18           **THE COURT:**  You can stick to the records.

19           **MS. HAMPTON:**  Thank you.

20           **MR. MAGLIOLO:**  Thank you.

21       **(Bench conference ends at 4:34 p.m.)**

22  **BY MS. HAMPTON:**

23  Q    According to this wire transfer, December 28, 2009, on

24  this page, where did the money come from?

25  A    It originated with Silvia Beatriz Perez-Ceballos.

Ebright-Trevino - Direct / By Ms. Hampton                236

1      **MS. HAMPTON:**  Can we go to page 11, please?  Can you

2  down, please?  Between -- can you go down a little bit more,

3  please?

4  Q    Under "Description of Transactions" and dates posted on

5  page 11, there are several deposits between March 25th and

6  March 31st.  What can you tell from this document about those

7  deposits?

8  A    They were global transfers with MX.

9  Q    That's Mexico; is that correct?

10 A    Correct.

11 Q    And how much -- over $400,000 deposited; is that correct?

12 A    That's correct.

13 Q    And how long of a time frame was that?

14 A    About six days.

15     **MS. HAMPTON:**  Can we go to page 13, please?  Can you

16 go down, please?

17 Q    Between April 28th and May 24th, 2010, what can you tell

18 us about the deposits made according to this document?

19 A    There is a deposit made on 4/28 of 2010 for $20,700,

20 another deposit on 5/19 of 2010 for $100,000, another deposit

21 of $1,000 on 5/20 of 2010, a deposit on 5/24/2010 for 54,640,

22 and another on 5/24/2010 for 19,000.

23     **MS. HAMPTON:**  Can we go to page 19, please?  Can you

24 go back down, please?  I'm sorry, go back up, I apologize.

25 Q    What does page 19 of Exhibit 9 under 001 to 089 file tell

Ebright-Trevino - Direct / By Ms. Hampton                237

1  us about the activity in the account?

2          MS. HAMPTON:  Can you go up, I'm sorry, for the date?

3  Q    For the period ending in August 25th, 2010, what deposits

4  were made?

5  A    It shows that in checking account 8000, the deposits and

6  other additions totaled $191,000.44.

7  Q    And savings?

8  A    And savings, deposits were 988,000.

9          MS. HAMPTON:  Can you go down to page 22, please?

10 Q    There's two deposits on this page, on September 28th and

11 August 24th.  What does this document tell us about those

12 deposits?

13 A    On July 28th, 2010, an opening deposit of 800,000 was

14 transferred to the Saiz account ending in 2686.

15 Q    And the 188,000?

16 A    The 188,000 occurred on 8/24 of 2010, telephone transfer

17 from checking account ending in 80000.

18 Q    Page 23, please.  This is between August and September

19 2010, correct?

20 A    Yes.

21         MS. HAMPTON:  On this page, can you go down a little

22 bit, please?  I'm sorry, can you go back up to the account

23 activity section.

24 Q    Under the deposit account summary for the period ending

25 9/27/2010, what are the deposits and other additions for

1  checking and savings and the withdrawals or other subtractions?

2  A    For checking account 8000, deposits and other additions

3  total $22,000.09, and the withdrawals equaled $22,000.  For

4  savings account ending in 2686, deposits and other additions

5  totaled $22,582.27.  The check --

6  Q    Go ahead, I'm sorry.

7  A    The checks, withdrawals, and other subtractions totaled

8  $1 million.

9           **MS. HAMPTON:**  Can you go down, please?  Can you go

10 down, please?

11 Q    On page 24, what happened on August 31st, 2010?  If I'm

12 reading that correct.

13 A    Yes.

14 Q    Okay.  What happened then?

15 A    So this is the statement for the savings account ending in

16 2686, and according to this statement, it reads that on 8/31 of

17 2010, a telephone transfer to the checking account ending in

18 4575 occurred in the amount of $1 million.

19 Q    Which account is 4575?  Who's on that account?

20 A    It's a checking account that was initially opened by

21 Ms. Perez-Ceballos, and at a later date her husband,

22 Mr. Saiz-Pineda, was added.

23 Q    And according to the documents we've seen is this --

24 during this time frame, is Mr. Saiz-Pineda on the 4575 account

25 at this time?

1    A    Yes, he was added approximately two weeks prior to.

2          **MS. HAMPTON:**  Can we go out of this exhibit to

3    Exhibit 10, please?

4    Q    What bank account is this relating to, Exhibit 10?

5    A    An HSBC Securities account.

6          **MS. HAMPTON:**  Can we go to the application, 005 to

7    032, yes.

8    Q    Page one, what does this document say?  What is this

9    document?

10   A    It's an account application for HSBC Securities account.

11   Q    In the name of who?

12   A    It was a joint tenant account in the name of Silvia Perez

13   and Jose Saiz.

14   Q    What's the date that it was opened?

15   A    8/26/2010.

16         **MS. HAMPTON:**  Can you go down, please?

17   Q    What is the address for Ms. Perez and Mr. Saiz on this

18   document?

19   A    Calle Sanchez Magallanes 1113.

20         **MS. HAMPTON:**  Can you go down, please?

21   Q    According to this document, what is the name of Ms. Perez'

22   current employer?

23   A    Self-employed.

24   Q    And what is her occupation, according to this document?

25   A    Psychologist.

1    Q    And how long was she employed by her current employers, I

2    think is what it says there.

3    A    Twenty years.

4    Q    And for Mr. Saiz-Pineda, what does it say his current

5    employer is?

6    A    State of Tabasco, Mexico.

7              **MS. HAMPTON:**  Can you go down, please?

8              **THE COURT:**  Have we reviewed these documents already

9    with another witness last week?

10             **MS. HAMPTON:**  Some of them with -- just very limited

11   with HSBC, but not this one, Your Honor.

12             **THE COURT:**  Okay, because I just don't want to be

13   repetitive.

14             **MS. HAMPTON:**  I don't either, Your Honor.

15             **MR. MAGLIOLO:**  With Sonia Fernandez, Your Honor.

16             **THE COURT:**  You can proceed, but no repetition.  If

17   they've already been reviewed and presented to the jury, we

18   don't need to go back through with this witness.

19             **MS. HAMPTON:**  Yes, Your Honor.

20   **BY MS. HAMPTON:**

21   Q    On page two, what does Ms. Perez-Ceballos, according to

22   the records, say that her annual income is?

23   A    180,000.

24   Q    And Mr. Saiz-Pineda?

25   A    250,000.

1  Q    And their net worth?

2  A    30 million.

3        **THE COURT:**  Did Ms. Fernandez from HSBC, the very

4  first witness who testified, not go through all this?

5        **MS. HAMPTON:**  I'm done, Your Honor.  I'm not going

6  through it anymore.  She did go through some of it, but not all

7  of it, Your Honor.

8        **THE COURT:**  It's just still vaguely familiar.

9        **MS. HAMPTON:**  Can we get out of this document,

10 please?  Can we go to 033 to 179?

11 **BY MS. HAMPTON:**

12 Q    Page -- what is this document first, page one?

13 A    An account statement for the HSBC Securities account

14 ending in 507302.

15 Q    And whose name is this account in?

16 A    Silvia Perez, Jose Saiz.  It says JT, joint tenant.

17        **MS. HAMPTON:**  Can you go to page two, please?  Can

18 you go to page 29, I'm sorry?

19 Q    According to this page -- and we might need to zoom in a

20 little bit on page 29 -- was there a cash deposit made?

21 A    Yes.

22 Q    What was the cash deposit amount?

23 A    $700,006.

24        **MS. HAMPTON:**  Can we go back to page 20?

25 Q    According to this document, was there a cash deposit

Ebright-Trevino - Direct / By Ms. Hampton                    242

1  amount?

2  A    Yes.

3  Q    What was that amount and what date?

4  A    300,000.

5         **MS. HAMPTON:**  Can we go to Exhibit 17, please?  Under

6  "Application," can you go to page three, please?

7  Q    What is listed as -- on page three of this document in

8  Exhibit 17 as Ms. Perez-Ceballos' e-mail address?

9  A    Cmarlis@hotmail.com.

10        **MR. MAGLIOLO:**  Can we get that -- excuse me, Your

11  Honor, may this -- for the record, this document be identified

12  as to what document it is?

13        **THE COURT:**  Okay.  What exhibit is this?

14        **MS. HAMPTON:**  Exhibit 17.

15        **THE COURT:**  Page three?

16        **MS. HAMPTON:**  Page three of the application.

17        Can we go to Exhibit 18?

18  Q    Under the application, what is this bank account for?

19  Wells Fargo, correct?

20  A    Yes.  At the bottom, it will show the name.  This is for

21  EMC International, LLC.

22  Q    And on page one, what was the date that this account was

23  opened?

24        **MS. HAMPTON:**  Can we go up, please?

25  A    10/28/2011.

Ebright-Trevino - Direct / By Ms. Hampton                 243

1   Q    And on page two, what was the date that the business was

2   established?

3   A    11/8 of 2010.

4   Q    Whose business is this?

5   A    Mr. Enrique Marichal.

6   Q    Under "Business Information," if you keep going down, what

7   is the industry listed as?

8   A    Construction.

9         **MS. HAMPTON:**  Can we get out of this document,

10  please, and go into deposits, same exhibit, Exhibit 18,

11  deposits?  Page nine, please.

12  Q    What is this document?

13  A    A deposit slip.

14  Q    For how much money and when?

15  A    250,000 and the date is 5/15/2013.

16        **MS. HAMPTON:**  Page 11, please.

17  Q    Is this the check associated with that deposit?

18  A    Yes.

19        **MS. HAMPTON:**  Page 13, please.

20  Q    What is this document?

21  A    A check from Latour Law, the 4585 account, written to EMC.

22        **MS. HAMPTON:**  Can we go to a different file in the

23  same exhibit, Exhibit 18?  Can we go to 028 to 164, page eight,

24  please?  Let's go up to the top of the page here.

25  Q    Whose account is this?

1          **MS. HAMPTON:**  Page seven, please.

2  A     Should still be the EMC International.

3  Q     Okay.

4          **MS. HAMPTON:**  All right, page eight.

5  Q     What deposits were made to EMC International and when?

6  A     On 12/7 -- can we get the year, I'm sorry.  I didn't see

7  the year at the top, I apologize.

8  Q     2011.

9  A     2011.

10         **MS. HAMPTON:**  You can go back down.

11 A     On 12/7 of 2011, an incoming wire transfer in the amount

12 of 120,000 was received from Menudal S.A. de C.V.; on

13 12/14,2011, an incoming wire transfer in amount of 106,000 was

14 received from Menudal S.A. de C.V.; on 12/14/2011, an incoming

15 wire transfer in the amount of 94,000 was received from Gisela

16 S.A. de C.V.; on 12/21 of 2011, an incoming wire transfer in

17 the amount of 106,000 was received from Danuya, D-a-n-u-y-a,

18 S.A. de C.V.; on 12/22 of 2011 an incoming wire transfer in the

19 amount of 106 was -- 106,000 was received from Menudal S.A. de

20 C.V.

21 Q     And over on each of these deposits, it says Intercam Casa

22 for each one of them.  What is that?

23 A     Intercam Casa de -- de B, Bolsa.  It's like a -- it's like

24 a Casa de Cambio, an exchange house.

25         **MS. HAMPTON:**  Page 18, please.

1    Q    On March the 9th, --

2              **MS. HAMPTON:**  And can we go up to see the year,

3    please?

4    Q    -- 2012, correct?

5    A    That's correct.

6              **MS. HAMPTON:**  Okay.  You can go back down on page 18.

7    Q    On March the 9th, is there a transaction for a hotel?

8    A    Yes.

9    Q    According to the document, where was the hotel?

10   A    Marriott, Sugar Land, Texas.

11   Q    Page 22, beginning April 11th through April 13th,

12   according to this document on page 22, where are these

13   purchases made?

14   A    Sugar Land, Texas, and Houston, Texas.

15   Q    And for the record, where is Houston in relation to Sugar

16   Land?

17   A    Sugar Land is a suburb of Houston.

18   Q    Page 38.  September of 2012, correct?

19   A    Yes.

20   Q    On September 17th there's some purchases.  Where,

21   according to this record, are those purchases made?

22   A    Villahermosa, Mexico.

23   Q    What state is that in?

24   A    Tabasco.

25             **MS. HAMPTON:**  Can you go to page 52, please?

1   Q    And this is December of 2012, correct?

2   A    Yes.

3        **MS. HAMPTON:**  Can we go down, please?

4   Q    On December 27th of 2012, what, according to this record,

5   deposit was made and where was it from?

6   A    An incoming wire transfer was received from Oversea-

7   Chinese Bank Corporation in the amount of $175,859.  The

8   originator of the wire transfer was Sewick Limited.

9        **MS. HAMPTON:**  Page 57, please.

10  Q    This is Mr. Marichal's company account, correct?

11  A    Correct.

12  Q    This is January of 2013, correct?

13  A    Could you go -- I'm sorry, I missed the very top, I

14  apologize.

15  Q    Sure, no problem.

16  A    Yes, that's correct.

17       **MS. HAMPTON:**  Can you go down, please?  Thank you.

18  Q    There is a withdrawal or debit on January 10th, 2013.  How

19  much is that for?

20  A    It is an outgoing wire -- I'm sorry, 195,000.

21  Q    And according to the wire, where is it going to?

22  A    To Regionsbankclosing.com.

23  Q    According to your review of the property records, which

24  property is this in relation to?

25  A    I do not have any records regarding this property.

Ebright-Trevino - Direct / By Ms. Hampton                247

1   Q    January 16, 2013, tell us about the deposits shown on

2   here.

3   A    Incoming wire transfer from Oversea-Chinese Bank

4   Corporation, the amount of $70,000.  The originator of the wire

5   is Sewick Limited.

6   Q    On January 28, 2013, according to this document, where is

7   this purchase made?

8   A    Marriott, Sugar Land, Texas.

9           **MS. HAMPTON:**  Page 63, please.

10  Q    February 20, 2013, what is the deposit that's made?

11  A    The amount is 100,000.

12  Q    And where is it coming from?

13  A    Oversea-Chinese Bank Corporation.  The originator is

14  Sewick Limited.

15  Q    Page 69.  This is March of 2013, correct?

16  A    Correct.

17  Q    There's a deposit made on March 26, 2013.  How much is

18  that and where is it from?

19  A    $224,922.56, incoming wire transfer from Phantom

20  International and --

21  Q    Page 80.  May of 2013, correct?

22  A    Correct.

23  Q    There are two deposits made that are identical in

24  quantity, May 15th, May 16th, correct?

25  A    Correct.

1  Q    From a review of the records, do you know what these --

2  where these deposits came from?

3  A    Yes.

4        **MR. MAGLIOLO:**  We object to something "from a review

5  of the records," Your Honor.

6        **THE COURT:**  What records are they coming from?

7  **BY MS. HAMPTON:**

8  Q    What records are they coming from?

9  A    The bank records of accounts held by Mr. Latour.

10       **THE COURT:**  Overruled.

11       **MR. MAGLIOLO:**  We withdraw that objection.

12 Q    So where did these $250,000 deposits come from, according

13 to your review of bank records?

14 A    They came from accounts associated with Mr. Latour, his

15 Titan accounts, his Latour Law accounts.

16       **MS. HAMPTON:**  Page 93, please.

17 Q    This is August of 2013, correct?

18 A    Correct.

19 Q    What are the two deposits for this month, where are they

20 from?

21 A    On 8/27, an incoming wire transfer in the amount of 65,000

22 was received from Zebina S.A. de C.V.; and on 8/29, an incoming

23 wire transfer in the amount of 60,000 was received from Zebina.

24 Q    Page 103.  This is in October of 2013, correct?

25 A    Correct.

1   Q    What can we tell from this document about a deposit on

2   October 16, 2013?

3   A    An incoming wire transfer in the amount of 100,000 was

4   received from MB tech held at Bank of America.

5             MS. HAMPTON:  Okay.  Can we exit this exhibit,

6   please?

7             THE COURT:  Why don't we break right there?  Let's go

8   ahead and recess for the evening.  Thank you for your attention

9   today.  Don't discuss the case with anyone and don't try to get

10  information about the case outside the courtroom.  Thank you

11  for your time.  We'll see you at 8:30 tomorrow morning.

12            THE MARSHAL:  All rise for the jury.

13       (The jury exited the courtroom at 5:01 p.m.)

14            THE COURT:  You can step down.

15            Anything to address, Counsel?

16       (No audible response)

17            See you right before 8:30, I guess, tomorrow then.

18            MR. REYNAL:  Thank you, Your Honor.

19            THE COURT:  Government still thinking it might rest

20  tomorrow?

21            MS. HAMPTON:  Yes, Your Honor.

22            THE COURT:  Defendants will be ready to go?

23            MR. REYNAL:  Yes.  We'll -- if it's okay, I'll have

24  my witness come down here in the afternoon.  Does that sound

25  good, after lunch?

1          **THE COURT:**  I guess.  I'm not sure how much longer --

2          **MR. REYNAL:**  Does that sound reasonable?

3          **MS. SPEAKER:**  I'm sorry, I don't think we heard.

4       **(Voices off the record)**

5          **MR. REYNAL:**  Does that sound reasonable, that I have

6    my witnesses ready after lunch?

7          **MS. HAMPTON:**  Yes.

8          **THE COURT:**  Okay, thanks.

9       **(Hearing adjourned at 5:02 p.m.)**

10       **(AFTERNOON SESSION CONCLUDED AT 5:02 P.M.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 11, 2017

        Signed                                                    Dated


*TONI HUDSON, TRANSCRIBER*