UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:17-CR-00245-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| SILVIA BEATRIZ PEREZ-CEBALLOS, | ) | Wednesday, October 11, 2017 |
| | ) | |
| Defendant. | ) | (8:30 a.m. to 12:14 p.m.) |
| | | MORNING SESSION |


JURY TRIAL - DAY 7
VOLUME I OF II, PAGES 1 THROUGH 107

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


**APPEARANCES:**            SEE PAGE 2


Court Recorder:          Genay Rogan

Interpreters:            Judy Hawks / Maria Enriqueta Foraker
                         Lorena Parada-Valdes

Clerk:                   Brandy Cortez

Court Security Officer:  Adrian Perez

Deputy U.S. Marshal:     Hannah Word

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                     JULIE HAMPTON, ESQ.
                               JON MUSCHENHEIM, ESQ.
                               U.S. Attorney's Office
                               1000 Louisiana, Suite 2300
                               Houston, TX 77002

Defendant:                     FEDERICO ANDINO REYNAL, ESQ.
                               JOSEPH C. MAGLIOLO, JR., ESQ.
                               Fertitta Reynal
                               808 Travis, Suite 1005
                               Houston, TX 77002

                               SETH H. KRETZER, ESQ.
                               440 Louisiana St., Suite 1440
                               Houston, TX 77002

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | REDIRECT |
|---|---|---|---|---|
| PATRICIA EBRIGHT-TREVINO | 6/58 | 75 | 87 | |

| GOVERNMENT'S EXHIBITS | | | | RECEIVED |
|---|---|---|---|---|
| 26 | | | | 24 |
| 27 | | | | 26 |
| 44, 45 | | | | 61 |
| 132 | | | | 73 |

RULE 29 MOTION        93

4

1    **Corpus Christi, Texas; Wednesday, October 11, 2017; 8:30 a.m.**

2            **((Interpreter utilized for translation)**

3                      **(In Progress)**

4        **(Outside the presence of the jury)**

5            **THE COURT:**  -- morning, counsel?

6            **MR. MAGLIOLO:**  Just one thing, your Honor.  If --

7    based on yesterday, I think I understand the Court's ruling on

8    the witnesses testifying about things that aren't in evidence.

9    But if we are going to ask them, if the Government is going to

10   ask her about her opinion on stuff, particularly based on

11   anything that's not in evidence or ask about anything in

12   evidence, I'd ask if maybe we could approach the bench to cover

13   that so I don't have to just repeatedly have to get up before

14   the jury and object to --

15           **THE COURT:**  Yeah, and I guess my issue with yesterday

16   was when you asked based on your investigation, what did you

17   find about "X?"  I don't know if that's based on hearsay,

18   inadmissible evidence.  I can't -- now, the records were in as

19   business records.  She could testify about that.  But that was

20   my issue with yesterday, based on your investigation, what'd

21   you find out about "X?"  I'm thinking she's going to talk about

22   the records.  But if it involves hearsay, inadmissible

23   evidence, that's what I'm having trouble with.

24           **MR. MAGLIOLO:**  And that's the only thing that I ask,

25   your Honor.

1          **THE COURT:**  So, okay.  So that's where the -- my

2    rulings were coming from.  It's kind of hard to figure out when

3    we ask generally like that.  You know, statements by the

4    Defendant, obviously that would be admissible but I --

5          **MR. MUSCHENHEIM:**  Judge, in trying to develop

6    relationships between a lot of evidence, can we say something

7    like, you were here for the testimony of Paul Arnold, you'll

8    recall he said this about Exhibit 27, can you explain the

9    relationship between that evidence and Exhibit 72?  Just a --

10          **THE COURT:**  Sounds like closing argument to me.

11          **MR. MUSCHENHEIM:**  Well, I --

12          **THE COURT:**  It's your job to tie this in together

13   based --

14          **MR. MUSCHENHEIM:**  Right, --

15          **THE COURT:**  -- on the evidence at the end of the

16   case.

17          **MR. MUSCHENHEIM:**  Yes, your Honor, but often the case

18   agent in the long case can begin to highlight some parts of the

19   evidence.  It's just very --

20          **THE COURT:**  Right, we're not here to repeat --

21          **MR. MUSCHENHEIM:**  -- brief, it's very brief.

22          **THE COURT:**  -- evidence, right?  We're not here to

23   repeat evidence.

24          **MR. MUSCHENHEIM:**  No, your Honor.

25          **THE COURT:**  She can testify obviously about some

Ebright-Trevino - Direct / By Ms. Hampton                    6

1    things she did.  But we risk getting into inadmissible things,

2    and that's what I'm trying to avoid.

3            **MR. MUSCHENHEIM:**  All right, your Honor.

4            **THE COURT:**  But I don't know that clears up anything,

5    if that's more helpful or not.  It's just I'm concerned about

6    the general what did you do, what did you find out kind of

7    questions with no basis attached to evidence that's already in

8    or that's admissible.  Okay, anything else?  The jury ready

9    (indisc.) we're ready to bring the jury in then.

10           **(Pause)**

11           **THE MARSHAL:**  All rise for the jury.

12           **(Jurors enter at 8:33 a.m.)**

13           **THE COURT:**  Good morning.  You can have a seat and

14   we'll continue.

15           **MS. HAMPTON:**  May I proceed, your Honor?

16           **THE COURT:**  Yes.

17                    **DIRECT EXAMINATION (CONTINUED)**

18   **BY MS. HAMPTON:**

19   Q    Agent Trevino, we'll continue next with Exhibit 24, your

20   account docs.  Which account is this relating to under page one

21   of account docs Exhibit 24?

22   A    UBS.

23   Q    And whose account is this?

24   A    It's a joint tenant account with Silvia Perez-Ceballos and

25   Jose Manuel Saiz-Pineda.

Ebright-Trevino - Direct / By Ms. Hampton                7

1   Q    The bottom of page one, what is the date of the signature

2   page?

3   A    4/30/2012.

4        **MS. HAMPTON:**  Page 33, please.

5   Q    Under "other sources of wealth," what does this document

6   state is other sources of wealth?

7   A    Residential real estate rental income and mutual funds.

8        **MR. MAGLIOLO:**  Your Honor, I believe this is

9   repetitive and I'm going to object to it because of that.  I

10  think she's already --

11       **THE COURT:**  Has it come in through --

12       **MR. MAGLIOLO:**  -- already covered this --

13       **THE COURT:**  -- other witnesses?

14       **MS. HAMPTON:**  We haven't talked about this page, your

15  Honor.

16       **THE COURT:**  Okay, overruled.

17  A    Sale of a business is marked "no."  Private investment

18  marked "no."

19  Q    And, sorry, real estate income and mutual funds are the

20  other sources; is that correct?

21  A    That's correct.

22       **MS. HAMPTON:**  Okay, can we get out of this document

23  and go into "transactions" under the same exhibit?

24       **MR. MUSCHENHEIM:**  Exhibit 24?

25       **MS. HAMPTON:**  Yes, sir.

Ebright-Trevino - Direct / By Ms. Hampton                    8

1    BY MS. HAMPTON:

2    Q    Page 1, what is this document?

3    A    A cashier's check from HSBC.

4    Q    And, again, this is in the UBS account; is that correct?

5    A    Yes.

6         MS. HAMPTON:  Okay, page two, please.  Before we go

7    to page two, actually can you go back?

8    Q    Page one, what account is this coming from in HSBC, the

9    last four digits?

10   A    The checking account, 4575.

11        MS. HAMPTON:  Page two, please.

12   Q    What is this?

13   A    Cashier's check from HSBC referencing account number --

14   savings account number 2686.

15   Q    And each of these checks, the line says what on the second

16   line under the account number?

17   A    "Account to close."

18        MS. HAMPTON:  Page three, please.

19   Q    What is this?

20   A    Cashier's check from HSBC referencing checking account

21   8000, "Account to close."

22   Q    And these three checks were deposited where?

23   A    In the UBS account.

24        MS. HAMPTON:  Okay, can we get out of this document

25   and go into statements, please, under the same exhibit?

1   Q    Page one, what is the amount of the value of this account

2   at this time on page one in April of 2012?

3   A    Two million, sixty-nine thousand, two hundred and seventy-

4   nine dollars, and four cents.

5        **MS. HAMPTON:**  Can you go to page three, please?

6   Q    What deposits are made, according to page three?

7        **(Pause)**

8   A    In the cash activity summary, it says:  "Deposits and

9   other funds credited, $73,045.25."

10  Q    And under "change in the value of your account" section on

11  the upper right-hand side, opening account value, what is

12  stated under there?

13  A    "Deposits including investments transferred in:

14  $2,056,492.37."

15  Q    According to your review of these bank documents, where

16  did that money come from?

17  A    HSBC.

18       **MS. HAMPTON:**  Can we go to page 34, please?  Can you

19  zoom in a little bit, please?

20  Q    What month is -- month and year is this statement for?

21  A    June of 2012.

22  Q    Where are the purchases according to this statement made?

23  A    Sugar Land, Texas; Houston, Texas.

24  Q    And on the left-hand side of this document, under "card

25  purchases," what is stated?

1  A    "UBS Visa debit" ending in 4411, "Silvia Beatriz Perez-

2  Ceballos."

3           MS. HAMPTON:  Page 46, please.  Can you go down,

4  please?  Can we zoom in a little bit too, please?

5  Q    Under "card purchases," what is the location of the

6  purchases, according to this document?

7  A    Sugar Land, Texas; Houston, Texas; Humble, Texas; Lake

8  Buena Vista, Florida; Nassau.

9  Q    What's the month and year of this statement?

10  A    I believe it's June and July of 2012.

11  Q    And the card -- under "card purchases," whose Visa debit

12  card is that?

13  A    Silvia Beatriz Perez-Ceballos.

14           MS. HAMPTON:  Page 58, please.

15  Q    Under "card purchases," what is the location according to

16  this document of the card purchases?

17  A    New York.

18  Q    Between what days?

19  A    July 25th and August 11th of 2012.

20  Q    And under "card purchases," whose Visa debit card is it

21  that's being used?

22  A    Silvia Beatriz Perez-Ceballos.

23           MS. HAMPTON:  Page 70, please.

24  Q    Under "card purchases," --

25           MS. HAMPTON:  Can you go back up to 70, please?

Ebright-Trevino - Direct / By Ms. Hampton                    11

1    Q    Under "card purchases" at the bottom of page 70, what

2    location according to this record are included in these card

3    purchases?

4    A    Pennsylvania and Vermont.

5    Q    And whose Visa debit card is used to make those card

6    purchases?

7    A    Silvia Beatriz Perez-Ceballos.

8    Q    On page 71, what location of card purchases and when

9    according to this document are stated?

10   A    The dates on this page are August 29th through September

11   9th of 2012.  The locations are Vermont and New York.

12   Q    And whose Visa debit card is being used for those

13   purchases, according to the document?

14   A    Silvia Beatriz Perez-Ceballos.

15            **MS. HAMPTON:**  Can we go down, please?  Can we go to

16   page -- can you go back up to page 70, please?

17   Q     On "account activity" this month -- what month is this

18   again, according to page 70?

19   A    September, 2012.

20   Q    What deposit is made on September 6th?

21   A    A Federal funds deposit by Jose Manuel Saiz-Pineda in the

22   amount of $19,980.

23   Q    Can you tell where it came from?

24   A    I do not know what it says at the end of the deposit.  It

25   just says "Federal funds deposit."

1          **MS. HAMPTON:**  Page 82, please.

2    Q    Under "card purchases," what are the dates of the card

3    purchases and locations, please?

4          **(Pause)**

5    A    On page 82, the card purchases are October 13th through

6    October 15th of 2012.  The locations are New York, New York and

7    Vermont.

8    Q    And whose Visa debit card according to the document's

9    being used for those purchases?

10   A    Silvia Beatriz Perez-Ceballos.

11         **MS. HAMPTON:**  Continue on page 83, please?

12   Q    What are the location and dates of these purchases,

13   according to the record?

14   A    The dates are October 15th through October 18th of 2012.

15   The locations are Vermont; Sugar Land, Texas; Houston, Texas;

16   and Sharpstown, Texas, --

17   Q    And according to --

18   A    -- which is near Houston.

19   Q    Sorry, according to the document, whose Visa card is being

20   used for those purchases?

21   A    Silvia Beatriz Perez-Ceballos.

22         **MS. HAMPTON:**  Can we go down, please?  Page 96,

23   please.

24   Q    Under "card purchases," what are the dates and locations

25   of the card purchases for this month?  And what month is it?

1    I'm sorry.

2    A    It's November, 2012.  This page, the dates are November

3    1st through November 3rd.  The locations are Houston, Texas;

4    Sugar Land, Texas; Sunny Isles Beach, Florida; Miami, Florida;

5    Aventura, Florida.

6    Q    And whose card purchase -- whose Visa card is being used

7    for those purchases?

8    A    Silvia Beatriz Perez-Ceballos.

9          MS. HAMPTON:  Can you go down to 97, please?

10   Q    What additional card purchases are showed on this -- shown

11   on this page as far as dates and locations?

12   A    On page 97, the dates are November 3rd through November

13   26, 2012.  The locations are Miami, Florida; Burlington,

14   Vermont; and other Vermont locations.

15   Q    And for those purchases, whose card was being used?

16   A    Silvia Beatriz Perez-Ceballos.

17   Q    Is there another card being used under "card purchases" on

18   this record?

19   A    Yes.

20   Q    Whose card?

21   A    Jose Manuel Saiz-Pineda.

22   Q    What are the dates and locations of those card purchases?

23   A    November 2nd through November 3rd, 2012.  And the charges

24   occurred in Miami and Aventura, Florida.

25          MS. HAMPTON:  Page 108, please.

Ebright-Trevino - Direct / By Ms. Hampton                14

1    Q    Under the "card purchases" on this document, what are the

2    dates and locations of the card purchases, please?

3    A    The dates run from November 27th through December 22nd,

4    2012.  The purchase locations are Vermont; Aventura, Florida;

5    Miami, Florida.  And the card is used by Silvia Beatriz Perez-

6    Ceballos.

7         MS. HAMPTON:  Can you go down, please?  Page 109,

8    please.  Page 120, please.

9    Q    On this statement, for what month and year is it, and can

10   you tell us the date range and the location of card purchases,

11   please?

12   A    It says January of 2013.  Page 120 shows purchases ranging

13   from January 8th through January 22nd.  The purchase locations

14   are Vermont; Aventura, Florida; Pembroke Pines, Florida; Sunny

15   Isles, Florida; North Miami Beach, Florida.  And the card is

16   utilized by Silvia Beatriz Perez-Ceballos.

17        MS. HAMPTON:  Can you go to page 121, please?

18   Q    What information is contained under "card purchases" in

19   this -- on this page?

20   A    The purchases range from January 22nd through January 24th

21   of 2013.  The purchases occurred in Aventura, Florida and Sugar

22   Land, Texas.  And the card was used by Silvia Beatriz Perez-

23   Ceballos.

24   Q    Is there an additional Visa debit card that's being used

25   under "card purchases," according to this document?

Ebright-Trevino - Direct / By Ms. Hampton                15

1   A     Yes.

2   Q     Whose card is that?

3   A     Jose Manuel Saiz-Pineda.

4   Q     And what are the locations of the card use and dates,

5   please?

6   A     The dates range from January 18th through January 24th of

7   2013.  And the purchases occur in North Miami Beach, Florida;

8   Miami, Florida; and Humble, Texas.

9          **MS. HAMPTON:**  Page 132, please.

10  Q     What's the date and month of this document?

11  A     February of 2013.

12  Q     What card purchases are shown as far as locations and

13  dates on page 132?

14  A     The purchases range from January 29th through February 2nd

15  of 2013.  The location of the purchases is Sugar Land, Texas

16  and Stafford, Texas.  And the card is utilized by Silvia

17  Beatriz Perez-Ceballos.

18         **MS. HAMPTON:**  Can you go to page 133, please?

19  Q     What information is contained under "card purchases" on

20  page 132 here -- 133, excuse me?

21  A     The purchase dates range from February 2nd through

22  February 23rd, 2013.  The purchase locations are Sugar Land,

23  Texas; Missouri City, Texas; and Vermont.

24         **MS. HAMPTON:**  Page 144, please, 144, I'm sorry, I

25  didn't say that very clearly.

1  Q    On page 144, what month and year is this referring to?

2          MS. HAMPTON:  Can you go up a little bit, please?

3  A    March of 2013.

4  Q    And under "card purchases," what is shown as far as card

5  purchases on page 144?

6  A    The purchases range from March 1st through March 6th of

7  2013.  The locations of the purchases are Sugar Land, Texas;

8  Houston, Texas; and it looks like a New Jersey purchase as

9  well.

10  Q    Whose card is being used, according to this page?

11  A    Silvia Beatriz Perez-Ceballos.

12          MS. HAMPTON:  Can you go down, please, to the next

13  page?  Page 145, please.  Can you go to page 157, please?

14  Q    On page 157, what card purchases are reflected for April,

15  2013?

16  A    The purchases range from April 4th through April 21st of

17  2103.  And they occur in Aventura, Florida; North Miami Beach,

18  Florida; Miami, Florida; South Miami, Florida; and Vermont.

19  Q    And who's using this card, according to the document?

20  A    Silvia Beatriz Perez-Ceballos.

21          MS. HAMPTON:  Page 158, please.

22  Q    There's one additional card purchase; is that correct?

23  A    Correct.

24          MS. HAMPTON:  Page 180, please.

25  Q    In June of 2013 under "card purchases," --

1       **MS. HAMPTON:**  Can we go down to "card purchases,"

2  please?

3  Q     -- under "cash ATM transactions" on the same page, what

4  locations and dates are noted?

5  A     The dates are May 31st through June 20th.  And the

6  locations are Sugar Land, Texas; Houston, Texas; Vermont.

7  Q     And this is in 2013, correct?

8  A     Yes.

9       **MS. HAMPTON:**  Can we go down, please?

10  Q     Under "card purchases" on page 181, what date range is

11  reflected and what locations are reflected?

12  A     May 27th through June 17th of 2013.  The locations are

13  Sugar Land, Texas; Vermont; Stafford, Texas.

14  Q     And who's using the Visa debit card, according to page

15  181?

16  A     Silvia Beatriz Perez-Ceballos.

17       **MS. HAMPTON:**  Can you go down to the next page,

18  please?

19  Q     What additional purchases are reflected on page 182, and

20  locations?

21  A     The dates are June 17th through June 24th of 2013.  The

22  locations are Sugar Land, Texas; Stafford, Texas.

23       **MS. HAMPTON:**  Page 194, please.

24  Q     Month is July, 2013; is that correct?

25  A     Correct.

1  Q    Under "card purchases," what date range and locations are

2  reflected on this page?

3  A    The date range is June 25th through July 6th of 2013.  The

4  locations are Sugar Land, Texas; Stafford, Texas; and

5  Rosenberg, Texas.

6          **MS. HAMPTON:**  Can we go to the next page, please?

7  Q    Page 195, what additional card purchases are reflected on

8  page 195?

9  A    The dates run from July 6th through July 25th.  The

10  locations are Sugar Land, Texas and Rosenberg, Texas; Pensacola

11  Beach, Florida.

12  Q    And according to page 195, whose card is being used for

13  those purchases?

14  A    Silvia Beatriz Perez-Ceballos.

15          **MS. HAMPTON:**  Page 208, please.

16  Q    August of 2013 under "card purchases," what date range is

17  reflected and what locations?

18  A    The date range is July 28th through August 16th of 2013.

19  The locations are Sugar Land, Texas --

20  Q    And whose --

21  A    -- and Rosenberg, Texas.

22  Q    Whose Visa card is being used, according to this document?

23  A    Silvia Beatriz Perez-Ceballos.

24          **MS. HAMPTON:**  Can you go to the next page, please?

25  Q    On page 209, what additional card purchases are reflected?

1   A    The date range is August 16th through August 23rd of 2013.

2   The locations are Sugar Land, Texas -- just Sugar Land, Texas.

3   Q    And whose card is being used, according to page 209?

4   A    Silvia Beatriz Perez-Ceballos.

5          **MS. HAMPTON:**  Page 219, please.

6   Q    September, 2013, correct?

7   A    Correct.

8   Q    Under "card purchases," what purchases are reflected?

9   A    The date range is August 30th through September 24th.  And

10  the locations are Sugar Land, Texas.

11  Q    And whose card, according to page 219, was being used for

12  those purchases?

13  A    Silvia Beatriz Perez-Ceballos.

14         **MS. HAMPTON:**  Page 223.

15  Q    October of 2013, correct?

16  A    Correct.

17  Q    Whose names are reflected on page 223 on the account?

18         **MS. HAMPTON:**  Can we go back up, please?

19  A    It says:  "Account name:  Silvia Beatriz Perez-Ceballos"

20  on the first line.  And underneath her name shows "Jose Manuel

21  Saiz-Pineda."

22         **MS. HAMPTON:**  Can we go --

23  A    And --

24         **MS. HAMPTON:**  Can we go up a little bit, please?

25  Q    And on the right-hand side?

1  A    On the right-hand side, the first line shows "Silvia

2  Beatriz Perez-Ceballos."  Underneath her name shows "Jose

3  Manuel Saiz-Pineda."  The third line reads:  "Calle Sanchez

4  Magallanes."  The fourth line reads:  "1113 piso 1."  The fifth

5  line reads:  "Centro Villahermosa 86000."  And the bottom line

6  reads:  "Tabasco, Mexico."

7            **MS. HAMPTON:**  Can we go down, please?  Page 228.

8  Q    And October of 2013, what card purchases are reflected on

9  page 228?  And locations, please.

10 A    September 26th of 2013 through October 9th of 2013.  The

11 locations are Sugar Land, Texas -- just Sugar Land.

12 Q    Is there a Stafford, Texas one up there, too, on October

13 4th?

14 A    Oh, yes, Stafford also.

15 Q    Where is Stafford, Texas in relation to Sugar Land?

16 A    They're right next to each other.

17 Q    And whose Visa debit card is being used on these

18 purchases, according to page 228?

19 A    Silvia Beatriz Perez-Ceballos.

20            **MS. HAMPTON:**  Page 229.

21 Q    What withdrawals are shown on page 229 under "other funds

22 debited?"

23 A    October 15th, a withdrawal for $50,000 sent to Silvia

24 Beatriz Perez-Ceballos at Bank of America; another $50,000

25 withdrawal on October 15th to Silvia Beatriz Perez-Ceballos at

Ebright-Trevino - Direct / By Ms. Hampton                21

1   Wells Fargo; on October 16th sent to Silvia Beatriz Perez-

2   Ceballos at JPMorgan Chase in the amount of $1,970,744.46.

3   Q    Did you attempt in your investigation to subpoena records

4   from Bank of America regarding this account held under the name

5   Silvia Beatriz Perez-Ceballos shown on page 229 of this

6   exhibit?

7   A    Yes.

8   Q    Were those records available or unavailable from the bank?

9   A    Unavailable.

10  Q    How long ago did you attempt to retrieve those records

11  from the bank?

12  A    I don't know the exact date.

13  Q    What year?

14  A    Maybe two years ago.

15  Q    And at that time, they were unavailable from Bank of

16  America; is that correct?

17  A    That's correct.

18       **MS. HAMPTON:**  Page 235, please.

19  Q    What month and year is this?

20  A    November of 2013.

21  Q    And what is the value of the account on November 29th,

22  according to page 235?

23  A    The value on November 29th is zero.

24       **MS. HAMPTON:**  Can we get out of this exhibit, please,

25  and go to Exhibit 25?  Under "RBC53025."

Ebright-Trevino - Direct / By Ms. Hampton                    22

1  Q    What account is this?

2  A    RBC wealth management account ending in 53025.

3  Q    And under -- on page one under "account ownership," who's

4  the owner of this account?

5  A    Martin Alberto Medina-Sonda.

6  Q    And under "occupation" under Mr. Medina-Soda's name, what

7  does it say?

8  A    "Legal service provider."

9         **MS. HAMPTON:**  Can we go down, please?  Can we go to

10 page three?

11 Q    On the bottom of page three, what is the date that this

12 was signed?

13 A    Nine, five of 2012.

14        **MS. HAMPTON:**  Can we go to page 22, please?

15 Q    On page 22, what is stated regarding current employment

16 for Mr. Medina-Sonda under the box that says "provide a

17 detailed description of the client's current employment?"  What

18 company?

19 A    Hereditas.  It reads:  "Hereditas is a consulting firm

20 specialized in patrimonial, fiscal, legal, and financial

21 counseling, as well as in the formation and administration of

22 extraterritorial societies and trust.  Website:

23 www.hereditas.com.mx."

24        **MS. HAMPTON:**  Page 23, please.  Keep going, please.

25 Q    The box that says at the bottom of page 23 "politically

Ebright-Trevino - Direct / By Ms. Hampton          23

1  exposed person," what answer is checked?

2  A    "No."

3  Q    At this time, did Mr. Medina-Sonda still have the

4  Comprehensive bank accounts involving Mr. Saiz-Pineda open?

5  A    Yes.

6          MS. HAMPTON:  Page -- sorry, could we get out of this

7  exhibit and go to Exhibit 26, please?  Under "RBC314."  Can we

8  go to page two, please?

9  Q    What is this account regarding, what company?

10 A    Comprehensive Advisory and Development Company Limited at

11 RBC.

12 Q    And on page two, what is the date of this document?

13 A    September 5th, 2012.

14         THE COURT:  Let me just clarify.  Is -- this is

15 Exhibit 26.  Has it been admitted?

16         MS. HAMPTON:  Yes, your Honor.

17         THE COURT:  Okay, I didn't have it and Brandy didn't

18 have it admitted so just --

19         MS. HAMPTON:  I thought it was one of -- well, I move

20 to admit it, your Honor.  I thought it was one of them I --

21         THE COURT:  Okay, any objection to 26?

22     (No audible response)

23         Any objection from the defense to 26?

24         MR. REYNAL:  As to the bank records, no.

25         MR. MAGLIOLO:  As to the bank records, no, as per our

1    previous --

2              **THE COURT:**  Okay, so no objection to 26, it's

3    admitted.

4         **(Government's Exhibit Number 26 was received in evidence)**

5    **BY MS. HAMPTON:**

6    Q    So back to page one on Exhibit 26, what is this document,

7    according to page one?

8    A    Power of attorney.

9              **MR. MAGLIOLO:**  Your Honor, I'm not sure that's a bank

10   record.

11             **THE COURT:**  Well, what's the objection?  Twenty-six,

12   is this within the bank records, this power of attorney?

13             **MS. HAMPTON:**  Yes, your Honor.  Agent --

14             **THE COURT:**  Was there an objection to the power of

15   attorney within the bank records?

16             **MR. MAGLIOLO:**  Well, we'd like to -- I think we'd

17   need the predicate then that would show that it's a bank

18   record.  I mean, if it's just held at the bank, that's

19   different than a bank record.

20             **THE COURT:**  Okay, are you objecting to that portion

21   of the bank records?

22             **MR. MAGLIOLO:**  Yes, your Honor.

23             **THE COURT:**  The power of attorney.  Okay, and what's

24   your objection?

25             **MR. MAGLIOLO:**  That it hasn't been properly

1  identified at this time, your Honor.  If it's a business

2  record, then it has to be qualified as a business record and

3  that's why we were not objecting to the bank records.  It's

4  something else, then it has -- the proper predicate has to be

5  paid.

6           **THE COURT:**  Okay, Ms. Hampton?

7           **MR. MAGLIOLO:**  Not just because it's in the pile with

8  the bank records.

9  **BY MS. HAMPTON:**

10 Q    Agent, as part of the subpoena to RBC bank for the

11 Comprehensive records, were these documents included in the

12 response by the bank as documents they kept in the regular

13 course of business?

14 A    Yes.

15          **THE COURT:**  But, I mean, just because they're within

16 the bank records, there could still be some hearsay exceptions.

17 So what's the Government's response to the objection regarding

18 the power of attorney?

19          **MS. HAMPTON:**  Your Honor, we argue that this is an

20 adopted business record doctrine.  Basically the business --

21 the bank requires these documents when opening accounts to

22 justify what Comprehensive Advisory is about and so these are

23 documents supporting the company so that the bank can open the

24 account.  And the bank does keep these documents in the regular

25 course of business.

Ebright-Trevino - Direct / By Ms. Hampton                26

1            THE COURT:  They don't make those documents, though.

2            MS. HAMPTON:  No, your Honor.

3            THE COURT:  So sustained.

4            MR. MAGLIOLO:  Thank you, your Honor.

5        (Pause)

6            MS. HAMPTON:  Can we go to Exhibit 27, please?

7            THE COURT:  And 27 is not admitted either.  I don't

8    have it and Brandy doesn't have it.

9            MS. HAMPTON:  I'm sorry, I thought I had moved to

10   admit that yesterday, your Honor.  We move to admit it.

11        (Mr. Reynal/Mr. Magliolo confer)

12            THE COURT:  Any objection to 27?

13            MR. MAGLIOLO:  If the document's a bank record, your

14   Honor.  But if they're trying to get something in through the

15   back door, then we do object.

16            THE COURT:  Okay, well, I don't know what all is in

17   those records.  So bank records, admissible; anything else will

18   have to be addressed individually with the Court.

19        (Government's Exhibit Number 27 was received in evidence)

20            MS. HAMPTON:  Yes, your Honor.  Can you go to Exhibit

21   27, page 25 under "RBC?"  I'm sorry, go back, please.  Under

22   "RBC 494."  Can you go to page 25, please?

23   BY MS. HAMPTON:

24   Q    On page 25, what does this record show, Agent Trevino?

25   A    It's a wire transfer originating from Comprehensive

1    Advisory at Royal Bank of Canada transferring to JPMorgan Chase

2    account held by 6 Langstone Place, Inc.

3    Q    And whose bank account is this at RBC?

4    A    It belongs to Medina-Sonda.

5    Q    Under what company name?

6    A    Comprehensive Advisory and Development Company.

7    Q    According to these records, what was the amount of this

8    wire on page 25?

9    A    Five hundred thousand.

10   Q    Where is it going?

11   A    To account held by 6 Langstone Place at JPMorgan Chase.

12        **MS. HAMPTON:**  Can we get out of this exhibit, please,

13   go to Exhibit 29 under "201406 file."  Now go down, please, to

14   page five.

15   Q    What was the date of this document, according to page

16   five?

17   A    Six, 14 of 2013.

18        **MS. HAMPTON:**  Can you go up, please?  Can you go up

19   to the top of page five, please?

20   Q    Whose account is this?

21   A    Silvia Beatriz Perez-Ceballos.

22   Q    What type of account is this?

23   A    A Chase Total Checking.

24   Q    Held at which entity?

25   A    JPMorgan Chase.

1    Q    And what is the personal address listed on page five?

2    A    Calle 3115, Colonia Rovirosa (phonetic).

3         **MS. HAMPTON:**  Can you go down, please?

4    Q    What date according to page five --

5         **MS. HAMPTON:**  Can you go back up to page five,

6    please?

7    Q    -- was this document signed?

8    A    Six, 14 of 2013.

9         **MS. HAMPTON:**  Can we go down, please?  Page eight.

10   Q    What deposits are made on page eight?

11   A    On 6/27 of 2013, an ATM cash deposit in Sugar Land, Texas

12   in the amount of $500.

13   Q    What form of money does the document say that was in?

14   A    Cash deposit.

15        **MS. HAMPTON:**  Page 15, please, 15, I'm sorry, one,

16   five.

17   Q    What's the date of this document?

18   A    July 6 through August 6 of 2013.

19        **MS. HAMPTON:**  Can you go down, please?

20   Q    What deposits are made into this JPMorgan Chase account

21   during that month?

22   A    On 7/15, an ATM cash deposit in Sugar Land, Texas of $500;

23   on July 29th, an ATM cash deposit in Sugar Land, Texas of

24   $2,000; on 7/31, ATM cash deposit in Sugar Land, Texas of

25   $1,500; on 8/5, an ATM cash deposit in Sugar Land, Texas for

1    $1,500.

2    Q    For a total of what?

3    A    Five thousand, five hundred.

4         **MS. HAMPTON:**  Page 29, please?

5    Q    What's the date of this document?

6    A    April 7th through September 6th of 2013.

7         **MS. HAMPTON:**  Can you go down please?

8    Q    What deposits are made during this timeframe?

9    A    On 08/13 an ATM cash deposit in Sugar Land, Texas for

10   $1,000.

11        On 08/22 a purchase card return of $250.

12        On 08/26 ATM cash deposit in Sugar Land, Texas for

13   $500.

14        On 09/03 ATM cash deposit in Sugar Land, Texas for

15   $980.

16   Q    For a total of how much deposits?

17   A    Two thousand seven hundred and thirty.

18        **MS. HAMPTON:**  Page 41, please?

19   Q    What deposits and additions are made on this document on

20   Page 41?

21   A    On September 9th, 2013 ATM cash deposit in Sugar Land,

22   Texas for $1,000.

23        On 09/16 ATM cash deposit in Sugar Land, Texas for

24   $800.

25        On 09/17 ATM cash deposit in Sugar Land, Texas for

1   $800.

2          On 09/18 ATM cash deposit, Sugar Land, Texas for

3   $480.

4          09/23 ATM cash deposit, Sugar Land, Texas $700.

5          On 09/30 ATM cash deposit, Sugar Land, Texas for

6   $520.

7   Q    For totaling how much in cash deposits?

8   A    Four thousand three hundred.

9          **MS. HAMPTON:**  Page 59, please?

10  Q    What deposits are made according to this document on Page

11  59?

12  A    On 10/15 ATM cash deposit in Sugar Land, Texas for $500.

13         On 10/16 on line transfer from savings account 3395

14  for $10,000.

15         On 11/06 on line from savings for $6,000.

16  Q    This account that we're looking at which is ending 1806,

17  correct, according to Page 59?

18  A    Correct.

19  Q    Did you say this was a checking or a savings account?

20  A    It's a checking account.

21  Q    And a savings account ending on 3395 where these two

22  deposits are going -- or transfers, I'm sorry, transfers were

23  coming in, are you familiar with that account?

24  A    Yes.

25  Q    What account is that?

1    A    That's the savings account linked to this checking account

2    at J. P. Morgan Chase held by Silvia Perez-Ceballos.

3          **MS. HAMPTON:**  Can we go down to Page 61, please?

4    Could we go down, please?

5    Q    On Page 61 what is the beginning balance for this

6    timeframe, for this account?

7    A    The beginning balance is $1,996.05.

8    Q    What deposits and additions are added under "Savings

9    Summary?"

10   A    This shows deposits and additions in the amount of 1

11   million 970,749.42.

12   Q    And what electronic withdrawals are made under "Savings

13   Summary?"

14   A    One million 926,000 dollars.

15   Q    What is the ending balance under "Savings Summary?"

16   A    Forty-six thousand 700 dollars and 47 cents.

17         **MS. HAMPTON:**  Can you go down, please?

18   Q    What transaction detail is noted on Page 61 here beginning

19   with October 16th?

20   A    It shows an incoming wire transfer from UBS held by Silvia

21   Beatriz Perez-Ceballos incoming in the amount of 1 million

22   970,744 and 46 cents.

23   Q    What's the next transaction?

24   A    On 10/16 an on line transfer to checking account 1806 for

25   $10,000.

Ebright-Trevino - Direct / By Ms. Hampton                    32

1  Q    Which account was -- on 10/16 that UBS money coming into,

2  the checking or the savings?

3  A    The savings account.

4  Q    And then on the next -- the same day there's 10,000 that's

5  moved from the savings to the checking, is that correct?

6  A    That's correct.

7  Q    What's the next transaction under "transaction detail?"

8  A    There's a domestic wire fee, and then following that on

9  10/25 there is an outgoing transfer of 1 million 910,000

10 dollars outgoing to Bank of N. T. Butterfield and Son,

11 Hamilton, Bermuda.

12 Q    So the 1.91 million transfer to Bermuda came directly out

13 of this savings account, correct?

14 A    That's correct.

15 Q    Held at which entity?

16 A    Chase Bank.

17 Q    And what's the next transaction detail record?

18 A    An outgoing domestic wire fee, and then on 11/06 an on

19 line transfer to checking account 1806 in the amount of $6,000.

20 Q    With the ending balance of what?

21 A    Ending balance is $46,700 and 47 dollars -- cents.

22 Q    In which account, the savings or the checking?

23 A    The savings account.

24        MS. HAMPTON:   And can we go to Page 67 please?

25 Q    Under "Deposits and additions" can you tell us what's

Ebright-Trevino - Direct / By Ms. Hampton                33

1   noted on Page 67?

2   A    On 11/20 of 2013 on line transfer from savings 3395 in the

3   amount of $5,000.

4            On 12/02 of 2013 on line transfer from savings 3395

5   for $5,000.

6   Q    So that $10,000 was placed into checking, correct?

7   A    That's correct.

8        MS. HAMPTON:  Can you go down, please?

9   Q    For this timeframe we're looking at what timeframe on ATM

10  and debit card withdrawals?

11  A    November 8th through November 25th of 2013.

12  Q    And according to this document where did these purchases

13  happen?

14  A    Sugar Land, Texas, Cypress, Texas.

15  Q    Do you know where Cypress, Texas is?

16  A    Yes.

17  Q    How far is it from Sugar Land?

18  A    Sugar Land is south of Houston, Cypress is northwest of

19  Houston.

20       MS. HAMPTON:  Page 73, please?

21  Q    What deposits --

22       MS. HAMPTON:  Can you go to the top, please?

23  Q    What deposits or additions --

24       MS. HAMPTON:  Can you go to the top, please, on Page

25  73?  Thank you.

1   Q    What deposits and additions are noted on Page 73?

2   A    On 12/16 an on line transfer from savings 3395 in the

3   amount of $6,000.

4   Q    And under "ATM and debit card withdrawals" what date range

5   are noted and what locations are stated?

6          **MS. HAMPTON:**  Can you go down, please?

7   A    The date range is 12/06 through 12/23, and the locations

8   are Sugar Land, Texas, Houston, Texas.

9          **MS. HAMPTON:**  Can you go down to the next page,

10  please?

11  Q    What additional ATM and debit withdrawals are noted on

12  Page 74?

13  A    The range is from December 23rd through January 7th of the

14  following year.

15         The purchases occur in Sugar Land, Texas, Stafford,

16  Texas, Rosenberg, Texas.

17  Q    Where's Rosenberg in relation to Sugar Land?

18  A    They're next to each other, it's a little further south.

19         **MS. HAMPTON:**  Page 80, please?  Can you go down,

20  please?

21  Q    What deposits and additions are noted on Page 80?

22  A    On 01/21 on line transfer from savings 3395 in the amount

23  of $5,000.

24  Q    And under ATM and debit card withdrawals what's the date

25  range and locations noted?

1  A    From January 8th through February 3rd.  The locations are

2  Sugar Land, Texas, Bellaire, Texas.

3  Q    Houston, Texas, correct?

4  A    Yes, I'm sorry, and Houston, Texas.

5         **MS. HAMPTON:**  Go to the next page, please?

6  Q    On Page 81 what additional card purchases, locations and

7  dates are noted?

8  A    February 4th through February 6th of 2014 and the

9  locations are -- they appear to be on line purchases.

10         **MS. HAMPTON:**  Page 86, please?

11  Q    What deposits and additions are noted on Page 86?

12  A    On 02/28 an on line transfer from savings account 3395 in

13  the amount of $5,700 -- 701 dollars and 33 cents.

14  Q    And under ATM and debit card withdrawals on Page 86, what

15  date range and locations are noted, please?

16  A    The date range is February 7th through Feb -- through

17  March 6th, and the locations are Sugar Land, Texas and I

18  believe that's it.

19         **MS. HAMPTON:**  Can we go out of this file, please?

20         **MR. SPEAKER:**  I'm sorry?

21         **MS. HAMPTON:**  Can we go out of this file to another

22  file within Exhibit 29?  Through JPMS?

23  **BY MS. HAMPTON:**

24  Q    As part of the subpoenaed records that you asked for for

25  J. P. Morgan Chase Bank, did they send you records involving

1   the Sun Life account?

2   A    Yes.

3         **MS. HAMPTON:**  Can we go to Page 3, please?

4   Q    Is this one of the records J. P. Morgan Chase Bank sent

5   you in response to the Grand Jury subpoena?

6   A    Yes.

7   Q    Can we go --

8         What address is listed for Ms. Perez-Ceballos here?

9   A    Calle tres 115 Colonia Rovirosa.

10        **MS. HAMPTON:**  Can we go down, please?  Back to Page 1

11  -- I'm sorry, back to Page 3, the middle of Page 3.  Can we go

12  down a little bit?  Thank you.

13        **MR. MAGLIOLO:**  What's the number of this one?  I'm

14  sorry.

15        **MS. HAMPTON:**  This is Exhibit 29.

16        **MR. MAGLIOLO:**  Thank you.

17        **MS. HAMPTON:**  All right.

18  **BY MS. HAMPTON:**

19  Q    And under "the source of wealth" what is stated?  On the

20  bottom of Page 3.

21  A    I found it, other.

22  Q    And under -- if "other" what is explained?

23  A    "Sale of business, staffing consulting business in

24  Mexico."

25  Q    What is the mailing address listed on this account?

Ebright-Trevino - Direct / By Ms. Hampton                    37

1   A    2706 Lytham Court.

2   Q    And the current residential address is in Tabasco, Mexico

3   listed, is that correct?

4   A    That's correct.

5            MS. HAMPTON:  Can we go to Page 8, please?

6   Q    On the top of Page 8 under "additional information"

7   there's some initials, do you see those?

8   A    Yes.

9   Q    Do you know whose initials those are?

10  A    Yes.

11  Q    Whose?

12  A    Silvia Beatriz Perez-Ceballos.

13           MS. HAMPTON:  Can we go to Page 9, please?

14  Q    Is there a signature on this page?

15  A    Yes.

16  Q    And what's the date of the signature?

17  A    10/11 of 2013.

18           MS. HAMPTON:  Can we go to Page 18, please?  Can we

19  go down, please?  Can we go down to the bottom of the page?

20  Q    As occupation, what's the occupation listed?

21  A    Housewife.

22           MS. HAMPTON:  Can we go down, please?  Go to Page 20,

23  please?

24  Q    For financial information under "earned income" can you

25  tell the jury what was stated on this document, please?

1    A    Wages zero.  Passive income, her personal investment are

2    listed at zero.  Other assets $24,000.  Pension, Social

3    Security and other is $36,000, for a total annual income of

4    60,000.

5             **MS. HAMPTON:**  Page 23, please?  Page 23?  Thank you.

6    Q    What is this document?

7    A    Offshore withdrawal request form, offshore investment

8    contracts.

9    Q    For Ms. Perez-Ceballos' account?

10   A    Correct.

11   Q    And what is the withdrawal amount requested on this

12   document?

13   A    Eighty thousand.

14   Q    What was the withdrawal surrender reason listed on this

15   document?

16   A    Daughters' school tuition and expenses.

17            **MS. HAMPTON:**  Can you go down, please?

18   Q    What is the date of this document, bottom of Page 23?

19   A    06/20 -- 06/23 of 2014 is the date it was signed.

20   Q    A little less than a year after this account was opened in

21   Bermuda, correct?

22   A    That's correct.

23            **MS. HAMPTON:**  Page 27, please?

24   Q    What is this document?

25   A    UPS shipment receipt.

Ebright-Trevino - Direct / By Ms. Hampton                    39

1    Q     What's the transaction date?

2    A     June 13th of 2014.

3    Q     What does the "Ship to" information state?

4    A     Celso Perez Ceballos, Silvia Perez-Ceballos, Avenue

5    Universidad Number 252 Colonia El Recreo, Villahermosa,

6    Tabasco.

7              **MS. HAMPTON:**  Page 31, please?

8    Q     What is this document?

9    A     Offshore investment contracts transmittal of account

10   documents.

11   Q     For Ms. Perez-Ceballos' account?

12   A     Yes.

13             **MS. HAMPTON:**  Can you go down, please?

14   Q     How was the documents, according to this Page 31, received

15   from the client?

16   A     In person on 10/16/2013.

17   Q     And the document is signed and dated what?

18   A     Signed by Paul Arnold dated 10/16/2013.

19             **MS. HAMPTON:**  Page 32, please?

20   Q     What is this?

21   A     UPS shipment receipt.

22   Q     Dated what?

23   A     October 7th, 2013.

24   Q     Shipped to who?

25   A     Celso Perez Ceballos at Avenue Universidad Number 252

1    Colonia El Recreo, Villahermosa, Tabasco.

2         **MS. HAMPTON:**  Page 35, please?

3    Q    What is this?

4    A    Client attestation.

5    Q    Under the second paragraph, right up here "By signing,"

6    can you read that please?

7    A         "By signing this document I hereby certify and

8              represent that the documents listed below were signed

9              by me outside of the United States, its territories

10             or possessions."

11        **MS. HAMPTON:**  Can you go down to the bottom of the

12   document, please?

13   Q    Do you recognize the signature on the left?

14   A    Yes.

15   Q    Whose signature is that?

16   A    Silvia Beatriz Ms. Perez-Ceballos.

17   Q    And what's the date?

18   A    10/16/2013.

19        **MS. HAMPTON:**  Page 37, please?  Can you go up,

20   please?  Can you go up to the top of this document, please?

21   Q    What is the date of this document?

22   A    August 2013.

23   Q    And what entity does it purport to be from?

24   A    UBS Account Number FL 31309.

25   Q    And what is the account name?

1  A    On this document it reads Silvia Beatriz Perez-Ceballos.

2  Q    Is this different than the UBS document we just looked at

3  in Exhibit 24?

4  A    Yes.

5  Q    How is it different?

6  A    The name of her husband, Jose Manuel Saiz-Pineda is not

7  listed, nor is the Sanchez Magallanes address listed.

8        **MS. HAMPTON:**  Can we go out of this exhibit, please?

9  Q    Exhibit 30 is the savings account associated with this

10  checking account, is that correct?

11  A    Correct.

12  Q    And will it contain the same information that we just

13  looked at?

14  A    Yes.

15        **MS. HAMPTON:**  Okay, Exhibit -- let's go to Exhibit 31

16  under "statement," Page 41.

17  Q    First of all, what bank -- what banking statements are

18  this -- is this company regarding?

19  A    This is a Bank of America account, a checking account for

20  MB Tech.

21  Q    And who is the owner of MB Tech?

22  A    Fernando Latorre.

23        **MS. HAMPTON:**  Can we go to Page 49, please?  Can you

24  go down, please?  Can you go down, please?  Back up.  Back up.

25  Q    So we're in the MB Tech account at Bank of America,

1   correct?

2   A    Correct.

3   Q    Okay.  On September 11th --

4        **MS. HAMPTON:**  And what year is this, can we go up?

5   A    2009.

6        **MS. HAMPTON:**  Okay, so, Tim, can we go down, please,

7   to deposits?  I apologize.  Right here, stop, there we go.

8   Q    Under "deposits and credits" under September 11th, 2009

9   there's an incoming wire, is that correct?

10  A    That's correct.

11  Q    Can you tell us about that wire, please, according to this

12  document?

13  A    The amount of the wire is $8,028.58.  The originator is

14  Galaxy Real Estate SA.

15  Q    Galaxy Real Estate SA.  What does the "SA" tell you about

16  the company, does it tell you anything?

17  A    It's a society of some sort.

18  Q    Does this wire tell you where the wire originated?  What

19  location?

20  A    It's coming through Deutsche Bank.  The SA at the end

21  would indicate to me that it's likely a Mexican company.

22        **MS. HAMPTON:**  Okay, can we get out of this document,

23  please?

24        Can you go into a folder under Exhibit 31, the folder

25  is 1528, under 1528?  There you go, check images.

1           Can we go to Page 525.

2    Q    What is this?

3    A    This is an MB Tech check written to EMC Real Estate dated

4    01/03 of '14 in the amount of $198,101.

5    Q    What is EMC Real Estate?

6    A    It's a company owned by Enrique Marichal.

7    Q    How many companies have we heard about with the heading

8    that includes EMC?

9    A    He also owns EMC International as well.

10   Q    Okay, and this is different than that?

11   A    Correct.

12   Q    Okay.

13         **MS. HAMPTON:**  Can we go to Page 527?

14   Q    What is this?

15   A    It's another check written to EMC Real Estate dated

16   January 3rd of 2014 in the amount of 167,000.

17         **MS. HAMPTON:**  And Page 531, please?

18   Q    What is this?

19   A    This is a check written to Latour Law PA Trust dated

20   January 21st, 2014 in the amount of $124,899.

21   Q    Do you know which Latour Law PA Trust this is referring

22   to?

23   A    I believe it's a 4598 account.

24   Q    Which is in evidence, correct?

25   A    That's correct.

1          **MS. HAMPTON:**  Okay.  Can we get out of this Exhibit

2   and go to Exhibit 35, please?  Under "signature card?"

3          Page 1 of this signature card.  Can we go down to the

4   bottom of Page 1?

5   Q    And can you tell us what account this is regarding?

6   A    It's an account for Silvia Perez-Ceballos.

7   Q    At which entity?

8   A    This is Wells Fargo Bank.

9   Q    And what's the mailing address listed?

10  A    2706 Lytham Court.

11         **MS. HAMPTON:**  Can we go back to the beginning of the

12  document, please?

13  Q    What's the date of this document?

14  A    10/01 of 2013.

15         **MS. HAMPTON:**  Can we go to Page 2, please?  Go to the

16  top, please.

17  Q    Under "customer information" what is the street address

18  that's listed on Page 2?

19  A    2706 Lytham Court.

20         **MS. HAMPTON:**  And down -- can you go down a little

21  bit?

22  Q    Under "current employer" what is listed?

23  A    Homemaker.

24         **MS. HAMPTON:**  Can you go down please?  Under -- I'm

25  sorry, back up.  Can you go back up, please?

1   Q    Under "country of citizenship" and "permanently resides in

2   the US" what are stated?

3   A    Country of citizenship says "Mexico."  Permanently resides

4   in the US states "Yes."

5   Q    And the bottom of this document is signed and dated on

6   what date?

7            MS. HAMPTON:  Can we go down, please?

8   A    It's signed by Silvia Perez-Ceballos on 10/01 of 2013.

9            MS. HAMPTON:  Can we get out of this document, but

10  stay in the same Exhibit 35?

11           And can we go into "deposits with offsets?"  The

12  first one, yes.

13  Q    Page 1, what deposit is noted here and what date?

14  A    The date is 10/01 of 2013 in the amount of 500.

15           MS. HAMPTON:  Can you go down, please?  Can you go

16  back up to the bottom of Page 1?  Right at the bottom here,

17  please.

18  Q    Can you tell whether this is -- what type of deposit this

19  is?

20  A    There's no checks listed.

21           MS. HAMPTON:  Can you go back up, please?

22           Can we go to Page 2?  Can you go down, please?

23  Q    What does this page say?

24  A    "Cash in."

25  Q    And the bottom of the page, how much is the cash that's

                    Ebright-Trevino - Direct / By Ms. Hampton                46

1    in?

2    A      $500.

3              MS. HAMPTON:  Page 3.

4              MR. SPEAKER:  There's only two pages in this one.

5              MS. HAMPTON:  Oh, I'm sorry.  No, go to the other

6    one.  Thank you.  Yeah, same thing, go to Page 3, please?

7    Q      On Page 3 what is noted as far as what's occurring there?

8    A      Deposits.

9              MS. HAMPTON:  Can you go to the bottom, please?

10   Q      And how much is that?

11   A      Five hundred.

12   Q      And what's the date?

13   A      10/11 of 2013.

14             MS. HAMPTON:  Can we go to Page 4, please?

15   Q      What's noted here?

16   A      A deposit.

17             MS. HAMPTON:  Can you go down, please?

18   Q      What is the amount?

19   A      One thousand four hundred.

20   Q      What is the date?

21   A      06/16/2014.

22             MS. HAMPTON:  Can we go to Page 5, please?

23   Q      What's noted on Page 5?

24   A      Deposit.

25   Q      And what's the amount?

1  A    Three thousand.

2         MS. HAMPTON:  Can we go to Page 7, please?

3  Q    What is noted here?

4  A    Deposit.

5  Q    In the amount of what on the bottom?

6  A    One thousand nine hundred.

7         MS. HAMPTON:  And Page 8, please?

8  Q    What is noted on Page 8?

9  A    Deposit.

10 Q    And the bottom, in the amount of how much?

11 A    One thousand six hundred.

12 Q    On what date?

13 A    07/09/2014.

14        MS. HAMPTON:  Can we go out of this document, but

15 stay in Exhibit 35?

16        And go to "wire requests."  Yes.

17        On Page 1, can you zoom in a little bit, please?

18 Q    What is this wire information?  When did it happen?

19 A    October 15th, 2013.

20 Q    And the amount of what?

21 A    Fifty thousand.

22 Q    And where is it coming from?

23 A    Wells Fargo Bank.

24 Q    And where's it going to?

25 A    It shows beneficiary Silvia Beatriz Perez-Ceballos, Jose

1    Manuel Saiz-Pineda, Calle Sanchez Magallanes.

2    Q    Is this an incoming wire or an outgoing wire?

3    A    It's the incoming and at the bottom on the left-hand side,

4    the very bottom, it says, "Originator FL31309, Silvia Beatriz

5    Perez-Ceballos, Jose Manuel Saiz-Pineda."  The "FL31309" is the

6    UBS account.

7    Q    So this is incoming from UBS, correct?

8    A    That's correct.

9    Q    Okay.

10           **MS. HAMPTON:**  Can we exit this docket -- document?

11   I'm sorry.  Can we go into "Statements"?

12   Q    This is the statement for Ms. Perez-Ceballos' Wells Fargo

13   account, correct?

14   A    That's correct.

15   Q    Is this a checking or a savings account?

16   A    She has a checking account 3600 and then there's also a

17   linked savings account.

18   Q    And so this is account number what?

19   A    3600.

20   Q    This is the checking, correct?

21   A    Yes.

22   Q    Okay.

23           **MS. HAMPTON:**  Can we go down, please, to Page 3?

24   Q    On the bottom of Page 3 on the right-hand side, what does

25   it note about Wells Fargo Bank?

1   A     That it's a member of FDIC.

2           **MS. HAMPTON:**  Page 5, please.

3   Q     On Page 5 under "Transaction History," can you tell us

4   about deposits that you see?

5   A     On 10/11, an ATM cash deposit in Sugar Land, Texas for

6   $500.  On 10/15, a wire transfer, the originator as Silvia

7   Beatriz Perez-Ceballos in the amount of 50,000.

8   Q     And on October 15th, 2013, there's a debit for $40,000.

9   Can you tell us what this document says about that?

10  A     Online transfer to Ceballos savings account ending in 5454

11  for $40,000.

12  Q     Do you recognize that Account Number 5454?

13  A     Yes, it's also at Wells Fargo.

14  Q     Is this the savings account --

15  A     Yes.

16  Q     -- of Ms. Perez-Ceballos?

17  A     Yes.

18  Q     What other transactions do you see under "Transaction

19  History" as far as location and timeframe?

20  A     There are purchases occurring in Sugar Land, Texas and

21  Katy, Texas.

22  Q     Where is Katy, Texas in relation to Sugar Land, Texas?

23  A     North and west.

24          **MS. HAMPTON:**  Next page, please.  Page 6.

25  Q     What transactions are noted as far as locations and dates

1    here?

2    A    The dates range from 10/28 through 11/6 and the locations

3    are Dallas, Texas; Sugar Land, Texas; Houston, Texas.

4              **MS. HAMPTON:**  Can you move down, please?  Can we go

5    to Page 11?

6    Q    On December 2nd, there's a deposit.  Can you tell us what

7    this document tells us about the deposit?

8    A    It's an incoming online transfer from Ceballos, S. Savings

9    Account 5454 in the amount of $5,000.

10   Q    Whose savings account is that?

11   A    Silvia Perez-Ceballos.

12   Q    And just on this page, Page 11, where -- what locations

13   are the other transaction -- transactions occurring, according

14   to the document?

15   A    Sugar Land, Texas.

16             **MS. HAMPTON:**  Page 19, please.  Can we go up to see

17   the date?

18   Q    January 2014, correct, to February 2014?

19   A    That's correct.

20             **MS. HAMPTON:**  If you can go down to the transactions.

21   Q    On January 9th, 2014, there's a deposit.  Can you tell us

22   what this document says about the deposit?

23   A    It's an incoming online transfer from Ceballos, S. Savings

24   Account 5454 in the amount of $5,000.

25   Q    Is that Ms. Perez-Ceballos' savings account?

Ebright-Trevino - Direct / By Ms. Hampton                    51

1    A    Yes.

2    Q    And where did the locations of the other transactions

3    occur, according to this document?

4    A    Sugar Land, Texas.

5              MS. HAMPTON:  Can you go down, please?

6    A    And Houston, Texas.

7              MS. HAMPTON:  Page 30, please.  Move up, please.  Go

8    up a little bit.

9    Q    On March 14th of 2014, there's a deposit or addition.  Can

10   you tell us what this document says about that?

11   A    It's an incoming online transfer from savings account

12   ending in 5454 in the amount of $5,000.

13   Q    And on this page, where did the other transactions occur?

14   A    Sugar Land, Texas; Houston, Texas.

15             MS. HAMPTON:  Can you go down, please?  Page 31,

16   please.

17   Q    On March 31st, 2014, there's a deposit.  Can you tell us

18   what this page says about the deposit?

19   A    Online transfer from savings account ending in 5454 in the

20   amount of 3,000.

21             MS. HAMPTON:  Can you go down, please?

22   Q    On April 3rd, 2014, there's another deposit.  Can you tell

23   us what this page says about that?

24   A    An incoming transfer from Savings Account 5454 in the

25   amount of 2,200.

Ebright-Trevino - Direct / By Ms. Hampton          52

1  Q    And on Page 31, where are the location of these

2  transactions occurring, according to the document?

3  A    Sugar Land, Texas.

4        MS. HAMPTON:  Can we go to Page 35, please?

5  Q    On April 9th, there's a deposit.  Can you tell us what

6  this page says about the deposit, please?

7  A    It's an online transfer from Savings Account 5454 in the

8  amount of 2,500.

9  Q    And according to Page 35, where are the location of these

10 other transactions occurring?

11 A    Sugar Land, Texas.

12       MS. HAMPTON:  Can you go down a little bit, please?

13 Q    On April 14th, 2014, there's a deposit.  Can you tell us

14 what this document says about the deposit?

15 A    It's an incoming online transfer from Savings Account 5454

16 in the amount of 2,500.

17       MS. HAMPTON:  Page 36, please.  Can you go down,

18 please?

19 Q    May 5th, 2014, there's a deposit.  What does this document

20 tell us about the deposit?

21 A    Online transfer from Savings Account 5454 in the amount of

22 3,500.

23       MS. HAMPTON:  Can you go down to Page 41, please?

24 Can you go down a little further, please?  Thank you.

25 Q    On May 9th, 2014, there's a deposit.  What does this page

Ebright-Trevino - Direct / By Ms. Hampton                53

1  tell us about this deposit?

2  A    It's an incoming online transfer from Savings Account 5454

3  in the amount of $4,000.

4  Q    And where are the location of the other transactions on

5  this page?

6  A    Sugar Land, Texas.

7           **MS. HAMPTON:**  Can we go down to Page 42, please?

8  Q    On May 14th, 2014, there's a deposit.  What does this

9  document tell us about the deposit?

10  A    It's an incoming online transfer from savings account

11  ending in 5454 in the amount of $3,000.

12  Q    And the other locations on this page are where, according

13  to the transaction history?

14  A    Sugar Land, Texas and Houston, Texas.

15           **MS. HAMPTON:**  Page 48, please.

16  Q    This is June through July of 2014, correct?

17  A    Correct.

18  Q    On June 6th, 2014, there's a deposit.  What does this

19  document tell us about the deposit?

20  A    It's an online transfer from savings account ending in

21  5454 in the amount of $2,000.

22  Q    On June 16th, 2014, there's a deposit.  What does it tell

23  us about the first deposit?

24  A    It's an ATM cash deposit in Sugar Land, Texas in the

25  amount of 1,400.

Ebright-Trevino - Direct / By Ms. Hampton                 54

1    Q    And then there's a second deposit on June 16th.  What does

2    the document say about that?

3    A    It's an online transfer from Savings Account 5454 for

4    $2,000.

5              **MS. HAMPTON:**  Page 49, please.

6    Q    On June 19th, 2014, there's a deposit.  Can you tell us

7    what the document tells us about the deposit, please?

8    A    ATM cash deposit occurring in Sugar Land, Texas in the

9    amount of 3,000.

10             **MS. HAMPTON:**  Page 50, please.

11   Q    June 30th, 2014, there's a deposit.  What does this

12   document tell us about the deposit?

13   A    There's an ATM cash deposit in the amount of $1,900.

14             **MS. HAMPTON:**  Page 55, please.

15   Q    On July 9th, 2014, there's a -- the first deposit.  What

16   does this transaction record tell us about that?

17   A    It's an ATM cash deposit occurring in Sugar Land, Texas

18   for 1,600.

19   Q    And there's a second deposit on July 9th.  What does this

20   record tell us about that deposit?

21   A    An online transfer from Savings Account 5454 for 1,000.

22             **MS. HAMPTON:**  Page 61, please.

23   Q    This document is dated when on Page 61?

24   A    August 7th through September 5th of 2014.

25   Q    What is the ending balance under "Transaction History" on

Ebright-Trevino - Direct / By Ms. Hampton                    55

1    September 5th, 2014?

2    A    Zero.

3    Q    Do you know what happened to this account after that?

4    A    I do not know.

5    Q    It was -- according to this document, the account was

6    zeroed out in September of 2014?

7    A    That's correct.

8         MS. HAMPTON:  Can we go to Exhibit 36, please?  Under

9    "Statements."  Can you go down, please?  Can you go down,

10   please?  I think this is an old document.  Can you get out of

11   this one, please?  And can you go to statements with 5454?

12   Thank you.  Okay.  Can we go down, please?

13   Q    Okay.  So this Page 1 -- this was in October of 2013.  Is

14   that when it was dated, correct?

15   A    Yes.

16   Q    What does the activity -- what is the 5454 account, first

17   of all?

18   A    It's a savings account held by Silvia Perez-Ceballos.

19   Q    And on "Account Activity Summary," what does it say for

20   its deposits or additions?

21   A    Deposits were received in the amount of $40,520.14.

22   Q    And under "Transaction History," there's a deposit on the

23   15th of October, 2013.  Where did that come from according to

24   this record?

25   A    Online transfer from Checking Account 3600 for $40,000.

1    Q    Thank you.

2         **MS. HAMPTON:**  Can we get out of this document,

3    please?  Can we go to Exhibit 38?  Under "Scan to."  Page 11,

4    please.

5    Q    What is this document, first of all, on Page 1?

6    A    It says, "Sun Life Financial Confirmation Statement."

7    Q    And what is the address of Ms. Perez-Ceballos?

8    A    2706 Lytham Court, Sugar Land, Texas.

9         **MS. HAMPTON:**  Can you go to Page 11, please?

10   Q    On Page 11, there's some withdrawal instructions.  Do you

11   recognize this page?

12   A    Yes.

13   Q    What does the document say about this request for

14   withdrawal?

15   A    It's for the amount of 25,000 and the reason for

16   withdrawal is daughter's school tuition and expenses.

17   Q    And under "Wire Instructions," what is the name of the

18   beneficiary bank?

19   A    JP Morgan Chase Bank.

20   Q    And do you recognize the account number?

21   A    I believe it's 3395, the savings account.

22   Q    At the bank -- at JP Morgan Chase Bank?

23   A    That's correct, held by Silvia Perez-Ceballos.

24   Q    Okay.  And what is the date of this --

25        **MS. HAMPTON:**  Page 12, please.

Ebright-Trevino - Direct / By Ms. Hampton          57

1   Q    What is the date of this document?

2   A    It's signed on 10/14 of 2015.

3   Q    Do you recognize that signature?

4   A    Yes.

5   Q    Whose signature is that?

6   A    Ms. Perez-Ceballos.

7         **MS. HAMPTON:**  Can we go to Page 77, please?

8   Q    What is this document?

9   A    I believe this is part of the documentation to move the

10  funds out of Sun Life and put them over to Morgan Stanley with

11  Mr. Paul Arnold.

12  Q    What is this document dated?

13  A    5/29/17.

14        **MS. HAMPTON:**  Can you go down, please?

15  Q    And under the middle section, what is marked with a pen?

16  A    "Full liquidation."

17        **MS. HAMPTON:**  Can we go to Page 80, please?

18        **THE COURT:**  Let's break right there.  Let's take our

19  morning break and take 15 minutes.

20        **THE CLERK:**  All rise for the jury.

21        **(Jurors exited the courtroom at 9:59 a.m. and recess was**

22  **taken from 9:59 a.m. to 10:18 a.m.)**

23        **(Outside the presence of the jury)**

24        **THE COURT:**  Is the jury ready?  You can bring them

25  in.

1          What -- Mr. Muschenheim, I can't say I've ever heard

2    of adoptive business records.

3          **THE CLERK:**  All rise for the jury.

4        **(Jurors entered the courtroom at 10:19 a.m.)**

5          **MR. MUSCHENHEIM:**  Well, it's -- we can talk about

6    that later.

7          **THE COURT:**  All right, you can have a seat.

8          And continue.

9          **MS. HAMPTON:**  May I proceed, your Honor?

10         **THE COURT:**  Yes.

11                    **DIRECT EXAMINATION (CONTINUED)**

12   BY MS. HAMPTON:

13   Q    We were on Exhibit 38 document looking at "Scan to" and

14   we're at Page 80.  What does this document say?

15   A    It's requesting full withdrawal.  It says the reason is,

16   "Change investment" and the wire instructions list JP Morgan

17   Chase Bank with Account Number 3395.

18   Q    Which account at JP Morgan Chase is that?

19   A    It's the savings account belonging to Ms. Perez-Ceballos.

20         **MS. HAMPTON:**  Can you go down, please?  To Page 81.

21   Q    What is the date of this full withdrawal request according

22   to Page 81?

23   A    5/10 of 2017.

24   Q    Do you recognize the signature on Page 81?

25   A    Yes.

Ebright-Trevino - Direct / By Ms. Hampton                    59

1   Q     Whose signature is that?

2   A     Ms. Perez-Ceballos.

3         **MS. HAMPTON:**  Page 83, please.

4   Q     What is this document?

5   A     It's Identification of Account Holder.

6   Q     And who is the account holder?

7   A     Silvia Perez-Ceballos.

8   Q     What's the permanent address listed for Ms. Perez-

9   Ceballos?

10  A     Calle Tres 115 in Tabasco --

11        **MS. HAMPTON:**  Can you go down, please?

12  A      -- in Tabasco.

13        **MS. HAMPTON:**  Can you go down, please?

14  Q     Under that box, there's a sentence.  Can you read that?

15  A     "Please check this box to update account holder's

16  permanent residence address in our records."

17  Q     Is that box checked or unchecked?

18  A     It's unchecked.

19  Q     And what is the mailing address listed?

20  A     2706 Lytham.

21        **MS. HAMPTON:**  Can you go down, please?  Keep going.

22  Keep going, please.

23  Q     On Page 85, what's the date of the signature?

24  A     5/10/2017.

25  Q     Do you recognize the signature?

Ebright-Trevino - Direct / By Ms. Hampton                    60

1    A    Yes.

2    Q    Whose is that?

3    A    Ms. Perez-Ceballos.

4         MS. HAMPTON:  Can you go to Page 91, please?  Can you

5    go up to the top, please?

6    Q    What is this?

7    A    It is a copy of a bank card and it has at the top that

8    Silvia B. Perez-Ceballos with Calle Tres Number 113 or 5.

9    Q    And this was included in the bank documentation regarding

10   the withdrawal; is that correct?

11   A    Yes.

12   Q    In 2017?

13   A    Yes.

14        MS. HAMPTON:  Can you go to Page 98, please?

15   Q    What is this document?

16   A    UBS financial statement.

17   Q    Dated when?

18   A    October 2013.

19   Q    And was this document included in the bank documentation

20   regarding the May 2017 withdrawal?

21   A    Yes.

22        MS. HAMPTON:  Can we get out of this exhibit, please?

23        Your Honor, I move to admit Exhibits 44 and 45 at

24   this time.  These are EMC International and EMC Real Estate

25   Group incorporation documents.

Ebright-Trevino - Direct / By Ms. Hampton                          61

1           MR. MAGLIOLO:  No objection, your Honor.

2           THE COURT:  They're admitted.

3        (Government's Exhibits Numbers 44 and 45 were received in

4   evidence)

5           MS. HAMPTON:  May I publish, your Honor?

6           THE COURT:  Yes.

7           MS. HAMPTON:  Go to Exhibit 44, please.  On Page 4 --

8   actually go to Page 5, please, first.  Can you go up to the top

9   of the page?

10  BY MS. HAMPTON:

11  Q    What is this?

12  A    Articles of Incorporation for EMC International.

13  Q    And what's it dated?

14  A    November 8th, 2010.

15          MS. HAMPTON:  Can you go up to Page 4 now, please?

16  On the top of Page 4, please.

17  Q    What is this?

18  A    It's a letter from the State of Florida regarding EMC

19  International.

20          MS. HAMPTON:  Can you go down, please?

21  Q    Does this letter document the dissolve date of EMC

22  International?

23  A    Yes.  It was administratively dissolved on September 25th,

24  2015.

25          MS. HAMPTON:  Can you go up a little bit, please?

Ebright-Trevino - Direct / By Ms. Hampton                    62

1  Q    So this was in operation between November of 2010 and

2  September of 2015; is that correct?

3  A    That's correct.

4       MS. HAMPTON:  Can we go to Exhibit 45, please?  Page

5  4.

6  Q    What is this document?

7  A    It's from the State of Florida.

8  Q    Regarding which company?

9  A    Regarding EMC Real Estate Group.

10 Q    And what is the date that this company became effective,

11 according to this document?

12 A    August 6th, 2007.

13 Q    Okay.

14      MS. HAMPTON:  Can we close this exhibit, please?  Can

15 we go to Exhibit 56?  And the closing docs.  Page 1.

16 Q    Where is this wire from?

17 A    The wire instructions I don't see on this page.

18 Q    What is the amount of the wire?

19 A    There's a wire transfer credit on 2/20 of 2009 for

20 $1,304,978.

21 Q    To the account of Starr Associates, LLP?

22 A    Yes.

23 Q    Which property is this the escrow account for?

24 A    The New York.

25      MS. HAMPTON:  Can we go to Page 2, please?  Oh, I'm

1    sorry, back to Page 1.

2    Q    Under Starr Associates, what company is listed?

3    A    Performance Investment, Limited.

4         **MS. HAMPTON:**  Page 2, please.  Can you zoom in?  Can

5    we go up to the top?

6    Q    What is the date of this wire and the amount of this wire?

7         **MS. HAMPTON:**  Can we go up to the top of the page,

8    please?

9    Q    What is the date and the amount?

10   A    2/20 of 2009 in the amount of 1,304,978.

11        **MS. HAMPTON:**  Can you go down, please?

12   Q    Can you tell us where the wire is coming from and where

13   it's going to?

14   A    It's coming Federacion Tabasquena and it's going to Starr

15   Associates Casa 74 Attorney Escrow Account.

16   Q    And this is for the New York property; is that correct?

17   A    Yes.

18        **MS. HAMPTON:**  Page 3, please.  Can you zoom out,

19   please?  Can you go up?

20   Q    What are these wires in the amount of and what are the

21   dates?

22        **MS. HAMPTON:**  Can you move in a little bit?

23   A    On 1/5/2009 wire transfer credit in the amount of 500,000.

24   On 1/5/2009 wire transfer credit for 1,849,978.  On 1/26/09

25   wire transfer credit 1,300,000.

1          **MS. HAMPTON:**  Can you move to the top of the page.

2   Q     This is going to the Starr Associates escrow account?

3   A     Yes.

4   Q     And from what company?

5   A     Performance Investment Limited.

6          **MS. HAMPTON:**  And go to Page 4, please.  Can you zoom

7   in a little bit?

8   Q     What's the date and the amount of this wire?

9   A     12/31/08.

10  Q     What's the amount?

11  A     500,000.

12  Q     And where is it coming from and where is it going to?

13  A     From Federation Tabasquena going to Casa 74 Attorney

14  Escrow Account.

15         **MS. HAMPTON:**  Page 5.

16  Q     What is the date and amount of this wire?

17  A     The date is 12/31/08, the amount is 1,849,978.

18  Q     Where is it coming from and where is it going to?

19  A     Cody Torres Por El Campo (phonetic) and it's going to

20  Casa 74 Attorney Escrow Account.

21         **MS. HAMPTON:**  Page 6, please.

22  Q     What is the date and amount of this wire?

23  A     The date is 1/22/09, the amount is 1,300,000.

24  Q     And where is it going to and where is it coming from?

25  A     It's going to Casa 74 Attorney Escrow Account.  The

1   originator is Performance Investment Limited at Morgan Stanley.

2           **MS. HAMPTON:**  Page 7, please.

3   Q    What is the date and amount of this wire transfer?

4   A    9/23/08 in the amount of 587,478.

5   Q    And where it is coming from and where is it going to?

6   A    There are no instructions on this sheet.

7   Q    Starr Associates is what?

8   A    Starr Associates is the escrow account.

9   Q    And Performance is what?

10  A    Performance is the company that entered the contract.

11          **MS. HAMPTON:**  Can you go to Page 8, please.

12  Q    Can you tell me the date and the amount of the wire?

13  A    The amount is 587,478.  If we could go up just a little

14  bit for the date.  The date is 9/23/08.

15  Q    And where is it coming from and where is it going to?

16  A    Cody Torres Por El Campo going to Casa 74 Attorney Escrow

17  Account.

18          **MS. HAMPTON:**  Page 9, please.

19  Q    What is the date and amount of this wire?

20  A    3/28/2008, the amount is 587,500.

21  Q    And the company noted at the top of this is Performance,

22  is that correct?

23  A    That's correct.

24          **MS. HAMPTON:**  Page 10, please.

25          **MR. SPEAKER:**  Sorry?

Ebright-Trevino - Direct / By Ms. Hampton                66

1          **MS. HAMPTON:**  Page 10, please.  Sorry.

2    Q    What is the date and amount of this wire transfer?

3    A    3/25 of '08 in the amount of 587,500.

4    Q    Where is it coming from and where is it going to?

5    A    It's coming from Antonio Espinoza to Casa 74 Attorney

6    Escrow Account.

7          **MS. HAMPTON:**  Page 11, please.  Can you move up,

8    please.

9    Q    What is the -- what's the amount of this check, the date

10   of the check, and what's noted in the pay to the order?

11   A    The amount of the check is 26,335 dollars with 9 cents,

12   it's dated February 26, 2009, and it is made out to Performance

13   Investment Limited.

14         **MS. HAMPTON:**  Can you go to Page 12, please.

15   Q    What is the information on this check?

16   A    It's dated February 26, 2009 in the amount of $8,243.67,

17   pay to the order of Performance Investment Limited.

18         **MS. HAMPTON:**  Can you go to Page 18, please.

19   Eighteen, please.  Can you go down.  Can you go down, please.

20   Q    What is the closing date, according to Page 18, of this

21   property?

22   A    February 26, 2009.

23   Q    And what is the total purchase price?

24   A    Unit purchase price is listed as 5,875,000.

25         **MS. HAMPTON:**  Can you go to Exhibit 57, please.  To

1   the closing docs.

2   **BY MS. HAMPTON:**

3   Q    On Page 1 of the closing docs under Exhibit 57, what are

4   the total wires received?

5   A    The total for the wires received is $2,727,366.86.

6   Q    What property is this related to?

7   A    The Jade 2708.

8           **MS. HAMPTON:**  Can you go to Page 2, please.  Can you

9   go down, please.

10  Q    According to Page 2, who is the originator of this wire?

11  A    Amazing Real Estate.

12          **MS. HAMPTON:**  Page 3, please.

13  Q    What is the date of the wire according to Page 3?

14  A    4/17/2009.

15  Q    And the amount?

16  A    755,000.

17          **MS. HAMPTON:**  Page 8, please.

18  Q    Under contract sales price, what is the contract sales

19  price according to Page 8?

20  A    2,950,000.

21          **MS. HAMPTON:**  Page 11, please.

22  Q    According to Page 11, what is the proposed -- what is the

23  sales price on the right?

24  A    2,950,000.

25          **MS. HAMPTON:**  Page 43, please.

Ebright-Trevino - Direct / By Ms. Hampton                68

1  **BY MS. HAMPTON:**

2  Q    According to Page 43, who is the buyer?

3  A    Performance Investment Limited, authorized representative

4  Martin Alberto Medina-Sonda.

5        **MS. HAMPTON:**  Page 55, please.

6  Q    What is the date of the signing of this document?

7  A    June 11th, 2007, signed by Martin Alberto Medina-Sonda.

8        **MS. HAMPTON:**  Can you go to Exhibit 58, please.  And

9  go to closing docs.  Page 1, can you go down, please.

10 Q    What is the total deposits for wires received on Page 1

11 under total deposits?

12 A    7,787,722.

13       **MS. HAMPTON:**  Can you go down, please.

14 Q    And then under the second set of wires in 2010, what's the

15 total amount for that?

16 A    It says total disbursements 7,787,722.

17       **MS. HAMPTON:**  Can you go to Page 28, please.

18 Q    What is the policy amount of the purchase price for this

19 property according to Page 28?

20 A    7,600,000.

21       **MS. HAMPTON:**  Can you go to Page 40, please.  And go

22 to the bottom of Page 40, please.  Page 40.

23 Q    Who signs this document as the manager for Jade Ocean

24 Penthouse Holdings?

25 A    Angel Gonzalez.

Ebright-Trevino - Direct / By Ms. Hampton                    69

1          **MS. HAMPTON:**  Can you go to Page 46, please.

2    Q    Who signs this document as JEC Holdings LLC manager?

3    A    Angel Gonzalez.

4          **MS. HAMPTON:**  Page 56, please.

5    Q    Who signs this document as Jade Ocean Penthouse Holdings

6    LLC?

7    A    Angel Gonzalez.

8          **MS. HAMPTON:**  Can you go to Exhibit 59, please.  Can

9    you go to 59 and then Mara Escrow closing documents.  Can you

10   go to Page 3, please.

11   Q    On Page 3 who is listed as the selling broker?

12   A    EMC Real Estate with agent Enrique Marichal.

13   Q    And what is listed as the sales price for this property?

14   A    6,500,000.

15   Q    What property is this regarding?

16   A    The Century 23B in Los Angeles.

17          **MS. HAMPTON:**  Can you go to Page 5, please.

18   Q    According to Page 5, what disbursements or receipts were

19   received by wire?

20   A    There is a wire received in the amount of 325,000 from

21   Performance Investment Limited on 3/26 of '08.  On 8/6 there is

22   another wire in the amount of 324,978 by Performance

23   Investment.  And the remaining are from Galaxy for benefit of

24   Performance.

25   Q    Is this the same Galaxy company that we saw in the MB Tech

1    account?

2    A    Yes.

3    Q    And so the wires (indisc.) purchase of this Los Angeles

4    property?

5    A    That's correct.

6          MS. HAMPTON:  And we can get out of that exhibit,

7    please.

8    Q    When you were reviewing the Chase account records, the

9    Chase account statements, was there information regarding a

10   date and meeting between the Defendant, Ms. Perez-Ceballos,

11   Mr. Arnold, and her brother, Celso Perez-Ceballos?

12   A    Yes.

13   Q    What was the date?

14   A    The date is referenced as October 3rd of 2013.

15   Q    What date did the UBS funds come into the savings account

16   of Ms. Perez-Ceballos at JP Morgan Chase Bank?

17   A    I believe it was October 16th of 2013.

18   Q    In your -- in the case here have you come up with an

19   estimate of the value of the real property that we've talked

20   about in this trial?

21   A    Yes.

22   Q    What is the value --

23         MR. MAGLIOLO:  We object to -- I'm sorry, your Honor.

24   We object to her estimate of the property unless we have some

25   predicate as to how she came up with the estimate.

1          **THE COURT:**  Sustained.

2   BY MS. HAMPTON:

3   Q    How did you come up a value for the real property?

4   A    Adding up the amounts indicated in the closing contracts.

5   Q    What is the total amount of real property involved?

6   A    It's in excess of 30 million.

7   Q    Have you done the same with the vehicles involved in this

8   case?

9   A    Yes.

10  Q    The Minelo vehicles and the Premium Collection or just one

11  or the other?

12  A    Just the Minelo.

13  Q    Why?

14  A    Those are the only vehicles that we were able to get

15  actual title histories on, records for in the United States.

16  Q    What was the value of the Minelo vehicles?

17  A    Approximately eight million or more.

18  Q    And the bank accounts that were still in existence this

19  year, have you also calculated the value of those bank

20  accounts?

21  A    Yes.

22  Q    What was the value of the bank accounts still in

23  existence?

24  A    It was about three million.

25  Q    What day was Ms. Perez-Ceballos arrested on?

1    A    May 24th, 2017.

2    Q    Did you conduct a search warrant of her residence that

3    day?

4    A    Yes.

5    Q    What did you observe in her residence?

6    A    We observed furnishings.  Her -- she -- her bedroom was

7    located upstairs along with her two daughters' bedrooms.  The

8    master bedroom was occupied by her brother, Celso, and his

9    wife.  And there was a downstairs room that was being used as a

10   bedroom for Celso's son.

11   Q    What address was this?

12   A    This was at 615 Elmhurst.

13   Q    Was it -- was there any question whether Ms. Perez-

14   Ceballos lived there?

15   A    No.

16   Q    Prior to that, did you conduct surveillance of this

17   residence?

18   A    Yes.

19            **MS. HAMPTON:**  Your Honor, may I approach?

20            **THE COURT:**  Yes.

21   **BY MS. HAMPTON:**

22   Q    I've handed you what is marked as Government's Exhibit

23   132.  Is that correct, 132?

24   A    Yes.

25   Q    Do you recognize that?

1    A    Yes, I do.

2    Q    Is it a true and accurate depiction of a photo?

3    A    Yes.

4    Q    Do you recognize the photo?

5    A    Yes.

6    Q    What is the photo of?

7    A    It's a photo of the Elmhurst property and one of the

8    Minelo Escalades --

9    Q    Was this taken while you were conducting surveillance?

10   A    Yes.

11          **MS. HAMPTON:**  Your Honor, I'd offer Exhibit 132.

12          **MR. MAGLIOLO:**  No objection.

13          **THE COURT:**  It's admitted.

14       **(Government's Exhibit Number 132 was received in evidence)**

15          **MS. HAMPTON:**  May I publish, your Honor?

16          **THE COURT:**  Yes.

17   **BY MS. HAMPTON:**

18   Q    What is shown in this photo?

19   A    The -- a vehicle parked in the driveway of the Elmhurst

20   residence.

21   Q    What is the date of this photograph?  Do you remember when

22   it was taken?

23   A    I believe this one was just prior to her arrest in May of

24   2017.

25   Q    Do you recognize that vehicle?

Ebright-Trevino - Direct / By Ms. Hampton                    74

1   A    Yes.

2   Q    Can you see the license plate of the vehicle?

3   A    Yes.

4   Q    What is it?

5   A    It's a Florida license plate bearing 484 Yankee, it might

6   be a Q, X.

7            **MS. HAMPTON:**  Can we look at Exhibit 76, please.

8   Q    Page 1, what is the license plate of this vehicle under

9   registration information?

10  A    484 Yankee Queen X-ray.

11  Q    And it's a Florida license plate?

12  A    Yes.

13  Q    What type of vehicle is this in Exhibit 76?

14  A    The vehicle make says a Cadillac 2010.

15  Q    And who's the registered owner?

16  A    Minelo Acquisitions.

17  Q    Is Minelo Acquisitions or was Minelo Acquisitions still

18  the owner in May of 2017, when you were conducting surveillance

19  at the residence?

20  A    Yes.

21           **MS. HAMPTON:**  May I have a moment, your Honor?

22           **THE COURT:**  Yes.

23       **(Pause)**

24           **MS. HAMPTON:**  Pass the witness, your Honor.

25           **MR. MAGLIOLO:**  May I proceed, your Honor?

Ebright-Trevino - Cross / By Mr. Magliolo                    75

1          **THE COURT:**  Yes.  You'll need to stand.

2          **MR. MAGLIOLO:**  Yes, your Honor.

3                         **CROSS EXAMINATION**

4    BY MR. MAGLIOLO:

5    Q    Special Agent Trevino?

6    A    Yes, sir.

7    Q    I thought we might start this with what we can maybe agree

8    on.  Do you suppose there's anything?

9    A    There's probably many things, sir.

10   Q    Would it be fair to say that we could agree that Mr. Saiz-

11   Pineda was a wealthy man, as Ms. Hampton stated, when he went

12   into government service?

13   A    That's possible.

14   Q    And do you recall that in the Government's evidence there

15   is a wealth declaration that he made prior to entering

16   government service?

17   A    Yes.  I know there is one for his first year, yes.

18   Q    And it showed him to be a multi-millionaire?

19   A    I don't recall the exact amounts.  I'd have to see the

20   documents again.

21   Q    But do you recall it would show him to be a multi-

22   millionaire?

23   A    There was significant amount of money listed on there,

24   yes.

25   Q    And then I think you and Ms. Hampton were talking

1    yesterday about a document that was dated maybe three years

2    into his time as a government official in Tabasco and it showed

3    a estimated wealth of 30 million?

4    A    That was, I believe you're referencing a bank document --

5    Q    Yes.

6    A    -- where Ms. Perez-Ceballos and Mr. Saiz-Pineda had both

7    declared $30 million worth.

8    Q    Thirty million?

9    A    Yes, sir.

10   Q    Okay.  And -- okay, so we found some common ground.

11        Would you agree that he had a successful accounting

12   money advising kind of business prior to entering government

13   service?

14   A    That is what the information has -- is claiming.

15   Q    Okay.  And that that business continued while he was in

16   government service, would you agree with that?

17   A    That's what is indicated on the paperwork.

18   Q    Would you agree that my client, Ms. Perez, is a

19   psychologist?

20   A    That's what she's claimed her education is in, yes.

21   Q    And again on that kind of same paperwork we were talking

22   about that has the 30 million, it indicates that she had been a

23   working psychologist for over 20 years?

24   A    That's what was stated on the documentation.

25   Q    And I think the salary she showed was about 180,000 a

1   year?

2   A    That's what is listed, sir.

3   Q    Would you agree that Ms. Cortes, I believe, testified, she

4   was the USBC person and she testified that she traveled to

5   Mexico to talk about Mrs. Perez's account?

6   A    That was Ms. Sonia Fernandez, who was --

7   Q    Oh, okay.

8   A    -- initially with HSBC and then transferred to UBS.  And,

9   yes, she did indicate that she did travel to Mexico.

10  Q    Didn't she further indicate that she didn't talk to

11  Ms. Perez, she talked to her husband, Saiz-Pineda?

12  A    That's correct, but at their initial meeting at the

13  offices in Miami Ms. Perez-Ceballos was present during the

14  initial meeting.

15  Q    Yes, ma'am.  But when she went to Mexico she didn't talk

16  to Ms. Perez but she talked to the husband.

17  A    That's correct, sir.

18  Q    And I think she further indicated that when she called to

19  say the account was going to close because of some new bank

20  procedures she talked to Saiz-Pineda?  If you recall.

21  A    Sir, I recall her testimony was --

22  Q    It's a yes, kind of a yes or no to start with.

23  A    Okay, could you repeat it for me, please --

24  Q    Yes.

25  A    -- one more time?

Ebright-Trevino - Cross / By Mr. Magliolo                    78

1   Q    Do you recall that she testified that when called to say

2   the account should be closed based on some new banking

3   regulations that the person she called was my client's husband,

4   Saiz-Pineda?  Yes or no if you recall.

5   A    No, I do not recall that.

6   Q    Okay.  Do you believe, just as a general idea, that moving

7   money from Mexico to the United States could well be a good

8   idea?

9   A    I have no opinion either way on whether it's a good idea

10  or not.

11  Q    And are you aware of the sometimes rapid peso devaluation?

12  A    I am aware that the peso is constantly changing its value

13  on any given day.

14  Q    And sometimes to a significant amount.  I think there was

15  some testimony from one of you all's witnesses about that.  If

16  you recall.

17  A    I don't recall it being a significant amount.

18  Q    Okay.  Would you agree with me that following your

19  investment advisor's advice is a good idea, especially when you

20  don't know much about investment?

21  A    That can be a good idea, sir, yes.

22  Q    And would you also agree that if you live in Mexico and

23  your child is in boarding school in the United States it would

24  be a good idea to go visit your kids as much as you could?

25  A    I believe that would be a great idea, sir.

1    Q    See, we're finding a lot of common ground.

2         Would you agree with me that the Government presented

3    no evidence that Ms. Perez took any part in any discussion

4    relating to the purchases of these high dollar condominiums

5    that we talked about in I think it was New York, Los Angeles,

6    and Miami?

7    A    Can you repeat the question, please?

8    Q    Yes, ma'am.  Would you agree with me that Ms. Perez, the

9    Government presented no evidence that Ms. Perez took any part

10   in any discussions relating to the purchases of the what I call

11   high dollar condominiums?  I believe it was New York, Miami,

12   and LA?

13   A    We do not have any discussions with Ms. Perez-Ceballos

14   regarding that.

15   Q    And would you agree with me that the Government presented

16   no evidence that Ms. Perez had any part in the negotiations

17   regarding what we I think call the investment cars?

18   A    Can you repeat the question, please?

19   Q    Well, yes, ma'am.  Do you think it's fair to say that when

20   all those investment cars we were talking about were purchased,

21   there were probably some negotiations about how much they were

22   going to cost, how much they were going to pay, that kind of a

23   typical thing when objects are bought?

24   A    That's true, sir.

25   Q    Okay.  And the question is then did the Government present

1   any evidence that she was there, my client, Ms. Perez, during

2   those negotiations?

3   A    No, sir, and I believe that Mr. Fernando --

4   Q    Just yes or no, if you can.  The answer is no?

5   A    The answer is no, sir.

6   Q    Okay.  And Ms. Hampton, you know, will follow up here.

7   A    Okay.

8   Q    Okay.  Would you agree with me that based on what happened

9   to her husband's assistant in Mexico, that Ms. Perez might be

10  afraid for herself and her children?

11  A    That is a possibility, sir.

12  Q    And based on what happened to her husband or may be still

13  happening to her husband, she may have had some concern whether

14  she would ever even see him again?

15  A    That's possible.

16  Q    And would you agree with me -- and you indicated that

17  you're pretty close to bilingual, a Spanish and English

18  speaker, correct?

19  A    I have proficiency.

20  Q    I'm sorry?

21  A    I have proficiency.

22  Q    Okay.  And would you agree with me that if a person is a

23  Spanish speaker and the document is in English, that there's a

24  higher probability of a mistake being made than if someone who

25  is a Spanish speaker is reviewing for a Spanish document?

1            **MS. HAMPTON:**  Objection, your Honor, calls for

2    speculation.

3            **MR. MAGLIOLO:**  Well, she's --

4            **THE COURT:**  Overruled.

5    **BY MR. MAGLIOLO:**

6    Q    You can answer it, ma'am.

7    A    Okay.  Can I get it one more time, please, sir?

8    Q    Yes, ma'am.  If someone is a Spanish speaker and they're

9    reviewing a Spanish document, would you believe there is a

10   higher probability of them clearly understanding the Spanish

11   document than if they were a Spanish speaker reviewing an

12   English document?

13   A    It would probably depend on the content of the document,

14   sir.

15   Q    Is it unreasonable to believe that it would be easier for

16   a Spanish speaker to understand a Spanish document than a

17   Spanish non-English speaker understanding an English document?

18   You know, whether it's a two-word document or something, I mean

19   is that reasonable?

20   A    Language-wise it's reasonable, but of course the content

21   of the document depends as well.  There's plenty of English

22   documents that I don't fully understand as well, sir.

23   Q    Yes, ma'am.  But if that document was in Russian you

24   probably would understand it less?

25   A    That's correct.

1  Q    I think you heard Mr. Latorre or we all heard him testify

2  I believe that he told you that my client, Ms. Perez, had

3  nothing to do with any of this.  Do you recall that testimony?

4  A    I do not recall that testimony, sir.

5  Q    Do you recall anything close to that testimony?  Remember

6  when he pointed you out while you were sitting here?

7  A    I don't recall that testimony.  It possibly could have

8  happened, I just -- I'm not remembering at this moment.

9  Q    Well, do you recall that he told you that my client,

10 Ms. Perez, had nothing to do with any of this?

11 A    I recall that during --

12 Q    It's kind of a yes or no, if you could answer it.

13 A    I don't recall it at this moment, sir.  I do not.

14 Q    Is that something you believe you would be likely to

15 remember if he did say that?

16 A    It's possible, sir.

17 Q    Okay.  Now, I believe it was Ms. Es -- Mr. Espinosa

18 indicated that based on a conversation that occurred I think

19 while you and Ms. Hampton were there he felt intimidated.  Do

20 you remember that testimony?

21 A    Yes.

22 Q    And I think he further testified that he sent you an e-

23 mail laying, kind of, all that out?

24 A    Yes, sir.

25 Q    Do you recall that?

1   A     Yes, sir.

2   Q     And he did send you an e-mail, kind of laying out why he

3   felt he was intimidated?

4   A     Yes, sir.

5   Q     And was part of the reason he felt intimidated, as laid

6   out in that e-mail, because he said Ms. Hampton seemed to be

7   referring to something that could happen to the money in his

8   accounts, I believe in, perhaps, Florida?

9   A     Something to that nature, sir, yes.

10  Q     Okay.  Now, I think you-all just finished up, kind of,

11  with the arrest of Ms. Perez?

12  A     Yes, sir.

13  Q     And she was arrested at her home?

14  A     Yes, sir.

15  Q     And you knew she was there?

16  A     Yes, sir.

17  Q     And pretty much knew who-all was there?

18  A     I was not aware that her brother was living there, sir.

19  Q     Was living there or would be there?

20  A     Either one, sir.

21  Q     And you knew the -- at least you knew the daughters were

22  there?

23  A     I had anticipated that they would be there, but I did not

24  know for sure, sir.

25  Q     Okay.  So, you kind of knocked on the door; they answered

Ebright-Trevino - Cross / By Mr. Magliolo                84

1    it; you said, "You're under arrest," and took her into custody.

2    Is that the way it happened?

3    A    Pretty close, yes.

4    Q    Okay.  How many people -- how many law enforcement

5    officers attended that arrest, would you say?

6    A    Maybe ten, twelve.

7    Q    If I counted 17, would you disagree with that?

8    A    That would be fair.

9    Q    And that wouldn't be counting the dog?  The dog --

10   A    Give or take one dog.

11   Q    Yeah.

12   A    Possibly.

13   Q    And how were those guys dressed?  Were they in suits and

14   ties?

15   A    No, sir.

16   Q    Well, tell the jury how they were dressed to go arrest

17   this housewife.

18   A    They were in tactical pants.  They were wearing

19   identifying information, vests.

20   Q    Little hats, beanie-kind of hats?

21   A    Possibly some people had -- had hats on.  I don't recall

22   specifically, sir.

23   Q    Okay.

24   A    I apologize.  But it's possible.

25   Q    Sure.  Masks?

```
 1   A    I don't know for sure, sir, if there was masks.  It's --

 2   Q    But very possible?

 3   A    -- possible.  We had -- we had task force officers with us

 4   who --

 5   Q    Okay.  She'll ask you --

 6   A    Okay.  I'm sorry.

 7   Q    -- if you want to elaborate.

 8   A    Okay.

 9   Q    So, very possible they had masks on?

10   A    It's possible, sir.

11   Q    They have guns?

12   A    Yes, sir.

13   Q    They have pistols?

14   A    Yes, sir.

15   Q    They have rifles?

16   A    Probably.

17   Q    Probably or yes?

18   A    I don't recall every weapon that everyone was carrying,

19   but it's very possible, sir, that somebody had a rifle.

20   Q    It's called long guns?

21   A    Yes, sir.

22   Q    So they did have long guns?

23   A    I -- again, I don't recall every single weapon that was

24   out there, but it's very possible that there was a long gun out

25   there.
```

1   Q    Do you recall one long gun?

2   A    I only know what I was carrying, sir.

3   Q    Okay.  Did you personally attend to Ms. Perez?

4   A    Yes, sir.

5   Q    Place her in custody?

6   A    Yes, sir.  And -- sorry.

7   Q    And then gave her her *Miranda* warnings before you

8   interviewed her?

9   A    No, sir; I did not Mirandize Ms. Perez-Ceballos.

10  Q    Have you ever heard the expression, "If you look at the

11  world through dirty glasses, everything looks a little dirty"?

12  Have you ever heard that expression?

13  A    No, sir, I have not.

14  Q    Okay.  Now that you've heard it, do you think after 17

15  years as a police officer, and getting -- I mean, doing a fine

16  job in a dangerous profession, that maybe your glasses could

17  have some smudges on it?

18  A    Anything's possible, sir.

19       **MR. MAGLIOLO:**  Just one moment, your Honor.

20       **(Pause)**

21       **MR. MAGLIOLO:**  That's all we have, your Honor.

22       **THE COURT:**  Okay.  Ms. Hampton?

23  //

24  //

25  //

1                    **REDIRECT EXAMINATION**

2    BY MS. HAMPTON:

3    Q    Defense counsel asked you about Defendant being involved

4    with discussions regarding some of the real properties in this

5    case?

6            **MR. MAGLIOLO:**  I'm sorry, I couldn't understand you.

7            **THE COURT:**  Can you repeat?

8    Q    Defense counsel asked you a question about the Defendant

9    being involved in real property discussions.  Do you remember

10   that?

11   A    Yes, ma'am.

12   Q    Do you have information that she was involved in real

13   property discussions?

14           **MR. MAGLIOLO:**  And she's not -- that wasn't my -- my

15   question about real property discussions.  It was specifically

16   as to the, I guess you'd call them condominiums that were

17   purchased.

18           **THE COURT:**  Okay.

19           **MR. MAGLIOLO:**  Not general real property discussions.

20           **THE COURT:**  Okay.

21   BY MS. HAMPTON:

22   Q    Do you have information the Defendant was involved in real

23   property discussions?

24   A    Yes.

25           **MR. MAGLIOLO:**  That would exceed the scope of my

1    examination, your Honor, because I only asked specifically

2    about those properties.

3              **THE COURT:**  Overruled.

4    Q    And who specifically testified regarding the Defendant's

5    involvement with real property discussions?

6    A    Mr. Marichal.

7    Q    Who was the first person Mr. Marichal met?

8    A    Ms. Perez-Ceballos.

9    Q    And that relationship ended in a very lucrative

10   relationship for Mr. Marichal, correct?

11   A    That's correct.

12   Q    You were attempting to explain when the defense counsel

13   asked you about negotiations with the Defendant involving

14   investments.  You said something about Mr. Latorre.  Do you

15   want to explain your answer?

16             **MR. MAGLIOLO:**  We object to the form of the question,

17   your Honor.

18             **THE COURT:**  Sustained.

19             **MR. MAGLIOLO:**  It calls for a narrative response.

20             **THE COURT:**  Sustained.

21   **BY MS. HAMPTON:**

22   Q    What information do you have regarding Mr. Latorre in

23   negotiations with the Defendant involving investments?

24   A    Regarding the purchase of the Minelo vehicles, Mr. Latorre

25   had indicated that he participated in the purchase of the

1    vehicles directly.

2    Q    Ms. -- did Ms. Fernandez testify that she spoke Spanish?

3    A    I don't recall if she stated that she spoke Spanish.

4    Q    Do you know if she speaks Spanish?

5    A    Yes.

6    Q    Does she?

7    A    Yes.

8    Q    Does Mr. Paul Arnold speak Spanish?

9    A    Yes.

10   Q    Regarding Mr. Espinosa and the allegation that he was

11   threatened, was he threatened?

12   A    No, I did not hear him be threatened.

13   Q    And did -- were there problems with Mr. Espinosa's

14   statements to us regarding the veracity of what he was telling

15   us?

16            MR. MAGLIOLO:  We'd object.  That's a leading

17   question, your Honor.  We'd object.

18            THE COURT:  Sustained.

19   BY MS. HAMPTON:

20   Q    Were there problems with Mr. Espinosa's statements?

21   A    Yes.

22   Q    And were those problems brought to his attention when he

23   was in discussions with the government?

24   A    Yes.

25   Q    Thank you.

1          **MS. HAMPTON:**  I pass the witness.

2          **THE COURT:**  Any further questions from the defense?

3          **MR. MAGLIOLO:**  No, your Honor.

4          **THE COURT:**  Okay.  Thank you.  And you can step down.

5      **(Witness excused)**

6          **MS. HAMPTON:**  Your Honor, the government rests.

7          **THE COURT:**  Okay.  The government has rested.  Let's

8   take about a ten-minute break.

9          **THE MARSHAL:**  All rise for the jury.

10     **(Jurors exit courtroom at 11:09 a.m.)**

11         **THE COURT:**  Okay.  Where are we, from the defense?

12         **MR. REYNAL:**  Your Honor, we've just filed a brief on

13  Rule 29.  I don't know if your Honor would like to review that

14  before it hears argument?

15         **THE COURT:**  You can proceed with argument.  Brandy,

16  can I get a copy of it?  Does the government have a copy of it?

17         **MS. HAMPTON:**  No, your Honor.

18         **MR. MUSCHENHEIM:**  We haven't seen it yet -- right

19  now.

20         **MS. HAMPTON:**  We'd like an opportunity, if possible,

21  to respond in writing, though.  We'll do it now.  We have

22  something prepared as well.

23         **THE COURT:**  Yeah.  Well, what I can do is have the

24  jury come back at 1:00.  We can address that.  That's about two

25  hours.  That will -- hopefully, if we can wrap it up in an

91

 1  hour, you-all get about an hour for lunch, and then if we

 2  proceed, the defense will be ready.  So let's do that.

 3        Let me release the jury for lunch for about two

 4  hours, if they're ready.  I told them ten minutes, so they may

 5  be taking a little break.

 6        So, is the government filing something?

 7        **MS. HAMPTON:**  We'd like to respond in writing, your

 8  Honor, if possible.  I haven't seen what they filed.

 9        **THE COURT:**  I haven't either.

10     **(Pause)**

11        **THE COURT:**  I think what we'll do, I'll bring the

12  jury in.  Then I'll give the government a chance to review, as

13  well as the Court time to review that.

14        Are they ready or not yet?  If they'll just come back

15  in, so I can tell them we're going to go ahead and recess.  And

16  I'll instruct them.

17        **THE MARSHAL:**  All rise for the jurors.

18     **(Jurors enter courtroom at 11:11 a.m.)**

19        **THE COURT:**  Okay.  You can have a seat.  We are going

20  to give you your break, but we're going to give you a longer

21  break.  We're going to go ahead and do an early lunch.  I'll

22  have you come back about 1:15.

23        Please remember your instructions.  Don't discuss the

24  case with anyone at all.  Don't attempt to get any information

25  about the case outside the courtroom.

1          So, if you'll return at 1:15, we'll see where we are

2     at that point.  So, thank you for your attention this morning.

3          THE MARSHAL:  All rise for the jury.

4     (Jurors exit courtroom at 11:12 a.m.)

5          THE COURT:  About 11:15.  I don't know how long your

6     brief is.  I haven't seen it.  How long is it?

7          MR. KRETZER:  About 24 pages.

8          THE COURT:  Okay.  Can we do about 30 minutes and see

9     what the government, what you want to do at that point?  And

10    so, we're in recess for about 30 minutes.

11         MR. REYNAL:  Thank you, your Honor.

12    (Recess taken from 11:12 a.m. to 11:50 a.m.)

13    (Outside the presence of the jury)

14         THE COURT:  So, are you all ready to argue the Rule

15    29 motion, Government?

16         MR. MUSCHENHEIM:  Your Honor, we have filed a very

17    brief written response.

18         THE COURT:  I reviewed it.

19         MR. MUSCHENHEIM:  And we need to amplify it and I --

20         THE COURT:  In your argument or you need more time?

21         MR. MUSCHENHEIM:  Well, we could use more time, but

22    I'm ready to start, if you want to get started.

23         THE COURT:  Well, I'm trying to make this efficient.

24    So, I did review the briefing.

25         MR. MUSCHENHEIM:  Yes.

1          **THE COURT:**  And do you want to just supplement with

2   argument or are you asking for more time to address matters, or

3   what are you asking?

4          **MR. MUSCHENHEIM:**  The supplemental part of it, your

5   Honor, so we can keep this moving.

6          **THE COURT:**  Okay.  And defense is ready to go?

7   Reviewed the government's response?

8          **MR. REYNAL:**  We are, your Honor.

9          **THE COURT:**  Okay.  You can proceed with your Rule 29

10  motion.

11         **MR. REYNAL:**  Thank you very much, your Honor.

12         I'd like to begin with what I believe is the easier

13  of the two decisions before your Honor, and that is as to Count

14  Two which charges the bank fraud.

15         FDIC insured status is a jurisdictional element of

16  the offense.  In other words, it is not something -- it is a

17  necessary beginning before your Honor or the jury can ever

18  render any kind of a verdict of the conduct that went on.

19         In this case, and I think in their response, the

20  government, in effect, admits that they haven't been about to

21  show FDIC insured status.  The --

22         **MR. MUSCHENHEIM:**  Judge, we concede as to Morgan

23  Stanley and (indisc.) bank account, but not Chase Bank.

24         **THE COURT:**  Okay.

25         **MR. REYNAL:**  So, let's focus on Chase Bank.  Paul

94

1    Arnold was the witness who testified.  He testified that he

2    worked for Chase Investments.  I have with me, your Honor, and

3    they are in evidence, the documents that were filled out by

4    Mr. Arnold as an employee of Chase Investments.  And they are

5    the Sun Investor Admission paperwork, the application.

6    Obviously, Sun Investor is a Bermuda corporation.  It has

7    absolutely nothing to do with the FDIC.

8              Additionally, there is an application for the Chase

9    Insurance Agency, which is, I think, actually the direct

10   employer of Mr. Arnold, which is for him to give investment

11   advice over funds held in an offshore account.  So neither

12   Mr. Arnold did not work for an FDIC insured institution; the

13   application wasn't made with FDIC insured institution; the

14   money didn't go to an FDIC insured institution.

15             It is not enough that there be some sort of

16   relationship between a non-FDIC insured institution, to which a

17   misrepresentation is made, and an FDIC insured institution that

18   is part of a portfolio of companies.

19             And we cited the *Davis* case from the Fifth Circuit.

20   It's a case that I'm very familiar with because I was the

21   prosecutor on that case, and I read the opinion obviously with

22   a lot of attention when it got reversed.  In that case, the

23   Fifth Circuit repeated its admonition that prosecutors have to

24   be very, very careful to make sure that they are alleging and

25   proving an FDIC insured institution.

1              Just, I think, a week ago the Second Circuit--

2         **MR. KRETZER:**  Last year.

3         **MR. REYNAL:**  Last year the Second Circuit reversed

4   and rendered in a similar case where again the

5   misrepresentations -- alleged misrepresentations had been made

6   to a wholly owned subsidiary of an FDIC insured institution.

7   Here, we haven't even had evidence to show that Chase

8   Investments is, in fact, a subsidiary of J.P. Morgan Chase

9   Bank.  And frankly, I don't think it is, but we haven't even

10  had that evidence.  And even if we had, it wouldn't be enough

11  under binding Fifth Circuit case law and precedent from across

12  the country.

13             So, I think we can stop our analysis at that point

14  when it comes to Count Two.

15             I would also say that, kind of, when you fail to show

16  FDIC insured status, the whole structure of the account

17  collapses, because you can't show that a material

18  misrepresentation was made to an FDIC insured institution.  In

19  this case, Chase Investments isn't an FDIC insured institution.

20             You can't show that property was taken from an FDIC

21  insured institution, because Chase Investments and Sun Life

22  aren't FDIC insured institutions.  You can't show that there

23  was risk of loss or liability to an FDIC insured institution

24  because, once again, Chase Investments, Chase Insurance, and

25  Sun Life are not FDIC insured institutions.

1          As to Count One, your Honor -- if your Honor has no

2     questions as to Count Two?

3          **THE COURT:**  No.  You can proceed.

4          **MR. REYNAL:**  As to Count One, conceptually, the

5     government bears the burden of showing that the money used in

6     the transaction, that actual money came from specified unlawful

7     activity.  In our law, an exception to that rule has evolved

8     where the government is able to show sudden and unexplained

9     wealth plus the existence of the illegality -- the specified

10    unlawful act -- and knowledge by the defendant of that

11    underlying criminality.

12         And the *Alaniz* case kind of lays out a three-step --

13    the Fifth Circuit case I think from about four years ago --

14    lays out a three-step framework for the government to fit into

15    this narrow exception.  And that is that there must be evidence

16    of sudden wealth -- sudden unexplained wealth.  There must be

17    evidence that there was some knowledge by the defendant of the

18    crime; and some evidence that the crime, itself, even occurred;

19    and finally, evidence of an implicit agreement.

20         I'd like to begin by talking about this idea that the

21    wealth was sudden or unexplained.  We have had lots of

22    testimony that Mr. Saiz-Pineda was a very wealthy man before he

23    ever got into government office.  And, you know, the fact that

24    he made more money after he was in government office doesn't

25    mean that that money is tied to some kind of underlying

1    criminality.  So, I think that they haven't shown unexplained

2    sudden increase in wealth.

3            More importantly, there is an absolute vacuum of

4    evidence of the underlying criminality.  And the -- the only

5    thing we have from Mexico, contrary to what Ms. Hampton

6    promised in opening statement -- the only thing we have from

7    Mexico is the fact that 88 million pesos was recovered from an

8    office in a building that was owned by a former employee of

9    Mr. Saiz-Pineda.  There was no evidence whatsoever that tied

10   those $88 million -- sorry, 88 million pesos, to any type of

11   bribery or theft or anything illegal, for that matter.

12           We also have this letter from the Deloitte firm which

13   states that it is not coming to a conclusion as to whether any

14   funds have been missing, and simply that they don't have

15   sufficient documents to trace what happened with all the money.

16           Finally, the government cites the fact that Mr. Saiz

17   has been accused of a crime in support of its claim that

18   they've proven underlying illegality.  I -- I'm sure your Honor

19   recognizes that simply being accused of a crime isn't evidence

20   of anything.  And the fact that Mr. Saiz has been acquitted of

21   that crime on four occasions, I believe also kind of bears that

22   out, that that shouldn't even weigh in the consideration.

23           So, based on those elements, unless your Honor has

24   any questions, we'd ask for a judgment of acquittal at this

25   time.

1          **THE COURT:**  All right.  Thank you.  Mr. Muschenheim?

2          **MR. MUSCHENHEIM:**  Thank you, your Honor.  I'll start

3     with the second one first, that's counts, your Honor.

4          The bank fraud account under 1344(1), we have to show

5     an intent to defraud a scheme or artifice -- and it's right in

6     the Pattern Jury Instructions.  And the Fifth Circuit has even

7     said that it can be violated even when the principal target is

8     a third party.  That's right -- it's on Page 301 of the Pattern

9     Jury Charge, *United States versus Morganfield,* 501 F.3d 453.

10         Factually, in this case the record is very clear that

11    Paul Arnold said -- it's on Page 170 of the record -- that

12    "once all these" -- well, let me back up.

13         Ms. -- the evidence shows that the Defendant went to

14    a Chase Bank to open up a bank account.  The evidence showed

15    very clearly that the money moved to Chase, an FDIC bank.  In

16    connection with that scheme to move that money out of her joint

17    account with her husband to a bank account, numerous lies were

18    told.  The money passed through an FDIC bank several times --

19    Chase Bank, as alleged in the Indictment.  It passed through

20    Chase FDIC, when it came from UBS to Chase in Houston.  And

21    then it passed through that again heading to Sun Life, which is

22    not an FDIC bank.  But the scheme was to get it into an account

23    that she could access, that she could use the monies.

24         And she told lies to Chase Bank.  She said she's a

25    citizen of Mexico.  That's one of the lies that she told.  She

99

1   met with Mr. Arnold when she was referred to him by a banking

2   official --

3        **(Pause)**

4        **MR. MUSCHENHEIM:**  Okay.  Resident.  She said she's a

5   resident of Mexico.  Sorry.  Very clearly, Mr. Arnold said that

6   Chase is an FDIC bank, and he -- we know that the money went to

7   the Chase Bank --

8        **THE COURT:**  So what, exactly, is the Defendant's

9   argument on Chase, in terms of FDIC?  So there was evidence, so

10  there was an FDIC or insured bank, but you-all were saying

11  you're not looking at Chase here?

12       **MR. REYNAL:**  Mr. Arnold didn't work for Chase.  And

13  Ms. Perez didn't make any of the statements that they allege in

14  connection with opening an account at Chase.

15       **THE COURT:**  Okay.

16       **MR. REYNAL:**  I think what the evidence should --

17       **THE COURT:**  Yeah.  I'm just trying to figure out, the

18  argument then is, you're not arguing Chase is not federally

19  insured, I guess, or FDIC insured?  You're saying they're kind

20  of not part of --

21       **MR. REYNAL:**  Yeah.  That the -- the branch that she

22  went to and opened an account at, I don't -- they haven't shown

23  that that's FDIC insured.  But even if they did, assuming

24  arguendo they did, that account was opened up before Ms. Perez

25  had ever met Mr. Arnold.  And there are no misrepresentations

1   in any of the documents that -- she didn't really have to

2   submit any documents.  All she did, when she did, was give them

3   her photo ID. and open up the account.

4        **THE COURT:**  All right.  You can proceed.

5        **MR. MUSCHENHEIM:**  Judge, and I just -- this is a

6   classic jury argument.  We believe the evidence showed that she

7   filled out an account opening statement, used Lytham as an

8   address to distance herself from the Elmhurst asset, which she

9   needed to do.  She's distancing herself from the husband in her

10  contact with the bank.  And that was part of the account

11  opening statements that we went through in exhaustive detail

12  today, your Honor.

13        If the jury disagrees with us, that's fine.  But it

14  gets to the jury because we have to look at this evidence in

15  the light most favorable to the prosecution when deciding the

16  Rule 29.  The jury gets to decide, did we get there or not.

17        Counsel's argument about that, I would suggest, is

18  misplaced.

19        Finally, in 2017, she attempted to get it back to

20  Chase Bank.  Paul Arnold testified that it would go from Sun

21  Trust back to Chase Bank.  And she did new lies as part of the

22  scheme.  And the -- pretty clearly, Paul testified --

23  Mr. Arnold testified that the bank was at risk of civil

24  liability if they had known; that the real story would have

25  been problematic for them and they faced regulation on that.

 1          Your Honor, with respect to Count One, I want to

 2    point out a couple things.  First of all, with regard to the

 3    tracing argument, this is a conspiracy count.  And I want to

 4    remind the Court that the bank fraud part of Count One is

 5    broader than Chase Bank; and that the definition of "financial

 6    institution," for purposes of 18 U.S. Code 1956, is far broader

 7    than the definition in 18 U.S. Code 20 with respect to bank

 8    fraud -- a much broader set of financial institutions.

 9          Counsel relies on a 2015 case, *U.S. versus Cessa* in

10    suggesting that we must prove tracing.  They failed to tell the

11    Court that the Fifth Circuit revisited that -- and I have a

12    copy of the page, if you want it, Judge.  I gave counsel a

13    copy.  I'll just hand this up, in case you want to see it.

14          They revisited that this June and said that with

15    respect to tracing, "The government is under no duty to trace

16    the individual funds.  And it is not necessary that a

17    transaction be examined in isolation, if it is part of the

18    larger scheme designed to conceal the illegal proceeds."

19          So, the -- what I'm trying to tell the Court is

20    fundamentally, she's charged with a Conspiracy to Commit Money

21    Laundering.  And counsel suggested that Rule 29 lies on this

22    case for two reasons:  one, he says we have to prove tracing.

23    The Fifth Circuit says we do not.  In fact, they talk about

24    commingling.  I would imagine that counsel's final argument to

25    the jury about Count One is going to be that all the money is

1  clean.  And if the jury agrees that all the money is clean,

2  then they'll vote not guilty.

3         But there is evidence based on multiple wealth

4  statements made at different times in different countries, and

5  there's evidence from the convoluted nature of these

6  transactions that the money is dirty.  There's evidence that

7  the Defendant knew the money was dirty.

8         What evidence is there?  Well, the dramatic lies that

9  she told in an effort to move money from a bank, UBS, to

10  another bank, to another financial institution.  She falsified

11  the document.

12         And the Court should recall the testimony from

13  Mr. Latour.  There's numerous cash amounts that were flown to

14  Houston for Mr. -- the evidence before the jury is to

15  Mr. Fernando -- Mr. Fernando Saiz.  However, there is evidence

16  of substantial cash deposits made during the same time period

17  by this Defendant into her bank account -- cash deposits, U.S.

18  dollars.

19         She tells the bank she has no income.  She ends up

20  with cash.  One conspirator is flying cash to another.  Hardly

21  a type of movement of money that makes any economic sense.  And

22  the jury -- you're allowed to take that inference that that was

23  a way to move money surreptitiously, your Honor.  That's a

24  reasonable inference from the facts.

25         The -- counsel suggests that the evidence is

1    insufficient about embezzlement.  The evidence is that he is

2    charged with embezzlement.  The evidence, he says, "acquitted

3    four times."  Actually, the evidence from -- from the witness

4    was she confirmed one of those and did not have knowledge of

5    any of the other ones that she was asked about.  And she said

6    that he is still pending in an embezzlement case for his duties

7    during his time in state office.

8              The evidence further is that Deloitte, in trying to

9    get the records to do an audit for a particular year, the

10   records don't exist.  What's the inference from that?  The

11   inference is that they've been falsified.  They're missing.

12             Finally, your Honor, with respect to Marlis Cupil,

13   she has been described by many, many witnesses as Mr. Saiz's

14   right-hand man.  We talked -- you know, speaks for him, works

15   for him.  And during the course of this conspiracy, $88 million

16   being found at her house -- at her business, a business named

17   Jomali's -- is some evidence that money was stolen.  And all we

18   need is some evidence, your Honor, to get this in front of the

19   jury.

20             Mr. Latour testified that he is not a licensed money

21   transmitter.  This case is full of evidence of him transmitting

22   money over and over and over again, including sending cash and

23   sending his employees with cash on an airplane to Houston to

24   carry money.

25             We're allowed to -- the Court's allowed to have that

Case 2:17-cr-00245   Document 141   Filed on 10/12/17 in TXSD   Page 104 of 108

104

1   inference considered in the light most favorable to the

2   prosecution in making a decision as to whether there's

3   sufficient evidence for this case to be argued in front of the

4   jury, your Honor.

5           The Defendant was involved from the beginning of the

6   conspiracy by meeting Mr. Marichal and beginning that long

7   relationship.  That evidence is before the jury.  It's a

8   reasonable inference that the conspirators began to devise a

9   plan to conceal money from Mexico at the beginning of this

10  administration.

11          So, I -- I think that we have -- obviously, if the

12  money is stolen and it crosses international or state lines, or

13  in an amount more than 5,000, we've satisfied that burden.

14          The government's not required to believe Mr. Espinosa

15  that those monies were anything other than bribes.

16  Additionally, the evidence in the wealth declarations from

17  Mr. Saiz contradict the testimony from Mr. Espinosa.

18  Mr. Saiz's wealth declarations only show two vehicles in

19  Mexico, a BMW and a Volkswagen.

20          Mr. Espinosa testified about buying seven vehicles in

21  Mexico.  The jury doesn't have to believe him.

22          Interestingly, we also introduced documentation

23  showing that, in fact, Mr. Espinosa was involved in one vehicle

24  purchase in Mexico.  But my recollection is that it was not him

25  buying a vehicle but, in fact, him selling a vehicle.  I could

1    have that wrong.  But, in any event, none of those vehicles

2    were on Mr. Saiz's wealth declarations.

3         The jury is allowed to consider those wealth

4    declarations that are different than what is said in the United

5    States, and it's evidence that the money was stolen; that the

6    crime occurred.

7         Counsel argues about whether there's enough wealth to

8    satisfy unexplained wealth.  That's absolutely a jury decision,

9    your Honor; that is not a Judge decision, and looking at the

10   evidence with the inference most in favor of the government.

11        Can I just check with counsel?  We kind of did this

12   real quick.  We had done some work on it, but not prepared it

13   to the way we -- see what I missed.

14        **(Pause)**

15        **MR. MUSCHENHEIM:**  Okay.  That's all we have, your

16   Honor.  We ask you to let the jury hear this case.

17        **THE COURT:**  All right.  Thank you.

18        Mr. Reynal, final comments, if any?

19        **MR. REYNAL:**  Just that the -- on Count Two it's a --

20   it's a jurisdictional argument, so it's not a question of

21   submitting it to the jury, your Honor.

22        **THE COURT:**  Court's going to deny the Defendant's

23   Rule 29 motion.

24        So, at this point we're in recess until 1:15.  So,

25   the defense will then present evidence.  Where are we?  It is

1    Wednesday afternoon.  So you're thinking maybe a couple of

2    days?

3              **MR. REYNAL:**  Yeah.  I think at most, your Honor.  You

4    know, I've got a couple of witnesses to put on this afternoon.

5    I think that we should be able to get through them.  And we

6    haven't made a final decision as to whether the Defendant will

7    testify or not.  So ...

8              **THE COURT:**  Okay.  So I'm just kind of, trying to

9    figure out -- I know both of you submitted draft charges.  I

10   don't think that they're too far apart, I mean, for the most

11   part.

12             **MR. MUSCHENHEIM:**  I haven't seen -- I haven't had a

13   chance to review the Defendant's, your Honor.  We were going to

14   ask additionally for the commingling instruction; counsel

15   suggested that some of the money is clean.  And the -- it's in

16   the *Cessa* case.

17             **THE COURT:**  Yeah.  We can address that later.

18             **MR. MUSCHENHEIM:**  Yes, your Honor.

19             **THE COURT:**  I'm just trying to see kind of where

20   we're headed with the jury, when --

21             **MR. MUSCHENHEIM:**  Yes, your Honor.

22             **THE COURT:**  You know, so we may need to start talking

23   a little bit more about the charge.

24             **MR. MUSCHENHEIM:**  I will take a look at their --

25             **THE COURT:**  I'll see if I can get some sort of draft.

1          **MR. MUSCHENHEIM:**  -- (indisc.) charge over lunch.

2          **THE COURT:**  Okay.  So we're in recess 'til 1:15.

3     **(Counsel thank the Court)**

4     **(Lunch recess from 12:14 p.m. until 1:11 p.m.)**

5     **(MORNING SESSION CONCLUDED AT 12:14 P.M.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 12, 2017

          Signed                                                   Dated

*TONI HUDSON, TRANSCRIBER*