UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,      )      CASE NO: 2:17-CR-00245-3
                               )
              Plaintiff,       )            CRIMINAL
                               )
     vs.                       )      Corpus Christi, Texas
                               )
SILVIA BEATRIZ PEREZ-CEBALLOS, )      Thursday, October 12, 2017
                               )
              Defendant.       )      (8:29 a.m. to 11:53 a.m.)
                                          MORNING SESSION



JURY TRIAL - DAY 8
VOLUME I OF II, PAGES 1 THROUGH 80

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**            SEE PAGE 2


Court Recorder:            Genay Rogan

Interpreters:              Judy Hawks / Maria Enriqueta Foraker
                           Lorena Parada-Valdes

Clerk:                     Brandy Cortez

Court Security Officer:    Adrian Perez

Deputy U.S. Marshal:       George Butcher

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiff:                          JULIE HAMPTON, ESQ.
                                    JON MUSCHENHEIM, ESQ.
                                    U.S. Attorney's Office
                                    1000 Louisiana, Suite 2300
                                    Houston, TX 77002

Defendant:                          FEDERICO ANDINO REYNAL, ESQ.
                                    JOSEPH C. MAGLIOLO, JR., ESQ.
                                    Fertitta Reynal
                                    808 Travis, Suite 1005
                                    Houston, TX 77002

                                    SETH H. KRETZER, ESQ.
                                    440 Louisiana St., Suite 1440
                                    Houston, TX 77002

3

## INDEX

| DEFENSE WITNESS | DIRECT | CROSS |
|---|---|---|
| SILVIA BEATRIZ PEREZ-CEBALLOS | 38 | -- |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 1 | 40 |
| 2 | 41 |
| 3 | 46 |
| 4 | 49 |
| 1.1 | 71 |

1          **Corpus Christi; Thursday, October 12, 2017; 8:29 a.m.**

2                    **(Interpreter Utilized for Translation)**

3                              **(Call to Order)**

4          **(Outside the presence of the jury)**

5               **THE COURT:**  Okay.  This is Cause 2:17CR245-3, <u>United</u>

6  <u>States of America versus Silvia Beatriz Perez-Ceballos</u>.

7               **MR. KRETZER:**  Good morning, Your Honor.

8               **MR. MUSCHENHEIM:**  Good morning, Your Honor.

9               **THE COURT:**  Good morning.  We're outside the presence

10  of the jury, just kind of still conferring informally on the

11  instructions to the jury.  I just saw the Defendant's last

12  filing that had never been brought up about detailing each

13  specified unlawful activity.

14               **MR. KRETZER:**  They agree.

15               **MR. MUSCHENHEIM:**  We're not opposed to it, Judge.  We

16  just need to iron out the details.

17               **THE COURT:**  Okay.  You all submit something to the

18  Court.

19               **MR. MUSCHENHEIM:**  Counsel told me that Ms. Perez is

20  going to testify so maybe --

21               **THE COURT:**  That will give us a little bit of time?

22               **MR. MUSCHENHEIM:**  -- Mr. Kretzer and I can try to

23  iron out something that we agree on that part of it.  I'm happy

24  to do that this morning.

25               **THE COURT:**  So your client's testifying this morning?

1          **MR. REYNAL:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  So you all will work on that and

3    have a submission to the Court --

4          **MR. MUSCHENHEIM:**  We're going to do our very best to

5    have a joint submission on that, Your Honor.

6          **THE COURT:**  I did notice we didn't submit the charts

7    and summary instructions so I'll add that --

8          **MR. MUSCHENHEIM:**  Yes, Your Honor.

9          **THE COURT:**  -- probably is appropriate, correct?

10   Co-mingling.  I've got your briefing on that and --

11         **MR. MUSCHENHEIM:**  Yes, Your Honor.

12         **THE COURT:**  What is the Government's evidence on

13   that?

14         **MR. MUSCHENHEIM:**  Your Honor, the evidence is that --

15   the trial evidence is that he had a public accounting firm for

16   20 years and earned money.  He didn't come into it as a

17   absolute pauper.  And Counsel, through cross-examination, has

18   raised with the jury the fact that, in their view, all the

19   funds are legit.  In our view, none of the funds are legit but

20   the jury's allowed to draw inferences from those facts.

21   Counsel's sig --

22      **(Government counsel briefly confer)**

23         **MR. MUSCHENHEIM:**  Oh, right.  And there's cash that

24   comes in to the possession of Ms. Perez as evidenced by her

25   bank statements that is unexplained cash.  She had no income in

1    the United States.  Anyway, so we think it's raised by the

2    facts, Judge.

3              **MR. KRETZER:**  May I respond, Your Honor?

4              **THE COURT:**  Yes.

5              **MR. KRETZER:**  Yes, Judge.  I don't disagree with the

6    Prosecutor.  Their position throughout the trial has been that

7    all of the funds are illegitimate.  And our position is the

8    funds are legitimate.  Because those -- the subject of

9    co-mingling legitimate wealth with illegitimate wealth

10   necessarily suggests there's some gray area overlap in between,

11   if the Government honestly contends to the Court they think

12   it's all illegitimate and we think it's all legitimate, then we

13   would ask where is the evidence that anyone co-mingled?  We

14   would submit there necessarily, definitionally, not be any

15   evidence of co-mingling if both sides have adduced evidence

16   that are complete wholes.  There is no, raised-by-the-evidence,

17   facts upon which anyone could say that there has been

18   co-mingling because of the evidence that has been adduced over

19   the course of the trial.

20             **THE COURT:**  Okay.  Mr. Muschenheim?

21             **MR. MUSCHENHEIM:**  Well, Your Honor, Counsel yesterday

22   introduced this Asesoria income and tried to have this witness

23   say this is legitimate income.  Money kept coming into the

24   United States that was used in various ways to further the

25   conspiracy.  So there's -- there's mixing.  It's not an all-or-

1   nothing proposition.  The jury gets to -- the Judge, in

2   instructing the jury on the law, is allowed to listen to all

3   the evidence and instruct the jury appropriately.  And it's a

4   raise -- you know, we agree it's raised by the evidence that

5   there's some legitimate money in this conspiracy.

6         **MR. KRETZER:**  Realistically --

7         **MR. MUSCHENHEIM:**  It's certainly raised -- it's

8   certainly raised by the evidence.

9         **MR. KRETZER:**  That is the first time, Your Honor,

10  that I have heard that.

11        **MR. MUSCHENHEIM:**  That's -- it's certainly raised by

12  the evidence.  Counsel has raised it numerous times.

13        **MR. KRETZER:**  (Indisc.)

14        **MR. MUSCHENHEIM:**  I'm saying this -- I'm not saying I

15  agree, I'm saying it's raised by the evidence.

16        **MR. KRETZER:**  Hold on a second.

17        Judge, the Prosecutor is -- the Government is the

18  sponsoring party.  They are the one requesting the instruction.

19  Just now I heard for the first time in two weeks that they

20  believe, the Government is contending, that at least part of

21  the evidence is legitimate.  That has never been said at any

22  point in time from opening argument until we stand here right

23  now.  As I hear the Prosecutors say -- he says oh, well the

24  Defendant countered our argument; therefore, we say that must

25  be evidence of co-mingling, even though they're not going to go

8

1  the next step and say what evidence of co-mingling there is.  I

2  would ask the Prosecutor, if he could, please tell me what

3  evidence he has adduced of actual co-mingling.  If they cannot

4  answer it --

5       **THE COURT:**  Okay.  Well, I mean --

6       **MR. KRETZER:**  -- there is no evidence of it.

7       **THE COURT:**  -- that was my question.  What's the

8  Government's --

9       **MR. KRETZER:**  Right.

10      **THE COURT:**  -- evidence of co-mingling?

11      **MR. MUSCHENHEIM:**  Your Honor, the suggestion that it

12  is only the Prosecutor's evidence that we're obviously

13  charged --

14      **THE COURT:**  No, well, where is the evidence, I guess,

15  on the record?

16      **MS. HAMPTON:**  Your Honor, the evidence came from the

17  testimony of Mr. Latour partly, who testified that he was so

18  worried about the source of this money when he sold the cars he

19  -- he mislabeled wire transfers in an effort to conceal where

20  the money came from and put them in a different account that

21  had nothing to do with these people, according to the title of

22  the account.  From that money, he said, he sent that money to

23  Houston for the benefit of the Defendant through Mr. Fernando

24  Saiz-Pineda.  From there, the jury has seen cash deposits in

25  this Defendant's account that kept her going with the Wells

1    Fargo --

2              THE COURT:  So the Government's saying that's

3    legitimate money?  That's lawful?

4              MS. HAMPTON:  No.  The Government's --

5              THE COURT:  Well, where's the lawful?  Where's the

6    co-mingling of the unlawful funds with the lawful funds?

7              MS. HAMPTON:  The -- there is --

8              THE COURT:  Where are the lawful funds?

9              MS. HAMPTON:  The Defense is arguing that --

10             THE COURT:  The arguing is not evidence.

11             MS. HAMPTON:  The evidence that's come in, Your

12   Honor, is from Asesoria, from the Defense, saying that this

13   money was from businesses she had in Mexico coming legitimately

14   from HSBC to HSBC-US.  That's what the Defendant's argument is.

15             THE COURT:  Argument is not evidence.

16             MS. HAMPTON:  Well, that's what the evidence that --

17             THE COURT:  Okay.

18             MS. HAMPTON:  -- they put on before the jury is, Your

19   Honor.  That that Asesoria money --

20             THE COURT:  That it was productive, successful --

21             MR. KRETZER:  That --

22             THE COURT:  -- but where's the evidence that's the

23   money that was coming in, I guess?  I don't know.

24             MS. HAMPTON:  The answer's --

25             THE COURT:  There might --

1      **MS. HAMPTON:**  -- in Defendant's Exhibits, Your Honor.

2  They have attachments to the lender from HSBC-Mexico and

3  they've argued that the money came from HSBC-Mexico to the jury

4  and through testimony --

5      **THE COURT:**  Argument is not evidence.  I will say

6  that -- I have to keep saying that.  You keep saying "their

7  argument."

8      **MS. HAMPTON:**  Well, I apologize.

9      **THE COURT:**  Okay.

10     **MS. HAMPTON:**  Through the testimony of Angel

11  Gonzalez-Monterrubio they said -- they elicited testimony that

12  this money came from HSBC-Mexico, which we've never denied --

13  and the evidence is clear on the wire transfers it came in

14  from --

15     **THE COURT:**  But you're saying that's the Government's

16  evidence is that that was unlawful money.

17     **MS. HAMPTON:**  We believe the money was unlawfully

18  obtained, but there's evidence before the jury, Your Honor,

19  that that is legal money through Asesoria.

20     **THE COURT:**  But that's not the Government's position.

21  The Government's saying it's entirely unlawful, correct?

22     **MS. HAMPTON:**  That's correct.

23     **THE COURT:**  Based on the evidence.

24     **MS. HAMPTON:**  And there is evidence based on the

25  Wealth Declarations that Mr. Saiz-Pineda and Ms. Perez-Ceballos

1    were making income in Mexico.

2              **THE COURT:**  Okay.

3              **MS. HAMPTON:**  They did report.

4              **MR. KRETZER:**  Right.

5              **MR. MUSCHENHEIM:**  And that's evidence we offered,

6    Judge, and we don't deny that.

7              **MR. KRETZER:**  Judge, I think they're trying to maybe

8    rewrite their case here, the charge conference.  I'm hearing a

9    bunch of things I haven't heard in the last two weeks.  But

10   they do not have -- again, they contend it's all illegitimate.

11   Ms. Hampton just agreed that she -- her position has not

12   changed, it's all illegitimate.  We contend, the Defense

13   contends that it is all legitimate.  Those are two very

14   different constructions of the evidence.

15            What the Government has not answered in response to

16   the Court's repeated questions is where they have evidence of

17   the mixing of the two.  And we would say, definitionally, they

18   cannot show you that because their true representation they've

19   made repeatedly is that it is all illegitimate.  We say it is

20   logically impossible for them to make that showing based on how

21   they presented the evidence and they can't actually seem to

22   tell you what the evidence of co-mingling is.

23            **THE COURT:**  Sustained.  The Defendant's objection is

24   sustained.

25            **MR. MUSCHENHEIM:**  Your Honor, with respect to

1  unanimity, I could find not one case anywhere where unanimity

2  was -- unanimity with respect to specified unlawful activity

3  was given by any Court --

4          **THE COURT:**  But particularly in a --

5          **MR. MUSCHENHEIM:**  -- anywhere.

6          **THE COURT:**  -- conspiracy, right, where all acts are

7  kind of all go to each Defendant is taxed with the acts of the

8  other Codefendants so -- anyway, Mr. Kretzer?

9          **MR. KRETZER:**  Yes.  Our argument would be that,

10  Judge, and, of course, the famous Fifth Circuit case is Holly

11  (phonetic) where the Court was reversed for not giving a

12  specific unanimity instruction.  And it seems the reason that

13  it would be applicable in, at least with regard to Count One,

14  is that this is not just a general conspiracy case.  It's a

15  conspiracy case of a type of statute that was enacted more

16  relatively recently in our history, like money laundering, like

17  RICO, where the Government bears the burden of proving, in this

18  case they have chosen to allege four different specified

19  unlawful activities.  So -- and the Fifth Circuit said, Your

20  Honor, I quote, the general, conventional instruction is,

21  (quote):

22          "Insufficient, if there exists a genuine risk

23          that the jury is confused or that a conviction

24          may occur as a result of different jurors

25          concluding that the Defendant committed

1          different acts."

2          The reason we say that is appropriate in -- the

3     specific unanimity instruction would be appropriate in this

4     case is that we have so many different potential

5     co-conspirators that the Court has -- there have been so many

6     different sinuses of the crime.  We have New York, Miami, LA,

7     Sugarland, Mexico, over such a broad range of time.  The

8     indictment says from 2006 to the present so we're talking over

9     a decade.  What if, Your Honor, the jurors, when they go back

10    into that jury room, some of the jurors think, well, maybe the

11    agreement -- which of course is the perimatic instance of the

12    crime for conspiracy -- the agreement was in 2008 in Mexico.

13    And yet some other juror says no, I think the agreement must

14    have been with a different co-conspirator at some different

15    point in time, years later, when they first came to Miami for

16    the condo.  What you could have, Your Honor, would be a

17    conviction without the jurors agreeing on what nucleus of facts

18    actually establishes the crime.  That is the risk of confusion.

19         **THE COURT:**  They -- but they have to be unanimous on

20    the conspiracy.

21         **MR. MUSCHENHEIM:**  Yes --

22         **MR. KRETZER:**  Yes.

23         **MR. MUSCHENHEIM:**  -- and the men's rea --

24         **THE COURT:**  The details here are the unlawful

25    activity --

1          **MR. MUSCHENHEIM:**  Right.

2          **THE COURT:**  -- whether that had -- that requires

3    unanimity, correct?

4          **MR. KRETZER:**  Yes.  Yes, of course.  We would -- yes,

5    Judge.  And I think maybe the Prosecutor --

6          **MR. MUSCHENHEIM:**  Right.

7          **MR. KRETZER:**  -- they all know the offense.  No one

8    would disagree -- I've never heard any Prosecutor say that

9    there does not need to be unanimous --

10          **THE COURT:**  No.

11          **MR. KRETZER:**  -- very -- various mens rea.  That was

12    never our argument.

13          **THE COURT:**  What they're saying -- but you're going

14    there with your argument.

15          **MR. KRETZER:**  No.  We're saying it has to unanimous

16    as to at least -- it's in a multiple object conspiracy, it has

17    to be unanimous as to at least which SUA they are finding on.

18    That's why they're -- that's not -- we submit there shouldn't

19    be a general unanimity, but rather the specific unanimity

20    instruction.  General unanimity is in every case which is in

21    regards to mens rea.  Here, because the way the statute is

22    structured and requires the various SUAs be proved beyond a

23    reasonable doubt, that's how we're submitting there would be a

24    risk of jury confusion if there was not instruction with regard

25    to --

1          **THE COURT:**  But is that required --

2          **MR. MUSCHENHEIM:**  No.

3          **THE COURT:**  -- for the unlawful activities, for there

4    to be unanimity regarding which unlawful activity?

5          **MR. REYNAL:**  If I may, Your Honor?

6          **THE COURT:**  I don't think it is under the law.  Maybe

7    that we need to clarify some things but I don't -- the way I

8    was reading this, I thought what was submitted -- hold on.

9    What you all submitted, I believe, and what the instruction is,

10   "that in order to return a guilty verdict, all 12 of you must

11   agree that the same one has been proved."  "Same one" being the

12   unlawful activity.  And I don't know if that's required by law.

13         **MR. REYNAL:**  If I may, Your Honor?

14         **THE COURT:**  Yes.

15         **MR. REYNAL:**  I think it's a -- if memory serves, it's

16   element two or three in money laundering.  They have to prove

17   that the money, itself, was the proceeds of specified unlawful

18   activity.

19         **THE COURT:**  Right.  But --

20         **MR. REYNAL:**  And so --

21         **THE COURT:**  -- which one --

22         **MR. REYNAL:**  -- I --

23         **THE COURT:**  -- is the question here.

24         **MR. REYNAL:**  -- I agree, Your Honor.

25         **THE COURT:**  Okay.

1          **MR. REYNAL:**  If we can accept as a principle that

2    they have to be beyond a reasonable doubt on that element, then

3    it stands to reason that where the Prosecutor has elected to

4    have four different SUAs, that they be unanimous as to that

5    that money, the original sin that created that money, has been

6    proved beyond a reasonable doubt.  For example, if we had half

7    the jurors believe, you know what, I don't think Mr. Saiz --

8    the Government has proven that Mr. Saiz-Pineda stole money in

9    Mexico.

10          **THE COURT:**  Okay.  Fine.

11          **MR. REYNAL:**  Okay.  Half of them say, we don't agree

12   that that happened.  Another half of them, six, say yes, that's

13   where it came from, but we don't agree that there was

14   unlicensed money transmitted.  Right?  You could have a

15   situation where half the jurors believe the Government has met

16   its burden of proof as to unlicensed money transmitted, half of

17   the jurors believe that they've met their burden of proof as to

18   public corruption in Mexico.  They put those two together and

19   they say they've met their burden of proving the case beyond a

20   reasonable doubt as to the SUA.

21          **THE COURT:**  Because they haven't, right, lawful

22   activity.  But you're saying -- I guess we're going back to, is

23   that required?  Unanimity on one unlawful activity?

24          **MR. REYNAL:**  Your Honor --

25          **THE COURT:**  And I didn't think the law says that.

1          **MR. MUSCHENHEIM:**  No.

2          **THE COURT:**  I understand how it can be confusing, but

3    I'm trying to get to the legal requirement here.

4          **MR. MUSCHENHEIM:**  Your Honor, I could find no case

5    that imposed a unanimity requirement on specified unlawful

6    activity.  There can be multiple SUAs.  All we need to show,

7    the essence of it is the agreement, and the pattern jury charge

8    from the Fifth Circuit, she needs to know this from some form

9    of unlawful activity.  If they don't agree unanimously that she

10   thinks the money is from some form of unlawful activity they

11   should vote not guilty.  But that's the --

12         **THE COURT:**  Some unlawful activity.  But as

13   Mr. Reynal argued if six say it came from the embezzlement, if

14   six say it came from something else --

15         **MR.  MUSCHENHEIM:**  There is -- right.

16         **THE COURT:**  What is the Government's position on

17   that?

18         **MR. MUSCHENHEIM:**  The jury is not --

19         **THE COURT:**  Hold on.  I have a question.  His

20   hypothetical.  Six say it came from the embezzlement, six say

21   it came from some other unlawful activity, the Government's

22   saying that's okay as long as --

23         **MR. MUSCHENHEIM:**  It's all dirty money, then they

24   think that Mr. Latour was creating illegal money, he's a

25   Conspirator, that's dirty money.  They may think that Mr. Saiz-

1   Pineda embezzled.  It's all dirty money.  There is no unanimity

2   requirement in a concealment money laundering --

3           **THE COURT:**  Yeah, and I did not --

4           **MR. MUSCHENHEIM:**  -- conspiracy for the SUA.

5           **THE COURT:**  -- see anything.  So that's why I'm

6   asking the Defense.  Do you have some law that requires

7   unanimity on the unlawful activity?  Yes, there must be -- all

8   12 must agree that there was some unlawful activity --

9           **MR. KRETZER:**  Yes --

10          **THE COURT:**  -- but in terms of which one?

11          I understand the argument situation.  I'm just not

12  sure this is the way we deal with it in this unanimity theory.

13  Obviously, Count Two, since we're down to one bank, I don't

14  think we need to worry about instructing anything there,

15  correct?

16          **MR. MUSCHENHEIM:**  No and we move to strike from the

17  indictment the two other banks at this time.

18          **THE COURT:**  Which is Morgan Stanley --

19          **MR. MUSCHENHEIM:**  Royal Bank and Morgan Stanley.

20          **THE COURT:**  -- and Royal Bank, correct?

21          **MR. MUSCHENHEIM:**  We move to strike that, Your Honor.

22          **THE COURT:**  So that, then, does not create an issue

23  on Count Two --

24          **MR. MUSCHENHEIM:**  No, Your Honor.

25          **THE COURT:**  -- correct?  On unanimity?

1          **MR. MUSCHENHEIM:**  No.

2          **THE COURT:**  So --

3          **MR. REYNAL:**  One thing that's raised by Count Two,

4   Your Honor, that I think is important that we deal with, if

5   we're moving on to Count Two --

6          **THE COURT:**  Well, I'm just -- I'm still talking --

7          **MR. REYNAL:**  -- okay.

8          **THE COURT:**  -- because the instruction regarding

9   Count Two also, the unanimity, but I'm saying if we're down to

10  one bank, we don't need to worry about unanimity on Count Two--

11         **MR. MUSCHENHEIM:**  We don't.

12         **THE COURT:**  -- regarding the banks.

13         **MR. MUSCHENHEIM:**  We do not.

14         **MR. REYNAL:**  Except in the following sense, Your

15  Honor:  the Government, in its indictment, charged a specific

16  misrepresentation and they need to prove and the jury needs to

17  convict based on that specific misrepresentation.

18         **MR. MUSCHENHEIM:**  We agree.

19         **MR. REYNAL:**  It -- it --

20         **THE COURT:**  Okay.

21         **MR. REYNAL:**  So we need to incorporate that into the

22  charge.

23         **THE COURT:**  Well is that not set forth, I guess, on

24  count two in elements?  What's being alleged?

25      **(Counsel confer)**

1          **MR. REYNAL:**  In count two, it is a general

2    statement --

3          **THE COURT:**  So where is it -- what's the suggestion

4    we add and where?

5          **MR. REYNAL:**  That the Defendant --

6          **THE COURT:**  Where?

7          **MR. MUSCHENHEIM:**  It'd be in the fourth element --

8    well, I guess that's really why, I don't know.

9          **MR. REYNAL:**  Well, I think that the scheme -- that

10   the scheme or artifice to defraud was material, employed a

11   false material misrepresentation the nature (indisc.) fact --

12         **MR. KRETZER:**  Regarding the movement of monies from

13   the United States.

14         What we would propose to do, Your Honor, on Page 12

15   of the draft that we got yesterday with the fourth element,

16   after material fact, right now, there's a semicolon.  We would

17   then in quote directly quote from Page 3 of the indictment

18   where they say (quote),

19         "Their resources of income regarding the movement of

20         monies from the United Mexican States to the United

21         States in furtherance of funding the accounts."

22         **THE COURT:**  So on the fourth element after or

23   concealed a material fact --

24         **MR. KRETZER:**  Right.

25         **THE COURT:**  -- colon and then what's set forth in the

1    indictment?

2              **MR. KRETZER:**  Yes.

3              **MR. REYNAL:**  Yes, we say that is --

4              **MR. KRETZER:**  Right.  Then, it's the exact words that

5    they chose to indictment on Page 3 of the indictment.  Do you

6    agree?

7              **MR. MUSCHENHEIM:**  That's fine, Judge.

8              **MR. KRETZER:**  Okay.

9              **THE COURT:**  Okay.  That way would -- okay.  So going

10   back to unanimity, we're still not clear.

11             **MR. MUSCHENHEIM:**  Judge, I could not find a case --

12             **THE COURT:**  I know.

13             **MR. MUSCHENHEIM:**  -- and I have looked for years for

14   this --

15             **THE COURT:**  You've already said that so I'm like

16   (indisc.) and here's the defense is going to have to convince

17   me here.  I'm just not seeing --

18             **MR. KRETZER:**  Sure.  The way that we would endeavor

19   to convince the Court is that, again, this is a special

20   instruction, the unanimity instruction.  It goes beyond the

21   general unanimity instruction and that's because the way we

22   would convince the Court is to see that there is this real risk

23   of jury confusion.  That's the situation in which the special

24   instruction is justified.  The --

25             **THE COURT:**  Both sides like this Cessa (phonetic)

1    case.  Did that only involve one specified unlawful activity or

2    did it have multiple things?  What did they do there?

3            **MR. KRETZER:**  I think there were three, if I recall,

4    specified unlawful activities in Cessa.  Correct me if I'm

5    wrong but I think the there were three.

6            **MR. MUSCHENHEIM:**  I --

7            **THE COURT:**  Their unanimity instruction in that case?

8            **MR. KRETZER:**  Let me look at the chart, Judge.  I

9    don't know if they requested it but let me look.

10           **(Pause / Counsel confer)**

11           No, Judge.  I think in that case, they just give the

12   general unanimity instruction.  I do not know if the parties in

13   that case requested the special unanimity instruction.

14           **THE COURT:**  I know.  I'm just not hearing that the

15   law requires that.  I'm not going to submit it at this point.

16   We can continue looking at it.

17           **MR. KRETZER:**  Sure.

18           **THE COURT:**  Then, I believe the defense had requested

19   a submission regarding the spending of money.

20           **MR. KRETZER:**  Yes.

21           **THE COURT:**  Anything else on that issue?

22           **MR. MUSCHENHEIM:**  We're opposed to that, Your Honor.

23   It's not -- we don't believe it's a correct statement of the

24   law.

25           **MR. KRETZER:**  Judge, I would just respond with what's

1    quoted directly from the Fifth Circuit cases that have reversed

2    on that issue.  It's not something I made up.  I mean, we're

3    direct quoting from the controlling case law.

4         **THE COURT:**  Court's going to sustain the Government's

5    objection on that.  We'll not include that so the Court, at

6    this point, rulings not including comingling instruction

7    requested by the Government, not including the unanimity

8    instruction requested by the defense in regards to particularly

9    the SUAs.  Court's not including the -- I'll call it the

10   spending instruction requested by the defense.

11        There was a proposed verdict submitted by the defense

12   -- Government last night regarding count one.  Did you-all look

13   at that?

14        **MR. KRETZER:**  I looked at it briefly, Judge.  I

15   think --

16        **MR. MUSCHENHEIM:**  It came from the Cessa case, Judge.

17   I think that's where I got.  It's just so that we have

18   unanimity about mens rea on count one.  We talked about it --

19        **MR. KRETZER:**  Right.  I think that's the way the

20   Court has ruled.  I think our issue with that verdict form --

21   and I know it came in late.  I should probably look at it

22   again, but the -- I think the issue there is that we would,

23   again, want the -- and I think the prosecutor and I spoke about

24   this yesterday, the -- I'm not sure the form reflects that the

25   jury found SUA beyond a reasonable doubt.  I think that was my

1    issue when we talked about yesterday --

2            **MR. MUSCHENHEIM:**  We'll get that going --

3            **MR. KRETZER:**  Let's take another look at it.  I think

4    we had some discussions yesterday.

5            **THE COURT:**  At the submission --

6            **MR. KRETZER:**  Yes, for the verdict form.

7            **THE COURT:**  -- from the Government regarding count

8    one.  Okay.

9            Then, you-all are going to work on the details --

10           **MR. MUSCHENHEIM:**  I'm going to try to do that right

11   now so we can have something in writing to submit to the Court,

12   hopefully jointly, --

13           **THE COURT:**  -- on the SUAs because that's not --

14           **THE COURT:**  Okay.  I'm going to --

15           **MR. MUSCHENHEIM:**  I don't know if it'll be jointly or

16   not.  We'll try.

17           **THE COURT:**  I'm going --

18           **MR. MUSCHENHEIM:**  Judge, I have one other comment on

19   the venue part.  The Court listed Sugar Land on the kind of

20   draft working copy we got yesterday --

21           **THE COURT:**  Yes, I think we underlined just kind of

22   wondering to see we -- you-all -- we needed to do there.

23           **MR. MUSCHENHEIM:**  I'm going to find it.  I'm not

24   finding it.  Anyway, it was on the venue --

25           **THE COURT:**  It's on Page 7.

1          **MR. MUSCHENHEIM:**  Thank you, Your Honor.  We would

2    ask you to include Houston also because there's -- the bank was

3    in Houston when they met with Mr. Arnold.

4          **MR. KRETZER:**  That sounds fine to us, Judge.  Houston

5    and Sugar Land --

6          **THE COURT:**  Okay.

7          **MR. KRETZER:**  -- are both in the Southern District.

8          **MR. REYNAL:**  We'd request -- I think it's been raised

9    by the evidence, the instruction that was given in Cessa which

10   is a Fifth Circuit pattern on accomplice, co-conspirator, deal

11   with the Government witnesses.

12         **THE COURT:**  The agreements?  Is that what you're

13   talking about where someone testifies --

14         **MR. REYNAL:**  It says you need to weigh with

15   particular care, you've had in front of you people who have

16   been described as co-conspirators and who may have some sort of

17   agreement with the Government.  That evidence should be taken

18   with care.  It's a standard --

19         **THE COURT:**  I know what you're talking about, I was

20   just trying to figure out how it applied and to who.  Whether

21   it was a proper agreement you're talking about or what.  So

22   what's Mr. Muschenheim's position on that?

23         **MR. MUSCHENHEIM:**  Pattern Jury Charge 1.15, there is

24   no plea agreement and that was the testimony I think as to

25   something that Counsel gets to argue.

1          **MR. REYNAL:**  The instruction, we look at it says:

2          "Accomplish" -- sorry.  Accomplish.  I'd like to

3     accomplish something today but I don't know about that.

4          "Accomplice (dash) co-defendant (dash) plea

5     agreement."  So I think that this can be -- can be modified.

6     And then we have the one before it which is accomplice (slash)

7     informer (slash) immunity.  I think we can modify these to fit

8     the testimony in the case.  I think, in fact, maybe accomplice

9     and former immunity is the preferred one.  I don't know.

10          "The testimony of an alleged accomplice and/or" --

11     the government has certainly alleged that these people are

12     accomplices.  -- "and/or the testimony of one who provides

13     evidence against the defendant as an informer for pay, for

14     immunity from punishment --

15          **THE INTERPRETER:**  Your Honor --

16          **THE COURT:**  Hold on.  Slow down.

17          **MR. REYNAL:**  "The testimony of an alleged

18          accomplice," (comma), "and/or the testimony of one

19          who provides evidence against the defendant as an

20          informer for pay," (comma), "for immunity from

21          punishment," (comma), "or for personal advantage or

22          vindication must always be examined and weighed by

23          the jury with greater care and caution than the

24          testimony of ordinary witnesses."

25          And I believe -- and it goes on.  I won't burden our

1    translator with reading the whole thing into the record.  It's

2    1.14.  I think that the fact that all these gentlemen made

3    millions of dollars and they have no -- I think I asked each

4    one of them, "Has the government asked you to get that back?"

5    "Are you hoping to keep it?"  I think Mr. Monterrubio said that

6    his understanding was that nothing was going to happen to him.

7    I think it's been raised by the evidence.

8              THE COURT:  Mr. Muschenheim?

9              MR. MUSCHENHEIM:  There is no immunity agreement;

10   there is no paid informer.

11             THE COURT:  Right so what would apply would be

12   potentially any personal advantage or vindication, I guess.

13             MR. MUSCHENHEIM:  I would be happy to take a look at

14   what the court is thinking and submitting.  Maybe I can comment

15   again.  Counsel seems to be trying to edit it as we're speaking

16   here and I'm not quite sure what the -- what they're

17   requesting.  Yeah.

18             THE COURT:  I think he's requesting that whole

19   instruction.  Obviously we have to tailor it.  There's not an

20   informer here; there's no immunity here.  I guess personal

21   advantage might fit.  So you want to look at that and see if we

22   need to --

23             MR. MUSCHENHEIM:  Sure.

24             MR. REYNAL:  I think immunity has probably been

25   raised by the evidence at this point.  We could inquire --

1          **THE COURT:**  But there's --

2          **MR. REYNAL:**  -- of the government whether they intend

3    to prosecute any of these gentlemen.

4          **THE COURT:**  But I think the evidence was there's no

5    immunity.

6          **MR. MUSCHENHEIM:**  There's no immunity agreement.

7          **MR. REYNAL:**  Well, I think that -- I think that the

8    law doesn't draw such a fine distinction between an immunity --

9    a transactional immunity agreement approved by a main justice

10   in Washington and the word of a prosecutor that you do what we

11   want and nothing bad's going to happen to you.

12         **THE COURT:**  I'm just saying -- I'm not telling you

13   we're not going to submit this.  I don't know yet.  I'm saying

14   some of these don't apply to the evidence before the court.

15         **MR. REYNAL:**  Right.  Thank you.

16         **THE COURT:**  So we'd have to tailor the language if

17   it's going to be submitted.

18         Mr. Muschenheim?

19         **MR. MUSCHENHEIM:**  Well, I can understand the court

20   saying "personal advantage" or "vindication" but there's no

21   paid informer.  Immunity agreements come from the court, not

22   from the executive branch.  There's not one of those and no one

23   was an informer for pay.  I just think Counsel argues -- he can

24   argue, well, look, the government didn't take their stuff yet.

25   The government didn't take their stuff.  They can argue that.

1        **THE COURT:**  Right.  But they're requesting

2   instruction that informs the jury --

3        **MR. MUSCHENHEIM:**  Yes and I'm -- and I guess I'm

4   trying to tailor it here and I can understand the court putting

5   in personal advantage or vindication, something like that, but

6   the other parts of it, that 1.4 don't apply to this case.  I

7   mean, I can understand saying the testimony of an alleged

8   accomplice must be weighed with great care.  I can see where

9   the court would give that.  I don't think that's -- would be

10  wrong to give that charge in this case.  It's just calling them

11  informers for pay.  Immunity, those things aren't in this case.

12       **THE COURT:**  I agree.  That's not -- that would not be

13  part of that instruction.

14           **MR. MUSCHENHEIM:**  That's fine.

15       **THE COURT:**  Okay.  What else?  From the government?

16           **MR. MUSCHENHEIM:**  Nothing else, Your Honor.

17       **THE COURT:**  Okay.  Let me see.

18       **MR. REYNAL:**  If we're sort of going page-by-page

19  here, Your Honor, we'd ask that in the -- and I guess we'll

20  wait to see what the revised money laundering one looks like.

21  If it comes out, to say so.  But in terms of the bank fraud, we

22  have the general charge here which refers to financial

23  institution and later on says it has to be FDIC insured.  We'd

24  request that that be put into each element that it applies.

25           "That Defendant knowingly executed a scheme or

1          artifice to defraud a federally -- FDIC insured bank

2          as alleged in the indictment.

3          "That the defendant had the intent to defraud the

4          FDIC insured bank.

5          "That the scheme or artifice to defraud was

6          material --

7          Well that part's fine.

8          "And that the defendant placed the FDIC insured bank

9          at a risk of civil liability or financial loss."

10          **THE COURT:**  Mr. Muschenheim?

11          **MR. MUSCHENHEIM:**  I don't recall that her knowledge

12  of -- we have to prove it's FDIC but I don't recall that she

13  has -- I don't know that it goes in every part of that, Your

14  Honor.

15          **THE COURT:**  It doesn't.

16          **MR. MUSCHENHEIM:**  Yeah.  I don't think it does.

17          **THE COURT:**  It's in the instruction.

18          **MR. MUSCHENHEIM:**  I'm just trying to find it and

19  think that's in the charge --

20          **THE COURT:**  Yes.  The court's not inclined to do

21  that.

22          **MR. MUSCHENHEIM:**  Thank you, Your Honor.

23          **THE COURT:**  Any -- anything else?  So we're going to

24  include the extra language on Count Two to direct it to the

25  indictment.  You-all are going to work on the elements of

1    the --

2              **MR. MUSCHENHEIM:**  we're going to work on and try to

3    get a joint specified unlawful activity.

4              **THE COURT:**  -- SUAs.  We're going to alter the

5    accomplice instruction.  I'm going to throw in the summary

6    instruction.  Anything else?

7              **MR. MUSCHENHEIM:**  No, Your Honor.

8              **MR. REYNAL:**  I don't think so.

9              **THE COURT:**  Okay.  So we've got some time to work on

10   that and try to get you a little bit cleaner copy.

11             **MR. MUSCHENHEIM:**  Thank you, Your Honor.

12             **THE COURT:**  But I do rely on you-all to do the

13   submissions on the -- unlawful activity submissions.

14             **MR. MUSCHENHEIM:**  Yes, Your Honor.

15        **(Pause; voices off the record)**

16        **(Recess taken from 9:00 a.m. to 9:39 a.m.)**

17        **(Outside the presence of the jury)**

18        **(Hearing already in progress)**

19             **MR. REYNAL:**  -- as I was sitting there thinking

20   through the pattern charges, I would request the -- there's a

21   pattern charge --

22        **(Mr. Reynal/Mr. Speaker confer)**

23             **MR. REYNAL:**  -- 1.09 on character evidence.  We had

24   testimony as to my client's character so I think it'd be

25   appropriate to include that charge.  And then may I?

1          **MR. SPEAKER:**  Yes.

2          **MR. REYNAL:**  Then there is a pattern charge on good

3    faith, and I will look for it.  And we were also going to offer

4    that one.

5          **THE COURT:**  Okay, you want to let me know where that

6    is?  I don't know, Mr. Kretzer, if you all had a chance to

7    review further what the Government had proposed in terms of the

8    verdict form.  That's what I was trying to pull --

9          **MR. KRETZER:**  Right.

10         **THE COURT:**  -- that case up but it sounds like they

11   grabbed it from there.

12         **MR. KRETZER:**  Judge, I have available -- this is the

13   first *Cessa* trial the May, 2013 jury verdict form on my

14   computer and I can --

15         **THE COURT:**  Okay.

16         **MR. KRETZER:**  -- show that to the Court right now.

17         **THE COURT:**  Yeah, let's see.

18         **MR. KRETZER:**  Sure.

19         **THE COURT:**  And then it was tried again --

20         **MR. KRETZER:**  Right.

21         **MR. MUSCHENHEIM:**  That's correct.

22         **THE COURT:**  And is that the one you got --

23         **MR. MUSCHENHEIM:**  Yes, Your Honor.

24         **THE COURT:**  (Indisc.)

25         **MR. MUSCHENHEIM:**  Yes, Your Honor.

1          **THE COURT:**  Why does it have Shreveport but it was

2   tried in Austin or what?

3          **MR. MUSCHENHEIM:**  I don't know all the facts but it

4   was a wide-ranging conspiracy --

5          **THE COURT:**  Okay.

6          **MR. MUSCHENHEIM:**  -- of --

7          **THE COURT:**  Anyway.

8          **MR. KRETZER:**  This is just Westlaw.  I don't know if

9   they always get everything --

10          **THE COURT:**  Yes.

11          **MR. KRETZER:**  -- right.  They might think Shreveport

12   is Dallas and --

13          **THE COURT:**  Yeah.

14          **MR. MUSCHENHEIM:**  I know some of the facts, very

15   interesting case.

16          **THE COURT:**  Okay, is -- we are on the record for

17   this, Genay.  Then is there any objection to the request on

18   character evidence?  It is appropriate.

19          **MR. MUSCHENHEIM:**  I don't see -- think so.  I think

20   if they raised it, Judge, --

21          **THE COURT:**  Yeah, they did.

22          **MR. MUSCHENHEIM:**  I think they did so --

23          **THE COURT:**  And then they're looking at good faith.

24          **MR. REYNAL:**  And we're looking for good faith.

25          **MR. MUSCHENHEIM:**  That one I'm -- I don't remember

 1  that one.

 2          THE COURT:  I gave my --

 3          MR. REYNAL:  And I'm going from memory, too, so I

 4  just --

 5          MR. MUSCHENHEIM:  And Mr. Kretzer and I are working

 6  hard on a joint filing --

 7          THE COURT:  Yes.

 8          MR. MUSCHENHEIM:  -- on the SUA elements.  And I

 9  don't know that we'll get that finished before testimony

10  starts.

11          THE COURT:  But at least --

12          MR. MUSCHENHEIM:  But we're working hard to get a

13  joint filing on that.  And then Ms. Hampton's going to want to

14  see it after -- and Mr. Reynal will want to see it before we

15  submit it to the Court, Your Honor.

16          THE COURT:  That's fine.

17          MR. KRETZER:  Those two individuals looking, I don't

18  think it'll be a contentious or --

19          MR. MUSCHENHEIM:  I don't think that's a --

20          THE COURT:  Yeah

21          MR. MUSCHENHEIM:  -- going to be a big thing at all.

22          THE COURT:  Can I see your pattern jury charge?  My

23  clerk has mine.

24          MR. KRETZER:  I'm going to send you the one that was

25  in the *Cessa* case right now.

1          THE COURT:  Okay.

2          MR. KRETZER:  I just sent that to you in Word.

3          MR. MUSCHENHEIM:  You didn't see the mustache and

4    devil's ears here on Judge Head's picture in the front.  Just

5    don't look at that.

6          THE COURT:  I'll take a picture and send it to him.

7    Oh, he personally autographed it for you.

8          **(Mr. Kretzer/Ms. Speaker confer)**

9          **(Pause from 9:42 a.m. to 9:43 a.m.)**

10         MR. REYNAL:  I think it only applies in tax cases,

11   Your Honor.

12         THE COURT:  Okay.  So --

13         MR. SPEAKER:  Are we about to get started?

14         THE COURT:  No, no, no, no, I just came in to talk

15   about -- I know you all were going to confer on the verdict

16   form so I was wondering if we had at least seen the *Cessa* case

17   verdict form, but it sounds like what was submitted by the

18   Government is probably tracking that exact case.

19         MR. MUSCHENHEIM:  Well, I'm already --

20         MR. KRETZER:  Yeah, I'm pulling it right now.  The --

21         MR. REYNAL:  No, the one that we're going to use in

22   this case.

23         **(Mr. Kretzer/Mr. Muschenheim confer)**

24         THE COURT:  Because they're alleging Count One in

25   alternate --

1          **MR. KRETZER:**  Right.

2          **THE COURT:**  -- forms.

3      **(Mr. Kretzer, Mr. Muschenheim, Mr. Reynal confer)**

4      **(Pause from 9:45 a.m. to 9:46 a.m.)**

5          **THE COURT:**  You all can look at it some more.  I just

6  -- I didn't realize you all had looked at the *Cessa* one and

7  that's kind of what had been submitted.  You all can keep

8  looking at that.  And the SUA, correct?

9          **MR. MUSCHENHEIM:**  We're still working on those,

10  Judge.

11          **THE COURT:**  That's fine.

12          **MR. REYNAL:**  Are we going to get started at 10:00?

13          **THE COURT:**  Yes.

14      **(Recess taken from 9:46 a.m. to 9:57 a.m.)**

15      **(Outside the presence of the jury)**

16          **THE COURT:**  All right, you can have a seat.  Is the

17  jury here, Adrian?

18          **CSO PEREZ:**  Yes, Judge.

19          **THE COURT:**  Okay, we're ready to go.  We just waiting

20  on Mr. Muschenheim?

21          **MR. KRETZER:**  I think he went out to redo work on the

22  charge.

23          **THE COURT:**  Okay.

24          **MR. KRETZER:**  (Indisc.)

25          **THE COURT:**  So he's not going to come in right now?

37

1          **MR. KRETZER:**  I believe so, yes.

2          **MS. HAMPTON:**  I believe so, Your Honor.

3          **MR. KRETZER:**  That's what he told me.

4          **THE COURT:**  Okay, he's not coming, we're not waiting

5    on him.

6          **MR. KRETZER:**  No.

7          **THE COURT:**  That's what Mr. Kretzer says, anyway.

8          **MR. KRETZER:**  I would not misrepresent to the Court

9    that a prosecutor's not coming so --

10         **THE COURT:**  So whenever the jury's ready, we can

11   bring them in.  The defense will present their next witness.

12      **(Pause)**

13         **THE MARSHAL:**  All rise for the jury.

14      **(Jurors enter at 9:59 a.m.)**

15         **THE COURT:**  Good morning.

16      **(Jurors respond in the affirmative)**

17         **THE COURT:**  You can have a seat.  Does the Defendant

18   have any other witnesses?

19         **MR. REYNAL:**  Yes, Your Honor.  The defense calls

20   Silvia Beatriz Perez-Ceballos.

21         **THE COURT:**  Good morning, ma'am, if you'll approach

22   over here and raise your right hand.

23   //

24   //

25   //

1              **SILVIA BEATRIZ PEREZ-CEBALLOS, DEFENDANT, SWORN**

2              **THE COURT:**  You can have a seat.

3              **MR. REYNAL:**  Good morning.

4              **THE WITNESS:**  Good morning.

5                         **DIRECT EXAMINATION**

6         **(Testimony translated through interpreter)**

7  BY MR. REYNAL:

8  Q    You've been waiting for this day for a long time.

9  A    Yes.

10 Q    Would you please introduce yourself to the ladies and

11 gentlemen of the jury?

12 A    Yes, I'm Silvia Beatriz Perez-Ceballos, 49 years of age, a

13 psychologist by profession, currently a housewife.

14            **THE COURT:**  Okay, if you could -- I know you all are

15 sharing the microphone but maybe we can hear her also.

16            **THE INTERPRETER:**  Yes, Your Honor.

17 BY MR. REYNAL:

18 Q    I'd like to begin in part there.  Where did you grow up?

19 A    In Villahermosa, Tabasco.

20 Q    And what was -- what kind of town was Villa (phonetic)

21 when you were a little girl?

22 A    It was and is a small city in Mexico.  It's not a big

23 city.  As we say, it's a province.  Most people know each

24 other.  It's calm, it's a very calm city.

25 Q    Do you have any brothers and sisters?

1   A    Yes.

2   Q    Can you -- who are they, tell us who they are?

3   A    I have five siblings.  I'm the eldest.  Celso is an

4   engineer by profession; my brother Manuel, who has a bachelor's

5   degree in information technology; my sister, Ila (phonetic) who

6   is an accountant; and, lastly, Juan who is still studying.

7   Q    What did your parents do for work?

8   A    My dad is an accountant, and my mom to this day is a

9   seamstress.  I don't know, she makes clothing, she makes

10  outfits.

11  Q    Was it a close-knit family growing up?

12  A    We are very close-knit.

13  Q    At some point did you choose to leave Villahermosa and

14  move to Guadalajara?

15  A    Yes.

16  Q    Can you tell us how old you were and why you went to

17  Guadalajara?

18  A    At 18 years of age, I finished high school and I went to

19  study a career in psychology in Guadalajara.

20  Q    What originally attracted you to the profession of being a

21  psychologist?

22  A    I like to speak to people, I like to listen to people.  So

23  looking for a type of career or what to study, I always lean

24  towards humanities.

25  Q    In what year did you move to Guadalajara?

Perez-Ceballos - Direct / By Mr. Reynal                40

1    A    In 1985.

2    Q    And how long did you live there?

3    A    Four and a half years.

4    Q    Did you get your degree as a psychologist?

5    A    A psychologist with a specialty in clinical psychology.

6         **MR. REYNAL:**  Can I have the ELMO, please?

7    Q    I'm going to show you what's been marked for

8    identification as defense Exhibit 1; do you recognize it?

9    A    Yes.

10   Q    What is it?

11        **MR. REYNAL:**  Move to admit --

12   A    It's my diploma for my career in psychology, for my

13   psychology studies, my degree in psychology.

14        **MR. REYNAL:**  Move to admit, Your Honor.

15        **MS. HAMPTON:**  No objection, Your Honor.

16        **THE COURT:**  It's admitted.

17   **(Defendant's Exhibit Number 1 was received in evidence)**

18   **(Pause)**

19   BY MR. REYNAL:

20   Q    And is that a picture of you; how old are you in that

21   picture?

22   A    Yes, 21 years old.

23        **MR. REYNAL:**  Nice hairdo.

24   Q    I'm going to hand you what's been marked for

25   identification as defense Exhibit 2; can you tell us what it

Perez-Ceballos - Direct / By Mr. Reynal                 41

1   is?

2   A    It's my photograph of my class in my studies.

3              MR. REYNAL:  Move to admit, Your Honor.

4              MS. HAMPTON:  No objection, Your Honor.

5              THE COURT:  It's admitted.

6        (Defendant's Exhibit Number 2 was received in evidence)

7   BY MR. REYNAL:

8   Q    And do you see yourself in this picture?

9   A    Yes.

10  Q    Can you tell us maybe what the lady standing next to you

11  looks like?

12  A    It's the second row.  I'm next to a person with blonde,

13  short hair.

14  Q    Is that you?

15  A    Yes.

16  Q    After you graduated, where did you move?

17  A    I returned to Villahermosa.

18  Q    And did you start working?

19  A    Yes.

20  Q    Who did you live with at the time?

21  A    At my parents' house.

22  Q    And where was your first job after college?

23  A    At the psychiatric hospital in Villahermosa.

24  Q    Can you describe for us the psychiatric hospital in

25  Villahermosa?

1   A    It was a health center, very austere.  There was a type of

2   -- there were large rooms with beds.  The outpatient area had

3   several offices and a reception area.

4   Q    What types of ailments did the people who were at the

5   psychiatric asylum in Villahermosa suffer from?

6   A    Specifically disorders such as psychosis, schizophrenia,

7   paranoia, dementia.

8   Q    At that time, what was the accepted -- the late eighties,

9   early nineties, what was the accepted treatment for people who

10  had schizophrenia or other types of psychological diseases?

11  A    Specifically treatment was done with medications.  Lithium

12  only was used.  The other type of treatment was electroshock.

13  Q    How long did you work at the psychiatric asylum with

14  adults?

15  A    Just eight months.

16  Q    At some point in that period, did you have the opportunity

17  to participate in helping children who had mental conditions?

18  A    Yes.

19  Q    Can you tell us about that?

20  A    Yes.  Children were only worked on as outpatients.  They

21  were not admitted.  Generally -- well, the contact I had was

22  with autistic children.  And at the time, autism was considered

23  within psychosis.  And at the time, I met two children in

24  particular with whom I had the opportunity to work.  But

25  because they were more or less reaching their stage of

Perez-Ceballos - Direct / By Mr. Reynal                    43

1    adolescence, they had increasingly aggressive episodes,

2    especially because there were no specific therapy treatments

3    for them.

4    Q    At that time -- well, do you agree that autism is like

5    schizophrenia or some other type of psychosis?

6    A    No.

7    Q    Today, is autism seen as being very different from

8    schizophrenia or other type of psychosis?

9    A    Totally.

10   Q    At that time, how were these children with autism treated

11   at the psychiatric institute?

12   A    When they reached an aggressive outbreak, the only

13   treatment that they were given was electroshock.

14   Q    Did you observe these electroshocks being administered?

15   A    Yes.

16   Q    How did that make you feel?

17   A    Oh, it's terrible.  Children, adults, in any form, it's

18   something that's really strong.

19   Q    Do you remember who those first two kids were that you

20   started working with?

21   A    Yes.

22   Q    Who were they?

23   A    One of them was named Abraham, the other one Daniel.

24   Q    Were you able to help both of them?

25   A    At that time, no.

Perez-Ceballos - Direct / By Mr. Reynal                    44

1    Q    Did one of them die?

2    A    Yes, there was an incident at that time.  One of them, the

3    younger one, was very mischievous and he was at the house,

4    tried to leave through the window.  The window closed.  And

5    most of these children don't have any language or means of

6    communication.  He was found with the window closed upon his

7    neck and he died.  No one could help him.

8    Q    Did you decide to go back to school at that point to focus

9    your career on helping children?

10   A    I decide to quit the hospital.  It really was an

11   unpleasant experience for me.  And, yes, I returned to

12   Guadalajara to study at ITESO, which is the Western Institute

13   for Technology and Higher Studies, and I decided to study a

14   degree in normal development and psychopathology in children.

15   Q    When you -- career-wise when you came back to

16   Villahermosa, what was the next step?

17   A    When I returned, I opened a center of specialized

18   stimulation for children.

19   Q    Who worked with you at the center?

20   A    I could precisely do it because my best friend studied

21   with a specialization in special education.  And together, we

22   opened the center.

23   Q    In approximately what year was this?

24   A    Ninety-two, I think it was '92.

25   Q    In addition to working at your own center, at some point

 1    did you become involved with a -- something -- a center called

 2    Unete (phonetic)?

 3    A    Yes.  At the time, we were a few people who focused on the

 4    area of special education and psychology and you were invited

 5    to participate in a new project created at the state with

 6    precisely the same model that we had started.

 7    Q    Can you describe the model for us; what was the model?

 8    A    The center is in charge of working with children from age

 9    zero to adolescents who have illnesses such as cerebral palsy,

10    autism, or Down syndrome but at profound levels, they're

11    totally dependent.  And for the first time, an area was

12    integrated specifically to work with children with autism.

13    Q    No electroshocks.

14    A    No.

15    Q    Was Unete as a program successful?

16    A    Yes.

17    Q    Did it attain a national reputation for excellence?

18    A    Yes.

19    Q    Were there magazine articles written about it?

20    A    Yes.  Yes, I did an interview for Televisa (phonetic), one

21    of the most important stations in Mexico.

22    Q    I'm going to hand you what's been marked for

23    identification as defense Exhibit 3; do you recognize these

24    photographs?

25    A    Yes.

1   Q    What are they photographs of?

2   A    They're photos of Unete and my work at Unete.

3            **MR. REYNAL:**  Move to admit, Your Honor.

4            **MS. HAMPTON:**  No objection, Your Honor.

5            **THE COURT:**  They're admitted.

6        **(Defendant's Exhibit Number 3 was received in evidence)**

7   **BY MR. REYNAL:**

8   Q    What year would this picture have been taken about?

9   A    Ninety-four, 1994.

10  Q    Do you recognize anybody in this picture?

11  A    Yes.

12  Q    Do you see yourself in this picture?

13  A    Yes.

14  Q    Can you identify an item of your clothing for us, perhaps

15  something in your hair?

16  A    A yellow flower in my hair.

17  Q    Is that you?

18  A    Yes.

19  Q    Do you recognize this person over here?

20  A    Yes.

21  Q    What's her name?

22  A    Lupita.

23  Q    How long did you treat Lupita?

24  A    Until I left the center.  She continued on there.

25  Approximately eight or nine years.

Perez-Ceballos - Direct / By Mr. Reynal                    47

1   Q    What does this picture show?

2   A    That's the area for psychomotor and physical therapy.

3   Q    And this photograph?

4   A    There, it's a type of what would you call that, you work

5   with children with cancer and it's a recreational area at the

6   same time.  They have group therapy including clay, painting,

7   looking to motivate them so that they can keep fighting for

8   their life.

9   Q    How about this photograph here?

10  A    It's also from Unete.

11  Q    And what is this picture depicting, what is it showing?

12  A    There we're working with children with mental deficiencies

13  on their psychomotor skills.

14  Q    And is that you with the yellow flower in your hair?

15  A    Yes.

16  Q    Can you describe for us sort of your daily work schedule

17  between your clinic and Unete during the late nineties, early -

18  - what year did you stop working at Unete as well,

19  approximately?

20  A    Yes.  We started work at 8:00 a.m. at Unete.  We had a

21  school-like schedule so we ended at 3:00 p.m., and so I,

22  between 4:00, 4:30, went to my own center where I stayed until

23  8:00 or 8:30 p.m. more or less.

24  Q    And where was your center located in relation to your

25  parents' house?

1  A     There is a part in the street exactly behind my parents'

2  home.  Since my parents have a lot that goes from one block to

3  the next, in the back there are commercial buildings and I was

4  at one of those.

5  Q     Did there come a time when you decided once more to change

6  your specialization in terms of psychology?

7  A     I stopped working at Unete at around 2004.  The reason was

8  I already had two daughters.  The youngest started having

9  little problems at school and was sent to the psychologist.  My

10 husband told me things were no longer working so we decided --

11 I decided to stop working in the mornings at Unete and switch

12 my private practice to the morning so that I could have my

13 afternoons off.  And on the weekends, I started studying a

14 master's degree program in Gestalt therapy.

15 Q     Did you receive your diploma in Gestalt therapy?

16 A     Yes.

17 Q     And how did that affect the type of services that you

18 provided at your clinic?

19 A     I started my Master's degree in Gestalt psychotherapy at

20 Cesun (phonetic) which is a center for human studies -- for

21 humanity studies.  Gestalt psychotherapy is a type of therapy

22 that applies to both adults and children.  It's very

23 humanistic, very quiet-centered and I was not planning on

24 returning to work but they offered me at Cesun the opportunity

25 to teach classes in the Master's degree program.

1          While working as a teacher, we planned a project.

2    Well, Cesun is only devoted to adolescents and children --

3    excuse me.  Cesun was only devoted to adolescents and adults

4    and so while working as a teacher, the plan was to open up a

5    children's area and I was to be in charge of that.  So there we

6    offered workshops for children in self-esteem and positive

7    development in general, values, anything that could help better

8    development in general.

9    Q    I'm going to show you what's been marked for

10   identification as Defense Exhibit 4.  Do you recognize those

11   photographs?

12   A    Yes.

13   Q    Can you tell us what they are photographs of?

14   A    Those are the facilities at Cesun.

15          **MR. REYNAL:**  Move to admit, Your Honor.

16          **MS. HAMPTON:**  No objection, Your Honor.

17          **THE COURT:**  They're admitted.

18       **(Defendant's Exhibit Number 4 was received in evidence)**

19   **BY MR. REYNAL:**

20   Q    Let me just -- what are we looking at here?

21   A    The main entrance.

22   Q    Here?

23   A    It's the same, just to one side.

24   Q    And what's it say on the door in the photograph?

25   A    Cesun.

1    Q     What are we looking at here?

2    A     That's where the classrooms were for the children's

3    workshops.

4    Q     Those were the ones you operated?

5    A     Yes.

6    Q     While you were working at Cesun, did you also continue

7    having your private clinical practice?

8    A     Yes, always.

9    Q     Did it change to dealing more with children and

10   adolescents with milder problems or did you continue seeing

11   both children with autism and Down Syndrome as well as children

12   who were having milder difficulties?

13   A     In 2006, my partner and friend married and moved to the

14   state of Toluca, Mexico.  And so I no longer continued working

15   with the special education area because I no longer had a

16   therapist.  So I started work -- I started doing the work of

17   Gestalt psychotherapy.

18   Q     And when you said earlier a therapist who worked for --

19   worked with, you meant a physical therapist?

20   A     A therapist in general, she worked with speech pathology,

21   psychomotor skills and cognitive therapy.

22   Q     And what was your kind of focus?

23   A     With the emotional portion and integrating the child into

24   what would be family and society.  Everything referring to

25   conduct, means of conduct, socialization and how to integrate

Perez-Ceballos - Direct / By Mr. Reynal                    51

1    both facilitating means of communication and general

2    integration specifically with the family nucleus.

3    Q    You haven't worked as a psychologist since 2013?

4    A    No.

5    Q    Do you miss it?

6    A    Very much.

7    Q    Let's talk about your family.  You have daughters?

8    A    Yes, two.

9    Q    When were they born?

10   A    Valeria in 1996 and Tania in 1998.  Thank you.

11   Q    You're married?

12   A    Yes.

13   Q    What's your husband's name?

14   A    Jose Manuel Saiz-Pineda.

15   Q    What do you -- what does everybody call him?

16   A    Pepe.

17   Q    How did you and Pepe meet?

18   A    When I returned from Guadalajara, I went to a high school

19   class reunion party.  He went and that's where we met.

20   Q    What attracted you to him or him to you in the -- at the

21   beginning?

22   A    When we went -- when we met that day and we sat down to

23   talk, it was as though I'd met him before.  There was a lot of

24   chemistry.

25   Q    How long did you-all date?

1   A    Four years.

2   Q    Where did you live during that period?

3   A    At my parents' house.

4   Q    How was Pepe employed at the time?

5   A    He had his accounting office.

6   Q    Do you recall what it was called then?

7   A    I don't think it had a name, Associated Accountants,

8   something like that.

9   Q    Are you a numbers person?

10  A    No.

11  Q    Do you enjoy talking about accounting?

12  A    Never.

13  Q    Now, both your father and your husband are accountants?

14  A    Yes, my sister as well.

15  Q    Does that surprise you?

16  A    No.

17  Q    In what year did you get married?

18  A    1994.

19  Q    Had Pepe been married before?

20  A    Yes.

21  Q    Did he have children from his prior marriage?

22  A    Yes.

23  Q    When you got married, did Pepe insist upon a particular

24  financial designation for your type of matrimony?

25  A    Yes.

Perez-Ceballos - Direct / By Mr. Reynal                53

1   Q    Tell us about that.

2              MS. HAMPTON:  Objection, Your Honor.  That calls for

3   hearsay.

4              THE COURT:  What -- it --

5              MR. REYNAL:  The question --

6              THE COURT:  I guess depending on how she takes the

7   question.  Rephrase it so it can be more specific.

8   BY MR. REYNAL:

9   Q    When you entered into your marriage, did Pepe insist upon

10  and was there a particular sort of legal designation for how

11  your property will be treated?

12  A    Yes.

13  Q    Please explain that to us.

14  A    We were married with separate property.  In Mexico, there

15  are two ways to do that.  You can be married through joint

16  property or through separate property.  Each of us had a

17  profession.  We each made our own money.  So he decided it

18  would fair if we each had our own thing.  So we married through

19  separation property.

20  Q    Now, does that apply to property that comes into the

21  marriage after you're married as well?

22  A    Yes.

23  Q    How did that make you feel?

24  A    In reality, I didn't consider it as anything that was that

25  important.  It didn't -- it wasn't anything that bothered me or

1    Pepe.

2    Q    After you got married, you and Pepe moved in together?

3    A    Yes.

4    Q    From that day forward and with your daughters, was there a

5    particular financial arrangement between the two of you?

6    A    Yes.

7    Q    Tell the members of the jury what the financial

8    arrangement was.

9    A    Financial and professional, I could continue working in my

10   profession with my money as long as the house and the daughters

11   were well cared for.

12   Q    I've heard a story about a pair of pants.  Can you tell us

13   that story?

14   A    He has always been very independent.  So when I would ask

15   him where he was going, why he was late, things that wives

16   sometimes ask, he would say he wore the pants and if I was

17   lacking for nothing, he considered it his right to his time.

18   Q    I want to concentrate during the period between when you

19   got married in 1994 and when Pepe started working on the

20   election campaign in 2006.  Can you describe for us his

21   professional trajectory during that time?

22   A    From before he entered government?  He started with his

23   office when I met him.  He had two or three partners and then

24   he worked in accounting for a long time, mainly tax

25   preparation, some auditing.  He then got his Master's degree in

Perez-Ceballos - Direct / By Mr. Reynal                    55

1   taxation at the Institute for Specialization of Executives.  So

2   this institute was headed by Mr. Carlos Orozco Filgueres, a

3   very illustrious tax specialist in Mexico where he had his

4   office.  So upon completing his Master's, he was invited to

5   form part of what was Orozco Filgueres Garcia Millan and

6   Associates.  The headquarters was in Merida and he, let's say,

7   had a branch in Tabasco and it's my understanding that he had

8   one in Veracruz and -- and -- and I think that's all.

9   Q    At some point, did his firm change names?

10  A    Yes.  When Mr. Carlos Orozco died, it is my understanding

11  that his children retired the franchises.  And he no longer

12  belonged to Orozco Filgueres.  It changed names.  That's all I

13  know.

14  Q    Did you go visit your husband at his offices often?

15  A    Often, no.

16  Q    After the girls were born, how often would you go to his

17  office?

18  A    The building where the offices are located is not a two-

19  story building as is shown in the photograph.  It's actually a

20  three-story building, a large one, and the entire third floor

21  was my in-laws' home.  In fact, that's where he lived his whole

22  life.  When we got married, on Mondays, we ate at my in-laws

23  and at times when we arrived and he was still working, we would

24  go find him so he would come up to eat.  Sometimes -- how many

25  times, I don't know but that was the only reason why at times

Perez-Ceballos - Direct / By Mr. Reynal                56

1    we would go to his office.  So when my in-laws moved to the

2    house that they have -- that they had and the entire building

3    was converted to office space, I don't think I've ever been.

4    Q    What year was that?

5    A    It may have been 2005, 2004 -- 2005, more or less.

6    Q    What happened to your in-laws' house?

7    A    It was converted to office space.

8    Q    No, the one they moved into.

9    A    What happened was my in-laws -- when he was arrested, my

10   in-laws moved to live in Mexico City.

11   Q    They were afraid to stay in Villahermosa?

12   A    Yes.  Their phones were intercepted.  There were people

13   monitoring the door of their home.  Obviously they were scared.

14   Q    In the 2004-2005-2006 period, financially how would you

15   describe your husband's wealth?

16   A    We were, I think, at our professional levels, both of us,

17   we were at our best moment.

18   Q    Did you travel internationally?

19   A    Yes.

20   Q    Did your daughters go to private schools?

21   A    Yes.

22   Q    Did your husband drive a fancy car?

23   A    Yes.

24   Q    Has your husband always been a car fanatic?

25   A    Yes.

Perez-Ceballos - Direct / By Mr. Reynal                    57

1   Q    During that period, was that ever a source of some

2   conflict between the two of you?

3   A    Yes, a strong one.

4   Q    Tell us about that.

5   A    Regarding what specifically?

6   Q    When you were living in an apartment and your husband

7   wanted to buy a Ferrari.

8   A    We lived in an apartment and in the front of the

9   apartment, he had parked a BMW, a Mercedes -- he had just

10  bought himself a Porsche and I told him, how is it possible

11  that we have all these cars parked in front of our apartment

12  and yet we do not have a home?

13  Q    Did you end up getting a home?

14  A    Yes.

15  Q    Please describe your home in Villahermosa for us.

16  A    It's a very pretty house, mostly glass walls.  The upper

17  portion, the bedrooms are divided and they have glass floors.

18  It's a two-story interior that would include a living room, a

19  dining room, a reception area.  There's an indoor garden.

20  There's an office.  There is a kitchen with a breakfast nook

21  and there's a pool with a fountain.  There's a very high wall

22  about as high as a house that is a fountain.  On the second

23  floor, we have four bedrooms including the main bedroom.  The

24  main bedroom has a big bath with hydro massage -- a hydro

25  massage tub, a very wide closet and a TV room.

Perez-Ceballos - Direct / By Mr. Reynal                    58

1    Q    What year did you buy your home?

2    A    We started building it in 2002 -- approximately 2001,

3    2002, more or less -- and we moved between May -- May 2003,

4    approximately.  I'm not really good in general at remembering

5    dates.  I just remember it was May 10th.

6    Q    This was long before your government ever -- your

7    government -- your husband ever went into public service?

8    A    Yes, way long before.

9    Q    Did your husband continue buying cars all the way up 'til

10   the time when he went into public service?

11   A    Yes.

12   Q    Describe for us what it was like being around your

13   husband's cars with the girls.

14   A    We couldn't be around cars because if he even found a

15   little finger somewhere, that was a problem.

16   Q    When he bought the Ferrari, how many times did he let you

17   or the girls ride in it?

18   A    So when he bought it, he obviously invited me to get into

19   the car, but, "Don't touch this.  Get on this way.  Don't

20   scratch that."  And so I said -- never get into the car again.

21   Q    Did he have rules about what could be on the walls inside

22   your house with the girls?

23   A    Yes.  We couldn't hang anything on the walls.  We couldn't

24   stick anything to the walls ever.

25   Q    Any rules about stickers?

1  A    He could not stand anyone placing stickers of any kind on

2  the cars.

3  Q    On any cars or just on his exotic cars?

4  A    The (indisc.) car.  He would see cars like mine, my truck,

5  that said, "I love my cat."  He didn't like that.

6  Q    Now, in fairness, when you lived with him, you didn't have

7  any stickers on your car, did you?

8  A    No.

9  Q    Would you say that he had a very strong, demanding

10 personality?

11 A    He has a very demanding personality.

12 Q    We've seen in evidence a document that was filled out with

13 you and Sonia Fernandez when you moved your money to the United

14 States.  And on it it says, "Estimated net worth, $30 million."

15 When you heard your husband say that, did that number surprise

16 you?

17 A    No.

18         MS. HAMPTON:  Objection, Your Honor.  It calls for

19 facts not in evidence.

20         THE COURT:  I thought it was on one of the exhibits

21 from --

22         MR. REYNAL:  It is.

23         MS. HAMPTON:  He said when she "heard her husband say

24 that."  There's nowhere in evidence that that happened, Your

25 Honor.

Perez-Ceballos - Direct / By Mr. Reynal                60

1          **THE COURT:**  Okay.

2          **MS. HAMPTON:**  And we'd ask --

3          **THE COURT:**  Sustained.

4          **MS. HAMPTON:**  We'd also object to any hearsay he's

5   eliciting.

6       **(Pause)**

7          **MR. REYNAL:**  Do you know what exhibit the HSBC

8   (indisc.)?

9          **MS. HAMPTON:**  Which one?

10         **MR. REYNAL:**  The account opening?

11         **MS. HAMPTON:**  For which account?

12         **MR. REYNAL:**  Her account.

13         **THE COURT:**  Checking, checking, savings, securities.

14         **MR. REYNAL:**  The securities account.

15         **MS. HAMPTON:**  It's Exhibit 10.

16  **BY MR. REYNAL:**

17  Q    I'm going to show you what's in evidence as Exhibit 10.

18  Do you see where it says, "Estimated net worth, $30 million"?

19  A    Yes.

20  Q    Did that number appear there magically?

21  A    Magically, no.

22  Q    Was that a number that was provided to the banker at the

23  meeting?

24  A    Yes.

25  Q    I think you said that that number didn't surprise you?

1    A      No.

2    Q      Why not?

3    A      Because by then, that's more or less the amount that we

4    had, yes.

5    Q      And what was your understanding of the source of that

6    wealth?

7    A      Oh, it was the money that was saved.

8    Q      From whose work?

9    A      Mine.

10   Q      The 30 million?

11   A      Yes.

12   Q      No.  But, the 30 million, was that the estimated net worth

13   of you, yourself, of -- or of you and your husband?

14   A      Mine.

15   Q      I think I'm -- I'm not asking about the money that's in

16   the account.  I'm asking about the estimated net worth

17   statement of the both of you.

18   A      Yes, or more.

19   Q      Okay.  And whose -- who did that come from?  What was your

20   understanding of where that money came from?

21   A      Where from specifically or where we obtained it?

22   Q      Where you obtained your wealth, you and your husband's

23   wealth.

24   A      From our work, of course.

25   Q      Tell us about the time that -- the conversation you had

Perez-Ceballos - Direct / By Mr. Reynal                    62

1   with your husband about when he told you he wanted to go into

2   politics.

3   A    Oh, that was a strong conflict between the two of us.

4   That summer of the elections we had planned to go to Europe.

5   He commented to me that he was going to work for the campaign.

6   That really bothered me and I was not in agreement.  At the

7   end, he did what he already had decided, and I went alone with

8   my daughters to Europe.  When he told me --

9        **INTERPRETER PARADA-VALDES:**  Excuse me.  The

10  interpreter will start again.

11  A    When I returned, he told me that he would form a part of

12  the transition team only.

13       **MS. HAMPTON:**  Your Honor, may we approach?

14       **THE COURT:**  Yes.

15    **(Begin bench conference)**

16       **MS. HAMPTON:**  This counsel is repeatedly soliciting

17  hearsay through the witness' testimony.  I object in that it's

18  hard for me with the translation to try to (indisc.).

19       **THE COURT:**  I know.  I want to jump in because of the

20  translation.

21       **MR. REYNAL:**  Your Honor, these conversations, they

22  are not admitted for the truth; they're admitted to show the

23  relationship, her state of mind, what she did afterwards, why

24  she did --

25       **THE COURT:**  But I think your questions can maybe be

Perez-Ceballos - Direct / By Mr. Reynal                    63

1    phrased better.  There may be some of that that comes in, but

2    there's a lot coming in.

3            **MR. REYNAL:**  Okay.

4            **THE COURT:**  So, sustained.

5            **MR. REYNAL:**  Thank you, Your Honor.

6        **(End bench conference)**

7            **THE COURT:**  Sorry.

8    **BY MR. REYNAL:**

9    Q    Why were you opposed to --

10           **INTERPRETER PARADA-VALDES:**  (Indisc.).

11           **THE COURT:**  Sorry.

12           **INTERPRETER PARADA-VALDES:**  One moment.  (Indisc.)

13           **MR. REYNAL:**  Oh, sorry.

14           **INTERPRETER PARADA-VALDES:**  Thank you.

15       **(Pause)**

16   Q    Why were you opposed to your husband going into government

17   service?

18   A    By that time he was already working a lot and traveling a

19   lot because of the office.  But he was his own boss and he

20   controlled his own time.  So if I told him there was an event

21   at school or we were planning a vacation, he could get himself

22   organized.  I knew that if he entered government, this was

23   going to change.  He would no longer have his time available to

24   him.  And I know a public official is that, and there would

25   always be work.  And I knew that he'd depend on a boss; that he

1  never was accustomed to depending on anyone.

2          **MS. HAMPTON:**  Your Honor, I'd object to any narrative

3  answer.  And there's no question.

4          **THE COURT:**  Okay.  Let her finish the response, just

5  for the record.

6          Are you finished?  The interpreter's finished with

7  the response?

8          **INTERPRETER PARADA-VALDES:**  Yes, Your Honor.  Thank

9  you.

10          **THE COURT:**  Okay.  Yes, sorry.  Yes, sustained.  Try

11  to break that up.

12          **MR. REYNAL:**  Okay.

13  **BY MR. REYNAL:**

14  Q    I heard that there were a number of reasons why you were

15  opposed to your husband going into public service.  Can you

16  tell us one of them?  Just one.

17  A    We were going to stop seeing him.

18  Q    Was there another one or was that the principal one?

19  A    That was the main one.

20  Q    Did your prediction come true?

21  A    Yes.

22  Q    How did your life change when he went into public service?

23  A    A lot.  He was practically out all day, even weekends.

24  Sometimes he would travel to Mexico City on Sunday so he could

25  be there early Monday, or he'd return Friday night or even

Perez-Ceballos - Direct / By Mr. Reynal                    65

1   Saturday.  We practically didn't see him.

2   Q    Did you continue to travel internationally?

3   A    Yes.

4   Q    About how many trips a year would you take?

5   A    Three or four.

6   Q    With the girls?

7   A    Always.

8   Q    About how many of those family vacations would he go with

9   you on?

10  A    He only accompanied us generally for Christmas.

11  Q    Was that difficult for your relationship?

12  A    Oh, it was by then practically more of a living

13  arrangement than a relationship.

14  Q    At some point did your older daughter start going to

15  school in the United States?

16  A    Yes.

17  Q    When was that?

18  A    In 19 -- in 2012.  She came to study for a year to improve

19  her English at a boarding school in St. Johnsbury, Vermont.

20  Q    Did you travel more frequently during that year to go

21  visit her?

22  A    Yes.

23  Q    Did you go on those trips alone?

24  A    Generally, yes.

25  Q    When your husband bought the first apartment in Miami,

Perez-Ceballos - Direct / By Mr. Reynal                66

1   were you surprised?

2   A     No.

3   Q     Why not?

4   A     He had the financial capability to do so.

5   Q     Did you guys -- had you rented an apartment in Miami

6   before then?

7   A     Yes.

8   Q     And we've heard about several apartments during this case.

9   Is there one primarily that -- or, one exclusively that you

10  used in Miami?

11  A     Yes.

12  Q     Can you tell us the address of it or identify it for us?

13  A     I don't know the address exactly, but it was in Sunny

14  Island.  The apartment number, 2708.

15  Q     Were you excited when your husband bought the apartment?

16  A     Yes.

17  Q     And when you were in Miami, is that the apartment you

18  always stayed in?

19  A     Yes.

20  Q     At some point did you become aware that your husband had

21  bought a second apartment in the same building?

22  A     I didn't know he had bought.  He told me he wanted to buy

23  it, yes.

24  Q     And at some point did you go and look at it with him and

25  Mr. Marichal?

Perez-Ceballos - Direct / By Mr. Reynal                67

1   A    Yes.

2   Q    Did you and -- as far as you know, did anybody ever sleep

3   there?

4   A    No.

5   Q    Did you understand it to be an investment property?

6        **INTERPRETER PARADA-VALDES:**  The interpreter needs a

7   repetition.

8        **(Speaks Spanish)**

9   A    Yes.  I knew it was to sell it.

10  Q    At some -- sticking with Miami, did your husband have

11  fancy cars in Miami?

12  A    Yes.

13  Q    Did you go to the place where they were stored ever with

14  him?

15  A    Yes, once.

16  Q    Can you describe what it looked like when you went there?

17  A    The details I don't remember, but it was a warehouse with

18  white walls, and it had approximately between 14, 15 cars,

19  something like that.

20  Q    Did it surprise you that your husband had 14 or 15 cars?

21  A    At that time, no.

22  Q    Before he'd gone into government, did he also have

23  multiple cars?

24  A    Yes.

25  Q    We saw some watches shown.  Did you ever see those watches

Perez-Ceballos - Direct / By Mr. Reynal                68

1   before?

2   A    No.

3   Q    What would you have said to your husband if you'd seen him

4   wearing one of those diamond-y watches?

5   A    I would have told him that that -- that wasn't good.

6   Q    Did you ever see all 32 of your husband's cars with all

7   the flags and stuff behind them?

8   A    No.

9   Q    What would you have said to him if you had seen that?

10  A    He knows that I would have told him that that was not a

11  good thing.  Perhaps that's why he never showed me.

12  Q    At some point did you become aware of some apartments

13  in -- or, an apartment in New York and an apartment in Los

14  Angeles?

15  A    Yes.

16  Q    What was your understanding as to the ownership of those

17  apartments?

18          MS. HAMPTON:  Objection, Your Honor; calls for

19  hearsay.

20          THE COURT:  Sustained.

21  BY MR. REYNAL:

22  Q    Did you ever stay in the New York apartment?

23  A    Yes.

24  Q    How many times?

25  A    Six, seven times perhaps.

1  Q    How about L.A?

2  A    No.

3  Q    The house in -- in Houston, when did you first learn about

4  it?

5  A    That I realized he had already bought it?

6  Q    Well, tell us how you come to go to Houston to look at

7  lots with Mr. Tsokos.

8  A    Yes.  We went to Houston.  We met Mr. Enrique Marichal.

9  We went to look at some sample homes and lots close to my

10  sister's house.

11  Q    Did you --

12        **THE COURT:**  Is that sister or brother?  I'm sorry.

13        **MR. REYNAL:**  You're right, Your Honor.  I think she

14  said "brother."

15  A    Brother.

16  **BY MR. REYNAL:**

17  Q    Which brother is this?

18  A    Celso Jose Perez-Ceballos

19        **MR. REYNAL:**  Thank you, Your Honor.

20  Q    Did you pick the final design for the house?

21  A    No.

22  Q    Who picked it?

23  A    My husband.

24  Q    Did you pick the furniture for the house?

25  A    No.

1  Q     Did anybody ask you your opinion on the furniture for the

2  house?

3  A     No.  He never did that.

4  Q     Why wouldn't he ask you about furniture and decoration for

5  the house?

6  A     One, because he had particular taste in certain types of

7  furniture that were not my style.  I like things that are

8  comfortable and functional.  And if I knew there was furniture

9  that was very expensive or very delicate, I was not going to

10 accept it and I was not going to use it.

11 Q     What -- did an event occur in you and your family's life

12 that taught you the importance of saving money?

13 A     Yes.

14 Q     Can you tell us about that?

15 A     I was at university when one of my brothers, Manuel, had

16 cancer.  He had Edwin's [sic] osteosarcoma in his arm -- one of

17 his arms, and his lungs.  My mom was told in Mexico that if

18 they cut off his arms, he'd have the possibility of living for

19 a few months.  But she did some research, and she came to

20 Houston with him to the Anderson Center.

21        They sold their cars.  They sold whatever they had to

22 sell at the time.  My brother Celso and I started working to

23 cover our personal expenses in Guadalajara, because my brother

24 was here with my -- with my mother living for approximately a

25 year during his treatments, and later, during the follow-up

1    treatment.  And my dad, since that time, has changed his way of

2    seeing things in general.  He has always told us -- well, he

3    used to tell us, "Because if you don't need things, you have no

4    reason to spend, because you never know when you're going to

5    need that."

6    Q    I'd like to fast-forward a little bit to the summer of

7    2012.  Were there elections in Tabasco that year?

8    A    Yes.

9    Q    Actually, before I go there, I just have a couple more --

10            I'm going to hand you what's been marked for

11   identification as Defense Exhibit 1.1.  Do you recognize that

12   photograph?

13   A    Yes.

14   Q    What year approximately were they taken in?

15   A    Between 2010 until 2012.

16            **MR. REYNAL:**  Move to admit, Your Honor.

17            **MS. HAMPTON:**  No objection, Your Honor.

18            **THE COURT:**  They're admitted.

19        **(Defendant's Exhibit Number 1.1 was received in evidence)**

20   BY MR. REYNAL:

21   Q    And when were these pictures taken?

22   A    In Villahermosa.

23   Q    What are we seeing in the first picture?

24   A    It's a Christmas event at Casa Hogar (phonetic) for

25   orphaned children.

1    Q    Was that one of the places where you worked and

2    volunteered during this time?

3    A    Yes.

4    Q    What are we looking at here?

5    A    It's a reception for a fundraising event where there was a

6    conference by a woman who has no arms and who has devoted

7    herself to personal motivation.

8    Q    Who's the little girl standing behind her in the blue

9    dress?

10   A    My daughter, Tania.

11   Q    What photograph are we looking at here?

12   A    That is the first communion of one of the girls at Casa

13   Hogar who was sponsored.

14   Q    Were you her godmother?

15   A    Yes.

16   Q    What are we seeing here?

17   A    That's the reception after the religious ceremony for the

18   first communion, so I'm there with the girl and my daughters.

19   Q    And what are we seeing in this last picture?

20   A    That's the church where first communion took place, and

21   I'm there with my daughters, who accompanied me.

22   Q    Who's the -- the girl in the blue dress is Tania?

23   A    Yes.

24   Q    Who's the girl in the white dress?

25   A    Valeria.

Perez-Ceballos - Direct / By Mr. Reynal                73

1  Q    Going back to Tabasco summer of 2012, were there elections

2  that year?

3  A    Yes.

4  Q    Can you describe the atmosphere during the electoral

5  period, during the campaign?

6  A    It was a very aggressive atmosphere, especially regarding

7  the media, all of the newspapers, there were even ads on the

8  streets, there were billboards referring to corruption and

9  having to do with the previous government.  They explained a

10 lot of things daily, all the time.

11 Q    As the family of a member of the outgoing government, did

12 you feel targeted by the opposition?

13 A    I certainly did.

14 Q    Ultimately, what were the results of the election?

15 A    The opposition party won, the PRD.

16 Q    During the electoral campaign and the transition, where

17 was Pepe?

18 A    Sometimes, there in Tabasco and sometimes, in Mexico City.

19 Q    Did you see him often?

20 A    No, hardly.

21 Q    After the election finished, did Pepe begin spending more

22 and more time in Mexico City?

23 A    Yes.

24 Q    And you were alone in Villa with, at this point, you and

25 Tania?

Perez-Ceballos - Direct / By Mr. Reynal                74

1   A    Alone.  In fact, she had her 15th birthday and he could

2   not attend.

3   Q    When's her birthday?

4   A    In June.  No, she's in May.

5   Q    Who's in June?

6   A    Valeria.

7   Q    Did something else happen in May which caused you to leave

8   Villahermosa?

9   A    Yes, kidnapping of his secretary, and the appearance of

10  money in her home that they said was my husband's.

11  Q    Were you scared when you heard about the kidnapping?

12  A    Yes.

13  Q    Were you scared when you heard that they were accusing

14  your husband of being the owner of the money that was in her

15  home?

16  A    Yes.

17  Q    Did you have a conversation with your husband?

18  A    Regarding?

19  Q    The kidnapping?

20  A    Yes.

21  Q    As a result of that conversation, did you leave Tabasco?

22  A    I didn't want to leave.  He insisted I was in danger.  And

23  my main concern was putting my daughters at risk, which is why

24  I accepted leaving.

25  Q    Do you recall, did you travel directly to Houston or did

1    you go through Mexico City on your way to the United States?

2    A    I went to Mexico City.

3    Q    Did you see your husband?

4    A    Yes.

5    Q    Tell us about the last time you ever saw your husband.

6    A    I went to Mexico City.  He explained --

7              **MS. HAMPTON:**  Your Honor, I object, calls for

8    hearsay.

9              **THE COURT:**  Hold on.  If there's any hearsay,

10   sustained.

11   **BY MR. REYNAL:**

12   Q    Without telling us what he told you during that meeting,

13   can you describe it for us?

14             **MS. HAMPTON:**  I object.  The answer is calling for

15   hearsay.

16             **THE COURT:**  Not at this point.  You want to go ahead

17   and translate.

18             **THE WITNESS:**  It was very sad.  I was afraid and I

19   was afraid that I was not going to see him again.  Especially,

20   he said that his greatest concern was that our daughters and I

21   would be safe.

22   **BY MR. REYNAL:**

23   Q    You went and got Valeria from Vermont after that?

24        **(Answer not translated)**

25   Q    And did Celso --

Perez-Ceballos - Direct / By Mr. Reynal                76

1          **THE INTERPRETER:**  Sir.

2          **MR. REYNAL:**  I'm sorry.

3   A    I traveled to Houston, then to New York, then to

4   Burlington, and I picked up Valeria, who had finished at

5   school.

6   **BY MR. REYNAL:**

7   Q    Did Celso go and get Tania, who had been staying with

8   friends?

9   A    Valeria didn't travel with me because she had final exams,

10  so she stayed at my godmother's house, who is a very close

11  friend of mine, and Celso picked her up at the end of exams so

12  she would not miss the school year.

13  Q    Where did you all go to live at that point?

14  A    To my brother's home, Celso.

15  Q    Is that in Sugar Land, Texas?

16  A    Yes.

17  Q    Describe the living situation after you moved in with your

18  brother in May of 2013.

19          **THE INTERPRETER:**  May the interpreter stop and

20  clarify

21      **(Interpreter clarifies with witness)**

22  A    It was very difficult.  They welcomed us, unconditionally;

23  however, theirs was a small home.  Even so, my sister-in-law

24  gave us my nephew's bedroom.  The three of us managed to

25  accommodate ourselves into two bedrooms.  The truth is, they

Perez-Ceballos - Direct / By Mr. Reynal                 77

1   made us feel very good.  Their behavior was -- their behavior

2   is excellent.  They've been our support these last few years,

3   and considering, we were fine with them.

4   Q    Do you recall where you were when you found out that your

5   husband had been arrested?

6   A    Around those days, we weren't going out much, but my

7   brother insisted that we go to a movie at a plaza.  And while

8   at the plaza, I received a message that he had just been

9   arrested.  That was how I found out.  He was trying to come

10  over here.  I did not know that he was trying to come over

11  here, but he couldn't cross the border and he was arrested.

12  That's what I found out.

13  Q    Has your husband been held in jail in Mexico ever since?

14  A    Yes.

15  Q    Has he been found not guilty of any kind of crime multiple

16  times?

17          **MS. HAMPTON:**  Objection, Your Honor, calls for

18  hearsay.

19          **MR. REYNAL:**  We've had it in evidence, Your Honor.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  Yes.

22  **BY MR. REYNAL:**

23  Q    What's your understanding as to why he gets kept in jail,

24  despite having been founding not guilty?

25          **MS. HAMPTON:**  Objection, Your Honor, calls for

1   speculation.

2              **THE COURT:**  Sustained.

3   **BY MR. REYNAL:**

4   Q    During the months that followed, did you continue to be

5   afraid?

6   A    Yes.

7   Q    Okay.  Were you afraid about what you and your daughters

8   would live on?

9   A    Yes, certainly.

10  Q    Were you afraid about whether you would have to go back to

11  Mexico?

12             **MS. HAMPTON:**  Your Honor, objection, leading.

13             **THE COURT:**  Sustained.

14  Q    Tell us the things you were afraid of.

15  A    I have always feared that my husband has never been able

16  to be found guilty, and that they'd try to pressure him in some

17  way by causing us harm.  They had already done that, and it's

18  possible.

19             **MS. HAMPTON:**  Objection, Your Honor, nonresponsive

20  and it's a narrative answer.

21             **THE COURT:**  Overruled.

22  Q    You can go on.

23  A    It's possible that they do it or that they're doing it.

24             **MR. REYNAL:**  I'm about to go into another area that's

25  going to take a while, Your Honor.  I don't know if you want to

1   take a lunch break.

2           **THE COURT:**  I guess we'll just go ahead and recess,

3   if you all want to return at 1:15.  Please remember your

4   instructions.

5           **THE CLERK:**  All rise for the jury.

6       **(The jury left the courtroom at 11:51 a.m.)**

7           **THE COURT:**  All right, so we're in recess, and

8   Anderson's (phonetic) is going to make some copies of at least

9   the charge that we have to this point you-all can start looking

10  at.  I'm assuming we won't be arguing today, but, you know,

11  we'll just see where it goes.  Because I'm afraid if we get to

12  argument, it will be quite a while and you all need to do it

13  together.

14          I do read the charge before you-all argue.  You know,

15  I don't know, it's possible I might be able to get that done

16  because that might be lengthy, and then we'll just come in the

17  morning.  We'll just play it by ear, see where we're headed and

18  where we're going.

19          **MR. REYNAL:**  Certainly, Your Honor.

20          **THE COURT:**  But if you all want a copy, he's doing

21  that right now.  If you want to wait for that, that's fine.

22          **MR. MUSCHENHEIM:**  Thank you, Your Honor.  I do.

23          **THE COURT:**  Okay.  And just -- we need to be careful

24  with the hearsay.  I know some of it does just kind of go,

25  well, she did X because -- but the way it's being brought in is

1   he said, she said, he said X, Y and Z.  You need to instruct

2   her about that, sir.

3          **MR. REYNAL:**  I will instruct her about that.  The

4   other thing I will bring it up to Your Honor now to avoid

5   objections at the time, obviously, she's charged with lying to

6   Paul Arnold.  I think I should be able to elicit that

7   conversation and every one of its details.

8          **THE COURT:**  Yes, so how are we going to do that?  He

9   came to testify to his version and I'm assuming she's going to

10  testify as to what happened that may involve, well, he said X,

11  Y and Z.  So is that impeach?  I mean, I don't know.  You-all

12  want to address that right now?  What's the Government's

13  objection?

14         **MR. REYNAL**:  If there is one.

15         **MS. HAMPTON:**  I don't think there's an objection,

16  Your Honor.  That's fine.

17         **THE COURT:**  Okay, because I'm assuming she'll get up

18  there and say, you know, he asked me this, I told him this, he

19  said this, okay.

20         **MR. REYNAL:**  That's what we're here to figure out.

21         **THE COURT:**  I know, but it just, I --

22         **THE CLERK:**  All rise.

23         **MR. REYNAL:**  Thank you, Your Honor.

24      **(Recess taken from 11:53 a.m. to 1:11 p.m.)**

25      **(MORNING SESSION CONCLUDED AT 11:53 A.M.)**

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    October 13, 2017

            Signed                                      Dated



*TONI HUDSON, TRANSCRIBER*