UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:17-CR-00245-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| SILVIA BEATRIZ PEREZ-CEBALLOS, | ) | Thursday, October 12, 2017 |
| | ) | |
| Defendant. | ) | (1:11 p.m. to 4:39 p.m.) |
| | | AFTERNOON SESSION |


JURY TRIAL - DAY 8
VOLUME II OF II, PAGES 81 THROUGH 165

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


APPEARANCES:              SEE PAGE 2


Court Recorder:           Genay Rogan

Interpreters:             Judy Hawks / Maria Enriqueta Foraker
                          Lorena Parada-Valdes

Clerk:                    Brandy Cortez

Court Security Officer:   Adrian Perez

Deputy U.S. Marshal:      George Butcher

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

82

**APPEARANCES FOR:**

Plaintiff:                    JULIE HAMPTON, ESQ.
                              JON MUSCHENHEIM, ESQ.
                              U.S. Attorney's Office
                              1000 Louisiana, Suite 2300
                              Houston, TX 77002

Defendant:                    FEDERICO ANDINO REYNAL, ESQ.
                              JOSEPH C. MAGLIOLO, JR., ESQ.
                              Fertitta Reynal
                              808 Travis, Suite 1005
                              Houston, TX 77002

                              SETH H. KRETZER, ESQ.
                              440 Louisiana St., Suite 1440
                              Houston, TX 77002

83

## INDEX

| DEFENSE WITNESS | DIRECT | CROSS |
|-----------------|--------|-------|
| SILVIA BEATRIZ PEREZ-CEBALLOS | 85 | 99 |

1          **Corpus Christi; Thursday, October 12, 2017; 1:11 p.m.**

2                  **(Interpreter Utilized for Translation)**

3                              **(Call to Order)**

4          **(Outside the presence of the jury)**

5                  **THE COURT:**  Is there anything to address, Counsel?

6                  **MR. MUSCHENHEIM:**  Your Honor, I guess Mr. Kretzer's

7     going to file a joint filing on (indisc.), and then a re-joint

8     filing of what --

9                  **THE COURT:**  Great.

10                 **MR. MUSCHENHEIM:**  -- the elements are (indisc.).

11                 **THE COURT:**  Okay.

12                 **MR. KRETZER:**  Would it be more convenient if I e-

13    mailed the Court the Word document to put into the chart or

14    would you prefer that we file it as a PDF form on the ECF

15    system?

16                 **MR. REYNAL:**  Or both?

17                 **MR. KRETZER:**  Or both?

18                 **THE COURT:**  Both is fine.  I would say, for sure send

19    it to the Court as a PDF, but --

20                 **MR. KRETZER:**  Sure.  I'll do that right now.

21                 **MR. REYNAL:**  As a Word document?

22                 **THE COURT:**  Yes.

23                 **MR. KRETZER:**  As a Word document?

24                 **THE COURT:**  Yes.  Yes.

25                 Is the jury ready?  We've got a couple of minutes.  I

1    just didn't know if we needed to address anything.

2         **(Pause)**

3              **THE COURT:**  Okay.  Ms. Perez-Ceballos can have a seat

4    back on the witness stand and we can bring the jury in.

5              **THE MARSHAL:**  All rise for the jury.

6         **(Jurors enter courtroom at 1:14 p.m.)**

7              **THE COURT:**  You can have a seat.  We'll continue with

8    the evidence.

9                         **DIRECT EXAMINATION**

10             **(Interpreter utilized for translation)**

11   **BY MR. REYNAL:**

12   Q    Silvia, when we left off we were discussing your life here

13   in America living with your brother, Celso, in Houston, shortly

14   after your husband's arrest.  How -- how did your daughters

15   adjust to life in the United States?

16   A    At first it was difficult.  They left their home, their

17   friends, their family.  But they're strong, so they adapted

18   well.

19   Q    Did you get them enrolled in school?

20   A    Yes.

21   Q    And at that school, were any of their relatives going to

22   school there as well?

23   A    Yes.

24   Q    Who?

25   A    It was the son of my brother and my brother-in-law's

                    Perez-Ceballos - Direct / By Mr. Reynal                86

1   daughter.

2   Q    During that period, did you have -- without telling us

3   what it was -- did you have much communication with your

4   husband?

5   A    Not much.

6   Q    Were you ever able to speak to him by phone?

7   A    Not that year.

8   Q    And about how often would you have news of him?

9   A    When the attorneys would come, they would keep me abreast

10  of the case.  And when members of the family would come and go,

11  they would bring me letters, and I would also send letters

12  back.

13  Q    Was that something that would happen every month or every

14  few months?

15  A    Not every month, but probably every two or three months.

16  Q    Did you receive a phone call sometime in September from a

17  banker at UBS telling you that your account was going to be

18  closed?

19  A    Yes.

20  Q    Did she explain to you why your account was being closed?

21  A    Yes.

22  Q    What did she say?

23  A    Because it had been her boss or her manager that had been

24  made known of the arrest of my husband, and he had asked me --

25  asked him to close the account.

Perez-Ceballos - Direct / By Mr. Reynal                87

1   Q    I want to talk a little bit about the money that was in

2   that account.

3   A    Uh-huh.

4   Q    Where did that money come from?

5   A    From Mexico.  From my savings account in Mexico.

6   Q    In terms of your financial agreement with your husband,

7   how much money were you -- well, let me ask it this way:  Did

8   your husband provide payment for the bills of the house in

9   Mexico?

10  A    Yes.

11  Q    Did he also pay for the children's schooling?

12  A    Yes.

13  Q    Did he pay for all the, sort of, incidentals of -- of life

14  for the family in Mexico?

15  A    Yes.

16  Q    And so, explain to the jury how you came to have that

17  quantity of money in your account.

18  A    Well, it was because of my work.  And I rarely spent any

19  money.  The expenses that I did have were loans to my brothers.

20  And when my mother lost the ligaments on her knees, I was the

21  one that paid for the surgery -- of both knees.  I did spend

22  some money on some personal things, some knick-knacks that I

23  wanted to buy.  Sometimes I would buy shoes or purses.  But in

24  that aspect, all of these expenses, they were always taken care

25  of by my husband.  And since my husband and I were married, by

1    separation of assets, I had this money because of the fruit of

2    my work and my savings.

3    Q    And did -- was part of having the savings also to give you

4    some security and some independence, were you and your husband

5    to separate?

6    A    Yes.

7    Q    Why -- well, before we get there -- from a financial

8    planning aspect, money management aspect, who helped you deal

9    with the money that you earned?

10   A    My husband.

11   Q    Why did you trust your husband to help you with the

12   financial administration of your money?

13   A    Because he was an expert at that.

14   Q    In addition to the money that you got from work, did you

15   also -- were you also able to save money from your household

16   budget and vacation budgets?

17   A    Yes.

18   Q    Explain to us how that worked.

19   A    Well, he would assign me a certain amount of money per

20   month, and then I was in charge of paying the household

21   expenses, schools, groceries, and some utilities.  And whatever

22   was left over that month, I would put it away.

23   Q    Did you make an effort to try and always have a little bit

24   left over to put away?

25   A    Yes.

1   Q    And was it the same with vacations?

2   A    Yes, the same.

3   Q    When the banker called you up and told you they were

4   closing your husband's account -- or, they were closing your

5   account because your husband's name was on it, how did that

6   make you feel?

7   A    Well, I was scared and it worried me because I didn't know

8   what to do at that time.

9   Q    What options did the banker give you, in terms of getting

10  your money?

11  A    Well, he told me that he needed a bank account so that

12  that money could be deposited there, or he could give me the

13  money in cash and he would give me a check.

14  Q    Why -- why didn't you want the money in cash or in a

15  cashier's check?

16  A    Well, that wasn't an option.  The money had to be in the

17  bank.

18  Q    Was this money that you thought you'd have to rely on

19  maybe for the rest of your life?

20  A    That's the only thing I have.

21  Q    Were you referred by a salesperson at a Chase --

22       **MR. REYNAL:**  Well, withdrawn.

23  Q    Did you have an account at Chase Bank in Sugar Land?

24  A    Yes.

25  Q    Were you referred by a salesperson at that branch to

1   someone else?

2   A    Yes.

3   Q    Who was that person?

4   A    Mr. Paul Arnold.

5   Q    Do you recall going to meet with Paul Arnold?

6   A    Yes.

7   Q    Where was the meeting?

8   A    In the Chase offices in downtown Houston.

9   Q    Can you describe the offices for us?

10  A    Well, it was an old building, a beautiful building.  And

11  we went up I don't know how many flights or how many floors,

12  but we got to some offices that had a reception, and we went

13  there and they had a, sort of a meeting place.  Mr. Paul was

14  the one who greeted us there, my brother and myself.  My

15  brother went with me.

16  Q    Was Mr. Arnold friendly?

17  A    Yes.

18  Q    Did he appear like he wanted your business?

19  A    Yes.

20  Q    Tell the members of the jury, as best you remember, your

21  conversation with Mr. Arnold that day.

22  A    Well, I told him that I wanted to change my bank account

23  that I had at UBS, Miami and Houston, where I was living

24  because at that time I needed it because my children were in

25  school there.

1        **MS. HAMPTON:**  Your Honor, I'm going to object.  It

2   calls for a narrative response to the question.

3        **THE COURT:**  Sustained.

4   **BY MR. REYNAL:**

5   Q    After you told him that you wanted to move your account to

6   Houston, what was his response about whether he could do that

7   or not for you?

8   A    Yes, it could be done.

9   Q    What did he tell you regarding his experience working with

10  Latin American clients and people from Mexico?

11  A    That that's what specifically or especially he did.

12  Q    Did you explain to him that you were a Mexican citizen;

13  and that you had no -- you know, you weren't a taxpayer or a

14  citizen of the United States?

15  A    Yes.

16  Q    And what did he say, in terms of your ability as a

17  foreigner -- and how long had you been gone from Mexico at this

18  point, about?

19  A    I don't recall exactly what we said about that, nor do I

20  recall if he asked me how long I had been out of Mexico.

21  Q    Did he ask you if you were married?

22  A    Yes.

23  Q    What did you tell him?

24  A    I did.  I told him that I was married, but at that moment

25  I was separated.

Perez-Ceballos - Direct / By Mr. Reynal                    92

1   Q    When you said that you were separated, do you mean just

2   that you were physically separated?

3            MS. HAMPTON:  Objection, your Honor; leading.

4            THE COURT:  Sustained.

5   BY MR. REYNAL:

6   Q    What did you mean when you told him that you were

7   separated?

8   A    That we weren't living together.

9   Q    At that point, were you separated more than just

10  physically?

11  A    Yes.

12  Q    At that point, did you know whether your marriage would

13  continue?

14  A    No, I didn't know.

15  Q    Had you seen much of your husband during the previous six

16  years?

17  A    If I had seen what?  Excuse me.

18  Q    Had you seen much of your husband during the five or six

19  years previous to opening this account?

20  A    Oh, no, not much.

21  Q    Do you recall any conversation about you being in

22  politics?

23  A    No.

24  Q    Did he ask you if your husband was in politics?

25  A    No.

1   Q    Did he ask you general questions about your life?

2   A    No.

3   Q    What did he suggest, in terms of what he had to do in

4   order to get the account opened?

5   A    Well, I had to fill in some paperwork.  I had to also give

6   him some documentation -- my passport, my ID.  And that's it.

7   I don't recall anything else.

8   Q    When he asked you for your home address in Mexico, what

9   address did you give him?

10  A    My parents' home.

11  Q    Is that your legal address in Mexico?

12  A    Yes.

13  Q    How long has that been the address on your national

14  identity document?

15  A    My whole life.  It's the one I have always put down,

16  always.

17  Q    After you told him that you were living in Sugar Land with

18  your daughters, did he ask you for a mailing address?

19  A    Yes.

20  Q    What address did you give him?

21  A    The address of my brother's house.

22  Q    Were you living there at the time?

23  A    Yes.

24  Q    Did he suggest -- did you express to him your desire to

25  name your daughters as the beneficiaries of the account that

1  you were creating?

2  A    Yes.

3  Q    What did he tell you about the options, in terms of that,

4  or what he was going to do?

5  A    He suggested that I open a bonds account.  He said that

6  that type of product was conservative; that there was very

7  little loss.  And, of course, I was going to make very little

8  as well, but that was a very good option for me.

9  Q    Are you an expert in how to allocate your wealth,

10  according to different asset classes?

11  A    No.

12  Q    Is that something that Sonia, the banker at HSBC, and

13  later UBS and your husband had done for you?

14  A    Yes.

15  Q    When you went to see Mr. Arnold, did you take him a copy

16  of your last UBS account statement?

17  A    Yes.

18  Q    Why did you bring it with you?

19  A    Because I had no idea of how that account was, so I wanted

20  to show him the way it was so that he would find something that

21  would be similar.

22  Q    Were you trying to open up an account in your name or in

23  both you and your husband's name?

24  A    Only in my name.

25  Q    Aside from your physical and emotional separation from

1  your husband, was there a reason why it was important to you to

2  open up an account in just your name?

3  A    Yes.

4  Q    What was that?

5  A    Because he was exposed, because he was accused, and

6  because he was in prison.

7  Q    Were you worried that the banker wouldn't accept your

8  account if it were in your name and your husband's name?

9            **MS. HAMPTON:**  Objection, your Honor.  Leading.

10           **THE COURT:**  Sustained.

11 **BY MR. REYNAL:**

12 Q    In terms of opening up an account in your name rather than

13 in both your names, what was your thought process?

14 A    Well, first of all, because it had to do with my savings;

15 this is the fruit of my work of all of my life, and if I would

16 ask for that account in both our names, it would be impossible

17 for me to -- for him to be physically there, and also for me,

18 it would be physically impossible to get his signature.  And

19 the reason why I had to change that account was because of him.

20 Q    Did Mr. Arnold ever ask you your husband's name?

21 A    No.

22 Q    If he had asked you, would you have told him?

23 A    Yes, I would have had to have told him.

24 Q    Did you think you were committing a crime by taking your

25 husband's name off the account statement?

Perez-Ceballos - Direct / By Mr. Reynal                96

1   A    No.

2   Q    Eventually was the account opened?

3   A    Yes.

4   Q    Had you explained to Mr. Arnold that you would have to

5   make somewhat regular withdrawals from the account to pay you

6   and your daughters' expenses?

7   A    Yes.

8   Q    At some point, did you attempt to get some money out of

9   the account to pay for you and your daughters' expenses?

10  A    Yes.

11  Q    Were you successful?

12  A    Not immediately as he had told me.

13  Q    Can you explain the difficulties that you had in getting

14  money out of the account?

15  A    Well, supposedly when you request the money, it takes two

16  weeks to get it from the investment account.  But on this

17  occasion, it took longer, approximately -- well, I requested

18  the amount in June and it was until October when that money got

19  to my checking account.

20  Q    So this would have been the following year?

21  A    Yes.

22  Q    In terms of your day-to-day living expenses, did there

23  come a time when you and your daughters just ran out of money?

24  A    Yes.

25  Q    And let me ask you, were you and your daughters careful

Perez-Ceballos - Direct / By Mr. Reynal                    97

1   with your money?

2   A    Yes.

3   Q    Tell us about that.

4   A    Well, we had a budget.  I prepared a fixed budget for

5   expenses, for groceries, school, dancing classes, and gasoline,

6   and they had an allowance of $50 a week.

7   Q    Is one of your -- one of your daughters a very serious

8   dancer?

9   A    Well, yes.  At that time, she was in a team -- a dancing

10  team in which they would compete.  And right now, at the

11  university level, she is taking dance.

12  Q    Did your daughters work also in order to supplement their

13  $50 a week?

14  A    Well, no, they didn't have a fulltime job.  The one that

15  dances, she would help with -- helping in dance classes.  And

16  also a babysitter.

17  Q    Did there come a time when you had some medical expenses?

18  A    Yes.

19  Q    Did you need a surgery?

20  A    One of my daughters and then I as well.

21  Q    Did you have health insurance?

22  A    No, we don't have medical insurance, health insurance.

23  Q    At some point, did you not have the money to pay for the

24  surgery or to pay for your day-to-day living expenses?

25  A    Yes.

1  Q    How did you get money to pay for those things?

2  A    When my daughter needed the surgery, it was an emergency

3  surgery.  She had to have her spleen removed, she had stones.

4  And so, my brother-in-law was the one who helped me with pay

5  for the surgery.

6         And also when I have -- I had difficulty paying my

7  daughters' school, he took care of paying their school.

8         And last year, they detected that I had cancer and I

9  needed surgery, and he, too, took care of that surgery.

10  Q    Did you borrow money from anyone?

11  A    Yes.

12  Q    Who did you borrow money from?

13  A    Principally, my dad.

14  Q    Would he bring you the money in cash?

15  A    Yes.  When he would come from Mexico, he would bring me

16  the cash in dollars.

17  Q    How much money are we talking about at a time?

18  A    Around $8,000, more or less; he would bring me $8,000

19  because he couldn't bring more than $10,000 at one time.

20  Q    Did you deposit that money into your bank account?

21  A    Sometimes, yes.

22  Q    Where are your daughters now?

23  A    Physically at this time?

24  Q    Where are they living these days?

25  A    The oldest lives in San Antonio.  She's studying at the

1   university.  And the youngest lives in New York, and she is

2   also studying there.

3   Q    Do you see one of your daughters in the courtroom?

4   A    Yes.

5   Q    Given everything that's happening, what kind of future do

6   you see for yourself?

7   A    A very complicated future.  Difficult.

8   Q    Thank you.

9         **MR. REYNAL:**  Pass the witness.

10        **MS. HAMPTON:**  May I proceed, your Honor?

11        **THE COURT:**  Yes.

12                    **CROSS EXAMINATION**

13  **BY MS. HAMPTON:**

14  Q    Good afternoon, Ms. Perez-Ceballos.

15  A    Good afternoon.

16  Q    So, from your testimony today, you admit that you gave

17  false documents to Mr. Arnold; is that correct?

18  A    No.

19  Q    The documents that you gave Mr. Arnold regarding your --

20  well, let's just talk about your August 2013 statement.  Do you

21  remember that?

22  A    Yes.

23  Q    You removed your husband's name from that statement before

24  you turned it over to Mr. Arnold; is that right?

25  A    Yes.

1   Q    So, did you -- did you scan the document to a computer?

2   Was it already on a computer?  Did you use a computer to redact

3   the document?  How did that go?

4   A    She sent me the document.  It was a PDF document, and I

5   erased my husband's name.

6   Q    On the computer?

7   A    Yes.

8   Q    And you did it on the August 2013 statement, correct?

9   A    Yes.

10  Q    And you also did that on the October 2013 statement again;

11  is that correct?

12  A    No, I only did it one time.

13  Q    You met with Mr. Arnold in August 2013 the first time,

14  right?

15  A    No.

16  Q    The first time you met with Mr. Arnold, you said you

17  brought your statement with you.  Do you remember saying that?

18  A    Yes.

19  Q    And that was in August of 2013; is that correct?

20  A    No.

21       **MR. REYNAL:**  Your Honor, it misstates the evidence.

22  It was October.

23       **MS. HAMPTON:**  Can we go to Exhibit 38, please?

24  Actually, Exhibit 29.  I'm sorry.  Exhibit 29.  Under "JPMS".

25  No, under -- yes, under that, please.  Page 8.

Perez-Ceballos - Cross / By Ms. Hampton                    101

1    BY MS. HAMPTON:

2    Q    On this Page 8, Ms. Perez-Ceballos, are these your

3    initials?

4    A    Yes.

5    Q    Page 9?  Is this your signature?

6    A    Yes.

7    Q    Page 11.  Is this your signature?

8    A    Yes.

9    Q    Page 16.  Are these your initials?

10   A    Yes.

11   Q    Page 17.  Is this your signature?

12   A    Yes.

13   Q    Page 20.  Are these your initials?

14   A    Yes.

15   Q    Page 22.  Is this your signature?

16   A    Yes.

17   Q    Page 23.  Is this your signature?

18   A    Yes.

19   Q    Page 26.  Is this your signature?

20   A    Yes.

21   Q    Page 27.  Is this your address?

22   A    Which one of the three?

23   Q    "Shipped to Silvia Perez-Ceballos, Celso Perez

24   Ceballos" --

25   A    No.

Perez-Ceballos - Cross / By Ms. Hampton                102

1    Q     "Avenue Universidad Number 252."

2    A     No.  That's the one my brother gave Paul Arnold so that he

3    could get correspondence from Mexico.

4    Q     And that's not -- that wasn't your brother's address

5    either, was it?

6    A     No.

7              MS. HAMPTON:  Page 23, please.  I'm sorry; 33,

8    please.

9    Q     Is this your signature?

10   A     Yes.

11             MS. HAMPTON:  Page 37, please.

12   Q     Do you recognize this document?

13   A     Yes.

14   Q     What is it?

15   A     It's the August statement from UBS.

16   Q     Did you give Mr. Arnold this document?

17   A     Yes, but not in August.

18   Q     Well, you gave it -- when did you give him this one?

19   A     When I went to open the account.

20   Q     So, you gave him two false documents when you opened the

21   account?

22   A     No, only one.

23   Q     Okay.

24             MS. HAMPTON:  Can we go to Exhibit 38?  Under "Scan

25   2," Page 98.

Perez-Ceballos - Cross / By Ms. Hampton                    103

1   Q    What about this document?  Do you remember this one?

2   A    Yes.

3   Q    Did you falsify this document?

4   A    I did omit my husband's name.

5   Q    You redacted your husband's name from this document before

6   you gave it to the bank; isn't that correct?

7   A    Yes.

8   Q    And this is the second document you gave to the bank,

9   correct?

10  A    This was sent in February or March of this year, but it

11  was sent to Arnold, not to the bank.  Not to Chase.

12  Q    You falsified this document and gave it to Mr. Arnold,

13  correct?

14  A    I erased my husband's name, and I gave it to him.  Yes.

15  Q    And after you gave this document and the August 2013

16  document to Mr. Arnold, $1.9 million came into your Chase Bank

17  Savings Account; is that correct?

18  A    If it -- if it got to the Chase account, no.  It got to

19  the investment account.

20  Q    Okay.

21       **MS. HAMPTON:**  Let's go back to Exhibit 29.  Under

22  "Statements."  It's going to be -- go back, I'm sorry; 201406,

23  I believe.  Under the File "201406."  Up one more.  There you

24  go.  Can we go to October of 2013?  Can you go up, please?  Can

25  you go down, please?

Perez-Ceballos - Cross / By Ms. Hampton                    104

1  Q    Okay.  Page 61.  This is your Chase Bank Savings Account.

2  Do you recognize that?

3  A    Yes.

4  Q    Ending in 3395 on the right there.  In your name, correct?

5  A    Yes.

6  Q    And under "Savings Summary," what is the deposits and

7  additions for your Savings Account at Chase Bank?

8  A    One-thousand nine-hundred -- no; $1,970,749.42.

9  Q    So, $1.9 million came into your Chase Savings Account; is

10  that correct?

11  A    Yes.

12  Q    You testified earlier that your -- I think you said your

13  in-laws lived at the Calle Magallanes 1113 address, in the top

14  floor; is that correct?

15  A    I said that they lived there.

16  Q    Yes, in the past.  I think you said -- did you say they

17  left in 2005?

18  A    2005, well, I don't recall exactly, but yes, yes.

19  Q    And you testified on Direct Examination that you have not

20  been back to Calle Sanchez Magallanes 1113 since they went to

21  Mexico City, correct?

22  A    No, they haven't returned to Tabasco.

23  Q    No, that "you".  You haven't gone back to the office since

24  they left.  That's what you testified to; is that correct?

25  A    Not that I hadn't returned but that I hadn't gone down to

EXCEPTIONAL REPORTING SERVICES, INC

1    my husband's office.

2    Q    Which is at Calle Sanchez Magallanes 1113 in Tabasco?

3    A    Yes.

4    Q    So you never went over there after your in-laws left?

5    A    No, not that I can recall.

6         **MS. HAMPTON:**  Can we go to Exhibit 7?

7    Q    And they left in 2005 approximately, right?

8    A    More or less, yes.

9         **MS. HAMPTON:**  Under Application, Page 1, please.

10   Q    Do you recognize this document?

11   A    Yes.

12   Q    On the bottom of the document, what's the date?

13   A    October the 13th of 2009.

14   Q    And in 2009 when you opened your HSBC account --

15        **MS. HAMPTON:**  Can we go back up to the top?

16   Q    -- what did you say under Number 4 for your permanent

17   residential address?

18   A    The address of my husband's business or office.

19        **MS. HAMPTON:**  Can we go to Exhibit Number 10, please?

20   Application, Page 1.

21   Q    What is the date of this document, right up here on the

22   right, top right?

23   A    The month is 08/26 of 2010.

24   Q    And in this application at HSBC --

25        **MS. HAMPTON:**  Can we go down a little bit?

Perez-Ceballos - Cross / By Ms. Hampton                106

1   Q     -- under your address, what did you list as your address

2   here?

3   A     The same, my husband's office.

4   Q     Now, on this account, your husband is added; is that

5   correct?

6   A     Yes.

7   Q     And this was the first time he was added, correct, to your

8   account?

9   A     Yes.

10  Q     And in 2009, your husband wasn't on your account, was he?

11  A     No.

12  Q     Okay.

13        **MS. HAMPTON:**  Can we go to Exhibit 17, please?

14  Application, Page 1.

15  Q     What's the date of this document?

16  A     December the 7th of 2011.

17  Q     So you hadn't even been back to Calles Sanchez Magallanes

18  1113 in about six years at this point; is that right?

19  A     That's correct.

20  Q     And what did you put as your address on here?

21  A     It's the same one, my husband's office.

22        **MS. HAMPTON:**  Can we go to Exhibit 24, please?  Under

23  Account Docs, Page 2.

24  Q     Now, this is your UBS application in 2012.

25        **MS. HAMPTON:**  Can we go down, please?

Perez-Ceballos - Cross / By Ms. Hampton                    107

1   A     Uh-huh.

2         **MS. HAMPTON:**  Go to Page 3, please -- 4.

3   Q     On -- what did you tell UBS in 2012 that your residential

4   address is?

5   A     The same one.

6         **MS. HAMPTON:**  Can we go to Page 29 in the same

7   document, please?

8   Q     On Page 29, what did you tell UBS that your mailing

9   address is right here?

10  A     The same address of my husband's office.

11  Q     And under Beneficial Owner Primary Residential Street

12  Address, what did you tell UBS on the same page that your

13  primary residential address is?

14  A     The same one.

15        **MS. HAMPTON:**  Can we go to Page 36, please?

16  A     Sanchez Magallanes 1113, First Floor.

17  Q     On Page 13 -- 36 -- excuse me -- of the same document for

18  your Foreign Status of Beneficial Owner for U.S. Tax

19  Withholding document, what did you tell UBS in 2012 your

20  permanent residential address was?

21  A     The same one.

22  Q     What -- who lives at the address of Francisco Sarabia

23  Number 224, Department 10 in Tabasco?

24  A     That apartment is my husband's.  We lived there before

25  moving to the house.

Perez-Ceballos - Cross / By Ms. Hampton          108

1   Q    And does Marlis Cupil live there now?

2   A    No.

3   Q    Did she live there while your husband was in office?

4   A    Not that I know of.

5   Q    Did you-all live there while your husband was in office?

6   A    No.  When he was in office, no.

7   Q    And then you've said that your parents' home is the Calle

8   Tres 115 Colonia Rovirosa; is that correct?

9   A    Yes.

10  Q    What is your address in Mexico?

11  A    The address of the house where I live?

12  Q    Yes, ma'am.

13  A    Plutarco Elias Calles 123 Colonia Garcia.

14  Q    Have you ever told any bank that that's your address?

15  A    No.

16  Q    Have you ever told anybody in the U.S. that that's your

17  address?

18  A    No.

19  Q    Instead you've given four other addresses, correct, in

20  Mexico?

21  A    No, only my parents.

22  Q    Well, we've seen some documents today that you're giving

23  this Calles Sanchez Magallanes address, correct?

24  A    Oh, yes, previously, yes.

25  Q    You've given the Rovirosa address of your parents,

Perez-Ceballos - Cross / By Ms. Hampton                       109

1   correct?

2   A    Yes.

3   Q    You've given the Universidad Number 252 address to Paul

4   Arnold, correct?

5   A    No.  We didn't give it to him as our address but as a

6   mailing address.

7   Q    But you didn't give Paul Arnold your Plutarco Elias Calles

8   123 address, right?

9   A    No.

10  Q    And is there -- do you know why your husband on his Public

11  Wealth Declarations listed the Francisco Sarabia address as

12  your only property?

13          **MR. REYNAL:**  Your Honor, objection, calls for --

14          **THE WITNESS:**  No.

15          **MR. REYNAL:**  -- for speculation.

16          **THE COURT:**  Sustained.

17  **BY MS. HAMPTON:**

18  Q    You talked about your home in Villahermosa.  It sounds

19  very nice, glass walls -- did you say a glass floor?

20  A    Yes.

21  Q    Is that the same residence that Mr. Marichal furnished for

22  you-all?

23  A    Yes.

24  Q    What other residences in Mexico did he furnish for you-

25  all?

1   A    None other for us.

2   Q    What about the ones in Cancun?

3   A    I don't know what house in Cancun you're referring to.

4   Q    In this case, there's been some testimony that you've been

5   listening to throughout the week and last week, correct?

6   A    Yes.

7   Q    You know who Martin Medina-Sonda is, correct?

8   A    Yes.

9   Q    He's a close associate of your husband; is that right?

10  A    He was.

11  Q    When did he stop being?

12  A    I don't know exactly.  I stopped hearing from him about

13  ten years ago approximately.

14  Q    Ten years ago?

15  A    More or less.

16  Q    2007?

17  A    I think before.

18  Q    I thought that you were on a company where Mr. Medina-

19  Sonda was involved named Asesoria; is that right?

20  A    I don't know.

21  Q    Do you know -- you know Angel Gonzalez-Monterrubio, right?

22  A    I met him in 2013.

23  Q    Oh, that's the first time you met him?

24  A    Yes.

25  Q    And the first time you met Mr. Angel Gonzalez-Monterrubio,

Perez-Ceballos - Cross / By Ms. Hampton                111

1    you-all went to a meeting with the lawyer together; is that

2    right?

3    A    Correct.

4    Q    And it was after your husband was arrested; is that

5    correct?

6    A    Correct.

7    Q    What about Fernando Latorre? You know him, right?

8    A    Yes.

9    Q    How long have you known him?

10   A    Some eight years, maybe less.

11   Q    Who did you meet first, Mr. Marichal or Mr. Latorre?

12   A    Marichal.

13   Q    When did you meet Mr. Marichal?

14   A    That was when I was looking on Internet for a realtor to

15   lease an apartment in Miami.

16   Q    When did you meet Mr. Marichal?

17   A    I don't recall the exact date.

18   Q    You heard him testify, didn't you?

19   A    Yes.

20   Q    And he said 2006.  Does that sound correct to you?

21   A    It must be, yes.

22   Q    He said that ever since he's known you, he's only known

23   you to be a housewife.  Do you remember him saying that?

24   A    Yes.

25   Q    You never told him about your business?

Perez-Ceballos - Cross / By Ms. Hampton                112

1  A    No.

2  Q    And then Antonio Espinosa, you know who he is, right?

3  A    Yes.

4  Q    He also said -- well, how long have you known him?

5  A    My daughter is 19.  I met him when she was three years

6  old.  It must be 16 years.

7  Q    And you heard Mr. Espinosa say that as long as he's known

8  you, he's only known that you're a housewife.  Do you remember

9  that?

10  A    Yes.

11  Q    You never told him about your business either?

12  A    No.

13  Q    Now, Mr. Espinosa, while your husband was in office, would

14  allow you by yourself to use his airplanes; isn't that right?

15  A    Yes.  To me and my daughters, that is correct, yes.

16  Q    And that started in about 2009 when Mr. Espinosa let you

17  start using his two twin airplanes, right?

18  A    Starting in what year?

19  Q    About 2009.

20  A    Yes, that must be, yes.

21  Q    And Mr. Espinosa worked with your husband while your

22  husband was in public office; isn't that right?

23  A    I don't know.

24  Q    Mr. Espinosa had contracts with the State of Tabasco while

25  your husband was in public office, didn't he?

1   A    I didn't know that but he said it in his testimony, yes.

2   Q    When was the last time you took a plane trip with

3   Mr. Espinosa's airplanes?

4   A    It must have been in 2012 but exactly what date, I can't

5   recall.

6   Q    Would it surprise you if the Government's exhibit that's

7   in evidence -- I think it's 122 -- let me be sure here -- 129

8   shows that it was in December, the end of December, 2012?  Does

9   that sound about right?

10  A    It must be if it's registered like that.

11  Q    And that's the last month that your husband was in public

12  office, right?

13  A    Yes.

14  Q    So those plane rides -- well, strike that.

15       January of 2013 you started taking United; is that

16  correct?

17  A    No.  I had also used it -- them before.

18  Q    In 2013 -- in January of 2013, isn't it true that you

19  began using other commercial airlines like United?

20  A    No, I had used them before in the past.

21  Q    Okay.  You had used commercial before in the past.  But in

22  January of 2013, from that point on, you never used

23  Mr. Espinosa's airplanes again; is that correct?

24  A    That's correct.

25  Q    And in January of 2013, your husband exited public office,

Perez-Ceballos - Cross / By Ms. Hampton                    114

1    right?

2    A     Correct.

3    Q     After you were arrested, didn't you ask your brother to

4    reach out to Mr. Espinosa or Tio Tonio, I think as you call

5    him, and ask him for money?

6    A     No.

7    Q     After you were arrested, isn't it true that Mr. Espinosa

8    gave you $30,000?

9    A     No.

10   Q     Did you hear him testify that that happened?

11   A     He didn't say that and I haven't received any money.

12   Q     Isn't it true that you asked your brother Celso to reach

13   out to Tio Tonio for $30,000 right after you were arrested?

14   A     That's not true.

15   Q     Isn't it true that when you were speaking with Mr. Arnold,

16   he asked you whether you had been -- whether you were an

17   immediate family member or close associate of a current or

18   former politically exposed person?  Didn't he ask you that?

19        **MR. REYNAL:**  Your Honor, objection, it assumes facts

20   not in evidence.

21        **MS. HAMPTON:**  Your Honor, Mr. Arnold testified to

22   that.

23        **MR. REYNAL:**  No, he didn't.

24        **MS. HAMPTON:**  Yes, he did, your Honor.

25        **MR. REYNAL:**  I have the transcript.

Perez-Ceballos - Cross / By Ms. Hampton                    115

 1              **THE COURT:**  Well, the jury will recall the evidence.

 2              **THE WITNESS:**  Could you repeat that question?

 3   **BY MS. HAMPTON:**

 4   Q    Mr. Arnold asked you whether you were a current or former

 5   politically exposed person, didn't he?

 6   A    He asked me at that moment, yes.

 7   Q    And you said, "No," correct?

 8   A    That's correct.

 9   Q    And you had previously had experience with that question,

10   hadn't you?

11   A    No, that I -- not that I recall.

12   Q    You don't remember telling -- having a conversation with

13   Sonia Fernandez both at HSBC and at UBS about whether you were

14   a politically exposed person?

15   A    Directly her with me, no.  Probably she asked my husband.

16   Q    You don't remember the -- well, you first met with Sonia

17   Fernandez without your husband, right, in 2009?

18              **MR. REYNAL:**  Your Honor, objection, that --

19              **THE WITNESS:**  No.

20              **MR. REYNAL:**  -- assumes facts not in evidence.

21              **THE COURT:**  Ms. Hampton?

22              **MS. HAMPTON:**  I'll rephrase the question, your Honor.

23   **BY MS. HAMPTON:**

24   Q    You opened the account in 2009 and your husband wasn't

25   involved, correct?

Perez-Ceballos - Cross / By Ms. Hampton                      116

1  A    I opened the account, yes, in my name but he was the one

2  who told me how to do it.

3  Q    And you knew from those accounts that you opened at HSBC

4  and UBS that when you answer "Yes" to that question regarding

5  being a politically exposed person that there's a lot more

6  documentation involved; isn't that right?

7  A    No --

8            **MR. REYNAL:**  Your Honor, assumes --

9            **THE COURT:**  Hold on.  What's the objection?

10           **MR. REYNAL:**  It assumes, again, facts not in

11 evidence.  She just said it that she never had the

12 conversation.

13           **THE COURT:**  Overruled.

14 **BY MS. HAMPTON:**

15 Q    So regarding the New York property, you stayed there quite

16 often; isn't that correct?

17 A    Not very frequently.

18 Q    So every time you traveled to New York, where would you

19 stay?

20 A    Sometimes in a hotel and sometimes at the apartment.

21 Q    So sometimes even though you owned an apartment in New

22 York, you would choose to stay at a hotel?

23 A    I'm not the owner of any apartment.

24 Q    Who is the owner?

25 A    I suppose my husband.

Perez-Ceballos - Cross / By Ms. Hampton                117

1    Q    So instead of staying at the apartment that your husband

2    is the owner of when you're in New York, you'd stay in a hotel?

3    A    In one occasion we did that.  We went with a friend and

4    the friend was the one who made the reservations.

5    Q    On one occasion?

6    A    Yes.

7    Q    One occasion you stayed in a hotel in New York?

8    A    Yes.

9    Q    And the rest you stayed in the apartment?

10   A    Yes.

11   Q    And when you would go to Miami, you would stay in one of

12   your residences there, correct?

13   A    In an apartment, yes.

14   Q    And you would go there a lot, wouldn't you?

15   A    Yes.

16   Q    You would spend weeks at a time there sometimes, right?

17   A    No more than two weeks.

18   Q    Who was the owner of that apartment?

19   A    I suppose it was my husband.

20   Q    Why do you suppose?

21   A    I've always thought it was his.

22   Q    Okay.  And the other apartment in Miami, who owns that?

23   A    I suppose that he is also.

24   Q    What about when you would travel to Los Angeles?  Where

25   would you stay there?

Perez-Ceballos - Cross / By Ms. Hampton                    118

1   A    In Los Angeles, in hotels.

2   Q    So you did not stay at your apartment in Los Angeles?

3   A    I didn't know that that apartment was his.  Actually I

4   never visited it.

5   Q    You didn't know about the apartment?

6   A    We went one time.  I don't recall what year that was in

7   and we stayed at a hotel adjacent to Century Plaza and that was

8   my daughter's, his son and he told us that he wanted us to

9   accompany him to visit a building of some flyers that Enrique

10  had sent him.  We went to see the building and then we went to

11  see an apartment that I supposed was like sample apartment.

12  Q    So you went with your husband to pick out the property in

13  Los Angeles?

14  A    I don't -- we didn't go to choose the apartment.  We went

15  to see the building and from there on, I don't know what he did

16  with that building.

17  Q    When your husband was looking for property in New York and

18  you-all -- you discussed that with Mr. Marichal, didn't you?

19  A    No, no.

20  Q    Didn't you tell Mr. Marichal that you wanted to live in

21  Trump Tower?

22  A    No.

23  Q    After your husband's arrest, we've seen lots of documents

24  about your purchases.  You've seen those, correct?

25  A    Yes.

Perez-Ceballos - Cross / By Ms. Hampton                    119

1   Q    You stopped traveling after he was arrested, didn't you?

2   A    That year I didn't travel but afterwards I did.

3   Q    So you didn't go back to Miami like you had spent weeks

4   there before?

5   A    No, not to Miami.

6   Q    And you didn't go back to New York like you had done

7   before?

8   A    Yes, to Miami we've been three or four times.

9              **THE COURT:**  I'm sorry.  Go ahead.

10             **INTERPRETER FARAKER:**  I think that was New York.

11             **INTERPRETER HAWKS:**  New York, excuse me.

12  **BY MS. HAMPTON:**

13  Q    You said when you went to Miami and you went to the

14  warehouse with Mr. Latorre that you weren't surprised to see a

15  warehouse full of cars; is that correct?

16  A    That's correct.

17  Q    You knew that your husband had collected many cars and put

18  them in a warehouse in Miami; is that correct?

19  A    Yes.

20  Q    And is it your testimony that at the residence at Jade

21  Ocean that you never knew that -- you never saw those watches

22  that were collected?

23  A    No, I had never seen them.

24  Q    Didn't Mr. Latorre arrange to have some of those watches

25  returned to you for sale?

Perez-Ceballos - Cross / By Ms. Hampton                    120

1    A    No.

2    Q    So you discussed when you were looking at the house in

3    Houston that you didn't get to pick the design for the house,

4    correct?

5    A    Correct.

6    Q    That no one ever asked your opinion, correct?

7    A    Correct.

8    Q    How were your bills paid?

9    A    Enrique Marichal took care of everything.

10   Q    Who else?

11   A    That's it.

12   Q    Now, you've lived your whole life in Tabasco, you said?

13   You grew up there; is that right?

14   A    That's correct.

15   Q    And you testified about when your husband was arrested,

16   the election before that year.  Do you remember that?

17   A    Yes.

18   Q    And the PAN party won over the PRI party which your

19   husband is a member of, correct?

20   A    No.  The party who won was PRD and my husband is part of

21   PRI.

22   Q    All right.  When your husband, you said, was trying -- you

23   knew he was trying to come to the United States when he was

24   eventually arrested, correct?

25   A    Yes.

Perez-Ceballos - Cross / By Ms. Hampton                    121

1   Q    He was arrested on June 8th, 2013, correct?

2   A    I don't recall the date.

3   Q    in June of 2013, the president of Mexico was Enrique Pena

4   Nieto; is that correct?

5   A    Yes.

6   Q    What political party is Mr. Pena Nieto a party of?

7   A    PRI.

8   Q    Okay.  And isn't it true that the federal government of

9   Mexico headed by Mr. Pena Nieto requested that your husband's

10  visa be denied by the United States?

11        MR. REYNAL:  Your Honor, that assumes facts not in

12  evidence.  Calls for speculation.

13        THE COURT:  Sustained.

14  BY MS. HAMPTON:

15  Q    Where were you on May 22nd, 2013 when Marlis Cupil's

16  residence was searched?

17  A    In my house in Villahermosa.

18  Q    And did you hear about it that day?

19  A    Yes.

20        MS. HAMPTON:  May I use this, your Honor.

21        THE COURT:  Yes.

22  Q    This is the name of the business where that money was

23  found; is that correct, Jomali?

24  A    I don't know.

25  Q    You don't know the name of the business?

Perez-Ceballos - Cross / By Ms. Hampton                    122

1   A    No, I don't know.

2   Q    You've never heard your husband discussing this business,

3   that he has any part in it?

4   A    No.

5   Q    So you testified that after you came to the U.S., that you

6   started living at your brother's house on Lytham; is that

7   correct?

8   A    Yes.

9   Q    And your house had been completely finished at the end of

10  2012; is that correct?

11  A    I don't know what time it was finished.

12  Q    The closing happened in December of 2012; is that right?

13  A    I saw it in the documents that you presented.

14  Q    And you testified that it was very difficult to live at

15  Celso's house, correct?

16  A    Yes.

17  Q    It was a small house is what your words were, I believe;

18  is that right?

19  A    Yes.

20  Q    And that they had to accommodate you in one and then two

21  bedrooms; is that right?

22  A    Yes.

23  Q    And you had a house that was completely paid for on

24  Elmhurst; is that correct?

25  A    I didn't know at that time.

Perez-Ceballos - Cross / By Ms. Hampton                    123

1    Q    You were at the closing, weren't you?

2    A    No.

3    Q    You did the final walkthrough for the house when it was

4    completed, didn't you?

5    A    The walkthrough was when the house was turned in and when

6    it had been completed, but that was in August.

7    Q    That house was built for you, wasn't it?

8    A    That I don't know.

9    Q    You don't know if the Elmhurst house was built for you.

10   A    It was built for my husband.

11   Q    I thought you testified that you wanted to be near your

12   brother Celso when you were determining to build this house; is

13   that correct?

14   A    My husband asked me where I would like the house to be and

15   I said that preferably I would like it to be close to my

16   brother, yes.

17   Q    The -- your testimony about when you left Mexico, you came

18   -- the last time you entered the U.S. was May 27, 2013; is that

19   correct?

20   A    Yes.

21   Q    And you haven't been to Mexico since; is that right?

22   A    Yes.

23   Q    When you left Mexico, you testified on direct examination

24   you were very scared for you and your family, correct?

25   A    Yes.

1   Q    But you were so scared, you wanted to come to the U.S. to

2   protect yourself; is that correct?

3   A    Yes.

4   Q    But you left your daughter in Mexico in Villahermosa; is

5   that right?

6   A    Yes.

7        **(Pause)**

8   Q    You also testified on direct that after your husband was

9   arrested, that you were very afraid; is that right?

10  A    Yes.

11  Q    And that you were afraid of what you would live on; is

12  that correct?

13  A    Yes.

14  Q    I thought you testified that you had $30 million and that

15  you told the bank that truthfully.

16  A    No, that wasn't what I said.

17  Q    Your lawyer asked you several times if you had $30 million

18  when you told HSBC that; do you remember that?

19  A    No, how much we had before.

20  Q    And then after your husband was arrested, you had no money

21  to live on; is that correct?

22  A    I didn't say that I didn't have any money to live on.

23  Q    You were afraid you were going to have no money to live

24  on; is that correct?

25  A    Yes.

1   Q    You talked about how you rarely spend any money even

2   before his arrest; is that correct?

3   A    Yes.

4   Q    You're very -- would you call yourself very frugal, you

5   watch your funds very carefully?

6   A    Yes.

7   Q    You don't spend them on frivolous things.

8   A    What kind of frivolous things?

9   Q    Your testimony was that you rarely spent any money, I

10  think is what you said; is that right?

11  A    No.

12  Q    That's not what you said?

13  A    I didn't say that I rarely spent money.  I said that I was

14  careful with how I spent money.

15  Q    Okay.

16      **MS. HAMPTON:**  Can we go to Exhibit 58, please?  I'm

17  sorry, Exhibit 7, not 58.  I apologize.  Under "statements,"

18  page 58.

19  Q    Okay, so this is your HSBC savings account from December

20  28, 2011, to January 27, 2012; do you see that?

21  A    Uh-huh, yes.

22  Q    So this is -- your husband wasn't arrested at this time,

23  correct?

24  A    Correct.

25  Q    And you were careful with what you spent money on,

Perez-Ceballos - Cross / By Ms. Hampton          126

1    correct?

2    A    Yes.

3    Q    Let's look at your expenses for January 3rd, 2012.  It

4    starts mid-page 58, so we have -- I'm going to add these up.

5    Thirty-eight fifty-one Disney Store, correct?

6    A    (No audible response)

7    Q    Is that correct?

8    A    Yes.

9    Q    And 40.66 the same day, correct?

10   A    Yes

11   Q    And 63.60 the same day, correct?

12   A    Yes.

13   Q    Then 71.54, correct?

14   A    Yes.

15   Q    Then 74.41, correct?

16   A    Yes.

17   Q    And $110, correct?

18   A    Yes.

19          MS. HAMPTON:  Let's just keep going down all the way

20   to the next page.

21   Q    Eight hundred dollars at Epicure Market on January 3rd,

22   Sunny Isles Beach; you see that one?

23   A    Yes.

24   Q    Eight hundred and ten dollars at Abercrombie and Fitch on

25   January 3rd; you see that one?

Perez-Ceballos - Cross / By Ms. Hampton                127

1    A    Yes.

2              **MS. HAMPTON:**  Keep going down, please.

3    Q    Eight hundred and sixty dollars in Aventura, Florida; you

4    see that?

5    A    Yes.

6    Q    Sixteen hundred dollars at Morton's in North Miami Beach;

7    do you see that?

8    A    Yes.

9    Q    Twenty-one hundred dollars at a wine store in Miami,

10   Florida; you see that?

11   A    Yes.

12   Q    So I added it up, and on that day you spent $9,300 in one

13   day; does that surprise you?

14   A    Uh-huh (speaks Spanish that is not interpreted)

15   Q    Were you watching your expenses on that day?

16             **MR. REYNAL:**  Your Honor, I think she was giving her

17   answer.

18             **THE COURT:**  You -- she can finish.

19   **BY MS. HAMPTON:**

20   Q    Was that yes?

21   A    Yes, I'm seeing it.

22   Q    And that was being careful with the way you spent money

23   that day.

24   A    Always, yes.

25   Q    So you told Mr. Arnold that you were separated, married

Perez-Ceballos - Cross / By Ms. Hampton                128

1    but separated; is that right?

2    A    Yes.

3    Q    And you meant physically separated; is that your

4    testimony?

5    A    Yes.

6    Q    And then you gave him a document that didn't have your

7    husband's name on it after you told him that, correct?

8    A    Yes.

9    Q    You told your attorney on direct examination, you hadn't

10   seen much of your husband in the last six years at that point,

11   right?

12   A    Yes.

13   Q    So that would be 2007 approximately; is that correct?

14   A    Two thousand and nine to 2012 is when he was absent the

15   most.

16   Q    And you told HSBC you were married when he was absent,

17   correct?

18   A    Yes.

19   Q    You told UBS you were married when he was absent, correct?

20   A    Yes.

21   Q    And you didn't offer any information about your husband to

22   Mr. Arnold when he was asking you those questions, did you?

23   A    He didn't ask me anything else.

24   Q    But you didn't offer it, did you?

25   A    No.

Perez-Ceballos - Cross / By Ms. Hampton                    129

1    Q    You didn't tell Mr. Arnold that UBS was closing your

2    account, did you?

3    A    No.

4    Q    Did you testify that you knew to bring with you when you

5    were meeting with Mr. Arnold your last statement from UBS?

6    A    No, I didn't know.

7    Q    And you testified that you were scared because your

8    husband was, I think your words were, exposed; is that right?

9    A    Yes, in the media, yes.

10   Q    Isn't it true that when your account with your husband was

11   at UBS, that your husband added money to that account?

12   A    No.

13          **MS. HAMPTON:**  Can we go to Exhibit 24, please?  Under

14   "statements," page 24.  Or page 70, I'm sorry, it's Exhibit 24.

15   Can you zoom in, please?

16   Q    So this is your account statement at UBS from September of

17   2012; is that right?

18   A    Yes.

19   Q    And under "deposits" and "other funds credited," do you

20   see your husband's name?  It says "funds" -- "Federal funds

21   deposit by Saiz-Pineda, Jose Manuel."  Do you see that?

22   A    Yes.

23   Q    And it's $19,980; is that correct?

24   A    Yes.

25   Q    So your husband did add money to your UBS account; is that

Perez-Ceballos - Cross / By Ms. Hampton                    130

1    correct?

2    A    I didn't know.  I didn't receive the bank statements.  He

3    was the one who had control of all of that.

4    Q    You testified that this account in your husband and your

5    name at UBS was the fruits of your labor, didn't you?

6    A    Yes.

7    Q    But your husband added money to it, right?

8    A    Well, I'm seeing that he did.

9    Q    You also said that you were very careful with your money;

10   do you remember that?

11   A    Yes.

12   Q    So when your husband was arrested, you opened two other

13   bank accounts besides your JPMorgan Chase savings and checking;

14   is that correct?

15   A    No, I opened them after.  I had to change the account in

16   UBS.

17   Q    You opened a Wells Fargo account; isn't that right?

18   A    Yes.

19   Q    And you opened a Bank of America account; isn't that

20   right?

21   A    Yes.

22   Q    Regarding the Wells Fargo account, you depleted that

23   account in less than a year; isn't that right?

24   A    Yes.

25   Q    You put $50,000 in that Wells Fargo account in October of

Perez-Ceballos - Cross / By Ms. Hampton                    131

1   2013, right?

2   A    Yes.

3   Q    And by August of 2014, it was zero, correct?

4   A    Yes.

5   Q    And you weren't paying your mortgage; you didn't have a

6   mortgage, did you?

7   A    No.

8   Q    That was already paid for, right?

9   A    What had been paid for?

10  Q    Your house.

11  A    I don't know.

12  Q    Did you have a mortgage payment for the house?

13  A    No.

14  Q    Did you pay your utility bills for the house?

15  A    No.

16  Q    Did you pay your cable bill for the house?

17  A    No.

18  Q    Did you pay your yard service for the house?

19  A    Yes.

20  Q    When did you start paying your yard service for the house?

21  A    Since I moved to the house.

22  Q    So you testified that you don't have health insurance,

23  right?

24  A    Yes.

25  Q    You haven't obtained health insurance for your two

EXCEPTIONAL REPORTING SERVICES, INC

Perez-Ceballos - Cross / By Ms. Hampton                    132

1    daughters, correct?

2    A    Yes.

3    Q    But you had electricity in your house, right?

4    A    Yes.

5    Q    You have a house that's worth $1.3 million.

6    A    I don't know.

7    Q    That's completely paid for, correct?

8    A    I don't know.

9    Q    You have flood insurance paid for you every single year,

10   correct?

11   A    I saw in the documents that you presented.

12   Q    You don't pay your flood insurance, do you?

13   A    No.

14   Q    You don't pay your cable bill.

15   A    No.

16   Q    You don't pay your car insurance bill, do you?

17   A    No.

18   Q    You said that Fernando Saiz-Pineda helped you pay for your

19   daughter's school; is that correct?

20   A    Yes.

21   Q    Did he get the money to pay for your daughter's school

22   from Mr. Latorre?

23            **MR. REYNAL:**  Your Honor, calls for speculation.

24            **MS. HAMPTON:**  Your Honor, --

25            **THE COURT:**  If she knows, she can answer.  But do not

EXCEPTIONAL REPORTING SERVICES, INC

Perez-Ceballos - Cross / By Ms. Hampton                    133

1   guess.

2   A    No.

3   Q    Did he get the money to pay for your daughter's school

4   from Inquisitec?

5   A    I don't know.

6   Q    Did he get the money to pay for your daughter's school

7   from Antonio Espinosa?

8   A    I guess.  I was told that he was the one that gave the

9   loan to pay.  My daughters told me.

10  Q    You borrowed money from your dad to make ends meet, right?

11  A    Yes.

12  Q    But you know that you have a house in Houston, right?

13  A    That who has?

14  Q    You do.

15  A    But who knows it?

16  Q    You.

17  A    I have a house where I live but it's not my house.

18  Q    Whose house is it?

19  A    I told you that I suppose it's my husband's.

20  Q    So if it's your husband's house and it's obtained legally,

21  why don't you sell the house to get some money?

22  A    Because it's not under my name and I can't sell it.

23  Q    What about your car, whose name is that under?

24  A    I saw in the receipts but I don't recall which company you

25  said, Minelli (phonetic), Minelo.

Perez-Ceballos - Cross / By Ms. Hampton                  134

1  Q    Do you know how much that car cost to purchase?

2  A    No.

3  Q    What about the BMW for one of your daughters; how much was

4  that?

5  A    I don't know.

6  Q    What about the MINI Cooper for your other child; how much

7  was that?

8  A    I don't know that either.

9  Q    But those are your assets, right?

10  A    Yes, one is under my name, yes.

11  Q    And under your brother's address, correct?

12  A    Yes.

13  Q    And that was in 2016; is that right?

14  A    Yes.

15        **MS. HAMPTON:**  May I have a moment, your Honor?

16        **THE COURT:**  Yes.

17     **(Pause)**

18        **MS. HAMPTON:**  Pass the witness, your Honor.

19        **THE COURT:**  Let's take our afternoon break right

20  there.

21        **THE MARSHAL:**  All rise.

22     **(Jurors exit at 2:52 p.m.)**

23        **THE COURT:**  All right, so you -- she can step down.

24     **(Witness steps down)**

25        We'll probably be wrapping up within the next 30, 45

```
 1    minutes or so.

 2              MR. REYNAL:  Probably sooner.

 3              THE COURT:  Yeah.  And then I guess we recess and

 4    I'll have -- Government needs about an hour and a half for --

 5              MS. HAMPTON:  Your Honor, I'm considering putting on

 6    a rebuttal witness.

 7              THE COURT:  Okay, do you know how long?  I'm just

 8    trying to figure out --

 9              MS. HAMPTON:  Can I talk it through with -- I'm not

10    sure what we should do at this point.

11              THE COURT:  Yeah.  I just don't know once I tell the

12    jury -- well, I guess you could present -- will they be ready

13    to go today?

14              MS. HAMPTON:  Yes, and it won't take very long.  It

15    would take --

16              THE COURT:  Okay.

17              MS. HAMPTON:  -- probably 20 minutes or less.

18              THE COURT:  So if they rest, you'll be ready to go --

19              MS. HAMPTON:  Yes, your Honor.

20              THE COURT:  -- with your -- I'm just trying to get a

21    gauge before we finish with the evidence what we're doing.  So

22    maybe at the end of 15 minutes --

23              MS. HAMPTON:  Thank you.

24              THE COURT:  -- we rehash --

25              MS. HAMPTON:  Yes, your Honor.
```

1          **(Recess taken from 2:53 p.m. to 3:13 p.m.)**

2          **(Outside the presence of the jury)**

3                  **THE COURT:**  Okay, so you're going to redirect your

4     client, I'm assuming.

5                  **MR. REYNAL:**  I -- we're done.

6                  **THE COURT:**  Okay.  So she will be getting off the

7     stand.  And then is the Government, you're going to call a

8     rebuttal?

9                  **MS. HAMPTON:**  No, you're -- no, your Honor.

10                 **THE COURT:**  So both sides rest and close.

11                 **MS. HAMPTON:**  Yes, your Honor.

12                 **THE COURT:**  Is the Government needing about an hour

13    and a half for closing?

14                 **MR. REYNAL:**  Oh, I'm sorry, I think we need to renew

15    our --

16                 **MR. KRETZER:**  We need to renew our Rule 29, motion,

17    Judge, out of an abundance of caution.  We don't -- we want to

18    (indisc.)

19                 **MR. MUSCHENHEIM:**  And we have the same response, your

20    Honor.

21                 **THE COURT:**  Okay, so it's denied.

22                 **MR. KRETZER:**  Okay, thank you.

23                 **THE COURT:**  About an hour and a half --

24                 **MS. HAMPTON:**  Yes, your Honor.

25                 **THE COURT:**  -- for closing.  So then at this point I

1   think we bring them back in the morning so we can -- okay, so

2   you all will break, we'll recess, and I'll tell them to come

3   back in the morning for instructions, closing arguments, and

4   deliberations.

5           **MR. REYNAL:**  So when they come back in, I'll rest and

6   then we'll do that?

7           **THE COURT:**  Yes.  Okay, if they're ready, we're

8   ready.  I guess -- hold on, she should -- probably should get

9   back on the stand.

10      **(Witness retakes the stand)**

11      **(Pause)**

12          **THE MARSHAL:**  All rise for the jury.

13      **(Jurors enter at 3:16 p.m.)**

14          **THE COURT:**  All right, you can have a seat.  The

15  Government had passed the witness.  Anything further from the

16  defense?

17          **MR. REYNAL:**  I have no further questions for

18  Ms. Ceballos, your Honor.

19          **THE COURT:**  Okay, thank you, ma'am, you can step

20  down.

21      **(Witness steps down)**

22          Anything further from the defense?

23          **MR. REYNAL:**  Your Honor, Members of the Jury, the

24  defense rests.

25          **THE COURT:**  Anything further from the Government?

1          **MS. HAMPTON:**  The Government rests and closes, your

2     Honor.

3          **THE COURT:**  Okay, so both sides rest and close.

4     Ladies and gentlemen, you've heard all the evidence that's

5     going to be presented in this case.  I need to visit with the

6     lawyers to finalize the instructions that will be given to you.

7     And the closing statements, or arguments, will be a little bit

8     extensive.  So we are going to recess at this time.  I ask you

9     to remember your instructions:  not to discuss the case with

10    anyone at all, don't get any information regarding the case

11    outside the courtroom.  When you return tomorrow, I'll have you

12    return at 8:45.  I will read you the instructions, the final

13    instructions.  You'll have a copy of the instructions because

14    they'll be quite lengthy.  I'm required to read those to you.

15    Then the attorneys will make their closing arguments.  That

16    probably take us close to the lunch hour.  And we'll either

17    recess, or in the morning we can discuss whether we can bring

18    lunch in.  And then you will deliberate, okay?  So that's our

19    plan for tomorrow.  Thank you very much.  I know it's been a

20    long two weeks and we appreciate your time and attention.

21         **THE MARSHAL:**  All rise for the jury.

22         **(Jurors exit at 3:17 p.m.)**

23         **THE COURT:**  Okay, let's hash out -- we've got a

24    couple of hours to finalize the charge.  I think we're working

25    off a -- Denise gave you all a new charge, right?  The only

1    thing I had done on that one was on accomplice, I had taken off

2    the title where it also said like immunity or -- I had taken

3    that off and then we just brought in the PDF.

4              **MR. KRETZER:**  Right.

5              **MR. MUSCHENHEIM:**  (indisc.) objection, that's fine.

6              **THE COURT:**  Okay.

7              **MR. KRETZER:**  We do have some issues, Judge.

8              **THE COURT:**  Okay.

9              **MR. KRETZER:**  And I've discussed these with opposing

10   counsel --

11             **THE COURT:**  Okay.

12             **MR. KRETZER:**  -- so he's, you know, obviously had a

13   chance to consider them as well.  Basically our objection's

14   trained, Judge, on page nine of the most recent draft, the one

15   that says:  "Count One, Conspiracy to Launder" and so forth at

16   the very top in bold heading.

17             **THE COURT:**  Okay.

18             **MR. KRETZER:**  And our first argument is really in

19   this first paragraph.  It is omitting at least two -- and the

20   second full paragraph.  The first paragraph is its own

21   sentence.

22             **THE COURT:**  Okay.

23             **MR. KRETZER:**  The first full paragraph, the one

24   beginning "Title 18" and then going (a)(2)(B), --

25             **THE COURT:**  Yes.

1          **MR. KRETZER:**  -- that sentence there.  The first,

2     Judge, this paragraph is -- I compared it word-for-word to that

3     which was given in *Cessa*.  There --

4          **THE COURT:**  Okay.

5          **MR. KRETZER:**  -- of course (indisc.) appealed that

6     aspect of that charge.  The first problem is that it omits the

7     words at the very end after comma, "or control of the

8     proceeds."  It needs to say "of specified unlawful activity."

9     It's just not proceeds of anything --

10         **THE COURT:**  Okay.

11         **MR. KRETZER:**  (indisc.)

12         **THE COURT:**  That is set forth in the elements, right?

13         **MR. KRETZER:**  Yes.

14         **MR. MUSCHENHEIM:**  Yes, your Honor.

15         **THE COURT:**  But you want it there and --

16         **MR. KRETZER:**  Right, it needs to be there as well.

17         **THE COURT:**  Okay, let's go one at a time, that way --

18         **MR. MUSCHENHEIM:**  Sure, I --

19         **THE COURT:**  -- we know it gets agreed to or no.

20         **MR. MUSCHENHEIM:**  -- apologize, yes.

21         **THE COURT:**  Or control of the proceeds of the

22     unlawful --

23         **MR. KRETZER:**  Specified unlawful activity.

24         **THE COURT:**  -- specified unlawful activity.

25         **MR. KRETZER:**  Yes.

1          **MR. MUSCHENHEIM:**  I don't mind adding that phrase.

2          **THE COURT:**  Okay.

3          **MR. KRETZER:**  Okay.  Similarly, before, in the

4    clause, the third line of that paragraph:  "Proceeds of

5    unlawful activity."

6          **THE COURT:**  Okay, same paragraph.

7          **MR. KRETZER:**  Same paragraph.

8          **THE COURT:**  Third line.

9          **MR. KRETZER:**  Just before the words --

10         **THE COURT:**  Okay.

11         **MR. KRETZER:**  -- "unlawful," that needs to have the

12   three-word phrase "some form of" because it's not just any

13   unlawful activity, it has to be some form of unlawful activity.

14         **THE COURT:**  That the person knows represents --

15         **MR. KRETZER:**  Some form of unlawful activity, those

16   three words need to be before the word "unlawful."

17         **THE COURT:**  Some -- what did you say?

18         **MR. MUSCHENHEIM:**  No objection to that, your Honor.

19         **THE COURT:**  Okay.

20         **MR. MUSCHENHEIM:**  I mean, it's from the form book I

21   think.

22         **THE COURT:**  Well, I thought we pulled it straight

23   from --

24         **MR. MUSCHENHEIM:**  I thought so, too.

25         **THE COURT:**  -- the questions but we may have missed

1    some words.  So some form of.

2         MR. KRETZER:  Yes, before the word "unlawful."  And I

3    apologize, I'm speaking too quickly again.  Some form of --

4         THE COURT:  No, I'm just --

5         MR. KRETZER:  Okay.

6         THE COURT:  -- I'm trying to do like --

7         MR. KRETZER:  I understand.

8         THE COURT:  -- ten things at one --

9         MR. KRETZER:  I know, your Honor.

10         THE COURT:  -- time as I usually do.

11         MR. KRETZER:  Oh, yes.

12         THE COURT:  But that's it.  So --

13         MR. KRETZER:  Some form of --

14         THE COURT:  Okay.

15         MR. KRETZER:  -- before the word "unlawful."  And I

16    understand the prosecutor is now unopposed.  And then --

17         THE COURT:  Okay.

18         MR. KRETZER:  -- the very end of that paragraph,

19    after the word "proceeds," it will now say "of specified

20    unlawful activity."

21         THE COURT:  Right, which we already talked about,

22    right?

23         MR. KRETZER: Okay, so just wanted --

24         THE COURT:  Nothing new.

25         MR. KRETZER:  -- to make sure (indisc.) you had

1    addressed those two.  The next issue on that page, your Honor,

2    is on --

3              **THE COURT:**  Wait, what did you say?  Or control of

4    the proceeds of the SUA, right?

5              **MR. KRETZER:**  Right, of -- right, of --

6              **THE COURT:**  Yes, okay.

7              **MR. KRETZER:**  -- the specified unlawful activities,

8    yes.

9              **THE COURT:**  You didn't add any words, okay.

10             **MR. KRETZER:**  That's right.  Well, you are adding --

11             **THE COURT:**  I mean you didn't add any words to what

12   you had already --

13             **MR. KRETZER:**  No, no.

14             **THE COURT:**  -- added.

15             **MR. KRETZER:**  I had not added any new words to what I

16   had added before, but you are adding those four, if I count

17   correctly, four words to the end of that paragraph.  Okay, our

18   next issue, your Honor, is on where it says "third" on that

19   same page.

20             **THE COURT:**  Okay.

21             **MR. KRETZER:**  That of course would be the third

22   element.  And this reflects the way that the Government charged

23   in this case, where it's not, you know, I guess in a

24   conventional situation.  It could say "some form of unlawful

25   activity."  But what the Government did here on page two of the

1    indictment, they then put a comma and the words "to-wit" and a

2    colon, and they reiterated their four specified unlawful

3    activities.   In other words, to be clear, in the indictment on

4    page one, the four specified unlawful activities are laid out,

5    and then the Government chose to reiterate them on page two,

6    confining that which they could, you know, prove any other

7    charge we would argue would be a constructive amendment or

8    variance.   They chose to reiterate the four specified unlawful

9    activities and that necessarily must be reflected in the

10   charge.   So we would ask the Court after the words -- and this

11   is where it says "third," of course -- "some form of unlawful

12   activity" semicolon, then to simply quote word-for-word that

13   which is on page two of the indictment, to-wit, and then of

14   course it lists the four SUAs.

15          **THE COURT:**  Okay.

16          **MR. MUSCHENHEIM:**  And we would object to that, your

17   Honor, for this reason.   It's covered in paragraph four anyway.

18   It's simply repeating it and it's already in the fourth

19   paragraph.   And --

20          **THE COURT:**  Okay.

21          **MR. MUSCHENHEIM:**  -- this Defendant must simply know

22   that it was some form of unlawful activity.   I believe they're

23   trying to overstate our burden by this change.

24          **MR. KRETZER:**  I don't -- may I respond, Judge?

25          **THE COURT:**  Yes.

1          **MR. KRETZER:**  Sure.  Well, there's two things.

2  First, I mean, this is how they chose to plead the indictment

3  so, you know, they drove -- you know, formed it beginning.

4  They also, if I recall, in the opening said that they were

5  going to advance a theory that these were the proceeds of tax

6  fraud, which of course is not an SUA under the money laundering

7  statute to begin with.  But if they were to advance that

8  argument in closing, that of course would be yet another

9  variance from -- or constructive amendment of the proof versus

10  that which they have pleaded.  It shows why -- a concrete

11  example of why this is so important.

12          **THE COURT:**  Okay.  Mr. Muschenheim?

13          **MR. MUSCHENHEIM:**  Your Honor, I disagree completely.

14  I think it's splitting hairs here.  We've had -- the Defendant

15  must simply know that it's some form of unlawful activity.  And

16  he's making up the overall goals of the conspiracy with the

17  charge that it is really about -- this is not a -- she only has

18  to know it's dirty money.  I mean, I think they're mixing up

19  what's required here.

20          **MR. KRETZER:**  May I respond, Judge?

21          **THE COURT:**  Yes.

22          **MR. KRETZER:**  Mr. Muschenheim, you say splitting

23  hairs, that's largely what the charge -- you know, charges are.

24  I am simply reading back to them the very word-for-word, a

25  direct quote, from the indictment that they presented to the

1     Grand Jury and chose to proceed on.  Maybe they could have

2     charged it some different way.  The indictment that is -- our

3     client is charged with and to which she is to be considered by

4     the jury, very clearly specifies these four SUAs.  So it's our

5     position they need to be included again in that third element.

6     That's simply how they chose to plead the case.  In other

7     words, because we prepared for trial based to defend against

8     the factual theories set out in the indictment, if they -- we

9     don't have this qualification and they start talking about some

10    other form of criminal conduct which they think might, you

11    know, make -- put the ball through the net, like tax fraud,

12    then we're necessarily in an indictment -- in an amendment,

13    constructive amendment variant situation.  They chose to plead

14    their case a certain way.

15            **THE COURT:**  I don't think -- the Government should

16    not be arguing that we're adding tax fraud, right?

17            **MR. KRETZER:**  Is that --

18            **MR. MUSCHENHEIM:**  We're not asking --

19            **THE COURT:**  Yeah.

20            **MR. MUSCHENHEIM:**  -- for task fraud.  And it is --

21            **THE COURT:**  And should not be arguing --

22            **MR. MUSCHENHEIM:**  And --

23            **THE COURT:**  -- that that's one of the specified

24    unlawful --

25            **MR. MUSCHENHEIM:**  No, we -- so that's -- but that's

1   for tomorrow.  For today, we simply gave notice of what the

2   specified unlawful activities are that generated the funds --

3           **MR. KRETZER:**  Yes, sir, it's on page two, see?

4           **MR. MUSCHENHEIM:**  -- and -- may I finish?

5           **MR. KRETZER:**  Yes, go ahead.

6           **MR. MUSCHENHEIM:**  Thank you.  The -- to say that that

7   means that this Defendant must know that this particular SUA,

8   other than is listed in paragraph four of the Court's proposed

9   charge, is -- I mean, this Defendant just needs to know it's

10  dirty money, your Honor, it's -- that the international -- we

11  have to prove that the money came from the SUAs we allege.  We

12  accept that burden.

13          **THE COURT:**  The Court's going to deny the Defendant's

14  request there.  And we will need to do a formal charge --

15          **MR. KRETZER:**  Sure.

16          **THE COURT:**  -- conference.  I'm still kind of doing

17  just --

18          **MR. KRETZER:**  I understand.

19          **THE COURT:**  -- informal until I can --

20          **MR. MUSCHENHEIM:**  That's fine.

21          **THE COURT:**  -- get you all clean copies.

22          **MR. MUSCHENHEIM:**  Thank you, your Honor.

23          **THE COURT:**  So you'll need to make --

24          **MR. KRETZER:**  A formal objection at the time.

25          **THE COURT:**  -- or you can refer to your --

1          **MR. KRETZER:**  Yes, and we'll make fresh objections --

2          **THE COURT:**  Yeah.

3          **MR. KRETZER:**  -- to make sure everything is in the

4    record.

5          **THE COURT:**  Okay.  Now, there's one thing.  I think

6    we had switched when we list the specified unlawful activities,

7    the indictment has "and" and we had changed to "or," but I

8    guess we need to change that to track the indictment "and

9    unlicensed money transmitting" --

10          **MR. KRETZER:**  And what page are you looking at?

11          **THE COURT:**  -- "business."  I'm just looking at page

12    ten at the top.

13          **(Mr. Magliolo/Mr. Kretzer confer)**

14          **THE COURT:**  You see where -- it's just the "and" or

15    "or" thing --

16          **MR. KRETZER:**  Okay.

17          **THE COURT:**  -- and I think we switched it.  The

18    indictment says "and unlicensed money transmitting business."

19    We had changed -- I think we had changed it to "or" but I guess

20    we should track the indictment, say "and."

21          **MR. MUSCHENHEIM:**  I think that's one of those --

22          **THE COURT:**  Do you know what I'm talking about?

23          **MR. MUSCHENHEIM:**  -- leaving the conjunctive charge

24    in the disjunctive rules.

25          **THE COURT:**  Yes, yes.

1           **MR. MUSCHENHEIM:**  And I will confess I got them mixed

2   up when counsel was talking to me about them so --

3           **THE COURT:**  Yeah, I'm just saying -- I'm probably --

4   I'm going to go back and put "and" there.

5           **MR. MUSCHENHEIM:**  Yes, your Honor.

6           **THE COURT:**  Right?  That's the way it's --

7           **MR. KRETZER:**  Yes.

8           **THE COURT:**  -- in the indictment.  Do you know what

9   I'm talking about?  The top of page ten, the benefit of the

10  public official --

11          **MR. MUSCHENHEIM:**  I understand what the Court's

12  saying.

13          **MR. KRETZER:**  Yes, I understand.

14          **THE COURT:**  Yeah.

15          **MR. MUSCHENHEIM:**  But I think it should be "or."

16          **THE COURT:**  Well, I do too and that's why we did

17  that.  I mean, do you all want to comment on that?  It's just

18  generally you see "and" because of the disjunctive/conjunctive

19  rules, --

20          **MR. MUSCHENHEIM:**  Right.

21          **THE COURT:**  -- whatever it may be.

22          **MR. MUSCHENHEIM:**  Right.

23          **THE COURT:**  But --

24          **MR. MUSCHENHEIM:**  I think it should be "or."

25          **THE COURT:**  Do you want --

1          **MR. KRETZER:**  Let me do some looking on that and I'll

2   get you an official --

3          **MR. MUSCHENHEIM:**  That one won't take long.

4          **THE COURT:**  Official response?

5          **MR. KRETZER:**  Yes, an official response.

6          **THE COURT:**  Okay, so, all right, then the defense?

7          **MR. KRETZER:**  On page seven, Judge, where it says

8   "first," I don't mean to be splitting hairs here, but the way

9   it reads is either, one, a money laundering offense or, two, a

10  bank fraud offense as charged in the indictment.  Just to be

11  clear, I think it should say a money laundering offense as

12  charged in the indictment, or a bank fraud offense as charged

13  in the indictment, lest they think it could be some other money

14  laundering --

15         **THE COURT:**  Okay.

16         **MR. KRETZER:**  -- offense, the distinction between --

17         **MR. MUSCHENHEIM:**  That's fine, your Honor.

18         **MR. KRETZER:**  -- the second one being so qualified.

19         **THE COURT:**  So money laundering offenses charged in

20  the indictment, okay.

21         **MR. KRETZER:**  Say the same thing twice.

22         **THE COURT:**  Yes.  Okay.

23     **(Mr. Magliolo/Mr. Kretzer confer)**

24         **MR. KRETZER:**  Yes, Judge, and I understand your

25  ruling from before, but just obviously I know we're going to

```
1   have an official --

2            THE COURT:  Yes.

3            MR. KRETZER:  -- charge conference and we'll get all

4   of our objections on the record.  But, of course, we would have

5   the same constructive amendment variance issue we argued a

6   second ago also with regard to the third element there on page

7   11.  So just know that we're going to have that same issue

8   reiterated; although I --

9            THE COURT:  Okay.

10           MR. KRETZER:  -- understand your ruling.

11           MR. MUSCHENHEIM:  Right.

12       (Mr. Magliolo/Mr. Kretzer confer)

13           MR. KRETZER:  And then, Judge, on page 11, with --

14   the paragraph that says:  "With respect to the second

15   element" --

16           THE COURT:  Yes.

17           MR. KRETZER:  -- that would now have to say "with

18   respect to the second and third elements" or "second element

19   and third element," either one.

20           MR. MUSCHENHEIM:  Yeah, we disagree with that, your

21   Honor.

22           THE COURT:  Let's see, what's the pattern charge say?

23   Yeah, I'm going with the pattern jury instructions.  The Court

24   will deny that.

25           MR. KRETZER:  Okay.
```

1           **THE COURT:**  And what else?

2           **MR. KRETZER:**  I think those are all of our

3  objections, your Honor.

4           **THE COURT:**  Okay.

5           **MR. MUSCHENHEIM:**  Now, I just want to say on the

6  record that Mr. Kretzer and I did a great job working through

7  the SUA.  And he did all the hard work and I kept making a

8  mistake.  He did a --

9           **THE COURT:**  No --

10          **MR. MUSCHENHEIM:**  -- fantastic job on that.

11          **THE COURT:**  And --

12          **MR. KRETZER:**  Oh, well, thank you.

13          **THE COURT:**  -- Anderson (phonetic) and I appreciate

14  it very much, all the work you put into it.  Now, let's look at

15  the verdict form very quickly.

16          **MR. KRETZER:**  Yes, we have --

17          **THE COURT:**  Same thing, you need to make a decision

18  on that because we changed that to "or" and --

19          **MR. KRETZER:**  Okay.

20          **THE COURT:**  -- you need to let us know --

21          **MR. KRETZER:**  Sure.  I'll let you know --

22          **THE COURT:**  -- on the "and."

23          **MR. KRETZER:**  -- on that, Judge; although, I think

24  our larger area of disagreement on the verdict form was earlier

25  this morning we got a copy of that which had been used in the

1    *Cessa* case, and what the judge did there was basically had a

2    question for -- it was, first, you know, do you find the

3    defendant guilty of conspiracy?  If no, then obviously it's the

4    end of the -- you all go home.  If yes, then he asked a

5    specific question for each SUA.  And the jury for each

6    defendant varyingly answered "yes" or "no."  So in that way the

7    Court would know that the jury did -- the issue somewhat some

8    more of what we talked about this morning, that they did reach

9    agreement as to some SUA.  And we would argue that that's the

10   same approach that should happen here.  So the jury form should

11   have a special question for each -- in the *Cessa*'s case, they

12   had three SUAs.  Obviously here we have four SUAs.  But you

13   should ask -- include a "yes" or "no" question for each of

14   those SUAs.

15           **THE COURT:**  So this is not the *Cessa* form?  I

16   thought --

17           **MR. MUSCHENHEIM:**  This is *Cessa* Two.

18           **MR. KRETZER:**  Two.

19           **MR. MUSCHENHEIM:**  This is *Cessa* Two.

20           **THE COURT:**  Not *Cessa* One?

21           **MR. KRETZER:**  Right.

22           **THE COURT:**  In *Cessa* Two, they already learned from

23   *Cessa* One.

24           **MR. KRETZER:**  Well, they weren't reversed on that

25   issue, though.  *Cessa* One, one fellow was acquitted because the

```
 1  evidence was insufficient.  The other one was reversed on a
 2  comingling instruction.  I don't think anybody appealed based
 3  on the jury verdict form.
 4           MR. MUSCHENHEIM:  And, your Honor, my response is
 5  that -- and I looked at what counsel provided me from Westlaw
 6  on the Cessa One charge and I didn't see --
 7           THE COURT:  Do you have it?  Can I see it?
 8           MR. KRETZER:  Yes, I'll --
 9           THE COURT:  Go ahead, Mr. Muschenheim.
10           MR. MUSCHENHEIM:  Well, I'm going to wait for him to
11  bring it up because I don't want to misspeak because we were
12  looking at quite a few documents this morning.
13           MR. KRETZER:  Yes, and, your Honor, let me email it
14  to Mr. Perez right here.
15           THE COURT:  But that's what I was asking this
16  morning, remember?  Do we have the Cessa verdict forms?
17           MR. KRETZER:  I think the prosecutor said he got it
18  from a friend of his.  That's the one that's under seal.
19           MR. MUSCHENHEIM:  Cessa Two, I did get -- you asked
20  for Cessa Two, the second one.  And counsel does have on
21  Westlaw Cessa One --
22           MR. KRETZER:  This is the verdict form from the
23  first, and what they did, it has the guilty, not guilty, go
24  this way.  And then he obviously just did a 1-A, B, C, so
25  forth.
```

1       **MR. MUSCHENHEIM:**  Right, but, your Honor, when he did

2  1-A, B, C, D, it's because there were -- it isn't to separate

3  out the SUAs, it's to say, for example, 1-C is do you find that

4  Jose Trevino Morales conspired to transmit da dat da dat da dah

5  for concealment.  And then it says --

6       **MR. KRETZER:**  (indisc.) specified unlawful activity,

7  namely --

8       **MR. MUSCHENHEIM:**  -- right, specified unlawful

9  activity, names them all.  And then 1-D says:  "Do you find

10  that he conspired to transmit to avoid a transaction reporting

11  requirement?"  So the distinction and the charge that -- the

12  verdict form I provided does list all the SUAs.  So I don't

13  think they're very different.  And I think what the court is --

14  what they did there was provide for the jury to demonstrate

15  unanimity as to theory as to whether it's concealment, avoiding

16  a transaction reporting requirement.  But each one of those --

17  it's not like check "yes" or "no" if you think it's this SUA,

18  check "yes" or "no" if you think it's this.  That's not what

19  the court did in this verdict form.

20       **THE COURT:**  Well, I need to see it, I guess.

21       **MR. MUSCHENHEIM:**  So anyway, it's not particular as

22  to SUA.  They're all listed in each one of those questions.

23  It's just that particular one they had more than the two *mens*

24  *rea* that we alleged in this one.

25       **THE COURT:**  I'll look at it and then you all can

1    discuss it further.

2              **MR. MUSCHENHEIM:**  Thank you, your Honor.

3              **THE COURT:**  Okay, you're going to make a decision on

4    the "and" or "or."

5              **MR. KRETZER:**  Yes.

6         **(Mr. Magliolo/Mr. Muschenheim confer)**

7         **(Pause)**

8              **THE COURT:**  Okay, you want to argue it further?

9              **MR. KRETZER:**  No, Judge, we'll stand on our

10   arguments.

11             **THE COURT:**  Okay.  Let me look at it a little bit

12   more.  I'm inclined to go with what the Government submitted

13   but --

14             **MR. KRETZER:**  Okay, Judge, and I'll do a little extra

15   research and -- if I may and we'll get that --

16             **THE COURT:**  Okay, so --

17             **MR. KRETZER:**  -- on file as soon as possible.

18             **THE COURT:**  -- what's our plan?  I want to have a

19   clean charge before we leave today.

20             **MR. KRETZER:**  Okay.

21             **MR. MUSCHENHEIM:**  That's fine, your Honor.

22             **THE COURT:**  Okay, so maybe we reconvene in about 20

23   minutes?

24             **MR. KRETZER:**  Yes.

25             **THE COURT:**  Okay.

1          **MR. MUSCHENHEIM:**  That's fine, your Honor, thank you.

2          **THE COURT:**  But I can't get you a clean copy, right,

3   until we figure out --

4          **THE MARSHAL:**  All rise.

5          **THE COURT:**  -- out some of the issues.

6      **(Recess taken from 3:36 p.m. to 3:58 p.m.)**

7      **(Outside the presence of the jury)**

8          **THE COURT:**  Okay, just cleaning up a couple of

9   matters then.  The defense is going to check the and/or

10  language.  It's "and" in the indictment.

11         **MR. KRETZER:**  Right.

12         **THE COURT:**  The Government doesn't object to "or."

13  What is the defense's position?

14         **MR. KRETZER:**  We're fine with "or," Judge.

15         **THE COURT:**  Fine with "or" so we'll --

16         **MR. KRETZER:**  Yes.

17         **THE COURT:**  -- leave it at "or."  And then we were

18  talking about the verdict form.  Anything else?

19         **MR. KRETZER:**  Nothing from us, Judge.

20         **MR. MUSCHENHEIM:**  Nothing else from the Government,

21  your Honor.

22         **THE COURT:**  Okay, Court's going to submit it as

23  requested by the Government.  Just to make it a little more

24  jury friendly, I think I'm going to put "Count One" in bold, --

25         **MR. MUSCHENHEIM:**  Yes, your Honor.

1          THE COURT:  -- "Count Two" in bold, just cleans it

2    up.  Anything else?  Because then I'm --

3          MR. MUSCHENHEIM:  No, your Honor.

4          THE COURT:  -- going to print -- we'll print copies

5    for you, I'll give you another 15, 20 minutes to look at it

6    real carefully, then we do formal objections.

7          MR. KRETZER:  Sure.

8          THE COURT:  Okay.

9          MR. MUSCHENHEIM:  Yes, your Honor.

10         THE MARSHAL:  All rise.

11        **(Recess taken from 3:59 p.m. to 4:31 p.m.)**

12        **(Outside the presence of the jury)**

13         THE COURT:  All right, counsel, the Court gave you

14   all a clean copy of the instructions to the jury, so we're here

15   for formal argument or formal charge conference.  Anything from

16   the Government?

17         MR. MUSCHENHEIM:  No objections, your Honor.

18         MR. KRETZER:  Yes, your Honor.  As an initial matter,

19   your Honor, just to protect the record, here at are our formal

20   charge conference we want to reiterate our objection to the

21   non-inclusion of the specific unanimity instruction.

22         THE COURT:  Okay, and that's overruled or denied, I

23   guess.

24         MR. KRETZER:  Yes.  Okay, and then, second, it's our

25   objection on page nine with the third element where it says

1    "third:" and then similarly the mirror charge on page 11 where

2    it says "third:" it's our argument one of a constructive

3    amendment, and that is that because the Government specifically

4    on page two of its indictment reiterated the four specified

5    unlawful activities after the words "to-wit," that not

6    including those here allows a conviction based on grounds that

7    were not -- outside those that were presented in the

8    indictment.

9            **THE COURT:**  Okay, that is -- that objection's

10   overruled.

11           **MR. KRETZER:**  And our only other objection is that

12   which of course you addressed this morning, which was our

13   request for an instruction that mere conspicuous consumption is

14   not money laundering.

15           **THE COURT:**  Okay, and that's overruled -- or that

16   request is denied.

17           **MR. KRETZER:**  Yes, yes.  I think those are all of our

18   objections, your Honor.

19           **THE COURT:**  Okay, so I'm going to read the Court's

20   instructions.  And then I will tell them probably before

21   argument just that depending on their verdict, we -- it may

22   require another special proceeding that would be short.  But

23   they would have to do some additional work because that would

24   be the forfeiture matter, correct?

25           **MR. MUSCHENHEIM:**  I have no objection to the Court

 1    telling them that, your Honor.

 2            THE COURT:  Yeah, so I just so they know --

 3            MR. MUSCHENHEIM:  That's fine.

 4            THE COURT:  -- and they have a heads-up.

 5            MR. MUSCHENHEIM:  For housekeeping, I think it's fair

 6    on that.

 7            THE COURT:  Okay, and then we can work on the

 8    forfeiture instructions or whatever we need to do --

 9            MR. MUSCHENHEIM:  We submitted one --

10            THE COURT:  -- there while they're deliberating.

11            MR. MUSCHENHEIM:  -- a couple weeks ago.

12            THE COURT:  Yeah, I think --

13            MR. MUSCHENHEIM:  But I haven't looked at it lately.

14    I think counsel has it.

15            THE COURT:  Okay, we can talk about that during

16    deliberations --

17            MR. MUSCHENHEIM:  Yes, your Honor.

18            THE COURT:  -- in case it's necessary.  And --

19            MR. KRETZER:  Okay.  And, Judge, we actually do have

20    one more objection.

21            THE COURT:  Okay.

22            MR. KRETZER:  I apologize.

23            MR. REYNAL:  If I may, your Honor?

24            THE COURT:  Yes.

25            MR. REYNAL:  Page 17, --

1          **THE COURT:**  Okay.

2          **MR. REYNAL:**  -- in the paragraph next to "fourth," --

3          **THE COURT:**  Fourth, okay.

4          **MR. REYNAL:**  -- "that the scheme or artifice to

5     defraud was material, employed a false material

6     misrepresentation, or concealed a material fact, namely the

7     sources of income regarding the movement of monies from the

8     United States [SIC] to the United States."  We'd ask that you

9     put a semicolon there and strike the rest of that sentence.

10         **THE COURT:**  Semicolon after "United States?"

11         **MR. REYNAL:**  Yes.

12         **THE COURT:**  Okay, we were just tracking the language

13    of the indictment, as requested by the defense earlier.  So

14    you're requesting something different now.  I mean, that's

15    okay, I'm just making sure because --

16         **MR. REYNAL:**  Yes, your Honor.

17         **THE COURT:**  So you want to stop after "United

18    States."

19         **MR. REYNAL:**  Uh-huh.

20         **THE COURT:**  And not mention the Morgan Chase Bank,

21    correct?

22         **MR. REYNAL:**  Correct.

23         **THE COURT:**  Okay, Mr. Muschenheim?

24         **MR. MUSCHENHEIM:**  I don't understand the difference.

25         **MS. HAMPTON:**  I don't understand the difference

1    either.

2              **THE COURT:**  You want to show them?

3              **MR. REYNAL:**  Unless we want to make it in furtherance

4    of opening an account at JPMorgan Chase Bank.  I'm just afraid

5    the jury's going to get confused (indisc.)

6              **THE COURT:**  Well, that's what the indictment says so

7    that's what we were tracking, but --

8              **MR. REYNAL:**  Well, I think that the material

9    misrepresentation is if it happened, the sources of income

10   regarding the movement of monies from the United Mexican States

11   to the United States.

12             **THE COURT:**  Towards who?  Yeah, so I'm just saying

13   the indictment which I believe the defense said earlier --

14             **MR. MUSCHENHEIM:**  We track -- we'd like it to track

15   the indictment, your Honor.

16             **THE COURT:**  -- in furtherance of the funding --

17             **MR. MUSCHENHEIM:**  That's what I thought was the

18   request was.

19             **THE COURT:**  And we didn't track the multiple accounts

20   because we were getting rid of --

21             **MR. MUSCHENHEIM:**  We struck them.

22             **THE COURT:**  -- the banks.

23             **MR. REYNAL:**  I -- we just believe that the material -

24   - it becomes confusing if we add too much stuff in there and we

25   just want to get in what the material misrepresentation was.

1              THE COURT:  Anything else from the Government on

2   that?

3              MR. MUSCHENHEIM:  No, your Honor.

4              THE COURT:  Court's going to deny that --

5              MR. REYNAL:  Thank you, your Honor.

6              THE COURT:  -- objection there.  And I'll read back

7   through it again.  You all might look, too, just any typos or

8   cleaning up a little bit here and there.  Jury's coming at

9   8:45.  If you all --

10             MR. MUSCHENHEIM:  Yes, your Honor.

11             THE COURT:  -- want to be here by 8:30.  I give

12  copies of the instructions to the jury.  It'll probably take a

13  little while for me to read through it.  And then you can start

14  your arguments.  I think hopefully we'll go straight through

15  the Government's, take a break depending -- I don't know how

16  long your opening's going to be from the Government so we'll

17  just see where we are.  I think we're going to bring them in

18  lunch just so that if we go through the --

19             MR. MUSCHENHEIM:  Yes, your Honor.

20             THE COURT:  -- lunch hour a little bit, they'll

21  already have some lunch there.  And then we'll see where we

22  are.  I'm scheduled for a civil trial -- I think one of the

23  attorneys was in here earlier -- next week that was supposed to

24  go into the following weeks so I'm playing with that, too.

25  We'll just see how it goes.

1          **MR. MUSCHENHEIM:**  Thank you, your Honor.

2          **THE COURT:**  Okay, so we'll see you all tomorrow

3    morning.

4          **(Recess taken from 4:37 p.m. to 4:38 p.m.)**

5          **(Outside the presence of the jury)**

6          **THE COURT:**  I'm sorry, it's just regarding the

7    alternate jurors.  After closing arguments, would there be an

8    objection if we allow the two alternates to go home?  I will

9    instruct them they need to continue following their

10   instructions, they can't talk to anyone.  Or do you all want

11   them to stay here in the courthouse?

12         **MR. REYNAL:**  The defense is fine with them being

13   released.

14         **THE COURT:**  Okay, released as not from their

15   instructions but to go home --

16         **MR. REYNAL:**  Yes.

17         **THE COURT:**  -- to leave the courthouse.

18         **MR. MUSCHENHEIM:**  I think that's fine.

19         **THE COURT:**  Okay.

20         **MR. MUSCHENHEIM:**  There's the odd times where

21   sometimes we end up inviting one back.  But they can go home.

22         **THE COURT:**  Okay.

23         **MS. HAMPTON:**  I don't remember where they're from.

24   Do you know if they're from far away?

25         **THE COURT:**  The two alternates, you want to check,

1    Brandy?

2            **THE CLERK:**  Portland and Robstown.

3            **THE COURT:**  Portland Robstown, that's not too bad.

4            **MR. MUSCHENHEIM:**  Oh, that's fine.

5            **THE COURT:**  And then the only other issue I had left

6    hanging was when we were making a record on possible *Brady*

7    violations, and the Government was going to want to get a

8    recording from the defense so --

9            **MR. MUSCHENHEIM:**  We'd ask that be made part of the

10   record under seal.

11           **THE COURT:**  Okay, but we don't have it yet, right?

12   Just --

13           **MR. REYNAL:**  I'll take care of that right now.

14           **THE COURT:**  Okay, you can be excused.

15           **MR. MUSCHENHEIM:**  Thank you.

16       **(This proceeding was adjourned at 4:39 p.m.)**

17       **(AFTERNOON SESSION CONCLUDED AT 4:39 P.M.)**

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          <u>October 13, 2017</u>

                Signed                                                        Dated

                        *TONI HUDSON, TRANSCRIBER*